```
1  G. SCOTT EMBLIDGE, State Bar No. 121613
   emblidge@meqlaw.com
2  RACHEL J. SATER, State Bar No. 147976
   sater@meqlaw.com
3  ANDREW E. SWEET, State Bar No. 160870
   sweet@meqlaw.com
4  MOSCONE, EMBLIDGE, & QUADRA, LLP
   220 Montgomery Street, Suite 2100
5  San Francisco, California 94104-4238
   Telephone:   (415) 362-3599
6  Facsimile:   (415) 362-2006

7  Attorneys for Plaintiff
```

E-filing

JCS

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D., as an individual and in his representative capacity under Business & Professions Code § 17200 et seq., <br><br> Plaintiff, <br><br> vs. <br><br> RUSSELL D. STANTEN, M.D., LEIGH I. G. IVERSON, M.D., STEVEN A. STANTEN, M.D., WILLIAM M. ISENBERG, M.D., Ph.D., ALTA BATES SUMMIT MEDICAL CENTER and does 1 through 100, <br><br> Defendants. | Case No.: C 07 2486 <br><br> **COMPLAINT RE:** <br> (1) RACE DISCRIMINATION; <br> (2) VIOLATION OF UNRUH ACT; <br> (3) VIOLATION OF CARTWRIGHT ACT; <br> (4) TORTIOUS INTERFERENCE WITH RIGHT TO PRACTICE PROFESSION; <br> (5) CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq.* <br><br> **DEMAND FOR JURY TRIAL** |

## JURISDICTION

1. This action arises under 42 U.S.C. Section 1981 as hereinafter more fully appears.

## NATURE OF ACTION

2. This case arises out of the concerted effort of medical doctors Steven A. Stanten, M.D., Russell D. Stanten, M.D., Leigh I.G. Iverson, M.D., and William M. Isenberg, M.D., Ph. D. (collectively "Individual Defendants") and Alta Bates Summit Medial Center ("Alta Bates Summit") to destroy the career of Plaintiff Coyness L. Ennix Jr., M.D. ("Plaintiff or "Dr.

Ennix"), a highly experienced and accomplished African American cardiac surgeon. Defendants sponsored, initiated and/or participated in a lengthy sham peer review process that falsely sought to blame Dr. Ennix for complications some patients experienced during or following cardiac surgery—unsurprising complications all Defendants knew did not reflect any lack of skill or attention by Dr. Ennix. After subjecting Dr. Ennix to months of an unwarranted and humiliating review process, Alta Bates Summit suspended Dr. Ennix's surgical privileges based on demonstrably false accusations that Dr. Ennix had neglected patients, and then reinstated Dr. Ennix's surgical privileges only upon the condition that he have a proctor present at all surgeries. During this proctorship period, Defendant Isenberg, then President of the Medical Staff of the Summit Campus, Alta Bates Summit, summarily suspended Dr. Ennix a second time without justification and without first consulting the proctors. Months later, Defendants refused to remove the proctoring requirement even after the panel of proctors—having observed twenty-nine of Dr. Ennix's surgeries—unanimously called for the lifting of the proctoring restriction. Dr. Ennix suffered hundreds of thousands of dollars in lost income, devastating damage to his reputation, and emotional distress as a result of Defendants' groundless and malicious actions. Dr. Ennix is informed and believes that Alta Bates Summit has not subjected a white surgeon to such harsh and unjustified treatment.

3. Throughout this tortuous peer review process, all evaluations of Dr. Ennix's performance provided by qualified, disinterested experts found no deviation from the standard of care and no justification for the restrictions placed on Dr. Ennix's privileges. Indeed, the Medical Board of California, after evaluating cases in question and the actions taken against Dr. Ennix, concluded that "[t]here is no evidence whatsoever, in these reviewed cases, that the conduct of Dr. Ennix, preoperatively, intraoperatively, or postoperatively, has violated the standard of practice in cardiac surgery." Thus, Defendants could not reasonably have believed that the restrictions they imposed on Dr. Ennix were warranted by the facts or furthered quality health care; rather, their actions were motivated by malice and racial discrimination.

