G. SCOTT EMBLIDGE, State Bar No. 121613
RACHEL J. SATER, State Bar No. 14976
ANDREW E. SWEET, State Bar No. 160870
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D., as an individual and in his representative capacity under Business & Professions Code § 17200 *et seq.*, | Case No.: C 07-2486 WHA |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | Date:    August 16, 2007 |
| | Time:    8:00 a.m. |
| | Dept:    Ctrm. 9, 19TH Floor |
| RUSSELL D. STANTEN, M.D., et al., | |
| | Trial Date:    TBA |
| Defendants. | Judge:    Hon. William H. Alsup |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ................................................................................. ii, iii

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

    I.      MINIMALLY INVASIVE SURGERY ISSUES ..................................................3

    II.     APPOINTMENT OF AD HOC COMMITTEE ...............................................4

    III.    MAY 2005 SUMMARY SUSPENSION ..........................................................5

    IV.   IMPOSITION OF PROCTORING REQUIREMENT .......................................6

    V.     DECEMBER 2005 SUMMARY SUSPENSION ..............................................6

ARGUMENT ...............................................................................................................7

    I.      DR. ENNIX IS REQUIRED TO PLEAD NOTHING MORE REGARDING HIS EXHAUSTION OF AVAILABLE REMEDIES, AND THE EXHAUSTION DOCTRINE IS INAPPLICABLE TO DR. ENNIX'S FEDERAL CLAIM..................................................................7

    II.     DR. ENNIX HAS STATED A CLAIM UNDER 42 U.S.C. SECTION 1981................................................................................................8

    III.    PLAINTIFF'S STATE LAW CLAIMS ARE NOT PREMISED ON PRIVILEGED COMMUNICATIONS AND THEREFORE ARE NOT PRECLUDED BY CALIFORNIA CIVIL CODE SECTION 47.........................12

    IV.   DR. ENNIX HAS ADEQUATELY PLED A CLAIM UNDER THE CARTWRIGHT ACT............................................................................14

    V.     THE COURT SHOULD NOT DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER DR. ENNIX'S STATE LAW CLAIMS BECAUSE THEY ARISE OUT OF THE SAME CONDUCT AND ARE BASED ON THE SAME FACTS AS DR. ENNIX'S FEDERAL CLAIM...................................................................17

    VI.    PLAINTIFF NEED NOT DISMISS DOE DEFENDANTS AT THIS STAGE OF THE CASE...................................................................20

CONCLUSION ..........................................................................................................20

i

# TABLE OF AUTHORITIES

**State Cases**

*Ascherman v. Natanson*, 23 Cal.App.3d 861 (1972) .................................................................... 12

*Buchanan v. Maxfield Enterprises*, 130 Cal.App.4th 418 (2005)................................................ 11, 12

*Joel v. Valley Surgical Center*, 68 Cal.App.4th 360 (1998) ........................................................ 12

*Kimmel v. Goland*, 51 Cal.3d 202 (1990) .................................................................................. 11

*McDaniel v. Bd. of Education*, 44 Cal.App.4th 1618 (1996) ...................................................... 7

*O'Byrne v. Santa Monica-UCLA Medical Center*, 94 Cal. App. 4th 797 (2001) ........................... 9

*Payne v. Anaheim Memorial Medical Center*, 130 Cal.App.4th 729 (2005)................................. 6

*Quelimane Company, Inc. v. Stewart Title Guarantee Co.*, 19 Cal.4th 26 (1998) .......... 14, 15, 16

*State ex rel. Van De Kamp v. Texaco, Inc.*, 46 Cal.3d 1147 (1988) ........................................... 15

*Westlake Community Hospital v. Superior Court*, 17 Cal.3d 465 (1976)........................ 11, 12, 13

**Federal Cases**

*Bell Atlantic Corp. v. Twombly*, ___ U.S. ____; 127 S.Ct. 1955 (2007)...................................... 14

*Borough of West Mifflin v. Lancaster*, 45 F.3d 780 (3d Cir. 1995) .................................... 17, 18

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994) ................................................ 9

*Clement v. American Greetings Corp.*, 636 F.Supp. 1326 (C.D. Cal. 1986)................................ 13

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006) ......................................................... 10

*Donaldson v. Taylor Products Division of Tecumseh Products Co.*, 620 F.2d 155 (7th Cir. 1980) ............................................................................................................................................. 7

*Executive Software North America, Inc. v. U.S. Dist. Ct.*, 24 F.3d 1545 (9th Cir. 1994)............. 17

*Floyd-Mayers v. American Cab Co.*, 732 F.Supp. 243 (D.D.C. 1990)......................................... 7

*Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980) ................................................................... 19

*Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738 (1976) ....................................14

*Housing Rights Center Inc. v. Moskowitz*, 2004 WL 3738293 at *4 (C.D. Cal. 2004)................ 18

*Janda v. Madera Community Hospital*, 16 F.Supp.2d 1181 (E.D. Cal. 1998) ........................... 8, 9

*Johnson v. Greater Southeast Community Hosp. Corp.*, 951 F.2d 1268 (D.C. Cir. 1991)............ 7

ii

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ........................ 13, 14, 15

*Maduka v. Sunrise Hospital*, 375 F.3d 909 (9th Cir. 2004)........................................... 7, 8

*McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir.1988)........................................... 15, 16

*Mincy v. Staff Leasing, L.P.*, 100 F.Supp.2d 1050 (D. Ariz. 2000) ................................. 17

*Oxborrow v. Eikenberry*, 877 F.2d 1395 (9th Cir. 1989) ................................................ 16

*Patsy v. Florida Board of Regents*, 457 U.S. 496 (1988) ................................................ 7

*SST Global Technology v. Chapman*, 270 F.Supp.2d 444 (S.D. N.Y. 2003) .............................. 18

*United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) ................................. 17

*Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 1999) .............................................19

**Out of State Cases**

*Gianetti v. Norwalk Hospital*, 557 A.2d 1249 (Conn. 1989)........................................... 9

*Virmani v. Presbyterian Health Services Corp.*, 488 S.E.2d 284 (1997) ................................. 8, 9

**Statutes**

28 U.S.C. §§ 1367(a) ................................................................................. 17, 18

42 U.S.C. section 1981 ................................................................................. passim

Cal. Civil Code § 43.7............................................................................... 13

California Business and Professions Code section 2282.5 .......................................... 9

California Civil Code section 47................................................................... passim

**Rules**

Federal Rules of Civil Procedure 12(b)(6)............................................................ 8

Federal Rules of Civil Procedure 8(a) ............................................................... 15

Plaintiff's Opposition to Defendants' Motion to Dismiss

**INTRODUCTION**

Defendants seek to bar plaintiff Coyness L. Ennix Jr., M.D. from having an opportunity to prove that he was subjected to a highly irregular and unfair peer review process – one that no non-African American surgeon has been forced to endure – that caused severe damage to his career and income. Defendants' attempts fail because Dr. Ennix has included more than enough detail in his complaint to state claims against the Defendants.

