MAUREEN E. MCCLAIN (State Bar No. 062050)
Email: mcclain@kmm.com
ALEX HERNAEZ (State Bar No. 201441)
Email: hernaez@kmm.com
MATTHEW P. VANDALL (State Bar No. 196962)
Email: vandall@kmm.com
KAUFF MCCLAIN & MCGUIRE LLP
One Post Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 421-3111
Facsimile: (415) 421-0938

Attorneys for Defendant
ALTA BATES SUMMIT MEDICAL CENTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D.,

Plaintiff,

v.

ALTA BATES SUMMIT MEDICAL CENTER,

Defendant.

CASE NO. C 07-2486 WHA

**DECLARATION OF ALEX HERNAEZ IN SUPPORT OF DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT**

**DATE:** April 3, 2008
**TIME:** 8:00 a.m.
**DEPT:** Ctrm. 9, 19th Flr
**JUDGE:** Hon. William H. Alsup

**COMPLAINT FILED:** May 9, 2007
**TRIAL DATE:** June 2, 2008

I Alex Hernaez, declare as follows:

1. I am counsel for Defendant Alta Bates Summit Medical Center ("ABSMC" or "Defendant") in this action. I submit this declaration in support of Defendant's motion for summary judgment. I have personal knowledge of the facts set forth in this declaration.

2. Attached hereto as **Exhibit A** is a document produced in discovery by Plaintiff. The document, titled MEDICAL DIRECTOR LOAN OUT AND COVERAGE AGREEMENT, is a contract between Summit Medical Center and East Bay Cardiac

- 1 -

DECLARATION OF ALEX HERNAEZ IN SUPPORT OF DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT CASE NO. C 07-2486 WHA

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

Surgery Center. The document bears Plaintiff's Bates Label E002697-E002717. This document was produced in response to the following request: All DOCUMENTS reflecting the terms and conditions of your alleged contractual relationships with ABSMC during the January 1, 2004 through July 31, 2006 time period.

3. Attached hereto as **Exhibit B** are excerpts from the deposition transcript (including relevant exhibits) of Plaintiff.

4. Attached hereto as **Exhibit C** are excerpts from the deposition transcript (including relevant exhibits) of Dr. Neil Smithline.

5. Attached hereto as **Exhibit D** are excerpts from the deposition transcript (including relevant exhibits) of Dr. Leland B. Housman, M.D.

6. Attached hereto as **Exhibit E** is a document produced in discovery by Plaintiff. The document is titled VERIFICATION OF CONSENT FOR CORONARY INTERVENTION. The document bears Plaintiff's Bates Label E002684. This document was produced in response to the following request: All DOCUMENTS reflecting the terms and conditions of your alleged contractual relationships with ABSMC during the January 1, 2004 through July 31, 2006 time period. Patient information has been redacted from this document.

7. Attached hereto as **Exhibit F** is a chart produced by Defendant pursuant to Plaintiff's Special Interrogatories, Set One. The chart has been redacted as its contents have been designated "attorneys' eyes only" by the Court. The chart shows peer review actions taken by the MEC from 1992 to the present.

8. Attached hereto as **Exhibit G** are excerpts from the deposition transcript (including relevant exhibits) of Bruce Reitz, M.D.

9. Attached hereto as **Exhibit H** is a document produced in discovery by Plaintiff. The document is a report made by Dr. J. Donald Hill concerning Plaintiff.

///

///

///

- 2 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DECLARATION OF ALEX HERNAEZ IN SUPPORT OF DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

10. Attached hereto as **Exhibit** I are excerpts from the deposition transcript (including relevant exhibits) of Hon S. Lee, M.D.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 22 day of February, 2008 at San Francisco, California.

ALEX HERNAEZ

4812-1376-4866.1

- 3 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DECLARATION OF ALEX HERNAEZ IN SUPPORT OF DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

EXHIBIT A

CONFIDENTIAL

# MEDICAL DIRECTOR LOAN OUT AND COVERAGE AGREEMENT

This Medical Director Loan Out and Coverage Agreement (this "Agreement") is entered into as of September 1, 2001, by and among Summit Medical Center, a California nonprofit public benefit corporation ("Hospital") and East Bay Cardiac Surgery Center ("Group").

## RECITALS

A.    Hospital operates an acute care general hospital located in Oakland, California and in conjunction therewith operates a cardiovascular surgery service (referred to collectively herein as the "Service").

B.    Hospital is an affiliate of Sutter Health, a California nonprofit public benefit corporation ("Sutter") and is in the process of consolidating its cardiovascular services with similar services currently offered at Alta Bates Medical Center, which is also a Sutter affiliate and is located in Berkeley, California ("ABMC").

C.    Service is a Supplemental Service licensed by the California Department of Health Services and, under California Code of Regulations ("CCR") Title 22 § 70433(d), Hospital is required, among other things, to have cardiovascular surgery services available at all times for emergencies and, under CCR Title 22 § 70435(b), is required to ensure that one of the three surgeons constituting a cardiovascular surgical team is certified by the American Board of Thoracic Surgeons ("ABTS") or the American Board of Surgery with training and experience in cardiovascular surgery.

D.    Hospital also is in need of experienced cardiovascular surgeons to be available on call on a 24-hour basis to respond to emergencies in the Service and to respond to Hospital's emergency room, in compliance with requirements of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. §1395dd.

E.    Hospital is in need of an experienced, qualified physician to serve as medical director for the Service, providing customary medical direction services and certain administrative services in connection with the consolidation between Hospital and Summit.

F.    In connection with Hospital's commitment to quality patient care, Hospital provides the ABTS with quarterly reports of cardiovascular surgery outcomes data necessary for the ABTS to assess and report on the quality of cardiovascular surgery services provided at Hospital, and Hospital is in need of non-physician personnel to gather this data, maintain the related database and assist in preparation of the reports.

G.    Group employs physicians who specialize, and are certified by the American Board of Thoracic Surgery, in the delivery of cardiovascular surgery services (each, a "Physician," and, collectively, the "Physicians"), and employs certain non-

CONFIDENTIAL

physician personnel ("Employees") qualified to gather and input cardiovascular surgery outcomes data.

H. Hospital wishes to contract with Group, and Group wishes to contract with Hospital, to provide Dr. Leigh Iverson to serve as medical director of the Service ("Medical Director"), to provide the Physicians to provide coverage and on-call services, and to provide the Employees to produce quarterly cardiovascular surgery outcomes reports and to provide corresponding data collection services upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

**Section 1. DUTIES OF GROUP AND MEDICAL DIRECTOR**

During the term of this Agreement, Group shall perform and comply with, or, as applicable, cause Medical Director to perform and comply with, all duties, responsibilities, conditions and covenants set forth in this Agreement, including but not limited to the following:

1.1 Medical Director Services.

(a) Services. Medical Director shall serve as medical director (or co-medical director) of the Service, shall be responsible for the overall supervision of the Service and shall perform the specific duties and responsibilities set forth in Exhibit A attached hereto (the "Medical Director Services").

(b) Coordination of Services. Hospital, through its Chief Medical Officer (the "CMO"), and Medical Director shall coordinate their activities in connection with the Service. Group shall cause Medical Director to inform the CMO of any extended periods (i.e., one week or more) during which Medical Director will be unavailable due to vacation, professional meetings, or other personal or professional commitments. Group shall ensure that Medical Director is unavailable for no more than eight (8) weeks per year. During all periods of Medical Director's unavailability, Group shall provide a substitute physician ("Substitute Medical Director"), approved in writing by Hospital and who shall be a member of Group, to perform the services required of Medical Director under this Agreement. Group shall be solely responsible for compensating the Substitute Medical Director, and shall cause the Substitute Medical Director to perform all duties of Medical Director under this Agreement.

(c) Minimum Time Requirements. Medical Director shall devote a minimum average of ten (10) hours per month performing the Medical Director Services described in this Agreement. The parties recognize that the actual time required in performing such services may vary from month to month, but the parties agree that Medical Director shall in no event devote less than thirty (30) hours during any quarter during the term of this Agreement.

(d) Time Reports. Group shall cause Medical Director to contemporaneously record the actual number of hours and a description of the actual

CONFIDENTIAL

services provided on a monthly time report (the "Time Report") in the form attached hereto as Exhibit B, as modified from time to time by Hospital. Group shall cause Medical Director to deliver to the CMO a completed and signed copy of the Time Report within 5 days after the end of each calendar month during the term of this Agreement.

1.2 Coverage Services.

(a) Services. Group shall provide Physicians to provide the clinical coverage services set forth in Exhibit C attached hereto (the "Coverage Services"). Physicians shall report to and be accountable to the CMO for the performance of the Coverage Services.

(b) Removal of Physician.

(1) All Physicians providing coverage services under this Agreement are subject to continuing approval by Hospital and shall cease providing such services upon ninety days' written notice; provided however, that

(2) Hospital may require the immediate cessation of coverage services by a Physician for cause upon written notice to Group specifying the reasons therefor.

(c) Medically Indigent Care Policy. During the term of this Agreement, Group and Physicians agree and understand that they shall not participate in, nor shall they be entitled to any compensation related to, Hospital's Medically Indigent Care Policy.

1.3 Data Collection Services. Group shall provide Employees to provide the data collection services set forth in Exhibit D attached hereto (the "Data Collection Services").

1.4 Professional Qualifications. Each Physician shall at all times:

(a) Hold an unrestricted license to practice medicine in the State of California, and be board certified to practice in the Specialty;

(b) Be permitted to prescribe medications and hold a valid DEA permit;

(c) Be a member in good standing of Hospital's Medical Staff;

(d) Be eligible to provide services to beneficiaries under the Medicare and Medi-Cal programs as a participating physician.

1.5 Representations and Warranties. Group represents and warrants to Hospital that:

CONFIDENTIAL

(a) Neither Group nor any Physician is bound by any agreement or arrangement which would preclude Group from entering into, or from Group or any Physician fully performing the services required under, this Agreement;

(b) Each Physician's license to practice medicine in the State of California or in any other jurisdiction has never been denied, suspended, revoked, terminated, voluntarily relinquished under threat of disciplinary action, or restricted in any way;

(c) Each Physician's medical staff privileges at any health care facility have never been denied, suspended, revoked, terminated, voluntarily relinquished under threat of disciplinary action, or made subject to terms of probation or any other restriction; and

(d) No Physician has ever been convicted of an offense related to health care, or listed by the Medicare or Medi-Cal Programs or any other federal or state agency as debarred, excluded or otherwise ineligible for federal or state program participation.

1.6 **Notice of Failure to Meet Professional Qualifications**. Group shall promptly notify Hospital of any event causing or likely to cause a failure by any Physician to meet the professional qualification requirements set forth in Section 1.4 hereof or any other breach of the terms of this Agreement by any Physician.

1.7 **Compliance with Rules and Laws**. Group shall ensure that each Physician shall at all times comply with all policies, bylaws, rules and regulations of Hospital and Hospital's Medical Staff, applicable standards and recommendations of the Joint Commission on Accreditation of Healthcare Organizations, and all applicable federal, state and local laws, rules and regulations.

1.8 **Insurance**. Group shall maintain for each Physician and any Substitute Medical Director professional liability insurance in the minimum amounts of $1,000,000 per occurrence/$3,000,000 annual aggregate from an insurance company acceptable to Hospital. If such insurance is on a "claims-made" basis, and such coverage is later terminated, or converted to an "occurrence" coverage (or vice versa), Group shall also acquire "prior acts" or "tail" coverage (as applicable), in the above amounts, covering all periods that this Agreement is or has been in force. Group shall provide Hospital with written evidence of such insurance upon Hospital's request.

1.9 **Medical Records**.

(a) **Creation of Medical Records**. Unless otherwise specifically agreed to by the parties, Group shall ensure that all Physicians cause a charge to be assigned, and a complete medical record to be created and maintained, for each patient evaluated and/or treated by a Physician, including all direct admissions that Physicians are asked to evaluate. All medical records shall be prepared in compliance with all State and Federal regulations, the regulations of all accreditation institutions in

CONFIDENTIAL

which Hospital participates, the Medical Staff Bylaws, and Hospital's rules and regulations.

(b) __Maintenance of Medical Records__. Any and all patient records and charts produced as a result of either party's performance under this Agreement shall be and remain the sole property of Hospital. Both during and after the term of this Agreement, Group and the Physicians shall be permitted to inspect and/or duplicate, at Group's expense, any individual chart or record to the extent necessary to meet professional responsibilities to such patient(s) and/or to assist in the defense of any malpractice or similar claim to which such chart or record may be pertinent; provided, however, that such inspection or duplication shall be conducted in accordance with applicable legal requirements and pursuant to commonly accepted standards of patient confidentiality. Group shall be solely responsible for maintaining patient confidentiality with respect to any information obtained by Group or the Physicians pursuant to this Section 1.9. This provision shall survive the termination of this Agreement for any reason.

(c) __Discharge Summaries__. Following the discharge of any patient to whom a Physician has provided professional services, Group shall ensure that the applicable Physician shall complete discharge summaries in a timely manner for all professional services provided to the patient by Physician under this Agreement.

1.10 __Use of Hospital Facilities__. Any facilities, equipment, supplies, or personnel provided by Hospital shall be used by Group and Physicians solely to provide services under this Agreement and shall not be used for any other purpose whatsoever.

1.11 __Expenses__. Group shall be responsible for all Physician expenses related to the performance of Physician duties under this Agreement including, but not limited to, the following: (a) Physician compensation and benefits, (b) professional license fees and professional association membership fees and dues; (c) automobile and other travel; (d) entertainment and promotion; (e) professional conventions and meetings; (f) professional liability insurance; and (g) all compensation attributable to any employees, subcontractors, or back-up physicians engaged by Group or a Physician.

1.12 __No Referral Required__. The parties acknowledge that none of the payments or benefits provided to Group under this Agreement is conditioned on any requirement or expectation that Group or any Physician make referrals to, be in a position to make or influence referrals to, or otherwise generate business for Hospital. The parties further acknowledge that Physicians are not restricted from establishing staff membership or clinical privileges at, referring any service to, or otherwise generating any business for any other facility of Physician's choosing.

**Section 2. DUTIES OF HOSPITAL**

During the term of this Agreement, Hospital shall perform and comply with all duties and responsibilities, conditions and covenants set forth in this Agreement, including but not limited to the following:

CONFIDENTIAL

2.1 **Equipment, Supplies, Etc.** Hospital shall provide and maintain all customary and necessary equipment, supplies, maintenance, utilities and personnel reasonably required for operation of the Service. The parties acknowledge and agree that the Service is currently equipped, maintained and staffed in a reasonable and satisfactory manner. The selection, deletion and purchasing of additional or replacement equipment and the selection, removal and retention of personnel shall be the exclusive function of Hospital, after consultation with the Medical Director, when reasonably possible.

2.2 **Rest Area**. Hospital shall make available an appropriately furnished room in which Physicians may rest when their services are not otherwise required under the terms of this Agreement.

2.3 **Insurance for Administrative Services**. With respect to administrative services provided under this Agreement, Medical Director shall be included in Hospital's standard policy of insurance or self-insurance in amounts of $1,000,000 per claim/$3,000,000 annual aggregate. This insurance shall be applicable only to Medical Director's administrative services and not to care of Medical Director's private patients.

