**EXHIBIT F**



**THE STAFF OF**

**SUMMIT**
MEDICAL CENTER

**CONFIDENTIAL**

April 21, 2004

Coyness Ennix, M.D.
3300 Webster Street Suite #500
Oakland, CA 94609

Letter sent via email EnnixC@Sutterhealth.org at Dr. Ennix's request and via U.S. Mail.

Re:   Minimally Invasive Valve Surgery; Ad Hoc Committee Formation

Dear Dr. Ennix:

Thank you for taking time on April 16, 2004, to talk with Steven Stanten, M.D., Chair of the Department of Surgery, and me regarding your performance of minimally invasive valve surgery at Summit Medical Center. As we discussed, problems were encountered in each of the four procedures that you have performed thus far. At least one reviewer is of the opinion that, although there were significant deficiencies in some of your documentation, your technical performance otherwise met the applicable standard of care in all instances. The Surgery Peer Review Committee, on the other hand, has formed the opinion that the problems were at least contributed to by shortcomings in your clinical judgment or skills. You have agreed, voluntarily, to refrain from performing any additional minimally invasive valve procedures until the issues can be resolved by an ad hoc committee and the Medical Executive Committee can consider the findings.

During our discussion, I noted that the concerns regarding your minimally invasive valve procedures have arisen in the context of broader concerns regarding other aspects of your practice. For example, we have received some information, and we are in the process of obtaining more information, from the Alta Bates Medical Staff regarding your performance at that facility before you transferred your practice to the Summit Campus. At this facility, too, data have been generated through routine Quality Assurance and Surgery Peer Review Committee activities suggesting possible deficiencies in your clinical performance. The above-mentioned ad hoc committee will be exploring all of these issues, in addition to the minimally invasive valve surgery issues, under the auspices of the Medical Executive Committee.

The ad hoc committee has not yet been appointed, but you will be kept abreast of developments as appropriate. Please be assured that this will be a fair process, and you will be given an opportunity to comment on any substantial issues before conclusions are reached.

As we discussed, because the voluntary restriction of your surgical privileges to refrain from performing minimally invasive valve procedures has occurred while you are under investigation as described above, we are required to make reports to the Medical Board of California and the National Practitioner Data Bank. The main part of each report will be a narrative statement describing the nature of the reportable event and the surrounding facts and circumstances. Before we file the reports, we would welcome your comments regarding the draft narrative statement that we have prepared. It is as follows:

On April 16, 2004, Dr. Ennix voluntarily agreed to restrict his surgical privileges by refraining from performing minimally invasive valve procedures pending further review of his first four cases, in which certain problems were encountered. It is unclear whether the problems were entirely attributable to risks normally associated with such procedures or to shortcomings in Dr. Ennix's clinical judgment or skills. The Medical Executive Committee has endorsed the appointment of an ad hoc committee to investigate these issues, and to review other information relating to Dr. Ennix's practice. Dr. Ennix has cooperated with every aspect of these activities, and no conclusions have been drawn as of the date of this report.

We are obligated to file our reports by Friday, April 30, 2004. Therefore, we would appreciate receiving any comments you wish to make by Wednesday, April 28, 2004, so we will have time to consider them before finalizing the narrative statement.

If you have any questions, please do not hesitate to contact me.

Sincerely,

William M. Isenberg, M.D., Ph.D.
President of the Medical Staff

cc:     Steven Stanten, M.D.

2

**EXHIBIT  G**



THE STAFF OF

**SUMMIT**
MEDICAL CENTER

<u>CONFIDENTIAL</u>

April 28, 2004

Coyness Ennix, M.D.
101 Sea View Ave.
Piedmont, CA 94610

Re:    Minimally Invasive Valve Surgery

Dear Dr. Ennix:

I am writing to follow up on the meeting that you had with Steven Stanten, M.D., and me on April 26, 2004, in which we discussed my letter to you dated April 21, 2004, your decision to refrain permanently from performing minimally invasive valve procedures, and the Medical Staff's ongoing review of your practice, in general.

Your decision to refrain permanently, rather than temporarily, from performing minimally invasive valve procedures does not change our reporting responsibilities. It is still a voluntarily-accepted restriction of your privileges while you are under investigation by the Medical Staff for reasons relating to the quality of your patient care, and must therefore be reported to the Medical Board of California and the National Practitioner Data Bank. However, instead of the draft narrative statement contained in my letter of April 21, 2004, the language has been modified to reflect those changes we agreed upon, as follows:

On April 26, 2004, Dr. Ennix announced that he is restricting his surgical privileges, effective immediately to preclude minimally-invasive valve surgery. It is unclear whether certain problems encountered during his first few cases were entirely attributable to risks normally associated with such procedures or to shortcomings in Dr. Ennix's clinical judgment or skills. The Medical Executive Committee has endorsed the appointment of an ad hoc committee to investigate these issues, and to review other information relating to Dr. Ennix's practice. Dr. Ennix has cooperated fully with every aspect of these activities, and no conclusions have been drawn as of the date of this report.

As reflected in the above statement, although you will no longer be performing minimally invasive valve procedures, specifically, at Summit Medical Center, the issues relating to those types of procedures as well as other aspects of your practice continue to warrant review by an ad hoc committee, and it is our plan to move forward with that process.

---

William Isenberg, M.D., Ph.D.   •   Frederic Herskowitz, M.D.   •   Bruce Moorstein, M.D.   •   Annette M. Shaieb, M.D.
*President*                     *Vice President*                 *Secretary/Treasurer*        *Immediate Past President*
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

Again, the ad hoc committee has not yet been appointed, but you will be kept abreast of developments as appropriate.

We are obligated to file our reports by Tuesday, May 11, 2004. Therefore, if you have any further comments, please submit them to me, in the care of the Medical Staff Office, by Friday, May 7, 2004, so we will have time to consider them before finalizing the narrative statement.

Sincerely,

William M. Isenberg, M.D., Ph.D.
President of the Medical Staff

cc:    Steven Stanten, M.D.

2

**EXHIBIT H**





**THE STAFF OF**

**SUMMIT**
MEDICAL CENTER
March 9, 2005

**CONFIDENTIAL**

Coyness L. Ennix, Jr. M.D.
101 Sea View Ave.
Piedmont, CA 94610

Re:     **Conferences with Outside Reviewers**

Dear Dr. Ennix:

All of the materials that you have submitted for consideration by Mercer Human Resources Consulting, Inc., have been forwarded to National Medical Audit, care of Neil Smithline, M.D., for that purpose. You have also requested an opportunity to meet with Dr. Smithline and the physicians who are reviewing your cases. Unfortunately, that will not be possible, since one of them, Robert H. Breyer, M.D., is located in Illinois, and the other, Leland B. Housman, M.D., F.A.C.S., F.A.C.C., is located in Southern California. However, we enclose their respective CVs for your information, and we have made special arrangements for you to speak with each of them by telephone, with Dr. Smithline serving as a moderator:

Your telephone conference call with Dr. Breyer will be on Wednesday, March 16, 2005, at 2:00 p.m., Pacific Time. Please be prepared to discuss the following cases during this call:

| NMA# | ABS-001 | ABS-002 | ABS-003 | ABS-004 | ABS-005 |
|------|---------|---------|---------|---------|---------|
| MR # | 1205056 | 1282678 | 1282803 | 1283240 | 1132816 |

Your telephone conference call with Dr. Housman will be on Saturday, March 19, 2005, at 9 a.m., Pacific Time. Please be prepared to discuss the following cases during this call:

| NMA# | ABS-006 | ABS-007 | ABS-008 | ABS-009 | ABS-010 |
|------|---------|---------|---------|---------|---------|
| MR # | 1281866 | 1296513 | 527129  | 6533343 | 1124908 |

Dr. Smithline has arranged for these calls to be facilitated by a telephone conference service. At the appropriate time, please call in as follows:

877-966-6338. The ID number for both calls is: #8704

We know that this opportunity to speak with the reviewers is very important to you, and we trust that you will make yourself available for the calls as scheduled. However, if there are compelling reasons to postpone one or both of the calls, please let us know, and we will speak with National Medical Audit about making alternative arrangements.

The basic "ground rules" for these conference calls will be as follows:

*   In each call, the only participants will be the reviewer, Dr. Smithline and you. There will be no attorneys or any other individuals, either as listeners or participants.

William Isenberg, M.D., Ph.D. •  Fredric Herskowitz, M.D. •  Bruce Moorstein, M.D. •  Annette M. Shaieb, M.D.
*President*                          *Vice-President*               *Secretary/Treasurer*        *Immediate Past President*
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

- An hour and a half will be allotted for each interview, subject to some flexibility at Dr. Smithline's discretion. You will be expected to make the best use of the time available by presenting your comments and responding to questions in a succinct and efficient manner.

- The discussions will be tape recorded. The tapes will used as warranted for further reference in the review process. The tapes might or might not be transcribed by Mercer or subsequently by the Medical Staff. The tapes will be owned by the Medical Staff as part of its confidential peer review records. You will be given a copy, if you wish, at your expense.

- The purpose of each call will be to afford you an opportunity to supplement your written materials with additional comments, and to respond to any questions the reviewer might have regarding your care in the cases at issue. For example, if an operative report appears to be unclear in describing what transpired during a particular procedure, or appears to be inconsistent with other information in the chart, a reviewer might ask you to provide additional facts or explanations. A reviewer might also explore your technical knowledge in certain areas. Essentially, any topic that is relevant to a reviewer's assessment of your knowledge, judgment, skill or experience will be appropriate for the reviewers to ask you about.

- While there will inevitably be some two-way discussion, and you might have some basic questions that are appropriate for Dr. Smithline or the reviewers to answer, you will not be allowed to "cross examine" them about the process, to ask them to state their opinions about the cases at this point, or to debate with them regarding any issues. If you try to engage in such activities, you will be reminded that the interviews are not being conducted for these purposes, and if you do not adhere to these ground rules Dr. Smithline might elect to terminate one or both of the calls.

- If you wish to submit literature or other materials after the calls, perhaps to address issues raised by the reviewers, this will be accommodated, if reasonable, at Dr. Smithline's discretion.

Please remember that these calls have been arranged for your benefit, to allow you to provide information on your own behalf. If you decide at any time that you do not wish to take advantage of this opportunity, either now or during either or both of the calls, you are free to forego it. In that event, the reviewers will form their opinions based on whatever information is otherwise available to them, including the materials you have already submitted.

Sincerely,

William M. Isenberg, M.D., Ph.D.
President of the Medical Staff

Enclosures

cc:    Neil Smithline, M.D.
       Lamont Paxton, M.D.

2

# CURRICULUM VITAE

## Leland B. Housman, M.D., F.A.C.S., F.A.C.C.

| | |
|---|---|
| Birthdate: | October 30, 1942 |
| Birthplace: | El Paso, Texas |
| Academic Degrees: | B.S. 1963-University of Texas, El Paso<br>M.D. 1967-Baylor College of Medicine, Houston, Texas |
| Internship: | Methodist Hospital, Houston, Texas |
| Residencies: | General Surgery, University of California, La Jolla, California July 1968-June 1973  Chief: Marshall Orloff |
| | Chief Resident, General Surgery, University of California, La Jolla, California-July 1972-June 1973 |
| | Cardiopulmonary Surgery, University of Oregon Medical School, Portland, Oregon-July 1973-June 1975 Chief: Albert Starr |
| | Chief Resident, Cardiopulmonary Surgery, University of Oregon Medical School, Portland, Oregon July 1974-June 1975 |
| Board Certifications: | American Board of Surgery, 1974<br>American Board of Thoracic Surgery, 1976<br>Recertified 1988 and 1994 |
| Medical License: | California-1968 C30547<br>Idaho- 1984 M4852 |
| Research Appointments: | Cardiac Surgery Research Associate, Laboratory of Nina Braunwald, M.D., University of California at San Diego, La Jolla, California July 1970-June 1971 |
| Academic Appointments: | Instructor, Department of Surgery, University of California at San Diego, La Jolla, California July 1971-June 1973 |
| | Instructor, Department of Surgery, University of Oregon Medical School, Portland, Oregon July 1973-June 1975 |

National Committee    Committee on Coronary Artery Disease, American College
Appointments:        of Chest Physicians 1977-1996

                     Council on Cardiovascular Surgery Credential Committee,
                     American Heart Association, October 1981-Present

                     Member, Section on Cardiovascular Surgery, American
                     College of Chest Surgeons, November 1983-Present

                     Member, Southern California District #6
                     Committee on Applicants, American College of Surgeons
                     January 1985-Present

Society
Memberships:

            Member, Multnomah County (Oregon) Medical Society, 1973-1975

            Member, California Medical Association, 1975-Present

            Member, San Diego Medical Society, 1975-Present

            Member, American Medical Association,1975-Present

            Member, Albert Starr Cardiac Surgical Society, 1974-Present

            Member, American Heart Association, 1975-Present

            Fellow, American College of Cardiology, 1977-Present

            Fellow, American College of Chest Surgeons, 1977-Present

            Fellow, American College of Surgeons,1977-Present

            Member, Society of Thoracic Surgeons, 1980-Present

            Fellow, International Cardiovascular Society, 1982-Present

            Member, Western Thoracic Surgical Association, 1983-Present

            Board of Directors, American Heart Association, 1986-1988
            Reappointed 1997, 2000, 2001

            Secretary, Baylor College of Medicine
            Alumni Executive Committee, 1994-1996
            Vice President, Baylor College of Medicine 1996-1998

President, Baylor College of Medicine 1998-1999
Alumni Executive Committee, 1998-2000

President, San Diego Chapter of the American Heart
Association, 2000-2001

Physician Leader, Project Scripps

Bibliography

1. Bernstein, E.F., Shea, M., Murphy, T. and Housman L.B.:
   Experimental and clinical experience with transcutaneous doppler
   Ultrasound flowmeters. Arch. Surg., 101:21, 1970.

