G. SCOTT EMBLIDGE, State Bar No. 121613
emblidge@meqlaw.com
RACHEL J. SATER, State Bar No. 147976
sater@meqlaw.com
ANDREW E. SWEET, State Bar No. 160870
sweet@meqlaw.com
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D., as an individual and in his representative capacity under Business & Professions Code § 17200 *et seq.*,<br><br>Plaintiff,<br><br>vs.<br><br>RUSSELL D. STANTEN, M.D., et al.,<br><br>Defendants. | Case No. C 07-2486 WHA<br><br>**DECLARATION OF COYNESS L. ENNIX JR., M.D. IN OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE**<br><br>Date:       **August 16, 2007**<br>Time:       **8:00 a.m.**<br>Dept:       **Ctrm. 9, 19th Floor**<br>Judge:      **Hon. William H. Alsup** |

I, Coyness L. Ennix Jr., M.D., declare:

1.    I am an African American cardiac surgeon and the plaintiff in this case. I have performed cardiac surgery at Summit and/or Alta Bates Hospitals since 1981. I have personal knowledge of the facts stated in this declaration.

2.    I have read Defendants' Special Motion to Strike and supporting declarations and find most of the allegations therein to be disingenuous at best. Defendants assert that the purpose of my lawsuit is to chill the participation of physicians in my peer review. That is untrue. Indeed, the peer review that is the subject of this lawsuit ended before I filed suit. At

1

1   this point, I am under no different peer review scrutiny than any other member of the Medical

2   Staff. Rather, the purpose of this suit is to hold Alta Bates Summit accountable for their unfair

3   and unlawful treatment of me and other physicians of color, the injury that this peer review

4   caused to competition and the injury that it caused to my reputation and surgical practice.

5           3.      As detailed below, in the Complaint and other declarations supporting this

6   Opposition, the very initiation of the peer review process was unnecessary and unjustified

7   because **each of the ten cases had been previously subject to peer review by qualified**

8   **cardiac surgeons and had been found free of care issues.** The four minimally-invasive cases

9   were reviewed by cardiac surgeon Dr. Hon Lee, among the top practitioners of the procedure in

10  the Bay Area, who found no patient care issues, as Defendants admit. Indeed, I have personal

11  knowledge that other surgeons at the Hospital who have performed the same procedures have

12  encountered the same or similar complications as those that I experienced in the four minimally

13  invasive cases. None of these other surgeons are African American, and none had their

14  privileges suspended, to my knowledge.

15          4.      Although Defendants describe Dr. Lee's review as a "preliminary review" of the

16  four minimally invasive cases, that characterization is disingenuous because Dr. Lee's review

17  was extensive and complete, as required by the Hospital's peer review system.

18          5.      The remaining six cases likewise had been reviewed and found free of patient

19  care issues by the Summit Cardiac Surgery Peer Review Committee. (True and correct copies of

20  the minutes of the Summit Cardiac Surgery Peer Review Committee discussion so these six

21  cases, noting "no care issues" for each case, are attached hereto as Exhibit A.) Nevertheless, Dr.

22  Steven Stanten—a general surgeon, not a cardiac surgeon—and the AHC—a group devoid of

23  cardiologists or cardiac surgeons—opined that there may be other problems not identified by the

24  cardiac surgeons who conducted the first peer reviews. In my experience, it is highly unusual to

25  subject cases to a second peer review and unprecedented for doctors outside the specialty being

26  reviewed to essentially overrule the findings of the specialists who found no patient care issues.

27          6.      Moreover, even if additional outside review were deemed necessary, defendants

28  had my cases reviewed by a relatively unknown and marginal private entity that gives itself the

1  misleading name of National Medical Audit ("NMA"). In addition to the fact that neither I nor

2  any of the peers with whom I discussed this matter had ever heard of NMA prior to my peer

3  review, I am informed and believe that of the three NMA reviewers, one had not practiced

4  medicine in many years, one was found by a state agency to have significantly substandard

5  mortality rates, and one is not licensed to practice medicine in California.

6       7.    Further, the bases Defendants cite for the peer review and summary suspension

7  are shams: First, Defendants cite the Junod Report as crucial in their determination to initiate the

8  peer review. But, as Defendants well know, the Junod Report reflected serious systemic

9  problems with the Alta Bates cardiac surgery program at that time, primarily related to a

10  precipitous drop in the volume of cardiac surgeries at the Alta Bates campus. These issues are

11  explained in letters submitted to the MEC by Dr. John S. Edelen, Chief of the Cardiology

12  Section at Alta Bates at the time, and Dr. John B. Girard, vice President of the Alta Bates campus

13  Medical Staff, true and correct copies of which are attached hereto as Exhibits B and C. Dr.

14  Edelen informed defendants that, among other things, he and Alta Bates "continue to have a

15  great confidence in Dr. Coyness Ennix as an experienced, technically sound, hard working and

16  very personable cardiac surgeon with good clinical judgment." Of course, Dr. Isenberg chose to

17  provide the Court with the Junod Report but not with copies of these letters.

18       8.    Indeed, because of the systemic problems at the Alta Bates campus, my partners

19  at the time, Defendants Dr. Russell Stanten and Dr. Iverson, often refused to operate there.

20  Because of these systemic problems related to low patient volume, I championed the cause of

21  consolidating the Alta Bates cardiac surgery program with the Summit program at the Summit

22  campus, which eventually occurred, despite early resistance from Dr. Russell Stanten and Dr.

23  Iverson, among others. In sum, Defendants Dr. Russell Stanten and Dr. Iverson were aware of

24  the issues at Alta Bates discussed in the Junod Report and knew those issues were not a

25  reflection of my surgical competence or skill. Moreover, as Defendants also well know, in

26  forwarding the Junod report to the Alta Bates Summit Medical staff, Dr. John Rosenburg, a

27  psychiatrist and President of the Alta Bates Hospital Berkeley Campus at that time, disclaimed

28  responsibility for or the "accuracy, credibility or reliability" of the Junod Report. (Again, Dr.

3

1    Isenberg failed to provide the Court with Dr. Rosenberg's letter; he simply provided the Report

2    from which Dr. Rosenberg distanced himself.) A true and correct copy of Dr. Rosenberg's letter

3    is attached hereto as Exhibit D. However, Dr. Isenberg – who had no personal knowledge of the

4    conditions at the Alta Bates campus – took no steps to substantiate the report or give me an

5    opportunity to address the issues in it in a peer review forum before initiating a new and

6    unwarranted peer review based in part on it.

7         9.    Second, Defendants justify the second peer review by stating that my mortality

8    and return-to-surgery rates were higher than those of my peers. However, Defendants' base this

9    statement on comparison of raw data. Every cardiac surgeon and biostatistician knows that

10   comparison of raw mortality data is meaningless. Rather, raw data must be adjusted in a

11   statistical process known as "risk stratification" to reflect the relative risk factors of each patient,

12   such as diabetes, advanced age, hypertension, and obesity. For example, if I operate on ten

13   hypertensive patients over the age of 70 and two die, and another surgeon operates on ten

14   otherwise healthy 35-year-olds and one dies, it obviously would be wrong to say that my

15   mortality rate is double that of the other surgeon and therefore cause for concern, because my

16   patients had the significant added risk factors of age and hypertension. Indeed, in this example,

17   my adjusted mortality rate might even be lower than my colleague who operated on young

18   healthy patients. Similarly, when Defendants assert, based on a comparison of raw data from a

19   hospital "printout," that my patient mortality rate was double that of my peers for the period

20   2000 to 2004 based on raw data, the comparison is a sham. After risk stratification, my mortality

21   rate for this period is similar to the rates of my peers and within the acceptable range. This was

22   confirmed by expert reports I submitted to the MEC from two prominent biostatisticians

23   (Richard Shaw and Howard Barkan), whose declarations and reports are submitted with by

24   opposition papers.

25        10.    It is also confirmed in the 2003-2004 California CABG Outcomes Reporting

26   Program Preliminary ("CCORP") Report, shows my mortality rate during this time period within

27   the acceptable range. Further, the CCORP Report shows that Dr. Iverson's mortality rate for

28   2003-2004 is higher than mine, although within the acceptable range, yet Alta Bates Summit did

1   not subject any of his cases to a second, outside peer review. Perhaps even more striking, the

2   CCORP Report shows that Dr. Housman, one of the NMA peer reviewers, had a mortality rate

3   *below the acceptable range*, yet the AHC and MEC accepted his negative review of my cases

4   while rejecting the unanimous positive reviews of Dr. Lee and the other world renowned cardiac

5   surgeons who contributed their opinions to the peer review process. If this case is permitted to

6   proceed, I will present expert testimony debunking all of Dr. Isenberg's and Defendants' claims

7   regarding my mortality and return-to-surgery rates, which are all entirely within acceptable

8   levels as Defendants well know. I have attached hereto as Exhibit E copies of the following

9   pages from the CCORP Report, which recently was released to the public: the Executive

10  Summary, "Table 5: Surgeon Risk-Adjusted Operative Mortality Results, 2003-2004" for

11  myself, Dr. Housman and Dr. Iverson, and "Figure 2: Surgeon Risk-Adjusted Operative

12  Mortality Results, 2003-2004" for myself, Dr. Housman and Dr. Iverson (the full report is

13  attached to the Request for Judicial Notice and can be obtained from the State's website at

14  http://www.oshpd.ca.gov/HQAD/Outcomes/Studies/cabg/200304HospSurgReport/fullreport.pdf)

15       11.   For the same reasons, Dr. Isenberg's assertion of an "alarming trend" in mortality

16  in my practice during January and February 2004 is erroneous and misleading: I had two

17  mortalities out of thirteen cases in that two-month period, which is not uncommon in cardiac

18  surgery and even more importantly would not be considered a statistically-significant sampling

19  period by any statistician or cardiac surgeon. Dr. Isenberg's assertion that I had more cases fall

20  out for peer review during 2003 and 2004 than my non-Kaiser peers is suspect for the same

21  reason. I was unaware of the numbers Dr. Isenberg cites before I read his declaration, so without

22  conducting discovery, I cannot evaluate their veracity. However, I do know that I had conducted

23  more cardiac surgeries during that time period than my peers, so one would expect that more of

24  my cases would fall out for peer review. Dr. Isenberg's assertion fails to take into account this

25  statistically critical fact.

26       12.   The decision to summarily suspend my privileges was not based on the facts and

27  was wholly unjustified. Dr. Isenberg states that two reasons justified his summary suspension of

28  my privileges. First, Dr. Isenberg asserts that I falsified a patient's chart to cover up a failure to

1   attend properly to the patient post-operatively. This statement differs significantly from what Dr.

2   Isenberg said at the time he suspended me: that I failed to even see the patient post-operatively,

3   not that I failed to attend properly to the patient. Moreover, this statement ignores my vigorous

4   assertion that I did attend to this patient properly, notations in the nurses' notes indicating I had

5   attended the patient *twice* that day and three corroborating letters from nurses on duty that day

6   substantiating that I had done so, all of which I submitted to the MEC. True and correct copies

7   of these letters and the nurse's notes are attached hereto as Exhibit F.

8       13.    Dr. Isenberg completely and bafflingly disregarded the nurses' notes and

9   statements at the time of the summary suspension and continues to do so in his declaration.

10  Although I did fail to enter a note recording my attending to the patient due to two lengthy

11  surgeries that day, I in fact entered the note the following day. This back-dating of chart notes is

12  not proper (and I no longer do it, even under severe time pressure similar to what I was under

13  that day). However, adding a note after the fact to reflect what happened on an earlier date does

14  not endanger a patient.

15      14.    With respect to the second alleged reason for the summary suspension, the

16  findings of the NMA report, Dr. Isenberg acknowledged that he acted on these findings before

17  they had been evaluated by the AHC and before I had an opportunity to respond to them. His

18  actions were improper and unfair, and highly unusual if not unprecedented, in my experience.

19      15.    After my summary suspension, I requested that I be permitted to surgically assist

20  pending the AHC's and MEC's evaluation of the NMA report and final determination so that I

21  could continue practicing and maintain some, albeit substantially reduced, income. I never

22  intended that my surgical assisting would mean that I could not seek to recover damages for the

23  harm Defendants caused me.

24      16.    Defendants attempt to characterize me as a bad surgeon who resisted peer review

25  and ultimately "disagree[d] with the conclusions reached by [my] peers." This statement is

26  ridiculous. As stated above, my *peers*—cardiac surgeon Dr. Hon Lee and the Summit Cardiac

27  Surgery Peer Review committee—found each of the ten cases to be within the standard of case.

28  Further, Dr. Bruce Reitz, Profession of Cardiothoracic Surgery at Stanford University School of

1    Medicine, and Dr. Bruce Lytle, chairman of the Department of Cardiothoracic Surgery at the

2    Cleveland Clinic—two world-renowned specialists in cardiac surgery—found no deviations

3    from the standard of care in any of the ten cases. (True and correct copies of these reports are

4    attached hereto as Exhibits G and H.) I submitted to the MEC these and several other reports

5    from leaders in the field of cardiac surgery—J.C. Walkes, M.D., Cardiovascular and Thoracic

6    Surgeon, Methodist DeBakey Heart Center, Texas; John Rea, M.D., Cardiothoracic Surgeon,

7    Texas Surgical Associates. (True and correct copies of each of these reports are attached hereto

8    as Exhibits I and J.)

9        17.    Dr. Isenberg now attempts to justify Alta Bates' disregard of these expert reports

10    by stating that they "did not appear to have substantial knowledge of the facts considered by the

11    investigatory bodies." (Isenberg Decl. ¶ 14.) This is absurd. As Defendants know, my lawyer

12    provided each of these experts with the relevant medical charts, the NMA's report, and the Ad

13    Hoc Committee's report as well as correspondence setting forth the procedural background of

14    the peer review. (See, for example, the detailed statements in this regard contained in Dr. Reitz'

15    report.) Thus, these experts were acutely aware of the NMA's and Ad Hoc Committee's

16    criticisms of me and nevertheless found them to be groundless. These renowned experts were

17    not paid for their opinions and had no possible reason to falsify them and every reason, given

18    their exemplary reputations and credentials, to give honest, forthright opinions. Moreover, the

19    *California Medical Board* – whose stated mission is "protect healthcare consumers through the

20    proper licensing and regulation of physicians and surgeons and certain allied healthcare

21    professions and through the vigorous, objective enforcement of the Medical Practice Act"

22    (http://www.mbc.ca.gov/abouttheboard.htm) – disagreed with the NMA, AHC and MEC, finding

23    the vast majority of the allegations against me "unfounded," and concluding: **"[t]here is no**

24    **evidence whatsoever, in these reviewed cases, that the conduct of Dr. Ennix;**

25    **preoperatively, intraoperatively, or postoperatively, has violated the standard of practice in**

26    **cardiac surgery."** A true and correct copy of the Medical Board's letter is attached hereto as

27    Exhibit K.

28

ENNIX DECLARATION IN OPPOSITION TO SPECIAL MOTION TO STRIKE    Case No. C 07-2486 WHA

18.    In addition to these expert reports, I submitted to the MEC numerous letters from peers and associates with many years of experience practicing medicine with me expressing their experience of my skill, competence and leadership as a cardiac surgeon and medical professional. True and correct copies of some of these letters are attached hereto, collectively, as Exhibit L.

19.    Defendants assert that "more than 35 different physicians have been involved" in my peer review since 2004. (OB at 3:22-23.) While this may literally be true if one adds up the number of persons serving on various committees, what is especially noteworthy is that of those 35 physicians, other than the NMA reviewers, **none was a cardiologist and only four were cardiac surgeons.** Of the four cardiac surgeons, two were Defendants Dr. Russell Stanten and Dr. Iverson, both of whom knew better than to hold me responsible for the poor results at Alta Bates, to require a second peer review after the ten cases had been cleared of care issues by cardiac surgeons, or to evaluate my performance based on raw data. Alta Bates Summit largely ignored the contributions of the two other cardiac surgeons (both physicians of color): (1) Dr. Hon Lee, who reviewed the four minimally invasive cases and found no care issues; and (2) Dr. Junaid Khan, who assisted me on the minimally invasive cases and therefore had first hand knowledge of my surgical management of those cases. Notably, Defendants do not submit declarations from these cardiac surgeons in support of their motion.

20.    Only cardiac surgeons, and to a lesser extent cardiologists, would have the expertise to conduct a meaningful peer review of my cases. By limiting the participation of such qualified physicians, the Defendants ensured their continued control of the process and their ability to manipulate it to their benefit and my detriment. Without discovery, it is unclear whether Defendants eliminated any qualified, dissident voices from my peer review intentionally; I suspect they did. Nevertheless, doing so was without question grossly unfair and unprecedented in my experience of peer review. Further, in addition to including no cardiologists or cardiac surgeons (except for Drs. Lee and Khan, whose opinions were ignored, and Defendants Drs. Russell Stanten and Iverson), neither the AHC nor the MEC included any African Americans. (It is interesting that Dr. Iverson insists he took no part in my peer review,

8

1  even though he admits to expressing the damning opinion (see Iverson Decl., ¶ 4), contrary to

2  Dr. Hon Lee's conclusions and without reviewing the relevant charts, that it was not reasonable

3  to attribute the outcomes of the minimally invasive cases to the newness of the procedure.)

4      21.    Defendants assert that, following the MEC's imposition of a proctorship

5  requirement, the proctors identified "complications" and "problems" with my cases that led to

6  the second summary suspension. (OB at 10.) That is untrue. There were a few routine minor

7  issues that occurred during some cases. Two of the five to which Defendants refer were not even

8  complications at all. The three other incidents were minor complications that can occur at any

9  practice, and the proctors did not raise them as concerns. Indeed, after proctoring me for six

10  months during 29 surgical cases, the proctors submitted a report expressing their unanimous

11  opinion that I met or exceeded all standards of care and that the proctorship should be

12  discontinued. A true and correct copy of that letter is attached hereto as Exhibit M.

13  Disregarding the proctors' opinion, the AHC recommending extending the proctoring

14  requirement, bizarrely asserting that 29 surgical cases was an insufficient number of cases to

15  evaluate my performance, even though ten cases which had already been cleared of care issues

16  had been a sufficient number for them to question my competence. The MEC accepted the

17  AHC's recommendation.

18      22.    Defendants make much of a peer review meeting where I refused to leave the

19  room during discussion of my cases. I remember that meeting well. This meeting occurred *after*

20  the official conclusion of the peer review process that is the subject of this suit. All the doctors

21  involved in the review gave their opinions that the cases did not raise any standard of care

22  concerns, with the exception of one doctor who had suggested a minor change in treatment may

23  have benefited a patient. At that point, Defendant Dr. Russell Stanten asked me to leave the

24  room while the discussion of the cases continued. I refused because none of the other surgeons

25  whose cases had been discussed that day had been asked to leave the room. Thus, Dr. Russell

26  Stanten's request appeared, once again, to unfairly single me out for unusual and harsh

27  treatment. After enduring over two years of an unfair, unjustified and destructive peer review

28  process, it could hardly have surprised anyone that I refused Dr. Russell Stanten's unprecedented

<div align="center">9</div>

1    request. Further, at every such meeting, doctors are often late or do not even attend; this meeting
2    was no different and the attendance issues Defendants' cite can hardly be blamed on the review
3    of my cases.

4        23.    Defendant Dr. Isenberg also justified his decision to suspend me by citing a time
5    that I left the hospital following surgery so that I was not present when my patient had a cardiac
6    arrest 8 minutes after leaving the OR, asserting that my continuing to practice posed "an
7    imminent issue of patient safety." (Isenberg Decl. at 9:23-26.) This, too, is ludicrous. It is well
8    documented that the patient in question was stable upon leaving the OR. Under such
9    circumstance, it is not at all unusual for a surgeon to leave for his or her office (across the street,
10   in my case), or to visit other patients, or go speak with the family, so long as the surgeon remains
11   in the reasonable vicinity of the ICU, such as my office across the street. In this case, a cardiac
12   surgeon colleague in the ICU at the time appropriately attended to the patient when he went into
13   cardiac arrest. I was back in the ICU within minutes of being notified by the ICU staff. This
14   incident was presented to NMA, which seized upon it and criticized me for it. However, no
15   other experts—not the Summit Cardiac Surgery Peer Review Committee, Dr. Bruce Reitz, or the
16   California Medical Board, to name a few—found any departure from the standard of care.
17   (Please see the last page of Dr. Reitz' report, attached as Exhibit F.)

18       24.    Defendant Dr. Steven Staten claims that I "lost" a guide wire during the insertion
19   of a pacemaker; this is not true. The wire was not "lost." The guide wire merely migrated from
20   my surgical field into a vessel outside of my surgical field such that I could not grasp it.
21   Although not ideal, every surgeon who implants pacemakers (and Dr. Steven Stanten does not)
22   knows that it occurs from time to time. Such an occurrence is not outside the standard of care,
23   unless the surgeon fails to notice it or fails to ensure retrieval of the wire. But there is no dispute
24   that I ensured that the wire was extracted appropriately by the radiologist shortly after
25   completion of the operation. Further, the surgical nurse who allegedly reported that I was less
26   focused on the morning of the procedure was not even the circulating nurse in the room during
27   the operation. Moreover, this incident was never cited as a reason for any of the actions
28   Defendants took against me.

1       25.    Defendants assert that I voluntarily accepted the proctorship requirement imposed

2   by the MEC.  That is untrue; I accepted the requirement because it was the only way I could

3   hope to rebuild my damaged practice, and support my family.  My action was hardly "voluntary"

4   given the alternative – financial and professional devastation – to not accepting the requirement.

5       26.    Defendants assert that I have not defined the market for my services.  I believe

6   that my complaint has defined the market adequately and that further definition would come as a

7   result of discovery and expert testimony.  However, I can add that I believe the primary market

8   for my services is the "immediate" East Bay, west of the Caldicott Tunnel, but also includes the

9   greater East Bay extending east of the Tunnel to such cities as Concord and Walnut Creek.  In

10   the immediate East Bay, I am one of approximately ten cardiac surgeons, and am the only lead

11   (as opposed to assisting) African American cardiac surgeon.  In the greater East Bay, I am one of

12   approximately sixteen cardiac surgeons, and one of only two African American cardiac surgeons.

