G. SCOTT EMBLIDGE, State Bar No. 121613
RACHEL J. SATER, State Bar No. 147976
ANDREW E. SWEET, State Bar No. 160870
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D., | Case No.: C 07-2486 WHA |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ALTA BATES SUMMIT MEDICAL CENTER, | Date:        April 24, 2008 |
| Defendant. | Time:        8 a.m. |
| | Dept:        Ctrm. 9, 19TH Floor |
| | Trial Date: June 2, 2008 |
| | Judge:      Hon. William H. Alsup |

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................I

TABLE OF AUTHORITIES ..........................................................................................III

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ..............................................................................................4

ARGUMENT ...................................................................................................................8

I.    DR. ENNIX HAS RAISED TRIABLE ISSUES OF FACT REGARDING WHETHER ABSMC TOOK ADVERSE ACTIONS AGAINST HIM BECAUSE OF HIS RACE. ..................................................................................8

    A.    Dr. Ennix Has More Than Sufficient Evidence To State A Prima Facie Case Of Race Discrimination. ................................................9

    B.    Dr. Ennix Has Raised Triable Issues Regarding The Legitimacy Of ABSMC's Claimed Reasons For Harming Dr. Ennix. ...............................9

        1.    ABSMC Acted Inconsistently With Its Proffered Motive Of Protecting Patient Safety. ................................................11

            a.    Normal AMSMC Peer Review Of Dr. Ennix Raised No Concerns About Patient Safety. ....................................11

            b.    ABSMC Ignored Other Issues That Threatened Patient Safety, Focusing Only On Dr. Ennix. ...................11

            c.    ABSMC Ignored Evidence That Other Cardiac Surgeons Posed More Of A Risk To Patient Safety Than Dr. Ennix. ...................................................12

        2.    ABSMC Employed Irregular And Improper Procedures In Its Evaluation Of Dr. Ennix. .........................................13

            a.    Manipulation Of The Initial Peer Review Process ............13

            b.    Manipulation Of The Ad Hoc Committee Process ............15

            c.    Manipulation Of The Review By National Medical Audit. ................................................................17

            d.    The End Result:  Unfair Adverse Actions. ........................18

        3.    ABSMC Treated Dr. Ennix More Harshly Than His White Colleagues. ...............................................................19

4.    ABSMC Has A Long History Of Subjecting Physicians Of Color To Higher Standards And Harsher Treatment Than Caucasian Physicians. .................................................................21

II.    DR. ENNIX HAS CONTRACTUAL RELATIONSHIPS PROTECTED BY 42 U.S.C. SECTION 1981. ..............................................................23

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Statutes**

42 U.S.C. § 1981 ................................................................................................. 1, 8, 9, 23

**Federal Cases**

*Aragon v. Republic Silver State Disp*, 292 F.3d 654, 662 (9th Cir. 2002)................................. 1, 20

*Beck v. United Food and Commercial Workers Union, Local 99*, 506 F.3d 874 (9th Cir. 2007)  19

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) ........................ 9

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978).................................................................. 19

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir.1998)................................................ 1

*Janda v. Madera Community Hospital*, 16 F. Supp.2d 1181 (E.D. Cal. 1998) ............................ 24

*Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1563 (9th Cir.1994)......................................................... 4

*Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138 (9th Cir. 2006) ....................................... passim

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)..................................... 8, 9, 21

*McGuinness v. Lincoln Hall*, 263 F.3d 49 (2d Cir.2001) .............................................................. 20

*Noyes v. Kelley Services*, 488 F.3d 1163 (9th Cir. 2007) ............................................................. 10

*Reeves v. Sanderson Plumbing Products,* 530 U.S. 133 (2000).................................................... 10

*Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.1996) ........................................ 4

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .................................................................. 10

**State Cases**

*Gianetti v. Norwalk Hospital,* 557 A.2d 1249 (Conn. 1989)........................................................24

*O'Byrne v. Santa Monica-UCLA Med. Ctr.,* 94 Cal.App.4th 797 (2001) ..............................23, 24

*Virmani v. Presbyterian Health Services Corp.,* 488 S.E.2d 284 (N.C.App. 1997).....................24

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT          Case No. C 07-2486 WHA

**INTRODUCTION**

Defendant Alta Bates Summit Medical Center's ("ABSMC") motion fundamentally misstates the law and ignores extensive evidence supporting plaintiff Dr. Coyness Ennix's claim. As the crux of its argument, ABSMC repeatedly asserts that "there simply is no evidence of racial animus by the Summit Medical Staff Medical Executive Committee ("MEC"). (ABSMC's Motion for Summary Judgment ("MSJ") at 2:22-24.) But the law does not require a plaintiff in a racial discrimination suit under 42 U.S.C. § 1981 to provide direct evidence of racial animus at the summary judgment stage. As stated by the Ninth Circuit in *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138 (9th Cir. 2006), "While direct evidence of discriminatory intent, such as racial slurs, could further support [a finding of discriminatory motive], they are not required if a prima facie case has been established and the plaintiff presents 'specific' and 'substantial' 'circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable.'"[1]  *Id*. at 1152, *quoting Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1222 (9th Cir.1998).

First, Dr. Ennix has ample evidence to establish a prima facie case of race discrimination: (a) he is African American; (b) he had a contract with ABSMC by virtue of his Medical Staff privileges and had multiple contracts to treat patients; (c) ABSMC's unjustified disciplinary actions impaired Dr. Ennix's rights and privileges under each of these contracts; and (d) none of Dr. Ennix's Caucasian peers received such harsh treatment for similar issues. *See Lindsey*, 447 F.3d at 1145. ABSMC's assertion that Dr. Ennix had no contract protected by 42 U.S.C. section 1981 defies logic and the law given the obvious contractual nature of the relationship whereby a hospital grants a surgeon privileges, the surgeon agrees to comply with the hospital's rules, and both parties derive income from the surgeon's treatment of patients at the hospital.

Second, Dr. Ennix has extensive, specific evidence that ABSMC's proffered nondiscriminatory motive – "a concern for patient safety" (MSJ at 13:15) – is but a pretext for

---

[1] The Ninth Circuit explained the crucial role of circumstantial evidence in this task: "[p]articularly because employers now know better, direct evidence of employment discrimination is rare." *Aragon v. Republic Silver State Disp*, 292 F.3d 654, 662 (9th Cir. 2002).

discrimination in this case. For example:

- ABSMC overrode the cardiac surgeon who reviewed Dr. Ennix's cases and found *no patient care issues*, an unprecedented disrespect for the peer review process that is meant to protect patient safety;

- ABSMC ignored that  peer reviewer's suggestions that ABSMC address systemic issues to improve patient care;

- ABSMC failed to investigate Caucasian cardiac surgeons who experienced the same surgical complications as Dr. Ennix and whose patient-mortality rates during the relevant time period exceeded those of Dr. Ennix;

- ABSMC provided its outside peer reviewers bogus statistics portraying Dr. Ennix in a bad light, when ABSMC had at its fingertips statistically sound data that showed Dr. Ennix's mortality rate to be within the normal range, and superior to some of his Caucasian peers.

Further, the following facts strongly suggest an improper, ulterior motive to "get" Dr.

Ennix regardless of the true facts about his patient care:

- ABSMC did not review Dr. Ennix's cases through the normal peer review process, the Cardiothoracic Surgery Peer Review Committee ("CTSPRC");

- Dr. Isenberg placed no cardiologists or cardiac surgeons on the Ad Hoc Committee ("AHC") reviewing Dr. Ennix's cases, even though the medical community included many such specialists and the Medical Staff bylaws require that peer review be performed by members of the reviewed physician's specialty;

- ABSMC employed outside reviewers, a technique ABSMC had used only with minority physicians, and only when the regular peer review process raised no patient care issues.

And regarding the report of the allegedly independent outside reviewers[2]:

- Those reviewers did not interview any of the medical personnel involved in cases it reviewed, other than Dr. Ennix;

---

[2] ABSMC's assertion that the outside reviewer, National Medical Audit ("NMA"), was not racially biased is a straw man. Dr. Ennix does not argue otherwise; rather, he argues that ABSMC as an institution discriminated against him because of his race. With respect to the NMA report, the evidence demonstrates that Dr. Isenberg chose NMA knowing, based on past experience, that NMA would furnish a harsh report on request, and ensured that result by maintaining close communication with NMA throughout the review and even commenting on drafts of its report. *See* Argument §I.B.2.c, *supra*. Such a process cannot reasonably be characterized as objective and allowed ABSMC to exercise its will through the NMA.

