G. SCOTT EMBLIDGE, State Bar No. 121613
emblidge@meqlaw.com
RACHEL J. SATER, State Bar No. 147976
sater@meqlaw.com
ANDREW E. SWEET, State Bar No. 160870
sweet@meqlaw.com
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:   (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D<br><br>                Plaintiff,<br><br>        vs.<br><br>ALTA BATES SUMMIT MEDICAL CENTER<br><br>            Defendant. | Case No.: C 07-2486 WHA<br><br>**DECLARATION OF ALEX ZAPOLANSKI, M.D. IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Date:    April 24, 2008**<br>**Time:  8:00 a.m.**<br>**Dept.:  Ctrm. 9, 19th Floor**<br>**Judge: Hon. William H. Alsup**<br><br>**Complaint Filed:** May 9, 2007<br>**Trial Date:         June 2, 2008** |

I, Alex Zapolanski, M.D., declare:

1.      I am Cardiothoracic Surgeon and the Director of Cardiac Surgery of the Valley Columbia Heart Center at the Valley Hospital in Ridgewood, New Jersey.  I am also an Assistant Clinical Professor of Surgery at Columbia University.  From 1983 until 2005, my Cardiothoracic Surgery practice was in Northern California.  I have been Board

1   Certified by the American Board of Thoracic Surgery since 1986, and by the American

2   Board of Surgery since 1983.  I have personal knowledge of the facts stated in this

3   declaration.

4         2.     Attached as Exhibit A to this declaration is a true and correct copy of my

5   current curriculum vitae.

6         3.     In January 2008, I was asked to review materials relating to certain

7   patients treated by Coyness L. Ennix, Jr., M.D.  The materials included medical records,

8   a report generated by the National Medical Audit concerning the same cases I reviewed

9   and information provided by other expert witnesses who also reviewed the same cases,

10  including a September 2, 2005, report of Bruce A. Reitz, M.D. and a September 7, 2005,

11  report of Bruce W. Lytle, M.D.

12        4.     Attached as Exhibit B to this declaration is a true and correct copy of the

13  September 2, 2005, report of Bruce A. Reitz, M.D that I reviewed.

14        5.     Attached as Exhibit C to this declaration is a true and correct copy of the

15  September 7, 2005, report of Bruce W. Lytle, M.D that I reviewed.

16        6.     Bruce A. Reitz, M.D. and Bruce W. Lytle are both undoubtedly among the

17  most respected and accomplished Cardiothoracic Surgeons in the United States.

18        7.     After reviewing the material mentioned above in paragraph three, in a

19  document dated January 25, 2008, I expressed my opinions regarding the care Dr. Ennix

20  provided to the patients in each of the cases and regarding the invalidity of the

21  conclusions reached by the National Medical Audit.  Attached as Exhibit D to this

22  declaration is a true and accurate copy of my January 25, 2008, report.  The statements I

23  made and opinions I expressed in that document were and are true to the best of my

24  knowledge.

25

26

27

28

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct and that this declaration was signed in Ridgewood,

3  New Jersey.

4

5  Dated:  March 26, 2008                    _____/s/_____

6                                               Alex Zapolanski, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## *CURRICULUM VITAE*
### *October 2007*

## *ALEX ZAPOLANSKI, M.D., F.A.C.S., F.A.C.C.*
*Director, Cardiac Surgery*
*The Valley Columbia Heart Center*
*Assistant Clinical Professor of Surgery*
*Columbia University College of P & S*
*223 North Van Dien Avenue*
*Ridgewood, NJ  07450*
*201-447-8371*

| Home Address | 34 Windsor Lane<br>Ramsey, NJ 07446 |
|---|---|
| Office Address | 223 No. Van Dien Avenue<br>Ridgewood, NJ 07450 |
| Date of Birth | April 2, 1951 |
| Place of Birth | Buenos Aires, Argentina |
| Marital Status | Married; Two Daughters, One Step-Daughter |
| Languages Spoken | English, Spanish, Italian, French |

## PREDOCTORAL EDUCATION

| High School | Bartolome Mitre–Graduate | 12/67 |
|---|---|---|
| Medical School | University of Buenos Aires<br>Argentina | 3/68–12/73 |

## POSTDOCTORAL EDUCATION

| Internship | Union Memorial Hospital<br>Baltimore, Maryland | 7/74–6/75 |
|---|---|---|
| Residency | Cleveland Clinic<br>Cleveland, Ohio<br>General Surgery<br>    Assistant Resident<br>    Senior Resident<br>    Chief Resident | <br><br><br>7/75–6/77<br>7/77–6/78<br>7/78–6/79 |
| Residency | University of Toronto<br>Ontario, Canada<br>Cardiothoracic Surgery<br>    Chief Resident<br>Toronto General Hospital<br>Hospital for Sick Children | <br><br><br>7/79–6/81 |

2

## STAFF POSITIONS

| | | |
|---|---|---|
| Associate Staff | Cleveland Clinic Foundation Cleveland, Ohio Department of Thoracic and   Cardiovascular Surgery | 7/81–6/82 |
| Staff Position | Straub Clinic Honolulu, HI | 7/82–5/83 |
| Hospital Appointments | Seton Medical Center Daly City, California | 6/83–9/05 |
| | Peninsula Hospital Burlingame, California | 1/85–9/05 |
| | Sequoia Hospital Redwood City, California | 1/93–12/01 |
| | California Pacific Medical   Center San Francisco, California | 1/94–9/05 |
| | St. Mary's Hospital San Francisco, California | 12/01–9/05 |
| | Stanford Hospital Stanford, California | 11/01–9/03 |
| | Sutter Medical Center Santa Rosa, California | 8/04–9/05 |
| | The Valley Hospital Ridgewood, New Jersey | 11/05–Present |
| Licensing | California #A39858 Florida #ME 81356 New Jersey # 25MA07984100 | 1983 1999 2005 |

3

| Board Certifications | American Board of Surgery | 1983 |
| | American Board of Thoracic Surgery | 1986 |
| | Recertified American Board of Thoracic Surgery | 1994–2006 |
| | Recertified American Board of Thoracic Surgery | 2004–2016 |
| Awards | Ohio Resident Essay Contest | |
| | American College of Surgeons Chapter | 1978 |
| Society Memberships | New Jersey Medical Society | |
| | New York Society of Thoracic Surgeons | |
| | American Medical Association | |
| | Sociedad Argentina de Cardiologia | |
| | Fellow American College of Surgeons | |
| | Fellow American College of Cardiology | |
| | Society of Thoracic Surgeons | |
| | International Society for Minimally Invasive Cardiac Surgery | |
| | International Andreas Gruntzig Society | |
| | European Association for Cardio–Thoracic Surgery | |

4

| Additional Professional Activities | Consultant responsible for organizing the initiation of two cardiac surgical programs.  Tasks included OR & ICU set up and personnel training. | |
|---|---|---|
| | **Community Hospital Santa Cruz, California** | 1987 |
| | **Memorial Hospital Modesto, California** | 1989 |
| | Co-Chairman Cardiology Task Force For Cost Containment Seton Medical Center | 1989–2005 |
| | Consultant Vishnevsky Central Military Hospital Moscow, Russia (41 open heart procedures performed) | 1994–Present |
| | Consultant for Rspad Gatot Soebroto Military Hospital Jakarta, Indonesia | 1996 |
| | Clinical Investigator Carbomedics Valve FDA Trial | 1989 |
| | Clinical Investigator Converge Anastomotic Device for Coronary Bypass FDA Trial | 2003 |
| | Clinical Investigator Shelhigh Valve | 2003 |
| | Consultant Alexander Fleming Institute Buenos Aires, Argentina Minimally Invasive Surgical Treatment of Atrial Fibrillation **Training Center for American Surgeons** | 2003–2005 |
| | Foreign Advisory Committee **Argential Journal of Cardiovascular Surgery** | |

# PUBLICATIONS AND ABSTRACTS

A.   **Original Peer Reviewed Articles**

1.   **Zapolanski A,** Aron R, Cooperman A, Hermann R: Regional Portal Hypertension.  Clev Clin Quart, 46(1) : 1–5.

