G. SCOTT EMBLIDGE, State Bar No. 121613
emblidge@meqlaw.com
RACHEL J. SATER, State Bar No. 147976
sater@meqlaw.com
ANDREW E. SWEET, State Bar No. 160870
sweet@meqlaw.com
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>ALTA BATES SUMMIT MEDICAL CENTER,<br><br>Defendants. | Case No.: C 07-2486 WHA<br><br>**DECLARATION OF EUGENE M. SPIRITUS, M.D., IN OPPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    April 24, 2008<br>Time:    8:00 a.m.<br>Dept:    Ctrm. 9, 19th Floor<br>Judge:   Hon. William H. Alsup |

I, Eugene M. Spiritus, M.D., declare:

1.    I am the Chief Medical Officer at the University of California Irvine Medical Center and have held the position for the past ten and a half years. My responsibilities include the oversight and direction of Performance Improvement, Case Management, Risk Management, Infection Prevention and the Medical Staff Office which is responsible for appointments and reappointments to the Medical Staff. I spent eighteen years in private practice as a pulmonary critical care specialist at Saint Josephs Hospital in Orange. I was the founding partner of one of the largest pulmonary groups in Orange County and the group has grown and remains in existence. During my time in practice I was a member of the Medicine Committee and spent two

1

years as Vice Chairman of quality and two years as Chairman of the Department. I spent a total of twelve years as a member of the Executive Committee initially as a representative of the Department of Medicine and then as an Officer including the posts of secretary-treasurer, vice-president and then president of the Medical Staff.

2. Attached as Exhibit A to this declaration is a true and correct copy of my current curriculum vitae.

3. In 2008 I was asked to review materials relating to a peer review process conducted by the Medical Staff of Alta Bates Summit Medical Center ("ABSMC") of certain cardiac surgeries performed by Coyness Ennix, M.D. After reviewing the materials provided to me, and based on my years of experience with medical peer review proceedings, I provided many comments and conclusions about the process used by ABSMC. Attached as Exhibits B and C to this declaration are true and correct copies of the two reports I wrote about these subjects.

4. One of the concerns I express in Exhibits B and C relates to the composition of the Ad Hoc Committee ("AHC"). Members of such a committee should be selected who are unbiased and have not been involved in any decisions regarding the process of review or the care of patients by the physician currently under review. However, the records show that Dr. Paxton was a member of the surgical peer review committee that met on April 12, 2004 regarding Dr. Ennix, and probably voted at that meeting. Also, I have been told that Dr. Ly was the attending anesthesiologist on one of Dr. Ennix's cases under scrutiny. In addition, I have been told that Dr. Horn was or is a member of the Governing Body that might be required to sit in final judgment should a judicial review occur. Accordingly, these physicians should not have been selected to be on the committee. In addition, in the twenty plus years I have attended MEC meetings I have never heard of a Medical Staff President attending the AHC meetings, as did Dr. Isenberg in this case.

5. Likewise I find it unusual for an attorney to be involved with an ad hoc peer review committee on a regular basis. After the committee is given its charge (which may be given by the attorney) doctors perform the peer review. I do not know why an attorney is present

at the AHC meetings regarding Dr. Ennix. He is not a "peer" and has no medical knowledge that would be relevant in a committee of this nature.

      6.    One of the other troubling aspects of this case is the fact that Dr. Isenberg raised serious questions during his deposition about the validity of Peer Review process in the Cardio-Vascular Division, and he cited those concerns as one of the reasons for moving forward with the external review of Dr. Ennix. If that is in fact true, then Dr. Isenberg had a duty to have all deaths from that Division reviewed. I am informed that no such review occurred, other than deaths associated with Dr. Ennix.

I have personal knowledge of the facts stated in this declaration, including the exhibits. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was signed in Newport Coast, California.

Dated: March __, 2008

                                                                           /s/
                                              Eugene M. Spiritus, M.D.

