# EXHIBIT B

# MEC Review

## Percentage of Minorities on Medical Staff* vs. Percentage of Minorities Reviewed by MEC



Hispanic: 0% (0/18)

Caucasian: 55.4% (10/18)**

African American: 27.8% (5/18)***

Asian: 16.7% (3/18)

**Percentage of Minorities Reviewed**

Hispanic: 1.3% (7/547)

Caucasian: 69.3% (379/547)

African American: 11.9% (65/547)

Asian: 17.6% (96/547)

**Percentage of Minorities on Medical Staff***

* There were 991 physicians on medical staff, but ABSMC identified only 547 by race.

** One physician, identified by ABSMC as "Physician G," was reviewed twice by the MEC. He is treated here as two separate physicians in order to avoid undercounting MEC review of Caucasians.

*** ABSMC stated that the doctor it identified as "Physician H" is "Non African-American." In fact, that doctor's race is a mix of predominantly Indian, African American and Native American. For that reason, he is treated here as African American.

# EXHIBIT C

# MEC Review by Race
## As Percentage of Medical Staff



| | Caucasian | African American | Asian | Hispanic |
|---|---|---|---|---|
| | 2.64%* (10/379) | 7.69% (5/65) | 3.13% (3/96) | 0% (0/7) |

\* One physician, identified by ABSMC as "Physician G," was reviewed twice by the MEC. He is treated here as two separate physicians in order to avoid undercounting MEC review of Caucasians.

# EXHIBIT D



Disciplined ABSMC Physicians, 2004-06
Race Comparison

# EXHIBIT E



# MEC Review by Race, for Standard of Care Issues
## As Percentage of Medical Staff

8%
6%
4%
2%
0%

Caucasian
0.79%*
(3/379)

African American
7.69%
(5/65)

Asian
3.13%
(3/96)

Hispanic
0%
(0/7)

* One physician, identified by ABSMC as "Physician G," was reviewed twice by the MEC. He is treated here as two separate physicians in order to avoid undercounting MEC review of Caucasians.

# EXHIBIT F

# Summarily Suspended ABSMC Physicians, 2004-06
## Race Comparison



# EXHIBIT G

# EAST BAY CARDIAC SURGERY CENTER
## Medical Group

*Specializing in Adult Cardiac Surgery and Thoracic Surgery*

Leigh I.G. Iverson, M.D.
Coyness L. Ennix, Jr., M.D.
Russell D. Stanten, M.D.
Junsid H. Khan, M.D.

February 13, 2005

William Isenberg, M.D., Ph.D
President, Medical Staff
Alta Bates Summit Medical Center
350 Hawthorne Ave.
Oakland, CA. 94609

CONFIDENTIAL

RE: Peer review of Dr. Coyness L. Ennix, Jr.

Dear Dr. Isenberg:

I was surprised and concerned to learn that an Ad Hoc Committee was sending 10 cases of Dr. Ennix's for an outside review.

I have been associated with Dr. Ennix in a practice of cardiac and thoracic surgery for about 5 years. We have been involved in several hundred cases together. I have known of his excellent reputation for at least 15 years. He is a nationally recognized for his leadership and innovation in cardiac surgery. He has without exception shown outstanding skill and judgment. I've have always respected his insight, technical abilities and judgment. It is my impression that he has been innovative and interested in new ideas and has added significantly to our practice.

I am not familiar with all 10 of the cases involved in this review but I am familiar with the four minimally invasive cases. I believe that after these four cases were peer reviewed by Dr. Hon lee, his review should have been accepted and these four cases closed. I'm not familiar enough with the other six cases to comment. However, in general cardiac surgery in 2005 still has significant risk and complications can occur. It is my understanding that Dr. Ennix's results over the last few years are statistically the same as for the national average when risk adjusted.

In summary, Dr. Ennix is a good surgeon with good judgment and technique. In addition, Dr. Ennix is a gentleman.

