# EXHIBIT J

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
--o0o--

COYNESS L. ENNIX, JR., M.D., as )
an individual and in his         )
representative capacity under    )
Business & Professions Code      )
Section 17200 et seq.,           )
                                 )
          Plaintiff,             )
                                 )
     vs.                         ) No. C 07-2486
                                 )
RUSSELL D. STANTEN, M.D., LEIGH  )
I.G. IVERSON, M.D., STEVEN A.    )
STANTEN, M.D., WILLIAM M.        )
ISENBERG, M.D., Ph.D., ALTA BATES)
SUMMIT MEDICAL CENTER and Does 1 )
through 100,                     )
                                 )
          Defendants.            )
_____ )

CERTIFIED COPY

CONFIDENTIAL

CONFIDENTIAL

DEPOSITION OF
JOANNE JELLIN, PsyD
_____
December 20, 2007

REPORTER: BRANDON D. COMBS, RPR, CSR 12978

HANNAH KAUFMAN & ASSOCIATES, INC.

1    coordinator level of peer review, then I won't ask more

2    questions and we'll just get another witness to testify

3    to those things.

4         MR. VANDALL:  Object that the witness has said

5    she does not know what questions you're asking.  If you

6    have questions you'd like to ask, she will respond if

7    she's able to.

8         MR. SWEET:  Q.  Okay.  What percentage of peer

9    review matters start at the quality improvement

10   coordinator level?

11        MR. VANDALL:  Asked and answered.

12        MR. SWEET:  Q.  You can answer.

13   A.    I believe I've answered that question.

14   Q.    Which is what, that you don't know?

15   A.    No.  I believe I answered the question, that

16   there are several ways that peer review issues are

17   identified.  That is one of them.

18   Q.    With all due respect that's not an answer to

19   my question.  I want to know what percentage of all the

20   different ways -- what percentage start at the quality

21   improvement coordinator level?

22   A.    I can't quantify that.

23   Q.    Can you explain for me how a case progresses

24   from the quality improvement coordinator level to the

25   physician review level?

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.    My understanding of the process is when it

2    fails a screen, it is referred to a physician reviewer.

3    Q.    And then what happens at the physician

4    reviewer level?

5    A.    If the physician reviewer reviews the medical

6    record and based on his clinical knowledge decides that

7    the case needs no further review, it's my understanding

8    it's closed.

9    If he or she feels that there is a question or

10    that, in fact, it does not meet the indicator, it's

11    referred to the full committee review.

12    Q.    And that would be either the department review

13    or a division review if there's a division?

14    A.    That's correct.

15    Q.    In this case that you're testifying about,

16    there was a division, cardiothoracic division.  Do you

17    ever sit in on the cardiothoracic peer review committee

18    meetings?

19    A.    I'm actually not testifying about this case.

20    I'm testifying about the peer review process.

21    Q.    Do you ever sit in on the cardiothoracic peer

22    review committee meetings?

23    A.    No.

24    Q.    Are those meetings tape-recorded?

25    A.    I do not know.

DEPOSITION OF JOANNE JELLIN, PSYD

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   And, again, are there circumstances where the

2    cardiothoracic surgery peer review committee level of

3    peer review could be skipped and the issue could start

4    somewhere else?

5    A.   I believe I've answered that question, but

6    yes.

7    Q.   And again, the answer is similar to the

8    skipping of other levels, that the circumstances warrant

9    it or in the discretion of the officers?

10   A.   Correct.

11   Q.   Okay.  Surgery peer review committee meetings,

12   do you sit on those meetings?

13   A.   No, I don't.

14   Q.   Do you know what percentage of the matters

15   that reach the surgery peer review committee go up to

16   the medical executive committee?

17   A.   No, I don't.

18   Q.   Do you know what issues that reach the surgery

19   peer review committee go up to the medical executive

20   committee level?

21   MR. VANDALL:  I'm sorry.  I don't understand

22   the question.

23   MR. SWEET:  Q.  Was that unclear?

24   A.   Yeah.

25   Q.   Of the peer review issues that come to the

DEPOSITION OF JOANNE JELLIN, PSYD

HANNAH KAUFMAN & ASSOCIATES, INC.

1    body known as the surgery peer review committee, I'd

2    like to know which issues then reach the medical

3    executive committee, what types of issues?  If you know.

4          MR. VANDALL:  Again, we're not responding to

5    substantive questions about peer review at this

6    deposition, but procedurally we can respond.

7          THE WITNESS:  I can respond to that

8    procedurally.

9          MR. SWEET:  Q.  Okay.

10    A.    Procedurally, any circumstance that is

11    requested by the department of surgery to go to the

12    medical executive committee will go.

