# EXHIBIT M

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CERTIFIED COPY

COYNESS L. ENNIX, JR., M.D.,  )
                             )
        Plaintiff,           )
                             )
    vs.                      )        Case No.:
                             )        C 07-2486 WHA
ALTA BATES SUMMIT MEDICAL    )              (JCS)
CENTER,                      )
                             )
        Defendant.           )
_____)


*** CONFIDENTIAL ***

DEPOSITION OF WILLIAM ISENBERG, M.D., Ph.D.

VOLUME I


DATE:        Thursday, November 29, 2007

TIME:        9:48 o'clock a.m.

LOCATION:    MOSCONE, EMBLIDGE & QUADRA, LLP
             220 Montgomery Street, Suite 2100
             San Francisco, California


REPORTED BY:  THERESA WARD, C.S.R. 9587





PULONE & STROMBERG, INC.
CERTIFIED SHORTHAND REPORTING
AND VIDEOCONFERENCING SERVICES
— Serving the Legal Community Since 1978 —

Offices in San Jose and Santa Cruz
Conference rooms throughout Northern California
1-800-200-1252
depos@pulone.com  •  www.pulone.com

1    committee of the OB/GYN department.

2         Q    And for what timeframe would you say you served

3    in that role?

4         A    I currently serve on that committee.

5         Q    When did you start?

6         A    I started in 2000.

7         Q    Before 2000, did you have any role in the peer

8    review process at Summit?

9         A    Could you define "role" for me?

10        Q    Well, okay.  How does -- in general, how does the

11   peer review process at Summit work, from the lowest level

12   to the highest level?

13        A    That is a very complicated and compound question.

14        Q    Okay.  How can I clarify that for you?

15        A    All physicians who are members of the medical

16   staff are under constant review of their activities.  There

17   are certain kick-outs, indexed outcomes, that are set or

18   are recommended by the individual departments and are

19   approved by the medical executive committee that will be

20   used as indicators to initiate peer review processing.

21        Q    Okay.  So when when you say, "initiate a peer

22   review process," what is the process that gets initiated?

23             MS. McCLAIN:  Objection.  Compound.  It assumes

24   only one process.

25             THE WITNESS:  When an unexpected outcome occurs,

                                                              15

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    related to the individual under review?

2        A    Well, bullet point number two of item two says

3    peers may also include other medical staff members in good

4    standing, not practicing in the same specialty as the

5    individual whose case is under review.

6        Q    Well, that is peers.  Do you understand that to

7    be the same thing as a peer reviewer in the prior bullet

8    point?

9        A    Yes.

10       Q    Oh, okay.  So that is synonymous, peer reviewer

11   and peer?

12       A    Yes.  I think that that person identified in

13   bullet point two has been asked to give his or her

14   evaluation of the case as a peer physician member of the

15   medical staff.

16       Q    Well, it says they may be consulted regarding

17   specific issues.  The peer reviewer comes to a conclusion,

18   correct?

19       A    The peer review body comes to a conclusion.

20       Q    Well, doesn't the peer reviewer?

21       A    Each individual person may come to his or her own

22   conclusion.

23       Q    Well, okay.  Let me step back.  I thought that

24   you said that a nurse could look at an unexpected outcome

25   and say, I'd like a doctor to look at this.

27

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    A    I did say that.

2    Q    And that doctor who would look at that would be

3  somebody with similar or related training and experience to

4  the individual who performed the procedure, correct?

5    A    That is correct.

6    Q    And that doctor would reach a conclusion about

7  whether or not it was within the standard of care, correct?

8    A    I think I said that doctor could reach a

9  conclusion that it was.

10    Q    Okay.  You wouldn't go to -- a nurse wouldn't go

11  to a podiatrist to determine whether the outcome of a

12  cardiothoracic surgery was within the standard of care,

13  would a nurse?

14    A    No.

15    Q    You would only go to somebody who was in the same

16  specialty, and in this case, cardiothoracic surgery, right?

