# EXHIBIT N

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
--oOo--

COYNESS L. ENNIX, JR., M.D., as )
an individual and in his        )
representative capacity under   )
Business & Professions Code     )
Section 17200 et seq.,          )
                                )
          Plaintiff,            )    CERTIFIED COPY
                                )
     vs.                        ) No. C 07-2486
                                )
RUSSELL D. STANTEN, M.D., LEIGH )
I.G. IVERSON, M.D., STEVEN A.   )
STANTEN, M.D., WILLIAM M.       )
ISENBERG, M.D., Ph.D., ALTA BATES)
SUMMIT MEDICAL CENTER and Does 1 )
through 100,                    )
                                )
          Defendants.           )
_____ )

CONFIDENTIAL

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF
RUSSELL D. STANTEN, M.D.

_____
December 12, 2007

REPORTER: BRANDON D. COMBS, RPR, CSR 12978

HANNAH KAUFMAN & ASSOCIATES, INC.

1         MR. EMBLIDGE:  Q.  Okay.  Dr. Stanten, will

2    you briefly tell me your medical training background.

3         A.   I to the Baylor College of Medicine where I

4    got my M.D. degree in 1985, then trained at UC Davis

5    Medical Center for my general surgery residency until

6    1991.  I went then went to Brigham and Women's Hospital

7    in Boston where I did my cardiothoracic surgery training

8    until 1993.  Then I went into practice after that.

9         Q.   And what was the name of the practice group,

10   if you joined a practice group, what was the name of the

11   practice group you joined in '93?

12        A.   At that time it was named Cardiothoracic

13   Surgical Associates.

14        Q.   And who else was in that group?

15        A.   Dr. Leigh Iverson and Roger Ecker.

16        Q.   How do you spell Ecker?

17        A.   E-c-k-e-r.  And Dr. Mark Taylor.

18        Q.   Okay.  And if you could summarize how that

19   group evolved to the present day?

20        A.   Dr. Taylor left and Dr. Mark Suzuki came on.

21   In 1996, Dr. Ecker retired; I believe it was 1996.

22   Dr. Suzuki left around the same time.  Dr. Khan joined

23   the group around 1998.

24        Q.   When did Taylor leave?  I'm sorry.

25        A.   '94.

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    problems his patients had experienced and they had

2    difficulty sometimes reaching him.

3        Q.   So it wasn't a problem that you had but a

4    problem that other people expressed to you?

5        A.   And it would become a problem when I would

6    cover those patients.

7        Q.   So there were times when you tried to reach

8    Dr. Ennix and you had trouble reaching him?

9        A.   I think there were times like that.

10        Q.   Do you recall any?

11        A.   I don't remember any specific instances, no.

12        Q.   Did these concerns give -- how would you

13    describe these concerns, serious, minor, how would you

14    categorize them?

15        A.   I would describe them as moderate.

16        Q.   And did you discuss your concerns about

17    Dr. Ennix with anyone else?

18        A.   No.

19        Q.   Did you discuss your concerns about him with

20    your brother?

21        A.   No.

22        Q.   And by your brother, throughout this

23    deposition, I mean Steven Stanten.

24        A.   No.  I did not discuss them with him.

25        Q.   Did you discuss your concerns about Dr. Ennix

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    surgeon?

2        A.   I'm not aware of that.

3        Q.   Are you aware at Doctors' Hospital of any ad

4    hoc committees being appointed to review surgeons?

5        A.   I'm not aware of that, no.

6        Q.   At Alta Bates Summit Medical Center, are you

7    aware of any cardiothoracic surgeon's cases being

8    reviewed by a body during the peer review process other

9    than the cardiothoracic peer review committee?

10       A.   I am, with Dr. Ennix.

11       Q.   Oh, okay.  Other than with Dr. Ennix, are you

12   aware of any cardiothoracic surgeon's cases being

13   reviewed at Alta Bates Summit Medical Center outside of

14   the cardiothoracic peer review committee?

15       A.   No.  I'm not aware of that.

16       Q.   Are you aware of any ad hoc committees being

17   appointed at Alta Bates Summit Medical Center to review

18   any surgeon other than Dr. Ennix?

19       A.   I'm not specifically aware of that, no.

20       Q.   Generally?

21       A.   I had heard rumors about other cases, but I

22   really have no direct knowledge.

23       Q.   You became chair of the cardiothoracic peer

24   review committee in 2004?

25       A.   Yes.

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    present any information he had, and to allow the members

2    to discuss the case from whatever perspectives they had.

3        Q.   So it's fair to say in your estimation, that

4    was the best way to engage in peer review; correct?

