# EXHIBIT O

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D., as      )
an individual and in his             )
representative capacity under        )
Business and Professions Code        )
Section 17200, et seq.,              )
                                     )
                Plaintiff,           )
vs.                                  )    Case No: 07-2486
                                     )
RUSSELL D. STANTEN., M.D., LEIGH     )
I.G. IVERSON, M.D., STEVEN A.        )
STANTEN, M.D., WILLIAM M.            )
ISENBERG, M.D., Ph.D., ALTA BATES    )
SUMMIT MEDICAL CENTER, DOES 1        )
through 100, inclusive,              )
                                     )
                Defendants.          )
_____)

**COPY**

**TRANSCRIPT MARKED CONFIDENTIAL**

DEPOSITION OF HON S. LEE, M.D.

VOLUME I, Pages 1 to 109

Monday, December 3, 2007

3:07 p.m.

taken at Kaiser Hospital
235 West MacArthur Boulevard, Room 669
Oakland, California

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By:  Linda Vaccarezza, RPR, CSR #10201

1

1      A    We scrubbed -- we scrubbed together for quite

2   a while.  So I would say probably -- particular to the

3   conversation, probably 15 minutes apiece.

4      Q    Did you review the full patient files of each

5   of those cases?

6      A    They are full patient files in the sense of

7   their admission -- admission file.  Yes.

8      Q    You reviewed the admission report from the

9   admitting physician?

10     A    Right.

11     Q    You reviewed the operating report or reports?

12     A    Right.

13     Q    Did you review nursing notes?

14     A    Yes.

15     Q    Did you review the nursing notes from the

16  operation?

17     A    The nursing notes from the operation?  Yes.

18     Q    Did you review any pictures, echocardiograms

19  or --

20     A    No.  Did not review the echoes.

21     Q    How about TEEs?  T-E-Es?

22     A    No.  Did not review the T-E-E-s.  No.

23     Q    You refer to that as a T-E-E?

24     A    T-E-E.  Yes.  Transesophageal echoes.

25  T-E-Es.

14

1    practitioners of minimally invasive valve procedures

2    in the Bay Area?

3        A    At the time of this?  No.

4        Q    Before you actually conducted a minimally

5    invasive valve procedure, did you have training?

6        A    No.

7        Q    Did you work with anyone else who had prior

8    training when you performed your first minimally

9    invasive valve procedures?

10        MR. EMBLIDGE:  Vague.  I need to make objections.

11        THE WITNESS:  No, I did not work with anybody who

12    has had.

13    BY MS. MCCLAIN:

14        Q    Did you understand one way or the other

15    whether the operating room team that worked with you

16    on your initial minimally invasive valve procedures

17    had had training or experience?

18        A    When I started?

19        Q    Yes.

20        A    Ask the question again.

21        Q    Did you understand that the people who were

22    with you in the operating room, the scrubs, the

23    perfusionists, the anesthesiologists, had had either

24    training or experience in minimally invasive

25    procedures?

1          A     They -- I understood that they did not have

2    formal training, because there was really no formal

3    training at that time.  But I understood they had

4    experience based on working with Dr. Ennix and

5    Dr. Kahn.

6          Q     Do you know whether Dr. Kahn had training

7    before he commenced these procedures?

8          A     Not -- I do not know.  When you say --

9          Q     Training, went to a different hospital to see

10   the training, had a proctor, any sort of training?

11         A     Yeah.  So -- yes, then, I need to qualify my

12   statement.  Prior to me doing my first one, I went and

13   observed other physicians do minimally invasive

14   cardiac surgery.  Do I consider training -- cardiac

15   surgery, valve surgery.

16         Q     When we use the term, "minimally invasive,"

17   you and I both, at times, said minimally invasive

18   procedures and minimally invasive valve procedures, we

19   are talking about the same thing, right?

20         A     Yes.  Yes.

21         Q     About how many other procedures had you

22   observed before you embarked on the first one?

23         A     Two or three.

24         Q     Where was that?

25         A     One in Atlanta; one in Oregon.  Those were

1      THE WITNESS:  They were long, but I thought they

2   were not doing minimally invasive surgery.  I thought

3   they would be in the purview of -- I thought it would

4   be in the window.

5      MR. EMBLIDGE:  I am sorry; in the window?

6      THE WITNESS:  In the window of standard.

7   BY MS. MCCLAIN:

8      Q    So at the time when you reviewed it, yourself

9   not having done minimally invasive procedures and

10   presumably not having studied at any great length

11   anyone else doing minimally invasive procedure; is

12   that right?

13      A    Yes.

14      Q    You were guessing to some extent that they

15   were within the realm of reason; is that right?

16      A    Yes.

17                    (Telephone interruption.)

18                    (Pause in proceedings.)

19   BY MS. MCCLAIN:

20      Q    If you need to step out, of course, Dr. Lee,

21   please do so.

