# EXHIBIT Q

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
--oOo--

COYNESS L. ENNIX, JR., M.D., as )
an individual and in his        )
representative capacity under   )     CERTIFIED COPY
Business & Professions Code     )
Section 17200 et seq.,          )
                                )
            Plaintiff,          )
                                )
    vs.                         ) No. C 07-2486
                                )
RUSSELL D. STANTEN, M.D., LEIGH )
I.G. IVERSON, M.D., STEVEN A.   )
STANTEN, M.D., WILLIAM M.       )
ISENBERG, M.D., Ph.D., ALTA BATES)
SUMMIT MEDICAL CENTER and Does 1 )
through 100,                    )
                                )
            Defendants.         )
_____)

CONFIDENTIAL

CONFIDENTIAL

DEPOSITION OF
LAMONT PAXTON, M.D.

_____
December 13, 2007


REPORTER: BRANDON D. COMBS, RPR, CSR 12978

HANNAH KAUFMAN & ASSOCIATES, INC.

1       A.    Yes.

2       Q.    Which ones?

3       A.    Summit Medical Center, San Leandro Hospital

4    and Eden Medical Center.

5       Q.    And just as a general proposition, of those

6    three, Summit, San Leandro and Eden, which one would you

7    say you have more peer review experience at?

8            MR. VANDALL:  Objection.  Vague.

9            MR. SWEET:  Q.  Do you understand that

10   question?

11      A.    Yes.

12      Q.    So what's the answer?

13      A.    I had considerable experience at Summit

14   Medical Center as well as San Leandro Hospital.

15      Q.    And to some lesser degree at Eden?

16      A.    Yes.

17      Q.    Okay.  Can you briefly describe your vascular

18   surgery group and how it's comprised and what your role

19   is in that group.

20            MR. VANDALL:  Can we ask one question at a

21   time.

22            MR. SWEET:  Q.  Go ahead.  Do you understand

23   the question?

24      A.    I do.  There are four partners in practice.

25   Shall I name them?

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   Yeah.  Go ahead.

2    A.   Dr. Robert Gingery, G-i-n-g-e-r-y, is the

3    senior partner.  Dr. Arnold Levine, L-e-v-i-n-e, is the

4    next partner.  Myself, and then Dr. Michael Ingegno,

5    I-n-g-e-g-n-o, is the fourth partner.  And we're a

6    partnership practice that -- and we practice peripheral

7    vascular surgical procedures.

8    Q.   What does that mean?

9    A.   Peripheral vascular as opposed to central

10   vascular means that we operate on the periphery of the

11   body as opposed to the central portions, such as the

12   brain, neurosurgeons, and the heart, cardiosurgeons.

13   Q.   And so I'm clear, those things, the brain, the

14   heart, are things you do not operate on?

15   A.   That's correct.

16   Q.   So is your practice comprised mostly of, I

17   guess I would call it, either less radical vascular

18   surgeries or more cosmetic vascular surgeries, as

19   opposed to the more serious internal types of vascular

20   surgeries?

21   A.   No.

22   Q.   What would you describe as inaccurate about my

23   question?

24   A.   The surgeries that we do are at times quite

25   complex, much as neurosurgery and cardiac surgery, and

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1        Q.   Any other professional experience that you've

2    had with Dr. Isenberg other than the time that you two

3    served on the MEC together?

4        A.   No.

5        Q.   Do you think he had input from other people in

6    who he should ask to be on the ad hoc committee?

7            MR. VANDALL:  Calls for speculation.  You can

8    answer if you know.

9            THE WITNESS:  I do not.

10           MR. SWEET:  Q.  Do you have any concerns about

11   the objectivity of the surgery peer review committee at

12   Summit?

13           MR. VANDALL:  Objection.  It's vague.

14           THE WITNESS:  No.

15           MR. SWEET:  Q.  Do you have any concerns about

16   the objectivity of the cardiothoracic surgery peer

17   review committee at Summit?

18           MR. VANDALL:  Same objection.

19           THE WITNESS:  I did not serve on that

20   committee.  I don't have much of a point of view.  I

21   have no reason to question objectivity.

