# EXHIBIT R

PROTECTED BY CALIFORNIA EVIDENCE CODE 1157
"CONFIDENT... DOCUMENT"

ALTA BATES SUMMIT MEDICAL CENTER
**The Staff of SUMMIT MEDICAL CENTER**
SURGERY PEER REVIEW COMMITTEE
April 12, 2004

CONFIDENTIAL

REDACTED

PRESENT:
Steve Stanten, MD (Chair)
Lamont Paxton, MD
Leigh Iverson, MD
Douglas Patton, MD
Lisa Bailey, MD
Tsuan Li, MD
Russell Stanten, MD
Bruce Moorstein, MD

ALSO PRESENT:
Debbie Mogg, RN, QIC

| TOPIC | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION/FOLLOW-UP |
|---|---|---|---|
| CALL TO ORDER | The regular meeting of the Surgery Peer Review Committee was held in Annex A at Summit Medical Center on Monday, April 12, 2004. After establishing a quorum, the meeting was called to order at 7:35 AM by Dr. Steve Stanten. | | |
| MINUTES | Minutes of the March 8, 2004 Surgery Peer Review meeting were presented for review. | No recommendations for change made. | M/S/C to approve minutes without revisions. |
| FOLLOW-UP | | | |
| Responses Received | There were no responses received. | | |

REDACTED

Sun... ..eer Review Committee
4/12/04

REDACTED  CONFIDENTIAL

| TOPIC | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION/FOLLOW-UP |
|---|---|---|---|
| Responses Not Received | There were no responses outstanding. | | |
| Follow-Up<br>Urology Consults for OB/Gyn | Because the Urology Service Chief is on vacation and not present, this topic was deferred. | | Follow-up at next meeting. |
| **ONGOING MONITORING AND EVALUATION**<br>Current Case Review | | | |
| Minimally Invasive Cardiac Surgery | The Chair informed the members that Anesthesia and other members of the medical staff raised concerns several months ago regarding minimally invasive cardiac surgery issues. The following events then occurred:<br>➤ Being a new Chief, he investigated the process surrounding approval and credentialing of new procedures. He found that minimally invasive cardiac procedures were not considered "new" | Two index cases reviewed (attached, #4.1 and 4.2). Long discussion of agenda topic ensued; key points included:<br>➤ Minimally invasive cardiac procedures can be done safely. If other surgeons were also performing the same procedures and all were having long O.R. times and complications, than this committee might conclude the issue | Chief will follow-up with Medical Staff Office and President of the Medical Staff regarding this committee's opinions and recommendations. |

apr04minisurgatwword/dm

D 4196

2

Surgeon Review Committee
4/12/07

CONFIDENTIAL

| TOPIC | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION/FOLLOW-UP |
|---|---|---|---|
| | procedures. He took the concerns he was informed of to the Officers, who elected to temporarily suspend the performance of these *procedures* while they further evaluated whether or not there were problems. The procedures so far had been performed by only one CT surgeon*, a Summit (non-Kaiser) physician, who was informed of the concerns and voluntarily agreed to stop doing the procedures. (*One other surgeon had attempted a minimally invasive case; it was converted to open).

The Officers had a Kaiser surgeon thoroughly review the cases (x4) for which specific concerns were raised. The reviewer closed two cases. Two others (#4.1 and 4.2) were felt to have major documentation issues, but not care issues. Concomitantly, the reviewer and the Chair discussed the issue in general. the reviewer suggested a multidisciplinary group be convened to evaluate the processes surrounding minimally invasive cardiac surgeries; approximately 12-points were suggested for consideration when evaluating.

The reviewer's case findings were conveyed to the Officers, who lifted the moratorium on minimally invasive cardiac cases several days ago.

While acknowledging that he is not a cardiac surgeon, the Chair had also looked at the cases himself and was uncertain whether the care concerns could be explained by documentation alone. Because the reviewer graded the cases as major care concerns, "3," (though his written comments referred to documentation only), the cases are brought to this committee, as per policy, for discussion and final care determination. | was the procedure, not the surgeon. This is not the case.
The performance of minimally invasive procedures does take longer than an open approach. However, the 2 cases attached had *extremely* long O.R. times. One *might* say the lengthy times are attributed to a learning curve. The complications and their management, however, should not be part of a learning curve, and cannot be explained by documentation failures alone.

Regarding documentation concerns- if the medical records had included: a) detailed documentation noting that the patient had been fully informed of the higher risks involved in minimally invasive surgery, and b) a complete, dictated operative note describing difficulties encountered, then *perhaps* one could more easily "pass" these cases.

The cardiac surgeon initially reviewing the cases questioned whether a minimally invasive approach was much more difficult to on mitral valves vs. aortic? A cardiac surgeon present commented the technique was designed for aortic valves.

Members were in agreement that above and beyond documentation issues, which they agreed do exist, and have existed previously, they are also concerned about the surgeon of record's overall:
▸ Patient selection,
▸ Technical skills, and
▸ Judgment skills, particularly when cases are not going well.

