# EXHIBIT U

Coyness Ennix Quality Assurance Review.

General Comments

1, Repeatedly in these 10 cases the issues that are being used as evidence of practicing below the standard of care for the community are speculative, subjective and judgmental in their evidence and conclusions. Many of these issues are discussed on a daily bases in heart center all over the country and there is often no clear course of action that can be consistently recommended as a universal standard of care.

2. In these 10 cases there was only on instance where I thought the medical standard of care for the community was breached. Case #7

3. Generally in all 10 cases the level of documentation was substandard but this is not an uncommon finding in many heart centers.

4. Many of the cases are related to minimally invasive valve surgery or other minimally invasive technology. This is a technology that has been in development for 10 years. A progressive heart center is expected to stay current with innovation to properly serve its community of patients. That includes introducing new procedures. A hospital and its medical staff have a duty to properly insure that new technology is introduced in a manner that no patient is placed at undo risk. In the material I read I did not have the feeling that there was a process in place by the medical staff for introducing new technology in cardiac surgery. This leaves the staff cardiac surgeon who wants to add new procedures to his or her operative privileges list to meet an unknown standard. When issues were raised about minimally invasive valve surgery the response of the medical staff was to place a moratorium on the procedure in the hospital. This is an appropriate response at the moment but where was the process to introduce minimally invasive valve surgery, and is there one now?

5. This process of review seems to have gone on for a very long period of time. Meanwhile a surgeon's career is in limbo and his reputation possibly damaged. Isn't there some benchmark timelines that the medical staff has to meet in the process of doing their job? In reading the material I have the feeling the medical staff is trying to be very thorough but they are not very prompt, have not always used experts from their hospital in the review of very complex medical issues and don't seem to be very experienced in the process. In addition to that the chief of staff I understand is new and he is being slow and cautious in his approach. In the meantime Dr. Ennix is administratively not able to do much to resolve the situation and has to wait.

6. Ultimately the cardiac surgeon is in charge of the final decision making process in taking action in cardiac surgery and doing the procedure. At the same time heart disease and cardiac surgery more and more require a multi-disciplined approach of specialists. The surgeon is often dependent and guided by their opinion. As a consequence options for therapy are often a collective decision that may not be the individual decision of a single physician e.g. the surgeon. There is shared responsibility but legally this is often ignored in an effort to attach singular responsibility. The important consideration in a review such as this when there were

many instances of shared responsibility to be satisfied there was adequate dialogue and discussion between he physicians to ensure the patient received the best collective decision of the envolved physicians. I think that happened in all of these cases except Case #7 where there was a breakdown in communication.

Blood Use and Operative Mortality Data

1. Operative Mortality Data. This data is sort of spotty with some low numbers in many of the categories. With certainty I can't draw any conclusions from this material.

2. Blood use. Case mix data on the population being analyzed is necessary to draw any comparative conclusions. E.g. how do we know that one of the surgeons did not had a disproportion number of patients that were more or less prone to have bleeding problems at surgery?

Case ABS 001

1. **Questionable informed consent.** Patient was a known schizophrenic since the age of 16 and under medical care. The operation and its risks were explained to him and his companion and later confirmed by letter that the operation was explained to him and he understood the operation and its risks. During his post operative care the patient became quite agitated and a consultation was obtained for that specific management problem. A pre-op psychiatric consultation might have been done as a courtesy but was not going to change the recommendation for surgery, a process of informing the patient more adequately, or preventing the post operative agitation. Complications such as agitation have to be managed as they arise and in concert with the situation surrounding them. If the psychiatric community that was caring for the patient believed he was at risk for responsible decision-making they would have appointed a legal guardian years ago. I don't think proceeding without a psychiatric consultation was outside a standard of care for this patient.

2. **Technical error related to minimally invasive approach leading to ventricular damage and need for second operation.** Patient developed AI and some AS two days post-operatively. This was diagnosed using ECHO. Based on the surgical finding at the second operation the etiology of the valve dysfunction is not clear. I would tend to believe it was related to the size 27 valve being used that proved to be too large. The Mosaic valve, if distorted by peripheral circumferential compression, can lose normal coaptation of the valve leaflets. There is no indication that the visibility was inadequate or the preservation was imperfect at the first operation. The reduction of the LV function before the second operation was more likely related to poor ventricular perfusion due to the AI since the ventricle made a complete recovery once the valve AI was corrected. Over sizing a valve at surgery can happen. It is related to the surgeon's goal of providing the patient with the largest valve possible so that the ventricle will not sustain any long-term ventricular strain that can lead to premature congestive heart failure. I don't see any significant deviation from an acceptable standard of care. Not requiring a second operation would have been optimal but is not below a standard of care.

3. **Failure to obtain a TEE in the operating room.** A TEE is not recorded to have taken place in the OR at the time of the first operation. Apparently they are always done and read on site by a board certified anesthesiologist. Not below the standard of care.

4. **Prosthetic valvular dysfunction.** Covered above in part # 2.

5. **Substandard documentation.** The documentation is incomplete and it is not possible to fully understand the events and their explanation based on the official information. The subsequent discussions with Dr. Ennix clarified most of the issues. Officially the documentation is below a standard one wants to have.