4. This lawsuit claims race discrimination (42 U.S.C. Section 1981), violations of the Unruh Act (California Civil Code Section 51 *et seq.*), interference with Dr. Ennix's right to

1  practice his profession, violations of the Cartwright Act (California Business & Professions Code
2  Section 16700, *et seq.*), and violations of California's Unfair Competition Law (Business &
3  Professions Code Section 17200, *et seq.*), against Alta Bates Summit, the Individual Defendants
4  and Does 1-100. As detailed below, Alta Bates Summit and the Individual Defendants have
5  discriminated against Dr. Ennix based on his race, conspired to injure Dr. Ennix's business
6  prospects and reputation, and otherwise caused damage to Dr. Ennix and his career.

## PARTIES AND VENUE

5.  Plaintiff Coyness L. Ennix Jr., M.D., is a certified cardiac and thoracic surgeon and the only African American lead cardiac surgeon at Alta Bates Summit. Dr. Ennix obtained certification by the American Board of Surgery in 1978 and the American Board of Thoracic and Cardiac Surgery in 1980, 1989 and 1999. Dr. Ennix currently has surgical privileges at the Summit and Alta Bates Campuses of Alta Bates Summit, Doctors Hospital in San Pablo, Highland General Hospital in Oakland, San Ramon Medical Center in San Ramon, and Valley Care Hospital in Livermore. During the time period relevant to this suit, Dr. Ennix held surgical privileges at Alta Bates Summit, Summit Campus, and Doctors Hospital in San Pablo. Dr. Ennix has held numerous hospital administrative appointments, including Medical Director and Chief of Cardiac Surgery at Alta Bates Medical Center; Chairman of the Cardiac Surgery Quality Management Committee at Alta Bates; Editor-in-Chief of the Alta Bates Cardiac & Vascular Rounds Newsletter; and Director of the Annual Cardiology Conference at Alta Bates. Dr. Ennix has also served on the Sutter Cardiac Services Oversight Committee. Dr. Ennix's teaching appointments have included Assistant Clinical Professor of Surgery at the University of California and Assistant Professor of Surgery at Baylor College of Medicine in Houston, Texas. Dr. Ennix is the founder and past president of the Bay Area Society of Thoracic Surgeons and past president of the California affiliate of the American Heart Association. He received the Frank Jordan Outstanding Citizen Award and American Heart Association Honored Citizen Award for his professional and civic contributions. Dr. Ennix has written and lectured extensively in his field of cardiac surgery. Dr. Ennix currently serves as Secretary of the Bay Area Society of Thoracic Surgeons, President of the Marcus Foster Educational Institute,

member of the Clinical Advisory Panel of the California CABG Outcomes Reporting Program and Co-Chairman of Mayor Ron Dellums' Oakland Health Task Force.

6. Dr. Ennix resides in Piedmont, California. Plaintiff sues on his own behalf and on behalf of the general public.

7. During the period of time relevant to this suit, Dr. Ennix, Defendant Russell Stanten, Defendant Leigh Iverson and Junaid Khan, M.D. co-owned a cardiac surgery partnership known as East Bay Cardiac Surgery Center, Medical Group.

8. Plaintiff is informed and believes that defendant Alta Bates Summit is a non-profit entity doing business in Oakland and Berkeley, California.

9. Defendant Steven Stanten, M.D. is Chair of the Department of Surgery and the Surgical Peer Review Committee at Alta Bates Summit, Summit Campus. Plaintiff is informed and believes that Steven Stanten is a resident of Contra Costa County.

10. Defendant Russell D. Stanten, M.D. is a cardiac surgeon at the Summit Campus of Alta Bates Summit and is the brother of Defendant Steven Stanten. Russell Stanten was a member of the Surgical Peer Review Committee, Chief of Cardiac Surgery and a partner in the East Bay Cardiac Surgery Center, Medical Group during the time relevant to this suit. Plaintiff is informed and believes that Russell Stanten is a resident of Contra Costa County.