For example, Defendants argue that Dr. Ennix has failed to allege with sufficient specificity that he exhausted available remedies. But, Dr. Ennix is not required to rebut an affirmative defense with specificity in his complaint, and the exhaustion requirements to which Defendants refer do not even apply to a federal claim like Dr. Ennix's claim under 42 U.S.C. section 1981.

Defendants assert that Dr. Ennix has failed to allege with sufficient specificity (1) the nature of the contractual relationship at issue in Dr. Ennix's section 1981 claim, and (2) the relevant market involved in Dr. Ennix's Cartwright Act claim. However, the complaint alleges more than is necessary regarding these claims to satisfy Rule 8's requirement of a "short and plain statement."

Defendants contend that Dr. Ennix's state law claims are precluded by the privilege conferred by California Civil Code section 47. But in making this argument, Defendants ignore a California Supreme Court decision (that they cite for other purposes elsewhere in their motion) that holds that section 47 does not preclude a physician from suing a hospital for revoking the physician's staff privileges.

Finally, Defendants' assertions that the Court should decline to exercise supplemental jurisdiction and should dismiss Doe defendants at this early stage are wholly without merit.

The Court should deny Defendants' motion in its entirety. However, should the Court believe any of Dr. Ennix's claims lacks any necessary allegations, Dr. Ennix requests leave to amend his complaint to address any such shortcomings.

1

## STATEMENT OF FACTS

2      Dr. Ennix is a certified cardiac and thoracic surgeon and the only African American lead

3  cardiac surgeon at Alta Bates Summit Medical Center. (Complaint ¶ 5.) Dr. Ennix obtained

4  certification by the American Board of Surgery in 1978 and the American Board of Thoracic and

5  Cardiac Surgery in 1980, 1989 and 1999. (*Id.*) During the time period relevant to this suit, Dr.

6  Ennix held surgical privileges at Alta Bates Summit, Summit Campus, and Doctors Hospital in

7  San Pablo. (*Id.*) Dr. Ennix has held numerous hospital administrative appointments, including

8  Medical Director and Chief of Cardiac Surgery at Alta Bates Medical Center; Chairman of the

9  Cardiac Surgery Quality Management Committee at Alta Bates; Editor-in-Chief of the Alta

10  Bates Cardiac & Vascular Rounds Newsletter; and Director of the Annual Cardiology

11  Conference at Alta Bates. (*Id.*)

12      Dr. Ennix's teaching appointments have included Assistant Clinical Professor of Surgery

13  at the University of California and Assistant Professor of Surgery at Baylor College of Medicine

14  in Houston, Texas. (*Id.*) Dr. Ennix is the founder and past president of the Bay Area Society of

15  Thoracic Surgeons and past president of the California affiliate of the American Heart

16  Association. (*Id.*) He received the Frank Jordan Outstanding Citizen Award and American

17  Heart Association Honored Citizen Award for his professional and civic contributions. (*Id.*) Dr.

18  Ennix has written and lectured extensively in his field of cardiac surgery. (*Id.*) Dr. Ennix

19  currently serves as Secretary of the Bay Area Society of Thoracic Surgeons, President of the

20  Marcus Foster Educational Institute, member of the Clinical Advisory Panel of the California

21  CABG Outcomes Reporting Program and Co-Chairman of Mayor Ron Dellums' Oakland Health

22  Task Force. (*Id.*)

23      From 1981 to 1993, Dr. Ennix was a partner in a five-person cardiac surgery group which

24  included defendant Dr. Leigh Iverson, practicing at Summit Hospital in Oakland. (Complaint

25  ¶ 17.) In 1993, Dr. Ennix and another partner, Dr. J. Nilas Young ("Dr. Young"), separated from

26  the group and commenced an independent cardiac surgery program at Alta Bates Hospital in

27  Berkeley. (*Id.*) The Alta Bates program proved to be very lucrative for Drs. Ennix and Young,

28

2

1   which lead to resentment and friction among Dr. Ennix's former partners, including Dr. Iverson.

2   (*Id.*)

3       In April 2001, Dr. Young left the practice at the Alta Bates Campus. (Complaint ¶ 18.)

4   In the fall of 2001, Dr. Ennix merged his practice with that of Junaid Khan, M.D., and

5   Defendants Dr. Iverson and Dr. Russell Stanten to form the East Bay Cardiac Surgery Center

6   Medical Group. (*Id.*)

7   **I.    MINIMALLY INVASIVE SURGERY ISSUES**

8       In 2003, Dr. Ennix was the busiest surgeon performing cardiac procedures among the

9   private doctors practicing at the Summit Campus. (Complaint ¶ 19.) During that year, Dr. Ennix

10  began promoting the idea of developing a minimally invasive cardiac surgery and robotic

11  surgery program at Summit. (*Id.*) Minimally invasive cardiac surgery was a relatively new

12  technique requiring specialized equipment and training. (*Id.*) The technique allows surgeons to

13  perform cardiac surgery by way of a small incision on the side of the rib cage, instead of by

14  opening the chest at the sternum, which can cause substantial noticeable scarring. (*Id.*) In

15  partnership with the Alta Bates Foundation, Dr. Ennix helped to raise one million dollars to fund

16  purchase of the robotic equipment, and attended numerous training programs throughout the

17  United States on minimally invasive and robotic techniques. (*Id.*)

18      In January and February of 2004, Dr. Ennix performed four minimally invasive cardiac

19  surgery procedures at the Summit Campus. (Complaint ¶ 20.) In these cases, Dr. Ennix and the

20  surgical staff encountered issues such as prolonged procedure time, increased blood usage and

21  conversion to the more traditional approach. (*Id.*) None of these issues was unexpected given

22  the newness of the minimally invasive surgical technique employed. (*Id.*) Nevertheless, these

23  four cases came to the attention of the Defendant Dr. Steven Stanten, Chair of the Department of

24  Surgery and Chair of the Surgical Peer Review Committee ("SPRC") at the Summit Campus,

25  who called for a moratorium on all minimally invasive cardiac surgery procedures, pending

26  further evaluation. (*Id.*) Dr. Ennix was the only surgeon to have completed any minimally

27  invasive cardiac procedures at that time, and Dr. Ennix suspended use of this technique in