2.4 **Responsibility for Service**. To the extent required by applicable laws and regulations, Hospital shall retain professional and administrative responsibility for the services rendered to patients in the Service.

**Section 3. COMPENSATION**

3.1 **Monthly Payments**.

(a) **Medical Director Services**. For all Medical Director Services rendered by Medical Director under this Agreement, Hospital shall pay Group $1,400 per month, payable within five business days after the CMO receives a completed and signed Time Report for the applicable month.

(b) **Coverage Services**. For all Coverage Services rendered by Group and Physicians under this Agreement, Hospital shall pay Group $500 for each day of coverage, payable monthly within five business days after the end of each month during the term of this Agreement.

(c) **Data Collection Services**. For all Data Collection Services rendered by Group under this Agreement, Hospital shall pay Group $4,225 per month, payable within five (5) business days after the end of each month during the term of this Agreement.

3.2 **Tax Reporting**. To the extent required by law, Hospital shall report all payments to Group under this Agreement on IRS Form 1099 and its state law counterpart.

CONFIDENTIAL

3.3 **Billing for Professional Services.**

(a) **Group Billing**. Group shall be solely responsible for the billing and collection of all charges for professional services provided by Group or any Physician. Group's separate billings shall constitute its sole compensation for all professional services rendered hereunder, including professional services rendered by the Physicians.

(b) **Covenants and Indemnification**. Group covenants that it shall bill all patients and payors promptly with respect to any professional services performed by the Physicians and shall use commercially reasonable efforts to collect all bills promptly. To the extent that Group or any Physician provides to Hospital patients professional services for which any other physician, medical group, or IPA is reimbursed from any patient or payor (for example, a health plan under a capitated payment arrangement), Group shall bill or otherwise seek reimbursement for such services from the other physician, medical group or IPA. Group shall indemnify, defend and hold Hospital harmless from any and all claims, costs and/or liability suffered or incurred by Hospital, in connection with any billing or collection of charges by Group. The indemnification obligations stated in this Section 3.3(b) shall survive termination of this Agreement.

(c) **Billing Information**. Hospital shall supply Group with any information necessary for Group to bill patients or payors for services rendered. Hospital shall assist Group in obtaining patients' signatures on assignment of insurance benefits and other reasonably appropriate forms supplied to Hospital by Group.

**Section 4. TERM**

4.1 **Term**. The term of this Agreement shall be one year commencing on the date of this Agreement, unless terminated earlier pursuant to Section 4.2. hereof.

4.2 **Early Termination.**

(a) **Immediate Termination by Hospital**. Hospital may terminate this Agreement immediately by written notice to Group upon the occurrence of any of the following events:

(1) the inaccuracy of any representation of Group in Section 1.5 hereof;

(2) closure of the Service or sale or closure of the hospital at which the Service is located, and

(3) with respect to Medical Director Services only, the death of Medical Director or permanent disability of Medical Director such that Medical Director, with reasonable accommodation, is unable to perform the duties and responsibilities set forth in this Agreement, unless Group

CONFIDENTIAL

promptly provides a replacement Medical Director, subject to Hospital's prior approval.

(b) Material Breach. Subject to the immediate termination rights of Hospital set forth in Section 4.2(a), either party shall have the right to terminate this Agreement upon a material breach of any terms or conditions of this Agreement by the other party, provided such breach continues uncured for 15 days after receipt by the breaching party of written notice of such breach from the non-breaching party. The parties hereto expressly acknowledge and agree that each of the following constitutes a material breach of this Agreement: (i) failure of Medical Director to deliver Time Reports in a timely manner, (ii) failure of Medical Director to satisfy the minimum time requirements set forth in Section 1.1(c) hereof, (iii) failure to provide the coverage services described in Exhibit C; (iv) failure to provide the Data Collection Services; or (v) any act or omission by a Physician that jeopardizes the quality of care provided to Hospital's patients.

(c) Legal Jeopardy. If either party obtains a written opinion of legal counsel stating that, in the event of an audit or investigation, this Agreement is likely to be challenged by any governmental agency as illegal or improper or resulting in fines, penalties or exclusion from the Medicare or Medi-Cal programs, or in the case of Hospital, loss of tax-exempt status or its ability to obtain tax-exempt financing, that party may terminate this Agreement by providing written notice, including a copy of such opinion, to the other party. Within ten days of such notice, the parties shall meet and confer to discuss mutually acceptable means of restructuring the relationship to eliminate the legal concern. In the event that the parties are unable to reach agreement on new terms within twenty days of their meeting, this Agreement shall automatically terminate.

4.3 Effect of Expiration or Termination.

(a) Termination of Obligations. Except as otherwise provided in this Section 4.3, upon expiration or other termination of this Agreement, the parties shall be relieved and released from any further duties and obligations under this Agreement.

(b) Pre-Termination Services. Hospital shall pay Group any unpaid monthly payment due for any period prior to the termination date, with such monthly payment prorated on a daily basis if the termination date occurs on a day other than the last day of a month.

(c) Continuation of Patient Services. Except for termination the cause of which is such that continued provision of services would be illegal or would pose an unacceptable risk to patient welfare, Group shall continue to be obligated under this Agreement, until the effective date of its termination, to continue to provide professional services to Hospital's patients, in full cooperation with Hospital, including but not limited to cooperation in transferring, to physicians designated by Hospital, patients who are receiving care provided or supervised by a Physician at the time notice of termination was given. In addition, if circumstances applicable to particular patients

CONFIDENTIAL

require the continuation of such services after the effective date of this Agreement's termination, each Physician shall continue to provide professional services to any patient for whom he/she had professional responsibility as of such date for a reasonable period following such effective date.

(d) **Liability for Breach**. A termination by any party as a result of a material breach by the other party shall not be an exclusive remedy, and the non-breaching party shall be entitled to pursue other remedies for such breach available at law or in equity.

(e) **Vacating Premises and Removing Property**. Upon expiration or termination of this Agreement and upon the request of Hospital, Group shall cause any Physician providing services under this Agreement to immediately vacate Hospital premises and remove any and all of Physician's personal property. Any personal property that is not so removed may be removed by Hospital at Group's expense.

(f) **Survival**. The provisions of Sections 1.9, 3.3, 4, 5, 6, 7, 8 and 10 shall survive termination of this Agreement.

4.4 **No Procedural Rights**. Continuation of this Agreement is not a condition of Medical Staff membership. Therefore, this Agreement may be terminated in accordance with this Section 4 without necessity of a hearing before the Hospital's Board of Trustees, a committee of the Medical Staff, or any other body. Group represents and warrants that Medical Director, all physicians providing services on behalf of Medical Director, and all Physicians, are aware of and accept this condition.

## Section 5. INDEPENDENT CONTRACTOR RELATIONSHIP

In performing the services described in this Agreement, Group (and each Physician and Employee) is acting as an independent contractor, and shall not be considered an employee, joint venturer or partner of Hospital for any purpose whatsoever. Hospital shall neither have nor exercise any control or direction over the methods by which Group, the Physicians or the Employees shall perform the services required under this Agreement. The sole interest and responsibility of Hospital is to assure that such services are performed in a competent, efficient and satisfactory manner. Group shall at all times remain the sole employer of Physicians and Employees, and Group shall not, nor shall any Physician or Employee, have any claim under this Agreement or otherwise against Hospital for workers' compensation, unemployment compensation, vacation pay, sick leave, retirement benefits, health plan benefits, Social Security benefits, disability insurance benefits, unemployment insurance benefits or any other benefits of any kind. Group shall be solely responsible for, and shall indemnify, defend and hold Hospital harmless from and against any liability or expense related to, all income tax withholding and other employment or payroll tax obligations related to the compensation payable by Hospital to Group under this Agreement and the compensation payable by Group to any Physician or any other physician engaged by Group, or to any Employee.

CONFIDENTIAL

Section 6. ACCESS TO BOOKS AND RECORDS

6.1 Access. If the value or cost of services rendered to Hospital pursuant to this Agreement is ten thousand dollars ($10,000) or more over a twelve-month period, Group agrees as follows:

(1) Until the expiration of four (4) years after the furnishing of such services, Group shall, upon written request, make available to the Secretary of the Department of Health and Human Services (the "Secretary"), the Secretary's duly-authorized representative, the Comptroller General, or the Comptroller General's duly-authorized representative, such books, documents and records as may be necessary to certify the nature and extent of the costs of such services; and

(2) If any such services are performed by way of subcontract with another organization and the value or cost of such subcontracted services is ten thousand dollars ($10,000) or more over a twelve-month period, such subcontract shall contain, and Group shall enforce, a clause to the same effect as subparagraph (1) immediately above.

6.2 Limits. The availability of Group's books, documents, and records shall be subject at all times to all applicable legal requirements, including, without limitation, such criteria and procedures for seeking and obtaining access that may be promulgated by the Secretary by regulation.

Section 7. CONFIDENTIALITY

7.1 Hospital Information. Group recognizes and acknowledges that, by virtue of entering into this Agreement and providing services to Hospital hereunder, Physicians, Employees and Group may have access to certain information of Hospital that is confidential and constitutes valuable, special and unique property of Hospital. Group agrees that it will not, and no Physician or Employee will, at any time, either during or subsequent to the term of this Agreement, disclose to others, use, copy or permit to be copied, without Hospital's express prior written consent, except pursuant to a Physician's duties hereunder, any confidential or proprietary information of Hospital, including, but not limited to, information which concerns Hospital's patients, costs, prices and treatment methods at any time used, developed or made by Hospital, and which is not otherwise available to the public.

7.2 Terms of this Agreement. Except for disclosure to Group's or any Physician's legal counsel, accountant or financial advisors (none of whom shall be associated or affiliated in any way with Hospital or any of its affiliates), Group shall not, and no Physician or Employee shall, disclose the terms of this Agreement to any person

CONFIDENTIAL

who is not a party or signatory to this Agreement, unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to in writing by Hospital.

7.3    **Patient Information**. Group shall not, and no Physician or Employee shall, disclose to any third party, except where permitted or required by law or where such disclosure is expressly approved by Hospital in writing, any patient or medical record information regarding Hospital or Service patients, and Group, each Physician and each Employee shall comply with all federal and state laws and regulations, and all rules, regulations, and policies of Hospital and its Medical Staff, regarding the confidentiality of such information, including, but not limited to, the Health Insurance Portability and Accountability Act (HIPAA) (45 C.F.R. Part 160, et seq.) and the Confidentiality of Alcohol and Drug Abuse Patient Records Act (42 C.F.R. Part 2), as amended from time to time.

## Section 8. DISPUTE RESOLUTION

In the event that any dispute relating to this Agreement arises between Group (or any Physician or Employee) and Hospital, either party may by written notice call a meeting regarding such dispute to be attended by an executive officer of each party who has the authority to negotiate and bind that party to a resolution. At the meeting, such officers shall attempt in good faith to resolve the dispute. If the dispute cannot be resolved within 45 days from the date of the initial notice, and if any party wishes to pursue the dispute, the dispute shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association. The decision of the arbitrator(s) shall be a final and binding determination of the dispute (including injunctive relief) and shall be fully enforceable as an arbitration decision in any court having jurisdiction and venue over the parties. The arbitrator(s) shall have no power to award any punitive damages or exemplary damages or to ignore or vary the terms of this Agreement and shall be bound by controlling law. The costs of such arbitration shall be split evenly between the parties; provided that each party shall pay its own legal expenses.

## Section 9. NOTICES

Any notices or other communications permitted or required by this Agreement shall be deemed made on the day personally delivered in writing or three days after mailed by certified mail (or first class mail), postage prepaid, to the other party at the address set forth below or to such other persons and addresses as either party may designate in writing:

If to Hospital:                 Summit Medical Center
                                350 Hawthorne Avenue
                                Oakland, California 94609
                                Attention: Warren E. Kirk, President and CEO

With a copy to:                 Sutter Health Legal Department
                                345 California Street, Suite 2000

CONFIDENTIAL

San Francisco, California 94104
Attention: Nancy Benn, Esquire

If to Group:

East Bay Cardiac Surgery Center
3300 Webster Street, Suite 500
Oakland, California 94609

With a copy to:

______________________________
______________________________
______________________________
______________________________

**Section 10. INDEMNIFICATION**

Each party agrees to indemnify, defend and hold harmless the other party and each of such other party's officers, directors, members, shareholders, agents and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of (i) a breach of this Agreement by the indemnifying party, or (ii) any professional act or omission of the indemnifying party in providing services under this Agreement.

**Section 11. MISCELLANEOUS**

11.1 **No Waiver**. No waiver of a breach of any provision of this Agreement shall be construed to be a waiver of any breach of any other provision.

11.2 **Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

11.3 **Assignability**. The rights and obligations of each party under this Agreement shall inure to the benefit of the parties to it and to their respective successors and permitted assigns. Neither party may assign any of its rights and obligations under this Agreement without obtaining the prior written consent of the other party.

11.4 **Use of Names and Logos**. Neither party shall be permitted to use the other's name, logo or corporate identity for any purpose without the prior written consent of the party whose name, logo or corporate identity is to be used.

11.5 **No Third Party Rights**. The parties do not intend the benefits of this Agreement to inure to any third person not a signatory to this Agreement. Notwithstanding anything contained herein, or any conduct or course of conduct by any party to this Agreement, before or after signing this Agreement, this Agreement shall not be construed as creating any right, claim or cause of action against either party by any person or entity not a party to this Agreement.

CONFIDENTIAL

11.6 Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

11.7 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.8 Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

11.9 Amendments. Amendments to this Agreement shall be made only in writing duly executed by both parties hereto.

11.10 Other Service Agreements. Exhibit E attached hereto lists all other current service agreements between the Hospital, on the one hand, and the Group or any Physician, on the other hand.

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**HOSPITAL:**

**SUMMIT MEDICAL CENTER**

By: [signature]
Name: Warren E. Kirk
Title: President and CEO

**GROUP:**

**EAST BAY CARDIAC SURGERY CENTER**

By: [signature] MD
Name: LEIGH IVERSON
Title: MANAGING PARTNER

**PHYSICIAN ACKNOWLEDGMENT**

The undersigned Physicians hereby acknowledge receipt of a copy of this Agreement and agree to carry out the duties of Physicians as set forth in this Agreement.

[signature] MD
Name: LEIGH IVERSON MD

[signature]
Name: Cornelius L. Ennix Jr

[signature]
Name: JUNAID KHAN

[signature]
Name: R. Stanten

CONFIDENTIAL

## EXHIBIT A

## MEDICAL DIRECTOR DUTIES AND SERVICES

Medical Director shall be responsible to perform the administrative services set forth below.

a. Consolidation of Cardiovascular Services between Hospital and ABMC. Medical Director shall assist with the consolidation of Hospital's and ABMC's cardiovascular services at Hospital's campus. Such assistance shall include, among other things, attending meetings, at least once per month during the term of this Agreement, with Hospital's Cardiovascular Services Service Line Director, attending meetings with architects and engineers engaged in connection with the cardiovascular services consolidation, advising and consulting with representatives and contractors of Hospital, ABMC and Sutter on issues associated with the cardiovascular services consolidation and providing such other advice and assistance regarding the cardiovascular services consolidation as may reasonably be requested by Hospital, Sutter and ABMC from time to time during the term of this Agreement.

b. License and Accreditation. Medical Director shall provide such professional guidance and supervision as necessary to obtain and maintain the Service's license and accreditation.

c. Policies and Procedures. Medical Director shall develop, maintain, implement, and update as necessary policies and procedures for the effective operation of the Service. These policies and procedures shall be consistent with applicable licensing regulations, and shall promote high quality patient care, standardization of procedures, efficiency of scheduling, and highly trained professional and technical personnel. Policies shall be approved by the Board of Trustees, and procedures shall be approved by Administration and the Medical Staff where appropriate.

d. Call Schedule. Medical Director shall develop a system for assuring physician coverage of the Service, 24 hours per day, seven days per week, as set forth in greater detail on Exhibit C. Physicians scheduled to provide this coverage must:

(1) Be members in good standing of the Medical Staff, with full privileges to provide necessary patient care services;

(2) Comply with Hospital's nondiscrimination policies, and be eligible to and agree to treat Medicare and Medi-Cal patients; and

(3) Provide services in accordance with Hospital's standards of quality and efficiency; and in accordance with all applicable Medical Staff and Hospital bylaws, rules, regulations, and policies.