2. Miller, S., Housman, L.B. and Halasz, N.A.: Intraoperitve cardiac
   tamponade secondary to an abdominal stab wound: a case report.
   Presented to Southern California Chapter, American College of Surgeons,
   Santa Barbara, California, 1969.

3. Turina, M., Housman, L.B., Intaglietta, M., Schauble, J. and Braunwald, N.S.:
   An automatic cardiopulmonary bypass unit for use in infants. Trans. ASAIO,
   Vol. XVII, p. 376, 1971.

4. Turina, M., Housman, L.B., Intaglietta, M., Schauble, J. and Braunwald, N.S.:
   An automatic cardiopulmonary bypass unit for use in infants. J. of Thoracic
   Cardiovascular Surgery, 63:263, February, 1972.

5. Housman, L.B. Turina, M. Braunwald, N.S.: Use if hemodilution during total
   cardiopulmonary bypass in neonates. Experimental evaluation employing a
   miniaturized heart-lung machine. Surgery, 72:460, September, 1972.

6. Housman, L.B. and Braunwald, N.S.: Experimental evaluation of the Travenol
   and Lande-Edwards membrane oxygenators for use in neonate perfusions.
   Presented to the 8th Annual Meeting of the Society of Thoracic Surgeons,
   January 24-26, 1972, San Francisco, California.

7. Housman, L.B. and Braunwald, N.S.: Experimental evaluation of the Travenol
   and Lande-Edwards membrane oxygenators for use in neonate perfusions. Ann.
   Thor. Surg., 14:150, August, 1972.

8. Housman, L.B., Bernstein, E.F., Dilley, R.B. and Braunwald, N.S.: A new
   Indication for intra-aortic balloon counterpulsation: The treatment of refractory
   Intra-operative-cariogenic shock. JAMA, Vol. 224 No. 8, p. 1131, May, 1973.

9. Levin, S., Housman, L.B. and Dilley, R.B.:Emergency myocardial re-vascularization for the treatment of unstable angina pectoris. Presented at the San Diego Chapter of the American College of Surgeons Meeting. May 19-20, 1973.

10. Housman, L.B., et. al.: Successful use of intra-aortic balloon counterpulsation for the treatment of refractory intraoperative cardiogenic shock. Presented at the American Medical Tennis Association Meeting. November 3-7, 1974. Las Vegas, Nevada.

11. Housman, L.B., Kalush, S.L., Li, W. Litchford, B. and Wood, J.A.: Successful Use of intra-aortic balloon counterpulsation for the treatment of refractory intra-operative cardiogenic shock. Presented at the Northwest Surgical Association meeting, Seattle, Washington, November 7-9, 1974.

12. Housman, L.B.: Intra-aortic balloon counterpulsation in the treatment of refractory intra-operative cardiogranic shock. Presented at the Symposium on Intra-Aortic Balloon Counterpulsation, providence Hospital, Seattle, Washington. March 8, 1975.

13. Housman, L.B., Bonchek, L.I., and Starr, A.: Crescendo angina pectoris in a 28 year old:. successful saphenous vein bypass grafting. A case report and review of the literature. JAMA, 232:160-161, April 1975.

14. Starr, A., Housman, L.B., and Bonchek, L.I.: Prognosis of patients after open mitral Commissurotomy: Actuarial analysis of late results in 100 patients. Presented at the International Symposium on the Mitral Valve. May 26-28, 1975. Paris, France.

15. Housman, L.B. , Kalush, S.L., Li, W. Litchford, B. and Wood, J.A.: Successful use of intra-aortic balloon counterpulsations for the treatment of refractory intra-operative cardiogenic shock. American Surgeon, 41:535-537, September 1975.

16. Housman, L.B., Casey, C., Speros, D., Hansen, I., Stephens B. and Dobbs, J.L. : Intra-aortic balloon counterpulsation in the treatment of refractory intra-operative cardiogenic shock. J. Extracorporeal circulation, VII: 2, 84-85, 1975.

17. Housman, L.B.: Intra-aortic balloon counterpulsation for the treatment of refractory intra-operative cardiogenic shock. Presented at the 41st Annual Meeting of the American College of Chest Physicians. October 26-30, 1975. Annaheim, California.

18. Housman, L.B., Bonchek, L.I. and Starr, A.: Prognosis of patients after open mitral Commissurotomy: Actuarial analysis of late results in 100 patients. Presented at the 48th Annual Meeting of the American Heart Association, November 17-20, 1975. Anaheim, California.

19. Pantley, G., Housman, L.B., Demots, H. and Rahimtoola, S.: Monocular blindness secondary to calcific embolization: an unusual presentation of rheumatic mitral valvular disease. Chest 69: 555-556, April, 1976.

20. Housman, L.B., Bonchek, L., Lambert, L. Grunkemeier, G. and Starr, A.: Prognosis of patients after open mitral commissurotomy: actuarial analysis of Late result in 100 patients. Journal of Thoracic and Cardiovascular Surgery, 73: 742-745, May, 1977.

21. Housman, L.B. Promisloff, S., McGreevy, M.J., Glazener, E., Litchford, B. and Colburn, L.: The routine use of positive end-expiratory pressure (PEEP) and Intermittent mandatory ventilation (IMV) following open heart surgery. Presented At the 43rd Annual Scientific Assembly, American College of Chest Physicians, Las Vegas, Nevada, October 30 - November 3, 1977.

22. Housman, L.B.: Experience with PEEP and IMV following open heart surgery presented at the XIV Congreso Latino Americano Y XVIII Congreso Mexicano de Anestesiologia in Guadalajara, Mexico, October 1977.

23. Housman, L.B.: Intra-aortic balloon counterpulsation and the treatment of Refractory intra-operative cardiogenic shock. Presented at the XIV Congreso Latino Americano Y XVIII Congreso Mexicano de Anestesiologia in Guadalajara, Mexico, October, 1977.

24. Housman, L.B., Morse, J., Litchford, B., Stein R., Mazur, J. and Starr, A.:Left Ventricular fistula as a cause of intractable angina pectoris: successful surgical repair. Journal of the American Medical Association, 240: 372-374, July 1978.

25. Housman, L.B., Pitt, W., Mazur, J., Litchford, B. and gross, S.:Mechanical failure (leaflet disruption) of a porcine aortic heterograft: a rare case of acute aortic insufficiency.
Journal of Thoracic and Cardiovascular Surgery. 76: 212-213, August, 1978.

26. Housman, L.B., Morse, J. and Mazur, J.H.:The routine use of positive end-expiratory pressure (PEEP) and intermittent mandatory ventilation (IMV) Following open-heart surgery. Presented at the International Congress of Anesthesiology, September 4-9, 1978. Paris, France.

27. Housman, L.B., Morse, J. and Mazur J.: The routine use of positive end expiratory Pressure (PEEP) and intermittent mandatory ventilation (IMV) following open-heart surgery. Presented at the International Congress of Anesthesiology, September 4-9, 1978. Paris, France.

28. Housman, L.B. and Litchford, B.: The routine performance of open heart surgery without blood. Presented at the American College of Chest Physicians 44th Annual Scientific Assembly, October 31, 1978. Washington, D.C.

29. Housman, L.B., Bonchek, L., Lambert, L., Grunkemeier, G. and Starr, A.: Prognosis of patients after open mitral commissurotomy; actuarial analysis of late results in 100 patients. 1978 Yearbook of Surgery. Schwartz, et al. editors, page 253, 1978.

30. Housman, L.B., Litchford, B. and Mazur, J.H.: The routine performance of open heart surgery without blood. J. Extra-Corporeal circulation 11: 163-167, October, 1979.

31. Starr, A., Macmanus, Q., Housman, L.B., Maloney, C. and Grunkemeier, G.L.: Long term results with Starr-Edwards mitral ball-valve prosthesis. Presented at the International Congress of the Association pour l' Information Cardiologique. September 28-30, 1979. Arles, France.

32. Starr, A., Macmanus, Q., Housman, L.B., Maloney, C. and Grunkemeier, G.L.: Long term results with Starr-Edwards mitral valve ball-valve prosthesis. Accepted for publication, Coeur, Paris, France.

33. MaManus, P., Grunkemeier, G., Housman, L.B., Maloney, C., Harlan, B. Lambert, L., and Starr, A.:Early results with composite strut caged ball prosthesis. American Journal of Cardiology, 46: 566-569, October, 1980.

34. Housman, L.B., Virgilio, R., Kinyon, G., and Zamost, B.: The use of crystal loid vs. colloid in the management of patients undergoing coronary artery bypass graft Surgery. Presented at the 7th World Congress of Anesthesiologists. September 14-21, 1980. Hamburg, Germany.

35. Housman, L.B., Litchford, B., Gomez-Engler, H.E. and Kinyon, G.: The use of intravenous nitroglycerine for the control of hypertension in open heart surgery. Presented at the 4th Greek Congress of Anesthesiology. Athens, Greece. May 30, 1981.

36. Prentice, J.O., Housman, L.B., and Kinyon, G.E.:Ventilatory support and weaning following cardiac surgery. Presented at the 4th Greek Congress of Anesthesiology. Athens, Greece. May 30, 1981.

37. Housman, L.B., Virgilio, R.W., Litchford, B. abd Scocca, J.: Crystalloid vs. Colloid for volume replacement in coronary artery surgery. Presented at the First World Congress on open-heart technology. Brighton, U.K. July 13-17, 1981.

38. Housman, L.B.: Pathophysiology and techniques of cardiopulmonary bypass, Volumn I. Blood conversation during cardiopulmonary bypass, (chap 11). Eds. Utley, J.R., and Ashleigh, E.A. Williams and Wilkins, 1982.

39. Chung, W.S., Cho, C., Housman, L.B., et al.: review of significant microvascular surgical breakthroughs involving the heart and lungs in rats. Microsurgery, Vol. 19 No. 2, p. 71-77, 1999.

40. Kimura, B., Phan, J.N. and Housman, L.B., utility of contrast echocardiography in the diagnosis of aortic dissection. Accepted for publication, Journal of echocardiography, January 2000.