13   I serve disproportionately more African American patients than do my white colleagues, such as

14   Dr. Iverson and Dr. Russell Stanten.  I believe the principal reasons for this disparity is the fact

15   that many African Americans patients prefer African American primary care physicians, who in

16   turn prefer to refer cases to African American cardiologists.  And the African American

17   cardiologists in the East Bay tend to refer their patients to me rather than to my Caucasian

18   colleagues.  Thus, during the time period I was barred from operating as a lead surgeon, all

19   cardiac patients, and African American cardiac patients in particular, had their choices limited,

20   and those who preferred African American doctors had no meaningful choice among cardiac

21   surgeons.  I would be happy to amend the complaint to add these allegations if the Court

22   requires it.

23       27.    At this point, without discovery, I cannot conclude whether the unfair and

24   unlawful treatment I suffered at the hands of Alta Bates Summit and the individual defendants

25   was motivated by racial animus, jealousy based on the success of my practice and my pioneering

26   the minimally invasive procedure at Alta Bates Summit, greed, or a combination of these factors.

27   However, I do know, from having served on the Medical Staff of Alta Bates and/or Summit

28   Hospitals for over twenty-five years, two things: (a) I was treated more harshly and was

ENNIX DECLARATION IN OPPOSITION TO SPECIAL MOTION TO STRIKE     Case No. C 07-2486 WHA

1   afforded less due process than any similarly situated Caucasian cardiac surgeon, and (b) these

2   hospitals have a history, including recent history, of treating physicians of color far more harshly

3   than they treat our white counterparts. I filed this suit in large part out of my concern that, if I

4   failed to do so, Alta Bates Summit would become even more secure in its belief that it could treat

5   physicians of color poorly with impunity. If this Court permits my case to go forward, I expect

6   that discovery of peer review records for Alta Bates Summit will substantiate Alta Bates

7   Summit's history of disparate treatment of physicians of color. Further, I expect that deposition

8   testimony of members of the medical staff will provide anecdotal evidence of such disparate

9   treatment and reveal the true motives underlying the unnecessary, unfair and destructive peer

10   review to which I was subjected.

11       28.     During and following the peer review process, many of my colleagues and other

12   hospital staff confided that they believed I had been treated unfairly and with unusual and

13   unwarranted harshness. I believe that Defendants have misrepresented many of the opinions of

14   my colleagues, including an anesthesiologist who worked on the minimally invasive cases, in an

15   effort to justify the peer review process. I expect that many of these individuals would provide

16   testimony supporting my allegations regarding the illegitimacy of the peer review, the Hospital's

17   treatment of physicians of color, and the potential improper motives of the individual defendants

18   if this case is permitted to proceed. However, they would not provide such testimony

19   voluntarily—in the absence of a subpoena—because doing so might jeopardize their

20   relationships with Alta Bates Summit staff and the individual defendants, who hold powerful

21   positions of authority, with whom they must work on a daily basis.

22       29.     Dr. Isenberg states that four doctors declined to participate in my peer review,

23   apparently attempting to suggest that I had intimidated them in some way. I believe a more

24   likely explanation is that few doctors wished to participate in my peer review because they knew

25   that the cases had already been thoroughly vetted, making the process appear more like a witch

26   hunt than a valid and justified peer review process.

27

28

1        I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct to the best of my knowledge and that this declaration was signed in

3    Oakland, California.

4

5    Dated:    July 12, 2007

                                            Coyness L. Ennix Jr., M.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ENNIX DECLARATION IN OPPOSITION TO SPECIAL MOTION TO STRIKE    Case No. C 07-2486 WHA

# EXHIBIT A

'5/16/2005  Case 3:07-cv-024{   VHA    Document ... SUMMIT MEDICAL CENTER07/1...007    Page 2 of 14
01:56 PM    AB-070

QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

PROPERTY OF SUMMIT MEDICAL
CENTER MEDICAL STAFF. THIS
DOCUMENT PROTECTED BY CALIF.
EVIDENCE CODE 1157.

Acct No.: 0428400252  HEISSER,MARILYN  41Y F
Facility: SUMMIT MEDICAL CENTER           QA No.: 04-396

================================ ENCOUNTER DATA ===============================

Start Date: 10/11/2004    MRN: 1124908       Admit Phys: Q-78259

Admit Complaint: CRNRY ATHRSCL NATVE VSSL       Consultant:

Disch Date: 10/15/2004    Disch Dx: CRNRY ATHRSCL NATVE VSSL

================================ SURGERY DATA =================================

Surg Date:        Surg Time:       Surgeon:

Procedure:

================================ EVENT DATA ==================================

Reference Date: 10/25/2004         Desc: Death

Location: _____    Surg Proc: _____

Event: COMPLICATION,INTRA-OP OR POST-OP                   Date: 10/15/2004
Outcome: RETURN TO SURGERY,UNPLANNED             Significance: QA-MAJOR TEMPOR

Physician        Type  Service    QA Disp      Action Date   Final Disposition
Q-1730                 CT-CARDIO/  PHYSICIAN REV 10/25/2004    PHYSICIAN CL
                 Major Issue: _____  Std of Care: NO CARE ISSUES

Abstract:      Pt was a 49 y/o woman admitted thru ED on 10/11/04 with left-sided
               chest/arm pain x 5 weeks. Treated for gastritis. In the ED, pt had
               abnormal EKG and cardiac enzymes. Question remote MI vs. acute
               coronary syndrome vs. GI.  Pt was given aspirin and admitted for
               workup of atypical chest pain. No significant PMH noted.  Cardiology
               consult on 10/12 - Probable Class III angina. Dobutamine stress ECHO
               consistent w/ single vessel disease involving inferior wall.  Cath
               on 10/14 showed critical left main disease (95% obstruction).  Left
               ventricular function was normal.  On 10/15 pt underwent CABG using
               saphenous vein graft to the LAD from the aorta and a saphenous vein
               graft to the marginal branch of the circumflex from the aorta. After
               being in CPU approx 1 hr, pt became suddenly lost BP.  Crash team
               opened chest, no sign of tamponade, heart was dilated and not moving.
               Open heart massage was done and intracardiac epi given à v-fib à
               cardioversion à sinus rhythm.  Pt was emergently returned to the OR.
               Placed back on bypass and IABP inserted.  No site of bleeding.  Vein
               grafts appeared satisfactory.  Pt was unable to wean from bypass.
               Portable ECMO was instituted and patient transferred emergently to
               CPMC.
               Addendum: Pt expired at CPMS. Further details not known.

5/16/2005 Case 3:07-cv-024     NHA     SUMMIT MEDICAL CENTER 07/1    .007     Page 3 of 44     PAGE
01:56 PM.

QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

14

Acct No.: 0428400252 HEISSER,MARILYN  41Y F
cility: SUMMIT MEDICAL CENTER          QA No.: 04-396

================================= REVIEW DATA =================================

Service: CT-CARDIO/THORACIC SURGERY

Review: PHYSICIAN REVIEW                Service/Committee: CT-CARDIO/THORACIC
Reviewer: Q-80128                       Date: 10/25/2004

Comments:       Unfortunate outcome. Operative technique a good approach for these
                situations. Warm pump assisted beating heart surgery may provide
                better myocardial protection in the face of MI.  Applaud good
                samaratin efforts of Dr. A.  Question: Was there an assessment of
                graft function?  Question is: whether we should invest in device to
                assess graft patency.
                No care issues found. [mb]

Disposition: _____ Referred to: _____ Routing Date: _____

======================= QUALITY MANAGEMENT EXTENDED SCREEN DATA =======================
                         Comments:

5/16/2005 Case 3:07-cv-024 WHA    SUMMIT MEDICAL CENTER07/1 .007    Page 4 of 44    PAGE
02:14 PM                          QUALITY MANAGEMENT WORKSHEET
                          CONFIDENTIAL PEER REVIEW INFORMATION
                             CT-CARDIO/THORACIC SURGERY

PROPERTY OF SUMMIT MEDICAL
CENTER MEDICAL STAFF. THIS
DOCUMENT PROTECTED BY CALIF.
EVIDENCE CODE 1157

Acct No.: 0420100717 SEQUEIRA,BARBARA  63Y F
Facility: SUMMIT MEDICAL CENTER        QA No.: 04-319

========================================= ENCOUNTER DATA ===========================

Start Date: 7/20/2004    MRN: 1296513        Admit Phys: Q-7346

Admit Complaint: CAD                 Consultant:

Disch Date: 7/23/2004    Disch Dx: CRNRY ATHRSCL NATVE VSSL

========================================= SURGERY DATA =============================

Surg Date:        Surg Time:     Surgeon:

Procedure:

========================================= EVENT DATA ===============================

Reference Date: 8/16/2004        Desc: Death post CABG + Carotid Endarterectomy

Location: _____    Surg Proc: CABG,SIMPLE

Event: DEATH,POST-OP                          Date: 7/24/2004
Outcome: DEATH                        Significance: DEATH


Physician      Type  Service    QA Disp      Action Date   Final Disposition
Q-1730               CT-CARDIO/  PHYSICIAN REV 2/28/2005    COMMITTEE CL
                     Major Issue: _____ Std of Care: NO CARE ISSUES

Q-79880              ANESTHESIA  PHYSICIAN REV 10/13/2004   PHYSICIAN CL
                     Major Issue: _____ Std of Care: NO CARE ISSUES


Abstract:   63 y/o woman with progressive angina and stress test strongly
            positive for global ischemia. Admitted to Summit on 7/20/04. CARDIAC
            CATH on 7/20 demonstrated significant triple vessel disease, normal
            left ventriculogram. CO-MORBIDITIES: Hx of chronic hypertension and
            obesity. On admission pt had an asymptomatic right carotid bruit.
            She was found to have 90% left common and internal carotid artery
            stenosis. Decision was made to proceed w/ left carotid
            endarterectomy and CABG as a combined procedure, so as not to
            compromise cerebrovascular circulation during bypass. On the evening
            of 7/22, prior to planned surgery the following day, pt began having
            increased chest pain which resolved. She had continued pain in the
            morning and during transit to the OR. PROCEDURE: During the carotid
            endarterectomy, with injection of dye, the pt had an episode of
            approximately 20 seconds asystole. After 2 chest compressions,
            normal pulse was restored. Following the endarterectomy, on-pump
            CABG x 2 with saphenous vein graft was carried out. Findings included
            a heavily calcified aorta, global left ventricular dysfunction (noted

SUMMIT MEDICAL CENTER
QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

0420100717 SEQUEIRA,BARBARA            63Y F
cility: SUMMIT MEDICAL CENTER          QA #: 04-319

Abstract: (cont)

by ECHO during induction) and evidence of acute MI at the apex and
anterior wall.  As the pt was taken off bypass, the heart began to
fail.  The pt was placed back on bypass. IABP was placed.  She
eventually was weaned from bypass with maximal inotropic support. The
sternum was not rewired and the pt was transferred back to the unit.
Later during the post-op evening, the patient went into VF and was
not able to resuscitated.

================================= REVIEW DATA =================================

Service: CT-CARDIO/THORACIC SURGERY

Review: PHYSICIAN REVIEW                Service/Committee: CT-CARDIO/THORACIC
Reviewer: Q-3532                        Date: 10/7/2004

Comments:     63 y/o female with unstable angina plus carotid disease. Cath done
              7/20 (Wednesday). Finished 3 pm.  Carotid study ongoing, unstable
              angina.  Surgery 7/23 at 15:00 ( 3PM). "The correct diagnosis is
              unstable angina.  In view of ongoing recurrent angina, the patient
              would probably hve benefited from 'emergency surgery' on 7/20 at 5
              pm, not 7/23 at 3 pm.  Also, I believe most surgeons would not have
              done the carotid endarterectomy in the fact of unstable angina. Issue
              for Committee Discussion:  Timing of CABG (urgent vs. delay) and
              sequence of procedures."

sposition: COMMITTEE           Referred to: CT-CARDIO/THORACIC S Routing Date: 10/8/2004

Review: COMMITTEE                       Service/Committee: CT-CARDIO/THORACIC
Reviewer: _____               Date: 10/25/2004

Comments:     Brief discussion CT Surgery Peer meeting 10/25/04.  Present: Dr.
              Ennix an Dr. R. Stanten.  Issue - 2-day delay in taking patient to
              surgery.  It was not incorrect to obtain carotid angiogram prior to
              OHS.  Very difficult to accelerate the process.  No acute infarct was
              noted.
              Determination:  Committee will request written reply from MD# Q-1730
              to obtain additional information concerning clinical decision making
              related to delay in proceeding to OHS.

Disposition: LETTER,RESPONSE REQU Referred to: CT-CARDIO/THORACIC S Routing Date: 10/25/2004

Review: LETTER,RESPONSE REQUIRED        Service/Committee: CT-CARDIO/THORACIC
Reviewer: Q-80128                       Date: 2/28/2005

Comments:     Peer Review Committee Meeting 2/28/05:
              The committee reviewed he letter of response from MD #1730.  In
              summary, the response stated that on admission, although the patient
              had a positive stress test and multi-vessel CAD with chronic angina,

SUMMIT MEDICAL CENTER
QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

Acct No.: 0420100717 SEQUEIRA,BARBARA  63Y F
Facility: SUMMIT MEDICAL CENTER          QA No.: 04-319

Comments: (cont)

she did not have acute coronary syndrome and was not unstable.  The
vascular surgeon saw the patient on 7/21 and recommended an arch
study by IR.  The study on 7/22 revealed significant bilateral
carotid disease.  During the carotid study, the patient developed a
brief episode of chest pain (5-7/10).  Cardiology was called in
follow-up.  During the night, the patient did not experience chest
pain or hemodynamic instabaility.  However, on the way to surgery on
7/23, the patient experienced chest pain.   She had probably
sustained a myocardial infarction some time the previous day, which
extended and became evident.  Given the clinical study and the
patient's combined carotid and coronary disease, there was no
indication for emergent surgery on 7/22.

The committee felt that given the extent of the patient's carotid
disease, the decision to proceed with a combined procedure was
reasonable.  The delay was not unreasonable.  The patient was
adequately assessed and treated.  Her pain had subsided and she
appeared to be stable.  The standard of care was determined to be
appropriate.

Disposition: _____  Referred to: _____  Routing Date: _____

========================= QUALITY MANAGEMENT EXTENDED SCREEN DATA =========================
Comments:

5/16/2005 Case 3:07-cv-0024t    VHA    DROFIT MEDICAL CENTER 07/1  J07    Page 7 of 44    PAGE 155
02:14 PM                     QUALITY MANAGEMENT WORKSHEET
                        CONFIDENTIAL PEER REVIEW INFORMATION
                        CT-CARDIO/THORACIC SURGERY PROPERTY OF SUMMIT MEDICAL
                                                CENTER MEDICAL STAFF. THIS
ct No.: 0405800363 ALLISON,DOLORES  57Y F     DOCUMENT PROTECTED BY CALIF.
 ility: SUMMIT MEDICAL CENTER    QA No.: 04-114    EVIDENCE CODE 1157.

===========================  ENCOUNTER DATA  =============================

Start Date: 2/27/2004    MRN: 1132816    Admit Phys: Q-9648

Admit Complaint: SYNCOPE                Consultant:

Disch Date: 2/29/2004    Disch Dx: AMI ANTEROLATERAL, INIT

==============================  SURGERY DATA  ============================

Surg Date:        Surg Time:    Surgeon:

Procedure:

==============================  EVENT DATA  ==============================

Reference Date: 3/17/2004        Desc: Postop death

Location: _____    Surg Proc: CABG,SIMPLE

Event: DEATH,POST-OP                        Date: 2/29/2004
Outcome: DEATH                        Significance: DEATH

Physician        Type  Service    QA Disp    Action Date    Final Disposition
^-1730                 CT-CARDIO/  PHYSICIAN REV 4/26/2004    PHYSICIAN CL
                 Major Issue: _____ Std of Care: NO CARE ISSUES

Abstract:        Admitted 2/27/04 with chest pain. SOB, N&V and syncope.  57 y/o
                 female, non-insulin dependent diabetic. Hx of MI in 1998 with
                 angioplasty.
                 On 2/28/04, patient underwent CABG x 3.  Intraaortic balloon pump
                 inserted.  The patient was weaned from CP bypass with difficulty due
                 failure of the right ventricle.  She was transferred to CPU in very
                 critical condition.
                 The patient failed to improve and remained in cardiogenic shock. She
                 expired at 14:10 on 2/29/04. [mb]

==============================  REVIEW DATA  =============================

Service: CT-CARDIO/THORACIC SURGERY

Review: PHYSICIAN REVIEW            Service/Committee: CT-CARDIO/THORACIC
Reviewer: Q-13936                Date: 4/26/2004

Comments:    Appropriate care given.

7/16/2005
02:11 PM  Case 3:07-cv-0248&  /HA  QUROCUMFN&153MENT Filed 02/26/1  J07  Page 8 of 44  PAGE 2

SUMMIT MEDICAL CENTER
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

PROPERTY OF SUMMIT MEDICAL
CENTER MEDICAL STAFF. THIS
DOCUMENT PROTECTED BY CALIF.
EVIDENCE CODE 1157.

Acct No.: 0412700776 WATERS,LILLIA M  72Y F
Facility: SUMMIT MEDICAL CENTER          QA No.: 04-236

================================ ENCOUNTER DATA ================================

Start Date: 5/6/2004     MRN: 527129          Admit Phys: Q-1730

Admit Complaint: AMI INFEROLATERAL, INIT        Consultant:

Disch Date: 5/12/2004     Disch Dx: AMI INFEROLATERAL, INIT

================================ SURGERY DATA ================================

Surg Date:        Surg Time:        Surgeon:

Procedure:

================================ EVENT DATA ================================

Reference Date: 6/8/2004          Desc: Death post CABG

Location: _____    Surg Proc: CABG,SIMPLE

Event: DEATH,POST-OP                        Date: 5/12/2004
Outcome: DEATH                      Significance: DEATH

Physician       Type  Service      QA Disp      Action Date    Final Disposition
Q-1730                CT-CARDIO/   PHYSICIAN REV 8/3/2004      PHYSICIAN RE
                Major Issue: _____ Std of Care: NO CARE ISSUES

Abstract:       72 y/o woman with hx of hypertension, diabetes and hyperlipidemia.
                The patient presented to the ED on 5/6/04 with 4-hr history of chest
                pain, n/v and abnormal EKG - acute inferior MI.

                CATH: On admit, the pt was taken directly to the Cath Lab and
                started on Integrilin. Because of severe 2-vessel disease on
                angiogram, she was referred for cardiac surgery. While awaiting
                transfer to the OR, her BP dropped from baseline of 170 to approx 80
                and she was started on dopamine Since she was complaining of LRQ
                discomfort, a STAT Hgb was done, showing a drop from 14.2 to 10.3
                gms. CT scan confirmed a small-to-moderate retroperitoneal
                hemorrhage. Since the pt's BP remained low, IABP was inserted.

                On 5/6, subsequent to the cath procedure, the patient underwent
                urgent CABG x 3. A temporary pacemaker was implanted. The procedure
                was complicated by a friable right atrium, a non functioning
                tricuspid valve and persistent bleeding secondary to coagulopathy,
                Multiple clotting factors were administered. Post operatively, the
                patient was hypotensive, requiring pressor support, and oliguric on
                CVVH. On 5/10, patient's rhythm was atrial flutter. She had

SUMMIT MEDICAL CENTER
QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

0412700776 WATERS,LILLIA M                      72Y F
Facility: SUMMIT MEDICAL CENTER                 QA #: 04-236

Abstract: (cont)

     significant metabolic acidosis in spite of bicarb administration.
Cardioversion was considered.  ID consult was obtained, with no
recommended change in regimen.  She remained on IABP.  ECHO/doppler
showed LVH with stage III-IV diastolic dysfunction, biatrial
enlargement and mitral regurg.  The patient failed to improve,
sustained multiorgan system failure and expired on 5/12.

     ADDENDUM:  Cardiology review raised concern regarding the decision to
proceed with immediate surgery in view of the retroperitoneal bleed.
Questioned whether surgery could have been postponed until
retroperitoneal bleeding stabilized.  [mb]

==================================== REVIEW DATA ====================================

Service: CT-CARDIO/THORACIC SURGERY

Review: PHYSICIAN REVIEW                 Service/Committee: CT-CARDIO/THORACIC
Reviewer: Q-80128                        Date: 8/3/2004

Comments:     Case reviewed by ▮▮▮▮▮▮:  Patient required IABP, dopamine post
              cath. The hematoma was addressed and in assessment, felt to warrant
              emergent OHS.  Vascular surgery was on hand should hematoma need
              surgery. The hematoma apparently did not play a large contribution to
              the ultimate outcome of what was a high risk situation.  A difficult
              decision point but no negligence was evident. No care or
              documentation issues identified.

Disposition: _____ Referred to: _____ Routing Date: _____

========================= QUALITY MANAGEMENT EXTENDED SCREEN DATA =========================
                        Comments:

5/16/2005
02:25 PM   Case 3:07-cv-0248(   HA   D         SUMMIT MEDICAL CENTER        7/12   J7   Page 10 of 44   PAGE
                                            QUALITY MANAGEMENT WORKSHEET
              069                       CONFIDENTIAL PEER REVIEW INFORMATION
                                          CT-CARDIO/THORACIC SURGERY               ... OF SUMMIT MEDICAL
                                                                                  CENTER MEDICAL STAFF. THIS
Acct No.: 0200800301 PRINGLE,ALMA   79Y F                                         DOCUMENT PROTECTED BY CALIF.
Facility: SUMMIT MEDICAL CENTER              QA No.: 02-100                        EVIDENCE CODE 1157.