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT        Case No. C 07-2486 WHA

- They only interviewed Dr. Ennix after they had written the report's conclusions, and after ABSMC's attorney said he wanted them to interview Dr. Ennix to give him a sneak preview of Dr. Ennix's likely arguments at a subsequent hearing;

- The reviewers sent a draft of their report to Dr. Isenberg and ABSMC's attorney to review before finalizing the report, and even incorporated additional critical comments at Dr. Isenberg's urging.

These facts undercut ABSMC's professed motive of protecting patient safety and suggest a process intended from the start to destroy Dr. Ennix's career.

Additionally, Dr. Ennix has facts demonstrating that ABSMC has a history of manipulating the peer review system to eliminate competition from doctors who are not part of a close-knit "club" of white, male physicians. ABSMC investigates, summarily suspends, and revokes privileges of physicians of color in numbers grossly disproportionate to their representation on the Medical Staff.[3]   (See Hernaez Decl., Ex. F; Sweet Decl., ¶¶ 2-9, Exs. A-F.) Moreover, when ABSMC subjects white physicians to MEC review, 70% of those inquiries are for behavioral problems, such as substance abuse or inappropriate treatment of staff.  But when it subjects minority physicians to a similar level of scrutiny, 100% of those investigations are for "patient care/safety" issues.  (Sweet Decl, ¶ 7, Ex. D.)  This evidence can mean only one of two things, either:  (1) as compared to Caucasians, physicians of color are less skilled but better behaved; or (2) ABSMC treats physicians of color differently than it treats Caucasian physicians. Also, Dr. Ennix can show that only he, and *none* of his white, male peers – all of whom have had similar, if not worse, outcomes and complications in their cases – has been the subject of scrutiny after a peer reviewer found no patient care issues with his cases.

Finally, ABSMC eliminated from the Medical Staff another physician of color who, like Dr. Ennix, was a highly successful surgeon who introduced innovative procedures to ABSMC. Moreover, ABSMC accomplished this through a strikingly similarly, procedurally irregular peer review process that involved many of the same members of the "club" that has tried to destroy

---

[3] ABSMC's assertion that its "chart shows that Caucasian doctors are more than three times more likely than African-American physicians to be subjected to MEC peer review" is specious; it fails to account for the critical fact that African Americans make up only a small percentage of the medical staff.  (MSJ at 16:16-19; Sweet Decl. ¶¶ 2-3, Ex. A.)

1  Dr. Ennix's career.  In an exchange that highlights the acute power disparity between a medical

2  staff official and the doctor under scrutiny, when this minority physician complained to the then

3  Chief of the Department of Surgery about the protracted and excessively harsh process, the Chief

4  replied, "What are you going to do about it?"  ("Physician H" Decl., ¶ 13)

5      The Ninth Circuit "has set a high standard for the granting of summary judgment in . . .

6  discrimination cases . . . 'because the ultimate question is one that can only be resolved through a

7  searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record.'"

8  *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.1996) (quoting *Lam v. Univ. of*

9  *Hawaii*, 40 F.3d 1551, 1563 (9th Cir.1994)).  This Court should deny summary judgment and

10 permit a jury to resolve the many disputed factual questions and issues of credibility and

11 motivation in this case.

## STATEMENT OF FACTS

13     Dr. Ennix is a well respected cardiac surgeon with some twenty years of experience.

14 (Ennix Decl., ¶ 2; Sweet Decl., ¶ 10, Ex. G)  In early 2004, after substantial research and

15 training, Dr. Ennix began performing some cardiac surgeries using a new, minimally invasive

16 process ("MIV"), rather than the standard process of opening a patient's chest.  (Ennix Decl.,

17 ¶ 3)  Shortly after Dr. Ennix performed four initial MIV procedures, Dr. William Isenberg, the

18 Chief of Staff at ABSMC, and Dr. Steven Stanten, the Chief of the Department of Surgery, asked

19 Dr. Ennix to cease performing the MIV procedures out of a professed concern with long

20 operating times and the outcomes in these cases.  (Ennix Decl., ¶ 4)

21     Concerns such as these regularly arise in cardiac surgery cases.  After all, cardiac surgery

22 is by its nature a risky procedure and some patients die during or shortly after surgery.  ABSMC

23 has a regular peer review process by which it examines cardiac surgeries that "fall out," meaning

24 that they have certain defined issues such as patient death that mandate review.  (Sweet Decl.,

25 ¶ 11, Ex. H)  This normal, established peer review process has many levels:

26  - Nurse review.  In cardiac surgery, as in most other departments, the first layer of
27    peer review occurs at the nursing level.  A quality control nurse reviews cases in
     which enumerated events or complications occurred (e.g., death, excessive
28    bleeding, unexpected return to surgery).  If the nurse sees no care issues in the

4

handling of such a case, he or she "closes" the case and peer review normally stops there. (Barkin 23:25-24:6; 25:24-26:5; Jellin 55:23-56:14)[4]

- <u>Physician review</u>. If the nurse thinks the case raises patient care issues, it is referred to a same-specialty surgeon for review. Again, if the physician sees no care issues, he or she closes the case and the process normally stops there. (*Id*.; Iverson: 56:1-23.)

- <u>CTSPRC review</u>. If the physician thinks the case raises care issues, the case is taken to the CTSPRC for evaluation. If, after review, the Committee finds no care issues, peer review normally stops there. (*Id*.; Barkin: 66:21-67:9)

- <u>SPRC review</u>. If the CTSPRC has concerns, it can send the case to the Surgery Peer Review Committee ("SPRC"). If, after review, the SPRC finds no care issues, peer review stops there. (*Id*.; Mogg: 40:16-23)

- <u>MEC and/or AHC review</u>. If the SPRC has concerns, it can send the case to the MEC. The MEC can appoint an "ad hoc committee" ("AHC") to review a case or a physician. (Jellin: 69:25-70:12; see Isenberg Decl., Ex. A, p. 34)

This is the process ABSMC used to review cardiac surgeons for over a decade. But when Drs. Isenberg and Stanten, neither of whom is a cardiac surgeon, developed concerns about Dr. Ennix's four MIV cases, they decided to have those cases examined outside of the normal process, something unprecedented for cardiac surgeons. (Isenberg: 144:20-23; R. Stanten: 30:6-15; 56:4-10; 96:14-97:23; Lee: 72:16-21; 75:19-76:12; Iverson: 72:11-73:5; 109:7-12; S. Stanten: 47:4-11; 48:19-24; 53:13-54:9; 81:5-24) Instead of having the cases go through the CTSPRC, Dr. Stanten asked a cardiac surgeon on staff, Dr. Hon Lee, to review the four cases and report back to Dr. Stanten. (S. Stanten 38:13-39:1; Lee: 84:9-20) After what Dr. Stanten himself called "a very thorough" review, that included interviews of the medical personnel involved in the cases, Dr. Lee found *no patient care issues* with any of the four cases. (S. Stanten 75:5-13; 99:7-15; Lee 14:4-17; 84:9-20; 79:14-80:10)

Unsatisfied with the result of Dr. Lee's review, Dr. Stanten took the cases straight to the SPRC, bypassing the nurse, physician and CTSPRC level reviews, contravening ABSMC's own standard procedures. (Barkin 77:16-78:2; Paxton 71:4-17) The SPRC then made two unprecedented decisions. First, it decided not to accept Dr. Lee's conclusion that the cases

---

[4] Excerpts from deposition transcripts are attached as exhibits to the Sweet Declaration.