2.   Chiulli R, **Zapolanski A,** Hermann R: Leiomyomas and Eimyosarcomas of the Duodenum.  Surg Rounds, 2(9) : 63–67.

3.   **Zapolanski A,** Jagelman D: Gastrocolic Fistula in Debilitating Crohn's Disease: Value of Initial Loop Ileostomy.  British Med J, 280 : 762–763, March 1980.

4.   **Zapolanski A,** Siminovitch J, Cooperman A: A Simplified Method for the Construction of the Spleno–Renal Shunt.  S.G.O., 150 (3) : 405–406.

5.   Lees D, **Zapolanski A,** Hermann R, Cooperman A: Cancer of the Bile Ducts.  S.G.O., 151 : 193–198, August 1980.

6 .  **Zapolanski A,** Weisel R:  Pericardial Graft for Intraoperative Balloon Pump Insertion.  Ann of Thoracic Surg, 33 : 516–517, May 1982.

7.   **Zapolanski A,** Ilves R, Todd T:  Injury to the Middle Lobe Bronchus and Pulmonary Artery:  An Unusual Pattern.  Ann of Thoracic Surg, 32(2) : 156–158, February, 1983.

8.   **Zapolanski A,** Loop F:  Myocardial Revascularization at the Cleveland Clinic Foundation.  Clev Clin Quart, 50(1) : 2–5, Spring 1983.

9.   **Zapolanski A,** Fishman N, Bronstein M, Ellertson D, O'Connell T, Siegel S:  Modified Pericardial Closure to Protect Cardiovascular Structures During Sternal Reentry.  Ann Thoracic Surg 1990; 50 : 665–666.

10.  **Zapolanski A,** Rosenblum J, Myler RK, Shaw RE, Stertzer SH, Millhouse FG, Zatkiz M, Wulff C, Schechtmann N, Siegel S, Bronstein M, Ellertson D, Mengarelli L:  Emergency Coronary Artery Bypass Surgery Following Failed Balloon Angioplasty:  Role of the Internal Mammary Artery Graft.  J Cardiac Surg 1991;6 : 439–443.

6

11. Myler RK, Webb JG, Nguyen KPV, Shaw RE, Anwar A, Schechtmann NS, Bashour TT, Stertzer SH, **Zapolanski A**: Coronary Angioplasty in Octogenarians: Comparisons to Coronary Bypass Surgery, Catheterization and Cardiovascular Diagnosis 1991; 23:1.

12. Myler RK, Shaw RE, Stertzer SH, Zipkin RE, Rosenblum J, Hecht H, Ryan C, Briskin JG, Dunlap RW, Hanson CL, **Zapolanski A,** Cumberland DC:  There Is No Such Thing As "Restenosis".  J Invasive Cardiol July–August 1992 : 4–6.

13. Pliam MB, **Zapolanski A**:  Retrocaval Routing of the Right Internal Thoracic Artery (RITA):  Another Option for the Utilization of Arterial Conduits in Coronary Artery Bypass Surgery. Ann Thor Surg 1993; 56 : 181–2.

14. Myler RK, Shaw RE, Stertzer SH, **Zapolanski A,** Zipkin RE, Murphy MC, Chan J, Hecht H, Cumberland DC, Ryan C, Mengarelli L:  Triple Vessel Revascularization: Coronary Angioplasty Versus Coronary Artery Bypass Surgery–Initial Results and Five Year Follow–up. Comparative Costs and Loss of Working Days and Wages. J Invasive Cardiol 6(4) : May 1994.

15. **Zapolanski A,** Pliam MB, Bronstein MH, et al: Arterial Conduits in Emergency Coronary Artery Surgery.  J Cardiac Surg 1995;10 : 32–39.

16. Pliam MB, Shaw RE, **Zapolanski A**: Comparative Analysis of Coronary Surgery  Risk Stratification Models.  J Invasive Cardiol 1997;9:203–22.

17. Pliam MB, **Zapolanski A,** Ryan C, Shaw R, Mengarelli L: Recent Improvement in Results of Coronary Surgery in Octogenarians. J Invasive Cardiol 1999; 11:281–89.

18. Ryan C, Shaw R, Pliam MB, **Zapolanski A,** Murphy M, Valle HV, Myler R: Coronary Heart Disease in the Filipino and Filipino–American Population: Risk Factors and Outcomes of Intervention. J Invasive Cardiol 2000; 12:134–139.

19. Ryan C, Shaw RE, **Zapolanski A,** Murphy MC, Millhouse F, Pliam MB, Mengarelli L: Risk Factors, Ethnicity and Type of Treatment Predict Need for Late Repeat Revascularization in Patients Presenting for

Treatment of Coronary Artery Disease. J of the American College of Cardiol 2000;35 (2-Suppl A):552A.

20.  Ryan C, Shaw R, **Zapolanski A,** Murphy M, Mengarelli L. Early and Late Effects of Coronary Intervention in the Hypertensive Patient. American Journal of Hypertension. Vol:13;4:295A.

21.  **Zapolanski A,** Korver, K, Pliam M: Multiple Coronary Artery Bypass Via Mini Left Thoracotomy With Conventional Occlusion. Heart Surgery Forum: 4 (2):109-112, 2001.

22.  Ryan C, Shaw R, Millhouse F, **Zapolanski A:** The Role of Ethnicity in Outcomes After Coronary Artery Intervention: How Important are Clusters of Risk Factors. J Amer Coll of Angiology. Sept/Oct 2003 Vol I;3:283-291.

23.  Yap A, Baladi N, **Zapolanski A,** Pliam MB, Shaw, RE: Influence of Body Size on Outcomes of Off-Pump Coronary Artery Bypass Surgery, The Heart Surgery Forum, Vol. 8, No. 3, June 2005.

24.  Pliam, M; **Zapolanski, A.,** Anastassiou, P., Ryan, C., Manila, L., Shaw, R., Pira, B., "Influence of Prior Coronary Stenting on the Immediate and Mid-Term Outcome of Isolated Coronary Artery Bypass Surgery," Innovations, September 2007, Vol 2, No. 5, 217-225.