# EXHIBIT A

# EUGENE SPIRITUS, MD

## Chief Medical Officer

## University of California, Irvine Medical Center

---

**DEGREES**

| | | |
|---|---|---|
| State University of New York, Buffalo, NY | Doctor of Medicine | 1966 |
| University of Wisconsin, Madison, WI | Bachelor of Science | 1962 |

**EDUCATION AND TRAINING**

| | | |
|---|---|---|
| Orange County Medical Center, Orange, CA | Fellowship, Pulmonary Diseases | 1971 - 1973 |
| University of California Irvine, Irvine, CA | Residency, Internal Medicine | 1970 - 1971 |
| Military Obligation | | 1968 - 1970 |
| Boston City Hospital, Boston, MA | Residency | 1967 - 1968 |
| University Hospital, Boston University, Boston, MA | Internship, Medicine | 1966 - 1967 |

**BUSINESS HISTORY**

<u>UCI MEDICAL CENTER, Orange, CA</u>                              May 1997 - present
*Chief Medical Officer*

- Responsible for the departments of case management, licensing and accreditation, quality management, infection control, utilization management, and risk management for both the hospital and the medical group.

    MAJOR MILESTONES
    - Responsible for managing JCAHO surveys with scores of 98 in 1998, and 96 in 2001.
    - Selected by UHC as having the best example of an integrated Performance Improvement Model.
    - Facilitated an initiative to mandate electronic order entry in 1999 along with Intensive Care staffing, which led to selection as the only hospital to meet the Leapfrog criteria for order entry and ICU coverage.
    - Developed an aggressive risk prevention program, which has led to the lowest rate of malpractice, on a risk-adjusted basis, of all UC Hospitals.
    - Worked on the development of new models for outpatient clinics.
    - Developed a comprehensive research compliance program.
    - Serve as Medical Director Liaison to UCOP HIPAA Task Force, and have been involved in the development of the educational program for clinical personnel.

- ➢ Serve on the executive board of SAFER California, which presented its first patient safety conference in September 2002.
- ➢ Serve on the new hospital planning committee, and co chair the Information/Technology Committee.
- ➢ Recipient $100,000 grant from the Frequent Users of Health Service Initiative supported by The California Endowment and the California HealthCare Foundation June 2003.
- ➢ Principal Investigator Understanding Norms of Error Disclosure 2003
- ➢ Principal Investigator Safety Light Study UCI Medical Center 2003
- ➢ Recipient $100,000 grant from Blue Shield Foundation for bar coding in the ICU 2004
- ➢ Recipient $100,000 grant from Blue Shield Foundation Wireless Beside Order Entry 2005
- ➢ Member of the Quality Committee of the Hospital Association of Southern California involved in the Development of CHART. California Hospital Report Cards
- ➢ Co-Chair Clinical Review Committee for Chancellor Drake 2006. Have completed 14 reviews with in the past 16 months. I was responsible for selecting the reviewers with the requirement that there be a minimum of two reviewers each being a chair of an academic department with one from in the University of California System and one from outside the system.
- ➢ In December of 2006 I was asked to devote 20% of my time as the CMIO responsible for selecting and leading a group of clinicians in the migration of our order entry system to a fully integrated electronic medical record across the inpatient and out patient setting utilizing Eclypsis Sunrise Clinical Manager. Our plan is to be fully operational six months before we move into our new hospital in the spring of 2009.

**BUSINESS HISTORY, continued**

**KPMG PEAT MARWICK LLP, Costa Mesa, CA**　　　　　　　　　　　　　　　1994 - 1997
*Consultant*

- Counseled large healthcare institutions and community hospitals in performance improvement initiatives, the development of clinical pathways and case management models. Assisted medical groups in organizing into delivery models for managed-care contracting.

   PROJECTS INCLUDED
   - ➢ Clinical Pathway Development; Lennox Hill Hospital New York, NY
   - ➢ Case Management Development for outpatient programs at Kings County Hospital, New York, NY and Elmhurst Hospital, Queens, NY

**ABBOTT LABORATORIES**     1993 - 1997
*Consultant*

- Provided consultation in case management and educational programs for residents and primary-care physicians.