Sincerely yours,

Junaid Khan

cc: Steven Stanten, M.D.
    Warren Kirk, CEO

3300 Webster Street, Suite 500, Oakland, California 94609-3149  (510) 465-6600  FAX: (510) 839-0806

D 4474

# EXHIBIT H

ATTORNEYS' EYES ONLY

**CONFIDENTIAL**

## SUMMIT MEDICAL CENTER
## DEPARTMENT OF SURGERY PEER REVIEW
## QUALITY INDICATORS

### 100% SCREENING

- ***Deaths- Intra-Op and Post-Op (w/in 30 Days of Surgery) and Non-Procedure Death w/ Surgeon as Attending***
  *(As of 11/06, it was decided that deaths following incidental tracheostomies would not be reviewed as "Post-Operative Deaths"*

- ***Returns to Surgery***
  *Excludes dialysis access cases*

### OTHER CASES BY REFERRAL

- ***Risk Referrals***
- ***Referral from Other Sources*** *(UOFs, Physicians, Other Committees, Critical Care Rounds , etc.)*
- ***JCAHO Monitor Referrals*** *(Blood Usage, Operative and Other Procedure Review, Medication Usage/ ADRs, Medical Records, Documentation, Core Measures)*

### *CARDIO-THORACIC SURGERY

***Deaths, Complications, Returns to Surgery***: *Cases involving cardiac surgery are reviewed by a separate Cardio-Thoracic Peer Review Committee. Physician peer review issues involving questionable sub-standard care/ requiring action are referred to the Surgery Peer Review Committee for follow-up. . Identified system issues are acted upon by that PI Committee (see below). CT indicators are also tracked/monitored via STS System (Society of Thoracic Surgery).*

*Cardiac Surgery has its own Multidisciplinary PI Meeting for identification of opportunities for Performance Improvement. This committee operates under the umbrella of, and its Performance Improvement activities are reported to, the Surgery Peer Review and/or Performance Improvement Committee.*

### RN CLOSURE CRITERIA

**Deaths**    ** REFER TO MORTALITY REVIEW FLOW CHART

**Returns to Surgery** **(Note: Dialysis Access cases are not screened)**

- Complication : a) recognized, and b) appropriate interventions taken, c) in a timely manner. No indication of care outside the standard is noted. These cases are "rated" in the MIDAS system.

Revised  March, 1998, Surgery Quality
Reviewed/Approved June, 1999, January-02, 2004, February 2007



EXHIBIT NO. 1200
DATE: 1-31-08
WITNESS: MOGG
TOM LANGE, CSR 4689

# EXHIBIT I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D.,
as an individual and in his
representative capacity under
Business & Professions Code
Section 17200 et seq.,

CERTIFIED COPY

CONFIDENTIAL

      Plaintiffs,

vs.                              No. C 07-2486

RUSSELL D. STANTEN, M.D.,
LEIGH I.G. IVERSON, M.D.,
STEVEN A. STANTEN, M.D.,
WILLIAM M. ISENBERG, M.D.,
Ph.D., ALTA BATES SUMMIT
MEDICAL CENTER and DOES 1
through 100,

      Defendants.

_____/

DESIGNATED "CONFIDENTIAL"
DEPOSITION OF:
MARILYN BARKIN
Thursday, January 24, 2008

Reported by:        HANNAH KAUFMAN & ASSOCIATES, INC.
                    Certified Shorthand Reporters
DARCY J. BROKAW       472 Pacheco Street
RPR, CRR, CLR,      San Francisco, California 94116
CSR No. 12584

----------------------

(415)664-4269

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q    And how much time did you spend with

2   Mr. Vandall in consultation?

3      A    About four hours, three or four hours.

4      Q    And how much time did you spend going over

5   the documents you've just mentioned?

6      A    Two or three hours.

7      Q    When were you first notified that there

8   was a potential that you would have to testify as

9   what we call the Person Most Knowledgeable on peer

10  review at the departmental division level at Summit?