13          MR. SWEET:  And, Matt, you're going to advise

14    your witness to not answer the questions of the exact

15    issues that she's aware of that have progressed from the

16    surgery peer review committee to the MEC?

17          MR. VANDALL:  We are not responding to the

18    substantive peer review questions at this deposition.

19    We've provided a chart regarding MEC level peer review

20    to plaintiff in response to special interrogatories, and

21    I think the parties' positions with respect to the peer

22    review are currently in dispute, and it's not a proper

23    line of questioning at this deposition.

24          MR. SWEET:  I'm not asking you what your

25    position is, are you advising your witness not to

DEPOSITION OF JOANNE JELLIN, PSYD

HANNAH KAUFMAN & ASSOCIATES, INC.

1          A.    To me it says that in the medical staff

2     leadership's discretion they can take appropriate action

3     given the circumstances in front of them.

4          Q.    Regarding ad hoc committee review or

5     investigation, would it be appropriate to have, as a

6     member of an ad hoc committee investigating peer review

7     issues at the behest of the medical executive committee,

8     a member of the board of directors on that ad hoc

9     committee?

10         A.    What was the beginning of your question?  Was

11    it appropriate?  Is that what you said?

12         Q.    Yeah.

13         MR. VANDALL:  Under what circumstances?

14         MR. SWEET:  Q.  Any circumstances.

15         A.    Not in my experience.  It hasn't happened in

16    my experience.

17         Q.    Who decides the membership of an ad hoc

18    committee that's convened to investigate peer review

19    issues?

20         A.    Can you clarify what you mean by peer review.

21         Q.    Well, when the MEC requests an ad hoc

22    committee to do an investigation, who decides the

23    membership of the ad hoc committee?

24         A.    The leadership.  Believe that's spelled out in

25    the bylaws.

DEPOSITION OF JOANNE JELLIN, PSYD

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _28th_

day of _December_, _2007_.

_____
Certified Shorthand Reporter

CSR No. _12 978_

EXHIBIT K

Certified Copy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


COYNESS L. ENNIX, JR., M.D., as an      )
individual and in his representative    )
capacity under Business &               )
Professions Code Section 17200 et seq.,)
                                        )
                Plaintiff,              )
     vs.                                ) Case No. C 07-2486
                                        )           WHA
RUSSELL D. STANTEN, M.D., LEIGH I.G.    )
IVERSON, M.D., STEVEN A. STANTEN, M.D.,)
WILLIAM M. ISENBERG, M.D., Ph.D.,       )
ALTA BATES SUMMIT MEDICAL CENTER and    )
does 1 through 100,                     )
                                        )
                Defendants.             )
_____)


CONFIDENTIAL

DEPOSITION OF LEIGH I.G. IVERSON, M.D.


        The following deposition was given on the **19th**

**day of December, 2007,** commencing at the hour of 9:28 a.m.,

before Jenna Osborn, a Certified Shorthand Reporter, License

Number 8681.

        The witness personally appeared at 409

Washington Street, Monterey, California.

1    BY MR. EMBLIDGE:                                        10:25

2         Q.   Russell Stanten, is he not someone you've    10:25

3    golfed with?

4         A.   I think I took him out to play golf two, maybe    10:25

5    three times over the years we were together.

6         Q.   What about Dr. Arthur Stanten?               10:25

7         A.   I don't believe I ever played with him.  No, I    10:25

8    did play with him once.  I think I played with him once

9    also.

10         Q.   What about Dr. Steven Stanten?              10:25

11         A.   I think I played with him twice.            10:25

12         Q.   Would you call Dr. Steven Stanten a friend?    10:26

13         A.   No.                                         10:26

14         Q.   How did Dr. Kahn come to join your practice?    10:26

15         A.   When Russell and I were looking for a third    10:26

16    person, he was recommended to us by I believe Art Thomas who

17    was one of his professors at UC.  And we interviewed him and

18    talked to him and offered him a job.

19         Q.   And he -- he was your partner from when to    10:26

20    when approximately?

21         A.   I believe he joined us in '98 or '99.        10:27

22         Q.   And you left in 2000 --                     10:27

23         A.   Six.                                        10:27

24         Q.   Six.                                        10:27

25         Is he someone you socialized with outside of work?    10:27

1    A.    No.                                                    10:27

2    Q.    Did you golf with him?                                 10:27

3    A.    No.                                                    10:27

4    Q.    Did there ever come a time where you had any           10:27

5  concerns about his medical practice?