17    A    Correct.

18    Q    If you go to the next page, there is a bullet

19  point toward the bottom.  We are on page D 0852.  The

20  bullet point towards the bottom says, "Circumstances

21  requiring external peer review."  You see that?

22    A    Yes.

23    Q    So then it lists some circumstances, the first of

24  which is "Need for specialty review.  When there are no

25  medical staff members with the identified specialty within

28

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    A    There are four elected officers of the medical

2    executive committee, the chief of staff, the vice chief of

3    staff, the immediate past chief of staff, and the secretary

4    treasurer.

5    Q    When did the officers ask the cardiothoracic peer

6    review committee to consider changing its procedure,

7    approximately?

8    A    We suggested it to them right around the time of

9    the first minimally invasive surgery cases.  There were

10   refusals on the part of some of the members to be involved

11   at all in the peer review process regarding Dr. Ennix's

12   cases specifically.  So it became a difficult issue.

13   Q    We are talking about two different things.  You

14   said that you had problems with the peer review process of

15   the cardiothoracic surgery committee, including the fact

16   that they allowed the physician being reviewed to attend

17   meetings, even during deliberations over that physician,

18   correct?

19   A    Correct.

20   Q    And did the officers recommend that the committee

21   change those procedures?

22   A    We recommended that they potentially decrease the

23   number of members on the committee, and we recommended if

24   they wanted to include the committee as a whole as they

25   were doing that, when the person under discussion was being

34

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    discussed, they would leave the room.

2        Q    Approximately when were those recommendations

3    made?

4        A    April of 2004.

5        Q    Before that time, were you aware of what you

6    considered to be problems or inadequacies in the peer

7    review process of the cardiothoracic peer review committee?

8        A    I personally was not aware of any.

9        Q    Were you aware of -- let me tell you what I'm

10   trying to get at.  Are these issues that the officers dealt

11   with only after the issues about minimally invasive cases

12   came to light, or were these issues being addressed by

13   anyone before April 2004?  Can you enlighten me on that?

14       A    To my knowledge, this was never a subject for

15   discussion in any of my roles as an officer or member of

16   the medical executive committee, the peer review process

17   within that division.  It became a subject of discussion

18   with the advent of the minimally invasive questions in

19   January, early February of 2004.

20       Q    So at that time, in that timeframe, how was --

21   how did the officers communicate their recommendations to

22   the cardiothoracic peer review committee?

23       A    I don't have an existing document to refer to,

24   but my recollection, and this is going back to early 2004,

25   so almost four years, was that Dr. Steven Stanten and I,

35

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    after the officers and I had discussed it, met with

2    Dr. Russell Stanten and communicated that we thought that

3    the model employed by the department of surgery, which is a

4    smaller number, not everybody in the department, and that

5    if the individual member under discussion was on the

6    committee, she or he would leave the room.  We suggested

7    that that model be used by CT surgery.

8         Q    And what was Dr. Russell Stanten's reaction?

9         A    My recollection of it was, "We have this method

10   so that we can all learn from what happens, but I will take

11   it back to the committee and we'll discuss it."

12        Q    And was there subsequent dialogue?

13        A    Not that I can recall.

14        Q    Did you ever follow up to see if, in fact, they

15   had changed their procedures?

16        A    I did not.

17        Q    But it is your understanding that they did not?

18        A    It is my understanding that they did not.

19        Q    And what is that based on?

20        A    The concerns registered to me by members of the

21   medical staff who are on that committee, that they felt

22   inhibited about discussing peer review issues regarding

23   Dr. Ennix subsequent to that date because he was in the

24   room and refused to leave while those cases were being

25   discussed.

36

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    Q    Oh, okay.  Not the -- we are not talking about

2    the cases that formed the basis -- the corrective actions

3    taken against Dr. Ennix?

4    A    No, subsequent cases.

5    Q    Got it.  Okay.  Given the concern that you had

6    about issues being swept under the rug at the

7    cardiothoracic peer review committee, did you look into

8    unexpected outcomes of physicians other than Dr. Ennix that

9    had been reviewed by that committee?

10         MS. McCLAIN:  Objection to the term "swept under

11    the rug."  I'm not sure that is an accurate phraseology.