5        A.   For most of these cases, yes.

6        Q.   Were there exceptions?

7        A.   I don't remember any specific exceptions.

8        Q.   Did Dr. Isenberg ever express to you concerns

9    that the way in which the cardiothoracic peer review

10   committee reviewed cases was not the best way to engage

11   in peer review?

12       A.   I recall him having discussion with me, but I

13   don't recall him making any specific suggestions for

14   change or any other specific modifications, no.

15       Q.   Have you made any changes in the way you

16   conduct peer review with the cardiothoracic peer review

17   committee since 2004?

18       A.   I would say I'm still evolving how I go about

19   running the committee, but I don't think there have been

20   any substantial changes, no.

21       Q.   Other than Dr. Isenberg, has anyone else

22   expressed concerns to you that the way in which the

23   cardiothoracic peer review committee conducts its peer

24   review is not the best way to conduct peer review?

25       A.   First of all, I don't accept the premise of

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    that question.

2        Q.   Excluding Dr. Isenberg and what he may or may

3    not have said to you, has anyone ever expressed to you a

4    concern that the way in which the cardiothoracic peer

5    review committee conducts peer review is not the best

6    way to conduct peer review?

7        A.   I still take issue with the way that question

8    is phrased.  He asked about the way we perform it, he

9    didn't necessarily express concern, but he did ask about

10   the methods and asked me to review the methods.

11           I believe Dr. Steven Stanten may have asked me

12   some general questions along the same lines, but again,

13   I believe they were along the similar lines that I

14   described.

15       Q.   Asking you about the process?

16       A.   About the process that we undergo.

17       Q.   And has there been anyone else with whom

18   you've had discussions about the process of peer review

19   at the cardiothoracic peer review committee?

20       A.   Not that I recall, no.

21       Q.   Did Dr. Steven Stanten ever ask -- did

22   Dr. Steven Stanten ever suggest that the process change?

23       A.   I don't recall anybody making specific

24   suggestions for change or modification of it, no.

25           MR. EMBLIDGE:  Let's take a short break.

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1          A.   He's African American.

2          Q.   And what about Garfield Bryant?

3          A.   African American.

4          Q.   Other than Dr. Ennix's case, are you aware of

5     any situation where the surgery peer review committee

6     did not accept the conclusion of a cardiothoracic

7     surgeon's review of a cardiothoracic surgeon's cases?

8               MS. McCLAIN:  Objection.  Lack of foundation.

9               THE WITNESS:  I'm not aware of any other

10    cases, no.

11              MR. EMBLIDGE:  Q.  Minimally invasive surgery,

12    when did it first start at the Alta Bates Summit Medical

13    Center?

14              MS. McCLAIN:  Objection.  Vague.

15              MR. EMBLIDGE:  Q.  In the cardiothoracic

16    world.

17         A.   Could you repeat the question, please.

18         Q.   What do you understand minimally invasive

19    surgery to be?

20         A.   Minimally invasive is a very broad category of

21    surgery defined differently by all different surgeons.

22         Q.   So I want to make sure we're talking about the

23    same thing.  How would you define the -- how would you

24    describe the four cases that Dr. Ennix had in terms of

25    minimally invasive?  Is it a subset of minimally

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.   Yes.  When we decided to proceed with the

2    technique, I felt that we should have one surgeon who

3    would be the primary surgeon for the majority of the

4    initial cases to develop the skill and expertise needed.

5    Dr. Khan put a lot of work and time into developing that

6    expertise and I felt it was important to support him in

7    doing that and that's how things evolved.

8      Q.   Have you experienced any complications in

9    minimally invasive cases like these?

10         MS. McCLAIN:  Objection.  Vague, compound.

11         THE WITNESS:  Yes.

12         MR. EMBLIDGE:  Q.  What types of

13   complications?

14     A.   Complications where -- one complication was

15   bleeding, for which I did a sternotomy to control the

16   bleeding.

17     Q.   Have you experienced any other complications

18   in performing these kind of minimally invasive

19   procedures?

20     A.   One complication was a conversion to a

21   sternotomy just to assist with the technical performance

22   of the operation.

23     Q.   Any others, any other complications?

24     A.   Nope.

25     Q.   So other than bleeding and conversion, you

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    haven't experienced any other complications in the

2    minimally invasive procedures you've performed?

3       A.   Those complications were actually things that

4    were taken care of at the time of surgery, so really

5    post-operatively, I'm not aware of any other

6    complications that occurred that I can recollect.

7       Q.   And have you experienced any complications in

8    any of the minimally invasive procedures on which you've

9    assisted?

10          MS. McCLAIN:  Same objection.

11          THE WITNESS:  I don't follow the patients that

12   aren't mine as closely.  I am aware of some

13   complications with those patients.