22      A    No.  That's okay.

23      Q    When you eventually came to do minimally

24   invasive procedures, did you reconsider your view with

25   respect to the excessive length or non-excessive

1  length of these first four procedures?

2      A    Yes.

3      Q    What was your thinking after you had actually

4  done the procedures?

5      A    That these times are probably appropriate for

6  first cases.

7      MR. EMBLIDGE:  I'm sorry.  "Probably

8  appropriate"?

9      THE WITNESS:  Yes.  They were -- yeah.

10     MR. EMBLIDGE:  I'm just having trouble hearing

11 you.  Sorry.

12     THE WITNESS:  Sorry.  I'll speak up.

13 BY MS. MCCLAIN:

14     Q    So one of the cases took seven hours and 31

15 minutes of actual surgery, one of the aortic valve

16 replacements, with a pump time of 234 minutes; and a

17 cross-clamp time of 171 minutes.

18         And based upon your subsequent familiarity

19 with minimally invasive valve procedures, do you think

20 those times are high?  Medium?  Low?

21     A    Those times are high.  I think -- but given

22 the scenario of the case, that was a difficult case,

23 the anatomy was difficult.  And sometimes we are faced

24 with difficult anatomy that takes us longer.

25     Q    How do you know that?

21

1    A    I think, yes.  I think it's a valid concern.

2    Q    Do you think the concerns that Brian Hite

3  were expressing were legitimate concerns?

4    A    Yes.

5    Q    Do you know that the officers of the medical

6  staff placed a hiatus on the minimally invasive valve

7  procedures after these first four were done?

8    A    Yes.  And I recall that.

9    Q    Did you think that was a reasonable response

10  to the outcomes?

11    A    I think that was a reasonable response.

12    Q    Do you agree that the outcomes of these four

13  procedures were alarming?  .

14    A    Yes.  There were -- there were reason to be

15  concerned.

16    Q    If you turn to the third page of the document

17  in front of you, about midway through that page, the

18  document says, "The officers had a Kaiser surgeon

19  thoroughly review the cases for which specific

20  concerns were raised.  The reviewer closed two cases;

21  two others were felt to have major documentation

22  issues, but not care issues."

23        Is that an accurate reflection of your

24  conclusion?

25    A    Yes.  I think that's -- I remember that's

24

1    <u>what I concluded.</u>

2        Q    What were your documentation concerns?

3        A    Documentation concern was the type of

4    procedure, the document -- the documentation of the

5    discussion with the patients as to the type of

6    procedure.

7        Q    Your concerns mainly revolved around whether

8    or not informed consent was documented; is that right?

9        A    Yes.

10       Q    Would you expect there to be more extensive

11   documentation of informed consent when a new procedure

12   is being done?

13       A    Yes.

14       Q    Would you expect there to be documentation

15   that the patient was told this was an alternative

16   procedure that had not previously been attempted?

17       A    Maybe not in those exact words, but something

18   to that effect.

19       Q    What would you expect to be conveyed in the

20   informed consent process for these new procedures?

21       A    That this is a new option, and that the

22   patient understands that.

23       Q    Would you expect the surgeon to convey that

24   this was not a procedure that the surgeon had done

25   before?

1    condition this patient found himself in?

2        A    It's a possibility; although that was not my

3    conclusion.

4        Q    What was your conclusion?

5        A    I didn't have one because there were so many

6    possibilities.  Signs, suturing, technique.

7        Q    And the National Medical Audit Group that

8    subsequently reviewed some of those surgeries found

9    the following with respect to that operation:

10    "Dr. Ennix made technical errors that led to

11    ventricular damage and a paravalvular leak, and the

12    need for a second surgery.  The leak should have been

13    apparent in the OR, and the patient should not have

14    left the OR without it being detected and repaired."

15        Do you think that's a reasonable conclusion

16    to reach, or are you able to comment upon it at all?

17        A    I'm not able to comment on it.  Because I

18    have -- sometimes I'm faced with the same results.

19    And intraopothy we don't see it.  Then something

20    happens post-operatively or either immediately or a

21    month or a couple of months, then we see it.

22        So that's not the conclusion that I came to,

23    although that is a possibility.

24        Q    Another physician reviewing that first

25    procedure came to the following conclusion:  "A 27

1    cases for him, under the auspices of quality peer

2    review.  And my comments was under -- they were under

3    that umbrella.

4        Q    Understood.  But typically when there is a

5    peer review examination of a cardiothoracic surgery,

6    that examination takes place at the cardiothoracic

7    peer review committee, correct?

8        A    Correct.

9        Q    And there's a discussion around the table

10   about the case?

11       A    Yes.

12       Q    And as to the four minimally invasive cases,

13   am I correct that that discussion around the table did

14   not occur?