22           MR. SWEET:  Q.  Are you able to tell me how

23   many vascular surgeons practice at Summit?

24       A.   Yes.

25       Q.   How many?

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   No.

2    Q.   Have you ever?

3    A.   I don't believe so.

4    Q.   Are you a golfer?

5    A.   I am.

6    Q.   Okay.  Steven Stanten, Dr. Steven Stanten, can

7    you describe your social relationship with him.

8    A.   Similar, we're quite good friends.  We were

9    neighbors at one time.  Our ten-year-old daughters are

10   in school together.  Our wives are good friends.  And

11   unfortunately, we don't have much time to socialize

12   together.

13   Q.   I guess stating the obvious, your children,

14   Dr. Russell Stanten's children and Dr. Steven Stanten's

15   children all go to school together?

16   A.   Yes.

17   Q.   How often -- I know you said you don't have a

18   lot of time, I certainly understand that, to socialize

19   with Dr. Steve Stanten, but how often do you socialize

20   with him?

21   A.   I may see him outside the hospital, three or

22   four or five times a year.

23   Q.   Do you play golf with him?

24   A.   No.

25   Q.   Have you ever?

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1     A.   Yes.

2     Q.   How many times?

3     A.   Twice.

4     Q.   As you sit here today, do you have a specific

5     recollection of two times?

6     A.   I believe the last time was at Spanish Bay ten

7     years ago.

8     Q.   Let me guess, you lost 15 balls.  No.  You're

9     better than that.  Okay.

10    A.   He's the good golfer.

11    Q.   What about Leigh Iverson?  Do you have a

12    social relationship with Dr. Iverson?

13    A.   No.

14    Q.   Dr. Isenberg, do you have a social

15    relationship with Dr. Isenberg?

16    A.   No.

17    Q.   Dr. Moorstein?

18    A.   No.

19    Q.   Dr. Horscowitz?

20    A.   No.

21    Q.   We've been going an hour, I'd like to take a

22    five-minute break.  Does that work for everybody?

23    A.   Of course.

24         MR. SWEET:  Thank you.

25         (Recess taken.)

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    but I'd have to review to make certain that I was at

2    that meeting.

3        Q.    This is a document that's been previously

4    marked as Plaintiff's 1014.  Could you review this

5    document, please.

6        MR. VANDALL:  I'm sorry.  I wasn't privy to

7    the marking discussion.  This is a handwritten notation

8    that says P's 1014, which I presume was designated on

9    the record with Ms. McClain; is that correct?

10        MR. SWEET:  Sure.

11        MR. VANDALL:  Okay.  Thanks.

12        THE WITNESS:  Okay.

13        MR. SWEET:  Q.  Okay.  What is this document

14    that's marked Plaintiff's 1014?

15        A.    It appears to be the minutes of our surgical

16    peer review committee meeting on April 12, 2004.

17        Q.    And by looking at this document, are you able

18    to now recall and confirm for us whether you attended

19    this meeting?

20        A.    I did attend this meeting.  My name is marked

21    as present.

22        Q.    And is this the surgery peer review committee

23    meeting where Dr. Hon Lee's opinions were discussed

24    regarding the minimally invasive cases?

25        A.    I believe that's correct.

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   And can you tell from this document whether

2  Dr. Hon Lee himself appeared at this meeting?

3    A.   I don't see his name as being present in the

4  names listed attending the meeting.

5    Q.   So that means he was not present; correct?

6    A.   I don't know the answer to that.

7    Q.   Well, if he was present, he would be listed as

8  present; right?

9         MR. VANDALL:  Objection.  Document speaks for

10  itself and the witness has provided his response.

11        MR. SWEET:  Q.  Doctor?

12    A.   I don't see his name as being listed as

13  present, thus I would interpret that he was not present.

14    Q.   Now, was Dr. Hon Lee's opinion regarding the

15  four minimally invasive cases conveyed to the surgery

16  peer review committee on April 12, 2004?

17    A.   I don't know the answer to that question.

18    Q.   Does that mean you don't have a recollection

19  of how Dr. Lee, Hon Lee's opinion was conveyed?