As this group is responsible for overseeing patient care under the Dept. of Surgery, the committee therefore felt obligated not to accept the physician reviewer's findings that issues with the cases were of documentation, not care. The committee did not determine a care classification on the two specific cases, as discussion and opinions were reflective of | |

april4minisurgalword.dm

D 4197

3

**CONFIDENTIAL**

Sur... cer Review Committee
-4/12/04

| TOPIC | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION/FOLLOW-UP |
|---|---|---|---|
| 10 Cases Screened<br>4 Cases Physician Reviewed<br>3 Cases to Committee | A summary of RN Closed cases, plus Rated cases, was presented for review. There were zero physician-closed cases. | a general perception of this surgeon's care. Members felt physician-specific concerns, including final care determinations for the cases, should be re-considered by the Officers. It was also recommended that x number of all minimally invasive procedures, no matter the surgeon, be reviewed. | Summaries accepted. |
| Focus Review Physician (Cardiac Surgery) | 4.1  (CT Surg)   MRN ▬▬  MD Q-1730<br>39 y/o male with longstanding h/o schizophrenia, prior rt. leg fracture with resolved underlying cellulitis, and aortic stenosis which was initially treated medically presents for surgery.  Prir cath had revealed Grade 3-4 aortic insufficiency, ASA IVE, consented for aortic valve replacement.  On 1/28/04 undergoes AVR using a 27 mosaic Medtronic bioprothesis- operative findings included a small amt of Ca++ involving particularly the commissure between one of the aortic valve cusps and the rt. cusp, where otherwise leaflets were only mildly thickened. This was a bileaflet valave, heart was moderately enlarged. "It appeared that it was a nice fit, but the prosthesis did fit a bit snug." Surgery time 0956-> 1431. To CPU post-op.  In immediate post-op period becomes increasingly dyspnic- TEE on 1/30- cardiologist suspects valvular dehiscense. On 1/31 returns to surgery and undergoes replacement of the prior prosthesis with a #25 Evans Bovine bioprothesis- there was no evidence of dehiscense, it could be that the original valve was too large...although there was no clear evidence of an obstructive process or significant aortic insufficiency."  2/2- Psych eval for severe agitation including pulling out CTs and IVs, requiring heavy sedation.  ID consult 2/11 for management of fever, tachycardia, and leukocytosis- suspects infection is not cardiac but related to RLE. Bone scan c/w underlying osteomyelitis.  2/17 is discharged- referred back to Eden Hospital for IVABX therapy.<br><br>4.2  (CT Surg)   MRN ▬▬  MD Q-1730<br>76 y/o with known aortic stenosis (0.86 squared cm | For general discussion of cases, especially specific practitioner MD Q-1730, and final discussion under agenda item above, please refer to discussion "Minimally Invasive Cardiac Surgery." | Final care determination not made by this committee; care issues referred back to Medical Staff Office and Officers for consideration of further action. |

**REDACTED**

CONFIDENTIAL

| TOPIC | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION/FOLLOW-UP |
|---|---|---|---|
| Surg___cer Review Committee 4/12/04 | valve area) presents for elective surgery. H&P note does not document any past medical history other than as related to current presentation. Consented for aortic valve repair or replacement. ASA III. On 1/30/04, undergoes AVR doing minimally invasive upper sternal incision implanting a #21 Mosaic bioprosthesis by Medtronic. Surgery time 0927-1745. Approximately 1330, anesthesia record notes bleeding suture line. Received 3l crystalloids and 11U cellsaver. To CPU post-op. Initially does well post-op, is extubated 2/1. Noted to be lethargic. Pulmonary consult 2/3 for ALOC and $CO_2$ retention- notes his poor gag reflex and WBC 15.1. Neuro consult on same date- feels pt. is probably experienced mixed toxic metabolic encephalopathy. Brain CT= low density in midbrain may reflect recent midbrain ischemic event, no hemorrhage, severe sinus disease. Blood C&S + for coag-neg staph, new echo finding of aortic regurgitation. IPC consulted to manage medical care. Receives Vit K for some coagulopathy- had tarry stools. Reintubated 2/6- died blood seen in post. pharynx, bronch reveals lge blood clots occluding rt. and lt. bronchus. Started on Dopamine for hypotension. Unsuccessful TEE 2/6. ID consult 2/8 regarding diagnosis and treatment (+ blood C&S, LLL infiltrate. WBC 18.7). By 2/10 is slowly weaning from vent and mental status improving. At 0735 on 2/22, pt. experiences sudden hypotension and bradycardia- Code Blue called but resuscitative efforts unsuccessful. (Autopsy reveals acute and sub-acute MI of lt. ventricle with pneumonia and pulmonary edema). | Issue discussed The committee did not feel this was a Dept. of Surgery issue- this is a hospital issue influenced by Administration and contractual issues. Seeing that: 1) the referral is cc'ed to the VPMA and President of the Medical Staff, hopefully the issue will be discussed at MEC tomorrow, and 2) Dr. | Response will be sent to the ED*. (*Addendum- issue discussed at 4/20 MSPI meeting where Dr. Burkhart, the ER Quality Chair; the VPMA, and President of the Medical Staff were present. |

## OTHER BUSINESS

Referral from Dept. of Emergency Medicine re: Neurosurgery Transfers

Referral received from Emergency Medicine with regard to difficulties encountered with Neurosurgery consults and care (attached).

Surg--- eer Review Committee
4/12/04

**CONFIDENTIAL**

| TOPIC | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION/FOLLOW-UP |
|---|---|---|---|
| Forms: Moderate Sedation and Pre-Op Checklists | Two forms were presented to committee members for approval: 1) a "Moderate Sedation/Local Anesthesia Record", and 2) "Department of Peri-Operative Services Pre-Procedure Checklist" (attached). Forms originated with Education Department; the President of the Medical Staff has requested a quick turn-around for input back to him to expedite approval. | Stettner is on vacation currently and will not be returning to Summit, a response stating this group's opinion can be sent to the presumptive new ED Medical Director, Dr. Todd Murray. | Decision there was to refer issue on to Officers for initial discussion. Therefore, a response will not be sent to the ED. |
|  |  | Members felt: It is unclear for what locations the form "Moderate Sedation/Local Anesthesia Record" is intended to be used? This is a form already in use at ABMC, and it appears they wish to mirror usage here. The need for two, let alone one, physician signatures on the form is also unclear? Apparently at ABMC, physician medication orders are written on the form and signed for there rather than on an order sheet. *If* the intent is to write MD orders here, then both nursing AND physician education must occur. Certainly the 2nd MD signature at the bottom of the page is illogical. Regarding the 2nd document "Department of Peri-Operative Services Pre-Procedure Checklist," it was agreed that this form is a nursing document and the need for a physician signature is absurd. The Chair pointed out that even though this form is supposedly being circulated for approval, it is already in use upstairs with the physician signature line left blank. Members expressed concern that we are already out of compliance with documentation vis a vis this form. | The Chair will convey the group's viewpoints to Dr. Isenberg. |
| Medical Records Committee Referral: Documentation Issues | A referral from Medical Records Committee regarding documentation of: 1) relevant past, social, and family histories, and 2) appropriate informed consent, was presented (attached). | Information noted. | No action. |
| Translation Services in the Office Setting | Excerpt from a letter sent to a surgeon from Lumetra (formerly CMRI) regarding adequacy of translation for non-English speaking patients was presented (attached). | Information noted. Surgeons present commented they use the translation services available by telephone when such a service is needed. | No action required. |
| Providence Pavilion | Dr. Stanten gave brief summary of recent incident | No resolution of issues was reached. | This remains a work in progress. |