Case ABS 002

## 1. Inadequate preoperative evaluation

Not performing a coronary angiogram or hemodynamic evaluation of the heart is not below the standard of care for this operation for isolated aortic stenosis. The patient had no risk factors, healthy parents, and the referring cardiologist was satisfied that the patient did not have coronary artery disease and the diagnosis was correct. The surgeon agreed and that is within the standard of care. A longer ECHO report and preop cath would not have assisted in predicting precisely the valve size that was going to fit except that it would be small which they already new. The final determination of valve size occurs at operation. The pre-op evaluation was not below the standard of care.

## 2. Conversion to partial sternotomy.
Conversion to a partial sternotomy is not a complication. Conversion is an adjustment of the operative plan based on the operative finding and the goal of the operation. It is a judgment decision and in this case the correct one if visibility was imperfect.

## 3. Greatly prolonged surgical time.
A prolonged operating time is not a complication but it can contribute to complications. If the time is necessary to correctly and accurately reach the goals of the operation it is time well spent. The operation was done via a minimally invasive incision with an inexperienced anesthesiologist and the valve had to be changed. It did take a long time but the outcome was satisfactory. If I understand the anesthesiologist's record correctly the set up time was from 7:00 am to 1:00 pm before they started cardiopulmonary bypass (CPB). The CPB lasted 5 hours and the rest of the time was to control bleeding. The bleeding was significant and probably was the major contributor to the postoperative respiratory failure. Despite this the patient was discharged from hospital 8 days post operatively. Long operation and a lot of blood, which makes it an outlier, but not below the standard of care.

## 4. Prosthesis too small.
Valve - patient mismatch re: valve size has been an ongoing discussion in cardiology and cardiac surgery for many years. There are strong opinions on it on both sides in the borderline sizes. A # 17 St. Jude mechanical valve placed in a supra annular position is at the very lower end of what is acceptable. It is a judgment call by the surgeon to determine the relative risks of implanting a borderline valve vs a more extensive operation. In ABS's conversation with Dr. Ennix he expressed the opinion that to enlarge the root would be a risk greater than using a # 17 valve. Not below a standard of care.

## 5&6 Deficient operative note and documentation.
The operative report and documentation are poor and below the standard of care for this operation.

Case ABS 003

**1. Prolonged Surgery Time.** The duration of the operation was longer than average and that can be related to complications. However 4 hrs of the time was related to set up and is not entirely controllable by the surgeon. The issue of visibility with this minimal incision is not a good explanation of the time it took or the complication of AI. The visibility is excellent. The leverage with the surgical instruments can be limited and that can slow things down when trying to place sutures accurately and strongly in the annulus. Using the time to do this paid off since the valve was well seated at post and was not the cause of the AI. The AI was related to the incomplete coaptation of the leaflets. Whether this was due to valve design, annular or ring distortion is pure speculation. Surgical bleeding is a know complication of aortic valve surgery. It did not occur since the surgeon took the time to manage the friable and thin walled aorta well. Securing that well can take time and managing bleeding is better done in the OR than in the recovery room.

The issue of the continued AI is an issue. They were aware of it and discussed it. The made a judgment call to do nothing for the moment.  It seems unlikely that it was related to the MI that caused his death.

**2. Intraoperative complications.**  See above

3.**Intraoperative TEE**. It was done in the OR but is not reported in the OP report.

**4. Postoperative diminished CNS function and possible CVA.**  With half a dozen issues that could be the etiology of cerebral dysfunction (age, preexisting cerebral vascular disease, aortic valve replacement, aortic cross clamping, calcified annulus, metabolic, cardiopulmonary bypass) focusing down on the length of the operation is a minor player.

**5. Death due to complications.** The cause of death was myocardial infarction that seems most likely due to a preexisting condition (coronary atherosclerosis) rather than the events of the operation.

**6. Substandard op note.**  The operative report is substandard.

Case ABS 004

1. **No documentation of indication.** The patient had minimal symptoms but severe mitral regurgitation. The purpose of repairing or replacing a mitral valve with severe regurgitation is to relieve symptoms and prolong life. There is ample evidence in the literature to support this. It was not necessary to do an exercise stress test to validate the need for surgical intervention. Severe mitral regurgitation in a patient who has no other significant contraindications is enough. Secondly the final decision to do the operation is in the hands of the surgeon. Before he or she makes that recommendation almost always a cardiologist has made the decision that intervention is in the best interest of the patient. In this instance Dr. Edelen had already recommended the patient for surgery.

2. **Prolonged operative note**. The operation was longer than average but the outcome was satisfactory. The procedure was early in their experience and switching to minimally invasive approach is a team effort that has to be organized carefully so that each step of the procedure is done carefully and accurately. Sometime that takes time and is better than rushing through any part of the procedure.

3. **Substandard operative note**. The operative note is substandard in its details of the procedure. Even though there is little evidence on the chart about the process of consenting the patient it appears by the letter from the patient and the verbal word of the resident that the patient was well informed about the procedure.