11. Defendant Leigh I.G. Iverson ("Iverson") was a cardiac surgeon at Alta Bates Summit, a member of the Surgical Peer Review Committee and a partner in the East Bay Cardiac Surgery Center, Medical Group during the time relevant to this suit. Plaintiff is informed and believes that Iverson is a resident of Monterey County.

12. Defendant William M. Isenberg, M.D., Ph.D. ("Isenberg") is a member of the Medical Executive Committee at the Summit Campus of Alta Bates Summit and was the President of the Medical Staff, Summit Campus, at Alta Bates Summit during the time period relevant to this suit.

13. Plaintiff is informed and believes that Defendants, and each of them, including all Doe Defendants, were at all times relevant the agents and/or employees of every other Defendant, and in doing the things herein alleged were acting within the course and scope of that

agency and with the knowledge and/or consent of each co-Defendant. Plaintiff is further informed and believes that each of the Defendants herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants. Defendants are sued both in their own right and on the basis of respondeat superior.

14. The true names and capacities of Defendants named herein as Does 1 through 100, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff, who therefore sues such Defendants by such fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiff is informed and believes that Doe Defendants are California residents and/or unknown business entities authorized to do business in the State of California. Plaintiff will amend this complaint to show the true names and capacities of such Doe Defendants when and as they have been determined.

15. Plaintiff is informed and believes that each Defendant is responsible for Plaintiff's damages as alleged herein and each is jointly and severally liable with all other Defendants.

16. Venue is proper in the Northern District because the events that gave rise to the claims occurred in that District.

## ALLEGATIONS

17. From 1981 to 1993, Dr. Ennix was a partner in a five-person cardiac surgery group which included Iverson, practicing at Summit Hospital in Oakland. In 1993, Dr. Ennix and another partner, Dr. J. Nilas Young ("Young"), separated from the group and commenced an independent cardiac surgery program at Alta Bates Hospital in Berkeley. The Alta Bates program proved to be very lucrative for Drs. Ennix and Young, which lead to resentment and friction among Dr. Ennix's former partners, including Iverson.

18. In April 2001, Dr. J. Nilas Young left the practice at the Alta Bates Campus. In the fall of 2001, Dr. Ennix merged his practice with that of Junaid Khan, M.D., and Defendants Iverson and Russell Stanten to form the East Bay Cardiac Surgery Center, Medical Group. Dr. Ennix championed the cause of consolidating cardiac surgeries from Alta Bates with cardiac surgeries at the Summit Campus. In the Fall of 2002, the medical staff and administration agreed to close the Alta Bates cardiac surgery program.

19. In 2003, Dr. Ennix was the busiest surgeon performing cardiac procedures among the private doctors practicing at the Summit Campus. During that year, Dr. Ennix began promoting the idea of developing a minimally invasive cardiac surgery and robotic surgery program at Summit. Minimally invasive cardiac surgery was a relatively new technique requiring specialized equipment and training. The technique allows surgeons to perform cardiac surgery by way of a small incision on the side of the rib cage, instead of by opening the chest at the sternum, which can cause substantial noticeable scarring. In partnership with the Alta Bates Foundation, Dr. Ennix helped to raise one million dollars to fund purchase of the robot, and attended numerous training programs throughout the United States on minimally invasive and robotic techniques. Defendant Steven Stanten, chair of the Department of Surgery, was interested in the use of the robot for general surgery and assisted in the establishment of a Robotic Surgical Program at Summit.

20. In January and February of 2004, Dr. Ennix performed four minimally invasive cardiac surgery procedures (also known as "Heart Port" procedures) at the Summit Campus. In these cases, Dr. Ennix and the surgical staff encountered issues such as prolonged procedure time, increased blood usage and conversion to the more traditional approach. None of these issues was unexpected given the newness of the minimally invasive surgical technique employed. Nevertheless, these four cases came to the attention of the Defendant Steven Stanten, Chair of the Department of Surgery and Chair of the Surgical Peer Review Committee ("SPRC") at the Summit Campus, who called for a moratorium on all minimally invasive cardiac surgery procedures, pending further evaluation. Dr. Ennix was the only surgeon to have completed any minimally invasive cardiac procedures at that time, and Dr. Ennix suspended use of this technique in compliance with the moratorium. Dr. Steven Stanten asked another cardiac surgeon, Dr. Hon Lee, an Asian American and a member of the Kaiser Permanente Medical Group, to review the four minimally invasive surgeries with regard to the standard of care. Dr. Lee concluded that there were no patient care concerns on any of the four cases.