28  compliance with the moratorium. (*Id.*) Dr. Steven Stanten asked Dr. Hon Lee, a cardiac surgeon

3

1    in the Kaiser Permanente Medical Group, to review the four minimally invasive surgeries with

2    regard to the standard of care. (*Id.*)  Although Dr. Lee noted some documentation issues, he

3    concluded that there were no patient care concerns regarding any of the four cases. (*Id.*)

4    **II.    APPOINTMENT OF AD HOC COMMITTEE**

5         Despite the fact that Dr. Lee, cardiac surgeon, cleared the four minimally invasive cases

6    of any quality-of-care issues, Dr. Steven Stanten, a general surgeon, second-guessed Dr. Lee's

7    conclusions and brought the cases before the Surgical Peer Review Committee ("SPRC").  The

8    SPRC consisted of Drs. Steven Stanten, his brother Russell Stanten and Iverson—the sole

9    cardiac surgeons on the committee and Dr. Ennix's partners—as well as a urologist, an

10   Ear/Nose/Throat Specialist and several general surgeons. (Complaint, ¶ 21.)  Despite his lack of

11   expertise in the area, Dr. Steven Stanten opined that the cases might present patient care issues

12   even though Dr. Lee had found none. (*Id.*)  Dr. Ennix was not afforded an opportunity to address

13   the SPRC regarding the four minimally invasive cases or other concerns referred to generally in

14   the minutes of this meeting. (*Id.*)

15        Some months later, Defendant Dr. Isenberg appointed an Ad Hoc Committee ("AHC") to

16   conduct a second round of peer review of the four minimally invasive cases as well as six more

17   of Dr. Ennix's cases.  Although there were ten cardiac surgeons and more than forty

18   cardiologists on the medical staff, the AHC did not include *any* cardiac surgeons or cardiologists.

19   (Complaint ¶ 23.)

20        After many months of delay, and without affording Dr. Ennix the opportunity to appear

21   before the AHC despite his requests, on January 4, 2005, the AHC requested that a private,

22   outside peer review organization called National Medical Audit ("NMA") review not only the

23   four minimally invasive cases, but also an additional six cases that had previously undergone

24   peer review by the Summit Cardiac Surgery Peer Review Committee and had been found to

25   present no patient care issues. (Complaint ¶ 24.)  Dr. Ennix objected to the referral to NMA,

26   which appeared to be a sham outfit, comprised of a nephrologist who had not practiced medicine

27   in many years, a surgeon with a very poor performance record, and a surgeon who had never

28   practiced in California. (*Id.*)  On May 3, 2005, the NMA returned an unsigned report harshly

4

criticizing Dr. Ennix's performance on all ten of the reviewed cases. (*Id.*) The NMA report was at odds with (1) the Summit Cardiac Surgery Peer Review, (2) Dr. Lee's review, (3) subsequent reviews of the cases by several nationally renowned cardiac surgeons and, ultimately, (4) the review by the Medical Board of the State of California. (*Id.*)

## III.    MAY 2005 SUMMARY SUSPENSION

On May 4, 2005, Dr. Ennix performed an operation in which he replaced two valves in a young male patient ("double valve patient"). (Complaint ¶ 25.) The surgery went very well. The next day, Dr. Ennix performed surgery on two very ill patients. (*Id.*) That day, Dr. Ennix made rounds on the double valve patient twice—once in the morning and once in the afternoon—as is documented in the nurses' notes. Dr. Ennix did not himself note his rounds on the double valve patient because he was busy with the two surgeries scheduled that day. The next day, May 6, 2005, Dr. Ennix made rounds on the double valve patient again, noted those rounds, and then noted his previous rounds on that patient which he had been unable to record the day before. (Complaint at 25.)

On May 11, 2005, Defendant Isenberg, President of the Medical Staff, summarily suspended Dr. Ennix alleging that he had placed the double valve patient in danger *by not making rounds on the patient on May 5th.* (Complaint ¶ 26.) Dr. Isenberg accused Dr. Ennix of not only failing to see the double valve patient, but also of falsifying the record claiming that he had seen the patient. (*Id.*) Dr. Ennix produced a letter from the on-duty nurse as well as nurses' notes verifying that he had seen the patient more than once on May 5th. Despite this, the MEC upheld the suspension on May 18, 2005 pending the outcome of the AHC process. (Complaint ¶ 26.)

Faced with a complete loss of his ability to practice, Dr. Ennix asked Dr. Isenberg to at least allow him to continue surgical assisting. (Complaint ¶ 27.) The MEC accepted Dr. Ennix's proposal. (*Id.*) However, Isenberg and Alta Bates Summit insisted that no hearing rights attached to these actions because Dr. Ennix "expressly stipulated" to surgical assisting in lieu of suspension. (*Id.*)

## IV.    IMPOSITION OF PROCTORING REQUIREMENT

Despite the fact that the medical staff includes several other cardiac surgeons, Dr. Ennix is informed and believes that the AHC solicited the help of Dr. Ennix's partners, Drs. Russell Stanten and Iverson, to help determine the validity of the NMA report. (Complaint ¶ 29.) Dr. Russell Stanten concluded that the report was very thorough and valid. (*Id.*) The AHC delivered a harsh review of Dr. Ennix that recommended reinstating Dr. Ennix's surgical privileges subject to the requirement that he have a proctor present. (*Id.*) On September 7, 2005, the MEC upheld the AHC's report and recommendation. (*Id.*)

Approximately forty-five days later, Alta Bates Summit gave Dr. Ennix two choices: either appeal the MEC's decision and remain suspended indefinitely or accept a condition that he have a proctor present at all his surgeries. (Complaint ¶ 30.) In order to begin rebuilding his surgical practice as quickly as possible, Dr. Ennix was forced to opt for the latter course. (*Id.*) On October 25, 2005, Dr. Ennix voluntarily separated from his business partners, secured six staff cardiac surgeons from the Kaiser Permanente Medical Group to serve as proctors, and began a solo cardiac surgery practice which he retains today. (*Id.*)

## V.    DECEMBER 2005 SUMMARY SUSPENSION

On December 30, 2005, in the final days of his tenure as President of the Medical Staff, Dr. Isenberg, an obstetrician and gynecologist, again summarily suspended Dr. Ennix' privileges without justification. (Complaint ¶ 31.) Further, Dr. Isenberg imposed the summary suspension without first consulting the proctors who had been observing Dr. Ennix' surgeries. (*Id.*) After consulting officers of the MEC, Dr. Isenberg reinstated Dr. Ennix' proctor-restricted privileges on January 6, 2006. (*Id.*)