CONFIDENTIAL

e. Personnel. Medical Director shall advise Hospital in the recruiting, evaluation, and retention of key Hospital personnel working in the Service.

f. Supervision. Medical Director shall provide clinical supervision of technical personnel in the Service.

g. Training and Education. Medical Director shall train or arrange for the training of Service personnel, and shall develop such continuing education materials and instruction as necessary to properly instruct members of Hospital's medical, nursing, and allied health professional staffs, as well as other employee groups deemed appropriate by Hospital and Medical Director.

h. Budgets. Medical Director shall assist Hospital's administration in the development of operating and capital expenditure budgets for the proper and efficient operation of the Service. Medical Director shall operate the Service efficiently, and in accordance with approved budgets, and shall exercise diligence in keeping controllable costs of the Service to a minimum.

i. Planning. Upon request of Hospital, Medical Director shall participate in Hospital's planning process as it relates to the operation of the Service.

j. Quality Assurance. In cooperation with Hospital's formal quality assurance program, Medical Director shall develop and implement appropriate quality assurance activities for the Service. In addition, Medical Director shall monitor utilization and quality of services, and shall recommend steps necessary to remedy deficiencies therein. These activities shall be conducted through Hospital's Medical Staff committee structure; nothing in this Agreement is intended to affect the privileges and immunities that attend such Medical Staff activities.

k. Equipment. Medical Director shall advise Hospital on the selection, maintenance, and repair of equipment for the Service; and shall arrange for or advise Hospital on the need for maintenance or repair of equipment within the Service.

l. Reimbursement. Medical Director shall cooperate with Hospital in the preparation of claim forms for reimbursement, and of other appropriate reports on the operation of the Service.

m. Committees. Medical Director shall participate on Hospital and Medical Staff committees at the request of the CMO or the Medical Staff.

n. Marketing. Medical Director shall assist in developing and implementing Hospital's marketing plan as it relates to the Service. Medical Director shall maintain the confidentiality of such marketing plan.

o. Other Responsibilities. Medical Director shall perform such other responsibilities as reasonably necessary for the proper operation of the Service.

**EXHIBIT B**

CONFIDENTIAL

**TIME REPORT**

[See attached form]

CONFIDENTIAL

*Complete and deliver to within 5 days after end of each month*

**MEDICAL DIRECTOR TIME REPORT**

Physician: ____________ Department: ____________

Month/Year: ____________

| Day | Services Performed | Hours Worked |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |
| 29 | | |
| 30 | | |
| 31 | | |
| | TOTAL HOURS | |

I certify that this Time Report is a true and accurate record of my services and hours during the month indicated, and that all time recorded above was devoted to providing administrative and teaching services to Hospital and that none of the recorded time was devoted to: (1) providing physician services to patients or (2) to other physician activities, such as funded research, that are not paid under either Part A or Part B of Medicare.

Date: ____________ ____________

Signature

E002714

SF 202336 6

**EXHIBIT C**

CONFIDENTIAL

**COVERAGE SERVICES**

**Summary**

1. At least 1 physician available on site within 30 minutes of receiving call to provide the following:

- 24/7 call coverage of Hospital's emergency room
- 24/7 call coverage of medically indigent patients

2. At least 1 physician available onsite 24/7 within 20 minutes of receiving call to provide back-up coverage for angioplasty procedures.

CONFIDENTIAL

**EXHIBIT D**

**DATA COLLECTION SERVICES**

Group shall provide Hospital with quarterly reports of cardiovascular surgery outcomes data for cardiovascular surgery services provided at Hospital (the "Reports"). The Reports shall include, among other things, morbidity and mortality data, ~~and data regarding six-month and one year patient post operative follow-up~~. In connection with Group providing Hospital with the Reports, Group shall cause its non-physician employees to gather, in coordination with Hospital and the Physicians, all data necessary to produce the Reports in the form and substance required by the ABTS in order for the ABTS to assess, and recognize, the quality of Hospital's cardiovascular surgery program.

## EXHIBIT E

CONFIDENTIAL

## OTHER SERVICE AGREEMENTS

1. Medical Director Loan Out and Coverage Agreement between East Bay Cardiac Surgery Center and Alta Bates Medical Center, dated September 1, 2001.

EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D., as )
an individual and in his )
representative capacity under )
Business and Professions Code )
Section 17200, et seq., )
)
Plaintiff, )
vs. ) Case No: C07-2486
)
RUSSELL D. STANTEN., M.D., LEIGH )
I.G. IVERSON, M.D., STEVEN A. )
STANTEN, M.D., WILLIAM M. )
ISENBERG, M.D., Ph.D., ALTA BATES )
SUMMIT MEDICAL CENTER, DOES 1 )
through 100, inclusive, )
)
Defendants. )
______________________________)

**TRANSCRIPT MARKED CONFIDENTIAL**

DEPOSITION OF COYNESS L. ENNIX, JR., M.D.

VOLUME I, pages 1 to 129

Friday, May 25, 2007

1:17 p.m.

Taken at Kauff, McClain & McGuire
One Post Street
San Francisco, California

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By: Linda Vaccarezza, RPR, CSR #10201

referencing in that paragraph?

A Which.

MR. EMBLIDGE: I'm sorry. What paragraph?

THE WITNESS: Which paragraph?

MS. MCCLAIN: Page 2, paragraph 2.

THE WITNESS: Okay. Yes.

BY MS. MCCLAIN:

Q Is there any reason why you didn't add in the description of this letter in the complaint that there had been findings of deviation from simple departures from the standard of care?

MR. EMBLIDGE: Caution you not to answer that question to the extent you would have to reveal conversations with your attorneys.

BY MS. MCCLAIN:

Q Aside from conversations with your attorneys, can you explain to me why you did not note in this paragraph that the letter from a senior investigator of the medical board had noted cases of simple departures from the standard of practice?

A Would you repeat the question, Ms. McClain?

lawyer talked about, can you tell me why you didn't describe this letter more fully in this complaint?

A No.

Q This is a letter you received from a senior investigator working at the medical board; correct?

A Yes. I think the signatory is on it, Teri Bennett, Senior Investigator, yes.

Q Did you have conversations with Teri Bennett with regard to the investigation?

A Yes. I was interviewed by her two times, if not more. At least two times.

Q Do you know one way or the other, Dr. Ennix, whether the Medical Board of California has the same or a different standard in examining questions of physician practice as compared to a medical staff?

MR. EMBLIDGE: Calls for speculation.

BY MS. MCCLAIN:

Q The question was: Do you know?

A Repeat the question, please, Ms. McClain.

Q Do you have any knowledge as to whether

there definitely was an arrangement. And if an arrangement -- if an agreement constitutes a contract, then there was a contract. What I'm unclear about is whether or not there is a document.

Q Those arrangements, however, were with the groups; correct?

A Yes.

Q In other words, the group provided certain services; you and Dr. Young both provided on-call services?

A Yes. Absolutely.

**Q Subsequent to October 2005, have you had any individual contract with Alta Bates Summit Medical Center? That is, just with you; not with Kaiser, not with a group?**

**A No.**

**Q Is it correct that your relationship to Summit Medical Center is as an independent contractor?**

A Repeat the question, please.

Q Is your relationship with Summit Medical Center one of being an independent contractor?

A You mean currently?

A As silly as it might sound, I'm not sure.

**Q You're certainly not an employee of the medical center; are you?**

**A No. That's for sure.**

**Q Have you ever been an employee of the medical center?**

**A No.**

Q Do you have individual contracts with your patients? Do you write a contract that both of you sign?

A Do I write a contract that both of us sign? No.

Q Have you ever written a contract with your patients that both of you sign?

A No.

Q Would you have a look, please, at page 12 of Exhibit 1.

A Page 12?

Q Yes. Paragraph 40 says "Such actions concerned Dr. Ennix's abilities to perform his contractual duties with Alta Bates Summit."

What contractual duties are you talking about there?

Q Not the Summit medical staff; correct?

A It is all the same culture; many of the same people.

Q Can you answer my question, sir?

A In a legal sense, you're correct.

**Q Is it correct, then, that none of the defendants ever said anything to you which was disparaging of your race?**

**A Of course not. I just told you that these are highly intelligent people. Of course** not. However --

Q There's no question pending.

A Excuse me?

Q There is no question pending.

MR. EMBLIDGE: If you want to explain your answer, you can.

THE WITNESS: But I haven't finished with the answer that I gave. With due respect --

BY MS. MCCLAIN:

Q Of whom?

A Of you.

Q Thank you.

A With due respect, it is clear to me that I was treated in a way that was disparate. Had I

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D., as )
an individual and in his )
representative capacity under )
Business and Professions Code )
Section 17200, et seq., )
)
Plaintiff, )
vs. ) Case No: 07-2486
)
RUSSELL D. STANTEN., M.D., LEIGH )
I.G. IVERSON, M.D., STEVEN A. )
STANTEN, M.D., WILLIAM M. )
ISENBERG, M.D., Ph.D., ALTA BATES )
SUMMIT MEDICAL CENTER, DOES 1 )
through 100, inclusive, )
)
Defendants. )
______________________________)

**TRANSCRIPT MARKED CONFIDENTIAL**

DEPOSITION OF COYNESS L. ENNIX, JR., M.D.

VOLUME II, pages 130 to 354

Saturday, May 26, 2007

10:11 a.m.

Taken at Kauff, McClain & McGuire
One Post Street
San Francisco, California

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By: Linda Vaccarezza, RPR, CSR #10201

Do you disagree with the conclusions of the entire audit team? This was a report written by all three members of the team, correct?

A I disagree with the report from the National Medical Audi.

Q And part of the people providing input to that report, to your knowledge, were two cardiac surgeons; correct?

MR. EMBLIDGE: Calls for speculation.

THE WITNESS: I have no idea.

BY MS. MCCLAIN:

**Q You talked to those two cardiac surgeons, didn't you?**

**A I did, yes.**

**Q You submitted them lots of information with respect to your position; correct?**

**A Yes.**

Q Was there any point in this peer review process when you weren't given a full opportunity to provide information to the bodies that made the decisions?

A Yes.

Q When?

A Well, there was a surgery peer review committee that, according to the minutes of at

think there are a lot of very good people at Alta Bates, at the Summit campus that don't have a racist bone in them.

But I think that this process and the defendants that I have named in the process are guilty of racial -- of some parts of racial discrimination.

Now, I have -- now, make note of the fact that it is -- it is the process and some of the people in the process. I don't -- and that's the way I feel.

Q Do you believe John Donovan has a racial bone in his body?

A I don't know.

Q Do you believe Goldie Gross has a racial bone in her body?

A Goldie Gross, that's your partner.

Q Gross?

A I don't know.

Q Do you believe that Fred Herskowitz has a racial bone in his body?

A I don't think so.

Q Do you believe that Louis Komarmy has a racial bone in his body?

A Before you read off all of the names of

the members of that committee, again, you are attempting to separate out parts of the process, either by doing it with individuals or doing it with a certain segment of the process.

And I think that I've already indicated to you that the way I view it, notwithstanding the way you're trying to force me to view it. The way I view it is a total process that has its basis in a deep seeded cultural manifestation of racism.

Q Please answer my question. Do you believe that Louis Komarmy has a racial bone in his body?

A I don't know.

Q Do you believe that Bruce Moorstein has a racial bone in his body?

A I don't know.

Q Do you believe that Todd Murray has a racial bone in his body?

A I don't know.

Q Do you believe that Rod Perry has a racial bone in his body?

A Probably not.

Q Do you believe that Rich Phillip has a racial bone in his body?

A Now, Rich Phillip --

Q Oh, thank you. Phillip Rich?

A Yeah. Probably not.

Q Do you believe that James Saunders has a racial bone in his body?

A I don't know.

Q Do you believe that Annette Schaieb has a racial bone in her body?

A I don't know.

Q Do you believe that Steven Stanten -- let's go back to the defendants, so let me skip to the next name for a moment.

Do you believe that John Warbritton has a racial bone in his body?

A No.

Q Do you believe that Lisa Yee has a racial bone in her body?

A I don't know.

Q Aside from the fact that Dr. Isenberg participated substantially in a peer review process, which you believe to be discriminatory, do you have any other indication of racial discriminatory motives on the part of Dr. Isenberg?

A Would you restate the question, please?

Q Aside from the fact that Dr. Isenberg participated in the peer review process that you globally believed to have been discriminatory, do you have any basis for believing that Dr. Isenberg has a racial bone in his body?

A I don't know.

Q Aside from the fact that you believe that Dr. Iverson participated in a peer review process --

A Oh, he participated.

Q -- which you globally --

MR. EMBLIDGE: Let her finish her question, please.

THE WITNESS: I'm sorry.

BY MS. MCCLAIN:

Q Aside from the facts that you believe Dr. Iverson participated in a peer review process which you globally believe to have had aspects of racial discrimination, do you have any factual evidence that Dr. Iverson has a racial bone in his body?

A Tough to say.

Q That's your answer?

A That's my answer.

Q Aside from the fact that Dr. Russell

Stanten participated in a peer review process which you believe globally had racially discriminatory aspects, do you have any factual basis for saying that Dr. Russell Stanten has a racial or racist bone in his body?

A Well, I'm sure Dr. Russell Stanten wouldn't consider himself a racist or has a racial bone in his body, but I believe that he does.

Q Why?

A Well, I've known him for a long time and I have just observed how he treats people.

Q Give me one example.

A I can't give you an example.

Q Give me one specific?

A Sitting here, I can't.

Q Aside from participating in a peer review process which you globally believe had some aspects of racial discrimination, do you have any factual basis for saying that Dr. Steve Stanten has a racial bone in his body?

A I suspect that he has.

Q Give me one factual basis for that suspicion?

A I can't give you any.

Dr. Isenberg on or about October 24, 2005?

A Yes. Wait. Wait. October 24th, yes.
Yes.

MS. MCCLAIN: May I have this marked as next in order, please.

(Exhibit 36 was marked for identification.)

BY MS. MCCLAIN:

Q Is Exhibit 36 a letter you received from Dr. Isenberg on or about the date of the letter, on or about December 30, 2005?

A Yes.

Q Dr. Ennix, you and I just had a discussion which we phrased as, "can you tell me whether this person has a racial bone in their body." I think at times we used the phraseology, I used the phraseology "racist." I want to make sure that we are clear as to what we were both talking about during that exchange.