# CURRICULUM VITAE

## Robert H. Breyer, M.D.

**HOME:**  226 Franklin Road
Glencoe, Illinois 60022
(847) 835-8954

**OFFICE:**  2800 North Sheridan Road
Suite 209
Chicago, Illinois 66657
(773) 477-4345

**DATE & PLACE OF BIRTH:**
July 7, 1947
Oak Park, Illinois

**MARITAL STATUS:**
Married - 1 child

**ACADEMIC DEGREE:**
B.S. (High Honors)
University of Illinois
Urbana, Illinois
1969

**PROFESSIONAL DEGREE:**
M.D.
University of Illinois
Chicago, Illinois
1972

M.M.
Kellogg School of Management
Northwestern University
1996

**POSTDOCTORAL TRAINING:**
Resident in General Surgery
Rush-Presbyterian-St. Luke's Medical Center
Chicago, Illinois
July 1972 - June 1974

Clinical Associate
Surgery Branch
National Heart and Lung Institute
Bethesda, Maryland
July 1974 - June 1976

Resident in General Surgery
Rush-Presbyterian-St. Luke's Medical Center
Chicago, Illinois
July 1976 - June 1978

Resident in Thoracic and Cardiovascular Surgery
Rush-Presbyterian - St. Luke's Medical Center
Chicago, Illinois
July 1978 - June 1980

**HONORS AND AWARDS:**
Phi Beta Kappa
Phi Kappa Phi
Alpha Omega Alpha

Resident Prize Paper
Samson Thoracic Surgical Society
June 1980

R. H. Breyer, M.D.
Curriculum Vitae

Best Scientific Paper
Southern Thoracic Surgical Society
November 1983

**PROFESSIONAL LICENSURE:**        Illinois (1973)
North Carolina (1980)
Massachusetts (1983)

**BOARD CERTIFIED:**        American Board of Surgery 1979 (#24626)
American Board of Thoracic Surgery 5/22/81 (#3666)
Recertification 1989, 2000 (#3666)

**APPOINTMENTS:**        July 1977 - June 1980
Instructor in Surgery
Rush Medical College

July 1980 - August 1983
North Carolina Baptist Hosp.
Winston-Salem, N.C.

July 1980 - July 1981
Instructor in Surgery
Section of Cardiothoracic
Bowman Gray School of Medicine

July 1981 - August 1983
Assistant Professor in Surgery
Bowman Gray School of Medicine

August 1983 - March 1989
Cardiac Surgeon
Baystate Medical Center

May, 1984 - March, 1989
Assistant Professor of Surgery
Tufts University School of Medicine

October 1986 - March, 1989
Assistant Clinical Professor
University of Connecticut School of Medicine

March 1989 - Present
Chief, Section of Cardiac Surgery
St. Joseph Hospital and Health Care Center

August 1999 - Present
Affiliate Board Member
Blue Cross & Blue Shield of Illinois

January 2002 – December 2003
Vice President, Medical Staff
St. Joseph Hospital and Health Care Center

R. H. Breyer, M.D.
Curriculum Vitae

**PROFESSIONAL MEMBERSHIPS:**   American Association for Thoracic Surgery
Andrew G. Morrow Cardiovascular Society
American Heart Association
American College of Chest Physicians
American College of Surgeons
The American Association for Vascular Surgery
American College of Cardiology
American Medical Association
Society of Thoracic Surgeons

**GRANTS:**   July 1981
Intramural Research Support Committee
Bowman Gray School of Medicine
"Is a Left Ventricular Vent Necessary with
Hypothermic Cardioplegic Arrest?"

**COMMITTEES:**   January 1998 - Present
Member, Ad Hoc Committee on Critical Care

January, 1998 - Present
Chairman, FMN Contract and Budget Committee

January, 1998 - Present
Member, FMN Board of Directors

January 1997 - December 1998
Co-Chairperson, FMN Budget and Contract Committee

January 1997 - December 1998
Member, Credentials Committee

January 1996 - December 1996
Chairman, SJPHO Finance Committee

January 1995 - December 1995
Chairman, Critical Care Committee

September 1995 - September 1996
Member, Bylaws Committee

1994 - 1995
Member, Risk Management Committee

January 1995 - December 1995
Member, Credentials Committee

R. H. Breyer, M.D.
Bibliography

1. Breyer RH, McClenathan JH, Michaelis LL, McIntosh CL, Morrow AG: Tricuspid regurgitation: A comparison of nonoperative management, tricuspid annuloplasty, and tricuspid valve replacement. J Thorac Cardiovascular Surgery 1976: 72: 867-874.

2. Breyer RH, spray TL, Kastl DG, Roberts WC: Histologic changes in saphenous vein aorta-coronary bypass grafts. J Thorac Cardiovasc Surg 1976: 72: 916-924.

3. McClenathan JH, Guyton RA, Breyer RH, Newman GE, Michaelis LL: The effects of isoproterenol and dopamine on regional myocardial blood flow after stenosis of circumflex coronary artery. J Thorac Cardiovasc Surg 1977: 73: 431-435.

4. Breyer RH, Arnett EA, Spray TL, Roberts WC: Prosthetic-valve endocarditis due to listeria monocytogenes. Am J Clin Pathol 1978: 69:186-187.

5. Doolas A, Breyer RH, Franklin JL: Pneumatosis cystoides following jejunoileal bypass. Am J Gastroenterol 1979: 72: 271-275.

6. Breyer RH, Monson DO, Ruggie NT, Weinberg M Jr, Najafi H: Atrial septal defect: Repair in patients over thirty-five years of age. J Cardiovasc Surg 1979: 20: 583-586.

7. Breyer RH, Dainauskas JW, Jensik RJ, Faber LP: Mucoepidermoid cardinoma of the trachea and bronchus: The case for conservative resection. Ann Thorac Surg 1980: 29:197-204.

8. Breyer RH, Zippe C, Pharr WF, Jensik RJ, Kittle CR, Faber LP: Thoracotomy in patients over age 70 years: A ten year experience. J Thorac Cardiovasc Surg 1981: 81: 187-193.

9. Breyer RH, Lavender S, Cordell AR: Delayed left ventricular rupture secondary to transatrial left ventricular vent: Report of two cases. Ann Thorac Surg 1982: 33: 189-191.

10. Mills SA, Johnston FR, Hudspeth AS, Breyer RH, Myers RT, Cordell AR: Clinical spectrum of blunt tracheobronchial disruption illustrated by seven cases. J Thorac Cardiovasc Surg 1983: 84: 49-58.

11. Mills S, Breyer RH, Johnston FR, Hudspeth AS, Marshall RB, Choplin RH, Cordell AR, Myers RT: Malignant fibrous histiocytoma of the mediastinum and lung. J Thorac Cardiovasc Surg 1982: 84: 367-372.

12. Breyer RH, Andrews RI, Mills SA, Cordell Ar, Ahl ET: Herpes simplex pneumonia following aortic valve replacement. JAMA 1983: 249: 1319-1322.

13. Poole GV Jr., Meredith JW, Breyer RH, Mills SA: Surgical implications in malignant cardiac disease. Ann Thorac Surg 1983: 36: 484-492.

R. H. Breyer, M.D.
Bibliography

28. Breyer RH, Meredith JW, Kon ND, Mills SA: Myocardial Biopsy Drill: Construction Details and Techniques. J Surg Res 1985: 38:134-137.

29. Breyer RH, Mills SA, Hudspeth AS, Johnston FR, Watts LE, Nomeir A, Cordell AR: Open mitral commissurotomy. Long term results with echocardiographic correlation. J Cardiovasc Surg 1985: 26:46-52.

30. Rousou JA, Parker T, Engelman RM, Breyer RH: Phrenic nerve paresis associated with   the use of ice slush and the cooling jacket for topical hypothermia. J Thorac Cardiovasc Surg 1985: 89:921-925.

31. Rousou JA, Meeran MK, Engelman RM, Breyer RH: Does the type of venous drainage or cardioplegia affect postoperative conduction and atrial arrhythmias. Circulation 72: 11:259-263.

32. Breyer RH, Engelman RM, Rousou JA, Lemeshow S: Post-infarction angina: An expanding subset of patients undergoing coronary artery bypass. J Thorac Cardiovasc Surg 1985: 90:532-540.

33. Breyer RH, Engelman RM, Rousou JA, Lemeshow SA: A comparison of cell saver vs. ultrafilter during coronary artery bypass operations. J Thorac Cardiovasc Surg 1985: 90:736-740.

34. Otani H, Engelman RM, Rousou JA, Breyer RH, Lemeshow SA, Das DK: Enhanced myocardial preservation by mepacrine, a phospholipase inhibitor. Surg Forum 1985: 36:205-208.

35. Breyer RH, Otani H, Engelman RM, Rousou JA, Lemeshow SA, Das DK: SOD and catalase pretreatment prior to cardioplegic arrest in the face of regional ischemia. Surg Forum 1985: 36:269-271.

36. Rousou JA, Engelman RM, Breyer RH, Alfred C, Farouhar F: Short term survival following perfusion with Fluosol-DA for cardiopulmonary bypass. Intl J Artif Organs 1985: 81:281-286, 1985.

37. Rousou JA, Engelman RM, Anisimowicz L, Lemeshow S, Dobbs WA, Breyer RH, Das D: Metabolic enhancement of myocardial preservation during cardioplegic arrest. J Thorac Cardiovasc Surg 1986: 270-276.

38. Otani H, Engelman RM, Rousou JA, Breyer RH, Lemeshow S, Das D: Cardiac performance during reperfusion improved by pretreatment with oxygen free-radical scavengers. J Thorac Cardiovasc Surg 1986: 290-295.

39. Das DK, Engelman RM, Dobbs WA, Rousou JA, Breyer RH: The role of oxygen-derived   free radicals in pathogenesis of reperfusion injury. "Second Colloquium in Biological    Sciences," ed. CD Burrell and FL Srand; Ann NY Acad Sci 1986: 463:274-277.

R. H. Breyer, M.D.
Bibliography

40. Das DK, Engelman RM, Rousou JA, Breyer RH, Otani H, Lemeshow S: Pathophysiology of superoxide radical as a potential mediator of ischemic and reperfusion injury. Basic Res Cardiol 1986: 81:155-166.

41. Otani H, Engelman RM, Breyer RH, Rousou JA, Breyer RH, Lemeshow S, Das DK: Mepacrine, a phospholipase inhibitor: A potential tool for modifying myocardial reperfusion injury. J Thorac Cardiovasc Surg 1986: 92:247-254.

42. Das DK, Engelman RM, Rousou JA, Breyer RH, Otani H, Lemeshow S, Mundt D: Role of membrane phospholipids in myocardial injury induced by ischemia and reperfusion. Am J Physiol 1986: 251:471-479.

43. Otani H, Engelman RM, Rousou JA, Breyer RH, Das DK: Enhanced prostaglandin synthesis due to membrane phospholipid breakdown in ischemic reperfused myocardium. Control of its production by a phospholipase inhibitor or scavengers of free radicals. J Mol Cell Cardiol 1986: 18:953-961.

44. Datta S, Otani H, Engelman RM, Rousou JA, Breyer RH, Jones R, Cordis G, Lemeshow S, Das D: Antilipolytic therapy: An effective intervention to protect the ischemic heart during open-heart surgery. Surg Forum 1986: 37:275-277.

45. Engelman RM, Das DK, Otani H, Rousou JA, Breyer RH: Retrograde coronary sinus cardioplegia - influence on fatty acid metabolism during myocardial ischemia. Proceedings of the 2nd International Symposium on Myocardial Protection Via the Coronary Sinus. Springer Verlag 1987: pp. 215-220.

46. Breyer RH, Engelman RM, Rousou JA, Lemeshow S: Blood conservation for myocardial revascularization. J Thorac Cardiovasc Surg 1987: 93:512-522.

47. Das DK, Engelman RM, Flansaas D, Rousou JA, Breyer RH, Jones R, Lemeshow S, Otani H: Age-related development profiles of the antioxidative defense system and the peroxidative status of the pig heart. Biol Neonate 1987: 51:3 156-169.

48. Rousou JA, Kirkwood JR, Engelman RM, Breyer RH: Catheter drainage of symptomatic postoperative mediastinal effusion guided by computed tomography. J Thorac Cardiovasc Surg 1987: 93:715-718.

49. Das DK, Engelman RM, Rousou JA, Breyer RH: Aerobic vs anaerobic metabolism during ischemia in heart muscle. Ann chir Gynaecol 1987: 76:68-76.

50. Rousou JA, Engelman RM, Breyer RH, Whittredge P, Shnider R: Transatrial repair of post infarction posterior ventricular septal defect. Ann Thorac Surg 1987: 43:665-666.

51. Otani H, Engelman RM, Rousou JA, Breyer RH, Lemeshow S, Das DK: The mechanism of myocardial reperfusion injury in neonates. Circulation 1987: 76 (Suppl V) 161-167.

R. H. Breyer, M.D.
Bibliography

52.    Rousou JA, Engelman RM, Breyer RH, Otani H, Clement R, Prasad R, Das DK: Myocardial salvage by trifluoperazine, a calcium-calmodulin antagonist. Surg Forum 1987; 38:270-272.