================================== ENCOUNTER DATA ==================================

Start Date: 1/9/2002       MRN: 653343         Admit Phys: Q-6266

Admit Complaint: CHEST PAIN NOS
                                               Consultant: Q-4886; Q-8625; Q-1730;
                                                           Q-78250; Q-4966; Q-5753; Q-7909;
                                                           Q-3952; Q-1188

Disch Date: 2/19/2002      Disch Dx: CRNRY ATHRSCL NATVE VSSL

================================== SURGERY DATA ==================================

Surg Date:          Surg Time:        Surgeon:

Procedure:

================================== EVENT DATA ==================================

Reference Date: 3/4/2002              Desc: Death

Location: _____      Surg Proc: CABG,SIMPLE

Event: DEATH,POST-OP                                   Date: 2/19/2002
Outcome: DEATH                                         Significance: DEATH


Physician        Type  Service        QA Disp    Action Date    Final Disposition
  Q-3730               CT-CARDIO/      PHYSICIAN REV               PHYSICIAN CL
                 Major Issue: _____  Std of Care: NO CARE ISSUES

Abstract:        79 year old Jehovah's Witness patient, with CAD admitted for Cardiac
                 Cath which showed severe triple vessel disease and EF 65%.  Referred
                 for cardiac surgery.  Underwent CABG x 2 on 1/10 without apparent
                 complication.  On POD#1 noted to have left hemiparesis and diagnosed
                 with post-op CVA.  Also diagnosed with respiratory failure, and
                 developed anemia and thrombocytopenia.  Rx'd with Epogen (refused
                 blood).  On 1/18, still on vent and having difficulty ventilating
                 (collapsing trachea), considering tracheostomy.  Over next several
                 days weaning poorly, agitated.  Tracheostomy done on 1/25.  Continued
                 to do poorly, and unresponsive by 1/30.  Family conference and
                 decision for expectant care on 2/8.  Transferred to med/surg and
                 expired on 2/19.

================================== REVIEW DATA ==================================

Service: CT-CARDIO/THORACIC SURGERY

5/16/2005 Case 3:07-cv-0248   'HA   Document 100000000 007   Page 11 of 44   PAGE
02:25 PM

SUMMIT MEDICAL CENTER
QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

Acct No.: 0200800301 PRINGLE,ALMA   79Y F
Facility: SUMMIT MEDICAL CENTER          QA No.: 02-100

Service CT-CARDIO/THORACIC SURGERY: (cont)

Review: PHYSICIAN REVIEW               Service/Committee: CT-CARDIO/THORACIC
Reviewer: Q-13936                      Date: 7/15/2002

Comments:        79y.o. Jehovah's Witness unterwent CABG (plan off pump--> to on-pump
                 because of intraop instability) on 2/10.  CVA postop with progressive
                 slow deterioration.  Family conf on 2/8-->expectant care.

                 _____

                 _____

Disposition: _____ Referred to: _____ Routing Date: _____

========================= QUALITY MANAGEMENT EXTENDED SCREEN DATA =========================
                 Comments:

SUMMIT MEDICAL CENTER
QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

PROPERTY OF SUMMIT MEDICAL
CENTER MEDICAL STAFF. THIS
DOCUMENT PROTECTED BY CALIF.
EVIDENCE CODE 1157.

Acct No.: 0401501034 AWAD,ABDEL A  87Y M
Facility: SUMMIT MEDICAL CENTER          QA No.: 04-67

============================== ENCOUNTER DATA ==============================

Start Date: 1/16/2004     MRN: 1281866          Admit Phys: Q-8572

Admit Complaint: INTERMED CORONARY SYND          Consultant:

Disch Date: 2/11/2004     Disch Dx: CRNRY ATHRSCL NATVE VSSL

============================== SURGERY DATA ==============================

Surg Date:          Surg Time:     Surgeon:

Procedure:

============================== EVENT DATA ==============================

Reference Date: 2/12/2004          Desc: Referral from CCR

Location: NO SPEC CARE (S     Surg Proc: CABG,SIMPLE

Event: REFERRAL FROM CRITICAL CARE ROUNDS          Date: 2/10/2004
Outcome: DELAYED RESPONSE                          Significance: QA-POTENTIAL MA

| Physician Q-53519 | Type | Service MEDICINE | QA Disp PHYSICIAN REV | Action Date 3/25/2004 | Final Disposition PHYSICIAN CL |
|---|---|---|---|---|---|

Major Issue: _____ Std of Care: NO CARE ISSUES

Event: DEATH,POST-OP                               Date: 2/11/2004
Outcome: DEATH                                     Significance: DEATH

| Physician Q-1730 | Type | Service CT-CARDIO/ | QA Disp PHYSICIAN REV | Action Date 4/26/2004 | Final Disposition PHYSICIAN CL |
|---|---|---|---|---|---|

Major Issue: _____ Std of Care: NO CARE ISSUES

Event: CLINICAL PERTINENCE FAILURES               Date: 2/11/2004
Outcome: DOCUMENTATION FAILURE/INCOMPLETE          Significance: QA-MINOR TEMPOR

| Physician Q-1730 | Type | Service CT-CARDIO/ | QA Disp PHYSICIAN REV | Action Date 4/26/2004 | Final Disposition PHYSICIAN CL |
|---|---|---|---|---|---|

Major Issue: _____ Std of Care: MINOR DOCUMENTATION ISSU

Abstract:     Event #1: Referral from Critical Care Rounds- pt. had to be
              emergently/urgently intubated in SCU by a pulmonologist not on the

6/16/2005  Case 3:07-cv-0248(   HA   DOCUMENT OF 7/12   07   Page 13 of 44   PAGE

02:14 PM

SUMMIT MEDICAL CENTER
QUALITY MANAGEMENT WORKSHEET
CONFIDENTIAL PEER REVIEW INFORMATION
CT-CARDIO/THORACIC SURGERY

0401501034 AWAD,ABDEL A                    87Y M
Facility: SUMMIT MEDICAL CENTER            QA #: 04-67

Abstract: (cont)

        case.   Appeared nursing had spoken to the pt.'s pulmonologist
        several times, who said he "would be in," but had not arrived in a
        timely fashion?   Referral notes death may not have been preventable,
        but response issue should be looked at and perhaps? tracked.
        QIC review: 87 y/o male undergoes CABGx3 on 1/16/04- post -op course
        requires Pulmonology consult 1/17 ventilator management. (H/o
        smoking, COPD). Long post-op course complicated by resp. failure and
        ARF. plus MRSA and stenotrophamonous sepsis. Slow weaning
        process-extubated 2/6 by attending pulmonologist. On-call pulm sees
        2/7-8, and another 2/9.  Comments on weak cough requiring deep
        suctioning, On oximizer during day and Bi-PAP at night, CXR w/ rt
        effusion.  Undergoes thoracentesis 2/10 for removal 1600cc bloody
        fluid- respiratory status much improved after.     On 2/11, pt. is in
        SCU and at ?time, (?8AM) a pulmonologist is called re: patient status
        and temp- Bi-PAP order received. Nephrologist is with patient
        inserting central line. At 0955, another pulmonologist arrives, was
        "urgently called to intubate patient." Placed back on vent, is
        hypotensive on pressors, febrile 104 and unresponsive...suspect
        septoc shock and aspiration pneumonia. Later experiences VFib arrest
        w/ successful resuscitation. Transferred to ICU. Discussion w/
        family- make pt. DNR, comfort care only. Event #2- Patient expires
        2/11.

=================================== REVIEW DATA ==================================================

Service: CT-CARDIO/THORACIC SURGERY

Review: PHYSICIAN REVIEW                    Service/Committee: CT-CARDIO/THORACIC
Reviewer: Q-3532                           Date: 4/26/2004

Comments:      87 y/o male.  CABG Left IMA to LAD, OM, PLRCA, emergent.  Unstable
               angina.  V-tach on induction, high risk patient.  Appropriate
               surgical care given.  (Lots of orders not countersigned. eg: 2/10 at
               11:50.)

Disposition: _____  Referred to: _____  Routing Date: _____

========================= QUALITY MANAGEMENT EXTENDED SCREEN DATA =========================
                          Comments:

# EXHIBIT B

11/13/2002  01:19    9252841362                    EDELEN                        PAGE  01

## Berkeley Cardiovascular Medical Group
## 2450 Ashby, Berkeley, CA 94705

November 26, 2004

Lamont D, Paxton, M.D.,
Chair, Ad Hoc Committee,
Alta Bates Summit Med Center

Dear Dr. Paxton,

It has come to my attention that your Ad Hoc Committee is reviewing the cardiac surgery cases that led to the transfer to the Alta Bates cardiac surgery program to the Summit campus nine months ahead of schedule. As Chief of the Cardiology Section at Alta Bates, I was part of that review and decision-making process and I want to share my perspective on the issues with you.

Our cardiac surgical volume at Alta Bates declined from about 240 cases per year to 74 cases per year over a two or three year period. This was the result of loss of a Naval Hospital contract, the dissolution of the East Bay Medical Network, the departure of Dr. Nilas Young and the more frequent use of multi vessel catheter based interventional procedures by our cardiologists.

The result of this declining volume caused a gradual ripple effect across our program, with loss of daily experience and expertise of OR personnel, cardiac trained anesthesiologists and ICU nurses, in addition to the lower volume by Dr. Ennix, our cardiac surgeon. The complications in 2002 caused a QA Committee to review the program, recognize the weaknesses and agree to consolidate it at the Summit campus.

There were, as I recall, eight fatalities in 2002, among our cardiac surgery patients. In reviewing these cases at that time, I was struck by the advanced age, co-morbidities, poor left ventricular function, diffuse coronary disease or poor coronary targets in many of these patients. More thoughtful medical judgment of risk versus benefit by the cardiologists prior to surgical referral would probably have prevented a number of these unfortunate surgical outcomes. Anesthesia quality issues were noted in a few cases as well. Delays in ICU nurse recognition of problems occurred in a few others.

It is my clinical impression that our patients who have had heart surgery at Summit since January, 2003, have had very good clinical outcomes. I have not, however, seen any Summit cardiac surgery complication data. Clearly, with a high patient volume program we appreciate better OR staffing, excellent cardiac anesthesia with TEE expertise and terrific CRU and ICU nursing care. Teamwork among all the players is very evident.

We continue to have a great deal of confidence in Dr. Coyness Ennix as an experienced, technically sound, hard working and very personable cardiac surgeon with good clinical judgment. We enjoy working with him and continue to send him all types of cardiac surgery cases from our practice. I think that the unfortunate complications of 2002 were more the problems of a low volume program and high preoperative patient morbidity than a reflection of Dr. Ennix's skill as a cardiac surgeon.

Good luck with your Committee's work. Please let me know if can can provide any more information for you.

Respectfully,

John S. Edelen, M.D., Chair, Cardiology Section, Alta Bates Campus, ABSMC.
cc: Steven Stanten, M.D., Chair, Dept. of Surgery
cc: William Isenberg, M.D., Medical Staff President

# EXHIBIT C

# BERKELEY - ORINDA WOMEN'S HEALTH, INC.

*A Medical Corporation*

*Obstetrics, Gynecology & Infertility*

12 Camino Encinas, Suite 15 • Orinda, CA. 94563 • (925) 254-9000 • (925) 254-0687 FAX
2999 Regent Street, Suite 701 • Berkeley, CA. 94705 • (510) 845-4200 • (510) 845-0185 FAX

November 29, 2004

William Isenberg, M.D., President
Medical Staff
ALTA BATES/SUMMIT MEDICAL CENTER
355 Hawthorne Avenue
Oakland, California 94609

RE:    COINESS L. ENNIX, Jr., M.D.

Dear Dr. Isenberg:

Dr. Ennix is an acquaintance but not a social friend of mine.  I am writing this letter on Dr. Ennix's behalf regarding what I know to have been his opinion as cardiac surgery was moved from Alta Bates to the Summit campus.

As the question of performance of angioplasty was debated at the Alta Bates campus, there was considerable resistance to the decision to move these procedures to the Summit campus.  The Alta Bates' cardiologists were appropriately concerned as such a move might represent a financial loss to them and they wanted to continue cardiac catheterizations at the Alta Bates campus.

Dr. Ennix spoke to moving it to the Summit campus, and I remember very clearly at an MEB meeting that this issue was discussed quite actively.  Dr. Ennix stated that if his wife were having a coronary event at the Alta Bates campus, he would request that she be taken by ambulance to the Summit campus for her cardiac surgical management.

Dr. Ennix is troubled that the discussion of substandard patient outcomes occurring at the Alta Bates Campus, as that program was being closed, are now being reinvestigated at the Summit Campus.

It was Dr. Ennix who strongly supported the Alta Bates closure.

If you have any questions regarding this recollection, please feel free to contact me.

Most sincerely,

John B. Girald, M.D.
JBG/cj
CC:    Lamont D. Paxton, M.D., Chairperson
Ad Hoc Committee, Medical Staff Office
ALTA BATES SUMMIT MEDICAL CENTER
355 Hawthorne Avenue
Oakland, California 94609

Steven Stanten, M.D., Chairperson
Department of Surgery
Alta Bates Summit Medical Center
355 Hawthorne Avenue
Oakland, California 94609

# EXHIBIT D



*Alta Bates Summit*
*Medical Center*

A Sutter Health Affiliate

PROPERTY OF SUMMIT MEDICAL
CENTER MEDICAL STAFF. THIS
DOCUMENT PROTECTED BY CALIF.
EVIDENCE CODE 1157.

DEC 29 2003

SUMMIT
MEDICAL STAFF OFFICE

2450 Ashby Avenue
Berkeley, CA 94705
510.204.4444

Annette Schaieb, M.D.
President, Summit Medical Staff
350 Hawthorne Ave.
Oakland, CA 94609

December 18, 2003

Dear Dr. Schaieb:

   Pursuant to your request, enclosed please find a copy of the outside report of Forest Junod, M.D. relative to the cases of Coyness Ennix, M.D., which were sent for outside review by the Alta Bates Medical Staff. As we discussed, the Alta Bates Medical Staff Leadership has just recently received this report and has not had an opportunity to either carefully review it or consider it in connection with any of our own internal peer review findings. Accordingly, we make no representation regarding its accuracy, credibility or reliability. Further, we make no representation or recommendation as to what impact, if any, this report should have on Dr. Ennix's membership and privileges on either the Alta Bates Medical Staff or the Summit Medical Staff. Rather, we are simply providing it to you as information for independent review and analysis by the Summit Medical Staff. It is our view that sharing this information at this early juncture is appropriate since Dr. Ennix is now practicing at the Summit Campus of Alta Bates Summit Medical Center and is no longer actively practicing at the Alta Bates Campus.

   Please note that we are providing this information in reliance on the fact that the Summit Medical Staff is a "peer review body" within the meaning of Business and Professions Code Section 805 and, further, that you will use this information solely in connection with your evaluation of the qualifications and credentials of Dr. Ennix. We expect that you will maintain the confidentiality of this information and that this document will be appropriately handled such that it will continue to enjoy all applicable privileges and immunities, including the immunity from discovery of Evidence Code Section 1157.

   We hope that you will share with us any information you have or may develop in the Summit peer review process regarding Dr. Ennix. In that regard, we expect to send a request for information once we are further along in our own internal peer review process.

   Thank you for your kind attention.

Sincerely,

John G. Rosenberg, M.D., M.P.H.
President, Alta Bates Medical Staff

enclosure

CONFIDENTIAL

Δ π EXHIBIT 16
Deponent Ennix
Date 8/26/7 Rptr. LV
WWW.DEPOBOOK.COM

# EXHIBIT E

March 2007
# CCOrp

# Coronary Artery Bypass Graft Surgery in California:
## 2003-2004 Hospital & Surgeon Data

### California CABG Outcomes Reporting Program



**Office of Statewide Health Planning and Development**

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

## EXECUTIVE SUMMARY

The *California Report on Coronary Artery Bypass Graft Surgery, 2003-2004, Hospital and Surgeon Data* presents findings from analyses of data collected from California's 121 state-licensed hospitals where 302 surgeons performed adult isolated coronary artery bypass graft (CABG) surgery[1] during 2003 and 2004.

The report uses risk-adjusted operative mortality to evaluate hospital and surgeon performance. Risk adjustment is a statistical technique that allows for fair comparison of healthcare provider operative mortality rates even though some have sicker or healthier patients than average. Operative mortality includes: 1) all deaths during the hospitalization at the hospital where the operation was performed, regardless of length of stay, and 2) deaths occurring anywhere within 30 days after the operation.

This report also provides hospital-level information on internal mammary artery (IMA)[2] usage (a process measure of surgery quality) and examines the relationship between the number of surgeries that hospitals and surgeons perform and their mortality rates. There were 40,377 isolated CABG surgeries reported in 2003-2004, making the California CABG Outcomes Reporting Program (CCORP) the largest public reporting program on CABG surgery outcomes in the United States.

Key findings from this report are:

- The operative mortality rate for isolated CABG surgery in California was 3.08% for 2003-2004 (2.91% for 2003 and 3.29% for 2004). Nationally, the Society of Thoracic Surgeons (STS) reported 2.4%[3] for the same time period. However, STS does not verify hospital reporting of deaths by linking with the state's vital statistics death file as CCORP does.

- The risk-adjusted operative mortality rate for California hospitals ranged from 0% to 7.83%, revealing wide variation in CABG surgery outcomes after adjusting for patients' pre-operative health conditions. However, 111 of 121 hospitals (91.7%) performed within their expected range compared to the state's overall mortality rate.

---

[1] Isolated CABG surgery refers to a CABG surgery without other major heart-related surgery, such as heart or lung transplantation, valve repair, etc., during the same admission. See Appendix A for a detailed clinical definition of isolated CABG.

[2] The internal mammary artery (IMA) is an artery that supplies blood to the front chest wall and the breasts. It is a paired artery, with one running on each side of the body. Evidence shows that the IMA, when grafted to a coronary artery, is less susceptible to obstruction over time and remains fully open longer than vein grafts.

[3] Society of Thoracic Surgeons: *Spring 2005 Report – Adult Cardiac Database Executive Summary*, 24 October 2005.

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

- Four of the 121 hospitals performed significantly **"Better"** than the state average, and six hospitals performed **"Worse"** than the state average. These hospitals are presented below in alphabetical order:

| Hospitals with "Better" Performance Ratings, 2003-2004 | |
|---|---|
| Hospital | Region |
| Fountain Valley Regional Hospital and Medical Center - Euclid | Orange County |
| Mercy General Hospital | Sacramento Valley and Northern California |
| Mercy Medical Center - Redding | Sacramento Valley and Northern California |
| St. John's Regional Medical Center (Oxnard) | San Fernando Valley, Antelope Valley, Ventura and Santa Barbara |
| Hospitals with "Worse" Performance Ratings, 2003-2004 | |
| Hospital | Region |
| Bakersfield Memorial Hospital | Central California |
| Beverly Hospital | Greater Los Angeles |
| Doctors Medical Center – Modesto Campus | Central California |
| Lakewood Regional Medical Center | Greater Los Angeles |
| Santa Rosa Memorial Hospital - Montgomery | San Francisco Bay Area and San Jose |
| UCSF Medical Center | San Francisco Bay Area and San Jose |

- Hospital ratings based on 2004 data were also produced to provide an indication of more recent performance. These results are presented in Table 4 of the main document. The 2003 hospital performance ratings were published in February 2006.

- The risk-adjusted operative mortality rate for surgeons overall (i.e., combined across all facilities where they operate) ranged from 0% to 32.96%, revealing wide variation among surgeons in their CABG surgery outcomes after adjusting for patients' pre-operative health conditions. However, 286 of the 302 surgeons (94.7%) performed within the expected range compared to the state's average mortality rate.

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

- Four surgeons' overall performance was significantly **"Better"** than the state average, and twelve surgeons' overall performance was **"Worse"** than the state average. These surgeons are presented below in alphabetical order:

| Surgeons with " Better" Performance Ratings Overall, 2003-2004 ||
|---|---|
| **Surgeon** | **Region** |
| Declusin, Richard J. | San Fernando Valley, Antelope Valley, Ventura & Santa Barbara |
| Giritsky, Alexander | Greater San Diego |
| Wang, Nan | Inland Empire, Riverside & San Bernardino |
| Yap, Alexander G. | San Francisco Bay Area & San Jose |

| Surgeons with "Worse" Performance Ratings Overall, 2003-2004 ||
|---|---|
| **Surgeon** | **Region** |
| Aharon, Alon S. | Inland Empire, Riverside & San Bernardino |
| Edwards, Phyllis A. | Central California |
| Hoopes, Charles W. | San Francisco Bay Area & San Jose |
| Housman, Leland B. | Greater San Diego |
| Kincade, Robert C. | Sacramento Valley & Northern California Region |
| Marchbanks, Marshall V. | San Francisco Bay Area & San Jose |
| Nuno, Ismael N. | Greater Los Angeles |
| Rosenburg, Jeffrey M. | Greater San Diego |
| Schwartz, Steven M. | San Francisco Bay Area & San Jose |
| Sweezer, William P. | San Francisco Bay Area & San Jose |
| Tzeng, Thomas S. | Orange County and Greater Los Angeles |
| Vunnamadala, Syam P. | Orange County |

- Surgeon ratings were also provided separately for each hospital where they operated. These ratings, which take into consideration both surgeon and hospital-specific factors, are presented in Table 5 of the main document.

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

Other major findings in this report include:

- Hospital rates for Internal Mammary Artery (IMA) usage, a process indicator of heart bypass surgery quality, are presented in this report for the first time. Use of the IMA in CABG surgery is a nationally endorsed measure of quality and very low rates are associated with poorer care. Results show that in 2003-2004, California hospitals had an average IMA usage rate of 89.6%, with a range from 57% to 100%. The IMA rate for 113 hospitals was deemed acceptable (71% or more), but eight hospitals had significantly lower IMA rates, which may be cause for concern. These ratings are presented in Table 6 of the main document.