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT    Case No. C 07-2486 WHA

1    presented no care issues.  The SPRC had never before rejected a cardiac surgeon-reviewer's

2    judgment about a case.  (R. Stanten 111:3-6; S. Stanten: 81:5-24)  Second, the SPRC chose not

3    to determine whether the cases presented any specific care issues, instead sending the matter to

4    Dr. Isenberg and the MEC.  (Sweet Decl., ¶ 21, Ex. R, p.4)  Again, the SPRC had never before

5    forwarded a case to the MEC (most of whom were not surgeons and none of whom was a cardiac

6    surgeon) without making a care determination.  (R. Stanten: 113:8-20; Iverson: 122:6-10)

7        The MEC accepted Dr. Isenberg's recommendation to appoint an AHC to examine Dr.

8    Ennix.  Dr. Isenberg created and governed an AHC that was unfair and preordained to

9    recommend that adverse action be taken against Dr. Ennix.  ABSMC's own rules state that peer

10   review must be conducted by physicians "practicing in the same general specialty, and with

11   similar and/or related training and experience as the individual under review."  (Sweet Decl, ¶

12   22, Ex S, p.48)  It was unheard of for ABSMC to conduct a peer review by a body that did not

13   include a like-specialist.  (Paxton 85:24-86:3)  Objective cardiac surgeons and cardiologists from

14   ABSMC's Medical Staff were available to serve on the AHC.  (Paxton 81:7-14)  Yet, Dr.

15   Isenberg appointed no cardiac surgeons or cardiologists to the three-member AHC.

16       Instead, Dr. Isenberg stacked the AHC with (1) a vascular surgeon, Dr. Paxton, who was

17   a close friend of Steven Stanten[5] and who, as a member of the SPRC, had already acted

18   consistent with Dr. Isenberg's wishes – for further review of Dr. Ennix (Paxton 14:17-15:7; 44:6-

19   45:3; Sweet Decl., Ex. R); (2) an anesthesiologist who participated in one of the surgeries under

20   scrutiny (Ly 11:8-9; 74:23-75:6); and (3) a pulmonologist with no background in surgery, much

21

22   _____
         [5] The description of the power brokers at ABSMC as a "club" of white, male physicians
23   is not hyperbole.  The majority of the key decision makers regarding Dr. Ennix's punishment are
     a close-knit group of exclusively white, male friends.  Drs. Russell and Steven Stanten are
24   brothers.  (R. Stanten: 16:19-24)  Russell Stanten and Dr. Iverson were business partners for over
     10 years until Dr. Iverson retired.  (R. Stanten: 5:9-14)  Dr. Iverson was acquainted with the
25   Stanten's father, and has known Russell Stanten since he was a teenager.  (Iverson Depo: 41:24-
     41:25)  Drs. Iverson and Moorstein are close friends.  (Iverson:  154:13-24)  Dr. Moorstein
26   played the lead role in ABSMC's use of outside reviewers to eliminate another minority surgeon
     – the only other surgeon subjected to outside review.  ("Physician H" Decl., ¶¶ 10-14.)  Dr.
27   Paxton is a close friend of Dr. Steven Stanten.  (Paxton 44:6-45:3; S. Stanten: 244:1-11)  All of
     these doctors are white men.  All of them golf together.  (Iverson: 43:2-11; 154:3-12; S. Stanten:
28   244:1-11; 247:15-20.)

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT        Case No. C 07-2486 WHA

1  less cardiac surgery, who did not practice at Summit, and who serves on the Board of Directors

2  of ABSMC with Dr. Isenberg, the body that might ultimately be called on to decide Dr. Ennix's

3  fate. (Horn 13:13-15; 15:16-17; 10:18-23; 24:1-10; 25:20-26:10)

4      Ignoring the proper role of a Chief of Staff in an investigative process, Dr. Isenberg

5  attended every AHC meeting and actively participated in its investigation. (Isenberg 118:15-18;

6  Spiritus Decl., ¶ 4, Exs. B, C) As expected given its members' lack of expertise in cardiac

7  surgery, the AHC concluded by its second meeting that it needed help from an outside cardiac

8  surgery expert. (Paxton 120:9-13; Sweet Decl., ¶ 26, Ex. W, p.1) After many months, and

9  without meeting with Dr. Ennix, the AHC sent the four MIV cases to an outside peer review

10  company, the NMA, and also sent to the NMA six more of Dr. Ennix's cases – all involving

11  deaths, and all previously reviewed and cleared of standard of care issues by the CTSPRC.

12  (Ennix Decl., ¶ 5; Iverson: 67:18-24)

13      As Dr. Isenberg desired, the NMA returned a scathing report. Based on that report and a

14  demonstrably false allegation that Dr. Ennix had failed to make rounds on a post-operative

15  patient, Dr. Isenberg summarily suspended Dr. Ennix. (Isenberg 220:18-223:1; Sweet Decl., ¶

16  27, Ex. X) At this point, the AHC still had not interviewed Dr. Ennix. (Ennix Decl., ¶ 7) To

17  maintain some source of income, Dr. Ennix requested, and the MEC agreed, that he at least be

18  allowed to assist other surgeons during the remaining duration of his peer review. (Ennix Decl.,

19  ¶ 6) Dr. Ennix submitted to the MEC reviews of the ten cases by nationally renowned cardiac

20  surgeons Dr. Bruce Reitz of Stanford and Dr. Bruce Lytle of the Cleveland Clinic, among others,

21  who cleared the ten cases of standard of care issues. (Zapolanski Decl., ¶¶ 4-6, Exs. B, C; Lee

22  74:24-75:9) Dr. Ennix also submitted reports by medical statisticians debunking the bogus

23  statistics the NMA and the AHC offered to justify their conclusions. (Ennix Decl., ¶ 8; Sweet

24  Decl., ¶¶ 36-37, Exs. GG, HH; *see* Weintraub Decl., ¶ 3, Exs. A, B)

25      Ultimately, the MEC reinstated Dr. Ennix's privileges with a requirement that he operate

26  only with proctors present. After observing 29 of his cases, the proctors unanimously

27  recommended removal of the proctorship requirement. (Paxton 221:23-222:18; Sweet Decl.

28  ¶ 28, Ex. Y) ABSMC rejected the proctors' recommendation – something ABSMC had never

7

1  done before, stating that twenty-nine cases were insufficient, even though brand new surgeons at

2  ABSMC only have proctors oversee about 10 to 15 cases before proctorship is no longer

3  required.  (Paxton 223:17-224:17; R. Stanten: 187:15-188:4; Sweet Decl., ¶ 34, Ex. EE

4  [Response to Interrogatory No. 12])

5       In stark contrast to the NMA's scathing report, the California Medical Board's

6  subsequent review found only three minor issues in all of the ten cases and concluded "[t]here is

7  no evidence whatsoever, in these reviewed cases, that the conduct of Dr. Ennix preoperatively,

8  intraoperatively, or postoperatively, has violated the standard of practice in cardiac surgery."

9  (Ennix Decl., ¶ 13, Ex. C)  The Medical Board closed the case without taking any action against

10  Dr. Ennix.  (*Id.*)  The entire peer review process lasted over two years and caused Dr. Ennix a

11  substantial loss of income, irreparable damage to his reputation and practice, and significant

12  emotional distress.  (Ennix Decl., ¶ 9)

**ARGUMENT**

13

14  I.  **DR. ENNIX HAS RAISED TRIABLE ISSUES OF FACT REGARDING
        WHETHER ABSMC TOOK ADVERSE ACTIONS AGAINST HIM BECAUSE
15      OF HIS RACE.**

16       To evaluate a case of race discrimination under section 1981, courts apply a burden-

17  shifting scheme based on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

18  First, a plaintiff must present sufficient evidence to state a prima facie case of race

19  discrimination.  *Lindsey, supra*, 447 F.3d at 1144.  The elements of a prima facie case under

20  section 1981 are that (1) the plaintiff is a member of a protected class, (2) the plaintiff attempted

21  to contract for certain services, and (3) the plaintiff was denied the right to contract for those

22  services; (4) such services remained available to similarly-situated individuals who were not

23  members of the plaintiff's protected class.  *Id*. at 1145.

24       If the plaintiff satisfies the initial burden of establishing a prima facie case of racial

25  discrimination, the burden shifts to the defendant to prove it had a legitimate non-discriminatory

26  reason for the adverse action.  *Id.*  If the defendant meets that burden, the plaintiff must prove

27  that such a reason was merely a pretext for intentional discrimination.  *Id.*  A court must deny

28  summary judgment if a plaintiff raises a triable issue of fact regarding any of the elements of the

8

prima facie case or whether the defendant's proffered reason for its actions is a pretext for discrimination. *Id.* at 1144.