B.  **Reviews, Chapters and Editorials**

1.  Curry GR, Ullyot DJ, Wood M, **Zapolanski A,** Berry W: Transesophageal Echo-guided Placement of Coronary Sinus Retrograde Cardioplegia Catheter. (letter) J Card Vasc Anesthesia 5(6) : 646, 1991.

2.  Myler RK, Shaw RE, Rosenblum J, Stertzer SH, Zipkin RE, Hecht HS, Cumberland DC, Ryan C, **Zapolanski A:** "A Complex Coronary Angioplasty" (chapter). Diagnostic and Therapeutic Cardiac Catheterization, 2nd Edition (Pepine CJ, Hill JA, Lambert CR, Editors). Williams & Williams, Baltimore 1993; 494-524.

3.  **Zapolanski A,** Pliam MB: Less Invasive Heart Surgery. J Invas Cardiol, 1999;11:177-83.

4.  **Zapolanski A,** Cirugia Coronaria en Enfermedad de Multiples Vasos. J Argentinian Society of Cardiology, Jan. 2000.

8

5.    **Zapolanski A,** Mengarelli L, Shaw R, Zapolanski T. Is Cardiovascular Surgery Here To Stay?  Coronary Surgery Via Left Mini Thoracotomy (West Coast Technique). J Invasive Cardiology. 2001;13:417–418

6.    **Zapolanski A.**  Ascending Aortic Cannulation During Type-A Dissection.  J Thorac Cardiovasc Surg.  Jan 2004  Letter to the Editor.

7.    **Zapolanski A.**  To Pump or Not to Pump:  A Surgeon's View of Randomization 25 Years Later.  Journal of Invasive Cardiology Vol17;3:175–176.

8.    **Zapolanski, A.,** El Tratamiento de le Fibrilacion Auricular.  La Perspectiva del Cirujano.  Presented Boletin Educativo Pro Educar, June 2006, Volume 2, No. 6.

C.   <u>Abstracts:</u>

1.    **Zapolanski A:**  Construccion Simplificada del Puente Espleno-Renal. Congreso Sociedad Argentina de Cirujanos, Mar del Plata, Argentina, 1979.

2.    **Zapolanski A,** Myler R:  Cirugia de Emergencia en Angioplastia Percutanea.  Resumenes Congreso Peruano de Cardiologia, Page 25, April 1985.

3.    **Zapolanski A:**  Can the Internal Mammary Artery Be Used Safely and Effectively in Emergency Bypass Surgery After Failed Coronary Angioplasty? Proceedings of the XI World Congress of Cardiology, Manila, Philippines, February 1990.

4.    **Zapolanski A,** Ellertson D, Bronstein M, et al:  Classification and Results of Urgent Coronary Bypass Surgery.  Proceedings of the V Pan American Congress of Diseases of the Chest, San Juan, Puerto Rico, April 1990.

5.    **Zapolanski A,** Bronstein M, Ellertson D, Shaw R, et al:  Internal Thoracic Artery for Failed Coronary Angioplasty:  A Safe Approach. Proceedings of the V Pan American Congress of Diseases of the Chest, San Juan, Puerto Rico, April 1990.

6.    **Zapolanski A,** Bronstein M, Ellertson D, et al:  Internal Thoracic Artery for Failed Coronary Angioplasty::  a Safe Approach.

9

Proceedings of the International Meeting for the Use of the Internal Thoracic Artery, Toulouse, France, June 1990.

7.  **Zapolanski A,** Bronstein M, Shaw R, Ellertson D, Mengarelli L, Anwar A, Stertzer S, Myler R:  Are Patients with a History of Recent Myocardial Infarction at Higher Risk of Complications During Coronary Bypass Surgery?  (abstract) J Am Coll Cardiol 1991;17 : 2100.

8.  Myler RK, Shaw RE, Baciewicz PA, Rosenblum J, Murphy MC, Stertzer SH, **Zapolanski A,** Ryan C, Mengarelli L, Chan J:  Five-Year Comparison of Triple Vessel Revascularization:  Coronary Artery Bypass Surgery Versus Balloon Angioplasty.  (abstract) Journal Amer Coll Cardiol 1993;21 : 73A.

9.  Shaw RE, Rosenblum J, Myler RK, Stertzer SH, Murphy MC, Hansell H, Ryan C, **Zapolanski A,** Mengarelli L, Chan J:  Comparison of Women Undergoing Multiple Vessel Revascularization with Coronary Bypass Surgery or Balloon Angioplasty:  A Five Year Study. (abstract) Jour Amer Coll Cardiol 1993; 21 : 132A.

10.  **Zapolanski A,** Pliam MB, Fishman NH, Shaw R:  Progresos Recientes en los Resultados de la Cirugia de By-pass Coronario en Octogenarios. (abstract) Argentinian Congress of Cardiology. August 1997

11.  **Zapolanski A,** Pliam M, Fishman NH, Shaw R:  Estratificacion de Riesgo Quirurgico en Cirugia Utilizando Cinco Modelos Predictivos de Mortalidad Hospitalaria.  (abstract) Argentinian Congress of Cardiology.  August 1997.

12.  **Zapolanski A,** Korver K, Pliam M, Shaw R, Mengarelli L. Minimally Invasive Multiple Coronary Bypass Grafting with Conventional Aortic Occlusion (West Coast Technique) (abstract) CTT January 2000.

13.  Ryan C, Shaw R, **Zapolanski A:**  The Role of Ethnicity to Risk Factor Presentation, Therapeutic Outcomes and Late Events in Patients Presenting for Treatment of Coronary Artery Disease. (abstract) American Heart Association Nov. 2000.

14.  **Zapolanski A,** Korver, K, Pliam, M:  Mitral Valve Surgery Via a Right Anterior Mini Thoracotomy With Central Aortic Cannulation and No Endoscopic Assistance. (abstract) International Society for Minimally

Invasive Cardiac Surgery; Heart Surgery Forum.com Vol 5 Supp 4 2001-6995html: June 27, 2001.

15. **Zapolanski A,** Korver K, Pliam M:  Left Main Coronary Artery Disease In Beating Heart Surgery.  (abstract) ISMICS June 2001.

16. **Zapolanski A,** Korver K, Pliam M: Beating Heart Surgery Reduces Utilization of Blood Products in Coronary Revascularization. (abstract) ISMICS June 2001.

17. **Zapolanski A,** Mengarelli L, Pliam M, Shaw R.  Diabetics undergoing Beating Heart Have Better Outcomes Compared with Conventional Coronary Artery Bypass Surgery.  (abstract) ISMICS June 2003.

18. **Zapolanski A,** Pliam M, Mengarelli L, Ley J, Shaw R.  Extensive Revascularization on the Beating Heart Early Results in Patients Receiving Four to Seven Grafts.  (abstract) ISMICS June 2003.

19. Santos D, Mastrogiacomo F, **Zapolanski A.**  Structural and Functional Differences of Arterial and Venous Coronary Grafts by Bi-dimensional Ecography and Doppler.  ISMICS London, June 2004.

20. Santos D, Mastrogiacomo F, **Zapolanski A.**  Variability of Flow in Coronary Grafts as a Function of Degree of Stenosis and Size of the Recipient Vessel.  ISMICS London, June 2004.