- Assisted in the development of several phase-four clinical trials designed to look at pharmecoeconomic benefits of clarithromycin.

- Participated in three roundtable presentations, which have since been published, regarding techniques for lowering length of stay, including switch therapy and case management models and clinical pathways.

**ST. JOSEPH HEALTH SYSTEM INFORMATION SERVICES, Orange, CA**     1996
*Consultant*

- Assisted in evaluating electronic medical records for medical groups, the use of Internet strategies for linking physicians and hospitals, and evaluating outcomes data for ongoing comparison of institutions within the health system.

**ST. JOSEPH HOSPITAL, Orange, CA**     1992 - 1995
*Chairman, Department of Medicine*
*Member, Executive Committee*

- Served as chairman on quality improvement; subsequently elected president of medical staff.

- Founding member of the first Physician-Hospital PPO in Southern California which initially had 22 Hospitals and Medical Staffs.

- Founding member St. Josephs Hospital IPA which grew to over 100,000 lives while I was at the hospital. I was responsible for case management and quality improvement for both the hospital and IPA

**BUSINESS HISTORY**, continued

*Vice President, Medical Staff*     1990 - 1992

- Responsible for all professional activities of the hospital including credentialing, judicial review, reappointment and quality.

*Chairman of Quality Committee*     1988 - 1990

- Responsible for quality management development for hospital.

- Oversight of quality issues for two JCAHO surveys. The first focused on quality indicators and outcomes data analysis while the second encompassed case management, credentialing and medical staff office issues. Both were successful.

*Medical Director, Respiratory Services*                                          1974 - 1995

- Oversaw the expansion of the department to include sleep disorders, arterial blood-gas analysis, pulmonary function testing and rehabilitation. Directed training program from its inception in 1976 until its discontinuance in 1992.

ST. JOSEPH HOSPITAL/ST. JOSEPH MEDICAL GROUP, Orange, CA          1991 - 1995

- Developed a case-management model with 72 active clinical pathways; designed a senior screening tool for at-risk capitated contracts.

- Lowered length of stay and bed days.

APRIA HEALTH CARE (formerly Abbey Health Care), Costa Mesa, CA          1992 - 1994
*Medical Director*, Part-time

- Participated in the development of asthma home-care model and case-management techniques.

PULMONARY CONSULTANTS OF ORANGE COUNTY, Orange, CA
*Chief Executive Officer/Founding Member*

- Instrumental in growth of group from zero to the largest, most successful group of pulmonary specialists in Orange County.

SHAMROCK MEDICAL (Oxygen and Durable Medical Company), Orange, CA          1986 - 1992
*Manager*

- Developed and managed a medical company that was sold for $1,250,000

**BUSINESS HISTORY**, continued

CLINICAL RESEARCH PROGRAMS, Southern California          1980 - 1994
*Manager*

- Developed a clinical research program with Pulmonary Consultants that was involved with more than twenty trials with such companies as Allergan, 3M,

Genentech, Abbott Laboratories, Xoma and Centecor.

## ACADEMIC APPOINTMENTS

University of California, Irvine, Irvine, CA  1976 - Present
Associate Clinical Professor of Medicine, Department of Pulmonary Medicine
Clinical Professor of Medicine 1993

Orange Coast College, Santa Ana, CA  1976 - 1988
*Medical Director, Respiratory Care Program*

## BOARD AND COMMITTEE EXPERIENCE

Foundation, Sisters of St. Joseph's of Orange, Board Member

## PROFESSIONAL AFFILIATIONS

American College of Chest Physicians
American College of Physicians
American College of Physician Executives

## CERTIFICATIONS

Board Certified, Internal Medicine (Sub-Boarded in Pulmonology)
American Board of Quality Assurance and Utilization Review

## LICENSURE

California

## PUBLICATIONS

6 Publications (4 principal author)

# EXHIBIT B

**EUGENE M SPIRITUS M.D.**
333 City Blvd. West, Suite 1810
Orange, California 92868
January 25, 2008

To Whom It May Concern:

By way of introduction I am the Chief Medical Officer at the University of California Irvine Medical Center and have held the position for the past ten and a half years. My responsibilities include the oversight and direction of Performance Improvement, Case Management, Risk Management, Infection Prevention and the Medical Staff Office which is responsible for appointments and reappointments to the Medical Staff. I spent eighteen years in private practice as a pulmonary critical care specialist at Saint Josephs Hospital in Orange. I was the founding partner of one of the largest pulmonary groups in Orange County and the group has grown and remains in existence. During my time in practice I was a member of the Medicine Committee and spent two years as Vice Chairman of quality and two years as Chairman of the Department. I spent a total of twelve years as a member of the Executive Committee initially as a representative of the Department of Medicine and than as an Officer including the posts of secretary-treasurer, vice-president and than president of the Medical Staff. I sat on the Governing Board of the Hospital for two years; I was a founding member of the first Physician Hospital PPO in Southern California and was responsible for the quality committee of the St. Joseph PPO. I was also a founding member of the St. Joseph IPA and was responsible for quality and case management until my departure from practice. During the past 4 years I have received three research grants one from the California Health Care Foundation which was designed to look at frequent users of Emergency Rooms who were either unfunded or under funded. In addition I received two grants from The California Blue Shield Foundation one to look at the ability of Bar Coding to reduce medication errors in the ICU and another to look at the effect of Mobile Computers in the ICU to improve efficiency in a teaching environment. I am a member of a research group looking at resource consumption and outcomes across the 5 University of California Hospitals and Cedars Sinai Medical Center for Medicare Patients admitted to the hospital in Congestive Heart Failure. I am Co-author of a paper entitled "A Conceptual Model for Disclosing Medical Errors" published in Advances in Patient Safety Volume 2 page 483-496

In preparation for my testimony I was furnished with the depositions of Dr. Isenberg, Dr. Paxton and Ms. Joanne Jellin, M.A. CPMSM. . I read the By-Laws, of 2003, 2005 and 2006, as well as the Rules and Regulations from 2/2004 thru 4/2007 of Alta Bates Medical Center Summit Campus. In addition I was given copies of the meetings held with regard to the Plaintiff by the Medical Executive Committee, the Ad Hoc Committee, and the Peer review committee of the Cardio Thoracic section as well as the Surgical Peer Review Committee. I was furnished letters to Mercer Consulting along documents provided to them as well as their final report. I was given copies of correspondence between Dr. Ennix and various members of the MEC and the AD Hoc Committee. I saw correspondence from additional outside consultants and Dr. Ennix's patients. In addition I saw a correspondence between the two Alta Bates Medical Center Campuses regarding

an outside review of cardiac surgery cases performed at Alta Bates by Dr. Ennix along with a copy of the Jung Report and deliberations of the Peer Review Committee at Alta Bates Medical Center. There are partial copies of Medical Records, copies of peer review documents and a report furnished by OSHPD regarding cardiac surgery in California from 2003-3004. The last correspondence I saw was from April 19, 2006 a letter to Dr. Paxton regarding the Peer review of Dr. Ennix and a note from the Ad Hoc committee dated May 4, 2006.