11         MR. VANDALL:  I'll just object.

12         He doesn't want to know the contents of

13  any conversations that you and I had.  He's just

14  asking you about timing.

15  BY MR. SWEET:

16     Q    Well, I do want to know the contents of

17  the conversations, but I'm not entitled to them.

18         But what I am entitled to is to know when

19  you were first notified that you would potentially

20  be testifying as the Person Most Knowledgeable.

21     A    To the best of my recollection, I think it

22  was about ten days ago, a week to ten days ago.

23     Q    Okay.  We'll flesh these concepts out a

24  little bit more as we go on here.

25         But my understanding is that at Summit,

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1    there is a nurse level of review, there is a

2    physician level of review, there then is a

3    cardiothoracic division level of review, and then a

4    surgery division or department level of review; is

5    that accurate?

6        A    Yes.

7        Q    Will you generally tell me -- and again,

8    I'm going to ask you more specifics about this; so I

9    just really want general answers if you can give

10   them -- your role in the nurse, is it quality

11   improvement coordinator --

12       A    Yes.

13       Q    -- level of review.

14       A    I review documents that are provided to me

15   by the organization that help me in identifying

16   cases that would meet the criteria for peer review,

17   meaning deaths, returns to surgery, CVAs and so

18   forth.

19       Q    Ms. Barkin, are you the quality

20   improvement coordinator for the cardiothoracic

21   surgery group?

22       A    Yes.

23       Q    Okay.  So there's not more than one?

24       A    No.

25       Q    Okay.

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1          MR. VANDALL:  I'm going to object.

2     Ms. Barkin was not finished responding to your

3     question, and you should let her finish her answers

4     before you interrupt her.

5     BY MR. SWEET:

6          Q    What about -- so you are the quality

7     improvement coordinator for the CT division?

8          A    Yes.

9          Q    What is your role in the -- what I look at

10    as the next level, the physician level of peer

11    review at Summit?  And I'm just talking about

12    cardiothoracic cases.

13         A    I understand.

14              When I identify cases that meet criteria,

15    I prepare a short abstract of the case and refer

16    it -- present that to the reviewing physician for

17    their determination.

18         Q    Okay.

19         A    And I also review the chart and flag the

20    appropriate documents.

21         Q    Meet "criteria" is a word you just used.

22    Is that the same thing as indicators?

23         A    Correct.

24         Q    As the quality improvement coordinator for

25    the CT group or division, do you have it within your

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1    gambit or power to close the case on your own at

2    that point?

3         MR. VANDALL: Objection; vague.

4         THE WITNESS: It is in my power. I rarely

5    do that.

6    BY MR. SWEET:

7         Q    Okay. Sometimes, do you?

8         A    I think I've closed one case over the last

9    year that I felt was -- didn't warrant

10   physician-level review.

11        Q    If I understand -- tell me if this is

12   right or wrong -- the rules and regulations of

13   Summit allow for the quality improvement coordinator

14   to clear the case, don't they?

15        A    Yes, they do.

16        Q    And then you've indicated that once you

17   review a matter as the QIC, you then submit an

18   abstract; is that what you said?

19        A    Correct.

20        Q    What is the abstract called? Does it have

21   a name?

22        A    It's just called the case abstract.

23        Q    Is it a one-page document?

24        A    It can be a lot less than that.

25        Q    What type of information is on the case

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1    until Dr. Iverson retired, whenever that was. It's

2    been over a year. So that would be seven, seven.

3    Except that Kaiser just added an additional surgeon,

4    so it's back up to eight.

5        Q    So it sounds like as a general

6    proposition, there have been eight cardiac surgeons

7    in the cardiothoracic division since 2004?

8        A    Between seven and eight. It varies at

9    times.