6    A.    No.                                                    10:27

7    MS. McCLAIN:    Same objection with respect to               10:27

8  Dr. Kahn's privacy.

9    THE WITNESS:    No.                                          10:27

10  BY MR. EMBLIDGE:                                              10:27

11    Q.    Did you -- do you have any reason to believe          10:27

12  that Dr. Russell Stanton -- I'm going to start this question

13  over.  Trying to figure out a way to do this without a

14  double negative but I don't know if I can.

15    In your experience with Dr. Russell Stanten, do you        10:28

16  have any concerns that he would not honestly express his

17  views about Dr. Ennix's patient care?

18    MS. McCLAIN:    Objection, vague, compound, improper        10:28

19  opinion.

20  BY MR. EMBLIDGE:                                              10:28

21    Q.    Do you want that again?                               10:28

22    A.    Do I have any concerns that he would not?             10:28

23    Q.    That he would not --                                  10:28

24    A.    Express his opinion.                                  10:28

25  No, I don't.                                                  10:28

1      Q.    Do you have any concerns that Dr. Kahn would    10:29

2   not honestly express his opinions about Dr. Ennix's patient

3   care?

4          MS. McCLAIN:    Same objections.    It's over broad,    10:29

5   compound, lacks foundation.

6          THE WITNESS:    No, I do not.    10:29

7   BY MR. EMBLIDGE:    10:29

8      Q.    Do you know Dr. Hon Lee?    10:29

9      A.    Yes.    10:29

10      Q.    Have you ever worked with him?    10:29

11      A.    No.    Well let -- let me ask you what -- what    10:29

12   do you mean have I ever worked with him?

13      Q.    Cared for the same patient.    10:29

14      A.    No.    10:29

15      Q.    Did you ever develop any concerns about    10:29

16   Dr. Lee's medical practice?    10:29

17          MS. McCLAIN:    Objection, invasion of Dr. Lee's    10:29

18   privacy, and lack of foundation that this witness is in a

19   position to judge that.

20          THE WITNESS:    I -- I have no information of which    10:29

21   to base an opinion like that.

22   BY MR. EMBLIDGE:    10:29

23      Q.    Well, you sat on the Cardiothoracic Peer    10:30

24   Review, correct?

25      A.    Based on that experience, I do not.    10:30

1  discussions?

2       A.   I don't remember.  That's long ago.   10:54

3       Q.   Sure.   10:54

4  Now the cases that the physician does not clear --   10:54

5       A.   Yes.   10:54

6       Q.   -- is there any discussion of that case at the   10:54

7  Cardiothoracic Peer Review Committee during which time

8  doctor A is present?

9       A.   No.   10:54

10       Q.   And that's been your experience both at   10:54

11  Doctors and Summit?

12       A.   Yes.   10:54

13       Q.   Was that your experience when Russell Stanten   10:54

14  was the chair of the Cardiothoracic Peer Review Committee?

15       A.   Yes.   10:55

16       Q.   At Doctors, were you aware at anytime that a   10:55

17  physician had his or her cases examined by outside peer

18  review?

19       A.   I do not recall that.   10:55

20       Q.   At Summit, other than Dr. Ennix, are you aware   10:55

21  of any physician who has been examined through outside peer

22  review?

23       A.   Yes.   10:55

24       Q.   Approximately how many?   10:55

25       MS. McCLAIN:  Dr. Iverson, I caution you not to   10:55

1      A.    No.   It didn't happen very often.   If it did,    11:11

2    if it was a non-cardiac case, I would have probably asked

3    Stallone to do it.   If it was a cardiac case, I would have

4    asked Russell and Junaid or Coy to do it.   But I was able to

5    keep up.   It was unusual for me to turn out one of those

6    cases.   I would have done it more except it was an onerous

7    job and it was hard to get it done on time.   And it just

8    became less painful if I would just suck it up and get it

9    done myself.

10      Q.    During the period of time when Dr. Ennix    11:12

11    returned to practice with you at Summit in 2001 forward, is

12    there -- did there come a time when you reviewed one of his

13    cases and determined that there were care issues?

14      MS. McCLAIN:   Objection, lack of foundation.    11:13

15      THE WITNESS:   I have no recollection of reviewing    11:13

16    any of his cases.

17    BY MR. EMBLIDGE:    11:13

18      Q.    Did there come a time where you participated    11:13

19    in the discussion at the Cardiothoracic Peer Review

20    Committee about one of his cases and you believed there were

21    care issues?

22      MS. McCLAIN:   Objection, lack of foundation.    11:13

23      THE WITNESS:   I believe there was some issues about    11:13

24    documentation.