12    Objection.  Vague.

13         THE WITNESS:  There were no other situations that

14    had been brought to my attention by either the chair of

15    surgery or the chair of anesthesia or both about the

16    performance of cardiothoracic surgery by any other member

17    of that division that prompted me to look more thoroughly

18    at his or her outcomes.

19    BY MR. EMBLIDGE:

20         Q    Right.  But you had a concern about this process,

21    correct, at the cardiothoracic peer review committee?

22    A    I did.

23    Q    Did you initiate any review of any of the other

24    physicians' cases?

25    A    I did not.

37

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1       Q    The outside peer reviewers or reviewer for the

2  surgical oncologist, what -- who or what entity was

3  retained to review the surgical oncologist?

4       A    I was not party to that, so I don't know.

5       Q    What about the geropsychiatrist?

6       A    The Mercer Group, NMA was retained, National

7  Medical Audit.

8       Q    And so are you aware of any outside peer reviewer

9  or peer review body engaged by Summit other than NMA?

10      A    I personally am not.

11      Q    Why do you qualify that as personally?  Do you

12  have any information that they have engaged someone else?

13      A    No, I don't.

14      Q    Were you involved in the decision to use NMA for

15  Dr. Ennix's review?

16      A    I was.

17      Q    Who else was involved in that decision?

18      A    There was a discussion with Counsel, Mr. Shulman,

19  the director of the medical staff office, and Joanne

20  Jellin, and I consulted with my predecessor, the immediate

21  past president, which was Dr. Annette Shaieb, S-H-A-I-E-B.

22      Q    You mentioned that you consulted with an office?

23      A    The director of an office.

24      Q    And is that --

25      A    Joanne Jellin.

52

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1      Q    Thank you.  Okay.  I want to separate for a

2    second two different decisions, the decision to engage

3    outside peer review on the one hand, and the decision to

4    engage NMA to perform the peer review on the other hand.

5    Okay?  As to the first decision, who was involved in that

6    decision, the decision to have outside peer review?

7        A    That was the ad hoc committee's decision.

8        Q    And was anyone involved in that decision besides

9    you, Dr. Paxton, Dr. Ly, L-Y, and Dr. Horn?

10        A    Joanne Jellin was present at the meetings.  I

11    don't think she made any subsequent contribution to the

12    discussion.

13        Q    So other than the four of you, no one else was

14    involved in the decision to engage outside peer review; is

15    that correct?

16        A    No.  No.

17        Q    The way you have answered the question, it is no,

18    I'm not correct.  So let me ask the question a different

19    way.

20        A    (Witness nodded in the affirmative.)

21        Q    Was anyone involved in the decision to seek

22    outside peer review of Dr. Ennix other than you,

23    Dr. Paxton, Dr. Ly, and Dr. Horn?

24        A    No.

25        Q    Was -- how did you come to the decision to retain

53

1  NMA to review Dr. Ennix?

2      A    As I mentioned, I had been involved in the

3  initial decision to employ them in the geropsychiatric case

4  and had been involved in the work product that they had

5  generated.  We, as officers and ultimately as an MEC, were

6  quite satisfied with the thoroughness, the promptness, the

7  completeness of their evaluation, and so when we decided at

8  the level of the ad hoc committee to move to outside

9  review, they were the first to come to mind.

10      I then discussed that with Mr. Shulman to see

11  that he agreed with the propriety of that, and I asked

12  Dr. Shaieb her opinion on whether she, too, had been

13  equally satisfied with the outcome before we moved ahead.

14      I then -- something that I had not been involved

15  in doing since I didn't make the initial engagement contact

16  with NMA for the geropsychiatrist, was I went to their

17  Website.  I looked at their written materials.  I saw who

18  their principals were and what those principals' histories

19  had been within the context of provision of quality care in

20  this country, and I felt that they were a reasonable body

21  to engage.

22      Q    Who was involved in the decision to use NMA for

23  the geropsychiatrist?