14          MR. EMBLIDGE:  Q.  What kinds?

15      A.   Bleeding and multi-organ failure.

16      Q.   Any deaths?

17      A.   I believe there's been a couple of deaths.

18      Q.   Other than yourself and Dr. Khan, are there

19   other cardiac surgeons performing minimally invasive

20   procedures at Alta Bates Summit Medical Center?

21      A.   Yes.

22      Q.   Who?

23      A.   Dr. Hon Lee and Dr. David Alyono perform

24   minimally invasive valve surgery.

25      Q.   What did Dr. Lee and Dr. Alyono do to prepare

HANNAH KAUFMAN & ASSOCIATES, INC.

1    for those procedures before beginning that?

2        A.   I'm not aware specifically of what training

3    they underwent.

4        Q.   Are you aware generally?

5        A.   In general, I know that they had also traveled

6    to visit some programs when they do it and had observed

7    us in doing it.

8        Q.   Other than that, are you aware of anything

9    else they did different to prepare?

10       A.   No.

11       Q.   Have you performed any of these types of

12   procedures at any other hospital besides Alta Bates

13   Summit?

14       A.   No.

15       Q.   So you've had at least one case where you had

16   to convert to a standard incision while performing a

17   minimally invasive procedure?

18       A.   Yes.

19       Q.   Have you had more than one?

20       A.   Two that I recall.

21       Q.   What was the reason for converting?

22       A.   The same two I mentioned a minute ago.

23       Q.   I remember you mentioning that one involved

24   converting to address bleeding.

25       A.   Yes.

1    carefully and I don't recall that there were any other

2    specific issues, no.

3            MR. EMBLIDGE:  Q.  Well, do you think your

4    patient selection of these two patients could be

5    questioned?

6            MS. McCLAIN:  Objection.  Calls for

7    speculation.

8            THE WITNESS:  Not that I recall.

9            MR. EMBLIDGE:  Q.  In performing cardiac

10   procedures, not just minimally invasive procedures, have

11   you had to replace a mitral valve in a patient where

12   you've earlier repaired that same mitral valve?

13       A.   Could you please repeat the question again.

14       Q.   Have you had to replace a mitral valve in a

15   patient when you had earlier repaired the patient's

16   mitral valve?

17           MS. McCLAIN:  Objection.  Vague as to time.

18           THE WITNESS:  Are you referring to minimally

19   invasive cases?

20           MR. EMBLIDGE:  Q.  Any kind of cases.

21       A.   I can recall one time where I did that, yes.

22       Q.   Have you had to replace a valve that you had

23   earlier repaired during the same procedure?

24           MS. McCLAIN:  Objection.  Vague.

25           THE WITNESS:  Yes.

HANNAH KAUFMAN & ASSOCIATES, INC.

1     MR. EMBLIDGE:  Q.  And have you had to replace

2  a valve that you had earlier repaired within, say, three

3  or four months?

4     A.  Yes.

5     Q.  And let's talk about the replacement within

6  the same procedure where you repaired.  What caused

7  that?

8     A.  In the course of doing a mitral valve repair,

9  the surgeon has to assess how successful that area

10  repair is at the conclusion, and if he judges that the

11  repair is not adequate, then he has the option of either

12  re-repairing the valve or replacing it, and I've had

13  that circumstance occur.

14     Q.  Approximately how many times?

15     A.  A couple times.

16     Q.  And do you think there's anything outside the

17  standard of care in a surgeon looking at the outcome of

18  a repair procedure and deciding it was in the patient's

19  best interest to replace the valve?

20     MS. McCLAIN:  Objection.  Compound, vague,

21  lacks foundation.

22     THE WITNESS:  I'm not sure I understand your

23  question.

24     MR. EMBLIDGE:  Q.  What don't you understand?

25     A.  I'd just like you to rephrase it again just

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    MS. McCLAIN:  May I have a continuing line of

2    objections to hypothetical questions that have no

3    relationship to actual cases?

4    MR. EMBLIDGE:  Well, you can have a continuing

5    objection of incomplete hypothetical if you want.

6    MS. McCLAIN:  I want the objections I've

7    already raised, which are lack of foundation, compound,

8    vague, improper hypothetical.

9    MR. EMBLIDGE:  Yeah.  I'll give you a

10   continuing objection on all those.

11   Q.   What I'm trying to get at is, there are times

12   where you got a patient, you repair the valve and a few

13   months later the patient is still symptomatic or

14   develops symptoms, and you got to go in and replace that

15   valve.  And the fact that you need to go in and replace

16   the valve that you earlier tried to repair, doesn't mean

17   that you did a lousy job the first time or selected the

18   wrong patient or used bad judgment, it's just that's one

19   of the things that sometimes happens.  That's what I'm

20   trying to get at.  That's not a question.