15       A    That is correct.

16       Q    Can you think of any instance in the past

17   where -- you're aware of, other than with Dr. Ennix,

18   where peer review of a cardiothoracic surgeon occurred

19   outside the context of the cardiothoracic peer review

20   committee?

21       A    No.

22       Q    Do you understand my question?

23       A    I understand.  The cases -- the normal flow

24   of the cases would have been through a

25   cardiothoracic -- it appears consisting of

72

1   aware of, was initiated by someone outside of the

2   cardiothoracic surgery division?

3       A    Yes.  You can have requests to review a case

4   in peer review by anybody.

5       Q    Okay.  But where -- okay.  I apologize.  My

6   question wasn't clear.

7            Are you aware of any case, other than

8   Dr. Ennix's case, where the initial review occurred

9   not at the cardiothoracic peer review committee, but

10  at a different level?

11      A    Am I aware of any other case?  I can't say

12  I'm aware of any other cases, but it doesn't surprise

13  me.

14      Q    Are you familiar with the National Medical

15  Audit?

16      A    National Medical --

17      Q    The organization that did the outside peer

18  review of Dr. Ennix.

19      A    I'm not familiar with them, no.

20      Q    Have you ever heard of Mercer Consulting?

21      A    No, I've not heard of them.  But that's

22  purely my ignorance.  And hopefully the fact that I

23  don't know them may be a good sign.

24      Q    Exactly.  Have you ever heard of Dr. Bruce

25  Reitz?

1    A    Yes.

2    Q    What do you know of him?

3    A    I know him professionally, and he has started

4    programs of his own.  He's very well respected.  He's

5    almost an icon.

6    Q    In the cardiac surgery?

7    A    In the cardiac surgery arena.

8    Q    Have you ever heard of Dr. Bruce Lyttle?

9    A    Another surgeon of similar stature.

10    Q    Have you ever heard of Dr. Leland Housman?

11    A    Housman, no.

12    Q    Am I correct that in your experience at

13    Kaiser in the peer review system, you're not aware of

14    any case where the cardiothoracic surgeons have found

15    no care issues but nonetheless, a cardiothoracic

16    surgeon was reviewed at a higher level?

17    A    Say that again.

18    Q    I think there were three negatives in there.

19        I thought I heard you say that at Kaiser --

20    you've had about seven years of experience in peer

21    review at Kaiser, correct?

22    A    Yes.

23    Q    Has there been an instance at Kaiser that

24    you're aware of where at the cardiothoracic peer

25    review level, there was a finding of no care issue,

75

1    A    Yes.

2    Q    What do you know of him?

3    A    I know him professionally, and he has started

4  programs of his own.  He's very well respected.  He's

5  almost an icon.

6    Q    In the cardiac surgery?

7    A    In the cardiac surgery arena.

8    Q    Have you ever heard of Dr. Bruce Lyttle?

9    A    Another surgeon of similar stature.

10    Q    Have you ever heard of Dr. Leland Housman?

11    A    Housman, no.

12    Q    Am I correct that in your experience at

13  Kaiser in the peer review system, you're not aware of

14  any case where the cardiothoracic surgeons have found

15  no care issues but nonetheless, a cardiothoracic

16  surgeon was reviewed at a higher level?

17    A    Say that again.

18    Q    I think there were three negatives in there.

19         I thought I heard you say that at Kaiser --

20  you've had about seven years of experience in peer

21  review at Kaiser, correct?

22    A    Yes.

23    Q    Has there been an instance at Kaiser that

24  you're aware of where at the cardiothoracic peer

25  review level, there was a finding of no care issue,

1    but nonetheless, that surgeon had his or her cases

2    reviewed at a higher level?

3        A    I've not been aware of any cases.

4        Q    And have you been aware of a case like that

5    at Summit, other than Dr. Ennix's case?

6        MS. MCCLAIN:  Objection.  Lack of foundation.

7        THE WITNESS:  No, I'm not aware of any.

8    BY MR. EMBLIDGE:

9        Q    During what time period did you or have you

10   served on the cervicothoracic peer review committee at

11   Summit?

12       A    November 2000 to present.

13       Q    Can you estimate the number of cases that you

14   have peer reviewed at Summit?

15       MS. MCCLAIN:  Objection.  Vague as to "you."

16   BY MR. EMBLIDGE:

17       Q    I don't mean the committee, I mean you

18   personally.

19       A    Me, personally, maybe ten a year at most.

20   Five to ten a year.

21       Q    So between 35 and 70?

22       A    Reasonable.

23       Q    Have you ever served on an ad hoc committee?

24       A    No.  If this is considered an ad hoc

25   committee, then I'm not sure if I'm serving or if I

1  surgery QI committee, and eventually the ad hoc

2  committee.