20    A.   Correct.

21    Q.   What was the conclusion of the surgery peer

22  review committee regarding Dr. Lee's opinion?

23        MR. VANDALL:  Objection.  It's vague as to

24  time, are you referring to this specific meeting?

25        MR. SWEET:  Q.  At this meeting.

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    time -- is not about what you thought or what other

2    people in the surgery peer review committee meeting

3    thought.

4         My question is, to your knowledge have you

5    ever heard of an in-field expert, Hon Lee in this case,

6    reports to the chairman of the department of surgery

7    that there are no quality of care concerns, yet the

8    department of surgery brings that case to the surgery

9    peer review committee?  Have you ever heard of that

10   happening?

11        MR. VANDALL:  Object to the question, lacks

12   foundation as to Dr. Hon Lee's being an expert,

13   misstates the witness's prior testimony.  It misstates

14   Plaintiff's 1014, and you can answer if you can

15   understand the question.

16        THE WITNESS:  I would say that I don't have

17   any prior experience with that.

18        MR. SWEET:  Q.  Still on 1022, do you still

19   have that document?

20        A.   I do.

21        Q.   Did you see these minutes before the ad hoc

22   committee met for the first time?

23        A.   No.

24        Q.   Were they summarized for you in any way?

25        A.   No.

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    needed more input from experts in cardiac surgery who

2    had no potential conflict of interest and would render a

3    fair and impartial opinion, expert opinion in this case.

4        Q.   What else?  What else, why else did you send

5    it out?

6        A.   For those reasons.

7        Q.   Are you suggesting that there was no

8    cardiologist or cardiac surgeon available on the medical

9    staff who would have objectively sat on the ad hoc

10   committee?

11       A.   No.

12       Q.   There were people that could have filled that

13   role from within; correct?

14       A.   Certainly.

15       Q.   Did you have discussions with Dr. Isenberg or

16   Dr. Steven Stanten or anybody at Summit regarding the

17   possibility of putting a cardiac surgeon or a

18   cardiologist on the ad hoc committee?

19       A.   No.

20       Q.   Why was there no Kaiser surgeon on the ad hoc

21   committee?

22            MR. VANDALL:  Objection.  Calls for

23   speculation.

24            THE WITNESS:  Again, I was not involved in

25   naming the people who would serve on the committee, and

DEPOSITION OF LAMONT PAXTON, M.D.

1    the deposition for you to reconsider your position after

2    you've had some time to think about it, but I'll move on

3    right now to my next question.

4        Q.    Whether real ad hoc committee or not, can you

5    think of any reviewing body -- peer reviewing body that

6    did not include a member that had the same specialty as

7    the person being reviewed?

8        MR. VANDALL:  The question lacks foundation,

9    and again, are we getting into questions about

10   third-party peer review here while the plaintiff is in

11   the room.

12       MR. SWEET:  Q.  You can answer the question.

13       THE WITNESS:  It's unclear.  Can you state it

14   again, please.

15       MR. SWEET:  Q.  Sure.  Can you think of any ad

16   hoc committee that did not include a member on it who

17   had the same specialty as the person being reviewed?

18       MR. VANDALL:  The question lacks foundation.

19       THE WITNESS:  This is the only ad hoc

20   committee I've ever been involved in.

21       MR. SWEET:  Q.  So the answer technically is

22   no; correct?

23       A.    Correct.

24       Q.    Can you think of any peer review committee

25   that did not include a member that had the same

HANNAH KAUFMAN & ASSOCIATES, INC.

1    specialty as the person being reviewed?

2          MR. VANDALL:  Same objections.

3          THE WITNESS:  Not that I'm aware of.

4          MR. SWEET:  Q.  Were you concerned that

5    Dr. Dat Ly was on the ad hoc committee since he had

6    worked in the operating room with Dr. Ennix?

7      A.   No.

8      Q.   Did you know that fact?

9          MR. VANDALL:  Vague as to time period.

10          THE WITNESS:  I'm not certain that I knew that

11    fact, no.

12          MR. SWEET:  Q.  Did Dr. Dat Ly ever tell you

13    that he worked in the operating room with Dr. Ennix?