apr04minnsurgabwordvm

D 4200

6

CONFIDENTIAL

| TOPIC | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION/FOLLOW-UP |
|---|---|---|---|
| Surgeries | discussed at the O.R. Committee. It involved a patient at North with an orbital injury requiring a surgery utilizing the microscope (note- eye surgeries are normally done at South as the equipment is housed there). . Multiple process issues were identified, and this led to a general discussion of North vs. South (Providence) surgeries | | under the aegis of the O.R. Committee.<br><br>(Refer to March-04 O.R. minutes). |
| Chair's Administrative/ Operational Update | There were no significant issues to report on since the last meeting. | | |
| NON-AGENDA ITEM: Surgical Nurses and Techs Scope of Practice | As somewhat of a follow-up to the O.R. committee's deliberation of this issue, a cardiac surgeon (who was not at that meeting), brought forth his concern's regarding the recent process change in the O.R. Issue re-discussed. Of note:<br><br>➤ There needs to be an increased pool of assistant, particularly for cardiac surgery,<br>➤ The role of the O.R. tech needs expanded,<br>➤ There should be RN First Assistants (RNFAs) available,<br>➤ The State needs to re-look at the scopes of practice of these two groups- they may need revised to reflect current hospital practices, not just at Summit, but at most hospitals . | The former Chief of Surgery commented that based on what he has been told, the O.R. tech's scope is limited thru the State as they are not licensed practitioners; RN's have more latitude in their roles. Members were in agreement that there is a need, in fact an growing need, for increased support in the O.R. including RNFAs. | Item to be discussed at tomorrow's Medical executive meeting. Follow-up next month. |
| ADJOURNMENT | There being no further business, the meeting was adjourned at 8:45 AM. | | |

Submitted by D. Mogg, RN, OIC

Steven Stanten, M.D.
Chairman, Surgery Peer Review

C:\Documents and Settings\nmcclain\Local Settings\Temporary Internet Files\OLK1\apr04min.doc

Surg. Peer Review Committee
- 4/12/04

apr04minsurgawprd\dm

D 4201

7

# EXHIBIT S

*** SUMMIT MEDICAL CENTER MEDICAL STAFF ****

RULES AND REGULATIONS

### INDEX

1.  ADMISSION OF PATIENTS ...........................................................................3
2.  ADVANCE DIRECTIVES...............................................................................6
3.  APPLICATION FEES ....................................................................................7
4.  CALL PANEL ................................................................................................8
5.  CONSENT FOR MEDICAL AND SURGICAL PROCEDURES ...................10
6.  CONSULTATIONS .......................................................................................11
7.  COVERAGE .................................................................................................13
8.  CREDENTIALS FILES.................................................................................15
9.  DEATHS.......................................................................................................18
10. DISASTER ASSIGNMENTS ........................................................................21
11. DISCHARGE OF PATIENTS........................................................................22
12. DISRUPTIVE PRACTITIONER BEHAVIOR................................................23
13. DRUG AND MEDICATION ORDERS ........................................................24
14. DUES ............................................................................................................27
15. FOREGOING LIFE-SUSTAINING TREATMENT.......................................28
16. HIPAA PROVISIONS ..................................................................................29
17. HOUSE STAFF ............................................................................................30
18. IMPAIRED MEDICAL STAFF MEMBERS .................................................32
19. INPATIENT SURGERY ...............................................................................36
20. MEDICAL RECORDS..................................................................................37
21. MODERATE SEDATION .............................................................................43
22. ORDERS.......................................................................................................44
23. OUTPATIENT SERVICES ...........................................................................45
24. PEER REVIEW PROCESS ...........................................................................48
25. PROCTORING..............................................................................................52
26. PROFESSIONAL LIABILITY INSURANCE................................................55
27. RESEARCH...................................................................................................57
28. RUBEOLA/RUBELLA .................................................................................58
29. UTILIZATION MANAGEMENT .................................................................59
30. UTILIZATION MANAGEMENT/COMMITTEE INQUIRY - NON-RESPONSE ...........60

APPENDIX A - COMMITTEES

APPENDIX B - ALLIED HEALTH PROFESSIONAL(s)

APPENDIX C –
1)        MEMORANDUM OF UNDERSTANDING REGARDING THE EXCHANGE
          OF CONFIDENTIAL INFORMATION
2)        CHAIN OF COMMAND POLICY

REVISED 2/04

D 0262

SUMMIT MEDICAL CENTER - MEDICAL STAFF RULES AND REGULATIONS

## 24.  PEER REVIEW PROCESS

24.1  **Purpose of Peer Review**

Summit Medical Center and its medical staff are responsible for the quality of care provided to the patient population treated throughout the facility.  In order to promote patient health and safety, Summit Medical Center will support the medical staff peer review process.  This process shall be a non-biased activity performed by the medical staff to measure and assess professional performance of licensed independent practitioners, as well as to focus and direct continuing education efforts for practitioners related to the quality of care and improvement opportunities. The peer review process will identify both practitioners and systems in need of improvement and provide a system whereby effective actions can be implemented and evaluated.