Case ABS 005

1. **Poor preoperative preparation.** There is the suggestion that the cardiologist and Dr. Ennix misread or over read the degree of narrowing in the left main and left anterior descending coronary artery. I tend to think not. The patient was a hypertensive diabetic with renal failure on chronic peritoneal dialysis with a history of a prior myocardial infarction in 1998. The probability of having diffuse triple vessel disease rather than two-vessel disease was great. Traditionally coronary artery angiography is under read and not over read. The cardiologist later, but not in the original report, indicated there was pressure damping in the left main coronary artery. An IVIS evaluation would have helped but the patient was not in a very stable condition in the cath lab and could have coded or become more severely compromised while doing that procedure rather getting on with revascularization. This is somewhat a subjective call and one has to rely on the historical reliability of the judgment of the cardiologist who is on the scene rather than in hindsight making the call of what was the correct interpretation and plan of action. Dr. Ennix who later acknowledged that he and the cardiologist had reviewed the films together and agrees there was significant narrowing in the main left and LAD system to warrant revascularization of those vessels. Not below a standard of care for this situation.

2. **CABG not indicated when preformed.** The patient had a RV infarction with a LVEDP of 8 mmHg in the cath lab. I could find no reference to what her CPV was at that time. She also had main left disease and triple vessel disease. She was improved in the cath lab with fluids and an IAB. It has been suggested in hindsight that she could have had a right coronary stent only. That management plan apparently was not the judgment of the cardiologist at the scene and Dr. Ennix agreed. This is judgmental but I find no action that is below the standard of care for the situation the physicians had to deal with at the scene.

3. **Substandard operative note.** The operative note is not very detailed and is substandard.

Case ABS 006

1. **Need to convert from OPCAB to on-pump.** The patient is 87-year-old male with severe triple vessel coronary disease and history of renal disease, hypertension, COPD, prostate cancer, diverticulitis, and peripheral vascular disease. There is good evidence that doing these high-risk elderly patients using an OPCAB strategy will have better outcomes than using cardiopulmonary bypass (CPB). There is also evidence doing conversion to CPB will have a higher mortality. Therefore there is always a plan by the surgeon not to convert unless necessary. Dr. Ennix is an experienced OBCAB surgeon. He knows all of the above guidelines. He also knows the third guideline. Not to convert when it is medically necessary yields the worst outcomes. He converted and it was the correct decision in his judgment giving the clinical situation at the operating table. Not below the standard of care.

2. **Need to redo a cardiac graft.** It has been suggested that the need to redo a cardiac graft is below a standard of care. On the contrary not to redo a graft that in the opinion of the operating surgeon is imperfect for whatever reason is below a standard of care. In the documentation it is also inferred that Dr. Ennix lied in representing that he did not redo a graft. Why would he ever do that when fixing an imperfect graft is good judgment and consistent with the standard of care that is practiced in cardiac surgery? All his decisions in the care are above the standard of care for this clinical situation.

3. **Death following complications.** It is a suggested there is no causal link between the complications the patient had as a consequence of his preexisting pathology and operation and his eventual death. This is a theory of postoperative pathophysiology that I have never heard before. I do not agree with it. It is not supported by any alternative hypothesis or evidence that would make one believe that the complications did not have a compelling relationship to the eventual outcome. It is not even clear what this suggestion has to do with the standard of care that was exercised.

4. **Substandard documentation.** The documentation is poor. The details of the consent procedure are poor even though Dr. Ennix appears to have provided an adequate explanation to the family as evidenced by his conversation of the events and a letter from the family.

Case ABS 007

1. **Several days delay before performing CABG.** The three main issues in this case are delay in investigating the carotid arteries, patient management till the surgery, and management of the patient immediately before and at the time of surgery. The optimal outcome is successful revascularization and being neurologically intact at discharge. To die or have a major stroke are equally bad and no different for the patient. One can only speculate on the hospital logistics of getting a rapid work up but is usually out of the hands of the surgeon. During that time one should have considered increasing myocardial ischemia drug management, heparin or an IAB to support the patient and greatly diminish the risk of infarct while the carotids were being investigated which was an important step. This decision was partly in the hands of the cardiologist but the surgeon bears some responsibility and this is very close to being the below a standard of care if not below it in a patient with severe LAD lesion and recurrent pain at rest. Later the events just before surgery and the operation were mismanaged. The patient should not have been allowed to be at risk with ischemic myocardial chest pain in the preop area. The carotid artery operation should have been deferred and managed in a different way. The priority is to diminish myocardial demand and/or increase blood supply. It is not so important to speculate on the best combinations of approaches. The important thing was not to proceed with the carotid and to proceed with the revascularization. The time in minutes X degree of ischemia is what one must reduce. Once the operation was started taking the IMA down instead of placing the patient immediately on bypass was also a judgment call that had a bad consequence. Dr. Ennix was not in the OR at the beginning of the operation and was not notified of the chest pain the patient was having in the pre op area. Perhaps he should have been in the OR. That depends on the practice guidelines of the department, OR and the anesthesiologists. He certainly should have been notified. The entire set of events and process that occurred from the time the patient came into the pre op area till the patient went into cardiogenic shock and was emergently placed on cardiopulmonary bypass is below the standard of care for this clinical situation and the surgeon must bear most of the responsibility. Comment: Quality assurance (QA) has an I associated with it (I) or QA&I. That is quality assurance and improvement. One of the major factors leading to the bad outcome in this case was a systems failure. Why was there not a process in place to prevent a patient with chest pain from going into the operating room to have an operation without a reevaluation of the clinical situation and the management plan? The system in place did not work. That systems failure must also share part of the responsibility for this outcome. Has this shortcoming of the system been addressed?