21. The SPRC reviewed Dr. Lee's report on April 10, 2004. The SPRC included Chair Steven Stanten (a general surgeon), his brother Russell Stanten and Iverson—the sole

1  cardiac surgeons on the committee and Dr. Ennix's partners—as well as a urologist, an
2  Ear/Nose/Throat Specialist and several general surgeons. Despite Dr. Lee's clearing of the four
3  cases of any patient care issues and despite his own lack of expertise in cardiac surgery, Steven
4  Stanten expressed his concern that the cases presented care issues. Minutes from this meeting
5  reflect that the SPRC questioned whether the long operating times were justified by the new
6  technique and expressed concern regarding Dr. Ennix's overall patient selection, technical skills,
7  and judgment. The SPRC declined to accept Dr. Lee's findings that issues with the cases were
8  of documentation, not care. Dr. Ennix was not afforded an opportunity to address the SPRC
9  regarding the four minimally invasive cases or the general concerns referred to in the minutes.
10 Plaintiff is informed and believes that his partners Iverson and Russell Stanten supported Steven
11 Stanten's initiative to further investigate Dr. Ennix in spite of Dr. Lee's report: as the only
12 cardiac surgeons on the SPRC, their opinions would have carried significant weight with the
13 SPRC.
14      22.     On April 16, 2004, Dr. Steven Stanten and Dr. Isenberg informed Dr. Ennix of the
15 SPRC's conclusions regarding the four minimally invasive procedures and other generalized
16 concerns. Steven Stanten and Isenberg also informed Dr. Ennix that the moratorium on
17 performing minimally invasive procedures had been lifted, allowing other surgeons, such as
18 Steven Stanten's brother, Russell Stanten, to perform minimally invasive cardiac surgery
19 procedures. However, Steven Stanten and Isenberg recommended that Dr. Ennix continue to
20 refrain from performing the minimally invasive cardiac surgery procedures until the issues raised
21 by the SPRC could be resolved by an ad hoc committee. Thereafter, despite the fact that Dr.
22 Ennix had voluntarily suspended performing minimally invasive procedures before the SPRC
23 decided to investigate his performance, Isenberg submitted a report to the Medical Board of
24 California and the National Practitioner Data Bank stating that Dr. Ennix had suspended use of
25 the procedure while under investigation.
26      23.     Several months later, Isenberg and the MEC established an Ad Hoc Committee
27 ("AHC") to review the four minimally invasive procedures and the other generalized concerns
28 discussed in the April 10, 2004 SPRC meeting. Although there were ten cardiac surgeons and

more than forty cardiologists on the medical staff, the AHC did not include any cardiac surgeons or cardiologists. Defendant Isenberg, President of the Medical Staff, appointed Lamont Paxton to be Chairman of the AHC. Paxton was a member of the SPRC who had presumably attended the April 10, 2004 meeting and knew of comments regarding Dr. Ennix by Steven Stanten and Dr. Ennix's business partners Russell Stanten and Iverson.

24. After many months of delay, and without affording Dr. Ennix the opportunity to appear before the AHC despite his requests, on January 4, 2005, the AHC requested that a private, outside peer review organization called National Medical Audit ("NMA") review not only the four minimally invasive cases, but also an additional six cases that had previously undergone peer review by the Summit Cardiac Surgery Peer Review Committee and had been found to present no patient care issues. Dr. Ennix objected to the referral to NMA, which appeared to be a sham outfit, comprised of a nephrologist who had not practiced medicine in many years, a surgeon with a very poor performance record, and a surgeon who had never practiced in California. On May 3, 2005, the NMA returned an unsigned report harshly criticizing Dr. Ennix's performance on all ten of the reviewed cases. The NMA report was at odds with the Summit Cardiac Surgery Peer Review, Dr. Lee's report, subsequent reviews of the cases by several nationally renowned cardiac surgeons and, ultimately, the review by the Medical Board of the State of California.