On April 19, 2006, the proctors reported on the twenty-nine surgical cases they had proctored, stating that "[i]t was the unanimous opinion that Dr. Ennix met" or exceeded expectations in pre-operative and post-operative phases, and met the standard of care in the peri-operative phases. The proctors went on to state "'[i]t is with unanimous decision from the group of proctors, that we recommend the proctorship be terminated and that Dr. Ennix be reinstated to the medical staff with full unrestricted privileges." (Complaint ¶ 32.) Despite the proctors'

6

1   evaluation and recommendation, the MEC voted to continue the proctorship requirement, stating

2   that 29 cases was an insufficient number. (Complaint ¶ 33.) The MEC finally voted to remove

3   the proctoring requirement on July 11, 2006. (*Id.*)

4       Dr. Ennix endured fourteen months of restricted privileges, costing him hundreds of

5   thousands of dollars in lost profits, emotional distress and damage to his reputation. (Complaint

6   ¶ 34.) Until only recently, Dr. Ennix' cases were subject to ongoing review by the Chief of

7   Cardiac Surgery, Dr. Russell Stanten, upon the recommendation of the AHC. (Complaint ¶ 34.)

8   Dr. Ennix is informed and believes that each Defendant, and especially Dr. Ennix's former

9   partners and fellow cardiac surgeons Dr. Russell Stanten and Dr. Leigh Iverson, knew that the

10  four minimally invasive cases were not below the standard of care, particularly in light of Dr.

11  Hon Lee's review confirming this. (*Id.*) Dr. Ennix is further informed and believes that all

12  Defendants knew that the other six cases reviewed by the AHC were within the standard of care,

13  as the Summit Cardiac Surgery Peer Review Committee had concluded. (*Id.*) Dr. Ennix is

14  further informed and believes that Dr. Isenberg and the MEC acted with racially-based malice

15  and in reckless disregard of the facts in suspending his privileges, and subjected Dr. Ennix to far

16  harsher treatment than similarly situated non-African American physicians. (*Id.*)

**ARGUMENT**

17

18  **VI.   DR. ENNIX IS REQUIRED TO PLEAD NOTHING MORE REGARDING HIS**
        **EXHAUSTION OF AVAILABLE REMEDIES, AND THE EXHAUSTION**
19      **DOCTRINE IS INAPPLICABLE TO DR. ENNIX'S FEDERAL CLAIM.**

20      Failure to exhaust administrative remedies is an affirmative defense; a plaintiff is not

21  required to "negate an affirmative defense in the complaint." *Payne v. Anaheim Memorial Medical*

22  *Center*, 130 Cal.App.4th 729, 742 n. 8 (2005). Rather, "because [exhaustion] is a defense, the

23  burden is on the defendant to raise it and ultimately to establish it" by producing, for example, the

24  document that supplies the administrative remedy and asking the court to take judicial notice of it.

25  *Id.* Further, to make out the defense, Defendants will be required to prove that the administrative

26  remedy was "adequate" and "fair," and that Dr. Ennix failed to exhaust that adequate and fair

27  remedy. *Id.*, at 738-41.

28

7

Defendants have not even attempted to make these showings. Indeed, in support of this motion Defendants did not even describe the specific administrative procedures they claim Dr. Ennix failed to exhaust. Nor do they explain how those procedures would have offered a fair and adequate remedy to redress Dr. Ennix's grievances. The Court should reject Defendants' request to shift the burden to Dr. Ennix to plead, with particularity, the non-existence of this affirmative defense.[1]

In addition, as a matter of law Dr. Ennix was not required to exhaust administrative remedies before bringing his federal civil rights claim. *Johnson v. Greater Southeast Community Hosp. Corp.*, 951 F.2d 1268, 1276 (D.C. Cir. 1991) (plaintiff physician need not exhaust administrative remedy before suing hospital under section 1981 for restricting his practice privileges; "[a] private party alleging federal civil rights violations need not pursue internal administrative remedies before pressing a claim in federal court"); *Donaldson v. Taylor Products Division of Tecumseh Products Co.*, 620 F.2d 155, 158 (7th Cir. 1980); *Floyd-Mayers v. American Cab Co.*, 732 F.Supp. 243, 247 (D.D.C. 1990) ("It is well-established that administrative exhaustion usually is not a prerequisite to bringing a § 1981 claim in federal court."); *McDaniel v. Bd. of Education*, 44 Cal.App.4th 1618, 1622 (1996) ("Generally, a federal civil rights plaintiff is not required to exhaust state administrative and judicial remedies."), citing *Patsy v. Florida Board of Regents*, 457 U.S. 496, 500 (1988). Defendants' motion to dismiss Dr. Ennix's section 1981 claim should be denied for this additional reason.

## VII.    DR. ENNIX HAS STATED A CLAIM UNDER 42 U.S.C. SECTION 1981.

Defendants argue that Dr. Ennix has failed adequately to plead the existence of a contractual relationship between himself and defendant Alta Bates. In making their argument defendants ignore the rule that a section 1981 plaintiff need only provide "a short and plain statement of the claim showing [he] is entitled to relief." *Maduka v. Sunrise Hospital*, 375 F.3d

---

[1] In support of their Special Motion to Strike, defendants presented evidence via declarations relating to the nature of the administrative remedies allegedly available to Dr. Ennix. Dr. Ennix's opposition to the Special Motion to Strike explains why, apart from not having to include additional allegations in his complaint, Dr. Ennix was not required to exhaust any other remedies before filing this lawsuit.

909, 912 (9th Cir. 2004). A plaintiff need not specifically allege every "element" of his claim, and even "conclusory allegations" of a section 1981 violation survive a Rule 12(b)(6) motion to dismiss. *Id.* (citing FRCP 8(a) and rejecting argument that a § 1981 employment discrimination plaintiff must allege each element of a *prima facie* employment discrimination case).

Dr. Ennix's complaint more than adequately pleads his section 1981 claim. In addition to describing in detail the actions that give rise to Dr. Ennix's lawsuit, the Complaint alleges that those "actions and discrimination concerned Dr. Ennix's abilities to perform his contractual duties with Alta Bates Summit and his patients and Dr. Ennix's abilities to enjoy the benefits, privileges, terms and conditions of those contractual relationships." (Complaint, ¶ 41). These allegations satisfy the liberal pleading standards of Rule 8(a). *Maduka*, 375 F.3d at 912-13.