I understood that I was asking you whether you had any information that the individual about whom we were speaking had racial animus against African-Americans.

Were you understanding the same concept when we had that discussion?

A I think so, yeah.

STATE OF CALIFORNIA )
COUNTY OF SONOMA )

I, LINDA VACCAREZZA, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

COYNESS L. ENNIX, JR., M.D.,

The witness in the foregoing examination, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing examination and caption named, nor in any way interested in the outcome of the cause named in said caption.

Dated the 27th day of May, 2007

LINDA VACCAREZZA, RPR, CSR #10201

# Exhibit 4

STATE OF CALIFORNIA -- STATE AND CONSUMER SERVICES AGENCY Arnold Schwarzenegger, Governor

MEDICAL BOARD OF CALIFORNIA
PLEASANT HILL DISTRICT OFFICE
3478 BUSKIRK AVENUE, SUITE #217
PLEASANT HILL, CA 94523
(925) 937-1909 fax (925) 937-1964

July 13, 2006

Coyness Ennix, M.D.
3300 Webster Street, Suite 404
Oakland, CA 94609

Dear Doctor Ennix:

The Medical Board of California has concluded its investigation regarding the 805 Business and Professions Code Section reports filed by Alta Bates Summit Medical Center. This case was reviewed by a outside expert.

The expert found no departure from the standard of practice in two of the four cases reviewed for minimally invasive procedures. The two cases that the expert found simple departures read as follows:

<u>Patient #</u>

The operative approach was indicated. The length of operative times was not unreasonable, considering the approach and the surgeon's experience, and does not represent a violation of the standard of practice. The amount of IVF administered was excessive, and resulted in the subsequent administration of numerous blood products, that would, in all likelihood, not have been otherwise necessary. That is the responsibility of both the anesthesiologist, as well as the surgeon, and represents a simple departure from the standard of practice. The remainder of the intra and postoperative care are within the realm of surgeon experience and preference.

<u>Patient #</u>

The failure to recognize and prevent the administration of the large volume of crystalloid to the patient intraop constitutes a simple departure from the standard of practice. The remainder of the allegations are unfounded, and no other departures from the standard of practice can be clearly demonstrated in this case.

After receipt of the supplemental 805 reports filed by Alta Bates Summit Medical Center, additional records were obtained and reviewed by our expert. Six additional records were reviewed by the expert who found the following:

Δ π EXHIBIT 4
Deponent Ennix
Date 5/25/17 Rptr. LV
WWW.DEPOBOOK.COM

Patient #:

The delay in transporting this patient to surgery from the time the diagnoses were made to the time of the operative interventions probably contributed to her poor outcome and represents a simple departure from the standard of practice. The remainders of the case including preoperative, operative, and postoperative management were within the realm of physician experience, training, and bias.

Summary Conclusion

A simple departure in the standard of practice could be identified in one case. The remainder of the cases had no evidence of deviations in the standard of practice by Dr. Ennix. There is no evidence whatsoever, in these reviewed cases, that the conduct of Dr. Ennix; preoperatively, intraoperatively, or postoperatively, has violated the standard of practice in cardiac surgery.

Based upon the expert reviewer's opinion, this case will be closed and kept on file for a period of five years. In the event that a similar complaint is received, this case may be re-opened.

Sincerely,

Teri Bennett
Senior Investigator
12-2004-158215

cc: John Etchevers, Esq.

EXHIBIT C

00001

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D., as an individual and in his representation capatcity under Business & Professions Code Section 17200, et seq.,

Plaintiff,

vs. Case No. C 07-2486

RUSSELL D. STANTEN, M.D.,LEIGH I.G. IVERSON, M.D., STEVEN A. STANTEN, M.D., WILLIAM M. ISENBERG, M.D., Ph.D., ALTA BATES SUMMIT MEDICAL CENTER and DOES 1 through 100,

Defendants.

______________________________/

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF

NEIL SMITHLINE, M.D.

SAN FRANCISCO, CALIFORNIA

February 11, 2008

REPORTED BY:

RICHARD M. RAKER, CSR NO. 3445

00036

Q. Can you estimate -- or it sounds like it's going to be a very large number -- the number of external peer review matters you've worked on since 2001.

A. Well, as I said, we've reviewed thousands -- you know, several thousand records, and that was, you know, for hundreds of different engagements.

Q. And I guess -- what I was curious, when you say "we've" done that, do you mean Mercer has done that or you mean Neil Smithline, slash, StratiVision has done that?

A. Well, Mercer has done it and I manage the process.

Q. So is it fair to say that in the last, let's say, five years you have managed external reviews of hundreds of physicians?

A. Yes.

Q. Have you managed external reviews of other cardiac surgeons?

A. Many.

Q. Have you managed external reviews of cardiologists?

A. Many.

Q. The work you do on external reviews, is that always work you're doing for a hospital?

00043

right way to do external peer review?

MR. VANDALL: Objection; vague.

**THE WITNESS: Well, when we started this process again in 2002 or when the -- I shouldn't say started it again, but when we kind of took a fresh look at it, we hired Lucian Leape's group at the Harvard School of Public Health -- it's L-u-c-i-a-n, L-e-a-p-e -- to help us develop our methodology and our workshop worksheets that we use for cardiology and cardiac surgery.**

And so we consulted what we considered was the best authority in the country to help us evaluate our current methods and to refine them.

BY MR. EMBLIDGE:

Q. And Lucian Leape is someone you've felt was the best authority in the country on external peer review?

A. Yes.

Q. And when you say refine "our" methods, are you talking about Mercer's?

A. Mercer's, yes. Yes. The work I do with the intellectual capital is all Mercer's.

Q. And what was the outcome of your consultation with -- is it Dr. Leape?

A. Yes.

00065

MR. VANDALL: Objection; argumentative, vague, calls for speculation.

THE WITNESS: I don't think so. I mean, it goes both ways.

BY MR. EMBLIDGE:

Q. What do you mean?

A. Well, you know, sometimes they'll call us and say they think this guy's a problem and we'll say he's not after, you know, a final conclusion. So -- I mean --

Q. How often does that happen?

MR. VANDALL: Objection; incomplete hypothetical.

**THE WITNESS: I'd say about 20 to 30 percent.**

**BY MR. EMBLIDGE:**

**Q. So about 20 to 30 percent of the time, the conclusion of your final report is that there was no deviation from the standard of care?**

**MR. VANDALL: Objection; misstates the testimony.**

**THE WITNESS: Well, about 20, 30 percent of the time we don't think there is a substantial problem in the overall practice of that physician. That doesn't mean that there wasn't an instance here or there where the case didn't meet the standard of care.**

00320

A. No.

MR. EMBLIDGE: Thank you very much.

THE WITNESS: Thank you.

MR. VANDALL: I have a few comments.

First, I'd like to place on the record a reservation of the deponent's rights to make any changes to the transcript within the next thirty days.

Second, I'd like to ask the court reporter to designate the entire transcript as confidential under the parties' stipulated protective order and to mark all exhibits attached to the deposition transcript as confidential under the same order.

Is that okay with you, Mr. Emblidge?

MR. EMBLIDGE: That is totally far out.

MR. VANDALL: Great. I have a follow-up question for Dr. Smithline.

EXAMINATION

BY MR. VANDALL:

**Q. Dr. Smithline, at any time prior to May 3, 2005, were you aware of Dr. Ennix's race?**

**A. No.**

MR. VANDALL: Thank you. No more questions.

DR. ENNIX: Dr. Smithline, thank you for your

REPORTER'S CERTIFICATE

I, RICHARD M. RAKER, CSR #3445, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this 14th day of Fbruary, 2008.

______________________________

RICHARD M. RAKER, C.S.R. No. 3445

EXHIBIT D

00002

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D., )
)
Plaintiff, )
)
vs. ) Case No. C 07-2486 WHA
)
ALTA BATES SUMMIT MEDICAL )
CENTER, )
)
Defendant. )
______________________________)

C O N F I D E N T I A L

DEPOSITION OF LELAND B. HOUSMAN, M.D., F.A.C.S., F.A.C.C., taken at 7510 Hazard Center Drive, San Diego, California, on Wednesday, January 23, 2008, at 7:03 p.m., before R. Denise Marlow, Certified Shorthand Reporter, No. 11631 in and for the State of California.

00030
different way.

What I'd like to know is in the Ennix case you were presented with, I think, five charts or five cases. Right?

A Yes, sir.

Q And when you received those, did you know that the hospital had identified problems in all five of those cases?

MS. IMARA: Objection. Calls for speculation, lacks foundation.

THE WITNESS: Absolutely not. I didn't know anything about the hospital until this week when I got this.

BY MR. SWEET:

Q Okay. So what did you think the five charts were about? I mean --

MS. IMARA: Objection. It's vague and ambiguous.

THE WITNESS: Well, somewhere out in the great ether, somebody asked Mercer to look at some charts.

BY MR. SWEET:

**Q So I'm clear, your testimony is at no time before last week when you reviewed this May 5th, 2005, document, the Alta Bates Summit Medical Center Focus Review, May 3rd, 2005, at no point prior to your review**

00031

of that last week did you know that the hospital had identified problems in these five cases?

MS. IMARA: Objection. It's vague.

MR. BARTON: Yeah, and it does misstate and it is vague.

But you can answer the question.

THE WITNESS: That's correct. And just for clarification, I received this -- I remember correctly now. I received it Monday morning of this week.

BY MR. SWEET:

Q Okay. At any point before Monday morning, which was January 21st, 2008, did Neal Smithline communicate with you in any way that the hospital had concerns about the five cases you were reviewing?

MR. BARTON: Vague and uncertain.

But you can answer.

MS. IMARA: Objection. It's vague.

THE WITNESS: Could you read that back.

(Record read)

MS. IMARA: Objection. Also lacks foundation.

THE WITNESS: Yeah. I don't believe so.

BY MR. SWEET:

Q What about anybody else at Mercer? The same question: Did anybody at Mercer communicate with you that the hospital had concerns about these five cases?

00032

**A No, sir, and that's the nice thing about Mercer. We work in a vacuum. We don't know who sends the charts, who asks for them, why they ask for them. It's literally they arrive in a box. And also in that box is the electronic form, you know, to answer, and you answer it online. I think early on we had to return the form; now we can do it online. And so I had no idea that anyone else had reviewed it.**

Q As a Mercer reviewer, how many times have you rendered an opinion voicing your opinion that the physician did not fall below the standard of care in the cases you were reviewing?

MR. BARTON: It's vague.

MS. IMARA: Objection. It's vague and ambiguous.

THE WITNESS: If I understand the question, I'll try and answer it in charts. If they send me five or ten charts to review of a physician, it's not uncommon until this case to find, you know, maybe four or five of them that were fine or that I didn't find any problem with. So that's not uncommon.

BY MR. SWEET:

Q Are you saying that this is the only case that you've done work for Mercer where you found problems or errors in all five cases, all the cases they sent you?

00131

allow some very limited follow-up by plaintiff's counsel, but that's it. So -- and then you guys can discuss it with the judge and work it out between yourselves.

MR. SWEET: That sounds fine. Just to complete the record, there was never a discussion about how the three hours would be split, nor did defendant indicate they wanted to reserve any of the time to ask questions. So let's have the questions and see where it leads us, given all these different statements.

MR. BARTON: Fair enough.

EXAMINATION

BY MS. IMARA:

**Q Dr. Housman, at the time that you reviewed the medical records concerning Dr. Ennix and submitted your online evaluations, did you know the race of Dr. Ennix?**

**A No.**

**Q And did you at some point after you submitted your online evaluation become aware of what Dr. Ennix's race is?**

**A I think only very recently.**

**Q Can you approximate when you learned what Dr. Ennix's race is?**

**A When the -- I received the information that it**

00132

**was a case that was going to involve violation of civil rights. I asked about it, what that meant, and they told me that he was -- I don't know exactly but that he felt because he was African-American that his civil rights had been violated.**

MS. IMARA: I don't have any further questions.

MR. SWEET: I'm fine with those. I have no questions.

MS. IMARA: I have a couple of housekeeping issues. I wanted to ask on the record that the transcript be designated as confidential under the confidentiality stipulation and protective order.

MR. SWEET: That's fine.

MR. BARTON: So stipulated.

MS. IMARA: And also wanted to ask that Dr. Housman be given 30 days under Federal Rule of Civil Procedure 30 to review the transcript and make any changes.

MR. SWEET: No objection there.

MR. BARTON: None here.

With that I think we are concluded.

MR. SWEET: I think we're, quote/unquote, done.

(Deposition concluded at 10:19 p.m.)

* * *

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN DIEGO )

I, R. Denise Marlow, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR 11631 issued by the Court Reporters Board of California and which is in full force and effect. (Fed. R. Civ. P. 28(a)).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. (Fed. R. Civ. P. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

/ / /

BARKLEY

of the testimony given by the witness. (Fed. R. Civ. P. 30(f)(1)).

Before completion of the deposition, review of the transcript [XX ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

Dated: February 4, 2008

P. Denise Marlena

BARKLEY

EXHIBIT E





SUMMIT

# VERIFICATION OF CONSENT FOR CORONARY INTERVENTION

Your physician has recommended a procedure to open up one or more of your coronary arteries, which are now blocked. Your doctor should have already explained how this coronary intervention procedure works. To make sure you understand the issues your doctor has discussed with you, this form reviews the procedure and its effects.

The coronary intervention called "angioplasty" may use a balloon, a laser, various mechanical devices, or a combination of these things to open the arteries. During the procedure, small catheters will be placed inside the coronary arteries and these tubes will be used for access during the unblocking procedure. A device known as a "stent" may be placed in the artery to hold the artery open. While undergoing coronary intervention, patients often experience angina, but it usually stops at the end of the procedure.

Complications of the procedure can include heart attack, stroke, life threatening cardiac irregularities, and even death. Blockage can also occur in the leg or arm artery where the catheter is placed. Bleeding may occur, and in rare cases, a blood transfusion may be needed. (This possibility is considered "less than a reasonable possibility" for the purpose of the Paul Gann Blood Safety Act.) Rarely, a surgical procedure may be required to treat complications.

During the procedure medications may be given to relax you and reduce discomfort; this is called "conscious sedation." Conscious sedation has a small risk that you could stop breathing during the procedure. You will be carefully monitored.

The alternatives to coronary intervention are continued medical therapy and coronary bypass surgery. Each of these options has its own risks and benefits and you should discuss these with your physician.

By signing below, you will indicate that you understand the nature of the coronary intervention procedure, that you are aware of its risks, and that you understand the alternatives. Your signature confirms that you are consenting to having coronary intervention performed. If you have second thoughts about having the procedure, do not sign this form. Ask to discuss your options further with your physician.

REDACTED

(Patient Signature) (Date)

REDACTED

(Witness Signature) (Date)

96-2000-6 (7/00)

CONFIDENTIAL

EXHIBIT F

**EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL**

**ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order**

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician A** (Dept of Family Practice) | 1995 | Behavioral issues (inappropriate language & treatment of others); questionable prescription practices; substance abuse investigation; appointment of AHC[6] (review included all clinical patient files and concerned poor documentation re discharge notes); Review by Officers and MEC; Medical Board investigation.[7] | Thomas P. Forde, M.D., Pres. Medical Staff. Robert Beallo, M.D., AHC Chair. | Interim voluntary suspension of all privileges (lasting approximately 1.5 months); supervision of physician by AHC. | Physician agreed to temporary suspension of all privileges pending investigation by the AHC and MEC; physician returned to full privileges following investigation; 805 report[8] filed. | None required. | No | Caucasian |

[1] These dates are approximate.