53.    Clement R, Engelman RM, Rousou JA, Breyer RH, Otani H, Anlor M, Hoory S, Bandyopadhyay D, Das DK: Ibuprofen inhibits neutrophil accumulation but does not prevent myocardial reperfusion injury in coronary revascularization after acute myocardial infarction. Surg Forum 1987; 38:273-275.

54.    Vertrees RA, Engelman RM, Johnson JW III, Auvil J, Breyer RH, Rousou JA: Blood conservation during open-heart surgery: A literature review. 1986; 18:200-210.

55.    Vertrees RA, Engelman RM, Breyer RH, Johnson J, Auvil J, Rousou JA: Protamine induced anticoagulation following coronary bypass. Proc Acad Cardiovasc Perf 7:1986.

56.    Rousou JA, Engelman RM, Breyer RH, Otani H, Lemeshow S, Das DK: The effect of temperature and hematocrit of oxygenated cardioplegic solutions on myocardial preservation. J Thorac Cardiovasc Surg

57.    Otani H, Engelman RM, Datta S, Jones RM, Cordis GA, Rousou JA, Breyer RH, Das DK: Enhanced myocardial preservation by nicotinic acid, an antilipolytic compound. Improved cardiac performance following hypothermic cardioplegic arrest. J Thorac Cardiovasc Surg 96:81-87, 1988.

58.    Clement R, Rousou JA, Engelman RM, Breyer RH: Perioperative morbidity in diabetics requiring coronary artery bypass surgery. Ann Thorac Surg. 46:321-323, 1988.

59.    Das DK, Engelman RM, Prasad MR, Rousou JA, Breyer RH, Jones R, Young H, Cordis GA: Improvement of ischemia-reperfusion-induced myocardial dysfunction by modulating calcium-overload using a novel, specific calmodulin antagonist, CGS 9343B. Biochem Pharmacol. 38:465-471, 1989.

In Press

1.    Otani H, Engelman RM, Rousou JA, Breyer RH, Das DK: Enhanced susceptibility of immature hearts to free radical mediated reperfusion injury. (Ed. N. Yoshikawa)    Medical Biochemical and Chemical Aspects of Free Radicals 1988. Elsevier Science, Amsterdam.

Abstracts

1.    McClenathan JH, Guyton RA, Breyer RH, Newman GE, Michaelis LL: The effects of isoproterenol and dopamine on regional myocardial blood flow after circumflex coronary stenosis. Am J Cardiol 1976; 37:153.

R. H. Breyer, M.D.
Bibliography

2.   Breyer RH, Dainauskas JR, Jensik RJ, Faber LP: Mucoepidermoid carcinoma of the trachea
     and bronchus: The case for conservative resection. Curr Surg 1982: 39:114.

3.   Mills SA, Poole GV, Breyer RH, Hudspeth AS, Johnston FR, Cordell AR: Digoxin and
     Propranolol in the prophylaxis of dysrhythmias after coronary artery bypass surgery.
     Circulation 1982:66 (Supp II) :11-220.

4.   Breyer RH, Mills SA, Johnston FR, Hudspeth AS, Cordell AR: Subxiphoid pericardial window for
     benign and malignant pericardial effusion. Chest 1983: 84:364.

5.   Breyer RH, Karstaedt N, Mills SA, Johnston FR, Choplin RH, Wolfman NT, Hudspeth AS, Cordell
     AR: Computed tomography for evaluation of mediastinal nodes in lung cancer. correlation with
     surgical staging. Chest 1983: 84:352.

6.   Breyer RH, Mills SA, Hudspeth AS, Johnston FR, Watts LE, Nomeir A, Cordell AR: Open mitral
     commissurotomy: Long term results with echocardiographic correlation. J Cardiovasc Surg
     1983: 24:386.

7.   Rousou JA, Meeran MK, Engelman RM, Breyer RH: Does the type of venous drainage or
     cardioplegia affect postoperative conduction and atrial arrhythmias. Circ 1984: 70
     (Supp II) :253.

Movies

Pomerantz MA, Salomon J, Breyer RH: "One Stage Conversion of Intestinal to Gastric Bypass."
Symposium on Spectacular Problems in Surgery, Clinical Congress, American College of Surgeons, October
1979.

Letters to the Editor

Breyer RH, Mills SA, Hudspeth AS: Subxiphoid pericardiotomy. JAMA 1982: 248:923.

R. H. Breyer, M.D.
Lectures, Speeches, Exhibits:

April, 1976
American Association for Thoracic Surgery Tricuspid
Regurgitation: A Comparison of Non-operative
management, Tricuspid Annuloplasty, and Tricuspid
Valve Replacement.
Los Angeles, California

June, 1980
Samson Thoracic Surgical Society
Thoracotomy in Patients over Age Seventy: A Ten
Year Experience
Durango, Colorado

March, 1981
Cardiology Seminar "Coronary Artery Bypass Surgery-
Selection of Patients and Results of Surgery"
American College of Physicians
North Carolina Chapter
Winston-Salem, North Carolina

April, 1981
Lenoir County Medical Society
Coronary Artery Bypass Surgery - Indications and Results
North Carolina

June, 1981
Continuing Education Program
Surgical Indications: Lung Cancer
Davie County Hospital Medical Staff
North Carolina

October, 1982
North Carolina Surgical Society
Treatment of Metastatic Pleural and Pericardial  Disease
Kiawah, South Carolina

April, 1983
American Association for Thoracic Surgery
Is a Left Ventricular Vent Necessary for Coronary
Bypass Operations Performed with Cardioplegic Arrests?
Atlanta, Georgia

May, 1983
North Carolina Chapter
American College of Surgeons
Lung Cancer: New Advances in Diagnosis and Management
Wrightsville Beach, North Carolina

October, 1983
American College of Chest Physicians
Computed Tomography for Evaluation of Mediastinal
Nodes in Lung Cancer: Correlation with Surgical Staging
Chicago, Illinois

October, 1983
American College of Chest Physicians
Subxiphoid Pericardial Window for Benign and
Malignant Pericardial Effusion
Chicago, Illinois

R. H. Breyer, M.D.
Lectures, Speeches, Exhibits:

| | |
|---|---|
| November, 1983 | Southern Thoracic Surgical Society<br>Computed Tomography for Evaluation of Mediastinal<br>Nodes in Lung Cancer: Correlation with Surgical Staging<br>Marco Island, Florida |
| October, 1984 | American College of Surgeons<br>Forum on Fundamental Surgical Problems<br>A comparison of Cell Saver and Ultrafilter in Cardiac<br>Surgical Patients<br>San Francisco, California |
| April, 1985 | American Association for Thoracic Surgery<br>Post-Infarction Angina: An Expanding Subset of<br>Patients Undergoing Coronary Artery Bypass.<br>New Orleans, Louisiana |
| August, 1985 | International Society for Cardiovascular Surgery<br>Coronary Artery Bypass for Unstable Post Infarction<br>Angina: An Analysis of Risk Factors and Results<br>Monte Carlo, Monaco |
| October, 1985 | American College of Surgeons<br>Forum on Fundamental Surgical Problems<br>SOD and Catalase Pretreatment Prior to Cardioplegic<br>Arrest in the Face of Regional Ischemia.<br>Chicago, Illinois |
| June, 1986 | Western Thoracic Surgical Association<br>Blood Conservation for Myocardial Revascularization:<br>Is It Cost Effective?<br>Napa, California |
| September, 1987 | Society of Thoracic Surgeons<br>Bilateral Thoracotomies and Bullae Resections 24<br>Hours after Myocardial Revascularization. |

**EXHIBIT I**



THE STAFF OF

**SUMMIT**
MEDICAL CENTER

<u>CONFIDENTIAL</u>

May 11, 2005

Coyness L. Ennix, Jr., M.D.
101 Seaview Ave.
Piedmont, CA 94610

Re:  <u>Summary Suspension of Clinical Privileges</u>

Dear Dr. Ennix:

I am writing to confirm our telephone conversation of May 10, 2005, in which I informed you that I have decided to summarily suspend your clinical privileges at the Summit Campus of the Alta Bates Summit Medical Center pursuant to Section 7.1 of the Medical Staff Bylaws ("the Bylaws"). This means that you cannot provide any patient care services at the Summit Campus. The suspension is effective immediately, and will remain in place pending consideration by the Medical Executive Committee ("MEC") at a special meeting which will be held on Wednesday, May 18, 2005, at 6:00 p.m., in Annex A. You are hereby requested to attend that meeting for purposes of making a statement on your own behalf and responding to questions. It will be an informal meeting, not a hearing, and no attorneys will be present. If the MEC does not remove the suspension after that meeting, you will be entitled to request a hearing pursuant to Article VIII of the Bylaws.

This summary suspension is based on my determination, as President of the Medical Staff, that failure to take such action may result in an imminent danger to the health or safety of patients. The underlying facts are as follows:

1. Over the last year, you have been under formal investigation by an Ad Hoc Committee ("AHC") because of concerns about the quality of your practice, as reflected in Quality Assurance and Surgery Peer Review Committee records at this facility as well as peer review data obtained from the Alta Bates Medical Staff.

   In January, 2005, the AHC submitted ten cases for evaluation by National Medical Audit ("NMA"), an outside peer review organization. Seven of the ten cases involved patient deaths. The issues and concerns were described in a letter to NMA dated January 4, 2005, a copy of which was sent to you. During the course of NMA's evaluation, you were given opportunities to submit information and speak directly with the reviewers. On May 3, 2005, NMA issued its Report. You were given a copy of the Report on May

William Isenberg, M.D., Ph.D.  •  Fredric Herskowitz, M.D.  •  Bruce Moorstein, M.D.  •  Annette M. Shaieb, M.D.
President                Vice President                Secretary/Treasurer            Immediate Past President
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

10, 2005, although it has not yet been considered by the AHC. NMA found that the cases reviewed exhibited: (a) poor judgment; (b) poor technique; and (c) grossly substandard documentation. NMA's final conclusion, after 31 pages of discussion, was that: "If these patterns of care go uncorrected, it is likely that there will be future patient harm."

2.   On May 4, 2005 you performed surgery on Patient F.B., a 40 y/o Hispanic man (MR #0847726). He underwent AVR and MVR with resection of a subaortic ring for severe rheumatic heart disease.

During late afternoon and evening of May 4, 2005, both you and your covering partner gave verbal orders for transfusion of blood and products:

| 1600 | 3units FFP; 2 plt superpacks; 2 units pRBC |
| 2000 | 2 units FFP; 2 units pRBC; 10 units cryo ppt |
| 2300 | 2 units pRBC |

At 0800 on May 5th you countersigned these verbal orders. However, there is no evidence from the chart that you physically saw the patient. There are notations through the day that you were aware of some aspects of the patient's condition, however, no visit was documented. The order for extubation was a verbal order.

On the morning of May 6, 2005, during critical care rounds, Dr. Herskowitz noted that there was no daily note on the patient's chart. Further analysis by Dr. Herskowitz and Dr. Stanten revealed that there were no progress notes for either May 5 or May 6, 2005. Finally, by 01600, notes dated May 5 and May 6, 2005, appeared on the chart. Examination of the note dated May 5, 2005, revealed that it contained lab data from May 6, 2005, indicating that it had been falsely dated and entered into the record to document a visit that may or may not have occurred. According to the nurse on duty, you had been seen signing orders while on the unit, but not visiting or examining the patient.

The issues were discussed with you on May 10, 2005, at which time you claimed that you examined the patient on a daily basis but were too busy to document it, and that you did not intend to falsify the record. You also expressed a vague understanding that your partners would look after the patient while you were busy, although you did not recall having made arrangements with any of them to do this. These responses did not resolve or mitigate the concerns.

Your apparent failure to examine this patient on a daily basis post-operatively, and your apparent falsification of the medical record, are alarming developments in the context of the Medical Staff's peer review activities as described above, and justify the summary suspension of your clinical privileges to avoid the ongoing exposure of your patients to an imminent threat of harm.

As noted above, the AHC has not yet had an opportunity to consider the NMA Report, which arrived very recently. The AHC will meet soon to discuss the matter and decide how to proceed. The AHC will communicate with you as appropriate.

Please contact Joanne Jellin, PsyD, CPMSM, Director of Medical Staff Services, as soon as possible to confirm that you will attend the MEC's special meeting at the time and place stated above.