- Utilization of Percutaneous Coronary Interventions (PCIs), such as angioplasty with stent insertion, in California has increased from 44,297 procedures in 1997 to 59,786 procedures in 2005—an increase of nearly 35%. Meanwhile, the number of isolated CABG surgeries has dropped from 28,175 to 17,166—a decrease of approximately 39% during the same period. A more comprehensive approach to examining the quality of revascularization procedures in California would include review of the outcomes of PCI providers. More information is included in Section VII.

- No significant association was found between the number of CABG surgeries that hospitals perform annually and their risk-adjusted mortality rates. At the surgeon level, no significant association was found between the number of isolated CABG surgeries performed and surgeons' risk-adjusted mortality rates. However, limited evidence suggests that surgeons who perform more than 100 CABG surgeries per year (isolated and non-isolated combined) have modestly lower isolated CABG surgery mortality rates. These results are presented in Section VII.

x

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

## Table 5: Surgeon Risk-Adjusted Operative Mortality Results, 2003-2004

| Surgeon | Hospital | All CABG Cases | Isolated CABG Cases | Isolated CABG Deaths | Observed Mortality Rate (%) | Expected Mortality Rate (%) | Risk-Adjusted Mortality Rate (% RAMR) and 95% CI | Performance Rating* |
|---|---|---|---|---|---|---|---|---|
| **State** | | 49,435 | 40,377 | 1,244 | 3.08 | | | |
| Ehman, Walter J. | Desert Regional Medical Center | 2 | 2 | 0 | 0.00 | 0.54 | 0.00 (0.00, 100.00) | |
| Ellertson, David G. | Surgeon Overall | 36 | 34 | 1 | 2.94 | 2.12 | 4.30 (0.11, 23.85) | |
| | Doctors Medical Center - Modesto Campus | 5 | 5 | 0 | 0.00 | 3.05 | 0.00 (0.00, 74.46) | |
| Ellis, Robert J. | Memorial Medical Center of Modesto | 31 | 29 | 1 | 3.45 | 1.96 | 5.45 (0.14, 30.27) | |
| | Surgeon Overall | 114 | 90 | 4 | 4.44 | 3.68 | 3.73 (1.01, 9.52) | |
| | California Pacific Medical Center - Pacific Campus | 4 | 4 | 0 | 0.00 | 2.44 | 0.00 (0.00, 100.00) | |
| | Marin General Hospital | 48 | 40 | 2 | 5.00 | 3.32 | 4.66 (0.56, 16.78) | |
| | St. Mary's Medical Center, San Francisco | 62 | 46 | 2 | 4.35 | 4.11 | 3.27 (0.39, 11.77) | |
| Emick, Coyness L. | Surgeon Overall | 164 | 136 | 6 | 4.41 | 2.85 | 4.78 (1.75, 10.36) | |
| | Alta Bates Summit Medical Center - Summit Campus | 163 | 135 | 6 | 4.44 | 2.87 | 4.79 (1.75, 10.38) | |
| | Doctors Medical Center - San Pablo Campus | 1 | 1 | 0 | 0.00 | 0.69 | 0.00 (0.00, 100.00) | |
| Esmailian, Farded | Surgeon Overall | 173 | 129 | 5 | 3.88 | 2.59 | 4.62 (1.50, 10.76) | |
| | Santa Monica - UCLA Medical Center | 32 | 30 | 1 | 3.33 | 2.74 | 3.76 (0.09, 20.85) | |
| | UCLA Medical Center | 141 | 99 | 4 | 4.04 | 2.54 | 4.91 (1.33, 12.52) | |
| Estioko, Manuel R. | Surgeon Overall | 230 | 199 | 7 | 3.52 | 4.28 | 2.54 (1.02, 5.22) | |
| | Good Samaritan Hospital - Los Angeles | 225 | 194 | 7 | 3.61 | 4.34 | 2.57 (1.03, 5.28) | |
| | St. John's Hospital and Health Center | 2 | 2 | 0 | 0.00 | 1.48 | 0.00 (0.00, 100.00) | |
| | St. Vincent Medical Center | 3 | 3 | 0 | 0.00 | 2.45 | 0.00 (0.00, 100.00) | |
| Eugene, John | Surgeon Overall | 85 | 81 | 1 | 1.23 | 2.71 | 1.41 (0.04, 7.83) | |
| | Anaheim Memorial Medical Center | 8 | 8 | 0 | 0.00 | 2.50 | 0.00 (0.00, 56.76) | |
| | Little Company of Mary Hospital | 9 | 7 | 0 | 0.00 | 6.91 | 0.00 (0.00, 23.48) | |
| | Torrance Memorial Medical Center | 1 | 1 | 0 | 0.00 | 0.87 | 0.00 (0.00, 100.00) | |
| | West Anaheim Medical Center | 2 | 2 | 0 | 0.00 | 0.76 | 0.00 (0.00, 100.00) | |
| | Western Medical Center - Santa Ana | 1 | 1 | 0 | 0.00 | 4.99 | 0.00 (0.00, 100.00) | |

* A surgeon is classified as "Better" if the upper 95% CI of the RAMR falls below the California observed mortality rate (3.08). A surgeon is classified as "Worse" if the lower 95% CI of the RAMR is higher than the California observed mortality rate. A surgeon's performance is considered "Not Different" from the state average (rating is blank) if the California mortality rate falls within the CI of the RAMR.

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

## Table 5: Surgeon Risk-Adjusted Operative Mortality Results, 2003-2004

| Surgeon | Hospital | All CABG Cases | Isolated CABG Cases | Isolated CABG Deaths | Observed Mortality Rate (%) | Expected Mortality Rate (%) | Risk-Adjusted Mortality Rate (%, RAMR) and 95% CI | Performance Rating* |
|---|---|---|---|---|---|---|---|---|
| State | | 49,435 | 40,377 | 1,244 | 3.08 | | 3.08 | |
| Hanna, Elias S. | Surgeon Overall | 31 | 18 | 1 | 5.56 | 3.47 | 4.95 (0.12, 27.45) | |
| | California Pacific Medical Center - Pacific Campus | 7 | 3 | 1 | 33.33 | 10.42 | 9.89 (0.25, 54.92) | |
| | Marin General Hospital | 10 | 8 | 0 | 0.00 | 2.52 | 0.00 (0.00, 56.29) | |
| | Salinas Valley Memorial Hospital | 5 | 3 | 0 | 0.00 | 1.04 | 0.00 (0.00, 100.00) | |
| | St. Mary's Medical Center, San Francisco | 9 | 4 | 0 | 0.00 | 1.99 | 0.00 (0.00, 100.00) | |
| Harmon, Adam L. | Surgeon Overall | 230 | 200 | 3 | 1.50 | 3.13 | 1.48 (0.30, 4.32) | |
| | Washington Hospital - Fremont | 230 | 200 | 3 | 1.50 | 3.13 | 1.48 (0.30, 4.32) | |
| Hastanya, Nahidh W. | Surgeon Overall | 23 | 22 | 0 | 0.00 | 2.02 | 0.00 (0.00, 26.52) | |
| | Loma Linda University Medical Center | 21 | 20 | 0 | 0.00 | 2.07 | 0.00 (0.00, 27.43) | |
| | Riverside Community Hospital | 2 | 2 | 0 | 0.00 | 1.55 | 0.00 (0.00, 100.00) | |
| Hemp, James R. | Surgeon Overall | 77 | 55 | 3 | 5.45 | 3.23 | 5.23 (1.07, 15.22) | |
| | Mercy Medical Center - Redding | 1 | 1 | 0 | 0.00 | 0.90 | 0.00 (0.00, 100.00) | |
| | Scripps Green Hospital | 16 | 14 | 0 | 0.00 | 2.74 | 0.00 (0.00, 29.61) | |
| | Scripps Mercy Hospital | 60 | 40 | 3 | 7.50 | 3.45 | 6.71 (1.38, 19.55) | |
| Hernandez, Jose G. | Surgeon Overall | 154 | 144 | 5 | 3.47 | 4.17 | 2.58 (0.83, 5.99) | |
| | Sharp Chula Vista Medical Center | 154 | 144 | 5 | 3.47 | 4.17 | 2.58 (0.83, 5.99) | |
| Hill, Arthur C. | Surgeon Overall | 89 | 80 | 0 | 0.00 | 2.92 | 0.00 (0.00, 4.87) | |
| | California Pacific Medical Center - Pacific Campus | 3 | 2 | 0 | 0.00 | 3.43 | 0.00 (0.00, 100.00) | |
| | UCSF Medical Center | 86 | 78 | 0 | 0.00 | 2.90 | 0.00 (0.00, 5.02) | |
| Hood, James S. | Surgeon Overall | 283 | 226 | 7 | 3.06 | 2.59 | 3.65 (1.46, 7.50) | |
| | Kaiser Foundation Hospital (Geary San Francisco) | 283 | 229 | 7 | 3.06 | 2.59 | 3.65 (1.46, 7.50) | |
| Hoopes, Charles W. | Surgeon Overall | 59 | 53 | 9 | 16.98 | 6.12 | 8.58 (3.91, 16.23) | Worse |
| | UCSF Medical Center | 59 | 53 | 9 | 16.98 | 6.12 | 8.58 (3.91, 16.23) | Worse |
| Housman, Leland B. | Surgeon Overall | 169 | 140 | 9 | 6.43 | 2.46 | 8.05 (3.68, 15.28) | Worse |
| | Scripps Green Hospital | 127 | 106 | 6 | 5.66 | 2.28 | 7.66 (2.81, 16.67) | |
| | Scripps Mercy Hospital | 42 | 34 | 3 | 8.82 | 2.99 | 9.12 (1.87, 26.55) | |

* A surgeon is classified as "Better" if the upper 95% CI of the RAMR falls below the California observed mortality rate (3.08). A surgeon is classified as "Worse" if the lower 95% CI of the RAMR is higher than the California observed mortality rate. A surgeon's performance is considered "Not Different" from the state average (rating is blank) if the California mortality rate falls within the CI of the RAMR.

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

Table 5: Surgeon Risk-Adjusted Operative Mortality Results, 2003-2004

| Surgeon | Hospital | All CABG Cases | Isolated CABG Cases | Isolated CABG Deaths | Observed Mortality Rate (%) | Expected Mortality Rate (%) | Risk-Adjusted Mortality Rate (% RAMR) and 95% CI | | Performance Rating* |
|---|---|---|---|---|---|---|---|---|---|
| **State** | | 49,435 | 40,377 | 1,244 | 3.08 | 3.08 | | | |
| Ingram, Michael T. | Surgeon Overall | 422 | 304 | 8 | 2.63 | 2.73 | 2.98 | (1.28, 5.85) | |
| | Sutter Memorial Hospital | 422 | 304 | 8 | 2.63 | 2.73 | | | |
| Iverson, Leigh I. | Surgeon Overall | 134 | 118 | 6 | 5.08 | 2.77 | 5.67 | (2.07, 12.30) | |
| | Alta Bates Summit Medical Center - Summit Campus | 101 | 89 | 5 | 5.62 | 2.69 | 6.45 | (2.09, 15.00) | |
| | Doctors Medical Center - San Pablo Campus | 33 | 29 | 1 | 3.45 | 3.01 | 3.54 | (0.09, 19.65) | |
| Iyengar, Sridhara K. | Surgeon Overall | 100 | 85 | 2 | 2.35 | 5.66 | 1.29 | (0.16, 4.63) | |
| | Fountain Valley Regional Hospital | 83 | 70 | 1 | 1.43 | 5.68 | 0.78 | (0.02, 4.31) | |
| | Saddleback Memorial Medical Center | 5 | 4 | 0 | 0.00 | 4.30 | 0.00 | (0.00, 66.07) | |
| | Western Medical Center - Santa Ana | 1 | 1 | 0 | 0.00 | 7.94 | 0.00 | (0.00, 100.00) | |
| | Western Medical Center Hospital - Anaheim | 11 | 10 | 1 | 10.00 | 5.77 | 5.35 | (0.14, 29.72) | |
| Jacobson, John G. | Surgeon Overall | 207 | 183 | 9 | 4.92 | 3.62 | 4.20 | (1.91, 7.94) | |
| | St. Helena Hospital | 207 | 183 | 9 | 4.92 | 3.62 | 4.20 | (1.91, 7.94) | |
| Jala, Sarika | Surgeon Overall | 157 | 145 | 2 | 1.38 | 3.73 | 1.14 | (0.14, 4.12) | |
| | Pomona Valley Hospital Medical Center | 157 | 145 | 2 | 1.38 | 3.73 | 1.14 | (0.14, 4.12) | |
| Jamieson, Stuart W. | Surgeon Overall | 26 | 9 | 0 | 0.00 | 1.24 | 0.00 | (0.00, 100.00) | |
| | UCSD Medical Center - La Jolla | 26 | 9 | 0 | 0.00 | 1.24 | 0.00 | (0.00, 100.00) | |
| Joyo, Colin I. | Surgeon Overall | 202 | 170 | 3 | 1.76 | 4.12 | 1.32 | (0.27, 3.86) | |
| | Hoag Memorial Hospital Presbyterian | 202 | 170 | 3 | 1.76 | 4.12 | 1.32 | (0.27, 3.86) | |
| Kallin, Kristopher | Surgeon Overall | 34 | 25 | 0 | 0.00 | 1.82 | 0.00 | (0.00, 24.94) | Not Applicable |
| | Mission Hospital Regional Medical Center | 2 | 0 | . | . | . | | | |
| | Saddleback Memorial Medical Center | 17 | 10 | 0 | 0.00 | 2.18 | 0.00 | (0.00, 52.22) | |
| | St. Joseph Hospital - Orange | 15 | 15 | 0 | 0.00 | 1.59 | 0.00 | (0.00, 47.75) | |
| Kapelanski, David P. | Surgeon Overall | 11 | 5 | 0 | 0.00 | 1.51 | 0.00 | (0.00, 100.00) | |
| | UCSD Medical Center - La Jolla | 6 | 1 | 0 | 0.00 | 2.13 | 0.00 | (0.00, 100.00) | |
| | UCSD Medical Center | 5 | 4 | 0 | 0.00 | 1.35 | 0.00 | (0.00, 100.00) | |
| Kaplon, Richard J. | Surgeon Overall | 529 | 437 | 9 | 2.06 | 1.89 | 3.36 | (1.53, 5.36) | |

* A surgeon is classified as "Better" if the upper 95% CI of the RAMR falls below the California observed mortality rate (3.08). A surgeon is classified as "Worse" if the lower 95% CI of the RAMR is higher than the California observed mortality rate. A surgeon's performance is considered "Not Different" from the state average (rating is blank) if the California mortality rate falls within the CI of the RAMR.

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

**Figure 2:** **Surgeon Risk-Adjusted Operative Mortality Results, 2003-2004**
(cont'd)



▼ Risk-Adjusted Operative Mortality Rate Significantly Higher than State Average
★ Risk-Adjusted Operative Mortality Rate Significantly Lower than State Average
■ Range of Risk-Adjusted Operative Mortality Rate (95% Confidence Interval)

THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

**Figure 2:** **Surgeon Risk-Adjusted Operative Mortality Results, 2003-2004**
(cont'd)



THE CALIFORNIA REPORT ON CORONARY ARTERY BYPASS GRAFT SURGERY

**Figure 2:** **Surgeon Risk-Adjusted Operative Mortality Results, 2003-2004**
(cont'd)



▼ Risk-Adjusted Operative Mortality Rate Significantly Higher than State Average
★ Risk-Adjusted Operative Mortality Rate Significantly Lower than State Average
▬ Range of Risk-Adjusted Operative Mortality Rate (95% Confidence Interval)

# EXHIBIT F

Case 3:07-cv-02486 Document 50-2 Filed 07/12 Page 33 of

NURSING PROGRESS NOTES

MCT/0045/Bed bath states pt frowning & turning initial CT white towel new dressing applied to IV site and to CT site redressed (L) femoral IV site 0130 received Morphine Sulfate 4mg IV for comfort ... 250cc ... len draining for CT site only scant drain from CT site 0330 continues ... MAP > 90 ... gtt ↑ able to ↓ MAP ... pt continues to rest on propofol gtt IV good relief 0400 ... remain ... 0500 PCXRay completed ... Bleed ↓ peep to 5 ↓ propofol gtt to 30mg/kg/min CT 32 ... 0.3mg ... pt sleeping ... of pain

... extubated ... mod ... radial ... placed ... VS + 5 CPAP @ 930 ... floating well ... ABG ... VC 750 ... ABG ... MAP ... Post ... ICU 2.

BREAKFAST % | LUNCH % | DINNER %

CARES AND ACTIVITIES

| INITIAL WHEN CARE COMPLETED | 24 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BATH | | ✓ | | | | | | | | | | | | | | |
| ORAL CARE | ✓ | ✓ | ✓ | | | | | | ✓ | | | | ✓ | | | |
| FOLEY CARE | | ✓ | | | | | | | | | | | | | | |
| BED REST | ✓ | ✓ | ✓ | ✓ | ✓ | | | | – | – | – | – | – | – | – | |
| CHAIR | | | | | | | | | | | | | | | | |
| AMBULATE | | | | | | | | | | | | | | | | |
| TURN Q2HOURS\ROM | ✓ | | ✓ | | | | | | ✓ | | | | ✓ | | | |
| TRACH CARE | | | | | | | | | | | | | | | | |
| RESTRAINTS: TYPE ____ (OFF ROM) | | | | | | | | | | | | | | | | |
| COUGH & DEEP BREATH/ INCEPTIVE SPIROMETRY | | | | | | | | | | | | | | | | |
| M.D. VISITS LIST: | | | | | | | | | ✓ | | | | | ✓ | | |
| | | | | | | | | | | | | | ✓ | | | |
| | | | | | | | | | | | | | | | | |
| TO/RETURN OTHER DEPTS: ____ | | | | | | | | | | | | | | | | |

Case 3:07-cv-02486-WHA    Document 153    Filed 02/26/2008    Page 47 of 111
07/05/2007 THU 14:27  FAX 51    35 2682 PULMONARY & SLEEP MED GP
Case 3:07-cv-0248C    HA   Document 50-2    Filed 07/12    )7    Page 34 of 44    @002/004

Dr William Isenberg
Dr. Fred Herskowitz
Dr.Steve Stanten

May 10,2001

I was asked to verify that on Thursday, May 5,2005 that Dr. Coyness Ennix was here in
the CPU to examine Filiberto Burciaga. I called RN Joni Shields that cared for the patient
tha: day on May 5th. She verified that the patient was attended to by Dr. Ennix and that
orders were given. Another nurse, Peggy Tavare, working that day verified that Dr Ennix
was here in CPU and saw the patient.

*Carolyn Wong RN*

Carolyn Wong, RN
CP'J Patient Care Coordinator

Case 3:07-cv-02486-WHA   Document 153   Filed 02/26/2008   Page 48 of 111
07/05/2007 THU 14:27  FAX 5   135 2682 PULMONARY & SLEEP MED GP
Case 3:07-cv-0248( .HA   Document 50-2   Filed 07/12 07   Page 35 of 44   ⓘ003/004

906 Lyon Court
Concord, CA 94518
May 10, 2005

Dr. William Isenberg
Dr. Frederick Herskowitz
Dr. Steven Stanten
Alta Bates Summit Medical Center
350 Hawthorn Ave
Oakland, CA 94609

Dear Sirs:

Last Wednesday, May 4, 2005, I admitted a patient named Filiberto Burciaga to CPU at 14.45 P.M. The coagulation values were abnormal so I had contact with Dr.Ennix over the next few hours.
On Thursday, May 5, 2005, I cared for the same patient who was still intubated with hemodynamic monitoring and on an inotrope. Early in the morning of that day, Dr. Ennix was in CPU before he started his early surgery. He came in the patient's room to assess the patient, look at his hemodynamic monitoring values, his need for the ventilator and discuss the goals for the day. I had time to discuss my concerns and he made clear his orders especially regarding weaning, extubation and use of anticoagulants.
After discussing the patient with me, Dr. Ennix went to the desk to look at the chart. I asked him to please sign the telephone orders from the night before as well as the wrist restraint orders, which he did.
I also talked to him later that morning regarding extubation. The patient was weaning we I but did not meet the criteria for extubation as the vital capacity was too low and respiratory rate was too high. Dr. Ennix ordered a longer weaning time and trying the patient on 't-piecing' with repeat mechanics and a second ABG.
He talked to me again after his first patient came out of the OR and ordered that the patient be extubated, which was done uneventfully.
The last time we talked was about Mr. Burciaga was right before his second patient came out of the OR. I told him that the patient did well with the extubation, that he was transferred to ICU 2 and that I was concerned about his doing incentive spirometry.

Sincerely,

Joan M. Shields, R.N.

·07/05/2007 THU 14:27 FAX 5   135 2682 PULMONARY & SLEEP MED GP                                    004/004

Dr. William Isenberg
Dr. Frederick Herskowitz
Dr. Steven Stanten

May 11, 2005

On May 5th, 2005 I was a staff member caring for a patient in CPU. I remember seeing Dr. C. Ennix in the cardiopulmonary unit during my shift from 0700 until 1530.

Margaret C. Tavare, RN

# EXHIBIT G

# MEMORANDUM

TO:        Medical Executive Committee, Summit Medical Center

FROM:      Bruce A. Reitz, M.D.
           Professor of Cardiothoracic Surgery
           Stanford Medical Center

DATE:      September 2, 2005

RE:        **_Summit Medical Center Peer Review of Dr. Coyness Ennix_**

---

I have been requested to review documentation pertaining to a pending Summit Medical Center Peer Review of Dr. Coyness Ennix. My qualifications are set forth in my curriculum vitae attached herein. I have reviewed correspondence setting forth the procedural background of the peer review, a report by National Medical Audit (hereinafter "NMA"), a report of the Ad Hoc Committee (hereinafter "AHC"), and relevant portions of the underlying medical charts. Before addressing the specifics of the 10 cited cases, I would like to offer some preliminary comments.