### A.    Dr. Ennix Has More Than Sufficient Evidence To State A Prima Facie Case Of Race Discrimination.

ABSMC concedes that, in section 1981 cases, "Courts apply the analysis set forth in" *McDonnell Douglas*. (MSJ at 10:10-11.)  Inexplicably, ABSMC then ignores the four-element test for determining if a plaintiff has established a prima facie case.   Rather, ABSMC argues only that Dr. Ennix "has no direct evidence of discriminatory intent" by the individuals involved in his peer review process, asserting that his evidence therefore is "wildly insufficient to avoid summary judgment." (MSJ at 10-13, 11:7, 12:16.)  But as *McDonnell Douglas* and its progeny make clear, a plaintiff need not offer direct evidence of race discrimination to survive summary judgment, let alone to state a prima facie case.   *See Lindsay*, *supra,* 447 F.3d at 1144.

The proof required to establish the four elements of a prima facie case is "minimal"; in fact, "it does not even need to rise to the level of a preponderance of the evidence." *Id.*; *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000).  Dr. Ennix easily meets this burden.  First, as an African American, Dr. Ennix is a member of a protected class.  Second, as described in Section II below, Dr. Ennix had relevant contracts with ABSMC and his patients.  Third, ABSMC's unjustified and unfair peer review process interfered with Dr. Ennix's ability to practice medicine at ABSMC pursuant to his medical staff privileges and his agreements to treat patients.  Finally, similarly-situated individuals who were not members of Dr. Ennix's protected class – namely, all other cardiac surgeons with privileges at ABSMC (Barkin 28:23-25) – continued to enjoy unfettered Medical Staff privileges at ABSMC, despite the fact that several of them had worse mortality rates than Dr. Ennix and experienced similar or more significant complications.  Thus, Dr. Ennix meets the four elements of a prima facie case for racial discrimination under Section 1981.  See *Lindsey*, 474 F.2d at 1145.

### B.    Dr. Ennix Has Raised Triable Issues Regarding The Legitimacy Of ABSMC's Claimed Reasons For Harming Dr. Ennix.

This Court must deny summary judgment if Dr. Ennix raises a genuine issue of material fact as to whether ABMSC's stated motivation for its actions is merely a pretext for intentional

9

discrimination.  "[A] plaintiff may raise a genuine issue of material fact as to pretext via (1) direct evidence of the employer's discriminatory motive or (2) indirect evidence that undermines the credibility of the employer's articulated reasons." *Noyes v. Kelley Services*, 488 F.3d 1163, 1170-71 (9th Cir. 2007) (emphasis added).  "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 147 (2000).  Thus, a plaintiff who offers evidence that undermines the credibility of the employer's articulated reasons will survive summary judgment, even if the plaintiff offers no "direct evidence" of discriminatory motive.  Further, the evidence a plaintiff used in establishing a prima facie case may be considered when examining pretext.  *Lindsey*, 474 F.2d at 1148.

ABSMC attempts to hold Dr. Ennix to a higher evidentiary burden, asserting that a reason "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason," citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  (MSJ at 14:4-6.)  ABSMC misreads *St. Mary's Honor*, which, unlike the present case, did not involve a plaintiff's burden at the summary judgment stage. *Noyes*, 488 F.3d at 1170-71.

Dr. Ennix easily meets the properly stated burden, because he has extensive evidence that undermines ABSMC's alleged motivation, "a concern for patient safety."  (MSJ at 13:15.)  This evidence includes the following:  (1) ABSMC's conduct was inconsistent with its proffered motivation; (2)  ABSMC used irregular and in many instances improper procedures in evaluating Dr. Ennix; (3) ABSMC treated Dr. Ennix – the only African American cardiac surgeon at ABSMC – more harshly than it treated his white colleagues; (4) ABSMC manipulated Dr. Ennix's peer review process to obtain a particular result; (5) the minor (at most) standard of care issues present in the ten cases under review could not reasonably justify ABSMC's harsh treatment of Dr. Ennix; and (6) ABSMC consistently holds physicians of color to higher standards and subjects them to harsher treatment than Caucasian physicians.  In light of this evidence, the Court must deny summary judgment and allow the myriad factual questions of witness credibility and ABSMC's motivation to go to a jury.

1

**1.    ABSMC Acted Inconsistently With Its Proffered Motive Of Protecting Patient Safety.**

2

**a.    Normal AMSMC Peer Review Of Dr. Ennix Raised No Concerns About Patient Safety.**

3

4        ABSMC cites safety concerns relating to ten of Dr. Ennix's cases.  As to six of those

5    cases, ABSMC's established peer review process – reviews by a nurse, a physician, and finally

6    the CTSPRC if necessary – had "closed" them, having found no issues of patient safety as to Dr.

7    Ennix's practice.  (Ennix Decl. ¶ 5; Iverson: 67:18-24)  The other four cases involved the

8    relatively new MIV technique.  As to these cases, ABSMC employed an unusual and

9    unprecedented review process.  As described above, ABSMC chose a respected cardiac surgeon

10    on staff, Dr. Hon Lee, to examine those cases, but rejected his report when Dr. Lee concluded

11    that the cases presented *no patient care issues* (Lee: 24:16-25:1), instead sending the cases on to

12    the SPRC for further review.

13        As explained above, no cardiac surgeon other than Dr. Ennix has ever been subjected to

14    additional peer review (much less the lengthy, tortured peer review process to which Dr. Ennix

15    was subjected) after having his cases cleared for care issues by an in-house, cardiac surgeon

16    reviewer.  In fact, no surgeon of any kind (other than Dr. Ennix) has ever been brought even to

17    the level of the SPRC after having his cases cleared for care issues by an in-field expert.

18    (S. Stanten: 81:5-24; R. Stanten 111:3-6; Paxton 71:4-17.)

19

**b.    ABSMC Ignored Other Issues That Threatened Patient Safety, Focusing Only On Dr. Ennix.**

20        If ABSMC's concern was to address patient safety relating to MIV procedures, then it

21    would have examined all those procedures, not just those performed by Dr. Ennix.  After all, the

22    first MIV cardiac surgery performed at ABSMC had one of the same "complications" ABSMC

23    cited to criticize Dr. Ennix – the surgeons abandoned the MIV procedure mid-operation and

24    converted to a standard, open-chest approach.  (Iverson 86:24-87:9)  But ABSMC did nothing to

25    reexamine that case.

26        Also, during the review of Dr. Ennix's cases, a number of surgeons noted systemic issues

27    at the hospital that should be addressed to improve patient safety.  For example, Dr. Lee

28    recommended that a multidisciplinary group be convened to evaluate the processes surrounding

1    MIV cardiac surgeries.  (Sweet Decl., Ex. R, p.3)  ABSMC did nothing to follow up on this

2    recommendation.  (R. Stanten 104:15-20; Barkin 44:22-48:6)

3        Even the hired guns ABSMC retained to examine Dr. Ennix identified a number of

4    systemic issues they said would improve outcomes in the cardiac surgery program.  (Paxton

5    Decl., Ex. A, App. A, pp. 32-33)  ABSMC failed to heed the patient safety warnings from their

6    paid experts.  (R. Stanten 207:21-208:22; 214:8-215:10; S. Stanten 145:7-146:23; Barkin 47:22-

7    48:6) In addition, in each of the ten cases used to criticize Dr. Ennix, ABSMC failed to conduct

8    additional peer review of (and in most cases failed to even interview) any of the other

9    responsible members of the operating team, even if those other team members were criticized by

10   the NMA.  (See, e.g., Paxton Decl., Ex. A [NMA report] at pp. 10 and 32 re case 007; Sweet

11   Decl. ¶ 34, Ex. EE [Response to Interrogatory No. 15])

12        ABSMC criticized Dr. Ennix for not engaging in extensive training personally and with

13   operating room personnel before beginning these procedures.  However, ABSMC did nothing to

14   require this of other cardiac surgeons, even after problems with the MIV procedure came to light.

15   (R. Stanten 66:18-67:10)   Moreover, the other cardiac surgeons who did these procedures before

16   and after Dr. Ennix undertook a level of planning and preparation consistent with that engaged in

17   by Dr. Ennix.  (Lee 16:4-17:15; Iverson  88:4-89:17; Ennix Decl., ¶ 3.)

### c.    ABSMC Ignored Evidence That Other Cardiac Surgeons Posed More Of A Risk To Patient Safety Than Dr. Ennix.

19        ABSMC used a slice of skewed and unreliable statistical data to claim that Dr. Ennix

20   posed a risk to patients.  But ABSMC had at its fingertips valid data that showed that Dr. Ennix's

21   mortality rate during the period in question was almost exactly at the state norm, and was *better*

22   than his Caucasian peer, Dr. Iverson.