21. **Zapolanski A,** Pliam MB, Yee E, Mengarelli L, Ley J, Shaw R.  Can Diabetic Patients be effectively Revascularized Off Pump?  London, June 2004.

22. **Zapolanski A,** Pliam MB, Mengarelli L, Ley J, Shaw R.  OPCAB with Multiple Anesthesiologists.  ISMICS London, June 2004.

23. Yap A, Baladi N, **Zapolanski A:** Influence of Small Body Size on Outcomes of  Off-Pump Coronary Artery Bypass Grafting (OPCAB) Surgery.  ISMICS London, June 2004.

24. Wolf RK, Schneeberger EW, Flege JB, Merrill W, Osterday R, Santos D, Villamil A, Zapolanski, A. Initial Experience with a Minimally Invasive Epicardial Approach to Pulmonary Vein Isolation and Left Atrial Appendage Exclusion.  Presented NASPE May 2004 San Francisco.

25. Villamil, A; Manente,D; Antonietti, L; Santos, D; Tajer, C; Labadet, C; Mastrogiacomo, F; **Zapolanski, A.** Nueva Tecnica De Aislamiento De Las Venas Polmonares En Fibrilacion Auricular: Resultados Clinicos Iniciales. Presented XI Congreso Argentino de Cardiologia, October 2004.

26. Ley J, Shaw R, **Zapolanski A,** Hill JD. Are Patients with Human Immunodeficiency Virus at Higher Risk for Complications Following Cardiac Surgery. Presented AHA November 2004).

27. **Zapolanski A,** Pliam M, Ley J, Mengarelli L. Reduction In Neurological Injury With Evolution to OPCAB: A Single Team's Experience. Presented ISMICS June 2005.

28. **Zapolanski A:** "Coronary Revascularization In HIV Patients: The Role of OPCAB" Presented ISMICS June 2005.

29. **Zapolanski A:** "LITA To LAD Last; A safe approach to OPCAB" Presented ISMICS June 2005.

30. Antonietti, L; Hadid, C; Santos, D; Villamil, A; Mastrogiacomo, F; **Zapolanski, A;** Tajer, C. Resultados A 1 Ano Del Tratamiento De La Fibrilacion Auricular Con Tecnica De Wolf Mini-Maze. Presented XII Congreso Argentino de Cardiologia, October 2005.

31. Bronstein, E., Carnevale N, Mindich B, **Zapolanski, A.,** "Midterm Follow-Up: Robotic-Assisted Lima Harvest, Minimally Invasive Direct Coronary Artery Revascularization Lima-LAD Bypass in the Community Setting," Presented ISMICS, June 2006.

32. **Zapolanski, A.,** Santos D, Mastrogiacomi F, Pliam M, Mengarelli L, "The Wolf Mini-Maze Procedure: Early and Mid-Term Follow-up," Presented ISMICS, June 2006.

33. Pliam, M; **Zapolanski, A.,** Anastassiou, P., Ryan, C., Manila, L., Shaw, R., Pira, B., "Influence of Prior Coronary Stenting on the Immediate and Mid-Term Outcome of Isolated Coronary Artery Bypass Surgery", Presented ISMICS, 2007.

D. <u>Audiovisual/Media:</u>

Safe Minimally Invasive Ligation of the Left Atrial Appendage Presented, ISMICS, Rome 2007.

E.    <u>Patents</u>

Santilli AN, **Zapolanski A**, Patel A., Minimally Invasive Surgical Retractor, U.S. Patent No. 5967972, 1998.

**Zapolanski A**, Hidalgo B, Multipurpose Medical Device, U.S. Patent 6238404, 2001

# EXHIBIT B

# MEMORANDUM

TO:      Medical Executive Committee, Summit Medical Center

FROM:    Bruce A. Reitz, M.D.
          Professor of Cardiothoracic Surgery
          Stanford Medical Center

DATE:    September 2, 2005

RE:       *Summit Medical Center Peer Review of Dr. Coyness Ennix*

---

      I have been requested to review documentation pertaining to a pending Summit Medical Center Peer Review of Dr. Coyness Ennix. My qualifications are set forth in my curriculum vitae attached herein. I have reviewed correspondence setting forth the procedural background of the peer review, a report by National Medical Audit (hereinafter "NMA"), a report of the Ad Hoc Committee (hereinafter "AHC"), and relevant portions of the underlying medical charts. Before addressing the specifics of the 10 cited cases, I would like to offer some preliminary comments.

      Initially, I must state that I find the overall process of what has transpired here as questionable and unusual for medical staff review. From a review of the documentation, it would appear that the initial peer review inquiry commenced in the spring of 2004 when the Chair of the Department of Surgery requested Dr. Han Lee, a cardiac surgeon, to review four (4) minimally invasive cardiac cases (cases 001-004). Dr. Lee returned his review of the cases, and with the exception of possible issues relating to documentation of pre-operative risk discussions, concluded that the cases did not present any substantive standard of care issues. Notwithstanding Dr. Lee's report, the Chair of the Committee, who is not a cardiac surgeon, raised a concern as to whether the cases presented standard of care questions. The Surgical Review Committee accepted Dr. Lee's conclusion of no standard of care issues as to two records, but disagreed on the remaining two records. It should be noted that the Surgical Review Committee Minutes do not reflect that the Committee actually reviewed the underlying medical charts, nor did they afford Dr. Ennix an opportunity to appear before the Committee to explain the cases. Not giving the practitioner a chance to describe their reasoning, and to augment the material in the written record, I find very unusual in this process.

      As a result of the foregoing, an AHC was then established. Although there were numerous cardiac surgeons on the medical staff, the AHC did not include a cardiac surgery staff member. After months of delay, and continuing to not allow Dr Ennix to comment on the cases in question, the AHC, in January of 2005, requested an outside review by NMA. The sending of the cases to an outside agency is unusual and questionable particularly because this outside review now included *six additional*



*cases* which had also received a prior in-house peer review, which again had found no standard of care issues.

## Informed Consent

In reviewing the NMA report, it would appear that many of the cases present some question regarding the adequacy of informed consent and the adequacy of documentation.

I have reviewed the descriptions of informed consent as set forth in Dr. Ennix's pre-operative notes. The critique of the NMA that Dr. Ennix's documentation of risk discussions is sub-standard, is definitely specious. I believe that the level of documentation of risk discussion and consent as provided by Dr. Ennix is consistent with most informed consent documentations that I see on a daily basis in multiple charts. I believe that the NMA criticism of the sufficiency of Dr. Ennix's documentation of risk discussion and consent is hyper-critical and unwarranted. With respect to other documentation, I would agree, and Dr. Ennix has conceded, that his documentation must improve and I understand that he has represented to the Medical Executive Committee that he intends to correct his documentation, both in terms of timing of report preparation and specificity of the reports. Once again, I do not believe that Dr. Ennix's documentation history is particularly unique. In my experience, there is virtually no medical record that is complete enough in detail to truly describe all reasoning and details of occurrences during care, particularly in complex cardiac cases. Having stating the foregoing preliminary thoughts, I now will address each specific case cited by the NMA and AHC.