I would like to review with you my findings regarding the actions of the Medical Executive Committee and the Ad Hoc Committee in chronological order. It appears that Dr. Ennix was a member of the Medical staff for many years but did most of his cases at the Alta Bates Campus where he apparently led the program for several years. His cases were apparently being reviewed by an outside consultant when the program was closed and he moved his practice to the Summit Campus where he apparently joined three other surgeons, Dr's Iverson, Kahn and Stanten. The first document in chronologic order is one from Dr. Rosenberg of Alta Bates responding to a request from Dr. Shaieb the President of the Summit Medical Staff in December agreeing to forward a copy of the Jung report to Summit. I know that there is an agreement between the two hospitals regarding the sharing of data for Peer review. I wonder how Summit was made aware of this report since the information should have been privileged and had they begun a peer review process that necessitated the request for information? If they had it would appear to have predated the minimally invasive cases. Had Dr. S. Stanten been made aware of this report prior to his decision to review the four cases? Was the Jung report forwarded to the Cardio Thoracic Peer Review Committee once it was received? Dr. S. Stanten reviewed the four cases and apparently requested a special meeting of the Medical Executive Committee Officers which was held on February 9th, 2004. During that meeting Dr Steven Stanten stated that he had received expressions of concern from anesthesiologists and OR/ICU staff regarding patient outcomes, length of procedures, patient selection and utilization of resources. While Dr. Stanten posed three questions regarding minimally invasive valve surgery it appears that the consensus of the group was that defined privileges for the procedure were not necessary nor was a change in the informed consent required. Additionally, it was recommended that a discussion be held with Dr. Ennix be held as soon as possible and the committee agreed to review other pertinent documents regarding the individuals clinical performance. The composition of the membership of this meeting is somewhat confusing. Since the report is signed by Dr. Steven Stanten one might assume that it was a meeting of the Surgery Committee because Dr.'s R. Stanten, S. Stanten, Iverson and Moorstein are members of that committee. On the other hand the presence of the Medical Executive Committee Officers might suggest that this is a committee of the MEC. I must make the assumption that at least Dr. Shaieb and Isenberg had already read the Jung report and if they had concerns about the clinical competence of Dr. Ennix at that point they should have appointed a committee immediately. While it was stated that they would meet with Dr. Ennix as soon as possible I can only find a note that both Dr.'s Russell and Steven Stanten met with Dr. Ennix. I see no documentation that this was done in a formal manner before a committee. I have concerns regarding the composition of this committee as two of the members are

partners of the accused, and the Chair of the Surgery Committee is the brother of one of those members.

Apparently after this meeting a moratorium was placed on minimally invasive surgery for all physicians while Dr. Hon Lee reviewed the charts of the four patients who had undergone the procedure. At the conclusion of Dr. Lee's report he found no quality of care issues but did find significant issues with documentation. There is a document from the Cardio-Thoracic Peer Review Committee on April 10, 2004 at which there is a review the report of Dr. Hon Lee and makes mention of a meeting between Dr. Hon Lee and the Chair. It is not clear if this is Dr. Russell or Steven Stanten. What is germane is the fact that Dr. Hon Lee suggested that a multidisciplinary team be convened to evaluate the process of MIS (minimally invasive surgery) and approximately 12 points were suggested. I see no evidence to suggest that this occurred. In addition the committee agreed to review all MIS cases but the one failed case of Dr. Khan and Iverson was not presented in the notes I reviewed.

On April 16th, 2004 Dr. Isenberg and Dr. Steven Stanten met with Dr. Ennix and informed him of the review by Dr. Lee. Based on Dr. Lee's findings he was informed that the moratorium on MIS was being lifted. However, an Ad Hoc Committee of the Medical Staff was being formed to investigate Dr. Ennix. The notes suggest that Dr. Russell Stanten had spoken with Dr. Ennix and Dr. Ennix had agreed not to do MIS cardiac surgery. Dr. Isenberg is quoted in the minutes saying "I want you not to do MIS until we are done" and he proceeded to tell Dr. Ennix that he had an obligation to report him to the Medical Board because he was relinquishing privileges while under investigation. I disagree with Dr. Isenberg. Dr. Ennix had not been granted specific privileges for MIS and he retained all privileges listed by the Division of Cardio-Thoracic Surgery. Since Dr. Ennix could continue to perform all cases presented to him there was no removal of privileges. Secondly, under the By Laws Sections 8.2, "O" and 8.3 A 1-4, I see no documentation that Dr. Ennix was provided with this information.

While I have not seen any deliberations of the Medical Executive committee regarding the initial decision to place a moratorium on MIS or to lift it nor did I see any documentation that the entire MEC was apprised of the review by Dr. Han Lee I will assume that it did occur. In addition I would assume that the MEC was involved in the decision to make the 805 report.