10       Q    Can you name them all?

11       A    Yes.

12       Q    Please do so.

13       A    Kaiser was, let's see, David Alyono,

14    A-l-y-o-n-o; Brian Cain, C-a-i-n; Hon, H-o-n, Lee,

15    L-e-e; Dennis Durzinsky, D-u-r-z-i-n-s-k-y.

16        The Summit group is Russell Stanten;

17    Coyness Ennix; Junaid, J-u-n-a-i-d, Kahn, K-a-h-n;

18    Leigh Iverson; it's L-e-i-g-h, Iverson,

19    I-v-e-r-s-o-n. And the new Kaiser physician who

20    started at the very end of last year is Daniel

21    Pellegrino.

22        I think that's all.

23       Q    In that group you just listed, is

24    Dr. Ennix the only African-American surgeon?

25       A    Yes.

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1    prior testimony.

2    BY MR. SWEET:

3        Q    With maybe one exception, correct?

4        A    I try to do all the abstracts on all the

5    cases that meet criteria.

6        Q    Okay.  And then it goes -- the matter goes

7    to a physician-level review, correct?

8        A    Correct, yes.

9        Q    Who chooses what physician will

10   participate in a physician-level review?

11       A    The usual -- well, the procedure that's

12   followed is in the cardiothoracic division, if it's

13   one of the Summit cardiothoracic surgeons' cases, it

14   will go to a Kaiser physician for review and vice

15   versa.  So if it's a Kaiser physician, it's going to

16   go to a Summit doc for review.

17       Q    Why?  Why that procedure?

18       A    To avoid -- to try to keep the process as

19   objective as possible.

20       Q    Whose idea was that, to send Summit

21   matters to Kaiser physicians and vice versa?

22       A    I can't answer that.  I don't know.

23       Q    Was that process in place before you

24   assumed the position?

25       A    Yes.

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q    Does it remain in place today?

2    A    Yes.

3    Q    Has Dr. Russell Stanten ever suggested

4    that that be changed in any way?

5    A    No.

6    Q    Has anybody --

7    A    Or not to me, he has not suggested it.

8    Q    Has anybody ever suggested that that be

9    changed in any way?

10    MR. VANDALL:  Objection; vague.

11    THE WITNESS:  I'm not aware.

12    BY MR. SWEET:

13    Q    Who chooses the specific physician that

14    will act as a reviewer?

15    A    For the most part, and -- well, I'm going

16    to say it depends.  For the most part, I distribute

17    the cases to the Kaiser physicians based on their

18    availability and who's done the last -- the most the

19    last time.  Somebody else is going to get the next

20    batch of cases.

21    Occasionally, Dr. Stanten will --

22    Dr. Stanten is aware of all the cases that I'm going

23    to have reviewed either by him or our cases that go

24    to Kaiser.  As chief of the department, he's made

25    aware of all the cases that need review, whether

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A    You know, I believe Dr. Iverson was

2    reviewing them.

3      Q    All of the Kaiser cases?

4      A    I'd be speculating.

5      Q    Okay.  Are you saying that you do not make

6    the decision when a Kaiser case needs

7    physician-level review on which Summit physician

8    will review it?

9      A    That would be correct.

10     Q    Why is that, do you know?

11         MR. VANDALL:  Calls for speculation.

12         THE WITNESS:  I don't know.  You'd have

13    to ...

14    BY MR. SWEET:

15     Q    This process, the physician-level review,

16    the Kaiser docs reviewing Summit and vice versa, is

17    that consistent with other peer reviews that you've

18    become aware of in your career, other divisional or

19    departmental peer reviews?

20         MR. VANDALL:  Objection; compound, vague,

21    incomplete hypothetical, lacks foundation.

22         THE WITNESS:  In the sense that physicians

23    who are part of the formal group do not generally

24    review each other's -- do not review a case of

25    another member from their group.

DEPOSITION OF MARILYN BARKIN

44

1    BY MR. SWEET:

2        Q    So that -- I don't want to put words in

3    your mouth, but it sounds standard for the

4    physician-level-review peer review to be handled in

5    the manner that the CT division handles it.