25      ///    11:13

1    the Surgery Peer Review Committee, does he ever appear at

2    the committee?

3            A.    No.                                                    11:19

4            Q.    Were you involved in meetings over your              11:19

5    career, were you involved in meetings at the Surgery Peer

6    Review Committee where cardiothoracic surgeons' cases were

7    reviewed by the Surgery Peer Review Committee?

8            A.    I believe so, yes.                                    11:19

9            Q.    Other than Dr. Ennix?                                 11:19

10           A.    I believe so.                                         11:19

11           Q.    In any of those cases are you aware of an            11:19

12   instance where the Surgery Peer Review Committee found there

13   to be a care issue but the cardiothoracic peer reviewer had

14   not found there to be a care issue?

15           A.    No.                                                   11:20

16           I have to qualify that.  Because what I don't              11:20

17   remember is if I ever was involved where a referral was made

18   outside the division of cardiothoracic surgery.

19           Q.    Okay.                                                 11:20

20           A.    I don't think one was but I can't swear to          11:20

21   that.

22           Q.    Okay.  But what I'm trying to get at is a case      11:20

23   where a cardiothoracic peer reviewer has reviewed a case,

24   found there to be no care issues, but that case nonetheless

25   was reviewed by the Surgery Peer Review Committee, and the

1  Surgery Peer Review Committee found care issues or felt

2  further review was necessary?

3          MS. McCLAIN:  Objection, compound.  That's a      11:21

4  different question.  Lack of foundation.

5          THE WITNESS:  I don't recall that happening.      11:21

6  BY MR. EMBLIDGE:                                          11:21

7          Q.    Have you ever been on the Medical Executive  11:21

8  Committee?

9          A.    Yes.                                        11:21

10         Q.    In what capacity?                           11:21

11         A.    Both as to Chief of Surgery, which is one of  11:21

12 the members of the Executive Committee, and also I was

13 elected as the member at large from the department of

14 surgery.  Surgery has two members on the Executive

15 Committee, as department of medicine a member at large and

16 the department chief.  And I was elected as the member at

17 large two or three times.  So I've been on the Medical

18 Executive Committee I know three times, and I think I was

19 also a fourth time quite a few years ago.

20         Q.    In your experience how often does that       11:22

21 committee meet?

22         A.    Monthly.                                     11:22

23         Q.    With the same qualification?                11:22

24         A.    Yes.  But fewer misses.                     11:22

25         Q.    Other than Dr. Ennix, are you aware of any   11:22

73

1       Q.    Okay?                                                    11:43

2       A.    I understand.                                            11:43

3       Q.    So in order to say talking about the minimally           11:43

4    invasive cases and have them refer to these procedures as

5    opposed to more general routine types of minimally invasive

6    cases that had earlier been performed, how would you

7    describe those cases?

8       A.    Cases done with groin cannulation, plus                  11:43

9    retrograde cardioplegia line placed by transesophageal echo,

10   through -- and that's the first part.  And then the surgery

11   itself is done through a limited incision.

12      Q.    Okay.  And that is your understanding of the             11:44

13   types of cases that Dr. Isenberg is asking you about?

14      A.    Yes.                                                     11:44

15      Q.    Before Dr. Ennix performed those cases at                11:44

16   Summit had you attempted to perform such a case at Summit?

17      A.    We -- by we, I mean we did a case of mine that           11:44

18   Dr. Kahn did.  I was not the surgeon.  Patient was aware of

19   that.  Because the patient wanted a minimally invasive case

20   and in discussing it with them, I told them that Dr. Kahn

21   was going to be the surgeon and that I would be the

22   assistant.  So that's the first thing.  So while it's

23   classified as my case, technically I wasn't the surgeon,

24   somebody else was.

25      Q.    Great.  Didn't realize that.                             11:45

1          A.    Okay.    And the patient was aware of that.       11:45

2     Fully informed and consented and written in the chart, all

3     that stuff.    So if you're talking about that case, which I

4     assume you are, we did the case through the median

5     sternotomy.    An incision up here (indicating).

6          Q.    What was the word you said before sternotomy?     11:45

7          A.    Median.    Middle.                                11:45

8          Q.    Right.    Sure.                                   11:45

9          A.    And we did it because we wanted to use all of     11:45

10    the equipment that you use through the lateral incision, the

11    small lateral incision to do it when things were open so

12    that we could see what we were doing and understand better

13    how the equipment worked.    I am uncertain as to whether -- I

14    don't remember whether we put the retrograde cardioplegia

15    line in by transesophageal echo through the neck, and

16    therefore it may not fulfill the criteria that you just

17    wrote down there, that we just gave to define the minimally

18    invasive surgery.