24      A    The officers ultimately made the decision.

25  Dr. Shaieb was the chief of staff and made the final -- I

54

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    am only presuming, because I know what happened with

2    Mr. Shulman and I in Dr. Ennix's case.  So I'm presuming

3    that she made that final decision with counsels.

4        Q    What role did you have in selecting NMA for the

5    geropsychiatrist?

6        A    We talked about getting an outside reviewer

7    because of this person being the only member in this

8    specialty.  We queried counsel about experiences in this

9    arena with outside review organizations and --

10            MS. McCLAIN:  Dr. Isenberg, let me caution you

11    not to disclose what counsel said.  You can talk about the

12    general discussion area.

13            THE WITNESS:  And discussed with him this process

14    and made use of his experience in this arena.

15    BY MR. EMBLIDGE:

16        Q    Okay.  But did you recommend NMA?  Were you aware

17    of NMA?  What role did you have in selecting NMA for the

18    geropsychiatrist?

19        A    I was only involved in the discussions about

20    getting an outside reviewer, and the next thing I knew, NMA

21    had been engaged.

22        Q    Were you aware of NMA before that?

23        A    I was not.

24        Q    Do you remember how or who brought up NMA in the

25    first place?

                                                              55

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1    January 4, 2005, letter to Dr. Smithline from Doctors

2    Paxton and Isenberg.

3              (Plaintiff's Exhibit 1001 marked

4              for identification.)

5    BY MR. EMBLIDGE:

6         Q    Looking at Exhibit 1001, Dr. Isenberg, can you

7    tell me who participated in the drafting of that letter?

8         A    Dr. Paxton, myself, and Mr. Shulman saw a draft

9    of it.  I'm not sure that he was involved in much of the

10   crafting of it.

11        Q    Was anyone else involved in drafting this letter?

12        A    Well, it was typed by the medical staff office,

13   but as far as content goes, I think that is the extent of

14   it.

15        Q    How did you decide what information to put in

16   this letter?  That is a lousy question.

17             How did you decide what to refer -- how did you

18   decide which cases to refer to NMA for review?

19        A    The ad hoc committee first began looking at the

20   minimally invasive cases, and so the first four cases that

21   were submitted to NMA were those minimally invasive cases.

22        Q    And as to the other six, how did you decide?  Why

23   six?  Why these six?  How did you make those decisions?

24        A    The additional six cases came to light during the

25   course of the ad hoc committee's meetings.  Some were

59

DEPOSITION OF WILLIAM ISENBERG, M.D., PH.D. - 11/29/2007

1        A     I think Dr. Smithline.

2        Q     And am I correct that you, and as far as you

3    know, Summit never had any direct communication with the

4    reviewers, Doctors Breyer or Houseman?  Am I correct about

5    that?

6        A     Yes.

7        Q     On the previous case where Summit used NMA about

8    the geropsychiatrist, did the NMA -- what did the NMA

9    conclude about the geropsychiatrist and his performance?

10       A     That it was outside the standard of care.

11       Q     When you talked to Dr. Smithline or anyone else

12   at the NMA, did you ever talk to them about how often they

13   conclude, in their reviews, that someone is outside the

14   standard of care?

15       A     I did not.

16       Q     Are you aware of any time that the NMA has done a

17   review of someone and not concluded that the doctor was

18   outside the standard of care?

19            MS. McCLAIN:  Objection.  Lack of foundation.

20            THE WITNESS:  I have no knowledge.

21   BY MR. EMBLIDGE:

22       Q     We talked about Dr. Khan and credibility issues,

23   and then Dr. Lee and credibility issues, and we talked

24   about the difference between what he said to Dr. Stanten

25   and what he said to the ad hoc committee about mitral and

                                                          92

1

2    STATE OF CALIFORNIA        )
                                )  ss.
3    COUNTY OF SANTA CLARA      )

4

5         I, THERESA WARD, a Certified Shorthand Reporter

6    in and for the State of California, hereby certify that the

7    witness in the foregoing deposition,

8              WILLIAM ISENBERG, M.D., Ph.D.,

9    was by me duly sworn to tell the truth, the whole truth,

10   and nothing but the truth in the within-entitled cause, and

11   that the foregoing is a full, true, and correct transcript

12   of the proceedings had at the taking of said deposition,

13   reported to the best of my ability, and transcribed under

14   my direction.