21   MS. McCLAIN:  I can't resist, it is compound.

22   MR. EMBLIDGE:  It's not a question, you don't

23   have to object to a nonquestion.

24   Q.   So now let me try to ask the question.  In

25   your experience as a cardiac surgeon, are there cases in

DEPOSITION OF RUSSELL D. STANTEN, M.D.

1    which you've performed or observed where a patient

2    requires valve replacement surgery after an earlier

3    surgery to repair the same valve and where the need for

4    the replacement surgery is not something that you would

5    fault the surgeon for?

6        A.    There are cases where that would be correct.

7        Q.    Have you had cardiac surgery procedures with

8    an operating time that's exceeded seven hours?

9        A.    Yes.

10       Q.    Have you had cases involving minimally

11   invasive procedures where the operating time has

12   exceeded seven hours?

13       A.    Not that I recall.

14       Q.    Well, how about cases where you converted from

15   minimally invasive to standard incisions, have you had

16   cases like that that have exceeded seven hours?

17       A.    No.  Not that I recall.

18       Q.    Do you think the fact that a case exceeds

19   seven hours means that a cardiac surgeon has used bad

20   judgment?

21       A.    For a standard valve repair or replacement

22   case, having it exceed seven hours is a sign of some

23   problem.

24       Q.    And could the problem be something other than

25   bad judgment?

HANNAH KAUFMAN & ASSOCIATES, INC.

1    period of time.

2        Q.   What types of cases can you recall where you

3    were the lead surgeon where the operating time exceeded

4    seven hours?

5        A.   A difficult reoperation requiring multiple

6    combined procedures, such as a multi-valve replacement

7    or a multi-valve replacement with coronary artery bypass

8    grafting or all of those in combination with an aortic

9    reconstruction could certainly last that long.

10       Q.   Is that what you recall being the types of

11   cases of your own that have lasted beyond seven hours?

12       A.   I would say of my own or that I've observed.

13       Q.   Approximately how many cases have you assisted

14   on where the operating time has exceeded seven hours?

15       A.   Be very hard for me to give you an accurate

16   number.  I'd only be guessing, and I would guess that it

17   may be 20 or possibly a little bit more than that over

18   the course of my career.

19       Q.   And did those cases where you were assisting,

20   did they involve something other than multiple valve

21   replacements or aortic reconstruction?

22       A.   Or multi-valve replacement with coronary

23   bypass grafting, I can't recall specific cases, and I'd

24   only be speculating.

25       Q.   Did you ever assist Dr. Ennix in a case that

DEPOSITION OF RUSSELL D. STANTEN, M.D.

1    present expressed concerns, did you have any other

2    reason for concluding that there was an individual

3    physician skill/judgment issue in these cases?

4        A.   Could you repeat the question, please.

5            MR. EMBLIDGE:  Why don't you read it back.

6            (Record read by the reporter.)

7            MS. McCLAIN:  Objection.  Misstates the

8    witness's testimony.  The testimony was severe

9    complications in multiple patients.

10           THE WITNESS:  The clustering of severe

11   complications, severe and life-threatening

12   complications, in these patients led me to conclude what

13   I stated.

14           MR. EMBLIDGE:  Q.  Have you ever had severe

15   complications with multiple patients in a one- or

16   two-month period of time?

17           MS. McCLAIN:  Objection.  Vague, compound,

18   lacks foundation.

19           THE WITNESS:  Probably, but I don't recall

20   specifically.

21           MR. EMBLIDGE:  Q.  In your observations, have

22   other cardiac surgeons at Summit experienced severe

23   complications in patients within a one- to two-month

24   period of time?

25           MS. McCLAIN:  Same objections.

HANNAH KAUFMAN & ASSOCIATES, INC.

1          THE WITNESS:  I believe so, yes.

2          MR. EMBLIDGE:  Q.  Have, to your knowledge,

3    any of those other cardiac surgeons ever had those

4    cluster of cases reviewed outside of the cardiothoracic

5    peer review committee?

6          MS. McCLAIN:  Objection.  Lack of foundation,

7    compound, incomplete hypothetical.

8          THE WITNESS:  I can't recall any other

9    situations where there was a cluster of these severe

10   technical complications over that short a period of time

11   that required review by the cardiothoracic peer review

12   committee or any other body.

13         MR. EMBLIDGE:  Q.  That wasn't what I asked.

14         You said that you believe that there have been

15   other cardiac surgeons who have had severe complications

16   with multiple patients during a one- to two-month period

17   of time.