3      Q    But as far as your direct communication,

4  apart from documentation that you may have done, did

5  you have any direct communication about Dr. Ennix's

6  four minimally invasive cases with anyone other than

7  Dr. Steven Stanten and the members of the ad hoc

8  committee?

9      A    I think I may have out of courtesy to the

10  chief of cardiothoracic surgery.  I told him that I

11  was reviewing this and these are my findings.

12      Q    And this is Russel Stanten?

13      A    Yes.

14      Q    Now, Dr. Steven Stanten is on record as

15  saying that your review of Dr. Ennix's cases was a

16  very thorough job, even interviewing all those

17  involved in the cases included anesthesiologists and

18  the operating team members.

19      I thought I heard you testify at the

20  beginning of your deposition that you didn't interview

21  anesthesiologists.  Is Dr. -- what's right?

22      A    I misspoke.  At that time, my -- my memory

23  failed me.  But after speaking -- and now I remember

24  when the question was, did anesthesiologists share the

25  concerns, that prodded -- and I remembered, yes, I

1    talked to Brian Hite about his concerns.  And I think
2    -- yeah.

3          So I talked to anesthesiologists and I
4    probably talked to circulating nurses, too, but I
5    specifically remember speaking with techs.

6       Q    And did you talk to assisting surgeons?

7       A    I would like to say yes, but I don't remember
8    specifically.  I may have spoken to Nolli, but I don't
9    remember the -- what was gleaned from that, so I can't
10   remember.

11      Q    And when you say Nolli, that's N-O-L-L-I,
12   Nolli Young?

13      A    Yes.  Nolli Silva.

14      Q    Nolli Silva.  Okay.  Sorry about that.

15          You reported to the ad hoc committee in the
16   meeting that Ms. McClain showed you on September 27th,
17   Exhibit 3, right?

18      A    Yes.

19      Q    You actually attended that meeting, right?

20      A    Yes, I attended that meeting.

21      MR. EMBLIDGE:  I need to go off the record for a
22   second.

23          (Recess taken from 5:30 p.m. to 5:31 p.m.)

24          (Discussion was held off the record.)

25   BY MR. EMBLIDGE:

1   there was a care issue sufficient to have a doctor

2   review, correct?

3        A    Yes.

4        Q    And then the doctor reviewed the remaining

5   five cases and found no sufficient care issues that

6   warranted review by the full cardiothoracic peer

7   review committee, right?

8        A    That's correct.  I think that -- yes.

9        Q    When you're doing the physician review for

10  the cardiothoracic peer review committee, is your

11  review at that level as extensive as the review you

12  did of Dr. Ennix's four cases?

13       MS. MCCLAIN:  Objection.  Compound.

14       THE WITNESS:  I would say the level of review for

15  Dr. Ennix's cases were more detailed because of the

16  attention brought to it.  And the scope of the cases.

17  BY MR. EMBLIDGE:

18       Q    What do you mean the attention brought to it?

19       A    I was asked to review the cases by

20  Dr. Stanten.  Steve Stanten.

21       MR. EMBLIDGE:  Let me mark as Exhibit 10 a Quality

22  Management Worksheet dated 8/16/2004.

23       (Exhibit 10 was marked for identification.)

24  BY MR. EMBLIDGE:

25       Q    If you look on the second page of this

1  think he made poor patient selection?

2      A    No.

3      Q    What's an example of poor patient selection?

4  Or would it be -- would an example of poor patient

5  selection be using a new innovative technique on the

6  healthy individual instead of the high-risk

7  individual?

8      A    Yes.  If you have -- if you have that bias.

9  Patient selection is purely a personal bias.  Someone

10 who I think may be too high risk for me may be a

11 standard for someone who operates at a Cleveland

12 clinic, let's say, who has a heart/lung machine -- who

13 has a VAD available, who takes care of those patients

14 all the time.  Ventricular assist device.

15     Q    So it's sort of in the eye of the beholder

16 thing?

17     A    Yes.

18     MR. EMBLIDGE:  I want to take a very quick break,

19 and then I may have a couple more questions but

20 shouldn't have many.

21     (Recess taken from 6:06 p.m. to 6:14 p.m.)

22 BY MR. EMBLIDGE:

23     Q    Dr. Dat Ly, L-Y.  Is that "Lee" or "lie"?

24     A    "Lee."

25     Q    Okay.  In your experience in cardiothoracic

1    peer review at Summit and Kaiser, have the other --

2    aside from Dr. Ennix, have the other cardiothoracic

3    lead surgeons had patients who have died during or

4    shortly after surgery?

5        A    Wait, wait, wait, wait.  Your question

6    again?

7        Q    Have the other cardiothoracic surgeons that

8    we identified --

9        A    Yes.

10       Q    -- practicing at Summit --

11       A    Yes.

12       Q    -- have they had patients who have died

13   during or shortly after surgery?