14      A.   No.

15      Q.   Were you concerned that you had been selected

16    to be on the ad hoc committee given that you were a

17    member of the surgery peer review committee who sat in

18    the April 12, 2004 meeting?

19      A.   No.

20          MR. VANDALL:  It's about lunchtime.  Is this a

21    good time for a break?

22          MR. SWEET:  Sure.  It's 12:05.  Let's come

23    back at 1:00 o'clock.

24          MR. VANDALL:  Great.

25          (Noon recess taken.)

DEPOSITION OF LAMONT PAXTON, M.D.

1    well, but I believe his name is Dr. Kwan, and he was the

2    head of the division of ear, nose and throat,

3    otorhinolaryngology.  Both of those surgeons were

4    non-Caucasian physicians.

5        Q.   Quan, Q-u-a-n?

6        A.   I'm not certain of his name, the spelling, I

7    believe it's K-w-a-n, but I may well be incorrect in

8    that.

9        Q.   Back to the April 12, 2004 surgery peer review

10   committee meeting that we talked about this morning, was

11   a vote taken of those present to decide what to do with

12   the peer review of Dr. Ennix?

13       A.   I don't recall the answer to that question.

14       Q.   How does that typically work in that committee

15   when a decision is made?  Is it a vote?  How does it

16   work?

17       A.   Typically, we would grade the -- when a case

18   is being presented and then the reviewer of that case,

19   the presenter, would then grade that case, and I believe

20   in this sense it was a 1, 2 or a 3, and I believe that

21   the committee members, my best recollection, would then

22   vote on whether they -- what level that they thought

23   that this was.  So we would vote on situations like

24   that.

25       Q.   Did that happen in this particular case

HANNAH KAUFMAN & ASSOCIATES, INC.

1    regarding Dr. Ennix?

2        A.    Whether we voted to grade the complication?

3        Q.    Correct.

4        A.    That's what we did in that committee, we

5    discussed complications and the reviewer would give

6    their opinion of the grade and we would vote whether we

7    agree or whether we would change that to a 1 or 2 or 3

8    and all cases that came up, we would discuss.  That

9    would be the case, the way it would work.

10        Q.    And the process is the reviewer presents

11    whatever information that they have and there's a vote

12    as to how to grade it?

13        A.    That's correct.

14        Q.    To beat a dead horse, I guess, in this case

15    Dr. Hon Lee at least from these minutes it appears did

16    not actually present his findings personally, somebody

17    else did perhaps; correct?

18            MR. VANDALL:  Asked and answered.

19            MR. SWEET:  Q.  It has been, but is that

20    right?

21        A.    I'm sorry.  Is what right again?

22        Q.    The reviewer in this case, this case is

23    different because the reviewer didn't present his

24    findings; correct, somebody else presented them on his

25    behalf?

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    discussions were pursued, so I can't answer that

2    question.

3        Q.    Did you have input regarding whom the ad hoc

4    committee would or would not interview?

5        A.    As I recall, when we first met, we

6    collaboratively discussed between -- I believe it was

7    the four of us -- three committee members and president

8    of the medical staff, Dr. Isenberg, who we believe would

9    be most appropriate to the interview in our evaluation

10   of these cases.

11       Q.    And how did you in the first instance come up

12   with that list?  What was it based on?

13           MR. VANDALL:  Objection.  Lacks foundation.

14           THE WITNESS:  It was based on the persons who

15   had interaction with Dr. Ennix and who we thought could

16   give best evaluation opinions of these cases.

17           MR. SWEET:  Q.  Who were those first witnesses

18   that you thought would be important to interview?

19       A.    I don't recall them in exact order, but we

20   thought that the cardiac surgeons, namely Dr. Russell

21   Stanten and Dr. Janette Khan would be of importance.  We

22   thought that Dr. Steven Stanten, the chair of the

23   department of surgery, would be important to interview,

24   and also an anesthesiologist who worked with Dr. Ennix,

25   we thought would be important to interview.

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    issues regarding Dr. Ennix.