24.2  **Definition of Peer Review**

Review of clinical performance of a licensed independent practitioner by another practitioner(s) with similar and/or related training and experience.

24.3  **Components of the Peer Review Program**
1.  Identification of Peer Review Issues
    Peer review issues can be identified through multiple mechanisms, which may include, but is not limited to:
    - Any type of patient death as defined and approved by the peer review committees.  For example: unexpected medical deaths, intra- or post-operative deaths, maternal deaths, etc.
    - Unexpected complications, as defined and approved by the peer review committees.
    - Sentinel Events
    - Physician/Patient/Staff complaints against a medical staff member related to management of care rendered
    - Department-Specific Quality Indicators.
    - Inter- and intra- departmental Referrals
    - Risk Management Referrals
    - Inter-facility Referrals
    - Referrals from Blood Usage and Operative and Other Invasive Procedure Review

2.  Peer Review Process Participants:
    - For the purpose of the peer review program, a peer reviewer shall be defined as a member of the medical staff, in good standing, practicing in the same general specialty, and with similar and/or related training and experience as the individual under review.
    - Peers may also include other medical staff members in good standing, not practicing in the same specialty as the individual whose case is under review.  They may be consulted regarding specific issues related to the management of the case under review.
    - An individual functioning as a peer reviewer will not have performed any medical management

D 03O9

SUMMIT MEDICAL CENTER - MEDICAL STAFF RULES AND REGULATIONS

on the patient whose case is under review. However, opinions and information may be obtained from participants that were involved in the patient's care.

3.  Medical Staff Peer Review Process
   - The Medical Staff peer review process focuses on the individual physician's clinical practice, including physician behavior. Its goal is to identify and resolve practice problems, whether single events or pattern of practice. First priority for actions should be given to those problems having the greatest potential for adverse effect on patients.
   - The Department/Section Peer Review Committee members, in consultation with the Department Chairpersons/Section Chiefs and the Medical Executive Committee, have the major responsibility for peer review. The departments/sections take corrective actions and monitor the effectiveness of the actions taken. The Quality Management staff provides support to these functions.
   - The Quality Improvement Coordinator (QIC) screens all cases that fall out on the basis of predetermined indicators. The QIC may close cases that meet department/section approved closure criteria. The QIC prepares an abstract for all cases requiring additional review, which are referred to a physician member of the appropriate Peer Review Committee. The physician reviews the case, assigns a Care Classification and either closes the case or refers it to the Peer Review Committee when additional consideration is necessary to adequately review a specific case.
   - Care Classification System
   - The following Care classification system is used in the peer review process:

     0  =  No Care Issue
     1  =  Minor Care Issue
     2  =  Moderate Care Issue (delay in care/treatment or potential for, or short-term adverse consequence)
     3  =  Major Care Issue (health/functional quality of life adversely affected [long-term] by medical action or inaction)
     4  =  Death attributable to acts of omission or commission

   Care Classifications of 3 or 4 are considered outside the standard of care, and will be referred to the Peer Review Committee for final decision.

   Trends of 2's are reported to the Peer Review Committee as necessary.

   Documentation classification:
     0A  =  No documentation issue
     1A  =  Minor documentation issue
     2A  =  Moderate documentation issue
     3A  =  Major documentation issue

   - Circumstances Requiring External Peer Review
     Circumstances that require external peer review may include, but are not limited to the following:
     ➢ Need for specialty review, when there are no medical staff members with the identified specialty within the organization

D 0310

SUMMIT MEDICAL CENTER - MEDICAL STAFF RULES AND REGULATIONS

> ➢ The Peer Review Committee cannot make a determination and requests external peer review
> ➢ It would be difficult to conduct peer review within the organization and still maintain objectivity
> ➢ The Medical Executive Committee requests external peer review

- Participation in the Peer Review Process By the Practitioner
  - ➢ The individual practitioner whose case is under review has the right to present his/her information regarding case management to the Peer Review Committee. Once the Peer Review Committee has reviewed the case and made a preliminary determination of Care Class 3 or 4, the practitioner is invited to submit *in writing* to the Peer Review Committee any additional pertinent information. After the Peer Review Committee has considered the written information, and before a final determination of substandard care is made, the practitioner may then request to address the Committee *in person*.
  - ➢ All individuals whose cases are referred for committee peer review and are deemed to be outside the standard of care (Class 3 or 4) shall be notified of the medical record number and date of admission of the case. Conclusions of the review process will be communicated to the physician within 14 working days of completion of review.

24.4    **Principles of Peer Review**

1. The peer review program is consistent.
   All cases referred for peer review shall follow the peer review program components listed above. Peer review documentation for cases undergoing Committee Peer Review must contain four essential components:
   - Findings
   - Analysis
   - Conclusions
   - Corrective Action (if indicated)
   A standardized score must be assigned to all cases utilizing the Care Classification system (see above).

2. Time Frames are adhered to in a reasonable fashion.
   All cases referred for peer review shall be reviewed within a reasonable time frame. This timeframe shall be 3 months from referral date for initial physician review or 4 months if referred to committee. In those instances where peer review falls out of the required time frames (medical record incomplete, practitioner under review is unavailable, reviewing committee rescheduling, etc) the reasons for the delay will be documented in the appropriate Peer Review committee minutes. All efforts will be made to complete the peer review process as soon as practical within the confines of the delay. The Department Chair has the authority to convene the Peer Review Committee to address urgent issues.

   D 0311

3. Conclusions of the review are defensible.
   All peer review cases reviewed by their respective committee will contain the four components listed above. The conclusions of the peer review committee must address the issues upon which the case review was based and be supported by current clinical practice, practice guidelines and/or literature. All literature and documents pertinent to the case will be attached to the report to be included in the

SUMMIT MEDICAL CENTER - MEDICAL STAFF RULES AND REGULATIONS

practitioner's file.