2. **Failure to preoperatively appreciate risk of intraoperative atherosclerotic stroke.** I don't think this was missed as much as not being noted on the chart

in light of the other serious problems. From a surgical point of view the final determination of its severity and a course of action comes intraoperatively with the examination of the aorta with ones figures to see if there is a sight for safe cannulation. A strategy for or against cross-clamping the aorta also comes at this point in time. The available options are at hand before one starts the operation. The femoral artery option does not come without risk for stroke in a patient with severe aortic atherosclerosis and is not necessarily a good choice.

3. **Failure to perform CABG before carotid.** See #1 above
4. **Failure to document reasoning/consent for carotid/CABG vs CABG.**
   Poorly documented but apparently well covered with the patient's family based on the letter from the family.

Case ABS 008

1. **Surgery contraindicated when preformed and resulted in death.** It has been suggested that the patient should have had an angioplasty/stent of the right coronary artery instead of surgical revascularization or that if surgery was to be done it would have been safe to wait until the effects of the integralin® had worn off.  This is a discussion that is going on in hundreds of cardiac centers all over the country every day. The patient has been premedicated with a strong antiplatelet therapy, the cardiologist determines that percutaneous intervention cannot be safely or successfully done, the patient is in a life-threatening situation because of coronary artery disease and myocardial ischemia. The surgeon has the choice of doing surgery or running the risk of the patient having an infarction that may or may not kill him or her. In this situation all three of these conditions were recognized and discussed between the cardiac surgeon, vascular surgeon, and cardiologist. A proper decision making process took place. The decision was made to proceed with the surgery. This happens at least 50 times/day in North America. Surgeons don't like to operate in the presence of integralin® but they do it. Usually it is successfully managed but not always. That is the known risk that is taken intentionally. There is no evidence of the process or actions that took place being outside the standard of care for this clinical situation.

2. **Substandard consent documentation.** No detailed documentation of the decision making process that took place. There is a note that all the risks and potential outcomes were explained to the patient. No consent for CABG on the chart. No consent is substandard. That is a shared responsibility.

Case ABS 009

**1. Unclear status: urgent vs. elective.** The issue is whether or not a patient who had been stable for a long time needed to be operated on urgently before her hemoglobin could have been elevated using Epogen®. Apparently the cardiologist who had followed the patient for some time felt that her symptoms had changed in recent weeks and it was not prudent to wait a month for the Epogen® to be effective. In this situation the surgeon, who has never followed the patient, has no alternative but to accept the cardiologist's recommendation to proceed. This is within the normal standard of practice.

**2. Prolonged interval of cardiovascular compromise while converting from OPCAB to on-pump leading to death.** Based on the chart there was a period of 40 minutes to convert to cardiopulmonary bypass (CPB). Dr. Ennix is an experience surgeon and can get on CPB in 10 minutes if need be. He obviously spent some time in trying to coax the heart back to some level of stability so he could proceed with OPCAB. No evidence that this one delay is directly related to her death 10 days later. The patient was as 79 years old atherosclerotic lady and could not receive blood who subsequently had a post operative stroke that probable had more to do with her spiraling down with multiorgan failure and death. There is a further suggestion that "on-pump" lead to her death. It certainly may have contributed but it is a standard of practice that is used to gain safe access and repair of the heart 400,000 to 500,000/year in this country. In this situation it was used with the proper indication. Not below a standard of care for this situation.

**3. Post operative parietal infarct.** No issue is raised or standard breached.

**4. Substandard documentation.** The operative report does not explain the 40-minuet interval between OPCAB to on-pump. Poor documentation. A discussion of consent and understanding of the operation is not documented on the chart but based on a letter from the family apparently took place to the satisfaction of the family.

Case ABS 010

1. **Delay of surgery**. Main left disease in not an indication for IAB. Main left disease with pain most often would be an indication for an IAB. This period of care is the responsibility of the cardiologist. The cardiologist is the first line of responsibility in this time period. Surgeon can advice if asked or the surgeon can request an IAB as an indicated preoperative adjunct he or she may want. The surgeon was not even notified of the incidence of pain. This event is not outside the standard of care for a surgeon.

2. **Failure to fully protect the heart after unplanned conversion from off to on pump**. All conversions are unplanned. Conversion from OPCAB to an open procedure is normal practice based on the judgment of the surgeon and the anesthesiologist. Revascularization using CPB but without cardioplegia is not outside the standard of care for revascularization. It is not clear whether or not there was any myocardial ischemia going on when the decision to convert was made that might influence one to use cardioplegia. CPB itself can relieve LV wall tension and raise arterial perfusion pressure leading to less on not ischemia so that cardioplegia is not mandatory unless one believed the LAD was suddenly100% occluded. In the absence of a calcified vessel, small vessel, poor quality vessel or buried vessel there is no evidence that cardioplegia is necessary to perform a technically competent anastomosis. All these events and actions were not outside a standard of care for coronary artery surgical revascularization.