25. On May 4, 2005, Dr. Ennix performed an operation in which he replaced two valves in a young male patient ("double valve patient"). The surgery went very well. The next day, Dr. Ennix performed surgery on two very ill patients. That day, Dr. Ennix made rounds on the double valve patient twice—once in the morning and once in the afternoon—as is documented in the nurses' notes. Dr. Ennix did not himself note his rounds on the double valve patient because he was busy with the two surgeries scheduled that day. The next day, May 6, 2005, Dr. Ennix made rounds on the double valve patient again, noted those rounds, and then noted his previous rounds on that patient which he had been unable to record the day before.

26. On May 11, 2005, Defendant Isenberg, President of the Medical Staff, summarily suspended Dr. Ennix alleging that he had placed the double valve patient in danger by not

making rounds on the patient on May 5th. Isenberg accused Dr. Ennix of not only failing to see the double valve patient, but also of falsifying the record claiming that he had seen the patient. Dr. Ennix produced a letter from the on-duty nurse as well as nurses' notes verifying that he had seen the patient more than once on May 5th. Despite this, the MEC upheld the suspension on May 18, 2005 pending the outcome of the AHC process.

27. Faced with a complete loss of his ability to practice, Dr. Ennix asked Dr. Isenberg to at least allow him to continue surgical assisting. The MEC accepted Dr. Ennix's proposal.

28. Dr. Ennix requested a hearing pursuant to Article VIII, Section 8.36 of the Medical Staff Bylaws to review Isenberg's summary suspension and the MEC's subsequent upholding of that suspension. However, Isenberg and Alta Bates Summit insisted that no hearing rights attached to these actions because Dr. Ennix "expressly stipulated" to surgical assisting in lieu of suspension.

29. Despite the fact that the medical staff includes several other cardiac surgeons, plaintiff is informed and believes that the AHC solicited the help of Dr. Ennix's partners Russell Stanten and Iverson—both of whom had participated in the initial SPRC meetings regarding Dr. Ennix initiated by Steven Stanten, the brother of Russell Stanten—to help determine the validity of the NMA report. Russell Stanten concluded that the report was very thorough and valid. The AHC delivered a harsh review of Dr. Ennix that recommended reinstating Dr. Ennix's surgical privileges subject to the requirement that he have a proctor present. On September 7, 2005, the MEC upheld the AHC's report and recommendation.

30. Approximately forty-five days later, Alta Bates Summit gave Dr. Ennix two choices: either appeal the MEC's decision and remain suspended indefinitely or accept a condition that he have a proctor present at all his surgeries. In order to begin rebuilding his surgical practice as quickly as possible, Dr. Ennix was forced to opt for the latter course. On October 25, 2005, Dr. Ennix voluntarily separated from his business partners, secured six staff cardiac surgeons from the Kaiser Permanente Medical Group to serve as proctors, and began a solo cardiac surgery practice which he retains today.

31. On December 30, 2005, in the final days of Isenberg's tenure as President of the Medical Staff, Dr. Isenberg, an obstetrician and gynecologist, again summarily suspended Dr. Ennix' privileges without justification. Further, Isenberg imposed the summary suspension without first consulting the proctors who had been observing Dr. Ennix' surgeries. After consulting officers of the MEC, Dr. Isenberg reinstated Dr. Ennix' proctor-restricted privileges on January 6, 2006.

32. On April 19, 2006, the proctors reported on the twenty-nine surgical cases they had proctored, stating that "[i]t was the unanimous opinion that Dr. Ennix met" or exceeded expectations in pre-operative and post-operative phases, and met the standard of care in the peri-operative phases. The proctors went on to state "'[i]t is with unanimous decision from the group of proctors, that we recommend the proctorship be terminated and that Dr. Ennix be reinstated to the medical staff with full unrestricted privileges."

33. Despite the proctors' evaluation and recommendation, the MEC voted to continue the proctorship requirement, stating that 29 cases was an insufficient number. The MEC finally voted to remove the proctoring requirement on July 11, 2006.