In fact, there were multiple "contractual" relationships between Dr. Ennix and Alta Bates. First, as a member of Alta Bates' Medical Staff, Dr. Ennix was by definition in a contractual relationship with the hospital. *Janda v. Madera Community Hospital*, 16 F.Supp.2d 1181, 1186-87 (E.D. Cal. 1998). The *Janda* court explained the reasoning behind this rule:

> Here, an express employment contract was formed between the Hospital and Dr. Janda that is supported by valid consideration. The consideration consists of the Hospital's promise to employ Dr. Janda on stated terms and conditions and Dr. Janda's promise to work under those conditions . . . [defendants] do not dispute that the parties had a contractual relationship in which the Hospital changed its position by granting medical staff and department employment privileges to Dr. Janda and Dr. Janda changed his position by agreeing to perform medical services at the Hospital and to abide by the Hospital's bylaws.

*Id.*

The *Janda* court went on to consider whether the bylaws of a hospital constitute part of the contract that existed between the hospital and physician. The court noted that, while there was a split of authority on that specific question, courts on both sides of that issue agreed that the physician-hospital relationship was a "contractual" one. *Id.* at 1184-85; see *Virmani v. Presbyterian Health Services Corp.*, 488 S.E.2d 284, 287-88 (1997) ("When, however, a hospital offers to extend a particular physician the privilege to practice medicine in that hospital . . . [i]f the offer is accepted by the physician, the physician receives the benefit of being able to treat his patients in the hospital and the hospital receives the benefit of providing care to the physician's

9

patients. If the privilege is offered and accepted, each confers a benefit on the other and these benefits constitute sufficient and legal consideration for the performance of the agreement") (quoted and cited in *Janda*); *Gianetti v. Norwalk Hospital*, 557 A.2d 1249 (Conn. 1989) ("By agreeing to extend privileges to the plaintiff physician, the hospital has then done something it was not already bound to do; in exchange, physician agreed to abide by its medical staff bylaws. Requisite contractual mutuality was present and agreement was supported by valid consideration.") (same).[2]

    This conclusion is further supported by the legislative history of California Business and Professions Code section 2282.5, the statute that governs the relationship between hospitals and their medical staffs. See Sen Comm. on Bus. & Prof., Rep. on Sen. Bill No. 1325 (2003-2004 Reg. Sess.) (April 12, 2004) (section 2282.5 was meant to clarify that "the bylaws adopted by the medical staff of a hospital *form [] a contractual relationship* that governs both the hospital and the medical staff . . ."). [3]

    Second, as defendants are no doubt aware, during the relevant time period there was an express written contract between Alta Bates and Dr. Ennix's medical group, East Bay Cardiac Surgery Center (the "Group"). Under that contract, Dr. Ennix was named individually as the physician who would serve as Medical Director for the hospital's cardiac unit. Further, that contract specifically stated that "each Physician and Employee" of the Group was "acting as an

---

[2] In *O'Byrne v. Santa Monica-UCLA Medical Center*, 94 Cal. App. 4th 797 (2001), the court cited approvingly the conclusions of the *Janda*, *Gianetti* and *Virmani* courts—that the relationship between a hospital and a member of its medical staff was contractual in nature. The court concluded, however, that the medical staff bylaws do not necessarily constitute part of the terms of that contract, such that they could be enforced by the physician in a breach of contract action against the hospital. *Id.*, at 810. The question presented by Defendants' motion is simply whether there was a contractual relationship between Dr. Ennix and Alta Bates, *not* whether the provisions of the Medical Staff Bylaws constitute enforceable terms of that contract.

[3] Defendants' reliance on *Clegg v. Cult Awareness Network*, 18 F.3d 752, 756 (9th Cir. 1994) is misplaced. In *Clegg*, the court held the plaintiffs were required to allege facts that would support the conclusion that the defendant organization was a "place of public accommodation" within the meaning of Title II. Because plaintiffs in that case alleged *no* facts that would support that conclusion, the court affirmed the dismissal of his claims. Here, Dr. Ennix has alleged facts that support his allegation that he had a contractual relationship with Alta Bates, including his allegations that he had surgical privileges, and held directorships, at Alta Bates, both of which required that he be a member of the hospital's Medical Staff.

1   independent *contractor*" to Alta Bates (emphasis added). (*Id.*, Ex. __ at __.) Defendants cannot

2   seriously contend that there was no "contractual relationship" between Alta Bates and a

3   physician it described, in a written contract, as a "contractor."

4         Defendants rely on *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 1265 S.Ct. 1246

5   (2006) to support their argument that the contract between Alta Bates and the Group cannot be a

6   basis for Dr. Ennix's section 1981 claim.[4]  *Domino's* is entirely inapposite.  In that case, the

7   Court merely held that that (1) "a plaintiff cannot state a claim under § 1981 unless he has (or

8   would have) rights under the existing (or proposed) contract that he wishes to make and

9   enforce," and (2) a shareholder of a corporation does *not*, simply by virtue of his shareholder

10  status, have a contractual relationship with the parties with whom the corporation contracts. *Id.*,

11  1265 S.Ct. at 1252.

12        Here, Dr. Ennix is not relying on "shareholder" status to establish a contractual

13  relationship with Alta Bates.  Rather, he is relying on the contract's express provisions that Dr.

14  Ennix must *personally* act as Medical Director, and its explicit definition of Dr. Ennix as a

15  "contractor" to Alta Bates.  Further, the *Domino's* Court expressly relied on the peculiar nature

16  of the relationship between shareholder and corporation to support its conclusion that a

17  shareholder could not personally assert the rights of the corporation:

18              McDonald's complaint does identify a contractual relationship, the one between
                Domino's and JWM.  But it is fundamental corporation and agency law—indeed,
19              it can be said to be the whole purpose of corporation and agency law—that the
                shareholder and contracting officer of a corporation has no rights and is exposed
20              to no liability under the corporation's contracts.

21  *Domino's*, 126 S.Ct. at 1250.  By contrast, the Group was a partnership, not a corporation, and

22  Dr. Ennix was a partner of the Group. (Complaint, ¶ 7.)  *Domino's* had nothing to say as to the

23  sufficiency of that relationship for purposes of making a claim under section 1981.

24        Finally, the *Domino's* Court expressly left open the question whether a party who was not

25  a direct signatory to a contract could nonetheless sue under section 1981 as an "intended third-

26  _____

27       [4]  Defendants do not even address the contractual relationship that was formed by virtue
    of Dr. Ennix's membership on the Alta Bates Medical Staff.

28

party beneficiary" of that contract. *Id.* at 1250, n. 3. Even if he was not a party to the contract between Alta Bates and the Group, Dr. Ennix was clearly an intended third-party beneficiary under that contract, because had very clear and enumerated personal rights and responsibilities thereunder. Dr. Ennix's third-party beneficiary status provides an additional reason to conclude that the contract can form the basis of Dr. Ennix's section 1981 claim.