[2] Corrective action taken relative to a failure to keep medical records current is excluded from this chart.

[3] This is not a complete listing of all involved in the peer review, but rather identifies the President of the Medical Staff at the relevant time and others with major involvement. The identity of the physician members of the Medical Executive Committee for the Summit Medical Staff during the January 1, 2004 through July 31, 2006 time period are also provided herewith at pages 12-14.

[4] This column includes a member's voluntary actions including acceptance of restrictions or proctoring.

[5] The Medical Staff does not keep statistics re race; the information in this column is the best "guess" of the person verifying the interrogatory responses.

[6] "AHC" refers to an Ad Hoc Committee appointed to conduct an investigation.

[7] Medical Board investigation means an investigation conducted by the Medical Board of the State of California which investigation was considered in taking corrective action by the MEC. Medical Board investigations initiated solely in response to a Section 805 report (see note 8) are not reported.

[8] "805 report" refers to the reporting required by section 805 of the California Business & Professions Code ("Section 805").

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL

**ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order**

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician B** (OB/Gyn) | 1992-1995 | Medical record keeping problems (including missing records, delayed dictation of essential documents); Consent Form Issues; Late for Procedures; Patient Care/ Safety Issues (including diagnoses and treatment plans, selection of procedures and techniques and clinical judgment regarding matters such as blood transfusions; poor outcomes involving return to surgery); Review by Officers and MEC; AHC appointed to investigate; Medical Board investigation. | Thomas Forde, M.D., Pres. Medical Staff; Goldee Gross, M.D., Chair AHC; Elijah Carter, M.D., Dept. Chair. | 13-day summary suspension; monitoring; required full compliance with operative report dictation requirements; warning. | Corrective actions taken including monitoring of delinquent operative reports. 805 report filed. | None Required | No | African American |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL

ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician C** (Dept of Medicine) | 1995-1996 | Patient Care/Safety; Behavioral Issues (unprofessional conduct and false statements; falsifying medical records; poor documentation; unwilling to acknowledge professional shortcomings); Investigation by Officers and MEC;. Investigation by Medicine Quality Assurance Committee acting as AHC; Medical Board investigation. | Thomas P. Forde, M.D., Pres., Medical Staff; Lawrence I. Schwartz, M.D., Chair of the Dept. of Medicine & AHC Chair | Summary suspension by Chair of Dept.; Suspension continued by the MEC pending completion of AHC investigation; Suspension from 11/17/95 through 07/06 when privileges lapsed and physician did not seek reappointment following MEC recommendation to deny such application. | Revocation of Medical Staff membership and clinical privileges. 805 reports issued. | Physician sought a hearing and agreed to postpone it. Physician waived right to hearing by not seeking reappointmen t and not pursuing hearing rights; Physician agreed not to seek future affiliation with Summit Medical Center. | No | Asian |
| **Physician D** (Orthopedic ırgery) | 1998-1999 | Patient care/safety, dishonesty and falsifying medical records. Medical Board investigation; licensure restrictions imposed by Medical Board which required surgical proctoring; MEC investigation; Physician admitted allegations against him. | Lawrence Schwartz, M.D., Pres. Medical Staff. | Surgical proctoring restrictions mandated by Medical Board were imposed; Physician asked by MEC to respond to issues raised by the Medical Board's Accusation; Physician refused to respond; MEC recommended termination of Medical Staff membership for failure to respond to MEC investigation. | Privileges were terminated for failure to respond to MEC investigation and following physician's admissions of allegations contained in Medical Board's Accusation. 805 reports filed. | Physician waived right to hearing by failing to respond to MEC investigation. | No | African-Americar |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL

ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician E** (Surgery (ENT)) | 2001-2002 | Patient care/safety issues (including complications from surgeries and delay in responding to calls concerning post-surgical care). Review by Officers and MEC; Appointment of AHC (which reviewed cases previously reviewed at the department level by the Surgery Peer Review Committee (involving surgical complications leading to a life-threatening situation and refusing to respond to emergency call); Medical Board investigation; Evaluation by neuro-psychologist conducted. | Samuel Dong, M.D. Pres. Medical Staff; Bruce Moorstein, M.D., Chair, Dept. of Surgery and Chair of AHC. | Summary restriction of certain privileges by Dept. (restrictions included privileges for sleep apnea procedures; tracheal/pharyngeal procedures; oral pharyngeal procedures and any procedures involving the potential for a difficult airway management issue); MEC imposed summary suspension of all privileges. | Voluntary relinquishment of certain privileges; 805 report filed. | Physician waived right to hearing through voluntary relinquishment of certain privileges. | No | African-American |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL

**ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order**

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician F** (Anesthesia) | 2003 | Patient care/safety issues (concerning concentration and vigilance affecting ability to provide safe patient care); falsification of medical records. Review by Officers and MEC; Appointment of AHC (which reviewed cases previously reviewed at the department level); Medical Board investigation. | Annette Shaieb, M.D. President Medical Staff; John Donovan, M.D., Chair, Dept. of Anesthesia; Lawrence Schwartz, M.D., Chair of AHC; Dat Ly, M.D. Chair Anesthesia PRC; Brian Hite, M.D., Acting Chair, Anesthesia PRC. | Summary suspension by Dept Chair (lifted after approximately 1.5 weeks by MEC); 100% prospective review of cases; 100% monitoring and proctoring of all aspects of physician's practice imposed in lieu of ongoing suspension. | Physician resigned from Medical Staff. 805 reports filed. | Hearing requested; Physician waived hearing rights upon resignation. | No | Caucasian |
| **Physician G** (Orthopedic Surgery) | 2001 | Violation of Bylaws and Medical Staff Rules and Regulations. Review by MEC and Officers. | Samuel Dong, M.D., Pres. Medical Staff; Mathias Masem, M.D., Chair, Orthopedic PRC. | Letter of Reprimand | Received Letter of Reprimand | None Required | No | Caucasian |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL

ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician G** (Orthopedic Surgery) | 2004 | Violation of Bylaws and Medical Staff Rules and Regulations; Falsification of medical records. Review of charting; Investigation by Officers and MEC. | Annette Shaieb, M.D., Pres. Medical Staff; Samuel Dong, M.D., William Isenberg, M.D., successor Pres., Medical Staff; John Warbritton, III., M.D. (Chair of the Orthopedic Surgery Dept.). | All privileges initially suspended for 29 days. Physician required to complete a report detailing how conduct would change (suspension was continued for an additional 30 days when physician failed to submit a timely report); Physician restricted from supervising surgical assistants for 3 months (allowed only to supervise AHPs as assistants in the OR, and not as providers of post-op or other hospital care); restricted from sponsoring students visiting the hospital; Physician's block time in the OR confined to a single Room (instead of two rooms normally allocated on Mondays); Required physician to attend a course on professional ethics; Prospective review of medical records. | Privileges were suspended from 1/23/04 through 3/9/04; Physician drafted action plan; physician did not supervise surgical assistants for three months; Limit on O.R. rooms imposed; Physician did not sponsor visiting students at the hospital. 805 report filed. | Physician waived hearing rights by accepting the corrective action plan. | No | Caucasian |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE
SUPPLEMENTAL
ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician H** (Surgery) | 2001-2003 | Patient care/safety issues (including informed consent, not following protocol, failure to respond in timely manner re patient management; poor documentation re indications for surgeries, pre-operative work-ups, surgical procedures, false or misleading entries in medical records) Investigation by Officers and MEC; Investigation by Institutional Review Board ("IRB"); Appointment of AHC; Outside reviewer obtained following deptl. review which initially refrained from recommending corrective action (in 12/01); Medical Board investigation. | Annette Shaieb, M.D., Pres. Medical Staff; John Salzman, M.D., Chair, IRB; Bruce Moorstein, M.D., Chair Dept. of Surgery; Richard J. Kerbavaz, M.D., Chair, Ad Hoc Investigatory Committee. | Surgery PRC focused review; Summary suspension of clinical privileges; Rejection of request for proctoring or lesser privileges in lieu of suspension; Revocation of Medical Staff membership and clinical privileges. | Physician resigned from Medical Staff. 805 reports filed. | Hearing commenced; physician resignation mooted hearing. | Yes – Outside review was not conducted by National Medical Audit | Non African-American |

**Entire Page Highlighted**

-7-

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE
SUPPLEMENTAL
ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician I** (Dept of Medicine / Psychiatry) | 2003 | Medical Board Investigation resulted in Investigation by Officers and MEC and outside review; Patient Care/Safety issues (including the overuse of medication (number of drugs and doses); inadequate initial assessment and lack of medical rationale for decisions; lack of informed consent for medications and treatment); documentation issues including potential back-dating of progress notes. | Annette Shaieb, M.D., Pres., Medical Staff. | Summary Suspension; Suspension continued pending exhaustion or waiver of hearing rights; Denial of application for reappointment; Proctoring recommended but physician failed to select a proctor. | Physician resigned from Medical Staff. 805 report filed. | Physician waived hearing rights by resigning from Medical Staff. | Yes – Outside review conducted by National Medical Audit | Asian |
| **Physician J** (Ob-Gyn) | 1999-2002 | Behavioral issues; involvement of Medical Group (which provided for administrative leave on one occasion); review by Officers and MEC. | Lawrence Schwartz, M.D., Annette Shaeib, M.D., Samuel Dong, M.D. (all Medical Staff Officers); William Isenberg, M.D., Ph.D., dept. chair, successor President. | 13 day suspension; warning; required anger management counseling. | Physician requested relief from 13 day suspension; it was denied; Physician underwent counseling; received written warning. | None required. | No | Caucasian |

**Entire Page Highlighted**

-8-

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE
SUPPLEMENTAL
**ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order**

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician K** (Orthopedic surgery) | 2002 | Behavioral issues (inappropriate language and treatment of others; dishonesty concerning hospital resources); review by Officers and MEC. | Annette Shaeib, Pres. Medical Staff; Samuel Dong, M.D., Medical Staff Officer; Mathias Masem, M.D., Chair Dept of Orthopedic Surgery. | Letter of Reprimand. | Received by Physician. | None required. | No | Caucasian |
| **Physician L** (Anesthesia) | 2006 | Patient Care, Safety Issues; review by Officers and MEC; involvement by physician's medical group; evaluation by an expert concerning potential medical causes of physician's actions. | Fredric Herskowitz, M.D., Pres. Medical Staff. | Physician removed self voluntarily from service pending medical evaluation; Situation monitored by the MEC. | Return to work following the investigation and medical evaluation; monitoring by medical group; warning. | None required. | No | Caucasian |
| **Physician M** ('Orthopedic .rgery) | 2007 | Violation of Medical Staff Rules by allowing a physician to participate in a surgical procedure without clinical privileges; review by MEC. | Fredric Herskowitz, M.D., Pres. Medical Staff. | Letter of admonishment. | Letter sent to physician. | None Required. | No | Caucasian |
| **Physician N** (Orthopedic Surgery) | 2007 | Violation of Medical Staff Rules by allowing a physician to participate in a surgical procedure without clinical privileges; review by MEC. | Fredric Herskowitz, M.D., Pres. Medical Staff. | Letter of admonishment. | Letter sent to physician. | None Required. | No | Caucasian |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL

ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician O** (Cardiology Dept.) | 1992-1994 | Patient care/safety issues (including clinical judgment errors and/or overly aggressive treatment protocols resulting in or contributing to multiple patient deaths), documentation issues; review by Officers and MEC; Appointment of Outside reviewer obtained following departmental review; Appointment of and Review by AHC; Medical Board investigation. | Joseph B. Marzouk, M.D., Pres. Medical Staff; Thomas P. Forde, M.D., successor Pres.; William R. DeWolf, M.D., Chair, Dept. of Medicine; Earl Holloway, Chair, Division of Cardiology. | Summary suspension restricting privileges to perform certain procedures (angioplasties, diagnostic catheterizations and stress testing of any type); Summary suspension continued for one year; Physician required to complete 3 month remedial education program while on leave of absence; 100% monitoring and proctoring imposed (including advanced approvals/authorizations for procedures, observation, and retrospective review following completion of education program. | 805 reports filed; Physician voluntarily accepted restrictions and subsequently resigned from Medical Staff to pursue opportunities in another state. | Hearing requested; Physician waived hearing rights by accepting restrictions. | Yes – Outside review was not conducted by National Medical Audit | Caucasian |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE SUPPLEMENTAL

ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

| Physician Designation and Medical Staff Department | Period of Investigation Under MEC or Medical Staff President's Auspices[1] | Category of Issue Raised[2]; Description of Investigation | President of Medical Staff and others primarily involved in the review[3] | Corrective Action by MEC[4] | Outcome | Hearing Under Bylaws? | Outside Peer Review? | Race[5] |
|---|---|---|---|---|---|---|---|---|
| **Physician P** (Dept. of Family Practice) | 1992-1993 | Matter inherited by the MEC of the Summit Medical Center which investigated termination recommendation based upon: (1) inability to follow logical course of management of patient care; (2) lack of documentation resulting in insufficient assessment and misdiagnosis; (3) inappropriate admissions; (4) inconsistent discharge medications; (5) inappropriate use of consultations. Review by Officers and MEC. Review by AHC | Joseph Marzouk, M.D., President Medical Staff; Leatrice Chang, M.D., Chair, Dept. of Family Practice; Alan Steinbach, M.D., Hiroshi Terashima, M.D., and Vernon Williams, M.D., Members of the AHC (no individual Chair). | Proctoring of all Physician's admissions during review period. | Peer review revealed adequate evaluations and recommendations, adequate participation in patient management Improvement in Physician's overall practice was noted and no further corrective action was taken. Physician remains on Staff at the Summit Medical Center. | None required. | No | Asian |

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE
SUPPLEMENTAL
ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

The following individuals where physician members of the Medical Executive Committee for the Summit Medical Staff during the January 1, 2004 though July 31, 2006 time period:

1.

| Summit Medical Center Medical Executive Committee<br>As of June 30, 2004 | |
|---|---|
| Members | Title |
| Physician Members | |
| Donovan, John F., M.D. | Anesthesia Chair |
| Herskowitz, Fredric N., M.D. | Vice-President |
| Isenberg, William, M., M.D. | President |
| Iverson, Leigh I., M.D. | Surgery Member-at-Large |
| Komarmy, Louis E., M.D. | Pathology Representative |
| Moorstein, Bruce D., M.D. | Secretary Treasurer |
| Murray, Todd I., M.D. | ED Chair |
| Perry, Rod W., M.D. | Medicine Chair |
| Rich, Phillip, M.D. | Diagnostic Imaging Representative |
| Saunders, James R., M.D. | Medicine Member |
| Shaieb, Annette M., M.D. | Past President |
| Stanten, Steven A., M.D. | Surgery Chair |
| Sykes, Susan C., M.D. | OB/GYN Chair |
| Usem, Michael N., M.D. | Pediatrics Chair |
| Warbritton, John D. III, M.D. | Orthopedics Chair |
| Yee, Lisa W., M.D. | Family Practice Chair |