Sincerely,

William Isenberg, M.D., Ph.D.
President of the Medical Staff

cc:    Lamont Paxton, M.D., Chair, Ad Hoc Committee
       Warren Kirk, CEO

3

EXHIBIT J



**THE STAFF OF**

**SUMMIT**
MEDICAL CENTER

**CONFIDENTIAL**

May 19, 2005

Coyness L. Ennix, Jr., M.D.
101 Seaview Ave.
Piedmont CA 94610

Re:    Stipulated Restriction of Privileges

Dear Dr. Ennix:

Thank you for meeting with the Medical Executive Committee ("MEC") on May 18, 2005, to discuss the summary suspension of your clinical privileges that I imposed in my capacity as President of the Medical Staff on May 10, 2005. I am writing to confirm the telephone conversations that you and I have had subsequent to that meeting.

Following your presentation, the MEC decided to keep the summary suspension in place pending the outcome of the current Ad Hoc Committee ("AHC") investigation. When I called to inform you of this, you asked whether, in lieu of the suspension, you could limit your practice to surgical assisting. I pointed out, and you acknowledged, that I do not have the authority to make this decision unilaterally, as it would affect an action formally taken by the MEC.

On May 19, 2005, I called you to say that I was willing to poll the members of the MEC regarding your proposal, but first I wanted to clarify that "surgical assisting" would mean only the task of physically assisting in the operating room for cardiothoracic surgical cases. This prohibits all other patient care services, including, but not necessarily limited to: the exercise of any discretion in selecting procedures to be performed, obtaining informed consent, making intra-operative decisions, documenting procedures, managing or following patients post-operatively, making progress notes, making orders, and taking call for inpatients or emergency situations. As the surgical assistant, you may not be the only cardiothoracic surgeon in the room with any patient at any time. We also clarified that these restrictions would remain in effect pending the outcome of the AHC investigation. Should the MEC then decide on an action or recommendation that gives rise to hearing rights under the Medical Staff Bylaws, you will be notified accordingly and your rights will be respected. You agreed to all of these terms.

William Isenberg, M.D., Ph.D.    Fredric Herskowitz, M.D.    Bruce Moorstein, M.D.    Annette M. Shaieb, M.D.
President    Vice President    Secretary/Treasurer    Immediate Past President
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

I have polled the members of the MEC, and your proposal has been accepted as a voluntary measure in lieu of the summary suspension. Therefore, effective immediately, you may assist in cardiothoracic surgery with the prohibitions as described above. Because you have expressly stipulated to the restriction, it is not subject to appeal, and the hearing rights we discussed generally with reference to the MEC's suspension decision do not apply.

Please understand that, under the circumstances, we are required by law to report this restriction of privileges to the Medical Board of California and the National Practitioner Data Bank. We will communicate with you further about this in due course.

Sincerely,

William Isenberg, M.D., Ph.D.
President of the Medical Staff

cc:     Warren Kirk, CEO
        Lamont Paxton, M.D., Chair, Ad Hoc Committee
        Russell Stanten, M.D., Chief, Cardiovascular Surgery Service

2

**EXHIBIT K**



THE STAFF OF

**SUMMIT**
MEDICAL CENTER

October 11, 2005

CONFIDENTIAL
VIA HAND DELIVERY OCTOBER 12, 2005

Coyness L. Ennix, Jr., M.D.
101 Seaview Ave.
Piedmont, CA 94610

Re:   Medical Executive Committee Actions Following Investigation

Dear Dr. Ennix:

On the evening of September 7, 2005, the Medical Executive Committee ("MEC") met with you to discuss the Report and Recommendation of the Ad Hoc Committee ("AHC"), dated August 1, 2005. As I explained to you the next day, the MEC did not make any decisions regarding your clinical privileges, because you had provided the MEC with a considerable amount of new information, from a variety of sources, and additional time was needed to evaluate it fairly and adequately. The MEC has now had an opportunity to assess the matter fully, including the undated letter that we received from you on September 15, 2005 (referenced below as "your letter of September 15, 2005"). This is to inform you of the results, as determined by the MEC on October 11, 2005.

1.   Fairness

You claim to have been treated unfairly during this peer review process. For example, at our meeting on September 7, 2005, you told the MEC that you had been treated unfairly "from the very beginning," in that we had received a copy of the Alta Bates peer review report by Dr. Forrest Junod on December 18, 2003, and you were not informed of its existence until four or five months later. Previously, you told the AHC that you had been treated unfairly because your cases were singled out for special scrutiny, when the process would have been put to rest in favor of other physicians after initial reviews at the Service Peer Review Committee level raised no quality of care issues. You also described the National Medical Audit ("NMA") reviewers as "business men," and attempted to undermine their findings by attacking their integrity. Similar themes were echoed in the letters you presented from other physicians who were recently engaged by your attorney to make comments on your behalf.

The MEC rejects the notion that you have been treated unfairly. At our meeting on September 7, 2005, you ultimately conceded, when questioned, that in fact you were aware of Dr. Junod's report before we informed you that we had received a copy, although you did not provide any details. We have since confirmed that Alta Bates Medical Staff leadership sent you a copy of the report before it was forwarded to us. Similarly, all of your other claims of unfairness have been determined to be unsupported by the facts or otherwise unfounded.

William Isenberg, M.D., Ph.D.   •   Fredric Herskowitz, M.D.   •   Bruce Moorstein, M.D.   •   Annette M. Shaieb, M.D.
President                              Vice-President                        Secretary/Treasurer                  Immediate Past President

350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

The AHC addressed this topic in Section III.G of its report, and we agree with its findings regarding the issues that were raised at that level. The comments that were later solicited by your attorney do not undermine these assessments. Those who wrote letters on your behalf do not appear to have any special expertise or insights regarding legal standards of fair procedure in Medical Staff peer review proceedings, much less do their comments exhibit any substantial knowledge of the facts surrounding the investigation in your case. You have chosen not to reveal what information was presented to any of these people (even though members of the MEC requested this), but it is clear that they did not know, or chose to ignore, material information regarding this Medical Staff's peer review process.

As you are aware, the Medical Staff is obligated to explore and resolve quality of care issues that come to its attention, even in cases where earlier reviews did not raise concerns. We believe you also realize, despite your presentation, that procedural fairness is a core value that has guided the Medical Staff in every aspect of these proceedings. At all times, you were treated with respect and courtesy. Not only did you have extensive opportunities to address the issues before NMA prepared its report, and again before the AHC prepared its own report, but you have since been afforded additional opportunities to generate and submit new information that should have been presented to the AHC months ago. Indeed, the fairness with which you have been treated has far exceeded the procedural requirements of the Medical Staff Bylaws and the law. We are confident of our ability to demonstrate this, should the need arise.

2.    <u>Quality of Care</u>

Your letter of September 15, 2005, expresses the belief that your "clinical results, judgment and comportment in all reviewed instances were in keeping with sound medical practice." The MEC does not agree.

Clearly, there is room for more than one opinion regarding certain aspects of your performance in some of the cases that were reviewed. This is why, after meeting with you, the AHC declined to endorse some of NMA's specific findings. Perhaps the new information and opinions you have since presented to the MEC would similarly affect a few of the AHC's specific conclusions. However, the letters solicited by your attorney do not reflect a balanced and objective effort to evaluate the quality of your practice. They are adversarial in nature, affording you the benefit of every doubt, while glossing over important facts and giving little or no attention to the issues that were of primary concern to the AHC. As noted above, we do not know what information or guidance they were given, or by whom, even though you were expressly asked to provide this information.

One need not be a specialist in cardiothoracic surgery to recognize the validity of the AHC's basic conclusions regarding your practice. Its first conclusion was that you should not be allowed to perform minimally invasive surgery. This was based on a variety of problems found in your documentation, judgment and technique in the first four minimally invasive valve procedures you performed. You have made a commitment never to perform these procedures again.

Many of the same types of problems were found among the six CABG procedures. The

concerns were corroborated by the peer review documentation from Alta Bates, and by the interviews with physicians and others who have worked with you routinely and are personally familiar with your practice. Based on the evidence collected during the AHC's investigation, as described in its report, the AHC drew these fundamental conclusions:

(a)     You cannot be relied upon to discharge the important medical record keeping responsibilities that are inherent to a cardiothoracic surgical practice; and

(b)     You cannot be relied upon to emulate your peers in their diligence and exercise of sound judgment in the care of patients.

The MEC has determined, after considering your rebuttal presentation, that the above conclusions are valid. We are prepared to demonstrate this, just as we are prepared to demonstrate the fairness of the peer review process, should the need arise.

3.     Actions

Contrary to the belief expressed in your letter of September 15, 2005, no aspect of this matter has anything to do with "punishment." Having identified deficiencies in your professional performance, the MEC's sole objective is to pursue remedial measures that are reasonable and warranted to protect the interests of patients. Your failure to acknowledge this, and your departure from what appeared earlier to be a recognition that your practice is in need of improvement, are discouraging developments that underscore the need for corrective action as set forth below. For the reasons stated above, and based on the facts leading to the current limitation of your privileges, allowing you to resume practicing cardiothoracic surgery with no restrictions in place, as you appear to suggest in your letter of September 15, 2005, may result in an imminent danger to the health or safety of patients and would not be acceptable.

(a)     Proctoring by Another Cardiothoracic Surgeon

Since May 18, 2005, by stipulation, your clinical privileges have been restricted to surgical assisting, only. The MEC has now decided to reinstate your cardiothoracic surgery privileges, without minimally invasive valve procedures, subject to the following proctoring requirements (which are based on the AHC's recommendations, as clarified in response to the questions raised in your letter of August 29, 2005):

(1)     In all heart cases, a proctor must oversee each patient's evaluation and informed consent process and concur in the judgment as to which, if any, procedures are indicated. In all thoracic cases, proctoring by retrospective chart review will suffice.

The initial evaluation of every heart patient must be overseen by a proctor, whether it is someone who needs surgery or not. If surgery is indicated, the proctor need not be present at the bedside during the informed consent or evaluation, but the proctor does need to evaluate the patient and review all tests and the treatment plan. The proctor will review the material in the medical record, including your evaluation of the patient and informed

consent. This review will occur before an operation begins and concurrently, if the patient is not going to surgery. The proctor will have veto power when it comes to decision-making regarding treatment.

Quality issues will be resolved by peer review, as deemed appropriate by the Medical Staff's designated representatives. We cannot speak to the issue of potential liability in the event of a "mistake in judgment." The proctors and you are free to consult with your respective attorneys and insurance carriers regarding this topic. This paragraph also responds to the same questions you have raised regarding the elements below.

(2)     **A proctor must be present in the operating room during the entire heart operation, and personally monitor the patient's postoperative care at least daily until discharge from an intensive care unit and every other day for the remainder of the hospitalization.**

This means that, in all heart cases a proctor must be in the room from sternotomy until the decision to close. Personally monitoring the patient's care daily means that, during the patient's critical care stay, a proctor must examine the patient and look at the chart at least once daily. After the patient has left the intensive care unit, a proctor must examine the patient and look at the chart at least once every 48 hours. The proctor's monitoring of the record must involve reviewing progress notes, orders and treatment plans.

(3)     **All documentation must be closely monitored by a proctor at least daily.**

If the patient is in the intensive care unit, all documentation must be monitored daily, whether it is a weekday, weekend or holiday. Prolonged ICU stays not due to cardiac issues may be monitored less frequently, i.e., at least once every 48 hours until off-service.

(4)     **In the event that any disagreement arises between you and a proctor on any issue, the proctor's judgment will prevail.**

This includes minor issues such as drug choices and fluid management. The proctor will have veto power.

(5)     **If the proctor determines at any time that a patient's welfare is in jeopardy, the proctor will have the prerogative to take over the care of the patient immediately. Any such event must be reported as soon as possible to the President of the Medical Staff.**

Again, the proctor will have veto power with regard to the care of the patient.

(6)     **We recognize that, based on scheduling and availability, more than one proctor might be involved in overseeing the pre-operative, peri-operative and post-operative aspects of your care of a given patient.**

MEC LETTER TO DR. ENNIX FINAL 1005                4

It will be your responsibility to coordinate the proctoring, and to assure that all proctors prepare and promptly submit written reports covering their respective activities, in every case.

A special proctoring form will be created to cover the pre-operative, peri-operative, and post-operative periods. It will be available in the Medical Staff Office.

(7)    At six (6) month intervals, the AHC will review the proctoring reports and other relevant information, interview the proctors and you, as warranted, and make progress reports and recommendations to the MEC. The above proctoring requirements will remain in effect until the MEC determines, as a matter of discretion, that they are no longer necessary.