Initially, I must state that I find the overall process of what has transpired here as questionable and unusual for medical staff review. From a review of the documentation, it would appear that the initial peer review inquiry commenced in the spring of 2004 when the Chair of the Department of Surgery requested Dr. Han Lee, a cardiac surgeon, to review four (4) minimally invasive cardiac cases (cases 001-004). Dr Lee returned his review of the cases, and with the exception of possible issues relating to documentation of pre-operative risk discussions, concluded that the cases did not present any substantive standard of care issues. Notwithstanding Dr. Lee's report, the Chair of the Committee, who is not a cardiac surgeon, raised a concern as to whether the cases presented standard of care questions. The Surgical Review Committee accepted Dr. Lee's conclusion of no standard of care issues as to two records, but disagreed on the remaining two records. It should be noted that the Surgical Review Committee Minutes do not reflect that the Committee actually reviewed the underlying medical charts, nor did they afford Dr. Ennix an opportunity to appear before the Committee to explain the cases. Not giving the practitioner a chance to describe their reasoning, and to augment the material in the written record, I find very unusual in this process.

As a result of the foregoing, an AHC was then established. Although there were numerous cardiac surgeons on the medical staff, the AHC did not include a cardiac surgery staff member. After months of delay, and continuing to not allow Dr Ennix to comment on the cases in question, the AHC, in January of 2005, requested outside review by NMA. The sending of the cases to an outside agency is unusual and questionable particularly because this outside review now included ~~six additional~~ _six additional_

*cases* which had also received a prior in-house peer review, which again had found no standard of care issues.

### Informed Consent

In reviewing the NMA report, it would appear that many of the cases present some question regarding the adequacy of informed consent and the adequacy of documentation.

I have reviewed the descriptions of informed consent as set forth in Dr. Ennix's pre-operative notes. The critique of the NMA that Dr. Ennix's documentation of risk discuss ons is sub-standard, is definitely specious. I believe that the level of documentation of risk discussion and consent as provided by Dr. Ennix is consistent with most informed consent documentations that I see on a daily basis in multiple charts. I believe that the NMA criticism of the sufficiency of Dr. Ennix's documer tation of risk discussion and consent is hyper-critical and unwarranted. With respect to other documentation, I would agree, and Dr. Ennix has conceded, that his documentation must improve and I understand that he has represented to the Medical Executive Committee that he intends to correct his documentation, both in terms of timing of report preparation and specificity of the reports. Once again, I do not believe that Dr. Ennix's documentation history is particularly unique. In my experience, there is virtually no medical record that is complete enough in detail to truly describe all reasoning and details of occurrences during care, particularly in complex cardiac cases. Having stating the foregoing preliminary thoughts, I now will address each specific case cited by the NMA and AHC.

### Case 001 –

The NMA Audit challenges the sufficiency of Dr. Ennix's risk discussion with a schizophrenic patient. The NMA states that a pre-operative psychiatric consult was mandated. The NMA additionally states that it was a surgical technical error leading to ventricular damage. Neither of these contentions has merit.

In reviewing the medical records underlying this case, this was a 39-year-old patient with aortic insufficiency coming from a bed and care home with a diagnosis of schizophrenia which was compensated. The patient was also accompanied by a representative of the board and care home who was present during all informed consent discussions. It should be noted that this patient had previous surgical procedures for a leg fracture six months earlier. I do not believe that the patient had a psychiatric consultation prior to surgical intervention for that particular injury. Based on the hospital chart, I do not believe that a psychiatric consultation was required in order to perform an adequate risk discussion for this operation.

Turning to the alleged technical error, Dr. Ennix initially inserted a 27 mm valve which was an appropriate size for this patient. There was a leak of the valve. It would be pure speculation to assert the cause of the leak, as nothing definite was seen at re-

operation. What is of import is that Dr. Ennix promptly recognized the leak and corrected it by replacement with a 25 mm valve.

With respect to the assertion that the patient suffered permanent ventricular damage, the medical record does not bear out that assertion. There was a temporary drop in the ejection fraction to 41%. However, the ejection fraction returned to 70% following replacement of the valve. Such a transitory drop in the ejection fraction is common during cardiac surgery. Had the AHC included a member from the Cardiac Surgery service, this misunderstanding on the part of the AHC would not have occurred.

In conclusion, it is my opinion that Dr. Ennix's evaluation and management of this patient met applicable standards of care.

### Case 002

The NMA alleged that Dr. Ennix used poor judgment in failing to obtain a pre-operative cardiac catheterization. The NMA contends that Dr. Ennix attempted to insert an implant that was too small. In my opinion, neither criticism is warranted.

This patient was a 37-year-old female with aortic stenosis. Most cardiac surgery textbooks and most cardiac surgeons do not require cardiac catheterization for women less than 45 years of age unless there is a prior history of symptoms or treatment for coronary artery disease. This patient did not present such a history. The failure to obtain a cardiac catheterization pre-operatively in this particular patient was not below the standard of care.

The criticism of the placement of the 17 mm valve is spurious in that the valve is an HP St. Jude valve which has an effective orifice of a 19 mm mechanical prosthesis. Thus focusing on the 17 mm valve as being too small for this 135-lb woman is inappropriate.

The NMA also comments that it believed that the surgery time was prolonged. As noted, this was one of the first minimally invasive cases performed by Dr. Ennix. Clearly, a learning curve would result in a more prolonged initial surgical time. In any event, this issue is moot since Dr. Ennix has voluntarily agreed not to perform such minimally invasive procedures.

### Case 003

The NMA noted that the procedure took a prolonged period of time and involved excessive bleeding from a somewhat thin aorta. The NMA questions the specificity of the operative report. The AHC noted that the patient developed post-operative aortic insufficiency. The AHC noted that at the post-mortem it was determined that the valve was damaged and it was unknown whether the valve had a manufacturing defect or was somehow damaged by Dr. Ennix during the procedure. Both the AHC and the NMA speculated that perhaps there were technical difficulties intra-operatively that Dr. Ennix did not describe in the operative note. Such speculation on the part of both the NMA and AHC is unwarranted and unjustified in standard peer review. After review of

the underlying medical chart, I find no evidence of a deviation of the standard of care on the part of Dr. Ennix.

### Case 004

The NMA criticizes the documentation of the procedure and questions the prolonged OR time. On a substantive note, the NMA criticizes Dr. Ennix's failure to obtain a pre-operative treadmill in order to evaluate LV function, and prove the need for valve surgery. However, exercise tests are actually performed infrequently in the evaluation for mitral valve surgery in most surgeons' practice. It is not the standard of care to obtain this study.

With respect to the assumed prolonged OR time, the NMA states that the surgical time exceeded 12 hours with total anesthesia time almost 20 hours. In reviewing the actual anesthesia chart, it would appear that anesthesia commenced at 0955 and terminated at 2104. Surgery commenced at 1357 and terminated at 2115. Accordingly, total anesthesia time was approximately 11 hours and surgical time was approximately 7 hours and 15 minutes, not the 20 hours/12 hours asserted by the NMA.

### Other Comments

The preceding four cases all involved minimally invasive surgery. Clearly these operations took more than the usual expected time for valve surgery. Some of the prolonged time could be due to a learning curve, not only on the part of the surgeon, but also the remainder of the OR team. Further, it would appear that Dr. Ennix was attempting to perform various functions, such as chest incision and groin cannulation, by himself. These are typically performed by other members of a surgical team, in most settings. This also potentially contributed to prolonged operative time.

In any event, the issues pertaining to the minimally invasive cases appear moot in that Dr. Ennix agreed in the spring of 2004 not to perform any such procedures at Summit. This reviewer simply does not understand why these four cases continue to be included in an existing peer review of Dr. Ennix in the year 2005.

### Case 005

This case involves a 57-year-old diabetic female who underwent emergency coronary bypass surgery at the request of a well-respected cardiologist who did not feel (given the size of the patient's coronary arteries) that a PTCA would be successful. The NMA was of the position that most cardiologists would have performed a PTCA. Although I agree with the foregoing, it begs the question of the propriety of Dr. Ennix's involvement in this case. Given the fact that the cardiologist in the case did not feel that a PTCA approach was possible, Dr. Ennix was correct in proceeding with a bypass surgery for not only the RCA but also the LAD. In light of the developing ischemia in the

right leg from IABP insertion, any further delay in taking the patient to corrective surgery would have been inappropriate.

I would also note that it would appear that the AHC has backed away from the aggressive criticisms asserted by the NMA. The AHC noted that Dr. Ennix did not wish to question the judgment of the referring cardiologist who is "well-regarded in his specialty." The AHC concluded that it was not inclined to make a major issue of this case particularly given the fact that it was unlikely that this patient would survive and that Dr. Ennix's decision to perform an emergency bypass gave her at least some chance of survival.

In my opinion, Dr. Ennix comported with the standard of care in this case.

### Case 006

This case presents perhaps the most specious criticism of Dr. Ennix. This case presents an 87-year-old man with coronary artery disease who was converted from a planned off-pump bypass to on-pump bypass. The NMA notes that conversion raises risk of complications but does not criticize Dr. Ennix for his initial decision to commence the case off-pump.

The NMA then raises an issue as to whether Dr. Ennix performed a redo graft which he failed to document in the chart. Although Dr. Ennix consistently denied performing the redo graft, the NMA concluded that perhaps Dr. Ennix did perform a re-graft and failed to document the foregoing in the op report. The AHC backed away from this speculation of the NMA noting that Dr. Ennix had satisfied the AHC that he did not perform a redo bypass in this case. However, the AHC then goes on to explain that the most logical explanation for the discrepancy in the chart between Dr. Ennix and the perfusionist is Dr. Ennix's alleged failure to communicate adequately with the perfusionist. This conclusion is simply unsupported by any factual basis.

Based on my review of the underlying medical chart, I believe that Dr. Ennix comported with the standard of care in his evaluation and management of this patient.

### Case 007 −

This case involves a 63-year-old female with significant carotid artery and coronary artery disease. The right internal carotid was completely occluded and the left carotid presented with a 95% obstruction. The patient was being initially worked up by a vascular surgeon, for the carotid artery disease. The primary criticism asserted by both the NMA and AHC is that in the pre-operative time frame, while the vascular surgeons were preparing to commence the carotid procedures, the patient presented with chest pain and EKG changes in the holding area and intra-operative TEE detected global left ventricular dysfunction. The AHC felt that the key issue was the fact that Dr. Ennix was not present in the operating room at the start of the carotid procedure.

I am familiar with combined carotid and bypass procedures. They can be performed simultaneously or sequentially with either the coronary bypass first or the

carotid procedure first. In those cases in which the carotid procedure is felt best to precede the coronary bypass, it is not uncommon for the cardiac surgeon to not be present in the operating room when the vascular surgeons are performing the carotid procedure. The failure to be present in the operating room is not below the standard of care.

The NMA and AHC fault Dr. Ennix for failing to be aware of the ischemic event that occurred in the OR during the vascular aspect of the case. However, the failure to communicate the ischemic event should lie with the vascular surgeon and anesthesiologist then caring for the patient, who were both aware of the changes, and failed to inform Dr. Ennix of the change in the patient's status. The NMA also raised some questions regarding the delay in work-up of the carotid disease. However, those complaints should be addressed by the vascular surgeon, there choice of the studies such as angiogram, and not Dr. Ennix. I believe that Dr. Ennix's involvement in this case comported with the standard of care.

### Case 008

This case presents with a 72-year-old female with diabetes and hypertension who underwent a cardiac catheterization demonstrating RCA and LAD disease. A cardiologist attempted a PTCA which was unsuccessful. The cardiologist felt that a bypass graft was urgently required. The AHC stated that the issue in this case was whether it was appropriate for Dr. Ennix to have proceeded with the bypass procedure in the presence of an anti-platelet agent in lieu of postponing the procedure for a few hours.

In my opinion, the anti-platelet agent which was cited by the NMA as a cause for concern for bleeding intra-operatively, had, in all probability, been reversed by the time of the operation which was approximately 4-5 hours following its administration. I believe that most cardiologists would have been able to perform a PTCA in this patient. However, because the particular cardiologist at the time was unwilling or unsuccessful to complete the PTCA, Dr. Ennix cannot be faulted in agreeing to proceed in the manner in which he did. I do not believe the standard of care required Dr. Ennix to defer or delay the surgery.

### Case 009

This is a case in which both the NMA and AHC raised some questions as to whether this patient's bypass was urgent versus elective and whether Dr. Ennix should have waited until optimization with Epogen in a Jehovah's Witness surgical patient. After much discussion, both the NMA and AHC fall short of directly criticizing Dr. Ennix's decision to proceed with the surgery. In my opinion, there is strong evidence that waiting for a period of time to obtain optimization of Epogen administration would present the patient with a greater risk than going ahead with the procedure. There is the delay and possible ischemic events, as well as an increased risk of thromboembolism during administration of Epogen.

Both the NMA and AHC discuss that this was a planned off-pump operation which required conversion. However, neither body states that issue presented a standard of care concern, and I agree.

In my view, Dr. Ennix's evaluation and management of this patient is consistent with the standard of care.

### Case 010

Although the NMA noted several criticisms involving a delay in taking the patient to surgery, failing to protect the heart with cardioplegic arrest after a conversion to on-pump, and failing to place an IABP before the patient left the OR, the AHC concluded that Dr. Ennix's judgment decisions in these regards reflected reasonable judgment, and I agree. The AHC's main concern was Dr. Ennix's unavailability in the immediate post-op period when the patient became unstable and experienced a cardiac arrest only five minutes after arrival. Dr. Ennix had apparently left the CPU and returned to his office across the street. There is no doubt that the staff in the CPU knew that Dr. Ennix would be present in his office.

In my view, if a patient appears stable, it is common for the surgeon to be absent from the post-op recovery area, either speaking to the family or visiting other patients, as long as the surgeon remains in the reasonable vicinity of the ICU such as his office across the street which occurred in this case. The primary delay in this case consisted of a 30-40 minute delay before the anesthesiologist and/or the CPU nursing staff elected to call Dr. Ennix, to alert him that the patient's condition had changed. I believe that Dr. Ennix's evaluation and management of this patient, including his decision to leave the hospital site for his office across the street, was consistent with applicable standards of care.

This completes my review of the cases.

**Tasista, Janice**

| | |
|---|---|
| **From:** | Efiler |
| **Sent:** | Thursday, July 12, 2007 5:11 PM |
| **To:** | EfilerSecSF |
| **Subject:** | FW: Activity in Case 3:07-cv-02486-WHA Ennix v. Stanten et al Declaration in Support |

--------------------------------

From: ECF-CAND@cand.uscourts.gov[SMTP:ECF-CAND@CAND.USCOURTS.GOV]
Sent: Thursday, July 12, 2007 7:10:14 PM
To: efiling@cand.uscourts.gov
Subject: Activity in Case 3:07-cv-02486-WHA Ennix v. Stanten et al Declaration in Support Auto forwarded by a Rule

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.
U.S. District Court
California Northern District

Notice of Electronic Filing
The following transaction was entered  by Emblidge, G.  on 7/12/2007 5:09 PM  and filed on 7/12/2007

Case Name: Ennix v. Stanten et al
Case Number: 3:07-cv-2486 https://ecf.cand.uscourts.gov/cgi-bin/DktRpt.pl?191882

Filer: Coyness L. Ennix, Jr

Document Number: 50
Copy the URL address from the line below into the location bar of your Web browser to view the document:
https://ecf.cand.uscourts.gov/cgi-bin/show_case_doc?50,191882,,20390828,,,191

Docket Text:
 Declaration of Coyness L. Ennix Jr., M.D.  in Support of [45] Memorandum in Opposition <I>to Defendants' Special Motion to Strike</I> filed byCoyness L. Ennix, Jr.  (Attachments: # (1) Exhibit Exhibits A-G# (2) Exhibit Exhibits H-M)(Related document(s)[45]) (Emblidge, G.) (Filed on 7/12/2007)
3:07-cv-2486 Notice has been electronically mailed to:
G. Scott Emblidge                          emblidge@meqlaw.com,
helland@meqlaw.com, omar@meqlaw.com

Alex Hernaez                          hernaez@kmm.com,
efiler@kmm.com, llewelyn@kmm.com

Maureen E. McClain                          mcclain@kmm.com,
chavez@kmm.com, efiler@kmm.com

Rachel Josephine Sater                          sater@meqlaw.com

Andrew Edward Sweet                          sweet@meqlaw.com,
helland@meqlaw.com

Matthew P. Vandall                          vandall@kmm.com,
efiler@kmm.com, tasista@kmm.com·

3:07-cv-2486 Notice has been delivered by other means to:

The following document(s) are associated with this transaction:
Document description: Main Document

Original filename: M:\Clients\Ennix\F    .Ennix Decl without exhibits attached.pdf '    tronic document Stamp:
 [STAMP CANDStamp_ID=977336130 [Date=7/12/2007] [FileNumber=3592947-0]
[80b5b8e55d4e4359ce6ac6ffa1aaad43242b7ba32376712cec5f9348bc08ab91df4843361bdbe1903f7fff369f17e978ef17f2e
c7c058a45aea26e2f09bcbc7f]]

Document description: Exhibit Exhibits A-G  Original filename: M:\Clients\Ennix\PDF\Exhibits A-G to Ennix Decl.pdf
Electronic document Stamp:
 [STAMP CANDStamp_ID=977336130 [Date=7/12/2007] [FileNumber=3592947-1]
[03ca2ed9c805839e54225760baeb0f1694612bcaabd5a0c68cf314a4dc1aa9beee3ea37595ff2cfcef0a1baf738ad25a5b1a2
40f804b8698ff0e3a65869917cf]]

Document description: Exhibit Exhibits H-M  Original filename: M:\Clients\Ennix\PDF\Exhibits H-M to Ennix Decl.pdf
Electronic document Stamp:
 [STAMP CANDStamp_ID=977336130 [Date=7/12/2007] [FileNumber=3592947-2]
[8c2c8f5f9cea95a4ebf192f0458cb91c73ac60e2c6be3c6b08a7230052ad8301c62aad23d4a72d3533ac03038c20a074d35f
8af7edd9ffce4b663e3c4be9e34f]]

Document Selection Menu

## Multiple Documents

Select the document you wish to view.

| Part | Description |  |
|------|-------------|--|
| <u>1</u> | Main Document | 13 pages |
| <u>2</u> | Exhibit Exhibits A-G | 44 pages |
| <u>3</u> | Exhibit Exhibits H-M | 51 pages |

# EXHIBIT H

09/07/2006 13:04 FAX                                                                                                        ☒001

THE CLEVELAND CLINIC
FOUNDATION

September 7, 2005

Bruce W. Lytle, M.D.
Professor of Surgery
Chairman, Thoracic & Cardiovascular Surgery / F24
Office: 216/444-6962
Appts.: 216/444-4466
Fax: 216/444-3119
Toll Free: 1-800-223-2273
E-mail: lytleb@ccf.org

John A. Etchevers
Hassard Bonnington LLP
Two Embarcadero Center #1800
San Francisco, CA 94111-3993

RE: COYNESS ENNIX, MD

Gentlemen:

I have reviewed the written materials sent to me in which Dr. Coyness Ennix was involved. Keep in mind that I do not have any actual films and that I am looking entirely at written records. It seems to me that there are a number of things that can be pointed out here. The first is that it is certainly possible in any individual case to have difficulties. The most accurate reflection of the quality of medical care relates to performance over time. In reading through the communication from Howard Barkan, Doctor of Public Health, dated 31 January 2005, it does not appear that Dr. Ennix's outcomes are beyond the range of the performance by other surgeons operating at the same hospitals. Certainly surgeon technical skill and judgment plays a role in each individual case-but the overall environment also plays a role and it appears that the outcomes of Dr. Ennix's patients are within the range that other surgeons achieved in the same environment, according to the analysis by Dr. Barkan.

If we then look at the National Medical Audit review the cases are basically fell into two groups, those judged to be poor judgment and those judged to be technical error. Of those cases labeled as "poor judgment" in the first case the NMA audit criticized Dr. Ennix for performing the operation the day after an angiogram showed a 90% left main lesion. The NMA audit cites delay in the performance of the coronary angiogram and the fact that an intra-aortic balloon was not placed. I'm not familiar with the particular practice at this private practice hospital but in most settings those decisions are really not within the domain of the cardiac surgeon. Again, the environment played a substantial role there in an unfavorable outcome. Dr. Ennix was further criticized for not being present with the patient although he has responded to that.

~9/07/2005 13:05 FAX                                                          ☒002

Coyness Ennix, M.D.                         page two

Regarding the second case, a patient with triple vessel coronary artery disease and bilateral carotid stenoses, Dr. Ennix was criticized because the patient was not maintained on either IV heparin or with insertion of an intra-aortic balloon pump. Again, this is something that is mostly within the domain of the cardiologist who at that time was caring for the patient. He was also criticized for not performing bypass surgery before the carotid endarterectomy was done. However, given the observation of multiple studies that someone with bilateral severe carotid lesions has a risk of stroke at least in double figures associated with coronary bypass grafting, I think it is hard to retrospectively criticize someone for this judgment. During operation the patient evidently developed problems and subsequently succumbed. Exactly when to forget the carotid endarterectomy and proceed directly to revascularization is a matter of judgment and sometimes is more obvious in retrospect than it is at the time. Again, it seems to me that the problems here related in part to the environment in which this patient's care was carried out where there were cardiologists, vascular surgeons, cardiac surgeons and anesthesiologists that all impacted upon the patient.

In the next case Dr. Ennix is criticized for performing surgery too early rather than too late. These judgments by the examiners are, of course, carried out in retrospect and with the knowledge of an unfavorable outcome. Hindsight is often very accurate. I believe this was also a case where the cardiologist thought that percutaneous treatment was not a good solution. Dr. Ennix is also criticized for dictating a substandard operative note which is a justifiable criticism.

In the fourth case, again Dr. Ennix is criticized for operating too early rather than too late as he performed what he deemed was a necessary emergency operation in the face of a retroperitoneal bleed. This certainly can be a difficult decision and under the circumstances was a decision that did not work out well. However, they interpreted the patient as having ongoing myocardial ischemia, and the anatomic situation was judged by the cardiologist to be not appropriate for PTCA. Thus, Dr. Ennix had limited choices available to him and proceeded with operation with the agreement of the cardiologist.