23        As is true with all hospitals in California at which cardiac surgeries are performed,

24   ABSMC kept statistics about the mortality rates of its surgeons and reported them to the

25   California Office of Statewide Health Planning and Development's Coronary Artery Bypass

26   Graft Surgery Reporting Program ("CCORP").  The CCORP program puts the data through a

27   rigorous statistical analysis and adjusts it for risk factors, such as patient age and health.

28

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT        Case No. C 07-2486 WHA

(Weintraub Decl., ¶ 5; R. Stanten 183:13-18)  CCORP's analysis showed that Dr. Ennix's risk-adjusted mortality rate during 2003 and 2004 at ABSMC was 4.79, well within the acceptable range statewide.  (Weintraub Decl., ¶ 5; Sweet Decl., ¶ 29, Ex. Z)  The data also showed that Dr. Ennix's peers had similar mortality rates, but that at least one Caucasian peer had a risk-adjusted mortality rate at ABSMC of 6.45, *over 34 percent higher than Dr. Ennix*.  (*Id*.)

However, when ABSMC provided data to the NMA for its review of Dr. Ennix, it did not provide this accurate, regularly-collected data.  Instead, it provided the NMA with a portion of invalid statistics showing Dr. Ennix had a significantly higher mortality rate than his peers, ignoring NMA's request for more complete, risk-adjusted statistics.  (Smithline 149:19-150:6; 158:23-160:2)  The AHC used this same bogus untested data to criticize Dr. Ennix.  (Paxton Decl., Ex A [AHC report], p. 14)

Three cardiac surgeons at ABSMC, Drs. Lee, Kahn and Russell Stanten called the statistics that ABSMC used to "get" Dr. Ennix into question.  (Paxton 145:1-9; 159:5-10; Horn Depo. 216:2-9)  Dr. Ennix provided ABSMC with an expert report disputing the significance of ABSMC's statistics.  (Ennix Decl., ¶ 8; Sweet Decl., Exs. GG, HH)  Finally, ABSMC's own hired outside experts were asked to render an opinion regarding these statistics and curiously refused to do so even after hiring their own statistics expert.  (Smithline 186:24-188:22)  ABSMC's "cherry picking" of flawed data in order to condemn Dr. Ennix – especially when it had better, reliable data at its disposal – shows that ABSMC's concern was not any objective danger to patients, but a subjective desire to "get" one particular doctor. (Weintraub Decl., ¶ 5, Exs. A, B)

### 2.    ABSMC Employed Irregular And Improper Procedures In Its Evaluation Of Dr. Ennix.

#### a.    Manipulation Of The Initial Peer Review Process

As explained above, the established process for peer review has many layers.  Regarding the four MIV cases Dr. Ennix performed, ABSMC conducted peer review in a manner contrary to this normal, balanced process.  It never had the four cases reviewed by the quality control nurse of the CTSPRC.  Instead, Drs. Isenberg and Steven Stanten had Dr. Hon Lee review the

1  four cases outside of the CTSPRC process.  When Dr. Lee concluded that the cases presented no

2  care issues, Dr. Steven Stanten, who is *not* a cardiac surgeon, decided to have the SPRC review

3  the cases.  No other cardiac surgeon has ever had his or her cases reviewed by the SPRC after a

4  cardiac-surgeon reviewer had cleared them.  (R. Stanten 111:3-6; S. Stanten: 81:5-24)

5       In evaluating Dr. Ennix's performance on the four cases, the SPRC chose not to even

6  hear from Dr. Lee, contrary to the Committee's standard practice.  (Paxton 65:13-66:13; 91:19-

7  92:13.)  The SPRC also chose not to accept Dr. Lee's review, and decided to send the cases to

8  Dr. Isenberg and the MEC without making a determination about care.  Both these decisions

9  were unprecedented.  (Iverson: 121:3-21; R. Stanten 111:3-6; S. Stanten 81:5-24)

10      ABSMC's Rules and Regulations state:  "For the purpose of the peer review program, a

11  peer reviewer shall be defined as a member of the medical staff, in good standing, practicing in

12  the same general specialty, and with similar and/or related training and experience as the

13  individual under review."  (Sweet Decl., Ex. S, p. 48)  Thus, for cardiac surgeons, a peer

14  reviewer would be a member of the ABSMC medical staff who is a practicing cardiac surgeon.

15  (Mogg 14:18-24; 72:25-73:6; Isenberg 27:23-28:17; Barkin 41:9-16; Paxton: 85:24-86:3)  If

16  ABSMC's concern was patient safety, it would not have examined these cases at a level so

17  remote from the area of expertise – cardiac surgery – needed to evaluate them properly.

18      ABSMC claims it ignored its own peer review procedures because Dr. Isenberg felt the

19  cardiac surgeons would not be objective in their evaluations because of the process Dr. Isenberg

20  claims he understood the CTSPRC to use in peer review.  Dr. Isenberg claims that the CTSPRC

21  reviewed cases and made determinations about the need for corrective action with the full

22  participation of the surgeon under review, and that this process made the CTSPRC more likely to

23  avoid criticizing the physician being reviewed.  There are three glaring problems with Dr.

24  Isenberg's reasoning:  (1) most fundamentally, it is simply wrong – the CTSPRC policy was *not*

25  to include scrutinized physicians in decisions about those physicians' cases (Iverson 56:4-15;

26  97:11-25; R. Stanten 128:17-132:1); (2) despite his professed concern about the CTSPRC's

27  biased and "soft" process, Isenberg did nothing to change it (R. Stanten 40:8-41:24; Barkin

28  41:11-42:11; 47:22-48:6; Isenberg 34:13-36:18; 182:3-184:18); and (3) Isenberg never looked

14

1  into any other cardiac surgeon's cases reviewed by the CTSPRC.  (Isenberg 37:20-25)

2       The claim that the CTSPRC lacked objectivity is not credible for other reasons.  ABSMC

3  acknowledges that the CTSPRC is fair in how it conducts physician peer review.  (Barkin 47:22-

4  25.)  The CTSPRC operates in the same manner as other Divisions and Departments at Summit.

5  (Barkin 45:18-46:3)  Others familiar with the facts of this case and the CTSPRC's review

6  process do not question the objectivity of the CTSPRC.  (Paxton 40:15-21; Ly 62:10-15; R.

7  Stanten 146:3-24; Iverson 44:15-45:6)

8              **b.    Manipulation Of The Ad Hoc Committee Process**

9       ABSMC used Dr. Isenberg's pretense of claiming that Dr. Ennix's colleagues were not

10  objective to reject Dr. Lee's findings and create a reason to appoint an AHC.  Given that peer

11  reviewers of cardiac surgeons should, by ABSMC's own rules, be cardiac surgeons, it is

12  revealing that Dr. Isenberg did not put *one* cardiac surgeon on the AHC even though objective

13  cardiac surgeons were available to serve.  (Paxton 81:7-14).  Nor did he appoint a cardiologist.

14  Nor did he appoint truly independent physicians.

15       Instead, Dr. Isenberg hand-picked (1) Dr. Lamont Paxton, a vascular surgeon who, as a

16  member of the SPRC, had already agreed to Dr. Isenberg's chosen course –further review of Dr.

17  Ennix; (2) Dr. Dat Ly, an anesthesiologist who participated in one of the MIV surgeries under

18  scrutiny and who therefore was ineligible to sit on the AHC under ABSMC's own peer review

19  rules; and (3) Dr. Barry Horn, a pulmonologist with no background in surgery, much less cardiac

20  surgery, who did not practice at Summit, and who serves on the Board of Directors of ABSMC

21  with Dr. Isenberg, the body that might ultimately be called on to decide Dr. Ennix's fate.[6]  (See

22  evidence cited on pp. 6-7 above; see also Horn 33:17-22)   It is the objectivity of these AHC

23  members, not the CTSPRC and its cardiac surgeons, that is suspect.    No reasonable medical

24  officer could appoint such an AHC if he truly were looking for an unbiased, informed,

25  professional opinion of the care provided by a cardiac surgeon.  (Spiritus Decl., ¶ 4, Exs. B, C)

26       There are two reasons Dr. Isenberg chose these committee members.  First, he wanted to

27  _____

[6] ABSMC admits that a Board Member should not serve on an AHC.  (Jellin 101:4-16)

28

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT       Case No. C 07-2486 WHA

1   control the process, as is shown by the fact that he – often with the Medical Staff's attorney –

2   attended every single meeting of the AHC.  (Paxton 102:7-11; Ly 51:13-15; Isenberg 118:15-18)

3   Moreover, Dr. Isenberg did not simply observe the AHC meetings; he was an active participant.

4   He suggested which witnesses to interview.  (Paxton 100:3-10)  He selected the cases to be

5   reviewed by the AHC and the outside reviewer.  (Ly 85:11-18; 241:12-13)   With Dr. Paxton, he

6   drafted the cover letter to NMA requesting focus on specific issues, pointing out the care

7   concerns he wanted the NMA to highlight in its report.  (Isenberg 59:6-10; Paxton 174:3-12;

8   Sweet Decl., ¶ 31, Ex. BB)  Dr. Isenberg wrote and edited the AHC Final Report with Dr.

9   Paxton.  (Paxton 198:8-24; Horn 111:1-112:7; Ly 27:19-24)  He even interviewed a witness

10  outside the confidential structure of the AHC, the results of which he then reported to the AHC.