## Case 001

The NMA Audit challenges the sufficiency of Dr. Ennix's risk discussion with a schizophrenic patient. The NMA states that a pre-operative psychiatric consult was mandated. The NMA additionally states that it was a surgical technical error leading to ventricular damage. Neither of these contentions has merit.

In reviewing the medical records underlying this case, this was a 39-year-old patient with aortic insufficiency coming from a bed and care home with a diagnosis of schizophrenia which was compensated. The patient was also accompanied by a representative of the board and care home who was present during all informed consent discussions. It should be noted that this patient had previous surgical procedures for a leg fracture six months earlier. I do not believe that the patient had a psychiatric consultation prior to surgical intervention for that particular injury. Based on the hospital chart, I do not believe that a psychiatric consultation was required in order to perform an adequate risk discussion for this operation.

Turning to the alleged technical error, Dr. Ennix initially inserted a 27 mm valve which was an appropriate size for this patient. There was a leak of the valve. It would be pure speculation to assert the cause of the leak, as nothing definite was seen at re-

operation. What is of import is that Dr. Ennix promptly recognized the leak and corrected it by replacement with a 25 mm valve.

With respect to the assertion that the patient suffered permanent ventricular damage, the medical record does not bear out that assertion. There was a temporary drop in the ejection fraction to 41%. However, the ejection fraction returned to 70% following replacement of the valve. Such a transitory drop in the ejection fraction is common during cardiac surgery. Had the AHC included a member from the Cardiac Surgery service, this misunderstanding on the part of the AHC would not have occurred.

In conclusion, it is my opinion that Dr. Ennix's evaluation and management of this patient met applicable standards of care.

### Case 002

The NMA alleged that Dr. Ennix used poor judgment in failing to obtain a pre-operative cardiac catheterization. The NMA contends that Dr. Ennix attempted to insert an implant that was too small. In my opinion, neither criticism is warranted.

This patient was a 37-year-old female with aortic stenosis. Most cardiac surgery textbooks and most cardiac surgeons do not require cardiac catheterization for women less than 45 years of age unless there is a prior history of symptoms or treatment for coronary artery disease. This patient did not present such a history. The failure to obtain a cardiac catheterization pre-operatively in this particular patient was not below the standard of care.

The criticism of the placement of the 17 mm valve is spurious in that the valve is an HP St. Jude valve which has an effective orifice of a 19 mm mechanical prosthesis. Thus focusing on the 17 mm valve as being too small for this 135-lb woman is inappropriate.

The NMA also comments that it believed that the surgery time was prolonged. As noted, this was one of the first minimally invasive cases performed by Dr. Ennix. Clearly, a learning curve would result in a more prolonged initial surgical time. In any event, this issue is moot since Dr. Ennix has voluntarily agreed not to perform such minimally invasive procedures.

### Case 003

The NMA noted that the procedure took a prolonged period of time and involved excessive bleeding from a somewhat thin aorta. The NMA questions the specificity of the operative report. The AHC noted that the patient developed post-operative aortic insufficiency. The AHC noted that at the post-mortem it was determined that the valve was damaged and it was unknown whether the valve had a manufacturing defect or was somehow damaged by Dr. Ennix during the procedure. Both the AHC and the NMA speculated that perhaps there were technical difficulties intra-operatively that Dr. Ennix did not describe in the operative note. Such speculation on the part of both the NMA and AHC is unwarranted and unjustified in standard peer review. After review of

the underlying medical chart, I find no evidence of a deviation of the standard of care on the part of Dr. Ennix.

### Case 004

The NMA criticizes the documentation of the procedure and questions the prolonged OR time. On a substantive note, the NMA criticizes Dr. Ennix's failure to obtain a pre-operative treadmill in order to evaluate LV function, and prove the need for valve surgery. However, exercise tests are actually performed infrequently in the evaluation for mitral valve surgery in most surgeons' practice. It is not the standard of care to obtain this study.

With respect to the assumed prolonged OR time, the NMA states that the surgical time exceeded 12 hours with total anesthesia time almost 20 hours. In reviewing the actual anesthesia chart, it would appear that anesthesia commenced at 0955 and terminated at 2104. Surgery commenced at 1357 and terminated at 2115. Accordingly, total anesthesia time was approximately 11 hours and surgical time was approximately 7 hours and 15 minutes, not the 20 hours/12 hours asserted by the NMA.

### Other Comments

The preceding four cases all involved minimally invasive surgery. Clearly, these operations took more than the usual expected time for valve surgery. Some of the prolonged time could be due to a learning curve, not only on the part of the surgeon, but also the remainder of the OR team. Further, it would appear that Dr. Ennix was attempting to perform various functions, such as chest incision and groin cannulation, by himself. These are typically performed by other members of a surgical team, in most settings. This also potentially contributed to prolonged operative time.

In any event, the issues pertaining to the minimally invasive cases appear moot in that Dr. Ennix agreed in the spring of 2004 not to perform any such procedures at Summit. This reviewer simply does not understand why these four cases continue to be included in an existing peer review of Dr. Ennix in the year 2005.

### Case 005

This case involves a 57-year-old diabetic female who underwent emergency coronary bypass surgery at the request of a well-respected cardiologist who did not feel (given the size of the patient's coronary arteries) that a PTCA would be successful. The NMA was of the position that most cardiologists would have performed a PTCA. Although I agree with the foregoing, it begs the question of the propriety of Dr. Ennix's involvement in this case. Given the fact that the cardiologist in the case did not feel that a PTCA approach was possible, Dr. Ennix was correct in proceeding with a bypass surgery for not only the RCA but also the LAD. In light of the developing ischemia in the

right leg from IABP insertion, any further delay in taking the patient to corrective surgery would have been inappropriate.

I would also note that it would appear that the AHC has backed away from the aggressive criticisms asserted by the NMA. The AHC noted that Dr. Ennix did not wish to question the judgment of the referring cardiologist who is "well-regarded in his specialty." The AHC concluded that it was not inclined to make a major issue of this case particularly given the fact that it was unlikely that this patient would survive and that Dr. Ennix's decision to perform an emergency bypass gave her at least some chance of survival.

In my opinion, Dr. Ennix comported with the standard of care in this case.

### Case 006

This case presents perhaps the most specious criticism of Dr. Ennix. This case presents an 87-year-old man with coronary artery disease who was converted from a planned off-pump bypass to on-pump bypass. The NMA notes that conversion raises risk of complications but does not criticize Dr. Ennix for his initial decision to commence the case off-pump.

The NMA then raises an issue as to whether Dr. Ennix performed a redo graft which he failed to document in the chart. Although Dr. Ennix consistently denied performing the redo graft, the NMA concluded that perhaps Dr. Ennix did perform a re-graft and failed to document the foregoing in the op report. The AHC backed away from this speculation of the NMA noting that Dr. Ennix had satisfied the AHC that he did not perform a redo bypass in this case. However, the AHC then goes on to explain that the most logical explanation for the discrepancy in the chart between Dr. Ennix and the perfusionist is Dr. Ennix's alleged failure to communicate adequately with the perfusionist. This conclusion is simply unsupported by any factual basis.