After the MEC formed the Ad Hoc Committee in April 2004 members were not appointed until July and did not have their first meeting until August 13, 2004. This is clearly not fair to Dr. Ennix and does not comport with the By-laws. If one was going to be reviewing Cardiac Surgery the presence of a cardiologist, and cardiac surgeon would be important. Likewise members of the committee should be selected who are unbiased and have not been involved in any decisions regarding the process of review or the care of patients. Dr. Paxton was a member of the surgical peer review committee that met on April 12, 2004 and probably voted at that meeting. His deposition does confirm the fact that he was present (page 59.) I have been told that Dr. Ly was the attending anesthesiologist on one of MIS cases. If Dr. Horn was or is a member of the Governing

Body and might be required to sit in final judgment should a judicial review occur he should not have been selected to be on the committee. In addition, in the twenty plus years I have attended MEC meetings I have never heard of a President attending the Ad Hoc Meetings. As the president he has a responsibility to the accused to run an impartial meeting. With respect to the By-Laws and the Ad Hoc Committee was a formal request made in writing as stipulated in section 7.1 A? The MEC and the Ad Hoc Committee did not follow section 7.1 B, "any investigation shall be conducted promptly and efficiently..." While the Committee was doing its initial investigation between August and October and before sending a letter to Mercer it would have been fair and appropriate to hear from the accused physician prior to writing the letter to the consultants. Likewise a consultant to a committee that is not present during the interview of witnesses is not as helpful as having someone present throughout the proceedings. The hiatus from October until May was prolonged and did not comport with the By-Laws. Likewise I find it unusual for an attorney to be involved with an ad hoc peer review committee on a regular basis. After the committee is given its charge which may be given by the attorney it is usual for the doctors to do the peer review. I do not know why an attorney is present he is not a peer and has no medical knowledge that would be relevant in a committee of this nature. The letter to Dr. Ennix of May 31, 2005 invites him to a meeting stating that "it is informal and no lawyer will be there." If that is the case why was an attorney present for many of the other interviews?
I would now like to address the issues surrounding the summary suspension of Dr. Ennix on May 11, 2005 for fraudulent entry on a Medical record and secondarily the National Medical Audit Report which the Medical Staff Office Received in early May. The By-Laws clearly state in Section 7.2 A "Whenever a medical staff member's conduct may result in imminent danger to the health of any individual" he may be summarily suspended. Since Dr. Ennix had in fact seen the patient but neglected to write a note he may be guilty of back dating a note but this does not give rise to a situation that causes imminent danger. Clearly the main concern was the external report. Since Dr. Ennix received a letter outlining the concerns of the Medical Staff on May 11, 2005 and was asked to present himself for a meeting with the committee on May 18, 2005. The By-laws clearly state in section 7.2 section B that this meeting must be held with in 5 days. Once the MEC elected to uphold the suspension Dr. Ennix asked if he could at least assist in surgery. Dr. Isenberg apparently negotiated an agreement with the plaintiff that clearly required an additional report to the Medical Board. I believe that in fairness to Dr. Ennix had the Ad Hoc Review been done in a timely fashion and had Dr. Ennix been able to meet with the committee this summary suspension would never have happened. In fact the final conclusion of the MEC was to return his privileges with stipulations.

One of the troubling aspects of this case is the fact that Dr. Isenberg raised serious questions about the validity of Peer Review in the Cardio-Vascular Division during his deposition and it was one of the reasons cited for moving forward with the external review. If that is in fact true Dr. Isenberg had a duty to have all deaths reviewed. His comment that he had no other complaints is not a sufficient justification for not going further. There were a total of 43 CABG deaths between 2003 and 2004 at Summit and only 6 of these were from Dr. Ennix. One of the documents forwarded to me was the California Report on Coronary Artery Bypass Graft for 2003-2004. The data is broken