6        A    That would be --

7        MR. VANDALL:  Objection; vague,

8    argumentative and misstates the prior testimony.

9    BY MR. SWEET:

10       Q    Is that right?

11       A    In order to keep the process objective,

12   you try to find -- well, you find reviewers who are

13   on the committee -- the cases are reviewed by

14   someone who's on the peer review committee.  They're

15   not just parsed out to anybody on the medical staff.

16   And physicians who are in the same group do not

17   review each other's cases.

18       Q    Okay.  So the answer to my question on

19   whether this process at the Summit CT division,

20   where one group reviews the other group's cases, is

21   a common practice, right?

22       MR. VANDALL:  Objection; vague

23   argumentative, misstates the testimony.

24       THE WITNESS:  Well, I don't know if it's

25   common elsewhere, but, you know -- I don't know

HANNAH KAUFMAN & ASSOCIATES, INC.

1    whether it's common or not.  That's the way -- what

2    I've told you is the way that it's done in the CT

3    division and by other departments at Summit.

4    BY MR. SWEET:

5        Q    Like what other departments, if you know?

6        A    Cardiology, for example.  There are

7    several different cardiology practice groups.

8        Q    And you were mentioning the reason it's

9    done this way -- and I don't want to put words in

10   your mouth; tell me if this is accurate -- is that's

11   the fair way to do it; is that right?

12       MR. VANDALL:  Objection; misstates prior

13   testimony, argumentative, vague.

14       THE WITNESS:  It would be to make sure

15   that the reviewer could be objective in their review

16   and wouldn't be biased.

17   BY MR. SWEET:

18       Q    In the CT division, in your experience

19   there since 2004, has that process worked with the

20   physician-level review as you've just described it?

21       MR. VANDALL:  Objection; calls for

22   speculation, calls for a legal conclusion, vague.

23   BY MR. SWEET:

24       Q    Has it been fair and objective, like it's

25   supposed to be?

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A    I can't -- I have no way of answering
2    that.
3      Q    Well, do you sit in the cardiothoracic
4    peer review committee meetings?
5      A    Yes, I do.
6      Q    So you have an opportunity to see that
7    process play out, don't you, the peer review process
8    play out?
9      A    With respect to cases that go to the
10    committee level.
11      Q    Okay.  Well, back to the physician level,
12    have you -- do you have a concern about the
13    objectivity of the physician-level review in the CT
14    division?
15      MR. VANDALL:  Objection; vague, calls for
16    a personal conclusion.  It's outside the scope of
17    this 30(b)(6) deposition.
18      THE WITNESS:  Are you asking me for a
19    personal opinion or -- or whether I think the
20    process is fair?
21    BY MR. SWEET:
22      Q    As an institution, does Summit believe
23    that that physician-level review, as you've
24    described it, in the CT division is fair?
25      A    I believe they do.

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q    Has anybody ever voiced an opinion to you

2    to the contrary, that it's not fair?

3          MR. VANDALL:  Objection; vague, calls for

4    speculation, incomplete hypothetical.

5          THE WITNESS:  No one has voiced an opinion

6    to me.

7          MR. VANDALL:  Do you want to take a

8    two-minute break?

9          MR. SWEET:  That's fine.  We've been going

10   an hour.  Let's do that.  Thank you for the

11   suggestion.

12              (A brief recess was taken.)

13   BY MR. SWEET:

14     Q    Ms. Barkin, I want to change gears for

15   just a minute and ask you this question.  Each of

16   the physicians at Summit has a physician number; is

17   that right?

18     A    Yes.

19     Q    How are those numbers assigned to the

20   physician?

21     A    I think they come directly out of the

22   system.