19          So I'm not sure if by those criteria this was a         11:46

20    minimally invasive surgery.

21          Q.    Okay.                                            11:46

22          A.    Okay?  Is that -- do you understand what I        11:46

23    mean?

24          Q.    I hope so.                                       11:46

25          A.    Okay.    And so we did the case and we had        11:46

1    problems using the aortic cross clamp that you need to use

2    in the minimally invasive case that you are referring to

3    that Coy did that I'm assuming that is done through this

4    small incision over here (indicating).

5             Q.    Pointing to, for the record?                    11:47

6             A.    Excuse me.  You can't write that down.  The     11:47

7    anterior thoracotomy.  Because the cross clamp did not work

8    the way we should, we just converted to an open case and did

9    it the routine way.

10            Does that answer what you were after?                 11:47

11            Q.    I hope so.  I mean, I've seen references to     11:47

12   this.  Now I understand more about it.

13            A.    Okay.                                           11:47

14            Q.    Did that involve groin cannulation?             11:47

15            A.    Yes.                                            11:47

16            Q.    Okay.                                           11:47

17            A.    Well wait a minute.  I don't have that case in  11:47

18   front of me.  I can't swear to anything without the record

19   to know.

20            Q.    To the best of your recollection.               11:47

21            A.    I think we did the groin cannulation.  I also   11:47

22   think we did not do the transesophageal echo placement of

23   the retrograde catheter but we might have.  I'm not certain.

24            Q.    Other than you and Dr. Kahn, who was involved   11:48

25   in that surgery?

86

1     A.    I don't remember.                                    11:48

2     Q.    You had never done a case like that before,         11:48

3  correct?

4     A.    Well that's not quite true.                         11:48

5     Q.    Okay.                                                11:48

6     A.    I -- I don't remember when, late '80s, early        11:48

7  '90s, I did a series of minimally invasive upper median

8  sternotomy cases.  I did 12 or 13 of them and I stopped

9  doing them because I didn't see any advantage to them.

10         Those are considered minimally invasive but there   11:48

11  is a difference between that minimally invasive surgery and

12  the one you are discussing that Coy did, as I understand

13  what he did, because of the presence of the placement of the

14  retrograde cardioplegia line in the neck using

15  transesophageal echo, because some technical differences in

16  the cannulation devices that are used in the groin, and

17  because of the location of the incision from the midline of

18  the sternum to the anterior part of the chest.  In my mind

19  they are different techniques.  They are not the same

20  operation.  But if you look up you will find them both

21  identified as minimally invasive surgery.

22     Q.    Okay.                                               11:49

23     A.    That's part of the confusion when you say          11:49

24  minimally invasive surgery is you need to be very specific

25  about what you're talking about because there are different

1   minimally invasive surgeries.  They are not all the same.

2        Q.   Okay.                                                     11:49

3        A.   Okay?                                                     11:49

4        Q.   What training had you done prior to performing           11:49

5   the procedure that you were describing with Dr. Kahn in, and

6   I'll represent to you that it was in late 2003, early 2004?

7        A.   Mostly Dr. Kahn did it, which is why he was              11:50

8   the surgeon.  Which involved going to -- I would run into a

9   definition of what is a course.  Because this is I believe

10  all of these were started before there were formal CME, you

11  know, continuing medical education, accredited courses in

12  minimally invasive surgery, which I believe now exists.  And

13  at that time we did the same thing I assume Coy did, which

14  is you can go to programs by the companies who have courses

15  that they gave and to how you do the procedure, how you use

16  the equipment.  Although they were not CME recognized.  And

17  then also going to watch other surgeons who are familiar

18  with doing the technique and doing it -- and watching them

19  do it and then having one of them come as a proctor,

20  generally someone who the company who makes all of its

21  equipment has hired to come with you when you're doing the

22  cases initially.  That's what my case involved.  That's what

23  Kahn went and did.  I think he may have taken one of the

24  nurses with him, although I'm uncertain of that.

25        And I also believe that the anesthesiologist who           11:51

1  was principally involved in doing this did some additional

2  training in terms of learning to -- how to place the

3  transesoph -- how to place the retrograde cardioplegia line

4  into the transesophageal echo.  Those things were done.

5      I did not do those.  I saw some movies of them        11:52

6  doing this but actually the person who went and did the

7  training and went through with the companies and went

8  through the observation was Dr. Kahn, consequently he is the

9  one who did this operation on my patient as opposed to me

10 doing it.