15

16

17

18   Date _December 2_ , 2007 _Theresa Ward_

                              Theresa Ward, C.S.R. 9587

19

20

21

22

23

24

25                                                          99

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
---oOo---

COYNESS L. ENNIX, JR., M.D., as          CERTIFIED COPY
an individual and in his
representative capacity under
Business & Professions Code
Section 17200 et seq.,
       Plaintiff,
   vs.                          No. C 07-2486
RUSSELL D. STANTEN, M.D. LEIGH
I.G. IVERSON, M.D., STEVEN A.
STANTEN, M.D., WILLIAM M.
ISENBERG, M.D., Ph.D., ALTA
BATES SUMMIT MEDICAL CENTER and
DOES 1 through 100,
       Defendants.
_____/

CONFIDENTIAL
DEPOSITION OF:
WILLIAM ISENBERG, M.D.
VOLUME II
Monday, January 21, 2008

CONFIDENTIAL

Reported by:                HANNAH KAUFMAN & ASSOCIATES
Gina V. Carbone            Certified Shorthand Reporters
CSR NO. 8249                  472 Pacheco Street
                          San Francisco, CA  94116
                          (415) 664-4269

HANNAH KAUFMAN & ASSOCIATES, INC.

1  the NMA -- let me ask that question better.

2      Who decided to send those six cases, as

3  opposed to other cases, to the NMA?

4      A.   My recollection is that five of the cases were

5  the five cases that resulted in death.  Five cases that

6  Dr. Ennix had done during the time in 2004.  And one was

7  a case that came up during the interview with

8  Dr. Donovan, during which time he expressed concerns

9  regarding the consenting process and the management.

10     Q.   Okay.  That's sort of my -- the next question

11  I was going to ask, which is what was the criteria used

12  for selection.  But the question I asked is who

13  selected?

14     A.   The ad hoc committee.

15     Q.   Were you a member of the ad hoc committee?

16     A.   No.

17     Q.   But you attended all their meetings, right?

18     A.   I did.

19     Q.   Why is that?

20     A.   The president of the medical staff is an ad

21  hoc member of every medical staff committee at the

22  hospital, and has the prerogative of attending any or

23  none of any meeting that she or he wishes to.  I wanted

24  to preserve the fairness of this process to everybody,

25  patients, Dr. Ennix, the medical staff, and I felt that

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.    Yeah.  I'm hazy on that, but that is now

2  ringing true.  I had forgotten that.

3    Q.    Why would you, or anyone else at Summit,

4  review and comment on a draft report from the NMA?

5    A.    I can't think of an answer to that.

6    Q.    You wanted their own outside independent

7  review, right?

8    A.    Yes.

9    Q.    So doesn't it seem contrary to that intent to

10  have them send you a draft for you to review and comment

11  on before they provided you what was supposed to be

12  independent outside input?

13    A.    Well, you've taken me into the realm of

14  hypotheticals.  I could hypothetically say they could

15  say this might be at variance with your rules, but we

16  don't quite know what your rules are.  So if you could

17  provide us with them, then we'll tell you whether we

18  think this practitioner was within the bounds of your

19  rules or not.  And I could see that as a reasonable

20  clarification.

21    Q.    Okay.  If the NMA sent you their draft report

22  for you to review and comment on before they finalized

23  it, wouldn't that be contrary to your intent of seeking

24  an independent outside report from them?

25    MS. McCAIN:  Objection.  Calls for

DEPOSITION OF WILLIAM ISENBERG, M.D., VOL. II

HANNAH KAUFMAN & ASSOCIATES, INC.