18         As to those cardiac surgeons and those cluster

19   of cases, have any of them, to your knowledge, been

20   reviewed outside of the cardiothoracic peer review

21   committee?

22         MS. McCLAIN:  Same objection.

23         THE WITNESS:  Not that I'm aware.

24         MR. EMBLIDGE:  Q.  Now, the next paragraph,

25   and I'm now on the second full paragraph on page 1741,

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1        A.   I don't recall who the other surgeon is.

2        Q.   Further down in that column, then the next

3   bullet point towards the end of the next bullet point,

4   it says -- oh, well, actually, it refers to a reviewer

5   and the chair.  Do you see that?

6        A.   You're talking about the left column, second

7   bullet point, middle of that paragraph?

8        Q.   Yes.

9        A.   Yes, I do see that.

10       Q.   Is the reviewer Hon Lee?

11       A.   My presumption is that that's referring to

12   Dr. Hon Lee.

13       Q.   And the chair is your brother?

14       A.   That's my presumption.

15       Q.   Then it says, the reviewer suggested a

16   multi-disciplinary group be convened to evaluate the

17   processes surrounding minimally invasive cardiac

18   surgeries.

19            Was such a group convened?

20       A.   I'm not aware of one.

21       Q.   Then if you go back to the other column under

22   conclusions, recommendations, look at the third bullet

23   point.  There's a discussion here about mitral valves

24   and aortic valves and what are more difficult.  What's

25   your opinion on that subject?

HANNAH KAUFMAN & ASSOCIATES, INC.

1    physician reviewer's findings that issues with the cases

2    were of documentation, not care.

3         Are you aware of any other instance in which

4    the surgery peer review committee did not accept the

5    findings of a physician reviewer?

6         A.   I'm not aware of any other cases.

7         Q.   Then it says, the committee did not determine

8    a care classification on the two specific cases.  You

9    see that?

10        A.   Yes.

11        Q.   Isn't it typical that if the surgery peer

12   review committee is reviewing a case for care issues

13   that it makes a care classification?

14        A.   Not necessarily, no.  Many cases are discussed

15   in peer review committee, and further decisions,

16   information, and other input is required before

17   determination is made.

18        Q.   Okay.  And then it goes on to say on the next

19   page, members felt physician specific concerns included

20   final care determinations for the cases should be

21   reconsidered by the officers.  Do you see that?

22        A.   Yes.

23        Q.   The officers mean the medical staff officers;

24   correct?

25        A.   Yes.

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.   I know who the cardiac surgeons were.

2      Q.   Were any of them officers?

3      A.   Dr. Iverson was a member of the medical

4  executive committee at one point, I'm not aware that he

5  was a member at that time, but I don't recall the

6  specific times when he was a member versus when this

7  occurred.

8      Q.   Can you recall any other instance where the

9  surgery peer review committee deferred making a final

10  care determination to another body?

11      A.   I was not involved in some of the surgical

12  peer review committee's final decisions, and I can't

13  testify to what they did or did not.  I have no other

14  recollection of another case like that.

15      Q.   Are you aware of any circumstance where either

16  the cardiothoracic peer review committee or the surgery

17  peer review committee deferred to the officers to make a

18  care determination?

19      A.   I'm not aware of any other specific

20  circumstances.

21      Q.   And then the last sentence of that paragraph

22  says, it was also recommended that X number of minimally

23  invasive procedures, no matter the surgeon, be reviewed.

24  Do you see that?

25      A.   Yes.

DEPOSITION OF RUSSELL D. STANTEN, M.D.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

COYNESS L. ENNIX, JR., M.D.,

as an individual and in his

representative capacity under          CERTIFIED COPY

Business & Professions Code

Section 17200 et seq.,

        Plaintiff,

vs.                                    Case No.: C 07-2486

RUSSELL D. STANTEN, M.D.,              CONFIDENTIAL

LEIGH I.G. IVERSON, M.D.,

STEVEN A. STANTEN, M.D.,

WILLIAM M. ISENBERG, M.D.,

Ph.D., ALTA BATES SUMMIT

MEDICAL CENTER and Does 1

through 100,

        Defendants.

_____//


CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

DEPOSITION OF RUSSELL D. STANTEN, M.D.

Wednesday, January 23, 2008

VOLUME II, Pages 121 - 282


REPORTED BY:

APRIL DAWN HEVEROH, CSR NO. 8759

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q.   Anything else?

2      A.   No.

3      Q.   Did you talk to anybody about this case other

4   than your attorneys between the last time you had your

5   deposition taken and today?

6      A.   No, I did not.

7      Q.   And did you meet with your attorneys in

8   preparation for today's session?