14       A    Yes.

15       Q    Have they had to convert to cardiopulmonary

16   bypass while performing coronary artery bypass

17   procedures?

18       A    Yes.

19       Q    Have they had patients return to surgery

20   for -- and I'm going to pronounce this wrong,

21   mediastinal bleeding?

22       A    Yes.

23       Q    Have they had patients experience cerebral

24   vascular accidents during or shortly after open-heart

25   cases?

101

1      A    Yes.

2      Q    Have they had patients experience deep

3  sternal wound infections?

4      A    Yes.

5      Q    Have they had patients experience vein donor

6  site infections shortly -- during or shortly after

7  CAGB cases?

8      A    Yes.

9      Q    And have they had patients return to surgery

10  for valve-related problems?

11      A    Yes.

12      MR. EMBLIDGE:  That's all I've got for you,

13  Doctor.

14      MS. MCCLAIN:  I have just a couple of questions

15  Dr. Lee.

16      THE WITNESS:  Sure.

17            REEXAMINATION BY MS. MCCLAIN

18  BY MS. MCCLAIN:

19      Q    You said that you had been tangentially

20  involved with an ad hoc committee at Kaiser.

21      A    The question was:  Was I was aware?  And

22  tangentially, I was aware.

23      Q    So it didn't involve personal involvement on

24  your part?

25      A    Correct.

1   STATE OF CALIFORNIA      )

2   COUNTY OF SONOMA         )

3       I, LINDA VACCAREZZA, a Certified Shorthand

4   Reporter of the State of California, duly authorized

5   to administer oaths pursuant to Section 2025 of the

6   California Code of Civil Procedure, do hereby certify

7   that

8                   HON LEE,

9       The witness in the foregoing examination, was by

10  me duly sworn to testify the truth, the whole truth

11  and nothing but the truth in the within-entitled

12  cause; that said testimony of said witness was

13  reported by a disinterested person, and was thereafter

14  transcribed under my direction into typewriting and is

15  a true and correct transcription of said proceedings.

16      I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing examination and caption named, nor in any

19  way interested in the outcome of the cause named in

20  said caption.

21      Dated the 17th day of December, 2007

22      _____

23      LINDA VACCAREZZA, RPR, CSR #10201

24

25

108

# EXHIBIT P

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D.,     )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )
                                 )
ALTA BATES SUMMIT MEDICAL        )
CENTER,                          )
                                 )
                Defendant.       )
_____  )

**CERTIFIED COPY**

Case No.:
C 07-2486 WHA
                (JCS)

\*\*\* CONFIDENTIAL \*\*\*
DEPOSITION OF STEVEN STANTEN, M.D.


DATE:          Wednesday, December 5, 2007

TIME:          9:43 o'clock a.m.

LOCATION:      MOSCONE, EMBLIDGE & QUADRA, LLP
               220 Montgomery Street, Suite 2100
               San Francisco, California


**DISK
ENCLOSED**


REPORTED BY:  THERESA WARD, C.S.R. 9587



PULONE & STROMBERG, INC.
CERTIFIED SHORTHAND REPORTING
AND VIDEOCONFERENCING SERVICES
— Serving the Legal Community Since 1978 —

1-800-200-1252

1       A    I don't -- I don't know.

2       Q    Can you give me any range?

3       A    Within the year prior.  It would be a guess, but

4    within the year.

5       Q    And how did those facts come to your attention,

6    that Dr. Iverson had attempted this procedure before

7    Dr. Ennix?

8       A    I don't recall specifically.

9       Q    Do you recall generally how it came to your

10   attention?

11      A    I think I heard about it at a meeting, but I

12   don't recall which meeting or where it came up.

13      Q    Did you ask Dr. Hon Lee to review the four

14   minimally invasive cases?

15      A    I did.

16      Q    How did that come to be?  How did you come to do

17   that?

18      A    I don't understand the question.  Why did I do

19   it?

20      Q    Yeah.

21      A    I went to the officers and the president of the

22   medical staff with the concerns raised by the

23   anesthesiologists about these cases, and we felt we needed

24   a better understanding of what was involved with these

25   procedures and a review of those cases to see if there were

                                                          38

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1   issues that are beyond my expertise as a general surgeon.

2        Q    So okay.  The issues about these cases came to

3   your attention first through an anesthesiologist, right?

4        A    That's right.

5        Q    Who was that?

6        A    Dr. Maire Daugherty.

7        Q    Before going -- I'm sorry.  To whom did you go to

8   get approval to use Dr. Lee?

9        A    Once Dr. Daugherty notified me, I went to the

10   president of the medical staff, Dr. Isenberg, and the

11   officers met.  I then reviewed those cases myself, the

12   charts of those cases, and it became apparent that it was

13   beyond my expertise to thoroughly look at those, and so we

14   felt we needed some help.