2         Q.    Did Dr. Isenberg suggest these names?

3         A.    He was involved in the process, yes.

4         Q.    By the way, there's a lawyer present at this

5    meeting; correct?

6         A.    Yes.

7         Q.    Whose idea was it to have a lawyer present at

8    the ad hoc committee meetings?

9              MR. VANDALL:  If you know.

10             THE WITNESS:  I don't know the answer to that

11   question.

12             MR. SWEET:  I have to admonish Counsel that

13   that is the exact prohibition in Judge Alsup's order,

14   you cannot indicate to your witness that he should have

15   some question about whether he knows an answer to

16   something or not.

17             It's not the first time you've done it, and

18   frankly, I've let you get away with it, but now I'm not

19   going to.  So there's your admonition, and I hope as one

20   who's constantly citing to rules and regulations and

21   statutes that you would be able to adhere to

22   paragraph 24 of his order.

23        Q.    I'm sorry.

24        A.    My answer is the same, that I don't know, I

25   have no knowledge why he attended.  My impression was

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    that that was routine to have the medical staff legal

2    counsel present during the ad hoc committee discussion.

3        Q.   How were you elected chair of the committee?

4        A.   I'm afraid by default.  I went to answer a

5    page, when I came back they had elected me.  They asked,

6    I went away to answer a page, and they said would you

7    please be chair and I accepted.

8        Q.   Who said that?

9        A.   I don't recall.  I think it was consensus of

10   Dr. Isenberg, Dr. Dat Ly and Dr. Barry Horn.

11       Q.   Did you want to be the chair?

12       A.   I would say that I didn't have any prior

13   desires to be the chair, no.

14       Q.   Okay.  There's an initial list of people to

15   interview, and Dr. Ennix is not listed there, is he?

16       A.   His name is not on this list.

17       Q.   Why?

18       A.   I don't know the answer to that question, but

19   I would assume that this is a -- an initial list.  It

20   was expanded as we went on to include other people who

21   would be appropriate, and I would image that it was

22   always in our process to include Dr. Ennix in this

23   process as being fair and balanced.

24       Q.   But true, he's not listed on the initial list

25   of possible interviewees; correct?

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1       on August 30, 2004, this statistical information before

2       you interviewed Dr. Ennix; correct?

3           A.   I believe that's correct.

4           Q.   And as this minute order suggests in

5       paragraph 3, you are reviewing the Junoe report and

6       discussing its contents before you interviewed

7       Dr. Ennix; correct?

8           A.   I believe that's correct.

9           Q.   And in this minute order, and I think this is

10      the second meeting of the ad hoc committee, you generate

11      or the committee generates a list of people to

12      interview, do you see that?

13          A.   I do.

14          Q.   In priority order, do you see that?

15          A.   I do.

16          Q.   Dr. Ennix doesn't appear anywhere on this

17      list, does he?

18          A.   His name is not on this list.

19          Q.   And the last entry is the anesthesiologist

20      from Alta Bates medical staff, so somebody thought it

21      would be perhaps a good idea to interview an Alta Bates

22      anesthesiologist; correct?

23          A.   That's how it would appear.

24          Q.   Did you ever?

25          A.   I don't believe we did.

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1        Q.   Last three sentences, Dr. Lee was asked about

2    STS risk adjusted data.  Dr. Lee said that the

3    cardiothoracic peer review group reviews data by

4    surgeon, quote, I don't see any one physician falling

5    out, unquote.

6            What did that mean?

7        A.   It would be my interpretation that he's saying

8    that he does not see any one surgeon whose statistics

9    are falling out.

10       Q.   Was he telling you that the statistics that

11   you were relying on did not indicate that Dr. Ennix,

12   quote/unquote, fell out?

13           MR. VANDALL:  Calls for speculation.

14           THE WITNESS:  Well, I'm not a cardiac surgeon,

15   that would be speculation on my part.

16           MR. SWEET:  Q.  Back to the first page of this

17   document, back to the paragraph in the middle there,

18   starting Dr. Stanten then asked, four lines up from the

19   bottom of that paragraph, starting Dr. Stanten, and I'll

20   read it and I'm going to ask you some questions about

21   it, Dr. Stanten stated that combining these concerns

22   with other issues raised from the Alta Bates peer

23   review, he felt these issues were not procedure related

24   but physician related.