4. Peer Review is balanced.
All opinions regarding medical management of the case under committee peer review, including minority opinions, when applicable, will be considered in the ultimate determination of the case. This includes information and opinions from the individual whose case is under review.

5. The results of Peer Review are useful and ongoing.
All peer review activity will be considered at the time of reappointment to the medical staff. The information will be aggregated and analyzed, and used in practitioner-specific credentialing and privileging processes. Peer review information will be included on the physician-specific profile that is reviewed by the Department Chairperson/Section Chief prior to reappointment.

The Department/Section Peer Review Committee will review, as necessary, physician-specific aggregated data to track trends, identify patterns, and recognize clusters of similar cases.   Systems / process issues identified through Peer Review will be assessed on a departmental and an organization-wide level and used in performance improvement activities.

24.5 **Cross Reference**
- Joint Commission on Healthcare Accreditation
- Title 22 (California Department of Health Services)
- Healthcare Financing Administration
- California Civil Code

D 0312

# EXHIBIT T

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
---oOo---

COYNESS L. ENNIX, JR., M.D., as
an individual and in his
representative capacity under
Business & Professions Code
Section 17200 et seq.,
            Plaintiff,

    vs.                        No. C 07-2486

RUSSELL D. STANTEN, M.D., LEIGH
I.G. IVERSON, M.D., STEVEN A.
STANTEN, M.D., WILLIAM M.
ISENBERG, M.D., Ph.D., ALTA
BATES SUMMIT MEDICAL CENTER and
DOES 1 through 100,
            Defendants,
_____/

CERTIFIED COPY

CONFIDENTIAL

CONFIDENTIAL
DEPOSITION OF:
DAT LY, M.D.
VOLUME I
Friday, January 18, 2008

Reported by:            HANNAH KAUFMAN & ASSOCIATES
Gina V. Carbone         Certified Shorthand Reporters
CSR NO. 8249               472 Pacheco Street
                        San Francisco, CA  94116
                        (415) 664-4269

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   Do you need years as well or --

2    Q.   If you know them, that would be great.

3    A.   Undergraduate work was done at Princeton

4  University from 1985 to '89.  Medical school was at

5  Tufts University School of Medicine.  That was from '91

6  to '95.  My residency was at UC Medical Hospitals from

7  '95 to '99 and I've been at Summit since '99.

8    Q.   And what type of physician are you?

9    A.   I'm an anesthesiologist.

10   Q.   Did you do a fellowship or did you go straight

11  from residency into your practice?

12   A.   Straight from residency.

13   Q.   Is that common for anesthesiologists to not do

14  a fellowship?

15   A.   Yes.  More common than not.

16   Q.   What would be the reason to do an

17  anesthesiology fellowship?

18   A.   If you want to specialize your work in one

19  particular area.

20   Q.   Are you a -- is there something known as a

21  general anesthesiologist?

22   A.   Sure.

23   Q.   Is that what you are?

24   A.   Yes.

25   Q.   And what does that mean, as opposed to someone

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  Dr. Paxton, correct?

2          MR. VANDALL:  Calls for speculation.

3          THE WITNESS:  I would assume so.

4          MR. SWEET:  Q.  Well, you personally wouldn't

5  sign the document unless you agreed with everything in

6  it, right?

7      A.  Yes.

8      Q.  Who wrote the final report from the ad hoc

9  committee that was forwarded to the MEC?

10     A.  I think it was generated by Dr. Paxton with

11  help from Joanne Jellin.

12     Q.  And what makes you think that?

13     A.  Joanne Jellin was present at all of our ad hoc

14  committee meetings.

15     Q.  Right.  But what makes you think that she

16  helped Dr. Paxton write the report?

17     A.  You know, I guess that's speculation on my

18  part.  I actually don't know.

19     Q.  Did you write the report?

20     A.  I did not.

21     Q.  Did you write any part of it?

22     A.  No.

23     Q.  Okay.  So there is not one word in it that you

24  drafted, correct?

25     A.  No.  I mean yes.  Correct.

HANNAH KAUFMAN & ASSOCIATES, INC.

1         MR. SWEET:  Q.  Do you have any knowledge on
2    whether Dr. Horn drafted any of the report?

3         A.  I don't know that.

4         Q.  So are you saying you don't know who drafted
5    the report?

6         A.  I assume Dr. Paxton did, but I guess I've
7    never asked him directly, "Did you write the report?"

8         Q.  So you don't know?

9         A.  I don't know.

10        Q.  Were there drafts of the report that you saw
11   before it became final?

12        A.  No.  I think I read the final report.

13        Q.  By that answer, I take it you don't -- you
14   didn't participate in any revisions to drafts, correct?

15        A.  No, I did not.

16        Q.  And revisions to drafts were never, then,
17   discussed at ad hoc committee meetings, correct?

18        A.  I can't recall.  I don't think so, but I can't
19   recall.

20        Q.  Whether you recall or not to that question, do
21   you recall making specific suggestions that be either
22   added to the final report or taken out of the final
23   report?

24        A.  I did not make any suggestions.

25        Q.  Is it accurate to say that you read the final

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    report, agreed to its content, signed it, and that was

2    your only contact with that final report?

3        A.   Yes.

4        Q.   Do you know when you read the final report, or

5    where you were when you read it?

6        A.   I was in the medical staff office at Summit.

7    And as to the date, I don't remember.

8        Q.   Okay.  The medical staff office at Summit;

9    whose offices are in there?

10       A.   I think the chief of the medical staff office

11   is there, as well as credentialing offices.

12       Q.   So it would be Dr. Isenberg at the time?

13       A.   Was he still president?  I guess.

14       Q.   I'll ask it a different way:  Whoever the

15   president of the medical staff is has there office in

16   there?

17       A.   It wasn't in his office, I don't think.  It

18   was in Joanne Jellin's office.