3. **Failure to place IAB or arterial line before leaving the OR.** The patient apparently came off bypass without difficulty with satisfactory hemodynanics and LV function by TEE ECHO. There was no suspicion of a technical problem with the anastomosis. The heart had been revascularized. No indication for an IAB. Not outside the standard of care for hemodynamic management post surgical revascularization.

4. **Unavailability of surgeon in the immediate postoperative period.** It is not a standard of care for the principle surgeon to accompany the patient to the ICU if the patient is doing well. An individual hospital can have this requirement. I don't know what the guidelines are at Summit Hospital. If this had suddenly happened three hours later when the patient was doing fine would one have expected the surgeon to be at the bedside. He was not that far away and came immediately when located. In his absence an alternate surgeon substituted for him. Not outside the standard of care.

5. **Documentation.** Family seems satisfied that they were adequately informed about the risks and outcomes of the operation. Failure to document this on the chart is below a standard of care for this action.

# EXHIBIT V

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

COYNESS L. ENNIX, JR., M.D., as             CERTIFIED COPY
an individual and in his
representative capacity under
Business & Professions Code
Section 17200 et seq.,

            Plaintiff,

    vs.                              No. C 07-2486

RUSSELL D. STANTEN, M.D. LEIGH
I.G. IVERSON, M.D., STEVEN A.
STANTEN, M.D., WILLIAM M.
ISENBERG, M.D., Ph.D., ALTA
BATES SUMMIT MEDICAL CENTER and
DOES 1 through 100,

            Defendants,

--------------CONFIDENTIAL-------/

CONFIDENTIAL

DEPOSITION OF:

BARRY HORN, M.D.

VOLUME I

Friday, January 11, 2008


Reported by:             HANNAH KAUFMAN & ASSOCIATES
Gina V. Carbone          Certified Shorthand Reporters
CSR NO. 8249                472 Pacheco Street
                         San Francisco, CA  94116
                         (415) 664-4269

HANNAH KAUFMAN & ASSOCIATES, INC.

1    a major pulmonary problem that needed evaluation, you

2    were sent to us by hospital plane.  So at any given time

3    we had about 80 people in the hospital with various

4    kinds of lung disease.

5          Then in 1976, I came into practice in

6    Berkeley.  I joined Oscar Sheerer (phonetic), who is a

7    partially retired pulmonologist from my practice.  We

8    were in practice at Herrick Hospital, which is off of

9    Shattuck Avenue, was an acute care hospital.  Ten years

10    later Herrick and Alta Bates merged, and our practice

11    moved to the location you are at right now, and we

12    merged practices with the pulmonary group that was here.

13          Q.   And that brings us up to the present?

14          A.   Pretty much.

15          Q.   You've been here since then?

16          A.   I've been here on a corridor around the corner

17    since then.

18          Q.   And by here, I just want to distinguish for

19    purposes of this case, physically here is the Alta Bates

20    campus we're talking about as opposed to the Summit

21    campus, correct?

22          A.   Correct.  I practice at the Alta Bates campus.

23    I don't practice at the Summit campus.

24          Q.   Are you on the medical staff at the Summit

25    campus?

DEPOSITION OF BARRY HORN, M.D.

10

HANNAH KAUFMAN & ASSOCIATES, INC.

1    replace that which is there now.  So everything that's

2    in Berkeley will remain in Berkeley, and therefore we

3    are -- our practice decided we will stay in Berkeley and

4    not go to Oakland.

5        Q.    When is the last time you practiced at Summit?

6        A.    That I saw a patient over there?

7        Q.    Yeah.

8        A.    You know, I'm not sure.  Maybe three years

9    ago.

10       Q.    If you could give me just a very quick summary

11   of what a pulmonologist does, I would appreciate it.

12       A.    What we do in our practice?

13       Q.    What you do.

14       A.    We are, and I am, a pulmonologist critical

15   care specialist.  Our group runs the critical care units

16   here in Berkeley at the Alta Bates campus.  We take care

17   of the great majority of critically ill patients at this

18   hospital, no matter what gets them critically ill.

19           We consult with people in all the

20   subspecialties of the hospital when their patients are

21   very sick, and often assume, and typically assume

22   primary care of their patients in the ICU.  Sometimes

23   the others assume primary care, and we're in a

24   consulting capacity.

25           It would be as if cardiac surgery were still

DEPOSITION OF BARRY HORN, M.D.

1    pulmonary diseases.

2        Q.    What is the distinction between internal

3    medicine and pulmonary medicine?

4        A.    Pulmonary diseases is a subspecialty of

5    internal medicine.  To become a pulmonologist, you first

6    have to be trained in internal medicine.  To become

7    board certified in pulmonary disease, you first have to

8    be board certified in internal medicine.

9            This is true for multiple specialties.  So for

10    instance, it's true for cardiology.  It's true for

11    gastroenterology.  It's true for endocrinology.  It's

12    true for rheumatology and many other specialties that

13    are internal medicine-based specialties where you are

14    trained in internal medicine, and then in your

15    subspecialty.