34. Dr. Ennix endured fourteen months of restricted privileges, costing him and his family hundreds of thousands of dollars in lost profits, emotional distress and damage to his reputation. Until only recently, Dr. Ennix' cases were subject to ongoing review by the Chief of Cardiac Surgery, Dr. Russell Stanten, upon the recommendation of the AHC. Plaintiff is informed and believes that each Defendant, and especially Plaintiff's former partners and fellow cardiac surgeons Russell Stanten and Leigh Iverson, knew that the four minimally invasive cases were not below the standard of care, particularly in light of Dr. Hon Lee's report confirming this. Plaintiff is further informed and believes that Steven Stanten, Russell Stanten, Isenberg and Iverson knew that the other cases reviewed by the AHC were within the standard of care, as the Summit Cardiac Surgery Peer Review Committee had concluded. Plaintiff is further informed and believes that Isenberg and the MEC acted with racially-based malice and in reckless disregard of the facts in suspending Plaintiff's privileges, and subjected Dr. Ennix to far harsher treatment than similarly situated white physicians.

35. Individual Defendants provided information to the SPRC, AHC, NMA and MEC that they knew to be false. Defendants' professional review actions—including the SPRC's decision to review Dr. Ennix's performance notwithstanding that Dr. Lee and the Summit Cardiac Surgery Peer Review Committee had previously determined there had been no breach in the standard of care; Dr. Isenberg's report to the Medical Board of California and the National Practitioner Data Bank that Dr. Ennix suspended use of minimally invasive procedures while under investigation; the MEC"S and SPRC's assignment of the review to the AHC which included no cardiac surgeons or cardiologists, thus ensuring that the AHC would have no means to critically assess the facts; the SPRC's failure to allow Dr. Ennix to address it regarding the issues; the AHC's referral of the matter to the sham peer review outfit NMA; the suspension of Dr. Ennix's privileges based on demonstrably false allegations that he neglected a patient; Dr. Isenberg's second unwarranted summary suspension of Dr. Ennix's privileges; the AHC's heavy reliance on the false, malicious and self-serving representations of Dr. Ennix's partners Russell Stanten and Iverson in their evaluation of the NMA report and Dr. Ennix's performance; the AHC's factually groundless report and recommendation; the MEC's decision on that recommendation to require Dr. Ennix to practice only with a proctor present; and finally the MEC's decision to continue the proctorship requirement despite the unanimous opinion of all six proctors that the requirement should be immediately lifted (collectively "Professional Review Actions")—were not taken in the reasonable belief that they furthered quality health care. Nor were these actions taken after a reasonable effort to obtain the facts, or in the reasonable belief that the actions were warranted by the facts. Rather, Defendants took the Professional Review Actions against Dr. Ennix with the malicious and racially-motivated intent to destroy Dr. Ennix's career and eliminate one of the most successful cardiac surgeons practicing at Alta Bates Summit.

36. Plaintiff exhausted all administrative remedies available to him.

**FIRST CAUSE OF ACTION**
Race Discrimination in violation of 42 U.S.C. § 1981
(Against Alta Bates Summit and Does 1-100)

37. Plaintiff incorporates by reference all paragraphs set forth above as though fully set forth herein.

38. Alta Bates Summit's conduct as alleged in this complaint violates 42 U.S.C. § 1981, which guarantees that all citizens shall have the same rights under the law as are enjoyed by white citizens.

39. Dr. Ennix is African American.

40. In taking the Professional Review Actions, Alta Bates Summit intended to discriminate against Dr. Ennix on the basis of Dr. Ennix's race and treated Dr. Ennix differently than similarly situated white physicians.

41. Such actions and discrimination concerned Dr. Ennix's abilities to perform his contractual duties with Alta Bates Summit and his patients and Dr. Ennix's abilities to enjoy the benefits, privileges, terms, and conditions of those contractual relationships.

42. Dr. Ennix suffered damages proximately caused by Alta Bates Summit's conduct.

**SECOND CAUSE OF ACTION**
Race Discrimination in violation of Unruh Civil Rights Act
(Against Alta Bates Summit and Does 1-100)

43. Plaintiff incorporates by reference all paragraphs set forth above as though fully set forth herein.

44. The Professional Review Actions violate California Civil Code § 51, *et seq.*, which prohibits any business establishment from discriminating against any person on account of race.