## VIII. PLAINTIFF'S STATE LAW CLAIMS ARE NOT PREMISED ON PRIVILEGED COMMUNICATIONS AND THEREFORE ARE NOT PRECLUDED BY CALIFORNIA CIVIL CODE SECTION 47.

Ignoring the case to which they liberally refer earlier in their papers – *Westlake Community Hospital v. Superior Court*, 17 Cal.3d 465 (1976) – Defendants contend that California Civil Code section 47 provides them with blanket immunity for the tortious actions they took against Dr. Ennix. However, section 47 is much more limited: it provides a privilege only for "statements or publications," and it precludes only claims premised on such communications. It does not make privileged noncommunicative *conduct*, nor does it preclude claims based on such conduct. In *Kimmel v. Goland*, 51 Cal.3d 202, 211 (1990), the Supreme Court explained the limited scope of the privilege:

> [Section 47's] absolute privilege has always attached only to *statements* or *publications* made in connection with the applicable proceedings . . . a review of the myriad cases that have applied section 47(2) to shield defendants from liability demonstrates that, without exception, the privilege has applied only to torts arising from statements or publications.

*See also Buchanan v. Maxfield Enterprises*, 130 Cal.App.4th 418, 423 (2005) ("The threshold issue in determining whether [section 47] applies is whether the defendant's conduct was communicative or noncommunicative . . . [section 47] applies only to communicative acts and does not privilege tortious courses of conduct.") (quotations omitted).

Dr. Ennix's claims are based *not* on Defendants' statements or publications, but rather on the *actions* defendants took (or failed to take) during their "review" of his professional performance. Those actions include Defendants' (1) refusal to accept the conclusions of Dr. Lee and the Summit Cardiac Peer Review Committee; (2) formation of an Ad Hoc Committee that did not include physicians qualified to review Dr. Ennix's performance; (3) refusal to permit Dr. Ennix to address the Summit Peer Review Committee in his own defense; (4) referral of Dr.

12

Ennix's review to a sham outside review firm; (5) suspension of his privileges based on false accusations; (6) imposition of the requirement that Dr. Ennix work under the supervision of "proctors"; and (7) refusal to lift the proctorship requirement even after the proctors unanimously concluded that Dr. Ennix did not require supervision. (See Complaint, ¶ 35). Because these actions are noncommunicative, they fall outside the scope of section 47's privilege.[5]

*Westlake Community Hospital v. Superior Court*, 17 Cal.3d 465 (1976) is directly on point. In *Westlake*, the defendant hospital contended that section 47 precluded a physician's claims for injuries resulting from revocation of her staff privileges. The Supreme Court disagreed, holding that defendants' revocation of plaintiff's staff privileges, and their actions related to that revocation, were noncommunicative conduct. As such, these actions fell outside of the scope of the privilege:

> [T]he gist of [plaintiff's] claim is not that her injury has been occasioned simply by defendants' malicious *statements* at the proceedings, but rather that she has been injured by the malicious *actions* of the hospital and its committee members in revoking her staff privileges . . . [section 47's] absolute privilege has always attached *only to statements or publications* made in connection with the applicable proceeding.

*Id.*, at 482 (emphasis added).[6]

Tellingly, the two cases on which defendants rely involved the application of section 47 to preclude claims for *defamation*, premised on the publication of allegedly tortious statements. *See Joel v. Valley Surgical Center*, 68 Cal.App.4th 360, 371-72 (1998) (applying section 47 to sustain demurrer with respect to defamation cause of action; causes of action for tortious interference, unfair business practices, and intentional infliction of emotional distress survived);

---

[5]    Dr. Ennix does not claim (and defendants do not assert that he claims) that any defendant can be held liable based solely on having made reports to the California Medical Board or the National Data Bank.

[6]    The fact that conduct, such as the interference with the practice of medicine, *involves* some communication (discussions undertaken to further the interference; publication of the revocation of privileges, *etc.*) does *not* render the conduct "communicative" in nature. *Buchanan*, 130 Cal.App.4th at 423. Tortious conduct often involves communication, and vice versa. *Id.* The relevant inquiry is "whether the activities were communicative *in their essential nature.*" *Id.* (emphasis added). Here, despite the fact that defendants engaged in some communication and publication as part of their scheme, their course of conduct was essentially noncommunicative in nature. *Westlake*, 17 Cal.3d at 482.

*Ascherman v. Natanson*, 23 Cal.App.3d 861, 867 (1972) ("respondent's defamatory statements uttered at the . . . preliminary interview, *which constitute the only subject of this litigation*, were absolutely privileged" under section 47) (emphasis added).  Defendants cite no authority to support the extension of the privilege to noncommunicative conduct.[7]

## IX.    DR. ENNIX HAS ADEQUATELY PLED A CLAIM UNDER THE CARTWRIGHT ACT.

Contrary to Defendants' contention, this Court should apply a very liberal pleading standard to determine the sufficiency of Dr. Ennix's anti-trust allegations.  The pleading standards for state law claims brought in federal court are supplied not by state law, but rather by the Federal Rules.  *Clement v. American Greetings Corp.*, 636 F.Supp. 1326, 1328-29 (C.D. Cal. 1986) ("The manner and details of pleading in the federal court are governed by the Federal Rules of Civil Procedure regardless of the substantive law to be applied to the particular action . . . [a]lthough . . . California substantive law is to be applied to determine the ultimate validity of the plaintiff's claims . . . the Federal Rules govern issues concerning the adequacy of the pleadings.") (emphasis added); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) (applying federal pleading standards to a motion to dismiss a Cartwright Act claim).

Federal courts apply the permissive "short and plain statement" standard of Rule 8(a) of the Federal Rules of Civil Procedure to assess the sufficiency of anti-trust allegations, and have expressly refused to apply a stricter pleading requirement to such claims.  *See Knevelbaard*, 232 F.3d at 984.  Under Rule 8(a), Dr. Ennix "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Id.*;

---

[7] The California Legislature has supplied a limited and conditional privilege for *conduct* undertaken with respect to peer review proceedings.  *See* Cal. Civil Code § 43.7 (peer review actions and decisions are privileged *if* they are made "without malice" and involve a good faith investigation of facts and reasonable conclusion drawn from that investigation).  It is clear that the Legislature intended to provide different protections for peer review–related conduct (limited and conditional privilege) and peer review-related statements and communications (absolute privilege).  To stretch section 47's absolute privilege to cover peer review-related conduct would vitiate that important distinction.