-12-

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE
SUPPLEMENTAL
ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

2.

| Summit Medical Center Medical Executive Committee<br>February 8, 2005 | |
|---|---|
| Members | Title |
| Physician Members | |
| Donovan, John F., M.D. | Anesthesia Chair |
| Gross, Goldee H., M.D. | OB/GYN Chair |
| Herskowitz, Fredric N., M.D. | Vice-President |
| Isenberg, William, M., M.D. | President |
| Iverson, Leigh I., M.D. | Surgery Member-at-Large |
| Komarmy, Louis E., M.D. | Pathology Representative |
| Moorstein, Bruce D., M.D. | Secretary Treasurer |
| Murray, Todd I., M.D. | ED Chair |
| Perry, Rod W., M.D. | Medicine Chair |
| Rich, Phillip, M.D. | Diagnostic Imaging Representative |
| Saunders, James R., M.D. | Medicine Member |
| Shaieb, Annette M., M.D. | Past President |
| Stanten, Steven A., M.D. | Surgery Chair |
| Warbritton, John D. III, M.D. | Orthopedics Chair |
| Yee, Lisa W., M.D. | Family Practice Chair |

**Entire Page Highlighted**

-13-

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE

**SUPPLEMENTAL**

**ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order**

3.

| Summit Medical Center Medical Executive Committee<br>February 2, 2006 | |
|---|---|
| Members | Title |
| Physician Members | |
| Chafen, Less T., M.D. | Radiology Representative |
| Daugharty, Maire C., M.D. | Anesthesia Chair |
| Drury, Bernard J., M.D. | Surgery Member-at-Large |
| Gross, Goldee H., M.D. | OB/GYN Chair |
| Herskowitz, Fredric N., M.D. | President |
| Isenberg, William, M., M.D. | Past President |
| Kim, Michael, M.D. | Secretary Treasurer |
| McMillan, Eugene, M.D. | Medicine Member-at-Large |
| Murray, Todd I., M.D. | ED Chair |
| Perry, Rod W., M.D. | Medicine Chair |
| Rich, Phillip, M.D. | Vice President |
| Shaieb, Annette M., M.D. | Pathology Representative |
| Stanten, Steven A., M.D. | Surgery Chair |
| Warbritton, John D. III, M.D. | Orthopedics Chair |
| Yee, Lisa W., M.D. | Family Practice Chair |

**Entire Page Highlighted**

**EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE**
**SUPPLEMENTAL**
**ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order**

**VERIFICATION**

I, Joanne Jellin, PsyD., provide this verification of Exhibit A to Defendant's Responses to Plaintiff's Special Interrogatories, Set One, Supplemental, in my capacity as Director of Medical Staff Services for the Summit Medical Staff Office. In such capacity, I oversee the retention of records relating to peer review conducted by the Summit Medical Staff. I verify that the information contained in the attached Exhibit A (Supplemental) is true and correct either as a matter of my personal knowledge or as taken from records maintained by my office, or from information compiled by my office. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 6, 2007, in Oakland, California.

JOANNE JELLIN, PsyD.

4851-0966-7074.1

**Entire Page Highlighted**

EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE
SUPPLEMENTAL
ATTORNEYS' EYES ONLY Subject to Confidentiality Stipulation and Protective Order

**PROOF OF SERVICE BY MAIL**

I am a citizen of the United States and employed in San Francisco County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is One Post Street, Suite 2600, San Francisco, California 94104. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. On **December 6, 2007** I placed with this firm at the above address for deposit with the United States Postal Service a true and correct copy of the within documents:

> **EXHIBIT A TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE (SUPPLEMENTAL - ATTORNEYS' EYES ONLY - Subject to Confidentiality Stipulation and Protective Order)**

in a sealed envelope, postage fully paid, addressed as follows:

> **G. Scott Emblidge, Esq.**
> **Moscone, Emblidge & Quadra, LLP**
> **220 Montgomery Street, Suite 2100**
> **San Francisco, CA 94104**

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on **December 6, 2007** at San Francisco, California.

JANICE TASISTA

-16-

**Entire Page Highlighted**

EXHIBIT G

00001

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D., as )
an individual and in his )
representative capacity under )
Business and Professions Code )
Section 17200, et seq., )
)
Plaintiff, )
vs. ) Case No: 07-2486
)
RUSSELL D. STANTEN, M.D., LEIGH )
I.G. IVERSON, M.D., STEVEN A. )
STANTEN, M.D., WILLIAM M. )
ISENBERG, M.D., Ph.D., ALTA BATES )
SUMMIT MEDICAL CENTER, DOES 1 )
through 100, inclusive, )
)
Defendants. )
______________________________)

**TRANSCRIPT MARKED CONFIDENTIAL**

DEPOSITION OF BRUCE REITZ, M.D.

VOLUME I, Pages 1 to 128

Monday, December 3, 2007

9:30 a.m.

Stanford Hospital
300 Pasteur Drive
Palo Alto, California

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By: Linda Vaccarezza, CRP, RPR, CSR #10201

00036

A I can't recall.

Q Dr. Ennix was not present; is that right?

A That is correct.

Q Let's look at Exhibit 4, please; your dictated report. There are some handwritten notations on this document, which I represent to you that I got from a subpoena addressed to Mr. Etchevers law firm.

Can you tell me in whose handwriting those changes are?

A No.

Q It's not you, your handwriting?

A That's right.

Q If we look at Exhibit 4 and compare it to Exhibit 5, would you agree with me that you softened your criticisms of Dr. Ennix at the suggestion of Mr. Etchevers?

A I would have to go through it paragraph by paragraph to answer that question.

Q Fair enough. Let's look at some of the paragraphs.

Turning to page 4 of the August 30, 2005 draft, and looking at the second full paragraph on **page 4. Is it correct that you had initially drafted a paragraph saying that your review of the minimally invasive cases created in your mind concerns about the**

00037

**lack of training on the part of Dr. Ennix, perhaps, and on the part of the teams that were engaging in the surgery?**

A Yes.

Q You will see that that paragraph is eliminated from your final report; is there a reason for that?

A I don't know exactly the reason, but a lot of -- perhaps my unfamiliarity with the rest of the record may have been a factor, together with a -- a -- I would interpret a kind of wording or a content that is more in keeping with a legal document, so to speak.

Q When you say your unfamiliarity with the rest of the record, what are you referencing?

A Well, a lot of other information, as I suggest, about the other aspects of the care of these patients with respect to the team.

In all of the records, it would seem that many of the issues raised could be discussed with other members of the team. For example, a cardiologist referring a case to Dr. Ennix, with Dr. Ennix taking responsibility for decisions being made when, obviously, the cardiologist had a big input into the decision being made. And that isn't part of the record, or there's no evidence that that was taken

00041

than a regular sternotomy?

A Yes.

**Q Are you telling us that you -- that you don't now agree with the sentence you wrote in August of 2005?**

**A No. I think that concerns about training of the OR team and Dr. Ennix's own training still stand.** It's just that I cannot, as I sit here today, make an informed opinion about was Dr. Ennix's training adequate or was the OR team trained. I just don't know that, and I didn't know that at that time either. And so that's why I raised that concern.

Q Why did you write it if you didn't have any information about it?

A Part of my review.

Q Would you agree with me that you would expect the introduction of a new procedure, that is, a limited incision with a different view than a sternotomy would produce, was a procedure that should have been discussed with the anesthesiologist and the rest of the OR team before it happened?

A I would think so.

Q Would you agree with me that there should be some dry runs, some training in that regard?

A Not necessarily. I think the discussion is

00051

A Well --

Q Or are you not able to opine with regard to that?

A Yeah. That's -- there are many variations of technique. And is my particular technique used by the majority? I would say no. But I would say that the general principles that I use are used by the majority of surgeons.

**Q Let's look at Case Number 1, if we can, please, in your initial draft.**

**A (Witness complies.)**

**Q This was an aortic valve replacement, correct?**

**A Yes.**

**Q You say, in the last paragraph on page 2 of Exhibit 4, "I do have concerns about the length of time of this operation, which is excessive."**

**Do you see that criticism anywhere in the final report?**

**A No.**

Q Why did you remove that criticism or that concern?

A I think, because there was no documentation, that there had been a damage of the heart.

Q This was a return to surgery, wasn't it?

00053

BY MS. MCCLAIN:

Q You say here, "I do have concerns about the length of time of this operation, which is excessive."

What were your concerns?

A Well, it must have been about the total time of the operation. And, again, I don't have that information in front of me.

Q It was ten hours and six minutes in the OR; the surgery took seven hours and 31 minutes; the pump time was three hours and 54 minutes; and the cross-clamp time was two hours and 51 minutes.

A Those are all times that are longer than I would have thought would be necessary for this operation.

**Q Your next sentence on your draft that you dictated to Mr. Etchevers' firm is, "The operation report is scanty at best and does not go into the details of why the procedure took so much time."**

**Does that refresh your recollection as to whether there were criticisms both of the adequacy of the OR reports as well as the adequacy of consent?**

**A Okay. In this particular case, that may have been an issue. Again, I would have to go back and look at them. I did not -- as I sit here today, I don't have the gestalt feeling that all of the**

00054

**operation reports that I reviewed were scant and inadequate, to use your term.**

**Q Scanty is your term, Dr. Reitz.**

**A Yeah.**

**MR. SWEET: Objection. Argumentative.**

**BY MS. MCCLAIN:**

**Q Does that sentence appear in your final report?**

**A No.**

**Q Why did you omit that sentence?**

**A I don't recall.**

Q The second paragraph of your draft discussion of Case Number 1 says, "A 27 millimeter valve is actually a large valve and by itself should have a small gradient. If it is being forced into an opening that is too small, perhaps the struts of the valve are being pushed forward causing some obstruction, and also accounting for a failure of coopitation of a leaflets in giving regurgitation."

Do you see that?

A "This is speculation."

Q Your paragraph ends with "this is speculation." Do you see the language that I just read to you?

A Yes.

00062

A Case Number 1, page 2.

Q Page 3.

A Page 3. I guess, again, this is removed, and I can't say exactly why.

Q The NMA report that you were reviewing found significant issues with respect to Dr. Ennix's operating notes and the deficiencies in them, correct?

A I haven't reviewed that report recently. But I think you're right, they had concerns about everything.

MS. MCCLAIN: May I have this marked as next in order, please?

(Exhibit 7 was marked for identification.)

THE WITNESS: Okay.

BY MS. MCCLAIN:

**Q This is the operating report from the first operation of Case Number 1. Looking at that operating report prepared by Dr. Ennix, do you agree with the statement you made in your August 30, 2005 transcription that the operation report is scanty at best?**

**A I guess that remark relates to the fact that it sounds, from the operation report, as if it was a fairly straightforward procedure that I would have thought could have been accomplished in less time than**

00063

it was. And I would have to have the perfusion record or the anesthesia record, or maybe you've already given it to me at some time earlier, that would have raised this question in my mine.

Do you have that?

Q I can give you the times, again, yes.

A Yeah.

Q The operating room time was ten hours and six minutes; the surgery time was seven hours and 31 minutes; the pump time was three hours and 54 minutes; and the cross-clamp time was two hours and 51 minutes.

A Well, it's longer than I would have thought would be required. But is it out of the standard of care? I don't know. It's hard for me to judge.

Q My only question, Dr. Reitz, was, looking at this report and hearing those times, do you agree with what you wrote in August of 2005, that the operation report is scanty at best?

A Well, it's actually not a bad operation report. But it is the bare bones of what would have to be dictated. So I guess that's why I said "scanty at best."

Q Do you agree or disagree with that statement today?

A Yeah, I think so. I agree with it.

00068

caused the need to return to surgery?

A No. It isn't clear what the findings are that might have explained the difficulties. So I can't -- I do find that to be a problem or it may -- I don't know. It's an inadequacy, that's for sure.

Q It is an inadequacy in this operating report?

A In this dictation, yes.

**Q If you look at your September second final report, Dr. Rietz, and in particular the third page at the very top, there's a sentence that says, "What is of import is that Dr. Ennix promptly recognized the leak and corrected it by replacement with a 25 millimeter valve."**

**A Yes.**

**Q That is a sentence that does not appear in your dictated report of August 30, correct?**

**A Correct.**

Q Why did you add that sentence?

A I think that goes to what is the crux of the situation here. That if a patient has a -- is doing poorly and the problem has been identified, that the important thing is that it be taken care of in a timely manner. So I have no problem with adding that sentence.

Q Who suggested that you add that sentence?

00068

caused the need to return to surgery?

A No. It isn't clear what the findings are that might have explained the difficulties. So I can't -- I do find that to be a problem or it may -- I don't know. It's an inadequacy, that's for sure.

Q It is an inadequacy in this operating report?

A In this dictation, yes.

Q If you look at your September second final report, Dr. Rietz, and in particular the third page at the very top, there's a sentence that says, "What is of import is that Dr. Ennix promptly recognized the leak and corrected it by replacement with a 25 millimeter valve."

A Yes.

Q That is a sentence that does not appear in your dictated report of August 30, correct?

A Correct.

Q Why did you add that sentence?

A I think that goes to what is the crux of the situation here. That if a patient has a -- is doing poorly and the problem has been identified, that the important thing is that it be taken care of in a timely manner. So I have no problem with adding that sentence.

**Q Who suggested that you add that sentence?**

00069

**A Probably Mr. Etchevers.**

**Q Do you have any factual knowledge that Dr. Ennix recognized the leak?**

**A Other than the records I reviewed and I guess the timing, no.**

**Q Do you know whether or not that was apparent from the records or whether that's something that Mr. Etchevers represented to you?**

**A I don't know the answer to that, as I sit here today, without the records in front of me.**

Q Would you retract that sentence if it turned out to be the case that it was the cardiologist who recognized the leak and not Dr. Ennix?

MR. SWEET: Objection. Calls for speculation.

THE WITNESS: No.

BY MS. MCCLAIN:

Q Would you be at all concerned to see a record where a cardiologist wrote five notes documenting a worsened condition between January 30 and January 31st without any notes from Dr. Ennix?

MR. SWEET: Objection. Vague.

THE WITNESS: Would I be concerned?

BY MS. MCCLAIN:

Q Yes.

A I would be curious.

00073

MR. SWEET: Objection. Vague as to "minimally invasive" and what you mean.

MS. MCCLAIN: The minimally invasive procedure we are talking about.

Q You read the operating report?

A Well, yeah, it's different than the standard procedure. It's not in a whole spectrum of what can be minimally invasive. It's toward the end of being less radical, let's say. But it is different, yes.

Q So you would expect something of a learning curve, but certainly not to the extent of -- of the duration of the first operation, correct?

A That's a speculation I can't make.

**Q If you turn to the final report that you signed, Exhibit 5, you see on page 2, under "Informed Consent," that you had signed a report that says, "The critique of NMA that Dr. Ennix's documentation of risk discussions is substandard, is definitely specious."**

**Is "specious" a term suggested by Mr. Etchevers?**

**A Probably. I don't think that I use that word very often. But it's possible.**

**Q Your initial dictated report says that "the documentation of consent in Dr. Ennix's patient records could certainly be improved," correct?**

00076

and that's why I was assuming I had seen some kind of report from the ad hoc committee, but I may not have. I don't know. As I sit here today, I don't know the answer to that.