(8)    The above proctoring requirements involve a restriction of your clinical privileges, and therefore give rise to hearing rights under Article VIII of the Medical Staff Bylaws. However, because the reinstatement of your cardiothoracic surgery privileges, even on a restricted basis, calls for you to have more latitude than you currently have in your practice at this facility, the MEC has decided to make this action effective immediately upon my receipt of: (a) your written agreement to comply with the above proctoring requirements, as signified by your execution of a copy of this letter in the space provided below; and (b) a written commitment by at least one qualified proctor to perform the required services, as signified by his signature on a copy of the enclosed "Agreement of Proctor" form. This does not deprive you of your hearing rights, as discussed below.

(b)    <u>Involvement by a Cardiologist</u>

A cardiologist must follow every hospitalized heart patient until discharge. Ideally, it will be the referring cardiologist, if he or she is a member of the Medical Staff. If the referring cardiologist does not have clinical privileges at this facility, you must engage a cardiologist who is a member of the Medical Staff to follow the patient.

(c)    <u>Remedial Education in Medical Record Keeping</u>

You must attend, at your expense, the full two-day medical record-keeping course offered by the UCSD PACE program at the next available session, which is scheduled for January 26-27, 2006. (We understand that the course scheduled for October 27-28, 2005, is now full. If you have already signed up for it, we would strongly prefer that you take it instead of waiting until the next course in January). A certificate of successful completion must be submitted to the Medical Staff Office as soon as possible following the course. This requirement does not involve a restriction of your clinical privileges, and therefore does not give rise to hearing rights under the Medical Staff Bylaws.

(d)  **Standards and Expectations**

You will be held to the Medical Staff's standards and expectations regarding all aspects of your practice, including quality of care and medical record-keeping. Please review Section 22 of the Rules and Regulations for details regarding medical record-keeping. Note, in particular, that operative reports must be completed immediately following the procedure and must include certain information, as specified. You have suggested that you would be inclined to follow your patients to the CPU and dictate your operative reports there. We strongly encourage you to adopt this practice.

(e)  **Reservation of Rights**

The MEC reserves the right to take such measures as it deems warranted at any time to protect the interests of patients pursuant to the Corrective Action provisions of the Medical Staff Bylaws. Failure to comply with all of the above requirements or to meet the Medical Staff's standards of professional performance, including medical record-keeping, in any substantial way, would be deemed grounds for Corrective Action, which may include a summary suspension or restriction of your clinical privileges.

4.  **Hearing Rights and Reporting Requirements**

We sincerely hope that you will accept all of the above measures, and agree to comply with them so that we may put this controversy behind us and work cooperatively toward the necessary improvements in your practice. However, as noted above, the proctoring requirements do involve a restriction of your clinical privileges, and therefore give rise to hearing rights if you wish to exercise them.

If you wish to request a hearing, you must do so in writing, as stated in Section 8.1.G. of the Medical Staff Bylaws. Your request must be received by the Medical Staff Office within thirty (30) days of your receipt of this letter. If you do not request a hearing within the time and in the manner specified, you will be deemed to have waived any right to a hearing and accepted the restriction of your privileges as described herein. Note that, if you execute this letter in the space provided below, and thereby agree to the proctoring requirements specified in this letter, it will constitute an express waiver of your hearing rights and acceptance of the MEC's action.

If you make a timely request for a hearing, the proceedings will be conducted in accordance with Sections 8.1.H through R of the Medical Staff Bylaws. This will include the appointment of a special Hearing Committee comprised of impartial physicians who have not been involved in the matter previously; the appointment of an impartial Hearing Officer to preside over the hearing; rights of voir dire; rights of discovery; possible representation by an attorney; and the issuance of a written decision at the conclusion of the proceedings. Please review Article VIII of the Medical Staff Bylaws for a more complete description of your rights. A complete copy of the Medical Staff Bylaws was given to you previously, but if you need another copy, you may obtain one from the Medical Staff Office.

As you will recall, on June 16, 2005, the MEC made reports to the Medical Board of

MEC LETTER TO DR. ENNIX FINAL 1005                                    6

California ("MBC") and the National Practitioner Data Bank ("NPDB") regarding the MEC's summary suspension of your clinical privileges and your subsequent stipulation to surgical assisting privileges, only, pending the results of the investigation. Because the MEC's current actions modify the restriction of your privileges, effective immediately, they will be reported to the MBC and the NPDB within fifteen (15) days. If you agree to accept these actions without challenge, this will be stated in the reports. Similarly, if a hearing is requested or your intent is unknown as of the reporting date, the facts will be reflected in the reports.

If you have any questions or comments regarding this letter, please direct them to me in writing in the care of the Medical Staff Office. Any communications from your attorney should be directed to our attorney, as you have been advised previously.

Sincerely,

William Isenberg, M.D., Ph.D.
President of the Medical Staff

Enclosure

## AGREEMENT

I, Coyness L. Ennix, Jr., M.D., have read the proctoring requirements specified above, and I hereby agree to accept and comply with them. I understand that the Medical Staff Bylaws give me the right to request a hearing to challenge them. By signing this agreement I am waiving that right.

_____          Date: _____

Coyness L. Ennix, Jr., M.D.

Enclosures:     "Agreement of Proctor" forms (four copies)

MEC LETTER TO DR. ENNIX FINAL 1005                    7

**THE STATE OF**

**SUMMIT**
MEDICAL CENTER

### AGREEMENT OF PROCTOR

I, _____ M.D., hereby agree to serve as a proctor for Coyness L. Ennix, Jr. M.D. At all times, when serving in that capacity, I will discharge the following responsibilities:

(1)    In all heart cases, I will oversee the patient's evaluation and informed consent process and concur in the judgment as to which, if any, procedures are indicated. In all thoracic cases, proctoring will be by retrospective chart review.

More specifically, while serving as a proctor, I will oversee the initial evaluation of every heart patient, whether it is someone who needs surgery or not. If surgery is indicated, I will have the option not to be present at the bedside during the informed consent or evaluation, but I will evaluate the patient and review all tests and the treatment plan. I will review the material in the medical record, including Dr. Ennix's evaluation of the patient and informed consent. This review will occur before an operation begins and concurrently, if the patient is not going to surgery. I will have veto power when it comes to decision-making regarding treatment.

(2)    I will be present in the operating room during the entire heart operation, and personally monitor the patient's postoperative care at least daily until discharge from an intensive care unit and every other day for the remainder of the hospitalization.

More specifically, in all heart cases, I will be in the room from sternotomy until the decision to close. Personally monitoring the patient's care daily means that, during the patient's critical care stay, I will examine the patient and look at the chart at least once daily. After the patient has left the intensive care unit, I will examine the patient and look at the chart at least once every 48 hours. My monitoring of the record will involve reviewing progress notes, orders and treatment plans.

(3)    All documentation will be closely monitored by me at least daily.

If the patient is in the intensive care unit, all documentation will be monitored daily, whether it is a weekday, weekend or holiday. Prolonged ICU stays not due to cardiac issues may be monitored less frequently, i.e., at least once every 48 hours until off-service.

William Isenberg, M.D., Ph.D.  •  Fredric Herskowitz, M.D.  •  Bruce Moorstein, M.D.  •  Annette M. Shaieb, M.D.
President                          Vice-President              Secretary/Treasurer         Immediate Past President
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

(4)    In the event that any disagreement arises between Dr. Ennix and me, on any issue, it is understood that my judgment will prevail.

This includes minor issues such as drug choices and fluid management. I will have veto power.

(5)    If I determine at any time that a patient's welfare is in jeopardy, I will have the prerogative to take over the care of the patient immediately. Any such event will be reported as soon as possible to the President of the Medical Staff.

Again, I will have veto power with regard to the care of the patient.

(6)    I will prepare and promptly submit a written proctoring report in every case.

A special form will be given to me by the Medical Staff Office for use in this process. It will cover the pre-operative, peri-operative, and post-operative periods.

(7)    Based on scheduling and availability, more than one proctor might have to be involved in overseeing the pre-operative, peri-operative and post-operative aspects of Dr. Ennix's care of a given patient. It will be Dr. Ennix's responsibility to coordinate the proctoring.

I understand that, at six (6) month intervals, an Ad Hoc Committee will review the proctoring reports and other relevant information, interview me and any other proctors, as well as Dr. Ennix, as warranted, and make progress reports and recommendations to the Medical Executive Committee ("MEC"). The above proctoring requirements will remain in effect until the MEC determines, as a matter of discretion, that they are no longer necessary.

Quality issues, if any, will be resolved by peer review, as deemed appropriate by the Medical Staff's designated representatives.

I understand that the Medical Staff cannot speak to the issue of potential liability in connection with these undertakings. I acknowledge that I am free to consult with my own attorney and insurance carrier regarding this topic.

_____          Date:_____
Signature

_____
Printed name

**EXHIBIT L**

**COYNESS L. ENNIX, JR., M.D.**
**101 Sea View Ave.**
**Piedmont, CA. 94610**
**(510) 547-8945**



October 24, 2005

William Isenberg, M.D. PhD
President of the Medical Staff
Alta Bates Summit Medical Center
350 Hawthorne Ave.
Oakland, CA. 94609

Re: <u>Response to M.E.C. Actions Following Investigation</u>

Dear Dr. Isenberg:

I received your letter dated October 11, 2005. I have read the proctoring requirements specified in your letter and I hereby agree to accept and comply with them.

In total, I have approached nine cardiac surgeons on the staff of Alta Bates Summit Medical Center regarding the responsibilities of proctoring me. In keeping with the proctorship agreement, at this point, the proctorship management team will consist of six surgeons and possibly 2-3 additional surgeons at a later date.

Effective immediately, Doctors David Alyono, Brian S. Cain, Dennis S. Durzinsky, Thomas A. Gonda Jr., John L. Jones, and Hon S. Lee will assume proctoring responsibilities.

Concurrently, Doctors Junaid Khan, Leigh Iverson, and Russell Stanten have also been asked to consider the proctorship agreement. If I'm able to arrange for these additional physicians to proctor, I will inform you of their role immediately.

More specifically, Drs. David Alyono, Brian S. Cain, Dennis Durzinsky and Hon S. Lee will manage the preoperative and intraoperative proctorship. Drs. David Alyono, Brian S. Cain, Dennis Durzinsky, Thomas A. Gonda, John L. Jones and Hon S. Lee will manage the postoperative responsibilities.

However, we wish to suggest one slight amendment to the proctorship. All candidates for proctorship agree that the requirement of the proctor to be in the room during left internal mammary harvesting is unnecessary for optimal patient safety. The approach to mammary artery harvest limits this part of the operation to one person with little to no

input from a proctor. This particular issue has been discussed with Dr. Steven Stanten, Chairman of the Department of Surgery. He agrees that the consideration is valid but would of course, subject to your approval.

We suggest that the wording in item (2) of the proctor agreement be amended as such: *In the cases requiring internal mammary artery harvest, I agree to be on the premises of the Summit North Campus facility.*

All proctors curriculum vitae are enclosed. I hope to start the proctorship arrangement as soon as I hear from you.

Thank you Dr. Isenberg.

Sincerely yours,

Coyness L. Ennix, Jr., M.D.

**EXHIBIT M**

THE STAFF OF



**SUMMIT**
MEDICAL CENTER

**CONFIDENTIAL**

December 30, 2005

Coyness L. Ennix, Jr., M.D.
101 Seaview Ave.
Piedmont, CA 94610

Re:    **Summary Restriction of Clinical Privileges**

Dear Dr. Ennix.

Thank you for meeting with Steven Stanten, M.D., Chair of the Department of Surgery, and me this morning to discuss the concerns that have arisen regarding several of your cases since your surgical privileges were reinstated on October 25, 2005. I am writing to confirm that, pending prompt further review of those cases, and possibly a more comprehensive review of your recent performance, Dr. Stanten and I, in consultation with the Officers, have decided to summarily restrict your privileges pursuant to Section 7.1.F. of the Medical Staff Bylaws. Until further notice, you may continue to provide follow-up care for your patients who are already in the hospital, but you may not perform any surgery.

This summary action will be reviewed at a special meeting of the Medical Executive Committee next week. Because of the timing of the action, including the holiday weekend, it is not possible to schedule the meeting today, but it will be scheduled as soon as possible. We will keep you informed.