The fifth case involved a patient that had a very small prosthesis that was placed where Dr. Ennix started with a minimally invasive procedure and then converted to an open procedure because of the difficulty in replacing a valve. A small aortic root is a problem with a partial sternotomy at times, particularly if someone is not familiar with that approach, and the patient did, however, survive the operation.

In the technical error section there are 5 cases cited, the first being a Jehovah's Witness with coronary disease. This patient underwent an attempted off-pump operation which is reasonable in someone where blood cannot be used, but had to be converted to on-pump surgery. Certainly the need to convert to on-pump surgery has some downside associated

3/07/2005 13:05 FAX                                                              ☒003

Coyness Ennix, M.D.                     page three

with it, but that is not something the surgeon necessarily can predict in advance. Again, hindsight is 20/20.

The next case appears to be something where there were technical difficulties associated with doing a minimally invasive aortic valve replacement. There is no question that there is a learning curve associated with minimally invasive surgery of all kinds. If the hospital does not want their practitioners to become involved in minimally invasive surgery, they should tell them that.

The third case relates to a conversion from off-pump to on-pump again and there is no question that converting to on-pump surgery removed the potential benefits of OPCAB.

Again, this is something that can be sorted out in retrospect a lot easier than it can before the event.

Through the last two cases there are multiple criticisms of the entire care pattern relating to whether or not a treadmill test was performed, failure to perform transesophageal echocardiography. Again, those are issues that relate to the entire environment, that is to say, a relatively small private practice hospital where these operations are being performed and although Dr. Ennix is obviously part of that environment he is not the only part.

There are a number of criticisms related to poor operative notes and substandard documentation and I have not reviewed all of those notes.

The NMA reviewers point out a number of criticisms that relate to the systems through which care was delivered. These are valid criticisms and relate to the hospital approach rather than to Dr. Ennix's deficiencies. The relationship between the systems issues and outcomes is somewhat attested to by the fact that Dr. Ennix does not have outcomes that are significantly different from the other surgeons operating in that environment.

Given the records I have available and the time constraints placed upon this review, that is my assessment of the situation.

Thank you very much.

Yours truly,

Bruce W. Lytle, M.D.

BWL/mw

# EXHIBIT I

09/02/2005    17:19    HASSARD BONNINGTON → 15106557709                      NO.509    0002



T E X A S   S U R G I C A L
A S S O C I A T E S

J.C. Walker, M.D.
Cardiovascular &
Thoracic Surgery

September 1, 2005

John A. Etchevers
Hassard Bonnington LLP
Attorneys at Law
Two Embarcadero Center, Suite 1800
San Francisco, CA 94111-3993

      Re:    Coyness Ennix, M.D.

Dear Mr. Etchevers:

Thank you for asking me to participate in the review of the medical cases
which are currently being evaluated by the Ad Hoc Committee at Summit
Medical Center.

Specifically, these are ten cases which were performed by Dr. Ennix between
the time period of January 9, 2002 and October 11, 2004. In total they
comprise ten cases. I have been afforded the opportunity to review both the
correspondence between the medical leadership at Summit Medical Center to
Dr. Ennix as well as the specific cases in question. With this in mind, I would
like to comment on the aforementioned cases. Moreover, I would like to
address some of the concerns which were raised by the National Medical
Audit Subdivision of the Mercer HR Consulting Firm.

Specifically the Mercer Consulting Firm cited certain problems with
Dr. Ennix' judgment, technique, and documentation.

6560 Fannin
Suite 1002
Houston, TEX 77030
Tel: (713) 793-7409
Fax: (713) 793-7428
jcwalker@rmh.tmc.edu

09/02/2005    17:19    HASSARD BONNINGTON → 15106557709                    NO.589    P003

CASE #ABS-001 involved a 41 year-old African American woman who presented to the emergency room on 10/11/2004 with a five-six week history of chest pain, increasing over the past two days. Her EKG revealed inverted T waves in leads V3-V5, but her troponin at that point was 1.4. A Dobutamine Echo on 10/12/2004 was abnormal with diffuse EKG changes, chest pain and distal inferior and apical hypokinesia. An arteriogram performed two days later, on 10/14/2004, revealed a 90% left main lesion. Dr. Ennix first saw the patient on 10/14/2004 and performed a CABG on 10/15/2004.

Per the medical record, despite the normal ventricular function described in the intraoperative TEB at the beginning the procedure, the patient became hemodynamically unstable during takedown of the internal mammary artery and was subsequently placed on cardiopulmonary bypass. Later, after arriving at the Intensive Care Unit, the patient arrested and ultimately required ECMO and was transferred to another hospital for placement of a left ventricular assist device.

One of the issues raised by the Mercer Consulting Firm was that there was poor judgment in delaying surgery. They cited that, despite the moderately positive Dobutamine stress ECHO on 10/12/2004, and chest pain on 10/13/2004, cardiac catheterization was not performed until 10/14/2004. Clearly, the decision to proceed with cardiac catheterization is at the discretion of the cardiologist who cared for the patient to this point. It was not until 10/14/2004 that Dr. Ennix evaluated to the patient. Upon finding that the patient had a left main lesion, he scheduled the patient for surgery the following day. While it is true that left main coronary artery disease requires urgent surgery, it is not necessarily true that emergency surgery is warranted.

Another issue raised by the consulting firm was that there was failure to protect the heart after an unplanned conversion from an off- to an on-pump surgery. It is not clear why the patient became unstable during takedown of the internal mammary artery, although one would assume that it is secondary to ongoing ischemia. After review of the record, it is clear to me that the conversion to on-pump surgery was warranted. Rather than viewing the conversion to on-pump surgery as a failure, one should view this as a use of good judgment. It would be flawed for Dr. Ennix to have proceeded with off-pump coronary surgery in an unstable patient.

The auditing firm further refers to the lack of use of an intraaortic balloon pump before leaving the operating room or a femoral arterial line. The intraaortic balloon pump does not appear to have been indicated in this patient. It does not seem warranted to prophylactically insert an intraaortic balloon pump in a hemodynamically stable patient who was otherwise uneventfully separated from cardiopulmonary bypass.

The next issue raised regarding this 41 year-old African American woman was the unavailability of Dr. Ennix in the immediate postoperative period. Per the

09/02/2005    17:19    HASSARD BONNINGTON → 15106557709    NO.509    D004

medical record, Dr. Ennix was at his office which is located across the street, i.e.,
five minutes away from the intensive care unit, when the patient began to
deteriorate. He was subsequently called back to the intensive care unit and
arrived at the operating room within 8-10 minutes. During the course of events,
Dr. Alyano was immediately available in the intensive care unit and assisted with
the patient when she began to deteriorate. Dr. Ennix was subsequently available,
i.e., within 8-10 minutes, following the notification from the nursing staff and
aided from that point on with the patient's care. I would contend that, as long as
the patient arrived and was hemodynamically stable in the intensive care unit, it is
not uncommon for the surgeon to not be at the patient's bedside after the patient
has arrived in the ICU and has been connected to the monitors and transferred to
the ICU team.

Based on my review of the records, Dr. Ennix was clearly in the immediate
vicinity and readily accessible, as demonstrated by his prompt arrival to the
operating room. While one may argue that the surgeon should have been at the
bedside as the patient began to deteriorate, in light of the fact that the patient
arrived and was hemodynamically stable on arrival, it does not appear that there
were any signs that would have led Dr. Ennix to suspect that he needed to be at
the patient's bedside prior to the time that the patient became unstable. No doubt,
if there had been any signs that the patient was unstable, the Dr. Ennix would
have been at the patient's bedside.

CASE #ABS-002 involves a 37 year-old woman who presented with severe aortic stenosis by echocardiography. Dr. Ennix performed an aortic valve replacement on 1/28/2004 using a 17mm prosthetic valve.

The case was initially started as a minimally-invasive procedure and then converted to a partial sternotomy procedure. The issues that were raised included inadequate preoperative evaluation of this patient which specifically cited the absence of a cardiac catheterization in this 37 year-old female presenting with chest pain and abnormal EKG. While it is true that this 37 year-old female with severe aortic stenosis would have benefited from cardiac catheterization, it appears that, based on Dr. Ennix' relationship with the referring cardiologist, the decision made between the two individual practitioners was to proceed without coronary angiogram.

It appears that, after examining Dr. Ennix' response to the omission of a cardiac catheterization in this patient, he deferred to the team approach that he and his referring cardiologist took to this 37 year-old female. It is clear that, in retrospect, Dr. Ennix acknowledges that she would have benefited from coronary angiogram.

Again, one of the criticisms of the overall management of this patient was the conversion from a minimally-invasive surgical approach to a partial sternotomy. Again, it appears that Dr. Ennix recognized that there was difficulty with implanting the valve via a minimally-invasive incision and thus converted to an upper sternotomy incision. Once again, it appears that Dr. Ennix recognized the inadequacy of the minimally-invasive incision to perform the proper procedure to insure patient safety, and, consequently, converted to a bigger incision.

The review of this particular case also cites a greatly prolonged surgical time in their critique. During a phone conversation on March 19, 2005, with Dr. Ennix, he indicated that the operation took a long time because the attending anesthesiologist was inexperienced in putting in the appropriate neck lines for the third intercostals space approach to the aortic valve replacement. This, once again, speaks to the learning curve associated with performing minimally-invasive procedures. Once again, however, it would appear that Dr. Ennix recognized the shortcomings of the minimally-invasive approach and prudently converted to a more aggressive surgical incision.

With respect to the choice of a 17mm St. Jude prosthetic device, it is true that the use of such a small device is usually not necessary. It is, however, important to note that the ultimate decision with respect to the size of valve is made at the time of surgery. If, in fact, the annulus and sinotubular junction seemed too small, the use of a 17mm valve may, in fact, have been necessary. The concept of enlarging the aortic annulus, while well-described, carries an increase morbidity and mortality. Dr. Ennix placed the #17 St. Jude prosthetic valve with the understanding of the patient's clinical condition and expectations as well as the associated risks with performing an annular enlargement procedure.

CASE #ABS-003, which was reviewed by the outside consulting firm, involves a 76 year-old man who presented with shortness of breath, fatigue and ankle swelling. Cardiac catheterization and ECHO revealed critical aortic stenosis and normal coronary arteries. Dr. Ennix performed an aortic valve replacement with a minimally-invasive incision on 1/30/2004. Surgery lasted 6 hours. Postoperatively, the patient was lethargic, required reintubation on 2/6/2004 and subsequently died on 2/11/2004.

Some of the issues raised by the auditing firm included the prolonged surgery time, which was 6 hours 18 minutes. It is alluded to in the operative note that the prolonged time was secondary to inadequate visualization. Once again, after realizing that he was unable to perform the procedure via a minimally-invasive incision, Dr. Ennix converted to a more invasive surgical incision.

Again, it appears that conversion and prolonged operative time was secondary to the learning curve associated with performing minimally-invasive aortic valve replacements.

The use of blood products on this patient was called into question by the outside auditing firm. In Dr. Ennix' responses, he cites that there were no intraoperative complications, but that more blood products were used secondary to prolonged operative time. One cannot assume that the use of more blood products is summarily due to some intraoperative complication. I was unable to find any documentation of intraoperative complication as referred to in the Mercer audit.

It appears that the agency considers any conversion to a open procedure a form of intraoperative complication which is not the case.

A further criticism that they have of the management of this case was the failure to obtain a postoperative transesophageal echocardiogram. Dr. Ennix maintains that this was done, although not documented well by the anesthesia team. It is difficult to comment on this fact as one would expect that a postoperative transesophageal echo was performed to assess the function of the valve after it was implanted.

The issue of the aortic insufficiency that the patient suffered postoperatively is not clear cut. The pathologist who examined the valve implies that there was a problem with the valve itself, while the reviewer cites that the technical difficulty in placing the prosthetic valve led to its malfunction. This is an issue that is difficult to resolve. Clearly, the postoperative transesophageal echocardiogram, which Dr. Ennix refers to, although not well documented should have ruled out any prosthetic valve damage during implantation.

09/02/2005   17:19   HASSARD BONNINGTON → 15106557709                    NO.509   P007

CASE #ABS-004 is the case of a 75 year-old man with severe mitral
regurgitation who was admitted for elective mitral valve replacement surgery.
The patient was admitted and denied any chest pain, shortness of breath,
paroxysmal nocturnal dyspnea or orthopnea and worked out daily, walking up to
45 minutes and lifting weights.

Preoperative echocardiogram revealed severe mitral regurgitation.  Cardiac
catheterization indicated severe mitral regurgitation but no significant coronary
artery disease.  Dr. Ennix performed a minimally-invasive mitral valve
replacement with a 29mm valve on 2/5/2004.  The patient was discharged home
on 2/13/2004.

The issues raised by the auditing firm included no documentation of the
indications for surgery.  There is ample literature to support mitral valve
replacement in asymptomatic patients with severe mitral valve regurgitation.  A
recently published article by Enrique Z. Sarano et al, which appeared in the *New
England Journal of Medicine* in March of 2005, specifically looked at 456
patients with asymptomatic mitral regurgitation.  It is clearly well within the
standard of practice to operate on an asymptomatic patient with severe mitral
regurgitation, as documented by transesophageal echocardiogram.

With respect to the prolonged operative time during this procedure, once again it
is noted by Dr. Ennix that the time was, in fact, partly attributable to the surgical
learning curve associated with minimally-invasive approaches.

09/02/2005    17:19    HASSARD BONNINGTON → 15106557709                    NO.509    P008

CASE #ABS-005 is the case of a 57 year-old diabetic woman with renal failure on chronic peritoneal dialysis. She presented with unstable angina and acute Q wave MI on 2/27/2004. She underwent an emergency cardiac catheterization on 2/28/2004 which revealed 100% right coronary artery occlusion and other disease. She was hypotensive in the coronary catheterization lab, which necessitated placement of an intraaortic balloon pump. Her blood pressure subsequently improved to 100/66. Dr. Ennix was consulted and, later that evening, performed an emergency coronary artery bypass surgery.

The issues raised by the auditing firm regarding this case include the opinion that the right coronary lesion should have been percutaneously addressed by the cardiologist who was caring for the patient. Furthermore, the opinion of the firm was that Dr. Ennix should not have performed the surgery. The cardiologist involved in the case was Dr. Paul Ludmer.

In addition, another issue raised by the reviewing company was that the left main coronary lesion was not as severe as the cardiologist felt on cardiac catheterization.

It appears that Dr. Ennix discussed the case at length with his referring cardiologist. The two practitioners came up with a treatment plan for the patient. Dr. Ennix' response with respect to performing surgery was based in large part on the referring cardiologist's opinion that he was not safely able to perform percutaneous intervention on the right coronary artery lesion. With this in mind, Dr. Ennix proceeded with revascularization to salvage her myocardium.

It is clear that, based on the responses given by Dr. Ennix, that he would have preferred to defer surgery for 5-7 days if possible, but after discussing the case with the cardiologist, they came to the conclusion that the best option to salvage viable myocardium for the patient was to perform surgery.

CASE #ABS-006 is a case of an unplanned conversion to on-pump coronary artery bypass surgery in an 87 year-old man with chronic angina who was admitted to another hospital on 1/15/2004 with increasing pain and a reported EKG suggesting an inferior myocardial infarction of unknown age. He had a troponin level of 1.7. He was transferred to Alta Bates Summit Medical Center on 1/16/2004.

He was taken to the operating room by Dr. Ennix for an emergent coronary artery bypass surgery. The case initially was started as an off-pump coronary artery bypass surgery and then later converted to an on-pump surgery. The patient subsequently died on 2/11/2004 from respiratory insufficiency, renal dysfunction and sepsis.

Once again, it appears that the consulting firm views any conversion from a minimally-invasive procedure to a more standard well-described surgical approach for cardiac surgery as a complication. It is apparent from the medical record that Dr. Ennix, once recognizing that the patient was not suitable for an off-pump procedure, elected to convert to an on-pump procedure in an appropriate fashion.

Another issue raised by the auditing firm was the need to redo a cardiac anastomosis. The reviewer's comments that redoing a coronary artery bypass graft rarely happens is not well substantiated. There is a vast body of literature which notes that redoing a coronary anastomosis does, in fact, happen and that it is not an exceedingly rare occurrence. While, as cardiac surgeons, we would all like to believe that redoing a coronary graft is something that never happens to us, this is simply not founded.

CASE #ABS-007 involves a 63 year-old woman with a history of myocardial infarction in 1983 who presented with a 6-month history of typical exertional chest pain which had become increasingly frequent. An out-patient stress ECHO was highly positive with chest pain and abnormality seen in three segments on ECHO. She had a coronary angiogram performed on 7/20/2004 which showed three-vessel coronary artery disease including a 99% ostial LAD lesion.

The patient was admitted because of chest pain during cardiac catheterization. Dr. Ennix saw the patient in consultation. It was further noted that the patient had asymptomatic carotid bruits and, consequently, a vascular surgeon was consulted to evaluate the patient.

She underwent carotid arteriogram on 7/22/2004 which confirmed a right internal carotid occlusion and showed a 90% left internal carotid stenosis. Again, the patient developed chest pain during the carotid angiogram. She was subsequently brought to the operating room on 7/23/2004.

The issues raised by the auditing firm include a delay in performing her coronary bypass. Upon review of the record, it appears that the patient had several episodes of chest pain following her coronary angiogram. It is not clear whether or not she was started on IV Heparin drip. There is not good documentation in the cardiology notes to this effect. If her cardiologist did not, in fact, start her on a Heparin drip, this would have been clearly advisable.

Further issue was raised regarding the sequence of events in terms of performing the carotid endarterectomy before her coronary bypass. Based on the review of the medical records and the dialog between the reviewers and Dr. Ennix, it appears that the vascular surgeon had almost completed the carotid endarterectomy by the time Dr. Ennix arrived in the operating room. With this in mind, it appears that, given the sequence of events, the carotid endarterectomy had basically been finished and the only procedure left was the coronary artery bypass. Based on Dr. Ennix' responses to questioning, it appears that it is common practice at Summit Medical Center for staged carotid and coronary artery bypass surgery. Moreover, it appears that the two teams of operating surgeons often act independently. In light of the fact that the carotid endarterectomy had almost been completed, it does not appear that Dr. Ennix had any option at that point but to proceed expeditiously with coronary bypass.

In short, the decision to work up the patient's asymptomatic carotid bruit was warranted. It proved to be that the patient had an occluded internal carotid artery and one with high-grade stenosis. There is a substantial body of literature to support performing coronary artery bypass surgery and carotid endarterectomy at the same sitting.

09/02/2005    17:19    HASSARD BONNINGTON → 15106557709    NO.509    D011

CASE #ABS-008 is a case of a 72 year-old woman with diabetes and hypertension who presented to the emergency room on 5/6/2004. She had a 3-4 hour history of chest pain and an EKG showing inferolateral ST segment elevation. She was taken to the cath lab at 1356 and started on Integrilin and Heparin. Her arteriogram revealed a 90% mid-RCA lesion and 70-80% lesions in the LAD.

While awaiting cardiac surgery consultation, her blood pressure fell into the 80s and she was diagnosed as having retroperitoneal bleed.

Issues raised in this case were the fact that the reviewers believed that her retroperitoneal bleed was a contraindication for surgery. While retroperitoneal clearly makes her at increased risk of surgical intervention, given her clinical situation, it was felt by the surgery and cardiology team that surgical intervention was mandatory.

It appears, based on the medical records, that Dr. Ennix employed the opinions of both the vascular surgery service and the attending cardiologist when making his decision. The team agreement was that the approach to the patient was designed to save her life and that her life in imminent danger given her current clinical situation.

The issue regarding Integrilin is best summed up in Dr. Ennix' responses to the criticisms. This is a very difficult situation and one that a cardiac surgeon is faced with not infrequently. While delaying surgery would be ideal in the presence of a retroperitoneal hematoma, it was felt by the team that this would be to the detriment of the patient.

09/02/2005    17:19    HASSARD BONNINGTON → 15106557709    NO.509    P012

CASE #ABS-009 is the case of a 79 year-old Jehovah's Witness who had percutaneous intervention of the right coronary artery and circumflex coronary artery seven years earlier who presented with a four-month history of exertional chest pressure and an abnormal stress ECHO. She was found to have three-vessel coronary artery disease. Her hemoglobin was 11.3 at the time of admission. She underwent CABG X2 on 1/10/2002. This was complicated by an embolic stroke. She eventually expired on 2/19/2002.

Some of the issues raised in the review included the need for urgent versus elective surgery. In this respect, the reviewers questioned why Epogen was not used. In Dr. Ennix' response the use of Epogen in this patient was not felt to be warranted secondary to the prolonged time for the clinical effects of Epogen to be seen and the literature regarding Epogen and coronary surgery.

The reviewing firm also questioned the conversion to an on-pump procedure. Once again, it appears that the conversion from off- to on-pump is being viewed as a surgical complication. In my opinion, this shows good judgment on Dr. Ennix' part to convert the patient as the patient became unstable.

With respect to the postoperative parietal infarct, this was clearly embolic based on the medical records.

09/02/2005    17:19    HASSARD BONNINGTON → 15106557709    NO.509    P013

CASE #ABS-010 is a 39 year-old man with aortic insufficiency who underwent minimally-invasive aortic valve replacement on 1/28/2004. He developed severe aortic insufficiency and aortic stenosis postoperatively. He underwent aortic valve re-replacement on 1/31/2004. This was done via a full sternotomy and it lasted 4 ½ hours.

The issues raised by the review board were the question of informed consent. It appears, based on the medical record, that informed consent was obtained on this patient. Both the testimony and the chart, as well as the patient letters, support this.

It appears that, after recognizing the technical problem with the valve postoperatively, Dr. Ennix behaved appropriately in re-replacing the valve.