11  (Paxton 186:22-187:21)  Finally, Dr. Isenberg was an active participant in questioning witnesses

12  at the AHC, including being the main examiner of Dr. Ennix.  (Ennix Decl. ¶ 7.)  Dr. Isenberg's

13  presence affeced the AHC decisions, and inhibited open discussion and exchange of disparate

14  opinions.  (Horn 100:22-101:6; 101:20-102:4)[7]

15      Second, Dr. Isenberg knew that the only way he could obtain "cover" for punishing Dr.

16  Ennix was to have cardiac surgeons criticize him.  He also knew that he would not be able to

17  control the opinions of any of the cardiac surgeons performing surgery at ABSMC because none

18  of them had found fault with Dr. Ennix's patient care.  He also knew that when ABSMC sought

19  to punish other minority physicians in the past it paid an outside review company to do its

20  bidding.  So Dr. Isenberg made the retention of outside reviewers inevitable by staffing the AHC

21

22      [7] The opportunity for manipulation by Dr. Isenberg was clear from the outset.  Prior to the first meeting of the AHC, Dr. Isenberg told Dr. Horn (his colleague on the Board of Directors) that Dr. Paxton would Chair the AHC.  (Horn 97:20-98:1)  Neither Dr. Ly nor Dr. Paxton were similarly informed, and were put through a ruse of voting for the Chair position at the first meeting.  (Paxton 103:3-7; Ly 98:16-99:19)  Further, Dr. Ly had extensive experience working with Dr. Ennix.  He had participated in approximately 50 cardiac surgeries with Dr. Ennix (including one under review).  (Ly 52:6-53:4; 79:10-13; 79:20-81:16)  At the September 20, 2004 AHC meeting, the AHC asked Dr. Ly his opinion of Dr. Ennix's patient care abilities. Drawing on his experience with Dr. Ennix and after reviewing all of the AHC materials, Dr. Ly voiced a favorable opinion regarding Dr. Ennix's surgical practice and stated no patient care criticisms.  (Ly 125:14-126:23)  Although he did not participate in writing or editing the Final Report, Dr. Ly dutifully signed it, espousing the opposite views. (Ly 29:24-30:3)

23

24

25

26

27

28

1  with no experts in cardiac surgery.  Dr. Isenberg was contemplating this scenario *months before*

2  *the AHC first met*.  (Sweet Decl., ¶ 32, Ex. CC; Isenberg 143:14-144:4)  The ploy worked.  In its

3  second meeting, before interviewing even one cardiac surgeon, the AHC concluded that it

4  needed help from an outside reviewer.  Dr. Isenberg and the lawyer had the perfect hired gun in

5  mind, a company ABSMC had recently used to "get" another minority physician. (Hernaez

6  Decl., Ex. F, p. 8 [Physician I]; Isenberg 52:14-21; 54:22-55:21; 92:7-10)

7              **c.        Manipulation Of The Review By National Medical Audit.**

8        Also revealing is the process by which ABSMC utilized NMA and oversaw its work.   If

9  ABSMC wanted a truly objective review of Dr. Ennix's practice, it could have sent the NMA a

10  random sampling of Dr. Ennix's cases.  Instead, ABSMC hand-picked only cases involving

11  patient deaths (along with the four MIV cases, even though Dr. Ennix had already agreed not to

12  do any more MIV surgeries), and forwarded them to the NMA with a letter telegraphing the

13  specific concerns ABSMC wanted the NMA to raise in its report.  (Sweet Decl., Ex. BB)

14        The NMA took five months to review Dr. Ennix's cases and prepare its final report.

15  (Smithline 37:18-22)  The author of the report, Dr. Neil Smithline, never practiced surgery, much

16  less cardiac surgery.  (Smithline 13:19-16:20)  Although he sought input from cardiac surgeons,

17  it was Dr. Smithline, not the cardiac surgeons who wrote the report, including the language most

18  critical of Dr. Ennix.  (Smithline 69:16-70:5; 251:16-18)  The cardiac surgeons who reviewed the

19  cases simply performed a chart review and filled out an on-line questionnaire.  They had no

20  contact with NMA and were unaware whether their remarks were altered.  The NMA's

21  interviews of Dr. Ennix played no role in the cardiac surgeon's reviews since the interviews

22  occurred after their questionnaires had been submitted.  They did not read, edit or sign the final

23  report.[8]  (Smithline 69:16-23; Housman 30:22-32:8; 34:8-17; 35:10-12; 35:24-36:4; 58:24-59:13;

24  59:25-60:24; 61:2-9; 62:25-63:5; 117:3-10)  Dr. Smithline's criticisms of Dr. Ennix were

25

26        [8] The only surgeon from California used by the NMA, Dr. Leland Housman, had among
   the worst risk-adjusted cardiac surgery mortality rates in the state during the relevant time period
27  (7.66, compared with Dr. Ennix's rate of 4.79) and has since stopped performing cardiac surgery.
   (Sweet Decl., Ex. Z; Housman 41:10-14)

28

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT        Case No. C 07-2486 WHA

preordained, as the following facts demonstrate:

- The NMA did not interview any of the people involved in any of the ten cases, other than Dr. Ennix, and it did not interview Dr. Ennix until many weeks into its work. (Smithline 128:10-15; 311:14-16)

- In one of the earliest drafts of his report, before he obtained full input from the cardiac surgeons, before he obtained any input from the cardiologist and the statistician that he had hired, many weeks before the NMA talked with Dr. Ennix, and nine weeks before Dr. Smithline wrote the final report, Dr. Smithline wrote the report's headings concluding that Dr. Ennix's poor judgment had led to patient deaths. (Smithline 244:22-245:24: 247:23-248:9; 296:17-24; 311:14-16; Paxton Decl., Ex. A)

- Over two weeks before the NMA interviewed Dr. Ennix, Dr. Smithline wrote the most caustic criticism in the entire report: "If these patterns of [Dr. Ennix's] care go uncorrected, it is likely that there will be future patient harm," a conclusion that remained unchanged in the final report. (Smithline 311:14-312:20; Paxton Decl., Ex. A [NMA report], p. 31)

- While writing his report, Dr. Smithline was in constant contact with Dr. Isenberg and the Medical Staff's attorney, Harry Shulman. In fact, Dr. Smithline agreed to have the NMA interview Dr. Ennix only after Mr. Shulman made clear that the interviews could help Mr. Shulman be prepared for a hearing down the road involving Dr. Ennix. (Smithline 218:8-219:22)

- Dr. Smithline – the supposedly independent expert – sent a draft of his report to Dr. Isenberg and Mr. Shulman to review before finalizing the report, and even included additional critical comments at Dr. Isenberg's urging. (Isenberg 124:3-126:5; Smithline 313:5-315:18)

### d.    The End Result:  Unfair Adverse Actions.

After manipulating the peer review process to obtain the opinions he sought, Dr. Isenberg wasted no time in taking harsh adverse actions against Dr. Ennix. Before he even shared the NMA's report with the body charged with reviewing it – the AHC – Dr. Isenberg summarily suspended Dr. Ennix. He based his decision on the unvetted NMA report and on a demonstrably false allegation that Dr. Ennix had failed to see a patient post-operatively – the nurses on duty told Dr. Isenberg that Dr. Ennix had in fact seen the patient. (Sweet Decl., Ex. X; Paxton 182:23-183:10) He lifted the summary suspension only after Dr. Ennix agreed to limit his practice to surgical assisting while the AHC finished its work.