Based on my review of the underlying medical chart, I believe that Dr. Ennix comported with the standard of care in his evaluation and management of this patient.

### Case 007

This case involves a 63-year-old female with significant carotid artery and coronary artery disease. The right internal carotid was completely occluded and the left carotid presented with a 95% obstruction. The patient was being initially worked up by a vascular surgeon, for the carotid artery disease. The primary criticism asserted by both the NMA and AHC is that in the pre-operative time frame, while the vascular surgeons were preparing to commence the carotid procedures, the patient presented with chest pain and EKG changes in the holding area and intra-operative TEE detected global left ventricular dysfunction. The AHC felt that the key issue was the fact that Dr. Ennix was not present in the operating room at the start of the carotid procedure.

I am familiar with combined carotid and bypass procedures. They can be performed simultaneously or sequentially with either the coronary bypass first or the

carotid procedure first. In those cases in which the carotid procedure is felt best to precede the coronary bypass, it is not uncommon for the cardiac surgeon to not be present in the operating room when the vascular surgeons are performing the carotid procedure. The failure to be present in the operating room is not below the standard of care.

The NMA and AHC fault Dr. Ennix for failing to be aware of the ischemic event that occurred in the OR during the vascular aspect of the case. However, the failure to communicate the ischemic event should lie with the vascular surgeon and anesthesiologist then caring for the patient, who were both aware of the changes, and failed to inform Dr. Ennix of the change in the patient's status. The NMA also raised some questions regarding the delay in work-up of the carotid disease. However, those complaints should be addressed by the vascular surgeon, there choice of the studies such as angiogram, and not Dr. Ennix. I believe that Dr. Ennix's involvement in this case comported with the standard of care.

### Case 008

This case presents with a 72-year-old female with diabetes and hypertension who underwent a cardiac catheterization demonstrating RCA and LAD disease. A cardiologist attempted a PTCA which was unsuccessful. The cardiologist felt that a bypass graft was urgently required. The AHC stated that the issue in this case was whether it was appropriate for Dr. Ennix to have proceeded with the bypass procedure in the presence of an anti-platelet agent in lieu of postponing the procedure for a few hours.

In my opinion, the anti-platelet agent which was cited by the NMA as a cause for concern for bleeding intra-operatively, had, in all probability, been reversed by the time of the operation which was approximately 4-5 hours following its administration. I believe that most cardiologists would have been able to perform a PTCA in this patient. However, because the particular cardiologist at the time was unwilling or unsuccessful to complete the PTCA, Dr. Ennix cannot be faulted in agreeing to proceed in the manner in which he did. I do not believe the standard of care required Dr. Ennix to defer or delay the surgery.

### Case 009

This is a case in which both the NMA and AHC raised some questions as to whether this patient's bypass was urgent versus elective and whether Dr. Ennix should have waited until optimization with Epogen in a Jehovah's Witness surgical patient. After much discussion, both the NMA and AHC fall short of directly criticizing Dr. Ennix's decision to proceed with the surgery. In my opinion, there is strong evidence that waiting for a period of time to obtain optimization of Epogen administration would present the patient with a greater risk than going ahead with the procedure. There is the delay and possible ischemic events, as well as an increased risk of thromboembolism during administration of Epogen.

Both the NMA and AHC discuss that this was a planned off-pump operation which required conversion. However, neither body states that issue presented a standard of care concern, and I agree.

In my view, Dr. Ennix's evaluation and management of this patient is consistent with the standard of care.

## Case 010

Although the NMA noted several criticisms involving a delay in taking the patient to surgery, failing to protect the heart with cardioplegic arrest after a conversion to on-pump, and failing to place an IABP before the patient left the OR, the AHC concluded that Dr. Ennix's judgment decisions in these regards reflected reasonable judgment, and I agree. The AHC's main concern was Dr. Ennix's unavailability in the immediate post-op period when the patient became unstable and experienced a cardiac arrest only five minutes after arrival. Dr. Ennix had apparently left the CPU and returned to his office across the street. There is no doubt that the staff in the CPU knew that Dr. Ennix would be present in his office.

In my view, if a patient appears stable, it is common for the surgeon to be absent from the post-op recovery area, either speaking to the family or visiting other patients, as long as the surgeon remains in the reasonable vicinity of the ICU such as his office across the street which occurred in this case. The primary delay in this case consisted of a 30-40 minute delay before the anesthesiologist and/or the CPU nursing staff elected to call Dr. Ennix, to alert him that the patient's condition had changed. I believe that Dr. Ennix's evaluation and management of this patient, including his decision to leave the hospital site for his office across the street, was consistent with applicable standards of care.

This completes my review of the cases.

# EXHIBIT C

09/07/2005 13:04 FAX                                                                                     ☑001

THE CLEVELAND CLINIC
FOUNDATION

September 7, 2005

Bruce W. Lytle, M.D.
Professor of Surgery
Chairman, Thoracic & Cardiovascular Surgery / F24
Office: 216/444-6962
Appts.: 216/444-4466
Fax: 216/444-3119
Toll Free: 1-800-223-2273
E-mail: lytleb@ccf.org

John A. Etchevers
Hassard Bonnington LLP
Two Embarcadero Center #1800
San Francisco, CA  94111-3993

RE:  COYNESS ENNIX, MD

Gentlemen:

I have reviewed the written materials sent to me in which Dr. Coyness Ennix was involved.  Keep in mind that I do not have any actual films and that I am looking entirely at written records.  It seems to me that there are a number of things that can be pointed out here.  The first is that it is certainly possible in any individual case to have difficulties.  The most accurate reflection of the quality of medical care relates to performance over time.  In reading through the communication from Howard Barkan, Doctor of Public Health, dated 31 January 2005, it does not appear that Dr. Ennix's outcomes are beyond the range of the performance by other surgeons operating at the same hospitals.  Certainly surgeon technical skill and judgment plays a role in each individual case but the overall environment also plays a role and it appears that the outcomes of Dr. Ennix's patients are within the range that other surgeons achieved in the same environment, according to the analysis by Dr. Barkan.

If we then look at the National Medical Audit review the cases are basically fell into two groups, those judged to be poor judgment and those judged to be technical error.  Of those cases labeled as "poor judgment" in the first case the NMA audit criticized Dr. Ennix for performing the operation the day after an angiogram showed a 90% left main lesion.  The NMA audit cites delay in the performance of the coronary angiogram and the fact that an intra-aortic balloon was not placed.  I'm not familiar with the particular practice at this private practice hospital but in most settings those decisions are really not within the domain of the cardiac surgeon.  Again, the environment played a substantial role there in an unfavorable outcome.  Dr. Ennix was further criticized for not being present with the patient although he has responded to that.