down by hospital and by physician. It must be noted that Dr. Ennix is a member of the Clinical Advisory Panel but clearly could not manipulate the data to his advantage. During the Ad Hoc review much was made of the difference between the data for Dr. Ennix and his peers. Alta Bates Summit Hospital's Risk adjusted mortality rate was below the state average. The case volume for the two years was 1502 and while the mortality was calculated for isolated CABG cases Dr. Ennix had 135 cases at Summit with 6 deaths and an observed to expected mortality rate of 4.44 to 2.87. Dr. Ennix rate is considered not different from the state average since his rate falls within the CI of the RAMR. Dr. Iverson had 89 cases with 5 deaths for an observed to expected mortality of 5.62 and 2.69. He had 29 cases at San Pablo with 1 death for a ratio of 3.45 to 3.01. Dr Stanten had 83 cases with 2 deaths for an observed to expected ratio of 2.41 to 2.57. At San Pablo he had 26 cases with 2 deaths for a ratio of 7.69 to 4.68. None of the doctors had statistically better or worse outcomes. In fact it appears that Dr. Iverson's data was similar to Dr. Ennix with 5 deaths and it does not appear the MEC asked for a review of all deaths during this period. I did not cite the work of the Kaiser surgeons but they have a significant volume and accounted for 26 of the deaths during the time period 2003-2004. One physician Dr. Cain had 311 cases with 12 deaths and an observed to expected ratio of 3.86 to 3.05. I would think that since Dr. Isenberg raised the issued of cronyism in the peer review process he would have insisted that in fairness to Dr. Ennix several cases of other surgeons might have been reviewed. Mortality data in small numbers is difficult to deal with and that is one of the reasons that valve mortality is not put in the mix when calculating out comes.

The report of the outside consultants raised issues unrelated to Dr. Ennix and it would be important to find out if a committee had been formed and if any recommendations had been forthcoming to the Medical Staff.

With regard to the proctoring required by the medical staff the number of cases and the clearance by multiple physicians would suggest that he should be released from proctoring. As one looks at the data for the State he clearly falls with in the range of his peers at Summit Hospital. I assume he has been to the UCSD program on clinical documentation and he has been keeping is records up to date. The letter from the Cardiac Surgeons of April 19,2006 clear document enough cases to reach a conclusion and his Peers believed he should be reinstated. It is hard to understand how an Ad Hoc Committee with no cardiac surgeons on it could insist that Dr. Ennis be continued with proctoring based upon the report.

During the past four years I have not had a deposition taken nor have I appeared in court as an expert witness.

I charge $550.00 per hour to review records and $750.00 per hour to give a deposition.

Respectfully,

Eugene M Spiritus M.D.

# EXHIBIT C

**Eugene M Spiritus M.D.**
**9 Domani Drive**
**Newport Coast, CA 92657**
February 13, 2008

I was given the report of Kimberly S. Ware, Esq. and asked to make comments regarding her evaluation of the Peer Review Process at the Summit Campus of Alta Bates Hospital provided to Coyness L. Ennix, Jr. M.D. during the period of December 2003 through July, 2006.

I fully agree that Peer Review is an important and integral part of a Medical Staff's responsibility. I likewise agree that Medical Staff Bylaws and Rules and Regulations describe the process of Peer Review at an institution.

The most important aspects of Peer Review in my estimation are that it is *Fair, Unbiased, and Timely; Conducted by Peers and it is not a Legal Proceeding*.

On page 5 paragraph 1, lines 3-4 of her report it is stated "there has been recognition by the Courts of California and the Legislature that physicians under review are entitled to fairness in the process." On page 10 section C she cites "Fairness in the Process: Notice and the Opportunity to be Heard." I would argue that the process that Dr. Ennix was subjected to was not fair. We are talking about a process that began in February 2004 with the review of the four MIS surgical cases and the decision to form an Ad Hoc Committee in April 2004. In total 10 cases were reviewed by the Ad Hoc Committee and a formal report did not go to the MEC until September 2005. While he was made aware of the decision to do a review of his cases in April 2004, Dr. Ennix was not seen by the committee until July 2005, a span of fourteen months.

Page 12 Section III A discusses the review of Dr. Ennix performance of MIS valve surgery and the decision to voluntarily restrict such privileges temporarily and later permanently. Dr. Ennix did not agree to any reduction of his privileges as no privileges were ever granted for MIS valve surgery and after a review by the MEC it was agreed that no such privileges were necessary. What he agreed to was that he would not use the MIS approach for his surgery. He could still treat any and all patients referred to him for the privileges he had been granted by the MEC of Summit Hospital.