23     Q    Are they chronologically assigned?  In

24   other words, the doctors who have been there longer

25   have lower numbers than the doctors who have been

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1    BY MR. SWEET:

2        Q    Do you remember the last question?

3        A    No.

4        Q    Okay.

5    (The record was read back by the reporter as follows:

6                "Q    When a case proceeds from

7                the physician-level review to

8                the cardiothoracic peer review

9                committee level -- I'm sure I'm

10               messing these words up.

11               "A    Come again.  What did you

12               just say?

13               "Q    I'm working up the ladder

14               here.  We're going from

15               physician level --

16                    "MR. VANDALL:  Objection.

17               "Q    -- to cardiothoracic

18               surgery peer review committee

19               level.")

20   BY MR. SWEET:

21       Q    I want to know the process, after the

22   physician level, of the cases that go to the CT peer

23   review committee.

24       A    So to clarify what you're asking,

25   physician -- a physician-level case gets elevated to

DEPOSITION OF MARILYN BARKIN

66

HANNAH KAUFMAN & ASSOCIATES, INC.

1    go to the committee, and you're asking --

2        Q    What happens with the case at that point?

3        A    The case comes to the committee, the

4    cardiothoracic peer review committee, and it's

5    discussed.  And a determination as to the

6    appropriateness of the care or any concerns is read

7    into the minutes, and the case is either closed or

8    it could be left open for a deferred determination,

9    depending on additional information.

10       Q    How often does the CT surgery peer review

11   committee meet?

12           MR. VANDALL:  Objection; vague as to time.

13           THE WITNESS:  The model is quarterly.

14   Occasionally, those meetings get cancelled or

15   deferred because of scheduling conflicts.

16   BY MR. SWEET:

17       Q    And are those meetings specifically

18   cardiothoracic surgery peer review committee

19   meetings?

20       A    Yes.

21       Q    And the only thing discussed at those are

22   peer review matters?

23       A    What time frame are you asking about?

24       Q    Well, has it changed over time?

25       A    Yes.

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1    review matters involving CT division members that

2    start at the CT committee level?

3            MR. VANDALL:  Objection; vague, compound.

4            THE WITNESS:  Well, to clarify, the

5    percentage of cases that start at the committee

6    level?

7    BY MR. SWEET:

8        Q    Yes.

9        A    They generally don't start at the

10    committee level.  I mean -- well, at the

11    department -- and I'm only speaking to the CT

12    surgery department level; I'm not speaking to

13    anything higher up.  But at my level, a case would

14    generally start at the QIC or the physician reviewer

15    level and then rise.

16        Q    Have you ever heard of a peer review

17    matter starting at the CT division peer review

18    committee level?

19            MR. VANDALL:  Objection; vague.

20            THE WITNESS:  Meaning that it would not

21    have been entered into the database before the

22    committee meeting?

23    BY MR. SWEET:

24        Q    Because there was no QIC or

25    physician-level review, yes.

DEPOSITION OF MARILYN BARKIN

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A    I can't recall that happening.  That would
2  be outside of standard operating procedures.

3      Q    And let's talk a little bit more about the
4  CT peer review committee meeting itself.

5           What do the physicians have available to
6  them to consider when discussing the peer review
7  matters?  In other words, do they have the charts
8  there?  What do they consider?

9      A    They have the charts.

10          MR. VANDALL:  Objection; vague.

11          THE WITNESS:  I'm sorry.

12          MR. VANDALL:  It's okay.

13  BY MR. SWEET:

14     Q    They have the charts there?

15     A    They have the chart.

16     Q    Of all of the matters that come to the CT
17  division peer review committee level, all the peer
18  review matters that come there, what percentage of
19  those proceed to the surgery peer review committee?

20     A    During the time that I've been
21  functioning, I don't believe that any cases have
22  gone directly from the CT department, CT peer review
23  committee to the surgery committee.

24     Q    Is it true that -- I'm covering different
25  paths here.  But is it true also that no case has

DEPOSITION OF MARILYN BARKIN

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _5th_

day of _February_ , _2008_ .

_____
Certified Shorthand Reporter

CSR No. _12584_