11     Q.   Okay.                                            11:52

12     A.   Does that get what you needed to know?           11:52

13     Q.   That helps.                                      11:52

14     And you were comfortable with what you understood     11:52

15 to have been Dr. Kahn's level of preparation before this

16 procedure, correct?

17     A.   Yes.                                             11:52

18     Q.   Who was the anesthesiologist that you believe    11:52

19 had gone through this training?

20     A.   Brian Hite.  But I don't remember that he was    11:52

21 the anesthesiologist that did the case of mine that you were

22 referencing, because I don't remember if we did the neck

23 cannulation with the transesophageal echo with the

24 cardioplegia line.  If we did do that, then he was probably

25 the anesthesiologist for it.  But I am not sure we would

89

1   to these four cases?

2          A.    That is correct.

3          MS. McCLAIN:  I need to take about five minutes.

4                    (Recess held.)

5              (WHEREUPON, THE LUNCH RECESS WAS HELD.)

6                  (AFTERNOON SESSION.)

7                    1:03 P.M.

8

9                  **EXAMINATION** *(RESUMED)*

10  BY MR. EMBLIDGE:

11          Q.    Dr. Iverson, I took Dr. Isenberg's deposition,

12  in the course of the deposition I asked about the

13  Cardiothoracic Peer Review Committee and he expressed that

14  he had some concerns about that committee.  And he had some

15  concerns he said about their objectivity.  And he said the

16  following:  I came to understand that all of the members of

17  the Peer Review Committee were present for the entirety of

18  the discussion of cases; that an individual surgeon, whose

19  case was under discussion, did not leave the room at the

20  time of deliberations.

21          In your experience did he misunderstand the process

22  of the Cardiac Surgery Peer Review Committee?

23          MS. McCLAIN:  Objection, calls for speculation.

24          THE WITNESS:  I can't speak to his understanding

25  but I can tell you that's not the way we did it.

1   Peer Review Committee?

2         A.   I don't recall.                              13:20

3         Q.   Do you recall these cases ever being reviewed   13:20

4   by the Cardiothoracic Peer Review Committee?

5         A.   To my knowledge, they were never reviewed   13:20

6   there.

7         Q.   Can you think of any other instance where a   13:21

8   cardiothoracic surgeon's patient care activities have been

9   reviewed by other bodies within Summit, despite not having

10  been first reviewed by the Cardiothoracic Peer Review

11  Committee?

12        A.   I am not.                                   13:21

13        Q.   Do you have any understanding as to why that   13:21

14  occurred in this case?

15        A.   No.                                          13:21

16        Q.   Did you ever have any discussion with anyone   13:21

17  about whether these cases should be reviewed at the

18  Cardiothoracic Peer Review Committee?

19        A.   No.                                          13:21

20        Q.   Did you ever review these cases?             13:21

21        A.   No.                                          13:21

22        Q.   This was a -- this document says -- it's     13:22

23  entitled a special meeting but it doesn't say of who.  What

24  was your understanding of this body that was meeting?

25        A.   It was to discuss the curtailment of doing the   13:22

109

1    A.    I recall that the committee did not accept the    13:38

2    reviewer's position.  That's all I recall.

3    Q.    Do you -- can you recall anytime where that's    13:39

4    happened with a cardiac surgeon, that -- that the Surgery

5    Peer Review Committee did not accept a physician reviewer's

6    findings about care issues?

7    A.    I recall that there were times when a reviewer    13:39

8    presented a case with questions that were discussed in the

9    Peer Review Committee, and the committee disagreed or

10   altered the conclusion of the specific referring

11   physician -- the specific reviewing physician.  I don't    13:39

12   recall what they were or that there were major issues but I

13   know that that has occurred.

14   Q.    Do you recall any situation where the    13:39

15   committee voted not to accept the peer reviewer's findings

16   about care issues?

17   A.    After the discussion with the peer reviewer,    13:40

18   the peer reviewer generally changed, went along with the

19   committee.  I don't recall that there ever was an issue

20   where the peer reviewer had his grounds and the committee

21   refused to accept it.  I don't recall that happening.

22   Q.    It goes on to say that -- on the next page --    13:40

23   members felt physicians' specific concerns including final

24   care determinations for the cases should be reconsidered by

25   the officers.

1    My first question is probably just a quibble with

2  the word reconsidered.

3    Were you aware of the officers having been --

4  having made care determinations at this point?

5    A.  No.

6    Q.  Have there been situations that you recalled

7  that a Surgery Peer Review Committee chose not to make care

8  determinations regarding a surgeon's care deferring instead

9  to the officers?

10    A.  No.

11    Q.  It then goes on to say that it was also

12  recommended that X number of all minimally invasive

13  procedures no matter the surgeon be reviewed.