1    speculation.  Lack of foundation.
2         THE WITNESS:  I don't know how to answer the
3    question.
4         MR. EMBLIDGE:  Q.  Well, would it be
5    consistent with your intent in retaining the NMA or
6    inconsistent with your intent in retaining the NMA?
7         A.   I think I wanted to see what their work
8    product was.
9         Q.   Of course.  But you wanted it to be outside
10   independent work product, right?
11        A.   Right.
12        Q.   Okay.  So my question is, that's what you
13   wanted.  Is it consistent with your desire or
14   inconsistent with your desire for them to give you a
15   report that they first send to you in draft form for
16   your review and comment?
17        A.   I don't see why I couldn't see it, as long as
18   I didn't make substantive changes to it.
19        Q.   Okay.  So if they sent it to you and you made
20   substantive changes, that would be inconsistent; is that
21   right?
22        MS. McCAIN:  Objection.  Calls for
23   speculation.  Lack of foundation.
24        THE WITNESS:  I think that the document should
25   be as close to what they created as possible.

HANNAH KAUFMAN & ASSOCIATES, INC.

1          MR. EMBLIDGE:  Q.  Right.  So if they sent it

2   to you for your review and you made substantive changes,

3   that would be inconsistent with what you wanted in

4   retaining the NMA, right?

5          A.  Yes.

6          Q.  Did Mr. Shulman, to your knowledge, have input

7   into the text of the NMA's report?  The wording of the

8   NMA report?

9          A.  I'm not aware that he did.

10         Q.  Okay.  Let's shift focus a little bit and talk

11  about how issues about Dr. Ennix came to your attention.

12             The minimally invasive surgery issues; those

13  came to your attention from Dr. Steven Stanten; is that

14  correct?

15         A.  Dr. Steven Stanten, Dr. John Donovan and

16  Dr. Maire Daugharty.

17         Q.  Chronologically, do you recall the order in

18  which those individuals brought the issues to your

19  attention?

20         A.  No.

21         Q.  Okay.  Prior to the time that those

22  individuals brought to your attention issues relating to

23  the minimally invasive cases, did you have any concerns,

24  whatsoever, about the performance of Dr. Ennix?

25         A.  I had received, at the end of December,

HANNAH KAUFMAN & ASSOCIATES, INC.

1  a regular basis, isn't it?

2       A.   In what I felt was a problem-riddled way.

3       Q.   What would be wrong with them knowing about a

4  review of a doctor's cases when that's what they spend

5  their time doing every month?

6       A.   I wanted this done in an expedited way so that

7  we could have answers that we could act on.

8       Q.   I know you wanted it done expedited, but I'm

9  talking about the word "confidential."  So confidential

10 means confidential from the other members of the

11 cardiothoracic peer review committee, or confidential?

12      A.   From any member -- from any other member of

13 the medical staff.

14      Q.   And you talked to Dr. Moorstein about this,

15 correct?

16      A.   So it would appear from the memo, yes.

17      Q.   Do you recall that?

18      A.   Yes.

19      Q.   And he had what you called a persuasive

20 recommendation.  And one of his recommendations was that

21 you shouldn't give the impression that you were

22 circumventing internal peer review process; what did you

23 understand him to mean by that?

24      A.   That we shouldn't directly send these cases to

25 outside review.

DEPOSITION OF WILLIAM ISENBERG, M.D., VOL. II

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   And who were you trying not to give the

2    impression to that you were circumventing internal peer

3    review processes?

4        A.   Anybody.

5        Q.   And why was that important, that you not give

6    that impression to anybody?

7        A.   Well, I don't think that the members of the

8    medical staff would like it very much -- any member of

9    the medical staff would like it very much if the

10   immediate response of medical staff leadership was to

11   send cases outside for review before the internal

12   designated body had a chance to look at it.  It's peer

13   review.

14       Q.   And here you weren't going to have the

15   internal designated body look at them, were you?

16       A.   I was having a subset of the internal body

17   look at them.

18       Q.   One person.  That's the subset?

19       A.   That's the subset.

20       Q.   Are you aware of any other time where a case

21   involving a cardiac surgeon was reviewed by a subset

22   rather than by the cardiothoracic peer review committee?