9      A.   I met --

10      Q.   Don't tell me what you said, but just tell me

11   if you met.

12      A.   I met earlier today.

13      Q.   So between your last session and today, how

14   much time have you spent with your attorneys preparing

15   for your deposition testimony?

16      A.   30 minutes.

17      Q.   Okay.  There's been some confusion.  Well,

18   there's been some confusion in my mind as to the process

19   of peer review at the cardiothoracic peer-review

20   committee.

21           Since we last met I have learned that

22   Dr. Isenberg was troubled by the process of peer review

23   of the cardiothoracic peer-review committee, at least in

24   part because, as he understood it, when the

25   cardiothoracic peer-review committee was deliberating

HANNAH KAUFMAN & ASSOCIATES, INC.

1    about care issues regarding Physician A, Physician A was

2    in the room during those deliberations; that

3    Dr. Isenberg was troubled by that.

4         Doctor, I believe you testified somewhat

5    contrary to that the last time we got together, but when

6    I took Dr. Iverson's deposition, he specifically said

7    that in his tenure as chair of the committee and while

8    being a member of the committee under your tenure, he

9    believed that the doctor whose case was being

10   deliberated regarding was not in the room.

11        MS. McCLAIN:  Objection.  Lacks foundation as

12   to what Iverson said.

13        MR. EMBLIDGE:  Q.  Accepting as true what I've

14   just told you, since you weren't at those depositions,

15   what is your experience in that regard in terms of how

16   the cardiothoracic peer-review committee, let's say,

17   from 2000 to 2006, handled those kinds of issues?

18        A.   My belief was whenever there was a case being

19   reviewed where there was a need for determination of

20   corrective action, that we would ask -- my policy was to

21   ask the surgeon to leave the room, but I don't -- as a

22   determination was being made.  That is to say, they

23   would be there to present their portion of the case, and

24   then they would be asked to leave the room while the

25   remaining people on the committee would make a

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    determination about that.  That was the model I had in

2    mind.  But as to how often or whether I ever had to

3    employ that, my memory's not good enough to tell you

4    specific instances or dates or times, or whether there

5    were any cases that I can recall at all or not.

6        Q.   Okay.  That was the model you had in mind

7    while you were the chair; is that correct?

8        A.   Right.

9        Q.   Now, before you were the chair, you were a

10   member of the committee, right?  You have to answer

11   audibly.

12       A.   Yes.

13       Q.   When you were a member of the committee, was

14   it your understanding that that was the model that was

15   employed at that time, as well?

16       A.   I honestly don't have a strong recollection of

17   those meetings, how Dr. Iverson ran them, and I can't

18   give you -- and I'm reluctant to guess at what my memory

19   might have been because I really don't have strong

20   memories of how it was done.

21       Q.   Let me put it this way:  Do you have a

22   recollection different from Dr. -- what I've represented

23   to be Dr. Iverson's recollection, that is, that the

24   physician under review would be excused from the room

25   during deliberations?

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1          MS. McCLAIN:  Objection.  Lack of foundation.

2          THE WITNESS:  I don't have a different

3    recollection than that.

4          MR. EMBLIDGE:  Q.  And do you have any

5    understanding as to -- well, do you have any

6    understanding as to how Dr. Isenberg would have come to

7    believe that the physician remained in the room during

8    deliberations?

9        A.  I really don't know how he arrived at that

10   conclusion.  He was never present at a peer-review

11   meeting that I can remember.

12       Q.  Was that ever a subject that he discussed with

13   you?

14       A.  I know that he discussed some aspects of how

15   we do peer review.  My recollection is that he asked me

16   how we do it, and I described it to him, but I don't

17   know exactly when that conversation occurred, and I

18   don't recall him making other suggestions about it at

19   that point, except possibly to just express concern

20   about our ability to perform all of the duties.

21       Q.  What do you mean by your ability to perform

22   all of the duties?

23       A.  Whether he felt -- he asked me, as I recall,

24   whether I felt we could perform the duties that we were

25   charged with, and my recollection is that I answered

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      that I could.

2         Q.   Was it your understanding that his concern had

3      to do with the volume of work or something else?

4         A.   I don't think he -- I don't recall him

5      specifically mentioning any specific concerns.

6         Q.   We talked at the last session, or began to

7      talk, about some of the issues relating to the

8      four minimally-invasive cases.  The first case involved

9      a patient who had a history of schizophrenia.

10             Are you aware of that?

11        A.   I'm aware of one of the four patients having a

12     history of schizophrenia.  I don't recall which order

13     patient he was.

14        Q.   In your experience as a cardiac surgeon at

15     Summit, have you had occasion to perform surgery on

16     patients who are suffering from mental disorder?