15        Q    Before you went to Dr. Isenberg with your concern

16   about these four cases, had anybody expressed concern to

17   you, other than Dr. Daugherty?

18        A    I think I asked other people in the operating

19   room.  I don't remember who -- what their experience was

20   with how these cases were going, what was happening,

21   because this was the first I had heard about it, and so I

22   wanted sort of some confirmatory information that had other

23   people experienced difficulties and seen problems.

24        Q    When you say this is the first you had heard

25   about it, what do you mean?  What is the "it"?

39

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1          Q     In going to him, did you have any concerns that

2     he would do an objective review of the four cases?

3          A     No.

4          Q     Can you recall anytime that an expedited review

5     of a surgeon's cases -- can you recall anytime that an

6     expedited peer review of the surgeon's cases has taken

7     place outside of the peer review committee process, other

8     than this instance with Dr. Ennix?

9          MS. McCLAIN:  Objection.  Vague as to the phrase

10     "outside of the peer review committee process."

11          THE WITNESS:  I'm not aware of any.

12     BY MR. EMBLIDGE:

13          Q     Okay.  Let me --

14          MR. EMBLIDGE:  Actually, should we take a break?

15     And we'll start going through some documents.

16          (A break was taken.)

17     BY MR. EMBLIDGE:

18          Q     Dr. Stanten, going back to this point in time

19     where you went to Dr. Isenberg about the four minimally

20     invasive cases, before going to Dr. Isenberg, did you talk

21     to Dr. Ennix about those cases?

22          A     Not that I recall.

23          Q     Why not?

24          A     I felt that I needed to do some investigation

25     before going to him.  I didn't understand at all the

47

1    magnitude of the issue or anything about the issue, and I

2    felt this needed some investigation first.

3         Q    Sure.  As part of an investigation, wouldn't you

4    want to talk to the lead surgeon on the four cases?

5         A    Well, the concerns were raised by the

6    anesthesiologist about the conduct of the operation and the

7    choice of patients for that operation, and I felt that it

8    wasn't the appropriate time to go to Dr. Ennix.

9         Q    What did you feel was the appropriate time?

10        A    Once I understood the situation, once I

11   understood what was involved in these procedures, what the

12   nature of the complications were, what the nature of the

13   concerns of the -- whether the concerns of the

14   anesthesiologist were valid or not.  I didn't know anything

15   about this.  So I needed to learn about it.

16        Q    Did you inform Dr. Ennix of Dr. -- that Dr. Lee

17   had been asked to review the four cases?

18        A    I don't recall.

19        Q    In the -- am I correct that, as far as cardiac

20   surgeons, you can't recall another instance where a cardiac

21   surgeon's performance was first reviewed by a physician

22   outside of the Cardiothoracic Peer Review Committee; is

23   that correct?

24        A    That's correct.

25        Q    As far as any other type of surgeon who normally

                                                          48

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1    Medicine Department Peer Review Committee.

2        Q    Is there anything else that you can recall that

3    you did in response to repeated complaints of a serious

4    nature about a physician, other than have those complaints

5    reviewed at the peer review committee level?

6        A    Some issues that we hear are behavioral issues,

7    physician behavior, interaction with either colleagues or

8    staff.  Those, we take at the medical staff to be very

9    serious, but those are not issues that go to the nurse at

10   the Peer Review Committee for review in that regard.

11       Q    Where do they go?

12       A    They might go directly to the officers.

13       Q    But as far as patient care issues, other than

14   Dr. Ennix, the physicians who were brought to your

15   attention regarding serious issues of patient care, did you

16   do anything about those physicians, other than make sure

17   that their issues were reviewed by the relevant

18   departmental Peer Review Committee?

19       MS. McCLAIN:  Objection.  Compound.  Vague.

20   Lacks foundation.

21       THE WITNESS:  I forgot the first part of it, to

22   answer yes or no.  So I need that one again.

23   BY MR. EMBLIDGE:

24       Q    Sure.  Okay.  So right now, I'm talking about the

25   physicians who you received complaints about.

53

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1          A      Uh-huh.

2          Q      You considered those complaints to be serious and

3     involving patient care.

4          A      Uh-huh.

5          Q      Regarding those physicians, did you do anything

6     about those complaints, other than make sure the complaints

7     were brought to the attention of the relevant departmental

8     Peer Review Committee?

9          A      No.

10         Q      Okay.  Let me show you -- I'm going to show you a

11    document.  I'm going to try and figure out what number it

12    is.  We will call it 1010 because I know that's safe.

13              (Plaintiff's Exhibit 1010 marked

14               for identification.)

15    BY MR. EMBLIDGE:

16         Q      Okay.  Plaintiff's 1010 is a document Bates

17    stamped D 1739 through D 1714, and it involves a special

18    meeting that occurred on February 9, 2004.  Do you see

19    that?