25           What did that mean?

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.    I don't see that written here.

2    Q.    Well, did you?

3    A.    And I don't recall if we specifically asked

4    that question to Dr. Russell Stanten.

5    Q.    So we could draw from this that the chair of

6    the cardiothoracic surgery division was telling you that

7    at least some of the statistics you were analyzing were

8    not significant; right?

9    A.    I believe he was saying that some of the

10    statistics did not fall below standard of care, yes.

11    Q.    Did you do anything to figure out which

12    statistics he was talking about?

13    A.    I believe we looked at other statistics that

14    showed that there were patient care issues,

15    morbidity/mortality issues, compared to his peers.

16    Q.    This was the second time that Dr. Russell

17    Stanten was in front of the ad hoc committee; is that

18    right?

19    A.    He interviewed twice with our committee.

20    Q.    And in general, just a general flavor, was

21    Dr. Russell Stanten's testimony at this meeting,

22    October 27, 2004, favorable to Dr. Ennix or not

23    favorable?

24    A.    I'd have to look through the document again to

25    characterize it as such.

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1          (Whereupon, Exhibit 1031 was marked for

2     identification.)

3          MR. SWEET:  The next exhibit is a January 4,

4     2005 letter from Dr. Paxton to Dr. Smithline.  This is a

5     five-page letter.

6          Q.   I'm going to ask that you not review it again,

7     quite yet.  Okay.

8          My first question to you, Dr. Paxton -- I'm

9     sorry.  What number is this --

10         THE REPORTER:  1031.

11         MR. SWEET:  Q.  Who wrote this letter?

12    A.   I believe it was Dr. Isenberg and I.

13    Q.   Was it supposed to be a neutral letter?  I

14    don't think you need to read the letter to answer the

15    question.  Was it supposed to be a neutral letter, was

16    that the intent?

17    A.   I don't recall that I would say that it's not

18    neutral.  I don't know what you're getting at.

19    Q.   Well, what was the purpose in paragraph 2 of

20    telling the NMA at the bottom of that paragraph, that

21    medical staff began to take an intensive interest in his

22    practice.  What was that meant to convey?

23    A.   That we had concerns about his cases and

24    morbidity and mortality.

25    Q.   The next paragraph highlights, quote, specific

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   No.

2    Q.   Do you know what the summary suspension was

3    based on specifically?

4    A.   I would have to review the records to be

5    accurate, but I believe it was based on the

6    falsification of a medical record.

7    Q.   Were you told that the NMA report had any role

8    in the summary suspension?

9    A.   No.

10    Q.   You were not told that?

11    A.   Not to my recollection.

12    Q.   With all of this happening between the

13    October 28, 2004 meeting and your May 16, 2005 meeting,

14    the summary suspension, the NMA report coming out, the

15    pacemaker case, et cetera, looking back on it, do you

16    think it would have been a more fair procedure had

17    Dr. Ennix been talked to at that point?

18    A.   I believe the way we handled this ad hoc

19    committee with Dr. Ennix was performed quite fair and

20    the manner in which we interviewed Dr. Ennix was

21    performed in a very fair fashion as well.

22    Q.   I'm still on the May 16, 2005 minutes, and now

23    I'm on page 2, the first full paragraph reads the

24    committee requested information regarding the basis for

25    the summary suspension, Dr. Isenberg responded that he

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    consulted with the medical staff officers and then

2    implemented the summary suspension based on the most

3    recent incident in light of all the material currently

4    available, paren, most notably the Mercer report, close

5    paren, which indicates that continuing Dr. Ennix's

6    privileges pending the completion of the investigation

7    presents an imminent danger to the health or safety of

8    an individual including current or future hospital

9    patients.  Do you see that?

10        A.   I do.

11        Q.   So Dr. Isenberg was telling the ad hoc

12   committee that he relied on the Mercer report, most

13   notably on the Mercer report to impose the summary

14   suspension; right?