19       MR. VANDALL:  Just because there is a pause,

20   I'm going to note that just try to wait until he's

21   finished with his question before you respond, just for

22   the court reporter.

23       THE WITNESS:  Sure.

24       DR. ENNIX:  Would you like some water, Dat?

25       THE WITNESS:  I have coffee.  Thank you.

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1   I have an example of what he -- a type of issue he would

2   speak about at the ad hoc committee meetings?

3       A.   He would be a person where we could ask about

4   the QA process.  Rules and regulations of the medical

5   staff at Summit.  A good resource person.

6       Q.   Okay.  Joanne Jellin attended the meetings

7   also, correct?

8       A.   Yes.

9       Q.   Wouldn't she be a good resource for those

10  types of questions?

11      A.   That, I wouldn't know.  She never acted in

12  that capacity.

13      Q.   A lawyer by the name of Mr. Shulman attended

14  the meetings sometimes, correct?

15      A.   Yes.

16      Q.   Wouldn't he be a good person to ask about Q

17  and A and procedure type of questions?

18          MR. VANDALL:  Objection.  Calls for

19  speculation.

20          THE WITNESS:  Yeah.  I would only be

21  speculating if I say yes.

22          MR. SWEET:  Q.  Were the meetings taped?  Tape

23  recorded?

24      A.   Yes.

25      Q.   Why did you not insist that either a cardiac

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1   surgeon or a cardiologist serve on this ad hoc?

2           MR. VANDALL:  Objection.  Misstates the prior

3   testimony and it's argumentative.

4           THE WITNESS:  I felt that there were expertise

5   in the community that we could draw on if we needed it.

6           MR. SWEET:  Q.  Okay.  Can you tell me how

7   often you had worked with Dr. Ennix before becoming a

8   member of the ad hoc committee?

9           MR. VANDALL:  Objection.  Vague as to time.

10          THE WITNESS:  I don't remember exactly.  In

11  fact, I'm -- I don't even know if I can estimate for you

12  how many times.

13          MR. SWEET:  Q.  Okay.  I mean, you were the

14  anesthesiologist on any number of cases that Dr. Ennix

15  performed, correct?

16          MR. VANDALL:  Objection.  Vague.

17          THE WITNESS:  I've worked with Dr. Ennix.

18          MR. SWEET:  Q.  Can you just give me an

19  estimate of how many of his surgeries you were the

20  anesthesiologist on?

21          A.  I mean, I really can't.  We do -- we work with

22  different surgeons every day.  And I don't do cardiac

23  cases every day, and that's what Dr. Ennix does.

24          Q.  Right.  Would you say it was more than 50?

25  Five zero?

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   During which time period?

2    Q.   Total.

3    A.   Total?  Oh, more than 50.  Oh, maybe not.

4  Well, maybe close to 50.

5    Q.   All right.  Have you ever worked with

6  Dr. Khan?  By worked with, I mean act as the

7  anesthesiologist on one of their surgeries.

8    A.   Yes.

9    Q.   Do you have any reason to think or believe

10  that Dr. Khan is biased, in any way, for or against

11  Dr. Ennix?

12        MR. VANDALL:  Objection.  Calls for

13  speculation.

14        THE WITNESS:  No.

15        MR. SWEET:  Q.  In fact, he's someone whose

16  opinion it sounds like you value and you would seek out

17  regarding cardiac-related issues, correct?

18    A.   No.  But it's just that we only have three

19  other cardiac surgeons besides Dr. Ennix, so....

20    Q.   Okay.  So you've probably worked with Russell

21  Stanten, too, correct?

22    A.   Yes.

23    Q.   Any reason to think that he's biased for or

24  against Dr. Ennix?

25    A.   No.

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  proposition, is there an objectivity problem with the
2  cardiothoracic peer review committee?
3        MR. VANDALL:  Objection.  Lacks foundation.
4  Calls for speculation.  Misstates the prior testimony
5  and is compound.
6        THE WITNESS:  I guess since I don't sit on
7  that committee, I wouldn't know how they go about
8  looking at their cases and whether they were objective
9  or not in their -- in their reviews.
10        MR. SWEET:  Q.  Okay.  So even having reviewed
11  this case, Dr. Ennix's case, you have no opinion on
12  whether or not the cardiothoracic peer review committee
13  suffers from a lack of objectivity?
14        MR. VANDALL:  Same objections.
15        THE WITNESS:  I don't know that it does.
16        MR. SWEET:  Q.  Okay.  That particular
17  division has -- or at the time, had a private group and
18  a Kaiser group, correct?
19        MR. VANDALL:  Objection.  Vague.
20        MR. SWEET:  Q.  Is that right?
21     A.  Yes.
22     Q.  Is there anything inherently problematic about
23  two -- those two groups being the only two groups in a
24  division or department?
25        MR. VANDALL:  Objection.  Vague.  Calls for

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   But have you ever heard of that happening?

2    A.   I've never heard of that happening.

3    Q.   The ad hoc committee in this case ultimately

4  reviewed four minimally invasive procedures, correct?

5        MR. VANDALL:  Objection.  Misstates the scope

6  of the committee.

7        THE WITNESS:  Yes.

8        MR. SWEET:  Q.  I think we've -- we know what

9  we're talking about.  There were four procedures that

10  Dr. Ennix performed that were at issue initially,

11  correct?

12    A.   Yes.

13    Q.   And did you act as the anesthesiologist on any

14  of those?

15    A.   No.

16    Q.   If you did, would that be a violation of the

17  rules and regulations on peer review?

18        MR. VANDALL:  Objection.  Calls for

19  speculation.  Calls for a legal conclusion.  Lacks

20  foundation.

21        THE WITNESS:  Which part of the peer review

22  would it violate?

23        MR. SWEET:  Q.  I'm just asking you, before

24  you refer to any document, would it be improper for

25  someone who was involved in an operation that's at issue

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  to act as a peer reviewer?