16        Q.    Are you a surgeon?

17        A.    No.

18        Q.    Do your specialties or subspecialties, either

19    internal medicine or pulmonology, find themselves within

20    the surgery department?

21        A.    No.  We're in the department of medicine.

22        Q.    Okay.  Do you perform surgery of any type?

23        A.    Bronchoscopy.

24        Q.    What's that?

25        A.    Procedure where you look down into the lungs

HANNAH KAUFMAN & ASSOCIATES, INC.

1          Q.    Okay.  You also sit on the board of trustees

2     of the Alta Bates Summit Medical Center; isn't that

3     true?

4          A.    Correct.

5          Q.    How long have you been on the board of

6     trustees?

7          A.    Of that entity?

8          Q.    Of that entity.

9          A.    Well, that entity started in the year 2000,

10    and I've been a member of the board since the year 2000.

11         Q.    Is the board of trustees the same as the board

12    of directors at that entity?

13              MS. McCLAIN:  Objection.  Vague.

14              THE WITNESS:  I am -- well, I don't know

15    exactly what you are asking me.  I'm -- there is no

16    board of directors, there is the board of trustees.

17              MR. SWEET:  Q.  Does the board of trustees for

18    Alta Bates Summit Medical Center -- I'm not sure how to

19    phrase this, I've lost my phrasing -- but does it apply

20    to both the Summit and Alta Bates campus?

21         A.    Yes.

22         Q.    You understand what I mean?

23         A.    Yes.

24         Q.    And what are your responsibilities on the

25    board of trustees?

DEPOSITION OF BARRY HORN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.    What is the responsibility of the board?

2      Q.    What is the board of trustees?

3      A.    The board of trustees is responsible for

4  planning.  The board of trustees is ultimately

5  responsible for the quality of care.  The board of

6  trustees is ultimately responsible of making sure

7  patients believe that they're getting a proper

8  experience when hospitalized in Berkeley and Oakland.

9  The board of trustees is responsible for the evaluation

10  of senior management at the hospitals.  The board of

11  trustees is ultimately responsible for the quality of

12  care in Berkeley and Oakland at the hospitals, and all

13  of the programs that are run by the hospital.

14      Q.    Does the board of trustees -- and when I say

15  "board of trustees", I mean specific to the institution

16  I've identified, unless I say otherwise, which I won't.

17           Does the board of trustees have peer review

18  responsibilities?

19      A.    No.

20      Q.    Does the board of trustees have authority over

21  the medical executive committees of both campuses, Alta

22  Bates and Summit?

23           MS. McCLAIN:  Objection.  Vague.

24           THE WITNESS:  Ultimately, yes.

25           MR. SWEET:  Q.  What do you mean ultimately,

DEPOSITION OF BARRY HORN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    yes?

2        A.    The -- the medical executive committees are

3    responsible to report to the board.  Their processes

4    that are implemented by the medical executive committees

5    have to be approved by the board.

6        Q.    Could the board of trustees reverse a medical

7    executive committee decision to impose corrective action

8    on a physician?

9        A.    I think so.  I think you may be asking the

10   wrong person, but I think so.

11       Q.    Okay.  Have you ever heard of that happening?

12       A.    No.

13       Q.    We'll get to this in a bit.  But ultimately a

14   lot of your deposition today will be about the ad hoc

15   committee you served on that investigated the patient

16   care activities of Dr. Ennix; were you on that ad hoc

17   committee?

18       A.    Yes, obviously.

19       Q.    Okay.  This ad hoc committee was investigating

20   Dr. Ennix and his care activities at the Summit campus,

21   correct?

22       A.    Correct.

23       Q.    Yet you don't practice at the Summit campus,

24   right?

25       A.    Correct.

HANNAH KAUFMAN & ASSOCIATES, INC.

1     would not be able to participate in that process.

2          So -- but when I originally agreed to be on

3     the ad hoc committee, and certainly the person who asked

4     me to do this knew I was on the board of trustees at the

5     time, and others knew I was on the board of trustees,

6     this was not a problem for them and it just didn't occur

7     to me until much later.

8          Q.   And the board of trustee members knew you were

9     on the ad hoc committee also, correct?

10         A.   Correct.  Although I'm not sure at what

11    time -- I don't remember when they knew it, but they

12    eventually knew it.

13         Q.   Who did ask you to be on the ad hoc committee?

14         A.   Originally Joanne Jellin.

15         Q.   Who is that -- oh, Joanne Jellin.  I'm sorry.

16         A.   And shortly thereafter, Bill Isenberg.

17         Q.   And it's your opinion that both Jellin and

18    Isenberg knew you were on the board of trustees when

19    they asked you to be on the ad hoc committee?

20         A.   Well Bill Isenberg was on the board of

21    trustees at the time he asked me, so obviously he knew I

22    was on the board because we were at the same meetings.

23         Q.   And I guess a silly question, but I'll ask you

24    it for the record.  The board of trustees met during the

25    time that the ad hoc committee was convened, correct?

HANNAH KAUFMAN & ASSOCIATES, INC.