45. In taking the Professional Review Actions, Defendants intended to discriminate against Dr. Ennix on the basis of Dr. Ennix's race and treated him differently than they treat similarly situated white physicians.

46. As alleged herein, Defendants specifically discriminated against Dr. Ennix because of Dr. Ennix's race in taking the Professional Review Actions. Defendants denied Dr. Ennix full and equal advantages and privileges because of Dr. Ennix's race.

47. Dr. Ennix suffered damages proximately caused by Defendants' conduct.

### THIRD CAUSE OF ACTION
Violation of Cartwright Act
(Against Iverson, Russell Stanten, Steven Stanten, William Isenberg and Does 1-100)

48. Plaintiff incorporates by reference all paragraphs set forth above as though fully set forth herein.

49. Iverson, Russell Stanten, Steven Stanten and Isenberg formed and operated a conspiracy or combination to provide false information and false opinions regarding Dr. Ennix's professional competence, judgment and skill, to initiate a sham peer review process against Dr. Ennix, and to impose unwarranted and professionally and financially devastating restrictions on his surgical privileges.

50. The purpose of the conspiracy was to restrain trade by eliminating Dr. Ennix from the pool of lead cardiac surgeons available in his region.

51. Dr. Ennix suffered damages proximately caused by Defendants' conspiratorial conduct.

### FOURTH CAUSE OF ACTION
Interference with Right to Practice Profession
(Against All Defendants)

52. Plaintiff incorporates by reference all paragraphs set forth above as though fully set forth herein.

53. Defendants' conduct as alleged in this complaint violates the common law doctrine that prohibits intentional interference with one's right to practice a profession by means that are either unlawful or that are otherwise lawful, but unprivileged or without sufficient justification.

54. By taking the Professional Review Actions which were factually unwarranted, not in furtherance of quality health care and motivated by race-based discrimination, Defendants have unlawfully interfered with Dr. Ennix's right to practice his profession without privilege or sufficient justification.

55. Dr. Ennix suffered damages proximately caused by Defendants' conduct.

## FIFTH CAUSE OF ACTION
Business & Professions Code Section 17200, *et seq.*
(Against All Defendants)

56. Plaintiff incorporates by reference all paragraphs set forth above as though fully set forth herein.

57. The Professional Review Actions violate Business and Professions Code §§ 17200 *et seq.*, which prohibit unlawful, unfair, and/or fraudulent business acts or practices.

58. As alleged herein, Defendants' Professional Review Actions were unlawful, in that the Actions discriminated against Dr. Ennix based on his race, and lacked factual justification. As such, Defendants' actions constitute an unlawful, unfair, and/or fraudulent business act or practice within the meaning of Business and Professions Code §§ 17200 *et seq.*

59. Dr. Ennix lost profits and suffered injury in fact as a result of Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the defendants, and each of them, as follows:

1. For an award of compensatory, restitution, disgorgement and other special and general damages according to proof;

2. For an award of punitive damages;

3. For an award of interest, including prejudgment interest, at the legal rate;

4. For an award of costs of suit incurred herein on all causes of action;

5. For an award of attorneys' fees;

6. For an injunction pursuant to California Business & Professions Code Section 17203 requiring Alta Bates Summit to take immediate action to prevent future racial-based discrimination against Plaintiff and any Alta Bates Summit employees;

7. For such other and further relief as this court deems just and proper.

**JURY DEMAND**

Plaintiff requests this matter be tried before a jury.

Dated: May 8, 2007

Respectfully Submitted,

MOSCONE, EMBLIDGE & QUADRA, LLP

By: _____
G. Scott Emblidge
Rachel J. Sater
Andrew E. Sweet

Attorneys for Coyness L. Ennix Jr., M.D.

**CERFICATE OF INTERESTED ENTITED OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Dated: May 8, 2007

By: _____
G. Scott Emblidge
Attorneys for Coyness L. Ennix Jr., M.D.