*see also Bell Atlantic Corp. v. Twombly*, ___ U.S. ____; 127 S.Ct. 1955, 1969 (2007) (the antitrust complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery" under the claim advanced) (emphasis added).

Moreover, both federal and California courts are especially forgiving when determining the sufficiency of antitrust allegations; because of the special challenges presented by pleading such claims, motions to dismiss them should be granted "very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746-47 (1976) (applying a "concededly rigorous" test for granting motion to dismiss antitrust claims: "in antitrust cases, where the proof is largely in the hands of the alleged conspirators . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (quotations omitted); *see also Quelimane Company, Inc. v. Stewart Title Guarantee Co.*, 19 Cal.4th 26, 48 (1998) (in considering demurrer as to antitrust causes of action, court should be mindful that "it is usually the situation that [antitrust] agreements are made covertly, thereby making it difficult for a plaintiff to allege the full details of such . . . agreement prior to its ability to engage in the rock-turning allowed by discovery") (emphasis added).

A Cartwright Act claim for a conspiracy in restraint of trade must allege no more than (1) the formation and operation of the conspiracy with the purpose to restrain trade, (2) wrongful acts done pursuant thereto, and (3) damage resulting from such acts, specifically an "injury to the business of the plaintiff traceable to actions in furtherance of" the conspiracy. *Quelimane*, 19 Cal.4th at 47-49. In his Complaint Dr. Ennix clearly alleges that Defendants formed a conspiracy with the intent to impose a restraint of trade in the market of cardiac surgeons (by interfering with Dr. Ennix's cardiac surgery practice). (See Complaint, ¶¶ 49-50). He alleges that defendants engaged in concerted wrongful conduct in furtherance of that conspiracy. (See, e.g., *id.*, ¶ 35). And he alleges that he suffered serious injury to his career and livelihood as a result of the conspiracy. (*Id.*, ¶ 51). Dr. Ennix clearly has "alleg[ed] sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Knevelbaard*, 232 F.3d at 984. Rule 8(a) requires no more. *Id.*

1    Defendants contend that the Cartwright Act claim is subject to dismissal because Dr.

2    Ennix did not adequately define the relevant market that Defendants sought to harm through their

3    scheme. Dr. Ennix alleged that it was the intent of defendants "to restrain trade by eliminating

4    [him] from the pool of lead cardiac surgeons available in his region." (Complaint, ¶ 50) While

5    the "market" targeted by defendants' antitrust conspiracy might be subject to further definition as

6    discovery proceeds, for purposes of pleading his cause of action Dr. Ennix has clearly met the

7    very liberal requirements of Rule 8(a).

8    Second, defendants contend that Dr. Ennix failed to allege "injury to competition."

9    However, a plaintiff need not allege "injury to competition" to state a claim under the Cartwright

10   Act. See, e.g., *Quelimane*, 19 Cal.4th at 47-49 (discussing the elements of a Cartwright Act

11   claim for restraint of trade—no mention of injury to competition as an element).

12   Defendants' reliance on *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir.1988),

13   for the proposition that Dr. Ennix was required to plead injury to competition, is misplaced. In

14   *McGlinchy*, the Ninth Circuit upheld the dismissal of federal Sherman Act claims on the grounds

15   that the plaintiff had failed to plead injury to competition (an element of claim brought under that

16   federal statute). In a footnote, the court determined without any separate analysis that the

17   Cartwright Act claims failed for the same reason, because "Cartwright Act claims raise basically

18   the same issues as do Sherman Act claims," and "California state courts follow federal cases in

19   deciding claims under the Cartwright Act." *Id.*, n. 4.

20   Defendants contend that this broad-brush holding-by-analogy (in a footnote) establishes

21   that injury to competition is an element of a Cartwright Act claim. However, the fundamental

22   premise upon which the *McGlinchy* court based its Cartwright Act holding—that analysis of

23   Cartwright Act claims is more or less the same as Sherman Act claims—is contrary to California

24   law, and has since been disavowed by the Ninth Circuit. *State ex rel. Van De Kamp v. Texaco,*

25   *Inc.*, 46 Cal.3d 1147, 1164 (1988) ("judicial interpretation of the Sherman Act, while often

26   helpful, is not directly probative of the Cartwright drafters' intent") (emphasis added; superseded

27   by statute on other grounds); *Knevelbaard*, 232 F.3d at 998-99 (after *Van De Kamp*, "federal

28   antitrust precedents are properly included in Cartwright Act analysis, but their role is limited:

they are 'often helpful' but not necessarily decisive"). Further, subsequent to *McGlinchy* the California Supreme Court has listed the requirements of a Cartwright Act cause of action without mentioning injury to competition as one of them. *Quelimane*, 19 Cal.4th at 47-49. This Court should defer to the California Supreme Court's interpretation of California state law. See *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989).

Even if "injury to competition" is an element of a Cartwright Act claim, Dr. Ennix's Complaint meets the liberal pleading standards of Rule 8(a). By alleging that Defendants intended to restrain trade by causing damage to Dr. Ennix's medical practice, and that Defendants did in fact damage his practice, Dr. Ennix has alleged (at least by fair inference) that Defendants restrained trade, and thereby injured competition. *Twombly*, ___ U.S. ___; 127 S.Ct. at 1969 (antitrust complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery" under the claim advanced) (emphasis added); see also *Quelimane*, 19 Cal.4th at 49 (applying California pleading standards for antitrust claims, Court held demurrer improper because the elements of the Cartwright Act claim could be "infer[red] or implie[d]" from the pleading).[8]

## X.    THE COURT SHOULD NOT DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER DR. ENNIX'S STATE LAW CLAIMS BECAUSE THEY ARISE OUT OF THE SAME CONDUCT AND ARE BASED ON THE SAME FACTS AS DR. ENNIX'S FEDERAL CLAIM.

Defendants ask the Court to decline to exercise supplemental jurisdiction over the state law claims in Dr. Ennix's complaint "whether or not [his federal] Section 1981 claim is dismissed." As explained above, Defendants' two arguments for dismissing Dr. Ennix's federal claim lack merit because (1) any failure by Dr. Ennix to exhaust remedies would not bar his federal claim, and (2) Dr. Ennix has adequately alleged interference in a contractual relationship protected by 42 U.S.C. section 1981. Because Dr. Ennix's federal claim should remain in this case, the Court should exercise supplemental jurisdiction over his state law claims.

---

[8] If this Court disagrees, Dr. Ennix requests leave to amend so that he may allege more explicitly that Defendants did injure competition and restrain trade in the course of interfering with his medical practice.