Q Your reference being to the first paragraph of Exhibit 5; is that right?

A Yes.

Q Which would suggest to you that you had seen it?

A Right.

Q But you have no current recollection one way or the other; is that right?

A Right.

Q Looking at Case Number 1, just for a brief further moment. Would you have chosen a schizophrenic with significant history of psychiatric hospitalization to do your first minimally invasive procedure, as described in the operating report?

MR. SWEET: Objection. Lacks foundation, it's vague.

THE WITNESS: I don't know.

BY MS. MCCLAIN:

**Q Turning to Case Number 2, please. You say, in your August 30, 2005 dictated report, in the last paragraph, "The extreme length of this operation is a**

00077

**concern, as is the blood product usage."**

**Does that language appear in the final report?**

**A No.**

**Q In fact, the final report attempts to defend the prolonged surgery time, correct?**

**A Yes.**

**Q Do you agree with that?**

**A Yes.**

**Q Because it was a new procedure with a learning curve?**

**A The -- this particular case, again -- I'm trying to remember some of the specifics of it.**

**Q Is it correct that you attempted to defend the length of this procedure by referencing the fact that it was one of the first minimally invasive cases, and --**

**A Yeah. I accepted that assertion. Yes.**

**Q Who made that assertion?**

**A I think it was probably suggested by Mr. Etchevers.**

Q You go on to say, in your final report, "In any event, this issue is moot since Dr. Ennix has voluntarily agreed not to perform such minimally invasive procedures."

00082

with the patient, mobility of the patient. How active they are.

And you make a decision -- the basic question is: Do you accept what the patient has in terms of the aortic annulus or do you modify the procedure to enlarge the annulus, which has its own set of issues, which would prolong the aortic cross-clamp time and prolong the operation and introduce new potential complications.

It's all about -- it's factored into your judgment, and into my judgment when I make that decision.

**Q In this case the operating room time was 14.8 hours; the surgery time was ten hours and 14 minutes; the pump time was five hours and eight minutes; and the cross-clamp time was three hours and 39 minutes.**

**Did those times support the sentence, that appeared in your initial report but not in your final report, that the extreme length of this operation is a concern?**

**A Yes.**

Q When you say, "It depends on whether it is an isolated valve procedure or other things are going on," what do you mean by that? How does that affect the choice of the valve size?

00090

A As a hypothetical?

Q As a matter of good practice?

A I do not know the answer to that. Because it's not a simple question.

Q Have you ever gone to a patient and asked them to provide a letter of support for a peer review process for yourself?

A No.

Q Have you ever seen that happen, in your years of peer review?

A Well, not that I'm aware of.

Q In Case Number 3 -- by the way, do you have any knowledge that Case Number 3 is now the topic of a malpractice lawsuit?

A No.

**Q In Case Number 3 you have written in your transcription, or you dictated in your transcription, "The operative report should have had more data to explain the length of the procedure and the intra-operative management."**

**Was that a true statement when you wrote it?**

**A Yes.**

**Q Is that sentence in your final report?**

**A No.**

**Q Why did you omit that sentence?**

**A I think it's probably -- no, I don't know why that is.**

Q You agree with the NMA reviewer that "the regurgitation of a mosaic tissue valve is probably due to distortion of the annulus"; is that correct?

A Probably.

Q Does that sentence, "the regurgitation of a mosaic tissue value is probably due to the distortion of an annulus," as mentioned by the NMA reviewer, appear in your final report?

A No.

Q Was that sentence deleted at the request of Mr. Etchevers?

A I think so.

Q Is one cause of a distortion of the annulus improper technique on the part of the surgeon?

A It can be one cause, yes. There may be other causes.

Q What other causes may there be?

A The findings of the actual anatomy of the patient.

Q Would you expect that to be apparent before the end of the operation if it was caused by the anatomy of the patient?

A Not necessarily. No.

00094

A I don't know. I may have.

Q You don't know?

A I don't know.

Q Have you ever heard of that happening?

A No.

Q Moving to Case Number 4, please. Your initial report of August 30, 2005 says, "The 3.5 hours needed to place a coronary sinus cannula which is documented in the anesthesia record is very excessive. The fact that this took as long as it did should have raised some concern in Dr. Ennix that perhaps this was not the right operation to perform in this patient."

Is that a statement that was accurate when you wrote it?

A Well, it's something -- again, these judgments are made by the person there at the time. But looking at it in this way, I would have some concern that -- as I stated here, that this operation was getting off to a bad start. I think that's the way I would put it.

Q Are there things that the surgeon can do when he or she realizes that the operation is getting off to a bad start?

MR. SWEET: Objection. Vague.

00095

BY MS. MCCLAIN:

Q Particularly if it's a minimally invasive procedure?

A Well, as you suggest, one of the things would be to just back out and say, we'll do this in a more standard way.

Q To convert to a regular sternotomy?

A Yes.

Q That sentence -- actually, those two sentences, do not appear in your final report, correct?

A I think it's -- those two sentences do not appear. That's correct.

Q Were they deleted at the suggestion of Mr. Etchevers?

A Yeah. The wording that appears in the final report is suggested by Mr. Etchevers.

Q The wording that appears under Case Number 4, in general?

A Yes.

Q Do you agree that seven hours and 15 minutes is a prolonged time, an excessive time for a mitral valve replacement?

MR. SWEET: Objection. Lacks foundation.

THE WITNESS: It's a long time for a mitral valve

STATE OF CALIFORNIA )
COUNTY OF SONOMA )

I, LINDA VACCAREZZA, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

BRUCE REITZ, M.D.

The witness in the foregoing examination, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing examination and caption named, nor in any way interested in the outcome of the cause named in said caption.

Dated the 18th day of January, 2008

LINDA VACCAREZZA, RPR, CSR #10201

EXHIBIT H

Coyness Ennix Quality Assurance Review.

General Comments

1, Repeatedly in these 10 cases the issues that are being used as evidence of practicing below the standard of care for the community are speculative, subjective and judgmental in their evidence and conclusions. Many of these issues are discussed on a daily bases in heart center all over the country and there is often no clear course of action that can be consistently recommended as a universal standard of care.

2. In these 10 cases there was only on instance where I thought the medical standard of care for the community was breached. Case #7

3. Generally in all 10 cases the level of documentation was substandard but this is not an uncommon finding in many heart centers.

4. Many of the cases are related to minimally invasive valve surgery or other minimally invasive technology. This is a technology that has been in development for 10 years. A progressive heart center is expected to stay current with innovation to properly serve its community of patients. That includes introducing new procedures. A hospital and its medical staff have a duty to properly insure that new technology is introduced in a manner that no patient is placed at undo risk. In the material I read I did not have the feeling that there was a process in place by the medical staff for introducing new technology in cardiac surgery. This leaves the staff cardiac surgeon who wants to add new procedures to his or her operative privileges list to meet an unknown standard. When issues were raised about minimally invasive valve surgery the response of the medical staff was to place a moratorium on the procedure in the hospital. This is an appropriate response at the moment but where was the process to introduce minimally invasive valve surgery, and is there one now?

5. This process of review seems to have gone on for a very long period of time. Meanwhile a surgeon's career is in limbo and his reputation possibly damaged. Isn't there some benchmark timelines that the medical staff has to meet in the process of doing their job? In reading the material I have the feeling the medical staff is trying to be very thorough but they are not very prompt, have not always used experts from their hospital in the review of very complex medical issues and don't seem to be very experienced in the process. In addition to that the chief of staff I understand is new and he is being slow and cautious in his approach. In the meantime Dr. Ennix is administratively not able to do much to resolve the situation and has to wait.

6. Ultimately the cardiac surgeon is in charge of the final decision making process in taking action in cardiac surgery and doing the procedure. At the same time heart disease and cardiac surgery more and more require a multi-disciplined approach of specialists. The surgeon is often dependent and guided by their opinion. As a consequence options for therapy are often a collective decision that may not be the individual   decision of a single physician e.g. the surgeon. There is shared responsibility but legally this is often ignored in an effort to attach singular responsibility. The important consideration in a review such as this when there were

many instances of shared responsibility to be satisfied there was adequate dialogue and discussion between he physicians to ensure the patient received the best collective decision of the envolved physicians. I think that happened in all of these cases except Case #7 where there was a breakdown in communication.

# Blood Use and Operative Mortality Data

1. Operative Mortality Data. This data is sort of spotty with some low numbers in many of the categories. With certainty I can't draw any conclusions from this material.
2. Blood use. Case mix data on the population being analyzed is necessary to draw any comparative conclusions. E.g. how do we know that one of the surgeons did not had a disproportion number of patients that were more or less prone to have bleeding problems at surgery?

Case ABS 001

1. **Questionable informed consent.** Patient was a known schizophrenic since the age of 16 and under medical care. The operation and its risks were explained to him and his companion and later confirmed by letter that the operation was explained to him and he understood the operation and its risks. During his post operative care the patient became quite agitated and a consultation was obtained for that specific management problem. A pre-op psychiatric consultation might have been done as a courtesy but was not going to change the recommendation for surgery, a process of informing the patient more adequately, or preventing the post operative agitation. Complications such as agitation have to be managed as they arise and in concert with the situation surrounding them. If the psychiatric community that was caring for the patient believed he was at risk for responsible decision-making they would have appointed a legal guardian years ago. I don't think proceeding without a psychiatric consultation was outside a standard of care for this patient.
2. **Technical error related to minimally invasive approach leading to ventricular damage and need for second operation.** Patient developed AI and some AS two days post-operatively. This was diagnosed using ECHO. Based on the surgical finding at the second operation the etiology of the valve dysfunction is not clear. I would tend to believe it was related to the size 27 valve being used that proved to be too large. The Mosaic valve, if distorted by peripheral circumferential compression, can lose normal coaptation of the valve leaflets. There is no indication that the visibility was inadequate or the preservation was imperfect at the first operation. The reduction of the LV function before the second operation was more likely related to poor ventricular perfusion due to the AI since the ventricle made a complete recovery once the valve AI was corrected. Over sizing a valve at surgery can happen. It is related to the surgeon's goal of providing the patient with the largest valve possible so that the ventricle will not sustain any long-term ventricular strain that can lead to premature congestive heart failure. I don't see any significant deviation from an acceptable standard of care. Not requiring a second operation would have been optimal but is not below a standard of care.
3. **Failure to obtain a TEE in the operating room.** A TEE is not recorded to have taken place in the OR at the time of the first operation. Apparently they are always done and read on site by a board certified anesthesiologist. Not below the standard of care.
4. **Prosthetic valvular dysfunction.** Covered above in part # 2.
5. **Substandard documentation.** The documentation is incomplete and it is not possible to fully understand the events and their explanation based on the official information. The subsequent discussions with Dr. Ennix clarified most of the issues. Officially the documentation is below a standard one wants to have.

**Entire Page Highlighted**

CONFIDENTIAL

Case ABS 002

**1. Inadequate preoperative evaluation**

Not performing a coronary angiogram or hemodynamic evaluation of the heart is not below the standard of care for this operation for isolated aortic stenosis. The patient had no risk factors, healthy parents, and the referring cardiologist was satisfied that the patient did not have coronary artery disease and the diagnosis was correct. The surgeon agreed and that is within the standard of care. A longer ECHO report and preop cath would not have assisted in predicting precisely the valve size that was going to fit except that it would be small which they already new. The final determination of valve size occurs at operation. The pre-op evaluation was not below the standard of care.

2. **Conversion to partial sternotomy**. Conversion to a partial sternotomy is not a complication. Conversion is an adjustment of the operative plan based on the operative finding and the goal of the operation. It is a judgment decision and in this case the correct one if visibility was imperfect.

3. **Greatly prolonged surgical time**. A prolonged operating time is not a complication but it can contribute to complications. If the time is necessary to correctly and accurately reach the goals of the operation it is time well spent. The operation was done via a minimally invasive incision with an inexperienced anesthesiologist and the valve had to be changed. It did take a long time but the outcome was satisfactory. If I understand the anesthesiologist's record correctly the set up time was from 7:00 am to 1:00 pm before they started cardiopulmonary bypass (CPB). The CPB lasted 5 hours and the rest of the time was to control bleeding. The bleeding was significant and probably was the major contributor to the postoperative respiratory failure. Despite this the patient was discharged from hospital 8 days post operatively. Long operation and a lot of blood, which makes it an outlier, but not below the standard of care.

4. **Prosthesis too small.** Valve - patient mismatch re: valve size has been an ongoing discussion in cardiology and cardiac surgery for many years. There are strong opinions on it on both sides in the borderline sizes. A # 17 St. Jude mechanical valve placed in a supra annular position is at the very lower end of what is acceptable. It is a judgment call by the surgeon to determine the relative risks of implanting a borderline valve vs a more extensive operation. In ABS's conversation with Dr. Ennix he expressed the opinion that to enlarge the root would be a risk greater than using a # 17 valve. Not below a standard of care.

**5&6 Deficient operative note and documentation.** The operative report and documentation are poor and below the standard of care for this operation.

**Entire Page Highlighted**

CONFIDENTIAL

Case ABS 003

**1. Prolonged Surgery Time.** The duration of the operation was longer than average and that can be related to complications. However 4 hrs of the time was related to set up and is not entirely controllable by the surgeon. The issue of visibility with this minimal incision is not a good explanation of the time it took or the complication of AI. The visibility is excellent. The leverage with the surgical instruments can be limited and that can slow things down when trying to place sutures accurately and strongly in the annulus. Using the time to do this paid off since the valve was well seated at post and was not the cause of the AI. The AI was related to the incomplete coaptation of the leaflets. Whether this was due to valve design, annular or ring distortion is pure speculation. Surgical bleeding is a know complication of aortic valve surgery. It did not occur since the surgeon took the time to manage the friable and thin walled aorta well. Securing that well can take time and managing bleeding is better done in the OR than in the recovery room.

The issue of the continued AI is an issue. They were aware of it and discussed it. The made a judgment call to do nothing for the moment. It seems unlikely that it was related to the MI that caused his death.

**2. Intraoperative complications.** See above

**3.Intraoperative TEE.** It was done in the OR but is not reported in the OP report.

**4. Postoperative diminished CNS function and possible CVA.** With half a dozen issues that could be the etiology of cerebral dysfunction (age, preexisting cerebral vascular disease, aortic valve replacement, aortic cross clamping, calcified annulus, metabolic, cardiopulmonary bypass) focusing down on the length of the operation is a minor player.

**5. Death due to complications.** The cause of death was myocardial infarction that seems most likely due to a preexisting condition (coronary atherosclerosis) rather than the events of the operation.

**6. Substandard op note.** The operative report is substandard.

**Entire Page Highlighted**

CONFIDENTIAL

Case ABS 004

1. **No documentation of indication.** The patient had minimal symptoms but severe mitral regurgitation. The purpose of repairing or replacing a mitral valve with severe regurgitation is to relieve symptoms and prolong life. There is ample evidence in the literature to support this. It was not necessary to do an exercise stress test to validate the need for surgical intervention. Severe mitral regurgitation in a patient who has no other significant contraindications is enough. Secondly the final decision to do the operation is in the hands of the surgeon. Before he or she makes that recommendation almost always a cardiologist has made the decision that intervention is in the best interest of the patient. In this instance Dr. Edelen had already recommended the patient for surgery.