Preliminarily, we note that out of your 10 most recent surgical cases, 5 involved complications as noted by your proctors:

- In the case of J.L., MR #1326388, who had an ACB with IMA-5 on 10/25/05, the proctor reported, as a complication, difficulties encountered during the harvesting of the IMA.
- In the case of A.S., MR #770522, who had a pacemaker insertion on 11/16/05, there was an occlusion which was identified by your proctor, who felt that you should have been able to identify it yourself and modify your plan.
- In the case of E.J., MR #958544, who had a right video assisted thoracoscopy with talc pleurodesis on 11/23/05, there was a post-op hematoma and 2 take-backs and an inadvertent lung rent requiring repair by the proctor.
- In the case of R.T, MR #1275403, who had a mitral valve replacement, ACB x5, and MAZE on 12/13/05, there was post-op bleeding requiring take-back for evacuation of a pericardial blood collection.
- In the case of J.C., MR #1329920, who had an ACB with IMA and aortic valve

William Isenberg, M.D., Ph.D. • Frederic Herskowitz, M.D. • Bruce Moorstein, M.D. • Annette M. Shaieb, M.D.
*President*           *Vice-President*           *Secretary/Treasurer*           *Immediate Past President*
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

replacement and MAZE on 12/20/05; there was a post-op bleed requiring an almost immediate take-back and a subsequent problem with the IMA graft requiring stenting.

These cases will be reviewed as quickly as possible by Dr. Stanten and Lamont Paxton, M.D., who will speak with your proctors, and consult with me regarding the need for further investigative activities at this time. As noted at our meeting this morning, there are other cases, too, which have raised some concerns and will require attention in the peer review process, whether or not your privileges remain summarily restricted.

Sincerely,

William Isenberg, M.D., Ph.D.
President of the Medical Staff

cc:     Steven Stanten, M.D.
        Lamont Paxton, M.D.

2

**EXHIBIT N**



**THE STAFF OF**

**SUMMIT**
MEDICAL CENTER

January 3, 2006

William M. Isenberg, M.D., Ph.D.
Medical Staff President

      RE:    Review of Medical Records Pertaining to Coyness Ennix, M.D.

Dear Dr. Isenberg,

This review occurred on December 30th, 31st, January 1st and 2nd. It included a meeting with Lamont Paxton, M.D. on Sunday January 1st. There is a list of Dr. Ennix's patients from the end of October to the end of December 2005, five of those patients have asterisks next to them regarding potential complications. I will review all of these cases beginning with the non-asterisked cases to be followed by the five-asterisked cases at the end.

Patient F.C. MR #982677 -- This 88 y/o gentleman was admitted on November 18, 2005 by cardiology with four-vessel coronary disease. A pulmonary consultation and a cardiothoracic consultation by Dr. Ennix on 11/18/2005. Due to the patient's medical condition it was felt that surgery was not appropriate and the patient and family decided not to have surgery there was excellent documentation both in the work-up, explanation of options and timeliness of consultation and dictation. There were daily visits, orders and plans that were well documented. No problems were found with this case.

Patient W.C. MR #589440 – Date of admission 11/02/05, date of discharge 11/12/05 when the patient was transferred to the South Pavilion. Dr. Ennix consulted on this patient on 11/02/05 because of coronary artery disease. There was an adequate pre-operative evaluation with appropriate options and plans discussed, a cardiologist was on the case. There was no delay in surgery, which was performed on 11/02/05. Dr. Ennix as surgeon, Dr. Cain as first assistant, Dr. Hon Lee and Dr. Thomas Gonda as second assistants. The patient underwent an aorto coronary bypass four-vessels beating heart on pump, LIMA He had a left internal mammary artery to the LAD bypass and three saphenous vein grafts. The pump time was 116 minutes. There was adequate technique, blood usage and outcomes. No complications during surgery were noted. An adequate operative note and report was dictated. There was no return to surgery. Post-operatively the patient had small asymptomatic apical pneumothoraces and some atrial fibrillation, which was controlled with medications. Post op care was very thorough with daily and sometimes twice daily notes, appropriate orders and plans. No complications developed. Because of weakness the patient was transferred to Summit South for further rehab. No quality issues were identified.

William Isenberg, M.D., Ph.D.  •  Frederic Herskowitz, M.D.  •  Bruce Moorstein, M.D.  •  Annette M. Shaieb, M.D.
*President*           *Vice-President*       *Secretary/Treasurer*     *Immediate Past President*
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

Patient B.D. MR #1027325 – This is an 85 y/o women with chronic obstructive pulmonary disease and coronary artery disease. She came to the E.R. with shortness of breath was intubated found to have pneumonia and after being on the ventilator for approximately 8 days a consultation with Dr. Ennix was obtained. This was dictated, timely and thorough. She underwent a trachestomy on 11/04/05, operative report and technique was quite adequate, post-operative care was thorough and there were no post-operative problems.

Patient A.G. MR #1327278 – This gentleman underwent a total hip replacement at Alta Bates on 11/01/05 and while there it was noted on chest x-ray to have a big left upper lobe mass and was then transferred to Summit South for rehab. Patient has a history of hypertension and prostate carcinoma. A consultation with Dr. Ennix was obtained on 11/07/205 because of the left lung mass, CT scan was done which revealed this to a type III aortic aneurysm which extended down to the bi-furcation. There was an adequate work-up, thorough consultation dictated. The patient was felt not to be an operative candidate. The patient needed no further care other than blood pressure control. There were no quality problems identified with this case.

Patient D.T. MR # 1314079 – This gentleman was admitted on 11/15/05 with coronary artery disease, elevated lipids, obesity and asthma. A very thorough work-up and pre-operative evaluation was documented in the chart, there was cardiologist on the case, there was no delay in surgery. On 11/15/05 the patient was taken to surgery. First assistant Dr. Hon Lee, second assistant was Dr. John Jones. Patient had an off-pump beating bypass with left internal mammary artery to the LAD and two saphenous grafts. Appropriate pump times were documented. There was good technique, good outcomes and no complications during surgery. There was a very thorough and timely operative note, no post-operative complications, and no return to surgery. Patient was discharged on 11/21/2005, sixth post-operative day, there were very thorough post-operative progress notes, sometimes twice a day with appropriate orders and plans. This patient returned to the E.R. on 11/23/05 with right shoulder and chest wall pain that radiated to the right arm that was worse with movement and cough. The patient was seen by Dr. Liu in the E.R., patient had stable vital signs, was febrile. Chest x-ray showed small bi-lateral pleural effusions, EKG was unchanged, physical examination was otherwise unremarkable. Conversation with Dr. Ennix via telephone and was felt that this was due perhaps to a brachial plexus irritation and that the patient's arm should be placed in a sling and no further work-up was necessary. The patient was discharged for follow-up. During the patients hospitalization from 11/15/05 to 11/21/05 there is no mention of arm or should pain in the nurses notes or the doctors notes. There were no problems with the quality of care rendered in this case.

Patient D.T. MR #573712 – This is elderly women who fell at night, had chest pain, she also has hypertension, osteoarthritis and seizures she had a large right-sided pleural effusion. Dr. Ennix was consulted on the patient on 11/27/05 because of a persistent effusion and a chest tube was placed. Adequate pre-operative evaluation and a timely consultation were dictated. Daily visits were noted beginning on the 27th after the chest

tube was placed and daily visits occurred until 12/01/05. The chest tube was removed after the effusion was evacuated. No complications were noted during this case.

Patient C.S. MR #515079 – Date of admission 11/17/05 date of discharge is 11/23/05. This is a male with syncope, chest pain and atrial fibrillation who was admitted to the hospital. He underwent an off-pump aorto coronary bypass X 2 on 11/17/05. There is a thorough and well-documented pre-operative work-up, a cardiologist was on the case, options and plans were thoroughly discussed. Surgeon was Dr. Ennix, first assistant was Dr. Cain, second assistant was Dr. Gonda. Adequate technique and intra-operative decisions appear to have been made, there were no complications during surgery. There was an excellent operative note, a timely operative note dictated. There were no post-operative complications or returns to surgery. The patient was transferred to the floor on the 11/20/05, excellent post-operative documentation of care plans and orders was noted in the chart. The discharge summary was done timely and the patient was discharged on the 6th post-operative day. My only question was the saphenous vein graft was placed to the circumflex this was not documented in the pre-operative plan though this is clearly an intra-operative decision that was made. There were no problems with this case.

Patient M.C. MR #715603 – This is a 68 y/o male with hypertension, gout, diabetes, osteoarthritis and elevated lipids with coronary artery disease. He presented to the hospital with chest pain in a non-ST segmented elevated sub-endocardial MI. He was admitted on 11/27/05, the patient underwent surgery on 11/29/05. Pre-operative evaluation was timely, thorough and well documented. There was a cardiologist on the case. There was a delay in surgery of 2 days which was appropriate. On 12/01/05 the patient underwent an off-pump coronary bypass X 3. Dr. Ennix was the surgeon, Dr. Cain was the first assistant, Dr. Durzinsky the second assistant. There was adequate technique, thorough operative note dictated. Post-operative evaluation was similarly very thorough and timely. Post-operative notes, orders and plans were also well documented with at least once and most of the time twice daily visits. The patient was transferred to the floor on 12/04/05 and was discharged on 12/07/05. The patient subsequently returned to the E.R. on 12/13/05 with weakness, dizziness, and new on-set of atrial fibrillation with slight renal insufficiency. He was treated by the medical service and cardiologist with intravenous fluids and anticoagulation. A normal Echo was obtained. It was apparent by reviewing the chart that Dr. Ennix unaware that the patient was readmitted. The patient was hospitalized for 3 days and was discharged on 12/16/05. There were no problems with this case.

Patient W.F. MR #1329291 – This patient was admitted on 12/06/05 after falling and sustaining an injury to the left lateral chest wall subcutaneous air was noted and a pneumothorax noted on chest x-ray. Dr. Ennix was consulted on 12/07/05 and a timely and thorough consultation was dictated. The patient was seen on 7th and the 8th and the patient was discharged on the 9th. No complications were noted on this case.

Patient D.M MR #0587915 – Date of admission 12/03/05. This is a patient admitted with an altered level of consciousness, seizures and drug abuse who developed respiratory failure. He was intubated for a prolonged period of time and on 12/17/05 Dr. Ennix was

consulted for a tracheostomy. The patient self extubated himself and never did require re-intubation. The consultation by Dr. Ennix is timely and thorough.

Patient H.T. MR #1017406 – This patient was admitted to the hospital on 12/27/05 with mitral valve disease and increasing congestive heart failure. The patient underwent a cardiac cath on 12/27/05. A consultation was done on 12/27/05 by Dr. Ennix, which was thorough and timely. Surgery was scheduled on the 12/28/05 but was "bumped" due to another emergency. The patient was taken to surgery on 12/29/05 and underwent mitral valve replacement. Perioperative evaluation was good, no complications during surgery were noted, and an adequate and thorough post-operative note was dictated and written in the progress notes. No post-operative complications or return to surgery were noted. When the patient was last seen on 01/01/06 thorough progress notes, orders and plans were documented and the patient was having no problems.

Patient K.S. MR #1330242 – There is a consultation only dictated by Dr. Ennix on 12/20/05. The consultation appears thorough and is well documented. Surgery was post-poned due to social issues. I am not sure if surgery has been re-scheduled but other than the consultation there was not much of a chart to review.

We are now at the list of cases that have been noted by the proctors to stand out.

Patient J.L. MR # 1326388 – This gentleman was admitted to the hospital on 10/25/05 because of coronary artery disease. He was taken to surgery urgently on 10/25/05, there was a thorough and adequate pre-operative evaluation and a cardiologist was on the case. On 11/25/05 he went to surgery with Dr. Ennix as the surgeon, Dr. Hon Lee as the first assistant and Dr. Thomas Gonda as the second assistant. The patient underwent a free-graft of the internal mammary artery to the LAD. According to the operative note the LIMA could not be used in its entirety and therefore was cut and used as a free graft. This is documented in the dictated operative note thoroughly. Two other saphenous vein grafts were placed without problems. There were no other complications noted during surgery. The patient's post-operative course was smooth and without complications. Multiple daily visits post-operatively were noted and documented. Notes were thorough and timely. Patient was discharged on the 6th post-operative day without any problems. Upon reviewing this case, Dr. Paxton and I feel that the documentation of the intra-operative decision to use the IMA as a free graft appears adequate. This is an intra-operative decision, which is made at the time, and we found no fault with that decision.