After a thorough review of all ten cases which have been submitted to the outside Mercer Group Auditing Firm, it is my opinion that, overall, Dr. Coyness Ennix' care of the aforementioned patients was within the standard of practice. Clearly, there were some difficulties encountered in the minimally-invasive surgical approaches which Dr. Ennix appropriately recognized and compensated for by converting to a more standard incision. In many of the cases that I reviewed, it was clear to me that the decision making process was done in a team approach between multiple individual practitioners. It would be interesting and informative to know if each practitioner involved in the cases is being scrutinized with the same degree as Dr. Ennis has been.

If you have any questions regarding my comments on the aforementioned cases, please do not hesitate to contact me.

Sincerely,

J. C. Walker, M.D.
Clinical Assistant Professor of
Cardiothoracic Surgery
Methodist DeBakey Heart Center

JCW:bs

# EXHIBIT J

# JOHN E. REA III, M.D.

## CARDIOVASCULAR, THORACIC, AND GENERAL SURGERY

833 Heathcliff Court
Houston, TX 77024

Office: 713-776-0655
Office Fax: 713-776-1069

Home: 713-783-8376
Home: Fax: 713-973-2863

August 30, 2005

John A. Etchevers
Hassard Bonnington LLP
Two Embarcadero Center
Suite 1800
San Francisco, CA 94111-3993

Re: Coyness Ennix, M.D.

Dear Mr. Etchevers:

I have received the documents which you forwarded regarding the peer review process at Summit Medical Center including correspondence from the Chief of Staff, correspondence from the Ad Hoc Committee, pertinent medical records, the report of Forrest Junod, M.D., the report of National Medical Audit, and correspondence from Dr. Ennix in response to the Ad Hoc Committee.

I completed a residency in cardiovascular and thoracic surgery at Baylor College of Medicine Affiliated Hospitals in Houston, Texas, in 1978. I am board certified in cardiovascular and thoracic surgery. I am a practicing cardiovascular surgeon, and I have extensive experience in off pump coronary artery bypass as well as coronary artery bypass and valve repair and replacement utilizing cardiopulmonary bypass. I have been the chairman of the Cardiovascular and Thoracic Surgery Section at Memorial Hermann Southwest Hospital in Houston, Texas, and a member of the Credentials Committee and the Medical Executive Committee. I have had more than twenty-five years experience in peer review activities relative to cardiac surgery. Additionally I have extensive experience in medicolegal review and have provided expert witness testimony in a number of cases.

I have reviewed all the previously listed records and have reviewed in detail each case sent to National Medical Audit. My findings are as follows:

NMA #01 (1205056)
Meets the standard of care.

A postoperative perivalvular leak was corrected by replacing the aortic valve prosthesis. The patient's letter is evidence that he understood the operation well enough to give informed consent.

NMA #02 (1282678)
Meets the standard of care.

An annulus enlargement procedure could have resulted in bleeding and death. The patient is alive and well.

NMA #03 (1282803)
Meets the standard of care.

Aortic regurgitation from the Mosaic biprosthesis is a known complication since the valve is constructed from leaflets from two pig valves.

NMA #04 (1283240)
Meets the standard of care.

Treadmill exercise tests are not required in severe mitral regurgitation, and the majority of cardiac surgeons do not use this examination as a criteria for surgery. Blood use is expected for the procedure.

NMA #05 (1132816)
Meets the standard of care.

It is controversial to state that PCI would have better served the patient.

NMA #06 (2881866)
Meets the standard of care.

Conversion from OPCAB to on pump is not substandard.

NMA #07 (1296513)
Meets the standard of care.

With right carotid occlusion and 90% left internal carotid stenosis the patient would not have tolerated coronary bypass prior to the carotid surgery. The outcome is unfortunate, but her chances were severely limited by the extent and complexity of her multiple disease processes

NMA #08 (0527129)
Meets the standard of care.

Integrilin wears off very quickly. Proceeding to the operating room was a reasonable choice in this very ill patient.

NMA #09 (1226789)
Meets the standard of care.

Epogen treatment prior to surgery carries a risk of myocardial infarction.

NMA #10 (1224908)
Meets the standard of care.

An intraaortic balloon pump is not indicated in all patients with left main disease.
Beating heart surgery with pump support is a very acceptable choice.

In summary I do not find substandard care in any of the ten cases listed above. I agree
with the original peer review conclusions by cardiac surgeons at Summit that there are no
care issues with these cases. I do, however, have serious concerns with the peer review
process at Summit Medical Center as follows:

1. Why were Dr. Ennix's cardiac surgery peers excluded from the Ad Hoc committee?

2. Cardiovascular peer review had already examined and passed all ten cases selected by
the Ad Hoc Committee for outside review, including a case dating from 2002. Why did
the Chief of Staff and Ad Hoc committee members distrust their own reviewers?

3. The Ad Hoc Committee chose to ignore favorable statistical evidence presented by
Howard Barkan, PhD, regarding Dr. Ennix's surgical mortality.

4. Why did the Ad Hoc Committee and Chief of Staff choose to bypass outstanding
medical centers in the Bay Area as a source of outside reviewers with impeccable
academic credentials?

5. Did the Ad Hoc Committee and Chief of Staff choose instead to use National Medical
Audit for outside review because they could control the outcome of the report and/or
because they knew that they could expect a report which would condemn Dr. Ennix
regardless of the facts?

6. The letter sent to National Medical Audit by Dr. Lamont Paxton is clearly prejudicial
and contains snide remarks and negative statements which have no place in peer review
correspondence. Does the medical staff at Summit Medical Center expect a fair and
balanced analysis by National Medical Audit when the introductory letter is so clearly
biased?

7. The report by National Medical Audit is replete with errors, presumption, speculation,
half truths, and unfounded criticisms. The report ignores facts which any balanced
review would have included, and it lacks an appreciation for current management of
cardiac surgical patients. Indeed, this report is so outrageously biased that the integrity of
its authors should be seriously questioned.

8. Compounding the flawed peer review methods at Summit Medical Center is the egregious decision to summarily suspend Dr. Ennix's privileges over the controversial allegation that he did not examine a postoperative patient on May 5, 2005, when his presence on the unit was documented.

After careful review of the surgical cases in question and the report of National Medical Audit and the records provided from the Chief of Staff and the Ad Hoc Committee, I can only conclude that the peer review process at Summit Medical Center is highly suspect and that the Chief of Staff and the Ad Hoc Committee have relentlessly pursued a course of action whose sole aim has been to disenfranchise Dr. Ennix of his hospital privileges.

Sincerely,

John E. Rea III, M.D.

# EXHIBIT K

STATE OF CALIFORNIA -- STATE AND CONSUMER SERVICES AGENCY                    *Arnold Schwarzenegger, Governor*



### MEDICAL BOARD OF CALIFORNIA
PLEASANT HILL DISTRICT OFFICE
3478 BUSKIRK AVENUE, SUITE #217
PLEASANT HILL, CA 94523
(925) 937-1909 fax (925) 937-1964



July 13, 2006

Coyness Ennix, M.D.
3300 Webster Street, Suite 404
Oakland, CA 94609

Dear Doctor Ennix:

The Medical Board of California has concluded its investigation regarding the 805 Business and Professions Code Section reports filed by Alta Bates Summit Medical Center. This case was reviewed by a outside expert.

The expert found no departure from the standard of practice in two of the four cases reviewed for minimally invasive procedures. The two cases that the expert found simple departures read as follows:

### Patient #1283240

The operative approach was indicated. The length of operative times was not unreasonable, considering the approach and the surgeon's experience, and does not represent a violation of the standard of practice. The amount of IVF administered was excessive, and resulted in the subsequent administration of numerous blood products, that would, in all likelihood, not have been otherwise necessary. That is the responsibility of both the anesthesiologist, as well as the surgeon, and represents a simple departure from the standard of practice. The remainder of the intra and postoperative care are within the realm of surgeon experience and preference.

### Patient #1282803

The failure to recognize and prevent the administration of the large volume of crystalloid to the patient intraop constitutes a simple departure from the standard of practice. The remainder of the allegations are unfounded, and no other departures from the standard of practice can be clearly demonstrated in this case.

After receipt of the supplemental 805 reports filed by Alta Bates Summit Medical Center, additional records were obtained and reviewed by our expert. Six additional records were reviewed by the expert who found the following:

07/14/2006  08:31    9259371964    MEDICAL BOARD OF CA    PAGE  03/03

Page 2

Patient #1296513

The delay in transporting this patient to surgery from the time the diagnoses were made to the time of the operative interventions probably contributed to her poor outcome and represents a simple departure from the standard of practice. The remainders of the case including preoperative, operative, and postoperative management were within the realm of physician experience, training, and bias.

Summary Conclusion

A simple departure in the standard of practice could be identified in one case. The remainder of the cases had no evidence of deviations in the standard of practice by Dr. Ennix. There is no evidence whatsoever, in these reviewed cases, that the conduct of Dr. Ennix; preoperatively, intraoperatively, or postoperatively, has violated the standard of practice in cardiac surgery.

Based upon the expert reviewer's opinion, this case will be closed and kept on file for a period of five years. In the event that a similar complaint is received, this case may be re-opened.

Sincerely,

Teri Bennett
Senior Investigator
12-2004-158215

cc: John Etchevers, Esq.

Case 3:07-cv-02486-WHA    Document 153    Filed 02/26/2008    Page 86 of 111
Case 3:07-cv-0248   HA    Document 50-3    Filed 07/12  '07    Page 26 of 51

07/14/2006  08:31    9259371964    MEDICAL BOARD OF CA    PAGE  01/03

STATE OF CALIFORNIA - Department of Consumer Affairs

ARNOLD SCHWARZENEGGER, Governor



## Medical Board of California

Enforcement Program
Pleasant Hill District Office
3478 Buskirk Avenue, Suite 217
Pleasant Hill, California 94523-4326
(925) 937-1909
FAX (925) 937-1964

# FAX COVER SHEET

Date:        July 14, 2006

To:          Coyness Ennix, M.D.

Location:

Phone Number:    510-465-5500              FAX Number: 510-835-2682

From:        Teri Bennett, Sr. Investigator MBC

Phone Number:    925-937-1909              FAX Number:  925-937-1964

Number of pages following this page:  2

Message:

Privacy Notice: This message is intended only for the use of the individual, or entity, to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable federal or state laws. If the reader is not the intended recipient, you are hereby notified that any dissemination or copy of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by telephone and return the original message to the above address via United States Postal Service. Your cooperation is most appreciated.

# EXHIBIT L

AUG-31-2005 WED 05:18 PM EB CARDIAC SURGERY          FAX NO. 510 839 0808          P. 01/01

# EAST BAY CARDIAC SURGERY CENTER

*Medical Group*

*Specializing in Adult Cardiac Surgery and Thoracic Surgery*

Leigh I.G. Iverson, M.D.
Coyness L. Ennix, Jr., M.D.
Russell D. Stanten, M.D.
Junaid H. Khan, M.D.

February 13, 2005

William Isenberg, M.D., Ph.D
President, Medical Staff
Alta Bates Summit Medical Center
350 Hawthorne Ave.
Oakland, CA. 94609

RE:  Peer review of Dr. Coyness L. Ennix, Jr.

Dear Dr. Isenberg:

I was surprised and concerned to learn that an Ad Hoc Committee was sending 10 cases of Dr. Ennix's for an outside review.

I have been associated with Dr. Ennix in a practice of cardiac and thoracic surgery for about 5 years. We have been involved in several hundred cases together. He has without exception shown outstanding skill and judgment.   It is my impression that he has been innovative and interested in new ideas and has added significantly to our practice.

I am not familiar with all 10 of the cases involved in this review nor have I reviewed the four minimally invasive cases. However, it is my recollection that conversions to standard incision, intraoperatively altering the treatment of the valve pathology or length of operative time were all managed properly.  I believe that after these four cases were peer reviewed by Dr. Hon lee, his review should have been accepted and these four cases closed.  I'm not familiar enough with the other six cases to comment.

In summary, Dr. Ennix is a good surgeon with good judgment and technique. In addition, Dr. Ennix is a gentleman.  I hope your committee will be fair to Dr. Ennix.

Sincerely yours,

Junaid Khan

cc:  Steven Stanten, M.D.
     Warren Kirk, CEO

Per Dr. Ennix Request letter re-written 8/31/05.

3300 Webster Street, Suite 500  Oakland, California 94609-3149  (510) 465-6600  FAX: (510) 839-0806

1



*Alta Bates Summit
Medical Center*

A Sutter Health Affiliate

350 Hawthorne Avenue
Oakland, CA 94609
510.655.4000

January 3, 2005

Coyness L. Ennix Jr., MD
3300 Webster Street Suite 500
Oakland, Ca. 94609

Dear Dr. Ennix:

Mrs. Helena Lengel sent a letter to express her appreciation for the excellent care that her husband, Hamilton Lengel received from you during his hospitalization here at Alta Bates Summit Medical Center, Summit Campus.

In her words, "I have to say that it is very scary to delegate the love of your life to a total stranger for a procedure that holds great risk, but Dr. Ennix came through with flying colors. I am very aware that I owe my husband's life to the care and expertise of this surgeon, and I will never forget it."

Thank you, Dr. Ennix, for your contribution to providing excellent quality care. You certainly exemplify the goals of Alta Bates Summit Medical Center in providing the highest caliber of service to our patients.

Keep up the good work!

Sincerely,

Warren J. Kirk
President and CEO

CC:  Dr. William Isenberg, President, Medical Staff

Aug 28 05 06:16a    McKelveys    510-568-5993    p.1

DATE:    AUGUST 28, 2005

TO:    Dr. William Isenberg M.D. PhD.
       Pres. Medical Staff Alta Bates-Summit Med Center
       350 Hawthorne Ave.
       Oakland, CA. 94609

FROM:    Mrs. Loraine McKelvey RN, CNOR
         235 Begier Ave.
         San Leandro CA. 94577

It was brought to my attention this past week, that Dr. Coy Ennix M.D.'s professional medical

ability is being questioned. Questioned to the impact of revoking surgical privileges as an

Open Heart Surgeon.

I have been an open-heart surgical nurse for sixteen years. During the sixteen years I have

worked numerous times during scheduled and emergency Open Heart Procedures with

Dr. Coy Ennix M.D. Not once did I or the surgical team questioned his leadership or his

ability to handle emergent situation.

It would be a disservice to this medical facility and the Bay Area community to remove him

from your medical staff.

Mrs. Loraine McKelvey RN, CNOR

*Mrs. Loraine McKelvey RN CNOR*

# ALAMEDA COUNTY
# MEDICAL CENTER

*Highland Campus • Fairmont Campus*
*John George Psychiatric Pavilion*
*Ambulatory Healthcare Services*

February 18th, 2006

David Altman MD
Chief Medical Officer
Alameda County Medical Center

RE: Coyness Ennix MD

Dear Dr Altman:

I am writing this letter in support of Dr Coyness Ennix. I was introduced to Dr Ennix when I joined the staff of ACMC in mid-2003 as one of the leading cardiac surgeons at Summit Hospital with long experience and impeccable training at the Cleveland Clinic, Cleveland, and at Baylor University, Houston, to whom we referred our patients in need of a cardiac surgery intervention. I have referred many patients of varying complexity to Dr Ennix since that time and I have had consistently superior outcomes with patients under his care.

It therefore was a surprise to me when Dr Ennix informed me last year that his clinical privileges had been temporarily revoked at Summit Hospital pending an official inquiry. I was even more concerned that if there was a genuine medical problem that I had been unaware of, I owed it to my patients to find out the exact facts. I therefore told Dr Ennix that I required to know the complete details about the investigation. Dr Ennix gave me copies of the original documents which involved 10 patients spanning a few years where Dr Ennix had been charged with a series of specific patient management issues in cardiac surgery that were felt to be below the standard of care. I am fully qualified to evaluate these issues as I have spent over 15 years of my career in cardiac surgery in the capacities of Medical Director of the Cardiac Surgery ICU, both at the Cleveland Clinic, Cleveland, and at Cedars Sinai Medical Center, Los Angeles.

What I found immediately disturbing was that all of these cases which spanned a few years had already been peer reviewed internally either at the regular Morbidity & Mortality conferences or by Dr Hon Lee, an independent cardiac surgeon working at Summit, and all the cases had already passed internal peer review as being within the standard of care. I studied every issue that Dr Ennix had been charged with, and I determined independently that in every instance the charge had no medical basis. In every instance Dr Ennix had follow the standards of care supported by the evidence-based

Mar 07 06 03:34p     Dhun Sethna                   5109860468                p.1

guidelines. In fact, in some instances, it was the cardiologist or the Summit Hospital staff that had fallen below the standard of care. I have therefore continued to send my ACMC patients to Dr Ennix with continuing superior outcomes. Dr Ennix's charges have been subsequently reviewed by peers of international stature including the Chairmen of the Departments of Cardiac Surgery at Stanford University and The Cleveland Clinic, and faculty members at Harvard and the De Bakey Heart Center at Houston. As expected Dr Ennix was reinstated at Summit Hospital and continues to practice as an independent surgeon.

I have enclosed the official legal summary of the proceedings, and the detailed comments of the reviewers. After looking over the entire episode, it is hard for me not to conclude with some concern that the entire proceedings had no medical basis as was confirmed by his peers but seemed to be driven by personal, financial and racial factors.

If there is any other information that you may require, please feel free to contact me

Sincerely

Dhun H Sethna MD., MBA

08/25/05   THU 12:15 FAX 5106547498          EARL L HOLLOWAY MD                                    ☑001

### EARL L. HOLLOWAY, M.D., INC.
Fellow, American College of Cardiology
3318 Elm Street
Oakland, CA  94609-3012
(510) 654-7525 Phone
(510) 654-7498 Fax



November 30, 2004

William Isenberg, M.D.
Chief, Medical Staff
Alta Bates Medical Center
350 – 30th Street, Suite 301
Oakland, CA  94609

Dear Bill:

Dr. Coyness Ennix asked me to write a letter regarding surgical privileges.

I have known Dr. Ennix for 25 years.  He has operated on many patients for me during this period of time and they almost always have had an excellent outcome.  He has shown good judgment in deciding who is and who is not a surgical candidate and his choice of procedure for the patient has, to me, always seemed appropriate.

It has been a pleasure for me to work with Dr. Ennix over the years and I look forward to continuing my relationship.

Sincerely yours,

Earl L. Holloway, M.D.

# PREVENTIVE CARDIOLOGY ASSOCIATES

### ALAMEDA LIPID CLINIC &
Medical Corporations

DENIS W. DREW, M.D., F.A.C.C.                                    STEPHEN RASKIN, M.D., F.A.C.C.

2070 Clinton Avenue • Suite 3312 • Alameda, California 94501
TEL: 510.522.6323 • FAX: 510.522.5078
EMAIL: PREVENT@POL.NET

November 30, 2004

William Isenberg, M.D., PhD.
President, Medical Staff
Summit Medical Center
350 Hawthorne Avenue
Oakland, CA 94609

Dear Dr. Isenberg:

I have been requested by Dr. Coyness Ennix to comment on his character and clinical abilities based upon my long-term relationship with him.

I first knew Dr. Ennix when he was a resident at Highland Hospital. Following his training he initially started with Ivan Maye's surgical group in Oakland. Later he formed a separate cardiovascular surgery practice at Alta Bates Hospital at the hospital's request. When the program was no longer viable due to low volume he rejoined the Summit Medical Center Cardiovascular Group. During this time I have used his services almost exclusively and have referred all of my cardiovascular surgery patients to him.

In my opinion, Dr. Ennix is of high character and has not been reluctant to take on some very tough surgical cases. There have been a number of bypass and valve cases I have referred to him who I felt were quite high risk and have been pleased to see that they have done very well following his surgical intervention.

He has always been very quick to respond to my requests for help. He has been quite thorough in immediately following up with me on his operative cases. He has favorably impressed my patients, and I frequently hear positive comments about his care.

I have the highest regard for Dr. Ennix and I plan to continue referring all of my cardiovascular surgery patients to him for his expert care.

Denis W. Drew, M.D.

cc:
Lamont Paxton, M.D.
3012 Summit Street – Suite G621
Oakland, CA 94609

ih01130



# BERKELEY CARDIOVASCULAR MEDICAL GROUP

2450 Ashby Avenue • 2nd Floor • Berkeley • California • 94705
(510) 204 – 1691 • FAX (510) 204 – 5422 • www.bcvmg.com
Office with Testing: 2510 Webster St., Suite 200, Berkeley, CA 94705
(510) 549-4220 • FAX (510) 549-4224

Richard P. Balls, M.D., F.A.C.C.      J. Daniel Hill, Jr., M.D., F.A.C.C.      Duane D. Stephens, M.D., F.A.C.C.
John S. Edelen, M.D., F.A.C.C.        George Horvath, M.D.                     Michael W. Tsang, M.D.
Robert M. Greene, M.D. F.A.C.C.       Luisa Munoz, M.D., Ph.D.                 Samuel Wang, M.D., F.A.C.C.

Re:   ,

CONSULTATION

Dear Dr  Isenberg:

I am writing this letter on behalf of Dr. Coyness Ennix.  I have
worked with Dr. Ennix as a colleague in treating patients with
cardiovascular disease for over 20 years.  In that time, Dr. Ennix
has cared for many of my patients who required surgical treatment of
their cardiovascular disease.  These patients ranged from those with
coronary artery disease to valvular dysfunction to diseases of the
great vessels.

Dr. Ennix has always demonstrated superior judgment and ability in
his management of these patients, including those with complex and
challenging surgical problems.  In addition, Dr. Ennix also impressed
me as being at the forefront of learning and applying the most
current surgical techniques in the care of his patients.

I have every confidence in Dr. Ennix' ability as a physician and
surgeon and look forward to sending him patients who require surgical
treatment for their cardiovascular disease at Alta Bates Medical
Center in the future.

Addressee:  William M. Isenberg, M.D.
COURIER SERVICE
365 Hawthorne Avenue, #301
Oakland, CA 94609

Duane D. Stephens, M.D., F.A.C.C.