Subsequently the AHC concluded that Dr. Ennix could resume practice as a lead surgeon

18

but should have proctors monitor his work.  After observing 29 surgeries over many months, the proctors unanimously concluded that ABSMC should lift the proctoring restriction.  (Paxton 221:23-222:18; Sweet Decl., Ex. Y)  But that was not good enough for Dr. Isenberg.  He, along with Drs. Steven Stanten and Paxton (but without the input of a single cardiac surgeon), decided to reject the proctors' recommendation.  (Paxton 223:17-224:17)  ABSMC had never done anything like this before.  (Sweet Decl., Ex. EE [Response to Interrogatory No. 12])  Dr. Isenberg claimed it was necessary because the proctors had not observed enough cases, but they had observed about twice the number of cases proctors at ABSMC observe for brand new cardiac surgeons.  (R. Stanten: 187:15-188:4)

### 3.    ABSMC Treated Dr. Ennix More Harshly Than His White Colleagues.

"Evidence that one or more similarly situated individuals outside of the protected class received more favorable treatment can constitute sufficient evidence of discrimination" for a discrimination plaintiff to prevail.  *Beck v. United Food and Commercial Workers Union, Local 99*, 506 F.3d 874, 883 (9th Cir. 2007) (citations omitted).  "Such a showing of disparate treatment raises an inference of discrimination 'because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'" *Id.*; citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978) (emphasis added).  "[W]hether two employees are similarly situated is ordinarily a question of fact." *Id.* at 885, n. 5.  As stated above, no cardiac surgeon has ever been subjected to AHC, MEC or outside peer review.   Indeed, other than Dr. Ennix and "Physician H," no surgeon of any type has had their cases reviewed by the SPRC when a surgeon peer reviewer had "cleared" those cases.  Further, several of Dr. Ennix peers experienced similar complications and had mortality rates worse than Dr. Ennix's for the same time period, but ABSMC did not investigate them or subject them to any sort of heightened review.  (R. Stanten: 65:8-22; 66: 7-17; 71:14-72:4; 76:24-77:9; 79:13-18; 96:14-97:23; Lee: 20:23-21:6; 32:7-23; 100:25-102:11) This evidence demonstrates disparate treatment of similarly situated Caucasian physicians, requiring the Court to deny summary judgment.

1    The crux of ABSMC's argument regarding disparate treatment seems to be that, because

2    "the 'similarly situated' analysis is very difficult to apply in a peer review context because of the

3    large number of relevant variables," Dr. Ennix cannot compare himself with his white

4    colleagues.[9]  (MSJ at 15:27-16:1.)  Specifically, ABSMC cites the following "egregiously

5    serious factors" that "distinguish Plaintiff's peer review": (a) Dr. Ennix's "deficiencies while

6    performing the MIV Procedures;" (b) "the performance concerns expressed by Dr. Ennix's own

7    experts, Dr. Lee and the Medical Board of California;" and (c) Dr. Ennix's "elevated mortality

8    rate relative to other cardiac surgeons at the Summit Campus."  (MSJ at 16:3-8.)

9    However, none of these "factors" stands up under scrutiny.  First, the only ABSMC

10   "peer" to review Dr. Ennix's MIV cases – Dr. Lee – found no care issues in those cases, much

11   less any issues that would distinguish Dr. Ennix from his peers.  In addition, the evidence shows

12   that Dr. Ennix was not alone in experiencing complications while performing MIV procedures;

13   indeed, Drs. Iverson and Khan, who attempted the first such procedure at Summit, had to abort it

14   and convert to traditional approach.  (Iverson 84:15-86:10)

15   Second, despite ABSMC's lengthy but unsuccessful attempt to question the opinions of

16   Dr. Bruce Reitz, an acknowledged giant in the field of cardiac surgery, Dr. Reitz concluded that

17   none of the ten cases raised a legitimate patient care concern; the same is true of another icon in

18   the field, Dr. Bruce Lytle from the Cleveland Clinic.[10]  (Zapolanski Decl., ¶¶ 4-5, Exs. B, C; see

19

20   ───────────────────

     [9] ABSMC's reliance on slip opinions from other district courts for its narrow construction
21   of "similarly situated" is unavailing.  (MSJ at 15-16.)  The Ninth Circuit has not adopted such a
     limited interpretation.  *See Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 660 (9th Cir.
22   2002) (citing with approval the Second Circuit's opinion in *McGuinness v. Lincoln Hall*, 263
     F.3d 49, 53-54 (2d Cir.2001) as "explaining [the] minimal showing necessary to establish co-
23   workers were similarly situated").

24   [10] The only expert that Dr. Ennix had examine the cases who came up with any care
     concerns found no issues in nine of the ten cases.  (Sweet Decl. ¶ 24, Ex. U.)  That cardiac
25   surgeon, Dr. Don Hill, found but *one* departure from the standard of care in *one* case, but found
     the problems in that case to be attributable to "communication" and "systems" issues.  (*Id.*)
26   Moreover, Dr. Hill found:  "Repeatedly in these ten cases the issues that are being used as being
     below the standard of care for the community are speculative, subjective and judgmental in their
27   conclusions." (*Id.*)  Dr. Hill's comments hardly support ABSMC's suggestion that Dr. Ennix
     cannot be compared to his peer because of "egregiously serious factors."

28

───────────────────

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT        Case No. C 07-2486 WHA

1  Lee 74:24-75:9)  In fact, every cardiac surgeon at ABSMC has faced the same types of

2  complications and suffered the same unfortunate outcomes that Dr. Ennix experienced in the ten

3  cases.  Indeed, had the California Medical Board found any "egregiously serious factors," it

4  surely would not have closed the case and found "no evidence whatsoever, in these reviewed

5  cases, that the conduct of Dr. Ennix preoperatively, intraoperatively, or postoperatively, has

6  violated the standard of practice in cardiac surgery."  (Ennix Decl., ¶ 13; Ex. C)

7      Finally, as discussed above, the evidence demonstrates that ABSMC misused statistics  to

8  fabricate Dr. Ennix's alleged "elevated mortality rate relative to other cardiac surgeons."

9      Dr. Ennix has offered substantial evidence that ABSMC treated him more harshly than

10  his Caucasian colleagues.  None of ABSMC's "factors" distinguishing Dr. Ennix is credible.  At

11  a minimum, Dr. Ennix has raised triable issues of fact regarding this issue.

12          **4.      ABSMC Has A Long History Of Subjecting Physicians Of Color To
              Higher Standards And Harsher Treatment Than Caucasian
13            Physicians.**

14      Statistical evidence is relevant in this disparate treatment case to determine if ABSMC's

15  treatment of Dr. Ennix "conformed to a general pattern of discrimination against blacks."

16  *McDonnell Douglas,* 411 U.S. at 804-05.  Here, based on a review of those investigated by the

17  MEC since 1992 and the racial makeup of the Medical Staff, a pattern of racial discrimination is

18  clear.  The MEC investigates physicians of color in numbers greatly out of proportion with their

19  representation on the Medical Staff.  (See Sweet Decl., Exs. A-F)  The disparities include:

20      (1)  Physicians of color, and African Americans in particular, are disproportionably

21  investigated by the MEC.  While almost 70% of the Medical Staff is Caucasian, only about 55%

22  of physicians reviewed by the MEC are Caucasian.  In contrast, about 12% of the Medical Staff

23  is African American, but almost 28% of the physicians reviewed by the MEC are African

24  American.  (Sweet Decl., Ex. B)

25      (2)  African American physicians on the Medical Staff face almost *three times the risk* of

26  MEC review than their Caucasian colleagues.  Specifically, 7.69% of the African American

27  physicians on the Medical Staff are investigated by the MEC while only 2.64% of Caucasian

28  physicians face the same fate.  (Sweet Decl., Ex. C)

1    (3)  Physicians of color, and African Americans in particular, are investigated by the

2  MEC almost exclusively for patient care or safety concerns, while Caucasian physicians are

3  much more likely to be investigated for "behavioral issues" or violations of the bylaws.