9/07/2005 13:05 FAX                                                                          ☑002

Coyness Ennix, M.D.                              page two

Regarding the second case, a patient with triple vessel coronary artery disease and bilateral carotid stenoses, Dr. Ennix was criticized because the patient was not maintained on either IV heparin or with insertion of an intra-aortic balloon pump. Again, this is something that is mostly within the domain of the cardiologist who at that time was caring for the patient. He was also criticized for not performing bypass surgery before the carotid endarterectomy was done. However, given the observation of multiple studies that someone with bilateral severe carotid lesions has a risk of stroke at least in double figures associated with coronary bypass grafting, I think it is hard to retrospectively criticize someone for this judgment. During operation the patient evidently developed problems and subsequently succumbed. Exactly when to forget the carotid endarterectomy and proceed directly to revascularization is a matter of judgment and sometimes is more obvious in retrospect than it is at the time. Again, it seems to me that the problems here related in part to the environment in which this patient's care was carried out where there were cardiologists, vascular surgeons, cardiac surgeons and anesthesiologists that all impacted upon the patient.

In the next case Dr. Ennix is criticized for performing surgery too early rather than too late. These judgments by the examiners are, of course, carried out in retrospect and with the knowledge of an unfavorable outcome. Hindsight is often very accurate. I believe this was also a case where the cardiologist thought that percutaneous treatment was not a good solution. Dr. Ennix is also criticized for dictating a substandard operative note which is a justifiable criticism.

In the fourth case, again Dr. Ennix is criticized for operating too early rather than too late as he performed what he deemed was a necessary emergency operation in the face of a retroperitoneal bleed. This certainly can be a difficult decision and under the circumstances was a decision that did not work out well. However, they interpreted the patient as having ongoing myocardial ischemia, and the anatomic situation was judged by the cardiologist to be not appropriate for PTCA. Thus, Dr. Ennix had limited choices available to him and proceeded with operation with the agreement of the cardiologist.

The fifth case involved a patient that had a very small prosthesis that was placed where Dr. Ennix started with a minimally invasive procedure and then converted to an open procedure because of the difficulty in replacing a valve. A small aortic root is a problem with a partial sternotomy at times, particularly if someone is not familiar with that approach, and the patient did, however, survive the operation.

In the technical error section there are 5 cases cited, the first being a Jehovah's Witness with coronary disease. This patient underwent an attempted off-pump operation which is reasonable in someone where blood cannot be used, but had to be converted to on-pump surgery. Certainly the need to convert to on-pump surgery has some downside associated

/07/2005 13:05 FAX                                                                    ☒003

Coyness Ennix, M.D.                          page three

with it, but that is not something the surgeon necessarily can predict in advance. Again, hindsight is 20/20.

The next case appears to be something where there were technical difficulties associated with doing a minimally invasive aortic valve replacement. There is no question that there is a learning curve associated with minimally invasive surgery of all kinds. If the hospital does not want their practitioners to become involved in minimally invasive surgery, they should tell them that.

The third case relates to a conversion from off-pump to on-pump again and there is no question that converting to on-pump surgery removed the potential benefits of OPCAB.

Again, this is something that can be sorted out in retrospect a lot easier than it can before the event.

Through the last two cases there are multiple criticisms of the entire care pattern relating to whether or not a treadmill test was performed, failure to perform transesophageal echocardiography. Again, those are issues that relate to the entire environment, that is to say, a relatively small private practice hospital where these operations are being performed and although Dr. Ennix is obviously part of that environment he is not the only part.

There are a number of criticisms related to poor operative notes and substandard documentation and I have not reviewed all of those notes.

The NMA reviewers point out a number of criticisms that relate to the systems through which care was delivered. These are valid criticisms and relate to the hospital approach rather than to Dr. Ennix's deficiencies. The relationship between the systems issues and outcomes is somewhat attested to by the fact that Dr. Ennix does not have outcomes that are significantly different from the other surgeons operating in that environment.

Given the records I have available and the time constraints placed upon this review, that is my assessment of the situation.

Thank you very much.

Yours truly,

Bruce W. Lytle, M.D.

BWL/mw

# EXHIBIT D

*Alex Zapolanski, M.D., FACS*
Director, Cardiac Surgery, Valley Health System
Assistant Clinical Professor of Surgery, Columbia University



The Valley
Hospital
Valley Health System

January 25, 2008

*Cardiothoracic Surgery*
223 North Van Dien Avenue
Ridgewood, NJ 07450-2736
201 447 8377
201 447 8658 fax

Rachel Sater
Law Offices Of
Moscone, Emblidge and Quadra, LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104

Re: Ennix v. Alta Bates Summit Medical Center

Dear Ms. Sater:

I have compiled for you my interpretation on the ten cases you forwarded to me for review and opinion. I have attempted to be as organized as possible and cross-referenced the cases with the NMA reviews so that they correlate.

Following you will find my assessment of each case individually in the order that the NMA set. I used the chart information, the ad hoc committee reviews as well as the information provided by the other expert witnesses to compile my opinions.

In the past four years I have provided testimony as an expert witness in one case.

I have spent a total of 12 hours between reviewing the records and my telephone conversations with your office. My rate for these services is $500 per hour. If the case goes to trial and I have to testify my rate at trial is $1000 per hour plus expenses.

Please remit $6000 to my corporation as follows:
PAZA Staffing Services
34 Windsor Lane
Ramsey, NJ 07446
Federal Tax ID# 94-3315559

If you have any questions please feel free to contact me at 201-286-3504 (cell) or 201-447-8371(office).

Sincerely,

Alex Zapolanski, MD, ~~FACC, FACS~~
Director of Cardiac Surgery
The Valley Columbia Heart Center

REDACTED

The NMA has criticized the medical record keeping of Dr. Ennix in every one of the cases discussed here. I am NOT going to address this on a case-by-case basis as it appears to be true to different degrees in each case. Dr. Ennix has acknowledged this repeatedly and has agreed to correct this problem with his documentation.

Also of note: relating to the four minimally invasive cases is the fact that at the end of this series of cases, Dr. Ennix agreed to stop doing minimally invasive procedures.

Case # 001 MR# [redacted]
39y/o schizophrenic male admitted with 3 to 4+ aortic insufficiency for elective aortic valve replacement.

NMA Issues

#1 Questionable informed consent
I see no merit to this accusation. The patient was living in a board and care home. A representative from the home was present for all the discussion pre-operatively.

#2 Technical error leading to ventricular damage and second operation
This is purely speculative hindsight on the part of the NMA. The #27 valve was an appropriate size for the patient. The post-op discovery of the valve leaking was addressed appropriately as the patient was taken back to the OR and the valve was replaced with a #25 prosthesis. The "ventricular damage" was transient and not uncommon following operations of this nature.

#3 Failure to obtain an intra-op TEE
I have no way of assessing this as there is no documentation to support that it was ever done. In the letters from Dr. Ennix he insists that TEE was routinely used in the operating room at this facility.

#4 Prosthetic valve dysfunction
Dr. Ennix took the patient back to the operating room and changed the valve and corrected the problem.

It is my opinion that Dr. Ennix provided the appropriate care for this patient.

Case #002 MR# [redacted]
37y/o female admitted elective aortic valve replacement.

NMA Issues

#1 Inadequate pre-op evaluation-failure to obtain a cardiac catheterization
I agree with prior expert opinions that a 37y/o does NOT require a cardiac catheterization prior to valve surgery. It is not "standard of practice".

#2 Conversion of incision to partial sternotomy
NOT an issue. Dr. Ennix did was he felt was safest for the patient.