Page 13 of her report notes that Dr. Isenberg was given permission to form an Ad Hoc Committee (AHC) to review the work of Dr. Ennix and I concur that the appointment of an AHC was entirely appropriate. The selection of members to serve on such a committee is very important. It is expected that members have no prior knowledge of the

issues, that they be peers and that they have the appropriate knowledge, training and background to make informed decisions about the care they are evaluating. Dr. Isenberg was well aware of the fact that the Junod Report commissioned by Alta Bates Hospital was not acted upon because their committee felt that it did not have the appropriate expertise on its Medical Staff to go further; they in fact stated that Summit had cardiac surgeons on staff to do that. In addition it is hard to understand how the committee did not have a Cardiologist from Summit rather than a pulmonologist. While it might be appropriate to use outside reviewers it would have been much preferable to select an outside cardiac surgeon to sit on the AHC during its deliberations so that free and full discussions could have occurred in a collegial manner. Having read the minutes of the AHC the President of the MEC appears to have been an active participant in the process. The duties of the President of the Medical Staff under Section 9.2 A-1 include "enforcing the medical staff bylaws, rules and regulations, implementing sanctions where indicated, and promoting compliance with procedural safeguards where appointments, summary suspensions, corrective action, hearings or appeals have been requested or initiates." I believe that since the bylaws preclude him from being a member of the credentials committee, (9.2 A-4) it would also preclude him from sitting on a committee that could materially affect the credentials of a member of the Medical Staff. I have now been made aware of e-mail correspondence between Dr. Isenberg and Neil Smithline of NMA which suggest editing of the report by the President of the Medical Staff which is inappropriate.

I like wise believe that since the peer review process is not a legal proceeding the hospital attorney's role should be limited to explaining the rules that govern an AHC and should not be involved in the regular meetings.

In responding to the statements made by Ms. Ware on pages 24-27 about the process used by the Medical Staff, I would cite my previous report. It is true that the Medical Staff can ask for an outside review, however it should be timely and since Summit is a community hospital the outside reviewers should have all been from non-academic institutions.
I have already stated my concerns regarding the summary suspension for falsification of the medical records. This is inappropriate and clearly placed Dr. Ennix in a difficult situation which led him to request assisting privileges. As one looks at the timeline and the conclusions reached by the MEC this process was inordinately prolonged and had the medical staff acted on the review of Dr. Lee they might have sent Dr. Ennix to the Pace Program in San Diego in April of 2004. The fact that the MEC reinstated all of Dr. Ennix's privileges with proctoring suggests that it they did not have enough hard evidence to conclude that he was a danger to his patients. The proctoring that occurred by the Kaiser physicians suggested that he was practicing within the standard of care. When Dr. Ennix was again summarily suspended in December of 2005 I found it unusual that Dr. Paxton and Dr. Steven Stanton felt comfortable performing a chart review and rendering a conclusion regarding the five cases for which he was suspended when previously Dr. Paxton needed the services of NMA to review complications. It should be noted they took a total of 5 days to do their job; the review process for the previous ten cases took almost 18 months.

The continued proctoring until July of 2006 after the letter from the Department of Cardiovascular Surgery dated April 19, 2006 unanimously recommending termination of proctoring suggests that Dr. Ennix was being held to a standard that in retrospect is hard to justify.

In summary as I stated in my previous report there were many other deaths at Summit hospital and there were physicians who had risk adjusted mortality rates not unlike Dr. Ennix. Nobody looked at them and nobody to my knowledge addressed the systems issues raised by NMA and Dr. Ennix in his initial discussions.

While Ms Ware says that the Bylaws and Rules and Regulations of Summit Hospital give the MEC wide latitude they do state that requests for review is made to the MEC in writing and that the process be timely. This process was certainly not timely.

Eugene Spiritus M.D.