14    Do you recall that discussion?

15    A.  I recall such a discussion but I don't recall

16  as to whether it was at this meeting.  I am afraid it was an

17  agreed on thing before this meeting occurred, that all those

18  cases would be reviewed because it was a new procedure.

19  Which is fairly standard in a peer review situation when

20  somebody comes up with a new procedure, regardless of what

21  it is, that the first X number of cases are reviewed.

22    Q.  Did that happen?  Did there -- was there a

23  formal review of all minimally invasive procedures?

24    A.  I don't know.

25    Q.  You don't recall that one way or the other?

122

1    Ms. McClain's office to prepare for this deposition?    14:41

2            A.    No.    14:42

3            Q.    Apart from knowing that Dr. Monte Paxton was    14:42

4    the head of the Ad Hoc Committee in this case, do you have

5    any relationship with him?

6            A.    Colleagues at Summit.    14:42

7            Q.    Would you call him a friend?    14:42

8            A.    Much like Art Stanten or Dr. Ennix prior to    14:42

9    the lawsuit.

10           Q.    Is he someone you socialized or golfed with?    14:42

11           A.    I think he and I may have played golf once.    14:42

12   Maybe twice.

13           Q.    And what about Dr. Moorstein, is he someone    14:42

14   that you have any social relationship with --

15           A.    Yes.    14:42

16           Q.    -- outside of work?    14:43

17           A.    Yes.    14:43

18           Q.    How would you describe your relationship with    14:43

19   him?

20           A.    We are good friends.    14:43

21           Q.    You still keep in touch?    14:43

22           A.    Yes.    14:43

23           Q.    You talk to each other regularly?    14:43

24           A.    I wouldn't say regularly but often.    14:43

25           Q.    How about Dat Ly, do you have any relationship    14:43

```
 1   STATE OF CALIFORNIA      )
                              ) ss.
 2   COUNTY OF MONTEREY       )

 3

 4          The witness in the foregoing deposition appeared

 5   before me, JENNA OSBORN, Certified Shorthand Reporter No.

 6   8681 for the State of California.

 7          Said witness then and there at the time and place

 8   previously stated testified under penalty of perjury given

 9   on said day.

10          The testimony of the witness and all the questions

11   and remarks requested by counsel were taken by me in

12   shorthand at the time and place therein named and

13   thereafter, under my direction, transcribed into

14   longhand.

15          I further certify that I am not of counsel or

16   attorney for either or any of the parties to said

17   deposition, nor in any way interested in the outcome of the

18   cause named in said caption and that I am not related to

19   any party thereto.

20          IN WITNESS WHEREOF, I have hereunto set my hand

21   this _____28th_____ day of _____December_____, 2007.

22

23                          _____

24                          CERTIFIED SHORTHAND REPORTER
                            FOR THE STATE OF CALIFORNIA
25
```

174

# EXHIBIT L

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

COYNESS L. ENNIX, JR., M.D., as
an individual and in his
representative capacity under
Business & Professions Code
Section 17200, et seq.,

        Plaintiff,

vs.

RUSSELL D. STANTEN, M.D., LEIGH
I.G. IVERSON, M.D., STEVEN A.
STANTEN, M.D., WILLIAM M.
ISENBERG, M.D., Ph.D., ALTA
BATES SUMMIT MEDICAL CENTER and
DOES 1 through 100,

        Defendants.

_____/

CERTIFIED COPY

No. C 07-2486

Deposition of

DEBORAH MOGG

January 31, 2008

HANNAH KAUFMAN & ASSOCIATES
Certified Shorthand Reporters
472 Pacheco Street
San Francisco, California 94116
(415) 664-4269

Reported by:
THOMAS J. LANGE
CSR No. 4689
Registered Merit Reporter

1

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.  When did you become the Quality Improvement

2    Coordinator for the department of surgery?

3    A.  I would have to guess.  I'm not quite -- end

4    of --

5    Q.  I want to interrupt you.  "Guess" is a word

6    that sends shivers up and down the spines of lawyers.

7    Okay?

8    A.  Okay.

9    Q.  So I want to give you the example I usually

10   give witnesses about guessing and estimating.  If I ask

11   you to estimate the length of this table, well, you can

12   look at it and you can give me a reasonable estimation.

13   If I asked you to estimate how many chairs are in the

14   other conference room, that would be a total guess

15   because you haven't seen the other conference room.