23       A.   I am not.

24          MR. EMBLIDGE:  Let's mark as 1079, a document

25   Bates stamped D4151.

DEPOSITION OF WILLIAM ISENBERG, M.D., VOL. II

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   I don't know the answer.  Dishonesty implies

2    motivation, and I don't know what his motivation was.

3    Q.   Given your concerns about the cardiothoracic

4    peer review process at Summit, what have you done to

5    address those concerns systemically?

6    A.   Well I had a talk with Russell Stanten, the

7    chief of service, about the construction of the peer

8    review committee itself, and the way that I thought it

9    might be better served to be a multi-disciplinary team

10   involving anesthesiologists, cardiac surgeons and

11   calling in cardiologists on an ad hoc basis as

12   necessary.

13        I suggested that it not be a committee of the

14   whole.  That it, instead, be with representatives.  I

15   suggested that the person under review be allowed to

16   participate in the process.  That is, give their

17   perspective on the case, but when the final

18   deliberations went on, that person should leave the

19   room.

20   Q.   And the multi-disciplinary aspect you are

21   suggesting that the cardiothoracic peer review committee

22   be composed of cardiothoracic surgeons plus members who

23   are not cardiothoracic surgeons; is that correct?

24   A.   Yes.

25   Q.   Are you aware of any institution that does

DEPOSITION OF WILLIAM ISENBERG, M.D., VOL. II

1  peer review that way?

2      A.   I'm aware of a lot of institutions that are

3  using cross-disciplinary approaches more and more for

4  patient management.  And I think that since it's --

5  there is nothing that exempts a member of another

6  department from participating in the peer review

7  process, it would probably be advantageous to include

8  them.

9      Q.   You haven't done that in OB-GYN, have you?

10     A.   Well, we didn't at the -- we did at the Summit

11 campus, and I believe it is done at the Ashby campus.

12 Right now there is a neonatologist that sits on the OB

13 peer review committee.

14     Q.   As a member?

15     A.   As a member.

16     Q.   And are you aware of any institution, not that

17 looks across disciplinary issues for patient care, but

18 that has a multi-disciplinary peer review committee,

19 like you were suggesting to Russell Stanten, at a

20 department level?

21     A.   I am not aware of any that actively do that.

22     Q.   So you made these suggestions to Russell

23 Stanten approximately when?  You can give me a year.

24 Just whatever your best estimate is.

25     A.   Yeah.  I think probably mid to late 2004, or

HANNAH KAUFMAN & ASSOCIATES, INC.

1    early 2005.

2        Q.    And what is your understanding about what, if

3    anything, he's done to act on those recommendations?

4        A.    Well, it is my understanding that there are

5    attempts being made right now to limit the number of

6    members on the peer review committee.  This lawsuit has

7    cast a pall over that process, however.  I don't know

8    what he has done with the suggestion that I made about

9    other members.  I am no longer chief of staff, so I

10   regularly don't meet with Russell Stanten about these

11   issues.

12       Q.    Okay.  This lawsuit was filed in April of

13   2007.  Between the time you talked to Russell Stanten

14   and the time this lawsuit was filed, what, if anything,

15   are you aware of that the cardiothoracic surgery

16   division did to address your concerns about its peer

17   review process?

18       A.    I am unaware that they did anything.

19       Q.    Doesn't that give you concern about patient

20   care if you think that the peer review process that an

21   important division like cardiothoracic surgery is

22   engaging in might not result in thorough objective peer

23   review?

24       A.    Yes.  It is concerning.

25       Q.    So why not do something about it?

DEPOSITION OF WILLIAM ISENBERG, M.D., VOL. II

184

HANNAH KAUFMAN & ASSOCIATES, INC.

1    So in contrast to a fairly recent interview

2  with Mr. Lovin, I wanted to let the ad hoc committee

3  know that I had heard this.  She had written this

4  letter.

5    Q.  Did you call their attention to any letters

6  that came in from cardiac surgeons?

7    A.  I'm trying to remember.  The only cardiac

8  surgeon that I really recall we got a letter from was

9  Dr. Khan, and the committee interviewed him.  So I --

10  I'm not remembering any other.

11    Q.  What about Dr. Durzinsky?

12    A.  Maybe he did write one.

13    Q.  Did you call that to their attention?

14    A.  I can't, off the top of my head, remember.

15    Q.  Did you call to their attention any letters

16  you received from cardiologists?