17        A.   Yes.

18        Q.   And in your experience, if -- well, do you

19     always obtain a psychiatric consultation before

20     operating on such a patient?

21        A.   No.

22        Q.   Do you have any reason to believe it would be

23     improper at Summit for a cardiac surgeon to perform

24     heart surgery on a patient suffering from schizophrenia

25     if the cardiac surgeon explains all the risks involved

HANNAH KAUFMAN & ASSOCIATES, INC.

1    available, and I don't know if I would be surprised or

2    not surprised.

3         MR. EMBLIDGE:  Q.  At Summit in 2004, how many

4    cardiac surgeons were practicing?

5         A.  Six.

6         Seven.  Excuse me.  Seven.  Maybe I guess

7    there's eight.  Eight.

8         Q.  Does that include Kaiser?

9         A.  That includes Kaiser.

10        Q.  Only eight.  Okay.

11        Would you -- strike that.

12        Those eight cardiac surgeons all served on the

13   cardiothoracic surgery peer-review committee at a time

14   when you were the chair, correct?

15        A.  Yes.

16        Q.  Are there any of those cardiac surgeons that,

17   in your work with them, you believe could not have done

18   a fair and objective review of Dr. Ennix as a member of

19   the ad hoc committee?

20        A.  I believe they potentially could have done a

21   fair review of him.

22        Q.  And why do you use the word "potentially"?  Do

23   you have any hesitation?

24        A.  No.

25        Q.  Now, you -- you appeared before the ad hoc

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    difference between the mortality rate between those

2    two surgeons, right?

3        A.   Yes.

4        Q.   But you would not draw -- you would find that

5    data to be inconclusive based on the lack of sample size

6    and risk adjustment, wouldn't you?

7            MS. McCLAIN:  Objection.  Lack of foundation,

8    incomplete hypothetical, compound, vague.

9            THE WITNESS:  I would probably keep an eye on

10   the surgeon who had two deaths out of the first 10, but

11   I wouldn't necessarily arrive at the conclusion that he

12   was an inferior surgeon, no.

13           MR. EMBLIDGE:  Q.  And as far as statistically

14   sound data on mortalities, are you aware of any more

15   reliable data on surgeons in California than the data

16   compiled by the state of mortalities relating to CABG

17   procedures?

18       A.   No.

19       Q.   Let's go to the third page of the October 27th

20   document, please.  The committee asked you about

21   Dr. Ennix's decision-making skills, and there's a

22   discussion about port cases and other cases.

23           Do you see that?

24       A.   Yes.

25       Q.   Is it a fair summary to say the issues you

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1     A.   Proctoring occurs oftentimes when a new
2     surgeon joins the staff.

3     Q.   And it can also occur as part of a corrective
4     action, right?

5     A.   Proctoring can occur under many different
6     circumstances.

7     Q.   Can you give me some other examples?

8     A.   There could be voluntary proctoring or
9     mandatory proctoring.

10    Q.   Okay.  So you've got a new surgeon, you've got
11    an existing surgeon who voluntarily gets proctored and
12    an existing surgeon who involuntarily has proctoring; is
13    that correct?

14    A.   Yes.

15    Q.   And have there been -- when you started
16    performing cardiac surgeries at Summit, did you have
17    proctoring?

18    A.   Yes.

19    Q.   And since you've been there, have other
20    surgeons, cardiac surgeons come on board who have had
21    proctoring?

22    A.   Yes.

23    Q.   Approximately how many cases of yours were
24    proctored when you began performing surgeries?

25    A.   I believe it's in the range of 10 to 15.

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q.   And has that also been the range of cases that

2    you believe have been proctored for other surgeons who

3    have come on board?

4      A.   Yes.

5      Q.   What was your reason for concluding that you

6    didn't think Dr. Ennix's privileges should be removed?

7      A.   I believed he had the ability to continue to

8    do coronary artery bypass grafting and standard approach

9    valve repair and replacement.

10     Q.   And that was based on your years of working

11   with and observing him?

12     A.   Yes.

13     Q.   And assisting him in some of -- assisting him

14   in cases of those types, correct?

15     A.   Yes.

16     Q.   In your appearance before the committee, were

17   there particular individuals who seemed to be doing most

18   of the questioning, or was it all the committee members?

19     A.   I believe it was all of the committee members.

20     Q.   Did you have a sense, in appearing before the

21   committee on this occasion or the other occasions we've

22   discussed, that the committee seemed to be trying to get

23   you to say things that were unfavorable about Dr. Ennix?