20         A      Yes.

21         Q      Is this a special meeting of the officers, or

22    special meeting of some other body?

23         A      It's not the officers.  So it's a special meeting

24    of other members.

25         Q      So is it a special meeting of -- what? -- of a

                                                              54

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1   these charts, that there were some -- two of the four

2   cases, he had some concerns about the care, but felt they

3   fell within the range of a learning curve with new

4   procedures.

5       Q    So when it says here, "Dr. Lee noted several

6   documentation issues, but no quality-of-care concerns" --

7       A    Right.

8       Q    -- that's not accurate?

9       A    I think that -- no.  I think that's accurate.

10  That is Dr. Lee's assessment of the situation.

11      Q    And did you have concerns about the credibility

12  of Dr. Lee's assessment?

13      A    No.

14      Q    The -- this document then goes on.  I'm sorry.

15  Let's finish with Dr. Lee.  So he came back and he reported

16  this to you verbally, right?

17      A    Yes.

18      Q    Did you and Dr. Lee have any subsequent

19  discussions about Dr. Ennix?

20      A    Not that I recall.

21      Q    Ever?

22      A    Not that I recall.

23      Q    So going back to this document.  The third

24  paragraph says, "The Surgery Peer Review Committee met and

25  although their review was not as in depth as Dr. Lee's,

                                                           75

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1    two of which were cited by the initial reviewer, do you

2    recall what the complication was that wasn't cited by the

3    initial reviewer?

4        A    No, I don't.

5        Q    And this is the only time that you can recall

6    that the Surgery Peer Review Committee has declined to

7    accept the findings of a peer reviewer that there were no

8    quality-of-care issues, correct?

9        A    I don't think we really declined to accept his

10   report.  I think we took it into account and came up with

11   our own decision.

12       Q    You were just quoting me a portion of the report.

13   Where were you quoting from?

14       A    Yeah.  I was at the bottom of page 3, not to

15   accept the physician reviewer's findings that issues with

16   the cases were of documentation, not care.  So we didn't

17   accept that particular phrase.  We didn't ignore it.  We

18   formed our own -- took it into account, and formed our own

19   opinion.

20       Q    And this is the only time you are aware of,

21   correct, that the Surgery Peer Review Committee has not

22   accepted a physician reviewer's findings that there were no

23   care issues?

24       A    That is the only one I'm aware of.

25       Q    Going back to this document, 1015, the third

81

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1      about his portion?

2              MR. EMBLIDGE:  Yes.

3              MS. McCLAIN:   So just review your portion.

4              THE WITNESS:  Okay.

5              Okay.

6      BY MR. EMBLIDGE:

7          Q     On the first page, there is a paragraph that

8      starts, "Dr. Stanten then asked Dr. Hon Lee."

9              Do you see that?

10         A     Yes.

11         Q     And it says, it attributes to you a comment that

12     "Dr. Hon did a very thorough job."

13             Is that an accurate reflection of what you think

14     Dr. Lee did?

15         A     Yes.

16         Q     And it then says later in the paragraph that

17     "Dr. Stanten stated that combining these concerns, the

18     concerns stated above, he felt," meaning you felt "these

19     issues were not procedure related, but physician related."

20             Did you reach that conclusion yourself, that the

21     issues concerning Dr. Ennix and the minimally invasive

22     cases were not procedure related, but physician related?

23         A     I think that also reflects taking into account

24     the Junod report, which was more information I had, and

25     this was -- this was what came out of the Surgery Peer

                                                              99

CONFIDENTIAL DEPOSITION OF STEVEN STANTEN, M.D. - 12/5/2007

1      STATE OF CALIFORNIA        )
                                  )  ss.
2      COUNTY OF SANTA CLARA      )

3

4          I, THERESA WARD, a Certified Shorthand Reporter

5      in and for the State of California, hereby certify that the

6      witness in the foregoing deposition,

7                      STEVEN STANTEN, M.D.,

8      was by me duly sworn to tell the truth, the whole truth,

9      and nothing but the truth in the within-entitled cause, and

10     that the foregoing is a full, true, and correct transcript

11     of the proceedings had at the taking of said deposition,

12     reported to the best of my ability, and transcribed under

13     my direction.

14

15

16

17     Date_____ 19 _, 2007        _Theresa Ward_

                                           Theresa Ward, C.S.R. 9587

18

19

20

21

22

23

24

25

                                                              112

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
---oOo---

COYNESS L. ENNIX, JR., M.D., as
an individual and in his
representative capacity under
Business & Professions Code
Section 17200 et seq.,

CERTIFIED COPY

        Plaintiff,

    vs.                           No. C 07-2486

RUSSELL D. STANTEN, M.D. LEIGH
I.G. IVERSON, M.D., STEVEN A.
STANTEN, M.D., WILLIAM M.
ISENBERG, M.D., Ph.D., ALTA
BATES SUMMIT MEDICAL CENTER and
DOES 1 through 100,

        Defendants,

_____/

CONFIDENTIAL
DEPOSITION OF:
STEVEN STANTEN, M.D.
VOLUME II
Monday, January 21, 2008

CONFIDENTIAL

Reported by:             HANNAH KAUFMAN & ASSOCIATES
Gina V. Carbone            Certified Shorthand Reporters
CSR NO. 8249                 472 Pacheco Street
                        San Francisco, CA  94116
                          (415) 664-4269

HANNAH KAUFMAN & ASSOCIATES, INC.