15        A.   Well, I would interpret it that he implemented

16   the summary suspension based on the most recent incident

17   and in light of the available current material, the

18   Mercer report, indicating that the doctor's privileges

19   were being suspended due to the imminent danger to the

20   health and safety of individuals.

21        Q.   Dr. Paxton, if it was a falsification of a

22   medical record, how would that imply imminent danger to

23   the health and safety of a patient?

24        A.   Well, I'm not certain that falsification of a

25   record would necessarily put patients at risk, but it

1       A.   I believe I reviewed the report, and then

2    summarized in these paragraphs.

3       Q.   So, for instance, it starts with ABS-10, under

4    sub A and then it goes to ABS-007, that's how you

5    presented it to your ad hoc committee?

6       A.   It would appear so.

7       Q.   At the end of that section, and I'm now at the

8    bottom of D2004, which is page 3 of this minute, it

9    concludes, with this passage, discussed role of

10   cardiologist in these cases, should ad hoc committee

11   interview the cardiologists involved in these cases.  Do

12   you see that?

13      A.   Yes.

14      Q.   Whose idea was it perhaps to interview

15   cardiologists?

16      A.   I don't recall specifically who made that

17   comment.

18      Q.   Did the ad hoc committee bother to interview

19   cardiologists?

20           MR. VANDALL: Objection.  Argumentative.

21           MR. SWEET:  Perhaps.

22      Q.   Did you interview cardiologists?

23      A.   I believe the case was discussed with

24   Dr. Woodworth, with one of the cardiologists, yes.

25      Q.   In what capacity?

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.    To discuss these cases as he was involved in

2    one of these cases.  In the NMA report, and I can add I

3    recall that they had said that perhaps that further

4    cardiology intervention would have been appropriate as

5    opposed to proceeding with urgent coronary bypass, and I

6    believe that cardiologist was involved in this case.

7    And I believe that that was discussed with him, although

8    I don't recall the specifics of that.

9    Q.    Let me refer you to the second to last page of

10   this exhibit, D2008, which is entitled, Corrected

11   Chronology of Ad Hoc Committee Meetings and

12   Interviewees.  Do you see that page?

13   A.    I do.

14   Q.    Is there a cardiologist listed anywhere on

15   this list of the interviewees of the ad hoc committee?

16   A.    There's not.

17   Q.    So how was Dr. Woodworth involved in your ad

18   hoc committee investigation?

19   A.    I don't believe he was interviewed, but I

20   think the case was discussed with him by the, I believe,

21   the president of the medical staff.

22   Q.    And how did this information get to you, to

23   your committee, if you know?

24   A.    I don't recall specifically.

25   Q.    But certainly not in the form of testimony in

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.   To the best of my recollection, I thought we

2   had 19 meetings of our committee, but I could be

3   incorrect on that.

4      Q.   Right.  I think you said you interviewed 19

5   people.

6      A.   No.  Not interviewed.

7      Q.   That was a misstatement.

8           Who wrote the investigative report and

9   investigation issued by the ad hoc committee?

10     A.   I believe it was a collaborative effort.

11     Q.   Well, who typed it into the computer?

12     A.   I believe it was typed in the computer by the

13   medical staff.

14     Q.   Who submitted -- who wrote the document that

15   was submitted to the medical staff's secretary?

16     A.   I believe it was the committee members and

17   Dr. Isenberg.

18     Q.   Are you indicating that different parts of the

19   report were drafted by different committee members?

20     A.   I wouldn't specifically say that, no.

21     Q.   Was someone primarily responsible for drafting

22   the report?

23     A.   No.  I think that we all had a role in

24   drafting the report and submitting it together.

25     Q.   At this late hour, I don't mean to argue with

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.   I do.

2      Q.   What does that mean, and on what do you base

3   that?

4      A.   We base that on the report that we had from

5   our supervisors as well as the NMA report.

6      Q.   Does, did not go well, mean that the patient

7   care activities were outside the standard of care?

8      A.   I don't know that I would characterize it on

9   those terms.