2          MR. VANDALL:  I'm going to object to the

3  question, as you have placed a peer review process

4  document in front of the witness, and it's a misleading

5  question.

6          THE WITNESS:  Yes.

7          MR. VANDALL:  Can you read the question back?

8          MR. SWEET:  No.

9          MR. VANDALL:  I get to ask for the question to

10  be read back.

11          MR. SWEET:  You said to take a break.  Why

12  don't we take a break and you can have the question read

13  back off the record.  It's -- we're going to take a

14  five-minute break.

15          (Recess taken from 10:56 to 10:59.)

16          THE WITNESS:  So I may have misunderstood your

17  last question.

18          MR. SWEET:  Q.  Hold on a minute.  So what you

19  are saying is after we took a break and you had a chance

20  to talk to your counsel, had the question read back to

21  you, you now want to change your answer; is that what

22  you are saying?

23      A.   No.  I don't think I want to change my answer.

24  I just don't -- I'm just not sure that I understood the

25  question.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   This was you.  You were the anesthesiologist

2  on this operation, correct?

3        Is that a yes?

4    A.   According to the operative report.

5    Q.   Okay.  And for the record, this is the surgery

6  on January 31st, 2004 of patient -- the patient name is

7  redacted, of course, but the MR number is 1205056.

8        MR. VANDALL:  Objection.  The document speaks

9  for itself.

10       MR. SWEET:  Q.  This is you, right, Dat Lee,

11  L-e-e is misspelled.  It should be Dat Ly, L-y, correct?

12       MR. VANDALL:  Objection.  Asked and answered.

13       THE WITNESS:  I'm assuming.

14       MR. SWEET:  Q.  Well, is there another

15  anesthesiologist at Summit who worked in January 31st of

16  2004 with the first name of Dat, D-a-t?

17    A.   No.

18    Q.   This is you, right?

19    A.   As dictated.  As dictated, this is me.

20    Q.   Who was the surgeon on this case?

21       MR. VANDALL:  Objection.  Calls for

22  speculation.  Document speaks for itself.

23       THE WITNESS:  Dr. Ennix.

24       MR. SWEET:  Q.  Assuming that this is one of

25  the minimally invasive cases looked at by the ad hoc

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1   committee, we now know that you actually were the

2   anesthesiologist for one of the minimally invasive

3   procedures, correct?

4        MR. VANDALL:  Objection.  Lacks foundation.

5   Calls for speculation.

6        THE WITNESS:  But it's not a minimally

7   invasive case.  It's an open case.

8        MR. SWEET:  Q.  Well, you were the

9   anesthesiologist on this, correct?

10       A.   I was for the open case.

11       Q.   Okay.

12       A.   Not the minimally invasive.

13       Q.   The minimally invasive case was the one that's

14  documented on the second two pages of this document?

15       MR. VANDALL:  Objection.  You need to allow

16  the witness to review the document before he --

17       MR. SWEET:  Go ahead.

18       THE WITNESS:  Okay.

19       MR. SWEET:  Q.  Is that accurate?

20       A.   That this is the minimally invasive case?

21  Hang on a second.  I've never done a minimally invasive

22  case, so I can only assume so.

23       Q.   So on page NMA06749, in this document, where

24  it says "Anesthesia," colon, this is about a third of

25  the way down?

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   Uh-huh.

2    Q.   General endotracheal?

3    A.   Uh-huh.

4    Q.   There is no identification of who the

5  anesthesiologist was, correct?

6    A.   Yes.

7    Q.   And you are saying you know it was not you

8  because you've never done a minimally invasive

9  procedure?

10    A.   Yes.

11    Q.   The ad hoc committee studied this case,

12  correct?

13    A.   Yes.

14    Q.   Which included a study of the procedure that

15  you actually were the anesthesiologist on, right?

16    A.   Yes.

17    Q.   By the time the ad hoc committee was formed,

18  Dr. Ennix had already agreed to stop performing

19  minimally invasive procedures, correct?

20        MR. VANDALL:  Objection.  Calls for

21  speculation.  Vague as to time.

22        THE WITNESS:  I think so.

23        MR. SWEET:  Q.  Can you explain why, then,

24  those cases were reviewed if he had already agreed to

25  stop performing that procedure?

HANNAH KAUFMAN & ASSOCIATES, INC.

1   to look at by the --

2       Q.   Who -- I'm sorry, by the?

3       A.   Medical staff.  The MEC.  The Medical

4   Executive Committee.

5       Q.   What does that mean, that you were charged to

6   look at?  Was it stated to you when the ad hoc committee

7   was formed that you would be limited in what matters you

8   could consider?

9       A.   No.  But it was what we were starting with

10  when we met.

11      Q.   Where did you get the four minimally invasive

12  cases from?  Who brought those to your attention?

13      A.   Bill Isenberg.

14      Q.   What about the six other cases; who brought

15  those to your attention?

16          MR. VANDALL:  Objection.  Calls for

17  speculation.

18          THE WITNESS:  Bill Isenberg.

19          MR. SWEET:  Q.  So what was your understanding

20  what the purpose of the ad hoc committee was; were you

21  just to look at those ten cases?

22      A.   No.  I don't think we were limited to those --

23  to just those ten cases.

24      Q.   Did you do anything to look at other cases

25  other than those ten?

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.    Well, you've had a chance to review the

2    minutes from the ad hoc committee; do they appear to be

3    accurate as far as you know?

4    A.    As far as I know.

5    Q.    Take a minute, if you would, this is a short

6    one, and review this document, please.

7         MR. VANDALL:  Thank you, Mr. Sweet.

8         MR. SWEET:  You're welcome to review it also,

9    Mr. Vandall.

10        MR. VANDALL:  I shall.

11        MR. SWEET:  Q.  Ready?

12   A.    (Witness nods.)

13   Q.    Now, this was the first meeting of the ad hoc

14   committee, correct?