1          THE WITNESS:  Well, I don't see how you could

2    convince somebody to be part of an ad hoc committee

3    unless you explain the parameters of the issue.  When I

4    formed an ad hoc committee, I had to tell the people I

5    proposed to be committee members what the issue was and

6    why I wanted them to be members.  Otherwise why would

7    they say yes.

8          MR. SWEET:  Q.  I understand.

9      A.   Right.

10      Q.   My question is starting to probe the area of,

11    you know, were you given certain negative information

12    about Dr. Ennix before you had a chance to review the

13    evidence yourself?  Do you think that happened?

14      A.   It may have happened, but it would not have

15    influenced me.

16      Q.   What role, if any, did you have in deciding

17    the membership of the ad hoc committee other than

18    yourself?

19      A.   I didn't have any.

20      Q.   At the time you were originally contacted

21    either by Jellin or Isenberg, did they tell you who else

22    was going to serve on the ad hoc committee?

23      A.   Yes.

24      Q.   What did they tell you about that?

25      A.   Dr. Paxton was going to head the committee and

DEPOSITION OF BARRY HORN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Dr. Lee was on the committee.

2        Q.   So you were -- you were the last addition to

3    the committee?

4        A.   I think that's a reasonable conclusion to

5    reach.

6        Q.   And when you were first contacted, obviously

7    which is before there is even a meeting of the ad hoc

8    committee, you've already been informed that Dr. Paxton

9    will chair it; is that right?

10        A.   Right.

11        Q.   The -- I'll jump ahead to the meetings for a

12    second; were those audio taped?

13        A.   No.

14        Q.   Are you sure about that?

15        A.   I don't remember.

16        Q.   Okay.  I mean, you stated --

17        A.   I don't remember them being -- they -- I don't

18    recall them being audio taped.

19        Q.   Okay.  You stated it with such certainty, I

20    just wanted to make sure you are not guessing.  If you

21    don't know, that's one thing.

22        A.   You are right.  I don't remember whether they

23    were or not.

24        Q.   Did Dr. Isenberg attend all of the ad hoc

25    committee meetings?

HANNAH KAUFMAN & ASSOCIATES, INC.

1    important.  Does it surprise me he would show up at the

2    meetings when this is probably the most important thing

3    that happened during his presidency?  I don't know

4    everything that happened in his presidency, obviously.

5    It's not surprising.

6         And similarly, when -- when I had that

7    fiduciary responsibility, I felt the same burden.  That

8    is, there was a physician whose livelihood was put at

9    risk, and plus the issue of patients being potentially

10   irreversibly harmed, I had to be on top of what was

11   going on.  Obviously I wasn't the only one, because

12   if -- that's why I appointed an ad hoc committee.  But I

13   think that that would be his fiduciary responsibility to

14   do that in order to do an adequate job.

15        Q.   Well --

16        A.   Now whether he was at every meeting, I don't

17   remember.

18        Q.   Fair enough.  Did he simply attend the ad hoc

19   committee meetings or did he speak at them?

20        A.   He spoke.  I can't tell you what he said, but

21   he spoke.

22        Q.   When you attended ad hoc committee meetings as

23   the president of the medical staff, did you speak at

24   those meetings?

25        A.   Yes.  Although I tried to limit it.

DEPOSITION OF BARRY HORN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q.   Why?

2      A.   Because it's easy for a chief of staff to

3   suppress discussion.  You don't want to do that.  You

4   want to encourage discussion and opinion, and

5   potentially disparate opinion.  And it's very easy as

6   the chief to inhibit that.

7          So I guess you can see, I'm not a bashful

8   person, and I have opinions, and I'm willing to express

9   my opinions.  But when I was medical staff president, I

10   tried to temper that to allow other people to express

11   their opinions and then come in later with my opinions.

12          So that -- I mean that was just my style as

13   medical staff president, which is very different than I

14   would act as an ad hoc committee member or as a member

15   of the medical executive committee in general or as a

16   member of the board of trustees.  So I behave as a

17   member of the board of trustees very differently than I

18   would behave if I was the president of the board of

19   trustees.

20      Q.   Now, something different happened than how you

21   handled it in Dr. Ennix's case.  Dr. Isenberg went to

22   all or almost all of the ad hoc committee meetings and

23   he spoke at them.  That influenced the process, didn't

24   it?

25          MS. McCLAIN:  Objection.  Compound.

DEPOSITION OF BARRY HORN, M.D.

101

HANNAH KAUFMAN & ASSOCIATES, INC.

1        THE WITNESS:  You know, I don't have any

2    specific recall, but I would be hard-pressed to conclude

3    that he would not have had an impact on decisions we

4    made.

5        MR. SWEET:  Q.  At the point you realized that

6    there was going to be a vascular surgeon,

7    anesthesiologist, and a pulmonologist on the ad hoc

8    committee evaluating the patient care activities of a

9    cardiac surgeon, why didn't you insist that either a

10   cardiac surgeon or a cardiologist be a member of the ad

11   hoc committee?

12       A.   If the cardiac surgery department were

13   structured like the general surgeons where there were

14   multiple surgeons involved, then I probably would have

15   asked -- it wasn't my decision to make, but I would have

16   asked why there wasn't a cardiac surgeon involved.  From

17   the standpoint of cardiology, I'm not sure it made any

18   difference.  We had opportunity to get the opinion of

19   cardiologists anyway, to whatever extent we wanted them.