"[F]ederal courts are reluctant to remand state claims, once they obtain original jurisdiction based on a federal question, where all the claims derive from the same set of facts." *Mincy v. Staff Leasing, L.P.*, 100 F.Supp.2d 1050, 1053 (D. Ariz. 2000).  This reluctance stems from the fact that "the doctrine of pendent jurisdiction . . . seeks to promote judicial economy, convenience, and fairness to litigants by litigating in one case all claims that arise out of the same nucleus of operative fact."  *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir. 1995).

Defendants appear to concede (as they must) that Dr. Ennix's state law claims arise from the same set of facts as the section 1981 claim.  When such a common core of fact exists, the court may decline supplemental jurisdiction only if one of four tests is met:  (1) the state claims raise a novel or complex issue of state law; (2) the state claims "substantially predominate" over the federal claim in terms of proof, of the scope of the issues raised, or the comprehensiveness of the remedy sought; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) "in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. §§ 1367(a) & (c); *Executive Software North America, Inc. v. U.S. Dist. Ct.*, 24 F.3d 1545, 1152-56 (9th Cir. 1994), quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).  If one or more of these tests is met, the court must next determine that dismissal would serve the interests of economy, convenience, fairness and comity.  *Executive Software*, 24 F.3d at 1557; see also *Mincy*, 100 F.Supp.2d at 1053.

Defendants do not argue that this case presents novel or complex issues of state law under section 1367(c)(1) or that "exceptional circumstances" require dismissal under section 1367(c)(4).  Accordingly, so long as Dr. Ennix's federal discrimination claim remains in this case, the only basis on which the court may decline pendent jurisdiction is if the state claims "substantially predominate" over the federal claim in terms of proof, the scope of the issues raised, or the comprehensiveness of the remedy sought.

The "substantially predominates" standard is a difficult one to meet.  *Borough of West Mifflin*, 45 F.3d at 789.  It is satisfied "only where a state claim constitutes the real body of a case, to which the federal claim is only an appendage," (*id.*, quoting *Gibbs*, 383 U.S. at 727), or

18

1 | where the federal claim "involves a matter of mere tangential, technical, or peripheral relevance
2 | to the bulk and substance of the state claims." *SST Global Technology v. Chapman*, 270
3 | F.Supp.2d 444, 458 (S.D. N.Y. 2003).

4 |     Dr. Ennix's federal claim is anything but tangential, technical or peripheral. Indeed, it is
5 | at the very core of Dr. Ennix's case. Also, because the federal claim is premised almost entirely
6 | on the same course of conduct as the state law claims, it presents the same or similar issues, and
7 | to a large extent will require the same proof. Further, Dr. Ennix seeks the same remedy –
8 | damages – for the federal and state causes of action. Thus, the state law claims do not
9 | predominate with respect to the proof they will require, the issues they will present, or the
10 | remedies they will seek.

11 |     Defendants contend that the state claims substantially predominate because there are 16
12 | state claims, and only one federal claim. (MTD at 21:1-3) Putting aside Defendants' strange
13 | method of claim counting (there are in fact five state claims and one federal claim), the
14 | "substantially predominates" standard "is not satisfied simply by a numerical count of the state
15 | and federal claims the plaintiff has chosen to assert on the basis of the same set of facts."
16 | *Borough of West Mifflin*, 45 F.3d at 789; see also *Housing Rights Center Inc. v. Moskowitz*, 2004
17 | WL 3738293 at *4 (C.D. Cal. 2004) (following *Borough of West Mifflin* and rejecting argument
18 | that "substantially predominates" standard was met because state claims outnumbered federal
19 | claims seven to two).

20 |     Defendants also contend that Dr. Ennix's decision to file this action initially in state court
21 | "irrefutably demonstrates that state court [sic] issues predominate here." (MTD at 20:7-8) It is
22 | simply nonsense to suggest that Dr. Ennix's initial election to bring federal and state claims in a
23 | state forum proves *anything* about the relative weight of those claims, let alone that the federal
24 | claim is merely "an appendage" or "tangential" to the state claims.

25 |     Dr. Ennix's state law claims do not predominate over his federal discrimination claim.
26 | Section 1367 requires that the Court retain jurisdiction over all of the claims.

27
28

**XI.    PLAINTIFF NEED NOT DISMISS DOE DEFENDANTS AT THIS STAGE OF THE CASE.**

Defendants are incorrect in their contention that that the Doe defendants should be dismissed. Indeed, the very case on which Defendants rely held *precisely the opposite.* In *Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980), the Ninth Circuit concluded that, while use of Doe defendants is generally "not favored," such defendants must *remain* in the action until the plaintiff has an opportunity, through discovery, to identify them by name:

> As a general rule, the use of "John Doe' to identify a defendant is not favored . . . However, situations arise, such as the present, where the identity of alleged defendants will not be known prior to the filing of a complaint. In such circumstances, *the plaintiff should be given an opportunity through discovery to identify the unknown defendants*, unless it is clear that discovery would not uncover the identities or that the complaint would be dismissed on other grounds.

629 F.2d at 642 (emphasis added).

More recently, in *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999), the Ninth Circuit expressly *rejected* Defendants' proposed reading of *Gillespie*. The court held that Doe defendants should be allowed to remain until the plaintiff has a chance to identify them through discovery, "unless it is clear" that such an effort would be futile. *Id.*

Dr. Ennix included Doe defendants because he is unaware of the identities of defendants, other than those expressly identified, who participated with the other Defendants in the scheme to interfere with his practice of medicine. For example, other physicians may have played a role in restricting Dr. Ennix's practice in order to aid the individual Defendants' efforts to restrain trade. Defendants have made no showing that Dr. Ennix's effort to identify the Does through discovery will be futile. Accordingly, *Gillespie* commands that Dr. Ennix be given an opportunity to conduct discovery to identify these defendants, before the Court entertains a motion to dismiss.

## CONCLUSION

Dr. Ennix has stated valid claims against the Defendants arising out of the unjustified, discriminatory and unfair treatment Dr. Ennix received – treatment that has caused him

Plaintiff's Opposition to Defendants' Motion to Dismiss                    Case No. C07-2486 WHA

1  substantial harm.    He should be given the opportunity to prove these claims.    For all the
2  foregoing reasons, the Court should deny Defendants' motion.

3

4  Dated:  July 12, 2007                    Respectfully Submitted,

5                                           MOSCONE, EMBLIDGE & QUADRA, LLP

6

7

8                          By:_____

9                                   G. Scott Emblidge

10                          Attorneys for Plaintiff

Plaintiff's Opposition to Defendants' Motion to Dismiss            Case No. C07-2486 WHA