2. **Prolonged operative note.** The operation was longer than average but the outcome was satisfactory. The procedure was early in their experience and switching to minimally invasive approach is a team effort that has to be organized carefully so that each step of the procedure is done carefully and accurately. Sometime that takes time and is better than rushing through any part of the procedure.

3. **Substandard operative note.** The operative note is substandard in its details of the procedure. Even though there is little evidence on the chart about the process of consenting the patient it appears by the letter from the patient and the verbal word of the resident that the patient was well informed about the procedure.

**Entire Page Highlighted**

CONFIDENTIAL

Case ABS 005

1. **Poor preoperative preparation.** There is the suggestion that the cardiologist and Dr. Ennix misread or over read the degree of narrowing in the left main and left anterior descending coronary artery. I tend to think not. The patient was a hypertensive diabetic with renal failure on chronic peritoneal dialysis with a history of a prior myocardial infarction in 1998. The probability of having diffuse triple vessel disease rather than two-vessel disease was great. Traditionally coronary artery angiography is under read and not over read. The cardiologist later, but not in the original report, indicated there was pressure damping in the left main coronary artery. An IVIS evaluation would have helped but the patient was not in a very stable condition in the cath lab and could have coded or become more severely compromised while doing that procedure rather getting on with revascularization. This is somewhat a subjective call and one has to rely on the historical reliability of the judgment of the cardiologist who is on the scene rather than in hindsight making the call of what was the correct interpretation and plan of action. Dr. Ennix who later acknowledged that he and the cardiologist had reviewed the films together and agrees there was significant narrowing in the main left and LAD system to warrant revascularization of those vessels. Not below a standard of care for this situation.
2. **CABG not indicated when preformed.** The patient had a RV infarction with a LVEDP of 8 mmHg in the cath lab. I could find no reference to what her CPV was at that time. She also had main left disease and triple vessel disease. She was improved in the cath lab with fluids and an IAB. It has been suggested in hindsight that she could have had a right coronary stent only. That management plan apparently was not the judgment of the cardiologist at the scene and Dr. Ennix agreed. This is judgmental but I find no action that is below the standard of care for the situation the physicians had to deal with at the scene.
3. **Substandard operative note.** The operative note is not very detailed and is substandard.

Entire Page Highlighted



CONFIDENTIAL

Case ABS 006

1. **Need to convert from OPCAB to on-pump.** The patient is 87-year-old male with severe triple vessel coronary disease and history of renal disease, hypertension, COPD, prostate cancer, diverticulitis, and peripheral vascular disease. There is good evidence that doing these high-risk elderly patients using an OPCAB strategy will have better outcomes than using cardiopulmonary bypass (CPB). There is also evidence doing conversion to CPB will have a higher mortality. Therefore there is always a plan by the surgeon not to convert unless necessary. Dr. Ennix is an experienced OBCAB surgeon. He knows all of the above guidelines. He also knows the third guideline. Not to convert when it is medically necessary yields the worst outcomes. He converted and it was the correct decision in his judgment giving the clinical situation at the operating table. Not below the standard of care.

2. **Need to redo a cardiac graft.** It has been suggested that the need to redo a cardiac graft is below a standard of care. On the contrary not to redo a graft that in the opinion of the operating surgeon is imperfect for whatever reason is below a standard of care. In the documentation it is also inferred that Dr. Ennix lied in representing that he did not redo a graft. Why would he ever do that when fixing an imperfect graft is good judgment and consistent with the standard of care that is practiced in cardiac surgery? All his decisions in the care are above the standard of care for this clinical situation.

3. **Death following complications.** It is a suggested there is no causal link between the complications the patient had as a consequence of his preexisting pathology and operation and his eventual death. This is a theory of postoperative pathophysiology that I have never heard before. I do not agree with it. It is not supported by any alternative hypothesis or evidence that would make one believe that the complications did not have a compelling relationship to the eventual outcome. It is not even clear what this suggestion has to do with the standard of care that was exercised.

4. **Substandard documentation.** The documentation is poor. The details of the consent procedure are poor even though Dr. Ennix appears to have provided an adequate explanation to the family as evidenced by his conversation of the events and a letter from the family.

**Entire Page Highlighted**

CONFIDENTIAL

Case ABS 007

1. **Several days delay before performing CABG.** The three main issues in this case are delay in investigating the carotid arteries, patient management till the surgery, and management of the patient immediately before and at the time of surgery. The optimal outcome is successful revascularization and being neurologically intact at discharge. To die or have a major stroke are equally bad and no different for the patient. One can only speculate on the hospital logistics of getting a rapid work up but is usually out of the hands of the surgeon. During that time one should have considered increasing myocardial ischemia drug management, heparin or an IAB to support the patient and greatly diminish the risk of infarct while the carotids were being investigated which was an important step. This decision was partly in the hands of the cardiologist but the surgeon bears some responsibility and this is very close to being the below a standard of care if not below it in a patient with severe LAD lesion and recurrent pain at rest. Later the events just before surgery and the operation were mismanaged. The patient should not have been allowed to be at risk with ischemic myocardial chest pain in the preop area. The carotid artery operation should have been deferred and managed in a different way. The priority is to diminish myocardial demand and/or increase blood supply. It is not so important to speculate on the best combinations of approaches. The important thing was not to proceed with the carotid and to proceed with the revascularization. The time in minutes X degree of ischemia is what one must reduce. Once the operation was started taking the IMA down instead of placing the patient immediately on bypass was also a judgment call that had a bad consequence. Dr. Ennix was not in the OR at the beginning of the operation and was not notified of the chest pain the patient was having in the pre op area. Perhaps he should have been in the OR. That depends on the practice guidelines of the department, OR and the anesthesiologists. He certainly should have been notified. The entire set of events and process that occurred from the time the patient came into the pre op area till the patient went into cardiogenic shock and was emergently placed on cardiopulmonary bypass is below the standard of care for this clinical situation and the surgeon must bear most of the responsibility. Comment: Quality assurance (QA) has an I associated with it (I) or QA&I. That is quality assurance and improvement. One of the major factors leading to the bad outcome in this case was a systems failure. Why was there not a process in place to prevent a patient with chest pain from going into the operating room to have an operation without a reevaluation of the clinical situation and the management plan? The system in place did not work. That systems failure must also share part of the responsibility for this outcome. Has this shortcoming of the system been addressed?
2. **Failure to preoperatively appreciate risk of intraoperative atherosclerotic stroke.** I don't think this was missed as much as not being noted on the chart

**Entire Page Highlighted**

EXHIBIT I

00001

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D., as )
an individual and in his )
representative capacity under )
Business and Professions Code )
Section 17200, et seq., )
)
Plaintiff, )
vs. ) Case No: 07-2486
)
RUSSELL D. STANTEN., M.D., LEIGH )
I.G. IVERSON, M.D., STEVEN A. )
STANTEN, M.D., WILLIAM M. )
ISENBERG, M.D., Ph.D., ALTA BATES )
SUMMIT MEDICAL CENTER, DOES 1 )
through 100, inclusive, )
)
Defendants. )
______________________________)

**TRANSCRIPT MARKED CONFIDENTIAL**

DEPOSITION OF HON S. LEE, M.D.

VOLUME I, Pages 1 to 109

Monday, December 3, 2007

3:07 p.m.

taken at Kaiser Hospital
235 West MacArthur Boulevard, Room 669
Oakland, California

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By: Linda Vaccarezza, RPR, CSR #10201

00023

would be appropriate?

A And what times are you asking for now?

Q A mitral valve replacement.

A What specific time now? The OR time?

Q Fair enough. Yes. The OR time.

A I think it's -- it's six to eight hours is not -- six to eight hours is not unusual. A -- four to six hours is not unusual. So I think six hours is a good ballpark guesstimate.

Q For a normal mitral valve replacement without complications, an isolated valve?

A An isolated valve for -- yes. Your standard -- your standard mitral, through a sternotomy incision?

MS. MCCLAIN: I lost my connection.

(Interruption during proceedings.)

BY MS. MCCLAIN:

**Q Did you have any objection to the surgery peer review committee being concerned about the length of these operating times in these four procedures?**

**MR. EMBLIDGE: Objection. Vague.**

**BY MS. MCCLAIN:**

**Q Did you think it was a basis for a valid concern on the part of the surgery peer review committee?**

00024

A I think, yes. I think it's a valid concern.
Q Do you think the concerns that Brian Hite were expressing were legitimate concerns?
A Yes.
**Q Do you know that the officers of the medical staff placed a hiatus on the minimally invasive valve procedures after these first four were done?**
**A Yes. And I recall that.**
**Q Did you think that was a reasonable response to the outcomes?**
**A I think that was a reasonable response.**
**Q Do you agree that the outcomes of these four procedures were alarming?**
**A Yes. There were -- there were reason to be concerned.**
Q If you turn to the third page of the document in front of you, about midway through that page, the document says, "The officers had a Kaiser surgeon thoroughly review the cases for which specific concerns were raised. The reviewer closed two cases; two others were felt to have major documentation issues, but not care issues."
Is that an accurate reflection of your conclusion?
A Yes. I think that's -- I remember that's

00025

what I concluded.

Q What were your documentation concerns?

A Documentation concern was the type of procedure, the document -- the documentation of the discussion with the patients as to the type of procedure.

Q Your concerns mainly revolved around whether or not informed consent was documented; is that right?

A Yes.

**Q Would you expect there to be more extensive documentation of informed consent when a new procedure is being done?**

**A Yes.**

Q Would you expect there to be documentation that the patient was told this was an alternative procedure that had not previously been attempted?

A Maybe not in those exact words, but something to that effect.

Q What would you expect to be conveyed in the informed consent process for these new procedures?

A That this is a new option, and that the patient understands that.

Q Would you expect the surgeon to convey that this was not a procedure that the surgeon had done before?

00026

A Not necessarily the -- whether the patient -- the surgeon has done it or not. Just the fact that this is a -- something innovative.

Q Did the operating time suggest to you issues with whether Dr. Ennix had appropriately considered converting to a regular sternotomy?

A Does the operating time suggest? I think that's a difficult question to answer. I wouldn't know how to answer that.

**Q Do you agree, Dr. Lee, that the longer the operating time, the more risk to a patient in open heart surgery situation?**

**A Yes, I agree.**

Q Do you agree that the longer the cross-clamp time, the more risk to a patient?

A Yes.

Q What would you consider to be an acceptable cross-clamp time? Are you able to answer that?

A I'm not able to answer that because in my experience, it can -- some centers have very long cross-clamp times.

Q Not Summit?

A Not Summit. But some of the training centers, the cross-clamp time can be very -- some of the congenital cross clamps can be very long. And

00038

an outside reviewer enlisted. I'm not sure if that was -- I guess, that was the outcome of this committee. It was speculation, but...

Q Do you know whether either the medical staff officers or the surgery review committee, one or both of them, had information with respect to Dr. Ennix's quality of care that was in addition to your report?

MR. EMBLIDGE: Calls for speculation.

BY MS. MCCLAIN:

Q The question is whether you know that one way or the other.

A Whether I know that --

Q That the surgery peer review committee was considering other elements of Dr. Ennix's quality of care aside from your report.

A I speculate that those parties had other information outside the information that I had.

Q Why do you speculate to that?

A Because they didn't take my review.

Q And do you find anything shocking or upsetting about the fact that they didn't take your review?

A No.

**Q Do you find that it was unfair to Dr. Ennix that they didn't take your review?**

00039

**A No.**

Q If you look at that same column, please, under "Conclusions and Recommendations" on the third page of Exhibit 1, there is a reference to "members were in agreement," near the bottom third of the page?

A Uh-huh.

Q "That above and beyond documentation issues, which they agreed do exist, and have existed previously, they are also concerned about the surgeon of record's overall: patient selection, technical skills, judgment skills, particularly when cases are not going well."

Do you have any reason to doubt the sincerity of these concerns?

MR. EMBLIDGE: Calls for speculation.

THE WITNESS: I don't doubt -- I take it for face value.

BY MS. MCCLAIN:

Q That -- that those concerns were legitimately held by this group of people?

MR. EMBLIDGE: Same objection.

THE WITNESS: By this group of people, yeah.

MS. MCCLAIN: Yes.

Did you get an affirmative answer?

00040

Q "Yeah" means yes?

A Yes.

Q If you go to the next page, Dr. Lee, under "Action Follow-Up," there is a notation that "Final care determination not made by this committee; care issues referred back to medical staff office and officers for consideration of further action."

Do you agree that reasonable minds, looking at the outcome of these four cases, might see the need for further review?

MR. EMBLIDGE: Calls for speculation.

THE WITNESS: Do I see --

BY MS. MCCLAIN:

**Q Do you agree that reasonable minds, looking at the information with respect to these four cases and listening to your review, might legitimately determine that there was a need for further review?**

**A Review of the cases? Review --**

**Q Review of Dr. Ennix.**

**A Review of Dr. Ennix. Yes.**

**Q Did you think that your report had,** quote/unquote, cleared Dr. Ennix and there should be no further discussion of what occurred in those four cases?

MR. EMBLIDGE: Objection. Compound.

00067

Q Dr. Ennix is claiming in this lawsuit that he has filed against the Summit Medical staff and which he initially filed against Doctors Isenberg, Russell Stanten, Steve Stanten and Leigh Iverson, that this process was racially discriminatory toward him.

In your admittedly snapshots of the process, did you observe anything factual which would lead you to conclude that any decisions made were motivated by racial discrimination?

MR. EMBLIDGE: Vague and calls for speculation.

THE WITNESS: It's difficult to answer because discrimination is a matter of perception.

BY MS. MCCLAIN:

Q I'm asking you whether you perceived anything, as a matter of fact, that you would have concluded was racial discrimination toward Dr. Ennix in the admittedly limited observation you had of this process?

MR. EMBLIDGE: Vague and calls for speculation.

THE WITNESS: I'm tempted to -- you know, I can't answer that. I just personally -- just can't answer that because I can say yes and justify it and say no and justify it. So I can't do it.

BY MS. MCCLAIN:

**Q You can't cite to a specific fact, this**

00068

**person said this or this person did that --**

**A No.**

**Q -- which suggested to you racial discrimination, correct?**

**A Correct.**

**Q At all times in your interaction with Dr. Isenberg with respect to the peer review of Dr. Ennix, did you believe that he was acting in good faith with a consideration of patient safety?**

**MR. EMBLIDGE: Calls for speculation.**

**THE WITNESS: Who?**

**BY MS. MCCLAIN:**

**Q Dr. Isenberg.**

**A Dr. Isenberg?**

**Q Yes.**

**A Yes.**

**Q Did you believe that Dr. Paxton, Dr. Lee -- Dr. Ly, excuse me, and Dr. Horn were, at least in your interchanges with them, acting in good faith with a point of view of ensuring patient safety?**

**A Yes.**

Q In your interactions with Steven Stanten at the beginning of the minimally invasive procedures, did you believe that he was acting in good faith with a motivation of ensuring patient safety?

STATE OF CALIFORNIA )
COUNTY OF SONOMA )

I, LINDA VACCAREZZA, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

HON LEE,

The witness in the foregoing examination, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing examination and caption named, nor in any way interested in the outcome of the cause named in said caption.

Dated the 17th day of December, 2007

LINDA VACCAREZZA, RPR, CSR #10201