Patient A.S. MR # 0770522 – Date of admission was 11/12/05. This patient was admitted with sick sinus syndrome and evaluated by the hospitalists and cardiology. Dr. Ennix was consulted for placement of a pacemaker. The pacemaker was placed on 11/16/05 and the procedure was difficult due to occlusion of the left subclavian vein. The proctor felt that this is an issue which should have been recognized sooner and attention turned to the patient's right side in a more timely fashion. Intra-operative consultation by Dr. Ennix with two cardiologists and Dr. Gonda appeared appropriate and timely. Details are well documented in a thorough operative report. During surgery the patient had transient hypoxia and hypotension, which was treated medically. Chest x-ray and labs

were done which were unremarkable and the procedure was completed. There were no post-operative complications and the patient was discharged on the 2nd post-operative day. Dr. Paxton and I agree that intra-operative difficulties are going to be seen. Dr. Ennix made the correct diagnosis and sought help appropriately. We do not have any criticism of the care of this patient.

Patient E.J. MR #958544 – Date of admission 11/18/05, date of discharge 12/08/05. This is an unfortunate young man with recurrent atrial flutter and paroxysmal atrial fibrillation who has had an ablation once before. He also had coronary artery bypass grafting and is addicted to narcotics following abdominal surgery. History is remarkable for a spontaneous pneumothorax in May of this year that was treated interventional radiologically placed catheter. On 11/18/05 he was admitted under the cardiology service for a repeat ablation. A long procedure was performed and as he was ready to go home the next day he was short of breath and a chest x-ray showed a spontaneous pneumothorax. Dr. Ennix was consulted on 11/18/05 and a consultation was documented and dictated. The patient was noted to be on coumadin and aspirin. I believe on 11/20/05 a chest tube was placed with good re-expansion of the lung. Because of the recurrent pneumothorax this patient was recommended to have a thoracoscopy and pleurodesis, which was planned and done on 11/23/05. A thorough and adequate pre-operative evaluation was done; the patient had normal coagulations prior to that surgery. The patient underwent a thoracoscopy, pleurectomy and talc pleurodesis and did well. Follow-up chest x-rays revealed density in that right lung and because of progressive accumulation of fluid, interventional radiology attempted to drain some of the fluid but was unsuccessful. The patient was therefore taken back to surgery on 11/27/05 for evacuation of a clot. Thorough pre-operative evaluation and peri-operative evaluation was documented and dictated. The patient did well after that surgery with no coagulation problems. On 11/30/05 again progressive blood accumulating in the chest and after a thorough discussion with the patient and other consultants Dr. Ennix felt that re-exploration and evacuation of the clot was appropriate. This was done without complication and the patient gradually recovered from that last procedure, finally both chest tubes were removed, coumadin was started. Thorough operative notes and timely and thorough post-operative evaluation was noted throughout the chart. This was obviously a complicated case given the patient's cardiac status and anti-coagulation status. Dr. Paxton and I believe the appropriate protocols were followed and appropriate decisions were made in caring for this patient.

Patient R.T. MR #1275403 – This patient was admitted on 12/12/05 with severe mitral stenosis and a gradient of 20-25 millimeters, valve area of 0.6 centimeters squared with a normal ventricle. He presented with a TIA. He underwent a mitral valve replacement and MAZE procedure. Dr. Ennix, Dr. Lee and Dr. Gonda as surgeons. There was a thorough pre-operative evaluation with adequate explanation of options and an adequate consent. A cardiologist was on the case. There was no delay in surgery. Peri-operative evaluation was also good and there were no complications during surgery. Post-operatively the patient was started on coumadin as all valve patients were and despite only having two doses of coumadin he had a marked increase in his PT and INR. On 12/17/05 his INR was 5.27 with a PT of 49 seconds. Dr. Ennix was notified, platelets,

fresh frozen plasma and vitamin K were given and a follow-up PT was 27 seconds. Late on the evening the 17th the patient had blood coming from chest tube sites although earlier in the day he had been up in a chair. The patient was markedly short of breath and the E.R. physician was called to the bedside where on 100 % non-rebreather the patient was know to be significantly hypoxic and he was therefore intubated. Dr. Ennix emergently saw the patient and emergently felt that exploration of the mediastinum and pericardium was appropriate. A echocardiogram and been done 48 hours prior which showed a mild to moderate pericardial effusion. The patient was taken to surgery emergently and the clot was evacuated. The remainder of his post-operative course was uncomplicated. He was restarted back on his anti-coagulation. It appears that protocols were followed regarding anti-coagulation and there are obvious risks with that in someone who has had recent heart surgery. Dr. Ennix gave prompt and emergent care and problems were quickly recognized and treated.

Patient H.C. MR # 1329920 – This patient was admitted to the hospital on 12/06/05. He is a 56 y/o male from Highland admitted with chest pain, myocardial infarction, aortic valve disease and three-vessel coronary artery disease and atrial fibrillation. Consultation with Dr. Ennix on 12/18/05 was obtained. There was an adequate work-up with a thorough explanation of options and consent. A cardiologist was on the case. Patient was taken to surgery on 12/20/05, which was an appropriate time. Surgery was performed by Dr. Ennix with Dr. Cain and Dr. Pollock as assistants. This was apparently a very difficult case with the patient undergoing a three-vessel bypass. The operative note was thorough and adequate with appropriate decisions made and no complications noted during surgery. Patient was taken to the CPU post-operatively but continued to have excessive drainage from chest tubes and was taken back to surgery that evening for evacuation of a clot. He was found to be bleeding from a small branch from the proximal internal mammary artery; the proctor at this point, Dr. Hon Lee, felt that the patient might have been having too much bleeding to be closed at the first time though there was no criticism by the first proctor, Dr. Cain. Bleeding was controlled during this operation and the patient subsequently did very well and was getting ready for discharge on the 26th when he began having some chest pain, arm pain and hypotension. It should be mentioned that there were multiple daily visits by Dr. Ennix were documented. Eventually on 12/28 the patient was taken to the Cath Lab where he was found to have a low flow and spasms in the internal mammary artery. Two stents were placed and he placed back on blood thinners. The patient subsequently did very well and on 01/01/06 was discharged home without complications. Upon review of this case Dr. Paxton and I recognized that there was a post-operative complication however, operative technique appeared very adequate and there were no criticism at the time that the first operation was completed. With regard to problems with the IMA graft, this is a rare occurrence but it can happen and we did not feel that it was related to surgical care or the operation.

Patient A.C. MR # 1282907 – There was no medical record to review because this is a patient who recently expired so there was no information in the electronic medical record to review. This was an extremely ill man with multi-system problems who was consulted on by Dr. Ennix for placement of a tracheostomy. He was a very unstable and ill individual who was brought to the O.R. for tracheostomy by the anesthesiologist. Once

in the O.R. he was felt to be unstable for surgery and was transferred back to the ICU and expired approximately 48 hours later. Without a chart to review, it is difficult to have a thorough evaluation of the case. However, it appears that the anesthesiologist felt that it was appropriate to bring this patient to surgery and then the situation changed such that the patient became an unsuitable candidate. We could not find criticism of Dr. Ennix's care to make that decision.

In summary of the review of theses cases, we find that many of these patients are very complex and complicated. Protocols and surgical care appear to be very adequate. Prior problems with documentation have completely disappeared and in fact most charting is exemplary. Dr. Paxton and I do not find evidence that the suspension of clinical privileges should continue based on the quality of surgical care provided.

Sincerely,

Steven A. Stanten, M.D.
Chair, Department of Surgery

**EXHIBIT O**

**CONFIDENTIAL**

January 5, 2006

Coyness L. Ennix, Jr., M.D.
101 Sea View Ave.
Piedmont, CA 94610

Re:     **Restoration of Clinical Privileges**

Dear Dr. Ennix:

Thank you for your letter dated January 3, 2006, regarding the summary restriction of your
clinical privileges that was imposed on December 30, 2005, and the five specific cases cited in
my letter of that date. Those cases were reviewed on an expedited basis by Steven Stanten,
M.D., Chair of the Department of Surgery, who also discussed the cases with Monte Paxton,
M.D. As I informed you this morning, based on the preliminary results of that process, the
Officers have decided to lift the summary restriction. Therefore, your clinical privileges are,
once again, as described in my letters of October 11 and 25, 2005. Because of the short duration
of the summary restriction, it does not require a report to the Medical Board of California or the
National Practitioner Data Bank.

Please note that, although the Officers have determined that no summary action is warranted at
this time, there are issues that require further exploration regarding the five cases that
precipitated the summary restriction last week, as well as other recent cases. We acknowledge
the contention in your January 3, 2006 letter that your "judgment, management and character are
beyond reproach," which is essentially the view that you have always taken regarding your
practice here and at Alta Bates. However, the Medical Staff leadership has found otherwise in
the past, and final conclusions have yet to be reached regarding your recent performance. As the
review process continues, you will be given opportunities to provide additional input, as
appropriate.

Sincerely,


William Isenberg, M.D., Ph.D.
President of the Medical Staff

cc:     Steven Stanten, M.D.


SFO 284885v1 31240-90                                    1.

**EXHIBIT P**



**THE STAFF OF**

**SUMMIT**
MEDICAL CENTER

<u>**CONFIDENTIAL**</u>

July 11, 2006

Coyness L. Ennix, Jr., M.D.
101 Sea View Avenue
Piedmont, CA 94610

Re:     <u>Discontinuation of Proctoring Requirements</u>

Dear Dr. Ennix:

I am pleased to inform you that, upon recommendation of the Ad Hoc Committee ("AHC"), the Medical Executive Committee ("MEC") decided on July 11, 2006, to discontinue the proctoring requirements that have been attached to your cardiothoracic surgery privileges since October 25, 2005. This action is effective immediately. Specifically, it is no longer necessary for you to be accompanied by another cardiothoracic surgeon in heart cases, or for your cardiothoracic surgeries to be reviewed retrospectively by a proctor.

We will file updated reports with the Medical Board of California ("MBC") and the National Practitioner Data Bank ("NPDB") as soon as possible, and we will send you a copy.

Please note that, although your privileges are no longer restricted, the MEC decided, upon recommendation by the AHC, that all of your cases will be subjected to ongoing retrospective chart review by the Chief of the Thoracic and Cardiac Surgery Service and/or his designees. The results will be reviewed at three-month intervals by the AHC, in consultation with the chart reviewer(s). Reports will be made to the MEC at these three-month intervals, and the MEC will decide whether to continue or discontinue this special review process. Because this process does not involve any restriction of your clinical privileges, it will not be referenced in our update reports to the MBC and the NPDB, nor is it subject to hearing rights under the Medical Staff Bylaws.

The MEC appreciates your cooperation, and congratulates you on the improvements in your performance. Notably, during the last review period, there were no reports of medical record deficiencies or unavailability. We wish you continued success, and we look forward to ending the intensified review process in the not-too-distant future.

Fredric Herskowitz, M.D.     Philip Rich, M.D.     Michael Kim, M.D.     William Isenberg, M.D., Ph.D.
*President*                  *Vice-President*       *Secretary/Treasurer*  *Immediate Past President*

350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

We are sending a copy of this letter to your proctors, so they will know that their services are no longer required. The MEC wishes to express its gratitude for the time and effort that they have devoted to this important matter.

Sincerely,

Fredric Herskowitz, M.D.
President of the Medical Staff

cc:     Brian S. Cain, M.D.
        Dennis Durzinsky, M.D.
        Thomas Gonda, M.D.
        John Jones, M.D.
        Hon S. Lee, M.D.
        Lamont Paxton, M.D., Chair, Ad Hoc Committee

**EXHIBIT Q**



## MEDICAL BOARD OF CALIFORNIA
PLEASANT HILL DISTRICT OFFICE
3478 BUSKIRK AVENUE, SUITE #217
PLEASANT HILL, CA 94523
(925) 937-1909 fax (925) 937-1964



July 13, 2006

Alta Bates Summit Medical Center
Summit Medical Staff
Joanne Jellin, CMSC
350 Hawthorne Avenue
Oakland, CA 94609

Dear Ms. Jellin:

The Medical Board of California has concluded its investigation of the 805 Business and Professions Code Section reports filed by Alta Bates Summit Medical Center regarding Dr. Coyness Ennix. It has been determined that there is insufficient evidence to pursue this matter further.

Although this case is being closed, it will remain on file for five years in the event similar allegations are brought to our attention.

Thank you for bringing this matter to the Board's attention.

Sincerely,

Teri Bennett
Senior Investigator
12 2004 158215