DDS:MedQ   JOB #:  625469/145159673
DD:  08/30/2005 16:03:42    DT:  08/30/2005 16:38:39

6143 Acacia Avenue
Oakland, CA 94618
November 27, 2004

Lamont D. Paxton MD
Chairman, Ad Hoc Committee
Medical Staff Office
Summit Medical Center
355 Hawthorne Avenue
Oakland, CA 94609

Dear Dr. Paxton,

I have been contacted by Dr. Coy Ennix and informed of an ad hoc committee review of his recent cardiac surgical practice and patient outcome results. Dr. Ennix requested that I provide the committee with my impressions of his cardiac surgical practice from the perspective of an anesthesiologist. I have worked upon many cardiac and thoracic surgical cases with Dr. Ennix during the past 10 years. Approximately 6 months ago, my practice of cardiac anesthesiology ended with the formation of a more condensed cardiac anesthesiology team. However, as you are no doubt aware, I continue to maintain a full time (non-cardiac) anesthesiology practice at Summit Medical Center. I submit my evaluation of Dr. Ennix freely and objectively. Finally, I am not aware of any mutual involvement between Dr. Ennix and myself in any of the cases under review.

From the vantage of an anesthesiologist, I have observed Dr. Ennix to be a surgeon of excellent technical skill combined with secure and sound medical knowledge. He adeptly commands a strong leadership role in the operating room while promoting the cooperative efforts of the surgical healthcare team with due respect to his colleagues and coworkers. As a talented, reasonable, and approachable individual, he encourages a healthy work environment, which fosters the primary goal of excellence in patient care.

In various challenging operating room scenarios such as cardiac function deterioration and bleeding difficulties, Dr. Ennix maintains a calm and rational approach toward resolution of the problem. Whenever appropriate, he seeks consultation or further medical studies to best serve the patient's safety.

In summary, I am proud to support Dr. Ennix as a colleague at this medical center. Please contact me if I may be of any further assistance.

Respectfully,

Joseph Bermudez MD

cc. William Isenberg MD, PhD
Steven Stanten MD

DAVID L. ESTRICH, M.D.
*A Medical Corporation*

*Internal Medicine*
*Endocrinology*

350 - 30th Street, Suite 311
Oakland, CA 94609
Telephone: (510) 839-5640

November 28, 2004

Lamont D. Paxton, M.D.
Chair, Ad Hoc Committee, Department of Surgery, Medical Staff,
Summit Medical Center
350 Hawthorne Avenue
Oakland, CA 94609

RE:     **Professional Qualifications of Dr. Coyness L. Ennix**

Dear Dr. Paxton:

I was surprised and disturbed to learn that a committee of the Summit Medical Staff has been convened to investigate the professional record and qualifications of Dr. Coyness Ennix, a member of our medical staff in good standing for several decades.

Dr. Ennix has been the primary surgeon for at least 6 or 8 of my patients in the recent past, and he was a consultant or assistant in surgery for another 16 or 18 cases. He has without exception shown outstanding skill and judgment in:
1.     Case selection.
2.     Meticulous preoperative preparation.
3.     Supervision of technical, RN, and PA staff.
4.     Surgical skill and judgment.
5.     Follow-up care.

I recall his decisiveness when he rapidly intervened to tie off a mediastinal bleeder in the CPU for patient, Scott Werner, about 18 years ago. Dr. Ennix has been an innovative leader in the community for employing methods to reduce the risks of open-heart surgery. He has been a leader in promoting a careful perioperative control of blood glucose and operating on the beating heart to avoid the risks of a bypass pump. In every case, Dr. Ennix has spent great time and effort to educate patients and their families to visualize the whole rationale and inherent risks of the procedure so as to promote cooperative risk sharing.

RE:    Dr. Coyness L. Ennix
November 28, 2004
Page 2

Indeed, he was not the primary surgeon for the few unhappy outcomes that come to mind, for example:

1.    A prolonged hospital stay in an elderly woman because of delayed healing of a donor site.
2.    Intraoperative cortical blindness.
3.    Intraoperative lactic acidosis.

Those unfortunate outcomes highlight the necessity of careful preoperative case selection, and medical preparation, retaining full control of the surgical team, and respect for the inherent risk of platelet emboli.

As you and your committee are well aware, the soul of medical practice would lose its vitality if the oversight and control of practice were to be guided solely by published statistics and protocols. I know that you and your committee of peers will be perspicacious and fair in your deliberations.

Respectfully yours,

David L. Estrich, M.D.

DLE/str/srm

cc:    Steven A. Stanten, M.D., Chairman,
       Department of Surgery, Medical Staff
       Summit Medical Center
       350 Hawthorne Avenue
       Oakland, CA 94609

       William M. Isenberg, M.D., Ph.D., President, Medical Staff,
       Summit Medical Center
       350 Hawthorne Avenue
       Oakland, CA 94609

FROM :                          FAX NO. :5105302483              Dec. 23 2001 10:58PM P1

University of California
San Francisco



Department of Surgery
East Bay

1411 East 31st Street
Oakland, CA 94612-1018
tel: 510/437-4967
fax: 510/437-5127

January 4, 2004

Lamont D. Paxton, M.D.
Department of Surgery, Medical Staff
Summit Medical Center
350 Hawthorne Avenue
Oakland, CA 94609

Dear Dr. Paxton:

    This communication is written in support of the professional performance of Dr. Coyness Ennix as it relates to the UCSF-East Bay Program during the last 10 years.

    Dr. Ennix and his colleagues have been a major source of referral for both emergency thoraxic trauma and for cardiopulmonary procedures. The performance of Dr. Ennix in particular, has been outstanding. His consultative responses and treatment patterns have been consistently satisfactory and produced excellent results. His level of communication is superior and this office has been acutely aware of his continuing contributions to improve the use of advanced technology in the field of cardiac surgery. In short, we have been satisfied with his results, both at the clinical and educational levels.

    Dr. Ennix is a superb gentleman, a fine Surgeon, and represents his discipline well. This letter should be considered as a supportive document for any immediate or periodic review of his performance.

Respectfully,

*Claude H. Organ MD*

Claude H. Organ, Jr., M.D.
Emeritus Professor, UCSF-East Bay

:grb

Cc: William M. Isenberg, President
    Summit Medical Center

C:\Documents and Settings\mlclark\Desktop\Organ\Lamont Paxton 1-04-05.ltr.doc

November 26, 2004

Lamont D. Paxton, M.D.
Chairman, Ad Hoc Committee
Summit Medical Staff
Summit Medical Center
355 Hawthorne Ave.
Oakland, CA 94609

Dear Dr. Paxton:

    I am writing in support of Dr. Coyness Ennix, whom I have known and worked
with for over twenty years. Dr. Ennix has shown exemplary judgment and skills as a
cardiac surgeon during this time, and has been a valuable asset to the medical community
and to the professional care of cardiac patients specifically. His leadership in the
advancement of new and beneficial surgical techniques has greatly benefited the patients
here. I wholeheartedly support his continued excellent service at Summit Hospital.

Yours truly,

General K. Hilliard, M.D.
350 30th Street, Suite 411
Oakland, CA 94609

Cc: Steven Stanten, M.D.
     William Isenberg, M.D.

**Helena Lengel**
1007 Eagle Avenue
Alameda, Ca. 94501
(510) 865-0615

To:   Dr. William Isenberg, M.D., Ph.D.               December 10, 2004
President, Medical Staff
Summit Medical Center
355 Hawthorne Avenue
Oakland, California 94609

Dear Dr. Isenberg,

     I am writing to express my appreciation and gratitude regarding the services of Dr. Coyness Ennix, for the outstanding job he has done for my husband, Hamilton Lengel. Dr. Ennix's concern and expertise has turned a family crisis into a memorable and noteworthy experience rather than a potentially devastating tragedy.

     Hamilton presented with chest pains Sunday evening, November 12, and checked into Alameda Hospital on Monday, November 13. Tests revealed that he had had a mild heart attack so he was transferred to Summit for an angiogram. The angiogram was performed on Wednesday. Because the heart attack had been mild, the doctors expected minor vessel blockage in the heart. Unexpectedly, the angiogram revealed 90-95% blockage in six coronary arteries. Surgery was immediately scheduled for Friday. However, due to the severity of the situation and an unexpected cancellation, the surgery was actually performed on Thursday, November 16. The surgery took six hours for a quadruple bypass. You cannot believe my and my family's relief when we were finally able to see him in ICU.

     I want to commend Dr. Ennix for the excellent job he has done for my husband. As we watched Hamilton come out of anesthesia and recuperate on the cardiac floor it was obvious that the operation had gone well. I was told that the transition off the heart-lung machine went smoothly which in my mind meant 'no leaks'. The residual drainage from the thoracic cavity was relatively minimal and the patient's vital signs were all within expected ranges. Dr. Ennix came to see him several times during his hospital stay, and I was even surprised when the Doctor popped in at 5:00 am one morning to check up on the patient's oxygen use (you won't find me at my job that early in the morning)!

     Dr. Ennix was always friendly and courteous. He answered our questions clearly and concisely, and told us what to expect during recuperation. I have to say that it is very scary to delegate the love of your life to a total stranger for a procedure that holds great risk, but Dr. Ennix came through with flying colors. I am very aware that I owe my husband's life to the care and expertise of this surgeon, and I will never forget it.

     They say that heavenly angels watch us from above, but I give my true thanks to the earthly angels that work in the operating room.

                      With great appreciation,

                      *Helena Lengel*

                      Helena Lengel

Cc:  Dr. Coyness Ennix, M.D
      Dr. Steven Stanten, M.D.
      Warren K. Kirk, President/CEO, Alta Bates Summit Medical

08-22-05    06:03    From-Alta Bates Summit Med.Center    510 869 5153    T-389  P.001/00    F-( )

3396 El Monte Dr.
Concord, Ca. 94519

August 22, 2005

To Whom It May Concern:

It is my intention to show my support for Dr. Coyness Ennix by conveying my work-related experience with him. Specifically I wish to address three pertinent points in relation to Dr. Ennix: His behavior towards behavior towards nurses, scrub technicians and other ancillary personnel, his communication methods with the same personnel involved in his cases, and lastly my opinion of Dr. Ennix as a team leader.

First, I would need to point out that it has been my privilege to know, and work, with Dr. Ennix for well over a decade. In this time is been very seldom that I have had the occasion to meet another gentleman such as Dr. Ennix both in, or out of the operating room. I have never seen nor heard of Dr. Ennix acting n the least bit inappropriate in "any" capacity, under any circumstance. These circumstances include simple situations such as a cordial, "good morning,' to life and death situations. Dr. Ennix makes it a point to say hello to all of his colleagues when ever possible, even it is with a thumbs up sign through a window. In fact, I have seen Dr. Ennix take time to talk with housekeeping personnel on several occasions. Dr. Ennix is a true joy to know and work with.

Next, I feel it is important to address and important point in surgery, that which is Dr. Ennix's communication with those involved in his cases. As I stated before, I have worked with Coy for a long time. Not a single occurrence comes to mind in which I felt his communication with me was in the least it lacking. I feel it is my responsibility to ask questions about any case that could be considered out of the norm. Whenever I do have questions about our direction in a case, Coy answers my questions before they are even stated. To me this proves that he is not only thinking of his actions but also those around him. I feel Dr. Ennix orchestrates his cases with great precision. Now, sometimes those directions don't work out quite the way he may have expected, but I can say that in the last fifteen years, after being involved in over two thousand open heart cases, the same can be said about every single cardiac surgeon I have every worked with. I have

08-22-05   06:04   From-Alta Bates Summit Med.Center          510 869 6153      T-309   P.001/00   F-1 1

never questioned Dr. Ennix's ability to communicate with any person involved in his cases, specifically me.

Lastly, and arguably the most important point, is my opinion of Dr. Ennix as leader. It is paramount to have a leader in the operating room in any given cases. The cases that I have been involved with Dr. Ennix, he has always been the one that I look to. I have never questioned any of his decisions in any case. I do make it a point after cases in which I did not feel I had a complete understanding for certain actions, and Dr. Ennix has always taken the time to speak with me after the case to explain our actions. I feel the time after a case can be just as important as during a case. I sincerely believe that this communication makes me a better technician. If I had to choose someone to be my leader in the operating room, that person would be Dr. Ennix.

After reviewing the previous few paragraphs, and reviewing my thoughts, it is easy for me the recognize why it is that I enjoy working with Dr. Ennix so much. Working with Dr. Ennix makes me feel good about myself. I know that Dr. Ennix trusts my judgment as a technician and he allows me to do my job. I do not have a single doubt in my mind that Dr. Ennix has everything that I enjoy and respect as a surgeon.

Respectfully yours,

Paul J. Islas

AUG-30-2005 12:44 PM                                   9257764566                    P.01

Dr. Paxton
Medical Board
28 August 2005

Dear Dr. Paxton,

On 15 October, 2004, I sent a letter to you describing a surgery I was scrubbed on with Dr Coy Ennix. I described the actions of Dr Ennix. I have since learned that, at the time, Dr. Ennix was undergoing continuing therapy for cancer.

Since completion of his treatment, Dr Ennix has returned to his previous competent state, which is that of an extremely articulate, precise, and competent surgeon. Dr Ennix is liked by all of the staff and seems to always be there for the other surgeons (even the Kaiser group) if he is needed. I feel that the other doctors in Dr. Ennix's own group are not trying to return the same effort for their partner. He consistently has a very difficult time getting them to assist him, even when he outright asks for their assistance. I feel that, given the chance, he still has much to give to the community and our hospital. I would not hesitate to scrub on any of his cases if asked to do so.

One very recent incident that shows his skill during an emergency thoracic aneurysm is when he was left to work without the help of his own group partners for three hours before even the partner on call came to help him. Despite the impediments placed in Dr. Ennix's path by his own group partners, he had a good outcome for this procedure. His mind was both clear and precise and I had complete confidence in his ability as a cardiac surgeon. I do not want to see his professional life destroyed because the entire story did not get told.

Dr Ennix has a long and prestigious record both as a surgeon and a teacher. I feel he should be entitled to once again take his place as a fully functioning member of our heart program.

James R. Lovin,
Certified Surgical Technologist

08/22/2005  11:21    4152394452              KIM JOHNSON                    PAGE  02

August 22, 2005

Wm Isenberg, MD, PhD
Medical Staff President
Medical Staff Office
Alta Bates Summit Medical Center
350 Hawthorne Street
Oakland, CA 94609

Re: Coyness Ennix, Jr., MD

Dear Dr. Isenberg,

At the request of Dr. Coyness Ennix I am writing this letter to discuss my experiences with him in my role as a Cardiovascular Perfusionist during the period of 1990-1992 and again from 1997 to the present. I have worked with Dr. Ennix at Alta Bates Summit Medical Center and at Doctor's Medical Center-San Pablo (formerly Brookside Hospital) during this period. The role of perfusionist is exclusive to the Operating Room setting and I wish to address Dr. Ennix's performance in this area.

The Perfusionist and Cardiovascular Surgeon communicate before, during and immediately after the case in a constant and consistent manner. This is required because the responsibilities of the perfusionist include extracorporeal circulation, cardiac arrest and hypothermia during the progress of the surgery. I have found Dr. Ennix to be a consistently effective surgeon and communicator during all of the years of my experience with him. We have had a variety of experiences ranging from non-eventful to emergent cases, including several critical situations in which communication of problems was required and actions to be taken had to be communicated and performed expeditiously and effectively. We have both required help from the other with problems with equipment or patient care and Dr. Ennix always responded to my requests for assistance or information promptly and effectively. I can honestly state that he is a more effective communicator than other surgeons that I have had the experience to work with. He makes certain that the team members are aware of what he is attempting to do during emergent situations, and during the crises which can arise in the cardiac surgery suites he has consistently remained a calming and controlling influence over the team members and their actions. Even during the surgically difficult moments I have found him responsive to the needs of the team members and their individual professional practice requirements. As an example, I might mention that during one case a relatively inexperienced person was unable to use the defibrillator, and instead of getting angry or losing his cool, he asked that another person be called in to assist. After the crisis was over he even took the time to patiently explain why this was a problem and make certain that the individual not only understood what had happened but knew the proper corrective action to take should the event arise again. I do consider this a reflection of Dr. Ennix's particular character and behavior during cardiac surgery. I also would like to point out that he does not cast blame on others when the outcomes are unfavorable, he makes the team members feel that they have all contributed to the success of a case and takes the high road during the cases which have unfortunate outcomes. I believe that he has always been this way and I have not seen this change

08/22/288: 11:21     4152394452                    KIM JOHNSON                         PAGE  03

during my experience with him.

If I can answer any other questions, or you require any further information, please do not hesitate to contact me. I remain,

Sincerely yours,

Kim Johnson, BS, CCP
95 San Juan Avenue
San Francisco, CA  94112-2615

08/21/200!; 22:07    510-524-1769              MASTERSON DOVE                    PAGE 02

**EAST BAY PERFUSION SERVICES, INC**
**957 ORDWAY STREET**
**ALBANY, CA 94706-2142**

August 22, 2005

William M. Isenberg, M.D., Ph.D.
Medical Staff President
Medical Staff Office
Alta Bates Summit Medical Center
350 Hawthorne St.
Oakland, CA 94609

Dear Dr. Isenberg:

I have been asked by Dr. Coyness Ennix to comment to you on the issue of
communication between the perfusionists and him, particularly as it pertains to surgery.

I have worked continuously as a perfusionist at Summit Hospital since 1973. I have been
chief of perfusion since 1978. I have worked with Dr. Ennix since he joined the staff as a
cardiothoracic surgeon in 1981. I would like to state for the record that I do not find Dr.
Ennix difficult to communicate with, either during surgery or outside the surgical suite.
This is true whether the case is emergent or non-emergent. He has always impressed me
as being attentive and receptive to my observations and ideas and also to my immediate
requests during surgery. He is a person who is easily approachable and open to what I
have to say to him.

I am not aware that this has ever been a problem between Dr. Ennix and other
perfusionists who have worked for me in my career at Summit Hospital, now Alta Bates
Summit Medical Center.

Yours truly, -

Richard I. Masterson, C.C.P.
Vice President

Don Sheff CCP
811 Spring Dr.
Mill Valley, CA. 94941

August 21, 2005

William M. Isenberg M.D., Ph D.
Medical staff president
Medical staff
350 Hawthorne
Oakland, CA. 94609

Dear Dr. Isenberg,

This letter is in response to Doctor Coy Ennix request in pursuing a statement regarding his ability to communicate with the Perfusionist while performing cardiac surgery. I have been a Perfusionist since 1978, and under Dr. Ennix's direction since February 2002. Doctor Ennix's ability to dialogue with me professionally with full regard to giving excellent care to his patients is satisfactory.

Sincerely,


Don Sheff CCP


cc:    Coyness, Ennix M.D.

Wednesday, August 31, 2005

ABSMC Medical Review Board

Dear ABSMC Medical Review Board:

I am writing this letter of character reference on behalf of, Coyness Ennix, MD I have had the pleasure of working alongside Dr. Ennix for the past several years. He has proven to be in my opinion a skilled surgeon in his profession and I admire him for his ability to stay poised during stressful situations in the operating room. He has served the community in which he practices well and is a pioneer in the advancement of cardiac surgery. I know that over the past couple of years he has battled some health problems, but he has overcome these obstacles to continue serving this community.

It has come to my attention over the past few weeks that a person who claims to be a representative of the surgical technologists who scrub open hearts that we feel, Dr. Ennix is performing his duties as a surgeon in a manner that is inappropriate for patient well being. I have talked to a number of these technologists and we have not given our consent for someone other than ourselves to speak for us regarding this issue. No one person that I spoke with had anything negative to say about, Dr. Ennix; in fact they were amazed that anybody might has said things that were negative about him.

I know that Sutter health system feels that, Dr. Ennix is instrumental in cardiac surgery or they would not have featured him in television cameo commercials for the Sutter health system.

Lets allow Dr. Ennix to do what he does best! Lets allow him to continue to care for the people of this community that he serves!

Respectfully,

Anthony Provencio, CST
Surgical Technologist
Alta Bates Summit Medical Center

ARP
cc:  William Isenberg, MD Chief of Medical Staff
     Steven Stanten, M.D. Chief of Surgery
     Russell Stanten, M.D. Chief of Cardiac Surgery
     Nancy Alfisi, RN O.R. Director
     Scott Davis, RN O.R. Asst. Director

# EXHIBIT M

### Dept of Cardiovascular Surgery
**Kaiser East Bay Cardiac Services**
**Summit Medical Center, 2nd Floor**
**3012 Summit Street**
**Oakland, CA 94609**
**(510) 869-8660**

*David Alyono, M.D.*            *Brian S. Cain, M.D.*            *Dennis Durzinsky, M.D.*
*Thomas Gonda, M.D.*           *John L. Jones, M.D.*            *Hon S. Lee, M.D.*

**Privileged and Confidential**

April 19, 2006

Lamont Paxton, M.D. Chair,
Ad Hoc Investigating Committee
350 Hawthorne Avenue
Oakland California 94609

Re: Dr. Ennix Proctorship

Dear Doctor Paxton:

Thank you for taking the time in reviewing the proctorship process for Dr. Ennix. I apologize that the HandBase format was not useful, but at the time of transfer, it was meant to be a preliminary report. Please find attached the individual proctorship forms in spreadsheet format for each surgical and nonsurgical case over the last 6 months.

In summary, Dr. Ennix had 8 cases that were nonsurgical consultations. Of the 29 surgical cases please refer to the attached summary spreadsheet.

It was of unanimous opinion that Dr. Ennix met expectations in complying with the standards in the pre-op evaluation. In the peri-op evaluation, there were no departures from the standard of care. In the post-op evaluation, Dr. Ennix exceeded expectations in the care he provided for his patients.

It is with unanimous decision from the group of proctors, that we recommend the proctorship be terminated and that Dr. Ennix be reinstated to the medical staff with full unrestricted privileges.

Thank you very much for the privilege of participating in such an important and necessary part of the medical staff function.

Sincerely,


David Alyono, M.D.               Brian S. Cain, M.D.                Dennis Durzinsky, M.D.


Thomas Gonda, M.D.               John Jones, M.D.                  Hon S. Lee, M.D.




KAISER PERMANENTE.