4  Specifically, of the physicians disciplined by the MEC, 30% of Caucasian physicians were

5  disciplined for standard of care issues, while 100% of African American physicians were

6  disciplined for those reasons.  The remaining 70% of Caucasian physicians were disciplined for

7  behavioral issues or violations of the bylaws.  (Sweet Decl., Ex. D)  In other words, if you are a

8  Caucasian physician, you have less than a one percent chance of having your skill as a physician

9  questioned, but if you are African American, your risk is well over 7%.  (Sweet Decl., Ex. E)

10    (4)  Physicians of color, and African Americans in particular, disproportionably face

11  summary suspension by the MEC: 80% of African American physicians who reach the MEC

12  level are summarily suspended while only 40% of Caucasian physicians are so treated.  (Sweet

13  Decl., Ex. F)

14    The implication of these striking statistics is buttressed by anecdotal evidence from the

15  case of Physician H, which bears striking similarities to Dr. Ennix's.  For example, like Dr.

16  Ennix, Physician H stood out as a highly successful physician of color who brought innovative

17  procedures to ABSMC.  ("Physician H" Decl., ¶¶ 3-9)  Also like Dr. Ennix, ABSMC targeted

18  Physician H for an extensive peer review process, while his two Caucasian partners who worked

19  on similar cases and frequently assisted him were not peer reviewed.  (*Id.*, ¶¶ 10-18)

20  Additionally, Physician H's internal peer review was conducted by doctors outside his specialty,

21  and ABSMC found an obscure outside peer reviewer who they paid to review cases they hand-

22  picked, many of which had already been cleared of care issues.  (*Id.*, ¶¶ 11-16)  Also like Dr.

23  Ennix case, Physician H's peer review appeared to be orchestrated by several key physicians,

24  many of them competitors, and many also players in Dr. Ennix's peer review, identified by name

25  in Physician H's declaration, filed under seal.  (*Id.*, ¶¶ 8-18)

26    Not only is there overwhelming evidence that ABSMC's professed concern for patient

27  safety is untrue, there is substantial evidence that the real reason for ABSMC's mistreatment of

28  Dr. Ennix is the color of his skin.  To put it succinctly, there is more than sufficient evidence for

a jury to determine that if Dr. Ennix were white, ABSMC would never have taken these adverse

actions against him.

## II.    DR. ENNIX HAS CONTRACTUAL RELATIONSHIPS PROTECTED BY 42 U.S.C. SECTION 1981.

ABSMC argues that Dr. Ennix cannot prove a contract cognizable for section 1981

purposes. This argument is absurd on its face, and would render the Federal Civil Rights Act

powerless to redress racial discrimination suffered by doctors of color at the hands of hospitals

where they hold privileges.

The evidence reveals that ABSMC's unjustified and unfair treatment of Dr. Ennix

impaired two types of contractual relationships: First, Dr. Ennix's contractual relationship with

ABSMC to perform services at the hospital, and second, Dr. Ennix's contractual relationships

with his patients to treat them. With respect to the contract with ABSMC, Dr. Ennix agreed to

perform services at ABSMC, follow the Medical Staff's bylaws, and pay the hospital an annual

Medical Staff membership fee. (Ennix Decl., ¶ 10;) ABSMC also received the benefit of the

payments of hospital fees by Dr. Ennix's patients. (Sweet Decl., ¶ 35, Ex. FF [Response to RFP

No. 10]) In consideration of these benefits, ABSMC permitted Dr. Ennix to practice medicine at

its facilities.   (Ennix Decl., ¶ 10) During the summary suspensions, surgical assisting

requirement and proctoring requirement imposed by ABSMC, Dr. Ennix could not enjoy the full

benefits and privileges of that contractual relationship. (Ennix Decl., ¶ 12)

Similarly, during the first summary suspension, Dr. Ennix could not perform surgeries he

had agreed to perform, thus impairing contracts to treat those patients. (Ennix Decl., ¶ 11-12)

Thereafter, ABSMC's restriction to surgical assisting prevented Dr. Ennix from forming any

contracts with patients as lead surgeon, a substantial detriment to what had been a flourishing

cardiac surgery practice. (Ennix Decl., ¶ 12)

ABSMC urges a misguided interpretation of the contract requirement of section 1981,

based on inapposite case law. First, ABSMC cites *O'Byrne v. Santa Monica-UCLA Med. Ctr.*,

94 Cal.App.4th 797, 810 (2001) for the proposition that medical staff bylaws do not "in and of

themselves constitute a contract between a hospital and a physician on its medical staff." (MSJ

at 8:6-10.)  However, in contrast to *O'Byrne*, Dr. Ennix does not argue that the medical staff

bylaws "in and of themselves constitute a contract."  Rather, the contractual relationship arose by

virtue of ABSMC's granting medical staff privileges to Dr. Ennix.  *O'Byrne* expressly did not

address this question.  94 Cal.App.4th at 810.  Further, as this Court noted, the *O'Byrne* court

"did *not* dispute that there was 'an *underlying* contractual employment relationship between the

physician and the hospital supported by valid consideration:  the hospital's promise to employ

the physician under the stated terms and conditions, and his promise to work under those

conditions.'"  (8-28-07 Order re Motion to Dismiss at 13:16-19, emphasis in original.)  Indeed,

courts on both sides of the "bylaws" contract question addressed in *O'Byrne* agree that the

physician-hospital relationship is "contractual."[11]   Finally, ABSMC concedes that its contract

with Dr. Ennix's former partnership, East Bay Cardiac Surgery Center, describes Dr. Ennix as an

"independent contractor" in relation to ABSMC.  (MSJ at 9:16-24.)  Thus, ABSMC cannot

seriously dispute that Dr. Ennix had a contractual relationship with ABSMC.

Second, ABSMC insists that Dr. Ennix's agreements to treat patients do not form

contracts, citing a Massachusetts trial court case for the proposition that patient consent forms

are not enforceable contracts.  Dr. Ennix produced patient consent forms from patients, signed

between May 3 and May 5, 2005, days before ABSMC summarily suspended him the first time.

(Ennix Decl, ¶ 11, Ex. B)  Dr. Ennix does not submit that the patient consents themselves

constitute contracts.  Rather, Dr. Ennix submits the consents as evidence of agreements he had

entered to operate on patients at the time of the first summary suspension, agreements that he

could not fulfill due to ABSMC's unjustified actions.  If one of those patients had paid Dr. Ennix

in advance, and if Dr. Ennix had refused to return the payment when he could not operate, that

patient would have an action for breach of contract.  Conversely, if Dr. Ennix had performed

those surgeries and the patient had failed to pay him for services rendered, Dr. Ennix would send

the bill to collections.  (Ennix Decl., ¶ 11)

---

[11] *See, e.g., Janda v. Madera Community Hospital*, 16 F. Supp.2d 1181, 1185 (E.D. Cal. 1998); *Virmani v. Presbyterian Health Services Corp.,* 488 S.E.2d 284, 287-88 (N.C.App. 1997); *Gianetti v. Norwalk Hospital,* 557 A.2d 1249, 1254-55 (Conn. 1989).

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT      Case No. C 07-2486 WHA

1  In short, ABSMC's insistence that no contract relationship exists between Dr. Ennix and

2  his patients or between ABSMC and Dr. Ennix finds no basis in fact or law.  If nothing else, Dr.

3  Ennix has raised a triable issue of fact regarding this issue.

4  ## CONCLUSION

5  "Intentional discrimination cases such as this one present precisely the kinds of complex

6  factual questions best addressed by juries." *Lindsey*, 447 F.3d at 1153.  That is because,

7  "without a searching inquiry," "those acting for impermissible motives could easily mask their

8  behavior behind a complex web of post hoc rationalizations." *Id.* at 1150 (citation omitted).

9  Here, the cloak of secrecy surrounding medical peer review renders it ripe for abuse.  Dr. Ennix

10  has raised numerous triable issues of fact regarding the credibility of ABSMC's professed

11  motive of "concern for patient care," from its many actions inconsistent with that motive, to its

12  tampering with statistics and extensive meddling in the supposedly "objective" outside review, to

13  evidence of a pattern of harsh treatment of physicians of color.  Accordingly, this Court must

14  deny summary judgment and allow a jury to resolve these factual disputes and decide whether

15  ABSMC's professed motive was but a pretext for discrimination.

16

17  Dated:  March 27, 2008                Respectfully Submitted,

18                MOSCONE, EMBLIDGE & QUADRA, LLP

22  By:_____/s/_____
23                G. Scott Emblidge
                Rachel J. Sater
24                Andrew E. Sweet

25  Attorneys for Plaintiff

PLAINTIFF'S MPA IN OPP. TO MOTION FOR SUMMARY JUDGMENT        Case No. C 07-2486 WHA