#3 Prolonged surgery time
This was one of the first minimally invasive procedures Dr. Ennix performed; one would expect the operative time to be longer.

#4 Prosthesis implanted too small
This is a moot point and only the opinion of the NMA. The patient suffered no ill effects related to the size of the prosthesis implanted and was discharged from the hospital.

# REDACTED

**Case #003 MR#**████████

76y/o male admitted for elective aortic valve replacement.  Patient expired approximately 12 days post-op.

**NMA Issues**

**#1 Prolonged surgery time**
Again this was one of Dr. Ennix's early minimally invasive procedures.  It would be expected that the operative time would be prolonged.

**#2 Intra-operative complications**
Many patients bleed and require blood transfusions related to heart surgery.  This is not considered an "intra-operative complication".  The particular valve implanted is known to have some inherent AI and this is generally well tolerated by the patients.

**#3 Failure to obtain post-op TEE**
Even if one had been obtained, it is likely that if AI was present and the patient was hemodynamically stable it would not have been addressed surgically.

**#4 Post-op diminished CNS function and possible CVA**
These two complications are known risks of any cardiac procedure especially when cardiopulmonary bypass is used.  No one can say WHAT caused this in this patient.

**#5 Death due to complications**
The implication by the NMA that the patient's death would have been less likely had the bypass time been shorter is a hindsight discussion and completely unsupportable.

I see no deviation from the standard of care in this case.

**Case #004 MR#**████████
75y/o male for elective mitral valve repair vs replacement.

**NMA Issues**

**#1 No documentation of indications for surgery**
The criticism by the NMA as to the indications for surgery is unfounded as the patient had severe mitral insufficiency with insipient left ventricular dilation on pre-op trans-esophageal echocardiography.  Patients that are asymptomatic are candidates for surgery in an attempt to avoid ventricular deterioration.

**#2 Prolonged OR time**
Again, this was one of Dr. Ennix's early minimally invasive procedures.  It is expected that the operative time will be prolonged.

**Case #005 MR#**████████

57y/o female admitted to the cath lab with unstable evolving myocardial infarction.

**NMA Issues**

After reviewing the case in detail, it is obvious that there is no substance to any of the NMA criticisms.  Undoubtedly, there is a difference of opinion as to the treatment approach in this very sick woman.  It is very easy for the NMA reviewers to look at the case in hindsight.

# REDACTED

The criticism as to whether or not the right coronary artery should have been opened in the cath lab cannot be attributed to Dr. Ennix.

In summary, this unfortunate case does NOT reflect a lower standard of care on the part of the surgeon.

**Case #006 MR#**▮▮▮▮▮▮
87y/o male admitted for urgent/emergent coronary artery bypass.

**NMA Issues**

**#1 Need to convert from OPCAB to on-pump**
In his decision to convert the case to on-pump, Dr. Ennix did what was safest for the patient at the time given the instability the patient was experiencing.

**#2 Need to redo a cardiac graft**
The only mention of this is a note on the perfusion record. I cannot asses this with any accuracy as I was not present in the operating room.

**#3 Death following complications**
The patient suffered respiratory, renal and infectious complications as noted in the chart. Cardiac surgery (especially in octogenarians) is not without potential complications. To blame the complications on the need to convert the procedure to on-pump is unfair and unfounded.

Dr. Ennix care of this patient was within the standard of practice.

**Case #007 MR#**▮▮▮▮▮
63y/o female with threatening coronary and carotid anatomy, unstable prior to entering the operating room.

**NMA Issues**

**#1 Several day delay before performing CABG**
It seems it may have been prudent to take this woman to the operating room sooner or to have used different MEDICAL management to handle her symptoms. One must recognize that there were several physicians involved in the pre-operative care of this woman not just Dr. Ennix making the decisions.

**#2 Failure to pre-operatively appreciate the risk of intra-operative stroke from atherosclerotic aorta**
Again this is pure speculation on the part of the NMA. Many patients with calcified aortas are operated on and do not have strokes.

**#3 Failure to perform CABG before carotid**
There is no set rule as to which procedure is performed first when done in combination. It seems that the error here lies with the anesthesiologist and vascular surgeon that did not notify Dr. Ennix in a timely fashion that the patient was ischemic, when it appears it was quite obvious.

I do not believe Dr. Ennix deviated from the standard of care in this particular situation.

**Case#008 MR#**▮▮▮▮▮

72 y/o female with a 3 to 4 hour history of unstable chest pain taken emergently to the cath lab

**NMA Issues**

**#1 Surgery contraindicated when performed, resulting in death**

# REDACTED

The NMA felt that the patient should have been treated with a PCI of the RCA. This is easy to speculate in hindsight. The Cardiologist felt the patient needed to be operated on urgently. Dr. Ennix felt given the patients on-going coronary ischemia she would be best served with an expeditious operation, in-spite of the retroperitoneal hematoma and the Integrilin. It is quite likely that the effects of the Integrilin were wearing off by the time the patient was operated on.

Given the situation Dr. Ennix did what he and the cardiologist felt best for the patient at the time.

I see no standard of care issues with this case.

**Case #009  MR#** ▮▮▮▮▮
79y/o female Jehovah's Witness with triple vessel coronary artery disease underwent urgent coronary artery bypass.

**NMA Issues**

**#1 Unclear status:  urgent vs. elective**
There is clearly some discrepancy in the record as to the pre-operative status. Putting that aside, the risk of waiting for Epogen to take effect as well as the increased risk of thromboembolism related to Epogen administration seemed greater to all the practitioners involved in the care of this woman.

**#2 Prolonged interval of cardiovascular compromise while converting from OPCAB to on-pump leading to death.** Again, speculation on the part of the NMA in blaming this for the demise of the patient.

**#3 Post-op right parietal infarct**
The NMA states "The CVA did not appear related to any specific quality of care issue, nor did there appear to be any specific action that could/should have prevented it.

**Case #010 MR#** ▮▮▮▮▮

41y/o African American female admitted with a 5 to 6 week history of chest pain. Cath findings: critical left main coronary artery disease.

**NMA Issues**

**#1 Poor judgment in delaying surgery**
Dr. Ennix cannot be held responsible for the 2 day delay between the stress echo and the cardiac catheterization. He consulted on the patient the day of the cath and scheduled the surgery for the following day. This is not an unusual sequence of events in spite of the left main disease. The NMA's suggestion of putting in a pre-emptive IABP is unwarranted and not the standard of practice.

**#2 Failure to protect the heart after conversion from OPCAB to on-pump**
It is not unusual to perform beating heart surgery with cardiopulmonary support and not arrest the heart. The patient had a normal ventricle and likely was able to tolerate the grafting with the pump support. The NMA's statement that "continued beating-heart surgery likely played a role in the immediate post-op arrest" is not based on any factual data.

**#3 Failure to place IABP or arterial line before leaving the operating room**
The patient was stable at that point in time. The criticism is unwarranted

**#4 Unavailability of the surgeon in the immediate post-op period.**
Dr. Ennix was not unavailable and he returned to the Unit as soon as he was notified that there was a problem.

There are no standard of care issues in this case.