16   Right?

17   A.  Okay.

18   Q.  I'm entitled to your best estimation or best

19   approximation, and so on this question, for example, I

20   just want your best approximations based on your own

21   personal knowledge of your job history, when you became

22   the Quality Improvement Coordinator for the surgery peer

23   review.

24   A.  My best estimate would be the end of 1998.

25   Q.  Have you had any experience with the peer

HANNAH KAUFMAN & ASSOCIATES, INC.

1        A.  Pat Gardner.

2        Q.  Gardner?

3        A.  Yes.

4        Q.  And is she still at Summit?

5        A.  Yes.

6        Q.  Okay.  So we have talked about nurse level

7    review, physician level review, then some cases get

8    reviewed by the surgery peer review committee itself.

9    Correct?

10       A.  I said I don't recall if -- you mean bypassing

11    the physician level of review?

12       Q.  No, no.  The surgery peer review committee on

13    occasion reviews cases for quality issues.  Correct?

14       A.  The physician reviewer presents the case and

15    they discuss it.

16       Q.  Okay.  And what are the possible outcomes of

17    the discussion at the surgery peer review committee of

18    the case?

19       MR. VANDALL:  Objection, vague, incomplete

20    hypothetical.

21       THE WITNESS:  There's several possibilities of

22    what could happen.  The committee could decide there is

23    no care issue and close it themselves.  They may write a

24    letter to the physician asking for more information.

25    They may decide that the issues are not relevant with

HANNAH KAUFMAN & ASSOCIATES, INC.

1     Q.  Then there are cases that get actually reviewed

2  at the committee level for care issues, right?

3     A.  Correct.

4     Q.  How many of those, the latter, do you recall in

5  any given month or year?

6         MR. VANDALL:  Objection, vague.

7         THE WITNESS:  Zero to four in a month.

8     Q.  BY MR. EMBLIDGE:  Since 2001 have you attended

9  cardiothoracic peer review committee meetings?

10     A.  If 2001 is when I stopped doing it, I don't

11  attend them once I stopped coordinating that committee.

12     Q.  When the rules and regulations referred to

13  cases falling out, in your work on the surgery peer

14  review committee, is that the same as cases having the

15  quality indicators listed on Exhibit --

16         MR. VANDALL:  1200.

17     Q.  BY MR. EMBLIDGE:  -- 1200?

18     A.  Yes, means they fell out for the generic

19  indicators listed there.

20     Q.  Have you ever attended MEC meetings?

21     A.  No.

22     Q.  Is there a quality improvement coordinator

23  assigned to the MEC?

24     A.  No.

25     Q.  When you select the physician, either on your

HANNAH KAUFMAN & ASSOCIATES, INC.

1   own or in consultation with the chair, to review a

2   particular case at the surgery peer review committee, do

3   you always select a physician with the same specialty as

4   the physician being reviewed?

5          MR. VANDALL:  Objection, asked and answered.

6          THE WITNESS:  I believe so, yes.

7      Q.  BY MR. EMBLIDGE:  Okay.  Let me just take a

8   one-minute break, and we will be done.

9          (Recess taken from 3:06 to 3:09 p.m.)

10         MR. EMBLIDGE:  Just a couple of questions.

11     Q.  You talked about an instance where the surgery

12  peer review committee, the chair of the surgery peer

13  review committee sent a letter to Dr. Ennix about the

14  need to submit an operative report.  Do you recall that?

15     A.  Uh-huh, yes.

16         MR. VANDALL:  Objection, outside the scope of

17  the deposition.

18     Q.  BY MR. EMBLIDGE:  In your experience in the

19  peer review committee, the surgery peer review

20  committee, has that ever happened regarding any other

21  physician?

22         MR. VANDALL:  Objection, outside the scope of

23  the deposition.

24         THE WITNESS:  The cardiac surgery committee

25  asking the surgery committee to send a letter?  Or any

HANNAH KAUFMAN & ASSOCIATES, INC.

1

2                        REPORTER'S CERTIFICATE

3

4

5          I certify that the foregoing proceedings

6    in the within-entitled cause were reported at the time

7    and place therein named; that said proceedings were

8    reported by me, a duly Certified Shorthand Reporter

9    of the State of California, and were thereafter

10   transcribed into typewriting.

11         I further certify that I am not of counsel or

12   attorney for either or any of the parties to said cause

13   of action, nor in any way interested in the outcome of

14   the cause named in said cause of action.

15         IN WITNESS WHEREOF, I have hereunto set my hand

16   this 12th day of February, 2008.

17

18

19   _____

20   THOMAS J. LANGE
     Certified Shorthand Reporter
     State of California
21   Certificate No. 4689

22

23

24

25

DEPOSITION OF DEBORAH MOGG