17    A.  I can't recall, off the top of my head.

18    Q.  On May 11th, 2005 you decided to summarily

19  suspend Dr. Ennix, correct?

20    A.  That's correct.

21    Q.  What was the basis for your decision?

22    A.  Falsification of a medical record.

23    Q.  Anything else?

24    A.  We had recently received the NMA report that

25  had elements of criticism in it regarding his

HANNAH KAUFMAN & ASSOCIATES, INC.

1  performance, his clinical performance and judgment.

2      Q.   I know, did that -- did you suspend him, in

3  part, because of the NMA report?

4      A.   Well, it just so happened that that was

5  received right at the time, and so it was part of the

6  discussion.

7      Q.   I understand. I understand the confluence of

8  time. I want to know in your decision that you made to

9  suspend Dr. Ennix, was it solely because of the

10  falsification of the medical report, or did you decide

11  to suspend him in part based on the NMA report?

12      A.   I believe there were elements of the NMA

13  report that factored into the decision to suspend him.

14  Yes.

15      Q.   What elements?

16      A.   Well, there were elements about judgment,

17  decision making and documentation that were recurring

18  themes in the NMA report, and had been made patently

19  clear to Dr. Ennix on numerous occasions at the

20  initiation, and through the process of this report --

21  through the process of this investigation. And so for a

22  practitioner who was aware that his practice was being

23  looked at, and who knew that documentation issues had

24  already been considered significantly poorly done, for

25  him to falsify the medical record, misrepresent to the

HANNAH KAUFMAN & ASSOCIATES, INC.

1  officers about that whole process, to me seemed quite

2  worrisome.

3      Q.   Okay.  But what was it in the NMA report that

4  caused you to summarily suspend Dr. Ennix?

5          MS. McCAIN:  Objection.  Asked and answered.

6          MR. EMBLIDGE:  Q.  Go ahead.

7      A.   I thought that I had just said that the

8  elements regarding technical performance, judgment, and

9  documentation which were recurring themes in the NMA

10  report were then reinforced by this huge documentation

11  problem and falsification of the medical record.

12      Q.   At this point, the NMA report, had anyone at

13  the hospital seen it besides you?

14      A.   I'm not sure.

15      Q.   And it was a report that was meant to assist

16  the ad hoc committee, right?

17      A.   It was.

18      Q.   And the ad hoc committee hadn't reviewed it,

19  had they?

20      A.   No.

21      Q.   And Dr. Ennix hadn't seen it or had an

22  opportunity to respond to it, had he?

23      A.   He had not.

24      Q.   But you felt it was appropriate to summarily

25  suspend him in part based on that report?

DEPOSITION OF WILLIAM ISENBERG, M.D., VOL. II

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   Yes.

2    Q.   Why?

3    A.   Because I think there were elements of concern

4  expressed in that report that were reinforced by the

5  behavior that I had witnessed in what he had done

6  regarding this case.

7    Q.   Even though you, an OB-GYN, were the only

8  person who had reviewed the report?

9    A.   It doesn't take a cardiothoracic surgeon to

10 recognize fraud.

11   Q.   Well, the report did not accuse him of fraud,

12 did it?

13   A.   No.  But that's what his suspension largely

14 revolved around was his fraud.

15   Q.   I'm not asking about your allegation of fraud,

16 I'm asking about you basing your decision in part on the

17 conclusions in the NMA report.

18       Now fraud, what do you mean by that?

19   A.   I mean that Dr. Ennix represented in the

20 medical record that he had done something, had written a

21 note on a day that he had not written it.  He had

22 falsely represented that he had done something.

23   Q.   Right.  Okay.  So do you believe Dr. Ennix did

24 not see the patient on the date reflected in the note

25 that you are claiming was false?

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _1st_ day of _February_ , _2008_ .

Certified Shorthand Reporter

CSR No. _8249_