24     A.   No, I don't believe that was the case.  I

25   think they gave me the opportunity to do that, but I

HANNAH KAUFMAN & ASSOCIATES, INC.

1    indisputable.  The coronary cases I felt were more

2    complicated because there were many issues involved, and

3    that one might have a difference of opinion about some

4    of the aspects of those.  But at the same time, I felt

5    that the criticisms were valid.

6        Q.    Okay.  So coronary cases referred to the

7    six cases that weren't minimally-invasive, right?

8        A.    Weren't minimally-invasive valve cases, yes.

9        Q.    Now, apart from the criticisms that the NMA

10   had specific to Dr. Ennix, there were also some systemic

11   issues that the NMA raised, right?

12       A.    Yes.

13       Q.    And it states here that you say that -- and

14   I'm in the paragraph that begins with, "Dr. Stanten

15   noted that."  Do you see that?

16       A.    Yes.

17       Q.    -- "that the system issues are valid."

18            What did you mean by that?

19       A.    I'm not sure what I meant or that I even said

20   that, necessarily.

21       Q.    Did you think the system issues that the NMA

22   raised were valid?

23       A.    I thought some of them were and some of them

24   weren't, but I don't recollect exactly what they were.

25       Q.    And then it says that you stated that a

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    discussion with the cardiologists needs to take place

2    regarding how we make decisions about approach to cases.

3         What did you mean by that?

4    A.    Discussing with cardiologists whether there

5    was the opportunity to have multiple additional reviews

6    prior to a final decision regarding whether a patient

7    should go to surgery for treatment of a problem or

8    should have an angioplasty to treat the problem or be

9    treated medically.

10        Q.    What did you do following receipt of the NMA

11   report to see that discussions with cardiologists about

12   these issues took place going forward?

13        A.    I approached some cardiologists, I believe,

14   and mentioned that, but I got a less than positive

15   response about it and feeling from them that there

16   wasn't an issue in this regard, and I did not pursue it

17   further.

18        Q.    What cardiologist did you approach?

19        A.    I don't recall, specifically.  I think I

20   talked to several, but I don't remember who they were.

21        Q.    Are there any that you can recall?

22        A.    No.

23        Q.    At the bottom of the page, one line up, it

24   says -- or it attributes to you the statement, "Some of

25   the problems they called technique are actually

HANNAH KAUFMAN & ASSOCIATES, INC.

1    wasn't indicated, right?

2        A.   Yes.

3        Q.   Do you think Dr. Ennix did?

4        A.   I don't know what his feelings were when he

5    made decisions to operate, whether he felt the risks

6    were too high but that he should or not.  I can't really

7    testify to the state of his mind.

8        Q.   And then in the next paragraph it says, "It

9    was noted that this systemic issue needs the most

10   attention."

11            From the best of your memory, is that

12   something you noted or something that committee members

13   noted to you?

14       A.   This was stated in the NMA report and the

15   committee asked me about it.  I felt it was a reasonable

16   idea that was worth pursuing, but even at the time that

17   I said this, I knew there would be some resistance among

18   the cardiologists to develop a formal method to

19   implement this.  Some of it would just be the difficulty

20   in trying to implement a process like that.

21       Q.   And it talks about bringing this to the

22   cardiology committee.  Is there such a thing?

23       A.   Yes.

24       Q.   Did you take this issue to that committee?

25       A.   No.

DEPOSITION OF RUSSELL D. STANTEN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1        Q.   Why not?

2        A.   I don't know why not.

3        Q.   Are you aware of anybody that pursued this

4    issue with the cardiology committee?

5        A.   I -- after my initial discussions with

6    cardiologists, I declined to pursue it further with the

7    cardiology committee at that time.

8        Q.   Are you aware of anyone that pursued it with

9    the cardiology committee?

10       A.   No.

11       Q.   What was the resistance you received from the

12   cardiologists?

13       A.   There was some question -- the implication was

14   that the cardiologists doing the intervention were not

15   skilled enough to be able to perform procedures or make

16   decisions, and my recollection is that the cardiologists

17   were not receptive to this idea, and the realities of

18   trying to implement some system that would allow

19   additional cardiology evaluation under emergent

20   circumstances was not a simple problem to solve, and no

21   one really had any ideas about how to solve it, so I

22   didn't pursue it beyond that.

23       Q.   Do you think that would be -- establishing a

24   system like that would be an advantage for patients at

25   Summit?

DEPOSITION OF RUSSELL D. STANTEN, M.D.

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _27th_ day of _December_, _2007_.

_____
Certified Shorthand Reporter
CSR No. _12978_

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _22nd_

day of _____ February _____, _2008_ .

_April D. Heverah_
Certified Shorthand Reporter

CSR No. _8759_