1  meetings or training sessions that you are talking

2  about?

3      A.  No, I'm not.

4      Q.  Do you recall anything else that was done

5  systemically to improve the operating room staff?

6      A.  No.

7      Q.  And what about the -- the specific

8  improvements that are cited here by you, system

9  improvements with cardiology and cardiothoracic surgery;

10  what did you do to work on those system improvements?

11      A.  I personally didn't do anything.  The concern

12  that the NMA report talked about was the communication

13  issues between the cardiologists and the cardiothoracic

14  surgeons.  So I don't think that there was anything that

15  I could personally do to get involved with improving

16  that.  Hopefully as the identification of these issues,

17  that was something they each took on individually.

18      Q.  What did the hospital do to improve that

19  communication?

20      A.  I'm not aware of anything specifically that

21  the hospital did.

22      Q.  Are you aware of anything anybody did?

23      A.  What the cardiac surgeons and the

24  cardiologists are doing individually among themselves,

25  discussing these cases more closely, I'm not -- I don't

HANNAH KAUFMAN & ASSOCIATES, INC.

1    know.

2        Q.    Okay.  I understand you are not aware of what

3    they're talking about person to person, but are you

4    aware of anything that the hospital or the surgeons did

5    for system improvements with cardiology and

6    cardiothoracic surgery?

7        A.    I think what I'm doing is I'm naming these two

8    areas that need systems improvements.  There are some

9    things that I felt I might be able to impact, and other

10   things I didn't feel that I could personally impact.

11       Q.    Right.  I --

12       A.    So I don't know if I understand -- I mean, I'm

13   not sure I was necessarily tying cardiology to cardiac

14   surgery specifically here, but identifying systems

15   issues.

16       Q.    Sure.  And I'm putting what you personally did

17   to one side.

18       A.    Okay.

19       Q.    Are you aware of anything anyone did to

20   improve communication systemically between cardiology

21   and cardiothoracic surgery?

22       A.    I'm not aware whether that happened or not.

23   No.

24       Q.    The next line talks about weekends -- well,

25   what did you mean by the next line?

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   Lamont Paxton is a friend?

2    A.   Yes.

3    Q.   Neighbor?

4    A.   Yes.

5    Q.   Former or current neighbor?

6    A.   Well, pretty close still.

7    Q.   And your kids go to school together?

8    A.   Yes.

9    Q.   Again, he's somebody you golf with and

10   socialize with?

11   A.   Yes.

12   Q.   Outside of formal meetings, by that I mean

13   meetings of the ad hoc committee, or the medical staff,

14   or the Medical Executive Committee, have you had any

15   discussions with Dr. Paxton about Dr. Ennix?

16   A.   No.

17   Q.   Have you had any discussions with the other

18   members of the ad hoc committee, Dat Ly or Barry Horn,

19   about Dr. Ennix?

20   A.   No.

21   Q.   Do you have any relationship with either of

22   them?

23   A.   Friends and colleagues.

24   Q.   Again --

25   A.   They don't golf, so I've never played golf

1           Have you had any discussions with any surgical

2    assistants about Dr. Ennix outside of formal meetings?

3           MS. McCLAIN:  Other than what has been

4    testified to?

5           MR. EMBLIDGE:  Q.  Other than Mr. Lovin's

6    possible comment during a surgery with you.

7        A.   Well, Mr. Lovin is a surgical tech, so

8    surgical assistants might be physician assistants or

9    other surgeons.  So whether they were in on discussions

10   when Mr. Lovin or other people commented about

11   Dr. Ennix's behavior, I can't comment on.  But I have

12   not had anybody specifically -- we have not had that

13   specific discussion over the -- at the operating table

14   over a patient.

15       Q.   Dr. Bruce Moorstein, he's a friend of yours?

16       A.   Yes.

17       Q.   Somebody you socialize with?

18       A.   Yes.

19       Q.   Somebody you golf with?

20       A.   Good one.  He's a good one.

21       Q.   And have you had any discussions with

22   Dr. Moorstein about Dr. Ennix outside of formal

23   meetings?

24       A.   No.

25       Q.   None whatsoever?

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _1st_ day of _February_, _2008_.

_____
Certified Shorthand Reporter
CSR No. _8249_