10      Q.   Were you involved, your ad hoc committee,

11   involved in the proctoring that resulted with

12   Dr. Ennix's privileges?

13      A.   We reviewed the proctor reports.

14      Q.   You mean, the ad hoc committee had an official

15   role in proctoring, didn't it?

16      A.   I wouldn't say we had an official role in

17   proctoring.  I believe we said that they would be

18   proctored and that we would be involved in reviewing

19   that proctored information.

20          MR. SWEET:  I have another exhibit.

21          (Whereupon, Exhibit 1037 was marked for

22          identification.)

23          MR. SWEET:  Q.  Dr. Paxton, this is a letter

24   dated April 19, 2006 from the proctors; correct?

25      A.   Yes.

DEPOSITION OF LAMONT PAXTON, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1       Q.   And it's sent to you; right?

2       A.   Yes.

3       Q.   And this is at a time period, April 19 was as

4   the six-month proctoring restriction, the first set of

5   six months was about to conclude; correct?

6       A.   Yes.

7       Q.   And this letter expresses to you the unanimous

8   universally favorable reports from the proctors about

9   Dr. Ennix's patient care activities; right?

10      A.   I'll review it quickly.

11      Q.   Is that accurate?

12      A.   I'm sorry.  Please restate.

13      Q.   This letter is from all six proctors

14  indicating that they have no problem with Dr. Ennix's

15  patient care activities.

16      A.   That's what it states.

17      Q.   Did you receive this letter?

18      A.   I believe the answer is yes.

19      Q.   If I could have marked as next in order

20  number 1038, please.

21          (Whereupon, Exhibit 1038 was marked for

22          identification.)

23          MR. SWEET:  Q.  Dr. Paxton, this is the May 4,

24  2006 report of the ad hoc investigating committee to the

25  medical executive committee on the status of the

DEPOSITION OF LAMONT PAXTON, M.D.

1    proctoring.  Do you recognize this document and accept

2    my representation as to what it is?

3         A.    May I take a brief look?

4         Q.    Sure.

5         A.    Yes.  Thank you.

6         Q.    About two-thirds of the way down in this

7    minute, it says, the AHC reached the conclusion that

8    there were an inadequate number of cases to warrant a

9    conclusion to lift the proctoring process.  Do you see

10   that?

11        A.    I do.

12        Q.    Is that what the AHC decided?

13        A.    I believe it was the portion of the AHC that

14   reviewed these that was the opinion.

15        Q.    Which included you; correct?

16        A.    It did.

17        Q.    The point is that this is a report sent by you

18   to the MEC at the six-month interval and whether or not

19   to continue or discontinue the proctoring requirement,

20   and you're recommending to continue it; correct?

21        A.    That's what it states.

22        Q.    Notwithstanding that you had received a letter

23   from all of the proctors telling you that there was no

24   need to continue the proctoring; correct?

25        A.    I recall that Dr. Steven Stanten and I

HANNAH KAUFMAN & ASSOCIATES, INC.

1    reviewed these cases and read through the cases, the

2    charts, the medical records, and it was our feeling that

3    this was an inadequate number of cases to make a sound

4    judgment to allow Dr. Ennix to lift the proctoring.

5         Q.   Okay.  But my question was just a simple yes

6    or no, that you and I guess Steve Stanten together

7    decided that even though the proctors themselves said

8    it's okay to stop the proctoring requirement, you and

9    Steve Stanten decided to continue to recommend

10   continuing the proctoring requirement; correct?

11        A.   We felt that there were inadequate number of

12   cases to warrant a conclusion to lift the proctoring

13   process.

14        Q.   I know your reason, but I just want to know so

15   I have a clean record that you recommended to continue

16   the proctoring requirement --

17        A.   We did.

18        Q.   -- and the reason is because you felt there

19   were an inadequate number of cases to warrant the

20   conclusion?

21        A.   Correct.

22        Q.   Why?  I mean, what do you base that on?

23        A.   We base this on our opinion that there were an

24   inadequate number of cases to judge the -- judge this

25   and we felt that it would be most prudent in regard to

DEPOSITION OF LAMONT PAXTON, M.D.

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the 27th day of December, 2007.

_____
Certified Shorthand Reporter
CSR No. 12978