15   A.    I think so.

16   Q.    How was Dr. Paxton elected chair at this

17   meeting?

18   A.    We felt that he was closest to cardiac surgery

19   in terms of his practice.

20   Q.    How did it occur?  Can you describe the

21   procedure by which he was elected chairperson?

22        MR. VANDALL:  Objection.  Lacks foundation.

23        THE WITNESS:  I'm trying to remember.  We

24   talked about it and felt that he was appropriate because

25   of his surgical background.

DEPOSITION OF DAT LY, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1          MR. SWEET:  Q.  Was Dr. Isenberg part of that

2   discussion?

3      A.  I don't think so.

4      Q.  Was Joanne Jellin part of that discussion?

5      A.  No.

6      Q.  Was Harry Shulman part of that discussion?

7      A.  No.

8          MR. VANDALL:  Do you want the record to

9   reflect the response there?

10         MR. SWEET:  I think he said no.

11         MR. VANDALL:  I didn't hear it.

12     THE WITNESS:  Sorry.  No.

13         MR. SWEET:  Q.  Was Dr. Horn part of that

14   discussion?

15     A.  Yes.

16     Q.  Were you part of that discussion?

17     A.  Yes.

18     Q.  Was Dr. Paxton part of that discussion?

19     A.  Yes.

20     Q.  Was it a vote, or did everybody agree it

21   should be Dr. Paxton?

22     A.  No formal vote was taken, but everyone agreed.

23     Q.  Okay.  There is a two-line paragraph here

24   which reads as follows.  This is a little more than

25   halfway down the document.  "An initial list of possible

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   Did you explain to them what you meant by very

2  low opinion?

3    A.   I may have.  But the minutes doesn't reflect

4  that.

5    Q.   Did you make it clear that Dr. Hite was not

6  saying Dr. Ennix fell below the standard of care, that

7  he just had these other concerns or preferences, I would

8  call them?

9    A.   I don't recall specifically.

10    Q.   Don't you think that would be important to

11  share with them at this point in the meeting?

12    A.   I may have, but it's not reflected in the

13  minutes.

14    Q.   Did you tell the ad hoc committee that you

15  thought Dr. Ennix fell below the standard of care?

16    MR. VANDALL:  Objection.  Asked and

17  answered -- withdrawn.

18    THE WITNESS:  At this meeting?

19    MR. SWEET:  Q.  Yes.

20    A.   No, I did not.  We hadn't had enough

21  information to reach that conclusion.

22    Q.   Well, you had worked with him on maybe 50

23  cases at this point, correct?

24    A.   Yes.

25    Q.   You had reviewed all the written materials

DEPOSITION OF DAT LY, M.D.

125

HANNAH KAUFMAN & ASSOCIATES, INC.

1  provided to you in terms of the ad hoc committee,
2  correct?

3      A.   Yes.

4      Q.   And you had heard Maire Daugharty testify,
5  correct?

6      A.   Yes.

7      Q.   You had talked obviously to Dr. Hite about
8  Dr. Ennix, correct?

9      A.   Yes.

10     Q.   And here, when the committee is asking you
11 your opinion about the competency of Dr. Ennix, you are
12 actually complimentary to him, aren't you?

13     A.   I don't have a problem with Dr. Ennix,
14 personally working with him.

15     Q.   So at this point, as of September 20th, 2004,
16 you, as a member of the ad hoc committee, a person
17 experienced with Dr. Ennix, having reviewed all the
18 materials, you are asked your opinion about his
19 competency, and you have a favorable opinion, correct?

20     A.   Yes.

21     Q.   You don't tell the committee that Dr. Ennix
22 falls below the standard of care, correct?

23     A.   I don't remember doing so.

24     Q.   Well, you didn't think that, did you?

25     A.   I don't remember what I thought at the time.

DEPOSITION OF DAT LY, M.D.

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _30th_ day of _January_, _2008_.

_Gina V. Carbone_
Certified Shorthand Reporter
CSR No. _8249_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D.,
as an individual and in his
representative capacity under
Business & Professions Code
Section 17200 et seq.,

        Plaintiff,

vs.

RUSSELL D. STANTEN, M.D.,
LEIGH I.G. IVERSON, M.D.,
STEVEN A. STANTEN, M.D.,
WILLIAM M. ISENBERG, M.D.,
Ph.D., ALTA BATES SUMMIT
MEDICAL CENTER and Does 1
through 100,

        Defendants.

_____//

CONFIDENTIAL

CERTIFIED COPY

Case No.: C 07-2486

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF DAT LY, M.D.

Monday, January 21, 2008

VOLUME II, Pages 146 - 259

REPORTED BY:

APRIL DAWN HEVEROH, CSR NO. 8759

HANNAH KAUFMAN & ASSOCIATES, INC.

1    surgeon's opinion.

2        Q.   No. 3 -- I'm back on the document.  No. 3 on

3    page 6 --

4        A.   Yes.

5        Q.   -- says that, "Agreed to contact Mercer for

6    outside review."

7            Why Mercer?

8        A.   I think Dr. Isenberg said that the medical

9    staff has used Mercer in the past.

10       Q.   What else did Dr. Isenberg say about that?

11       A.   And that they had a good experience.

12       Q.   So it was Dr. Isenberg's idea to use Mercer?

13       A.   It was his suggestion to use Mercer.

14       Q.   Was there any debate or dissention about that?

15       A.   I don't think so.

16       Q.   Was there any discussion about it?

17       A.   We discussed that that's reasonable if we had

18   something that's a known quantity and had provided good

19   service in the past.

20       Q.   Did anybody suggest a different outside

21   reviewer?

22       A.   Not that I can recall.

23       Q.   Did the possibility of using a single

24   physician from outside of the hospital setting, was that

25   option raised?

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _7th_ day of _February_, _2008_.

_April Herech_
Certified Shorthand Reporter
CSR No. _8759_