20       Q.   Did that issue concern you at all --

21       MS. McCLAIN:  Objection.  Vague.

22       MR. SWEET:  If I could finish my question.

23       THE WITNESS:  Which issue?

24       MR. SWEET:  Q.  That there was no cardiologist

25   or cardiac surgeon on this ad hoc committee?

DEPOSITION OF BARRY HORN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   Who wrote the ad hoc committee report that was

2  forwarded to the MEC?

3    A.   I don't remember.  It wasn't me.  I

4  participated in its editing.

5    Q.   Okay.  Let's talk about the editing then.  How

6  did that go?

7    A.   What do you mean how did it go?

8    Q.   Well, what needed to be edited?

9    A.   I don't remember.

10   Q.   How many drafts were there?

11   A.   I don't remember that either.

12   Q.   Where are the drafts?

13   A.   I have no idea.

14   Q.   Did you keep the drafts?

15   A.   No.  I have nothing on -- except what I was

16  given yesterday.

17   Q.   Were they e-mailed to you?  The drafts?

18   A.   No.

19   Q.   How did you receive them?

20   A.   In print form.

21   Q.   From who?

22   A.   When I came to the meetings.

23   Q.   So did all of the editing take place

24  physically at the meetings, or have I drawn an improper

25  conclusion?

DEPOSITION OF BARRY HORN, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1          A.   Well, the concepts of the editing occurred at

2    the meetings.  Who actually wrote the change in words, I

3    can't tell you.

4          Q.   Did the lawyer write the report?

5          A.   I don't know.

6          Q.   But you definitely did not?

7          A.   I did not.

8          Q.   You didn't, and Lamont Paxton didn't.  You

9    don't know who did.  Did Dat Ly write it?

10         A.   I doubt it.

11         Q.   So the lawyer wrote it.

12         A.   Well, I don't know who wrote it.

13         Q.   Okay.  How many drafts were there?

14         A.   I don't remember.

15         Q.   Was there more than one draft?

16         A.   I'm sure there was more than one draft.

17         Q.   Were the edits substantive?  Do you recall

18   anything about the edits?

19         A.   No.

20         Q.   Were they suggested by the lawyer?

21         A.   Not that I can recall.

22         Q.   Were they suggested by a cardiac surgeon?

23         A.   No.  There was no cardiac surgeon involved in

24   the editing.

25         Q.   Was anyone involved in the editing other than

DEPOSITION OF BARRY HORN, M.D.

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _15th_ day of _January_, _2008_.

_Nina V. Carbone_
Certified Shorthand Reporter
CSR No. _8249_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

COYNESS L. ENNIX, JR., M.D., as
an individual and in his
representative capacity under
Business & Professions Code
Section 17200 et seq.,

        Plaintiff,

   vs.                 No. C 07-2486

RUSSELL D. STANTEN, M.D., LEIGH
I.G. IVERSON, M.D., STEVEN A.
STANTEN, M.D., WILLIAM M.
ISENBERG, M.D., Ph.D., ALTA
BATES SUMMIT MEDICAL CENTER and
DOES 1 through 100,

        Defendants.

_____/

CERTIFIED COPY

CONFIDENTIAL

CONFIDENTIAL

DEPOSITION OF:

BARRY HORN, M.D.

VOLUME II

Friday, January 18, 2008

Reported by:       HANNAH KAUFMAN & ASSOCIATES

Gina V. Carbone    Certified Shorthand Reporters

CSR NO. 8249      472 Pacheco Street

               San Francisco, CA  94116

               (415) 664-4269

HANNAH KAUFMAN & ASSOCIATES, INC.

1  just give you my impression.  He was very uncomfortable.

2      Q.  At the bottom of the second page of this

3  document, there is a short discussion about data.  The

4  last -- well, not the last line, but the last paragraph

5  before that.

6      A.  Yes.

7      Q.  And Dr. Kahn tells you he's hesitant to accept

8  this if the risk is stratified.  Do you see that?

9      A.  Right.

10     Q.  What does that mean?

11     A.  I don't remember.

12     Q.  Was he expressing to you that maybe in his

13  opinion the statistics were not significant?

14     A.  I don't remember.  You would have to ask him.

15     Q.  If he was, is that something that the -- your

16  final report should have reflected, that the cardiac

17  surgeon came before you and was questioning the value of

18  the statistical evidence you relied on?

19         MS. McCLAIN:  Objection.  Calls for

20  speculation.  Lack of foundation.

21         THE WITNESS:  I don't.  I don't know now what

22  data he was shown.

23         MR. SWEET:  Q.  At this -- comfortable or

24  what, Dr. Kahn told you that Dr. Ennix was not below the

25  standard of care in the minimally invasive cases,

DEPOSITION OF BARRY HORN, M.D.

STATE OF CALIFORNIA

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting; that thereafter, the witness was given an opportunity to read and correct the deposition transcript, and to subscribe the same; that if unsigned by the witness, the signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand the _30th_ day of _January_, _2008_.

_Nina V. Carbone_
Certified Shorthand Reporter
CSR No. _8249_