# EXHIBIT AA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D.,
as an individual and in his
representation capatcity under
Business & Professions Code
Section 17200, et seq.,

          Plaintiff,

vs.                  Case No. C 07-2486

RUSSELL D. STANTEN, M.D.,LEIGH
I.G. IVERSON, M.D., STEVEN A.
STANTEN, M.D., WILLIAM M.
ISENBERG, M.D., Ph.D., ALTA
BATES SUMMIT MEDICAL CENTER and
DOES 1 through 100,

          Defendants.

————————————————————————/

Exhibits Bound
Separately

CERTIFIED COPY

CONFIDENTIAL

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF

NEIL SMITHLINE, M.D.

SAN FRANCISCO, CALIFORNIA

February 11, 2008

REPORTED BY:

RICHARD M. RAKER, CSR NO. 3445

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.   Now, tell me a little bit about your

2   practice.  What is a nephrology practice?

3    A.   Well, my typical life would be spending

4   mornings in the hospital, in the intensive care unit,

5   taking care of very sick patients who had kidney

6   failure, which is a complication that follows major

7   surgery or severe infections or other adverse -- or a

8   series of adverse events that can happen.

9         And my afternoons were typically in the office

10   where I saw a mixture of nephrology patients and

11   internal medicine patients.

12    Q.   And when you say "taking care" of

13   patients in the hospital, what did that involve?

14   I know it's a broad question.

15    A.   It would mean evaluating them, examining them,

16   writing orders, managing their dialysis, managing their

17   multiple medications which frequently have to be

18   modified in the face of kidney problems.

19    Q.   Did you ever perform surgery?

20    A.   I've done closed-needle biopsies, but never

21   open surgery.

22    Q.   I think I know, but what is a

23   closed-needle biopsy?

24    A.   Well, it's a procedure on kidneys or livers

25   where you put a needle in through the skin, and you --

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  it has a cutting edge and it takes out a little piece

2  of tissue.

3      Q.   But you've never had -- you've never

4  performed surgery where you've had to make an

5  incision?

6      A.   Not on -- well, in medical school I did, but

7  not when I was in practice.

8      Q.   What background, if any, do you have in

9  cardiac surgery?

10     A.   Well, my background, I guess, in cardiac

11 surgery is certainly not in the operating room, but I

12 would say around several aspects.

13         One, evaluating indications for cardiac

14 surgery, and secondly, because we've done lots of case

15 reviews around cardiac surgery over the years, I guess

16 you would call it on-the-job training from having had

17 many discussions with cardiac surgeons about what

18 constitutes proper care and what are issues that may or

19 may not constitute proper care.

20     Q.   Let me go back to something.  You said

21 among the things that you had been doing at the

22 same time you were a nephrologist was you said you

23 were the president of an IPA.

24     A.   Yes.

25     Q.   What did you mean by that?

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.   Well, an IPA is an independent physician's

2   association, and at the time -- this was the early '80s

3   when HMOs were just beginning to play a role in

4   healthcare in the United States -- the requirements

5   were you needed a physician corporation to contract

6   with the HMOs to provide care, and so a group of us set

7   up an IPA, and at that time, I was the president of it.

8      Q.   The on-the-job training you were

9   referring to in cardiac surgery, the job that you

10   were involved in at that time was as an outside

11   reviewer?

12      A.   Yes.

13      Q.   Okay.  Let's go back to when you were

14   practicing medicine.  What experience, if any, did

15   you have with cardiac surgery?

16      A.   Well, I would take care of a lot of

17   postoperative cardiac surgery cases if they had kidney

18   problems, and the surgeons in our institution, some of

19   them, at least, were not particularly fond of

20   postoperative care, so a lot of that would end up in my

21   lap or my partners' laps.

22      Q.   Have you ever been in an operating room

23   during a cardiac surgery procedure?

24      A.   No.

25      Q.   What training, if any, have you ever

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  received in cardiac surgery?

2        MR. VANDALL:  Objection; vague.

3        THE WITNESS:  Am I supposed to answer?

4        MR. VANDALL:  (Nods head.)

5        THE WITNESS:  What I described before.

6  BY MR. EMBLIDGE:

7    Q.   Okay.  Apart from the -- what you called

8  on-the-job training --

9    A.   Right.

10    Q.   -- as an outside consultant, have you had

11  any training in cardiac surgery?

12        MR. VANDALL:  Objection; vague.

13        THE WITNESS:  Well, in medical school I had

14  some rotations through surgery where cardiac surgery

15  was part of that, yes.

16  BY MR. EMBLIDGE:

17    Q.   Since medical school and before becoming

18  an outside consultant, did you have any training

19  in cardiac surgery?

20    A.   No.

21    Q.   What about cardiology?  Any training in

22  cardiology since medical school?

23    A.   Yes.

24    Q.   What?

25    A.   Well, my residency there was a large part of

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.   Sometimes it's a medical group, but most of

2   the time it's a hospital.

3      Q.   What percentage of time is it a medical

4   group?

5      A.   Ten.

6      Q.   Do you ever do work on behalf of an

7   individual physician who's under scrutiny by a

8   hospital?

9      A.   We would, just -- well, I don't think anyone

10  has requested us to do that.

11     Q.   So you've never done that?

12     A.   Correct.

13     Q.   Have you ever done any work for Summit

14  Hospital before Dr. Ennix?

15     A.   Yes.

16        MR. VANDALL:  Objection.

17  BY MR. EMBLIDGE:

18     Q.   How many -- do you call them cases

19  or --

20     A.   Well, I think it was one physician.

21     Q.   Okay.  So you call it an assignment or a

22  case or a matter, or what do you --

23     A.   Engagement --

24     Q.   Engagement.

25     A.   -- I guess.

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1   anesthesiologist who has specific training, et cetera.

2        So it's really on a case-by-case basis based

3   on the nature of the practice, the type of cases we

4   get.

5      Q.   And are there cases like this one where

6   sort of midstream you decide you need some

7   additional specialty input?

8      A.   I think -- excuse me.  When we run up against

9   a question we can't answer and there is conflicting

10  opinions, then absolutely we'll try and bring in an

11  additional reviewer to answer -- you know, let's get a

12  third pair of eyes on -- you know, we're talking about

13  this -- I suspect -- you're saying this case may --

14  around Dr. Ennix cases where I believe we brought in an

15  extra cardiologist to review some of the angiograms.

16     Q.   In the report-writing process, what role

17  do you play personally?

18     A.   I do most of the drafting, and then when it

19  gets to be in pretty good shape, it gets peer-reviewed

20  internally by other people at Mercer.

21     Q.   And the individual reviewers, they fill

22  out worksheets, correct?

23     A.   Yes.

24     Q.   And sometimes do you cut and paste the

25  prose from the worksheets right into the review?

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1      A.    Typically I'll start that way.

2      Q.    And then you'll adjust that language to

3    make it more grammatically readable.  Is that

4    fair?

5      A.    Yes.  And also -- for several years --

6      Q.    What are those?

7      A.    One is that often the people reading this are

8    not of the same specialty.

9           So that in the case of a cardiac case, the --

10   if it's in a fair hearing process at the hospital, it

11   may be an orthopedic surgeon and an obstetrician,

12   et cetera.  So trying to put the language and explain

13   things that would not -- that would be obvious to

14   another cardiac surgeon but not obvious, perhaps, to an

15   obstetrician or an internist or a family practitioner.

16          And also in that process, it gets -- the

17   language gets adjusted based on the phone calls and

18   emails back and forth with the reviewers.

19     Q.    What role do others in the process play

20   in the writing of the final report?

21     A.    Well, Suzanne and Jennifer do a lot of fact

22   checking.  Suzanne probably more so will go back -- you

23   know, there were issues, and I guess in this particular

24   case there was one case where there is a question of

25   timing after surgery and what happened at 7:30 and at

DEPOSITION OF NEIL SMITHLINE, M.D.

1              AFTERNOON SESSION

2

3        (Exhibit No. 1301 was marked for

4    identification by the reporter.)

5              MR. EMBLIDGE:  Back on the record.

6        Q.  Dr. Smithline, I've handed you what's

7    been marked as Exhibit 1301.  Do you recognize

8    this document?

9        A.  Yes.

10        Q.  So let's start with the beginning.  Does

11    this indicate that the first contact you had

12    regarding Dr. Ennix was the phone call from

13    Dr. Isenberg and Mr. Shulman on December 22, 2004?

14        A.  Let me take a look here.  I believe it is.

15    Yes.

16        Q.  And are these notes that you took?

17        A.  Yes.

18        Q.  Tell me how that works.  Do you keep a

19    running journal or something as a Word document on

20    your computer or --

21        A.  Sometimes frequently when I -- a new client

22    will start up, rather than keeping notes on a yellow

23    pad or -- I'll do them on a computer.

24        Q.  And so is this a computer -- do you have

25    a home office, or do you work out -- do you have

HANNAH KAUFMAN & ASSOCIATES, INC.

1  there.

2      Q.   And so to see if there is a pattern

3  there, wouldn't you want to look at a random

4  sample of cases rather than a biased selection?

5      A.   We would want to look at a random selection to

6  see if there is a problem.  We'd want to look at the

7  cases that fell out to see if, in these cases that

8  appear to have bad outcomes, is there a contributory

9  pattern of care.

10     Q.   You had no input into which cases were

11  selected to send to you, correct?

12     A.   Yes.  That's correct.

13     Q.   Now, the STS is the Society of Thoracic

14  Surgeons, right?

15     A.   Yes.

16        MR. EMBLIDGE:  Off the record for a second.

17        (Counsel went off the record.)

18  BY MR. EMBLIDGE:

19     Q.   The STS data, that is data compiled in

20  large volume and statistically analyzed, correct?

21     A.   Yes.

22     Q.   Is that similar to the CCORP data that's

23  compiled in California?

24     A.   It goes into much more depth and asks many

25  more specific questions.

DEPOSITION OF NEIL SMITHLINE, M.D.

1     Q.   Well, the CCORP data is really to CABG

2   mortality, right?

3     A.   Yes.

4     Q.   And that is data that one would look at

5   to see if one was falling out.

6     A.   Yes.

7     Q.   Okay.  So -- where were we?

8          After you got this letter, referring to

9   Exhibit 1303 --

10    A.   Yes.

11    Q.   -- did this letter go to anyone on your

12   team other than you?

13    A.   I'm sure it went to Suzanne and Jennifer.

14    Q.   And what about to the reviewers?

15    A.   I don't recall.

16    Q.   Would that be typical?

17    A.   What would be typical would be we would

18   transmit to them the -- either verbally or in writing

19   the kinds of issues that were raised here.

20    Q.   Okay.  So the concerns raised in

21   Exhibit 1303, you conveyed those concerns to the

22   reviewers either in writing or over the phone?

23    A.   Well, let me look and see.  Sometimes we're

24   asked to convey them, sometimes we're asked not to

25   convey them.  Yes.  "Please provide a copy of this

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.    Only that sometimes they are in these kind of

2    instances.

3    Q.    Okay.  Could you go to the next page,

4    please.

5    A.    (Witness complies.)

6    Q.    Under "Timeframe," it says you will

7    mutually determine the time frame.  Do you recall

8    if at any point you did?  I mean, was there a

9    deadline set, a deadline requested?

10    A.    I don't recall.

11    Q.    And the hourly rates on this page, those

12    are the hourly rates that you agreed to charge the

13    hospital, correct?

14    A.    Well, to the best of my knowledge.  As I say,

15    Jennifer Herman takes care of those kinds of issues.

16    But given that they're in the contract, I would say

17    yes, those are the ones that were mutually agreed on.

18         MR. EMBLIDGE:  As 1305, let's mark a January

19    17th email.

20         (Exhibit No. 1305 was marked for

21    identification by the reporter.)

22    BY MR. EMBLIDGE:

23    Q.    This is an email that appears to be from

24    Dr. Isenberg to you, Dr. Smithline.  And it

25    says -- I'm sorry -- from you to Dr. Isenberg --

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1   that says, "One of your notes mentions STS data,

2   but we have not received that yet."

3        My first question is, what does that mean,

4   "one of his notes"?  Did he send you notes, or how did

5   you get notes from Dr. Isenberg?

6        A.   Well, it may be I was referring to my notes

7   here from that that you showed me before from the

8   December 22nd call.  And I don't recall specifically if

9   he had sent a note or if in this letter -- where is

10  that letter that I looked at a few minutes ago?

11       Q.   Right there.

12       A.   This one -- he mentioned the STS data.  "Is

13  this table perhaps from the STS data?"  "Yes."  So I

14  don't know if he meant -- I guess I was asking is there

15  anything beyond this that he was referring to that he

16  planned to say.

17       Q.   Why would you want something beyond that?

18       A.   Well, because we were asked to evaluate a

19  practitioner, and if there was more data, we'd want to

20  take a look at it.

21       Q.   The more data, the better able you are to

22  make conclusions, correct?

23       A.   Yes.

24       Q.   Did you receive any STS data other than

25  that one page attached to the January 4th letter,

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  as best you can recall?

2     A.   Not that I recall.

3     Q.   Did Dr. Isenberg send you notes in any

4  way?

5     A.   Like emails.  I don't -- you know, whatever is

6  in the email trail.

7     Q.   Okay.  So did you receive -- I'm still

8  curious about that sentence that says "one of your

9  notes."  Did you receive information from

10  Dr. Isenberg other than in your phone

11  conversations with him or in emails that he sent

12  you?

13    A.   No.  Well, there were letters, you know, like

14  this letter.

15         MR. VANDALL:  While you mark that exhibit, I'm

16  going to run to the restroom, if that's okay.

17         (Exhibit No. 1306 was marked for

18  identification by the reporter.)

19  BY MR. EMBLIDGE:

20    Q.   I've shown to you what we've marked as

21  1306.  It's a January 18th fax cover sheet.  This

22  appears to be the same data that you received with

23  the cover letter on -- but I guess you've already

24  answered my question.  This is all you remember

25  receiving as far as STS data; is that right?

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  was it read properly, those kinds of things.

2      Q.   In the next paragraph, it says, "Mercer

3  would like a pretty fast turn around."

4          Given that this is in February and you haven't

5  talked to Dr. Ennix yet and that your final report

6  wasn't produced until May, what was the need for a fast

7  turnaround at this point?

8      A.   Well, I don't remember specifically, but --

9  but typically where we're trying to get these reports

10 out as quickly as we can to the hospital.  And I think

11 a large part of -- I think that last month was

12 scheduling the calls with Dr. Ennix and setting up

13 those dates.  And as I mentioned, we had to reschedule

14 one or maybe two.  I don't recall.  And -- so, you

15 know, our goal was to get them turned around quickly.

16     Q.   You don't remember any particular time

17 constraint at the end of February; is that

18 correct?

19     A.   I do not.

20         MR. EMBLIDGE:  As 1313, a February 24th email.

21         (Exhibit No. 1313 was marked for

22 identification by the reporter.)

23 BY MR. EMBLIDGE:

24     Q.   Who is Christy Moynihan?

25     A.   She is a health services researcher, slash,

HANNAH KAUFMAN & ASSOCIATES, INC.

1  statistician person we work with.

2      Q.   And so you've worked with her -- you had

3  worked with her frequently prior to this Ennix

4  report?

5      A.   I would not say frequently, but maybe on two

6  or three occasions.

7      Q.   And what kind of assignments had she had

8  on those other occasions?

9      A.   I don't recall.  You know, where we needed

10 statistical support or analysis.

11     Q.   That's what I was getting at.  She's

12 someone you hired for statistical analysis?

13     A.   Yes.

14     Q.   And why did you conclude that you needed

15 statistical analysis in the Ennix matter?

16     A.   Well, I might -- my recollection is not great,

17 but by looking at this email, I think we wanted someone

18 else to take a look at the work Dr. Barkin had done to

19 see if another statistician would agree with the

20 methods and/or conclusions.

21     Q.   Okay.  It says in the second paragraph,

22 at the end, that you're interested in her thoughts

23 on Ennix versus STS data.  What does that mean?

24 The "versus" thing, what does that mean?

25     A.   How does he compare to the STS database.  Does

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1  he fall outside their norm.

2      Q.   So you want to know whether he falls out

3  of the statewide average.

4      A.   Well, I don't know if it's statewide, but

5  whatever competitors STS uses for like hospitals, like

6  size, and they have different ways they slice it.

7      Q.   Did you ever talk to Christy Moynihan

8  about the Ennix matter?

9      A.   My guess is I did.

10      Q.   Do you recall any discussion with her?

11      A.   No.

12      Q.   Do you recall any report from her?

13      A.   No.

14      Q.   It says in the third paragraph here that

15  "If you," meaning Chris Moynihan, "need any other

16  STS data, we can request it from the facility."

17  Do you recall doing that or do you recall your

18  staff doing that?

19      A.   I do not.

20      Q.   Do you recall incorporating any work she

21  did into your final report?

22      A.   I don't believe we did.

23      Q.   It says she is associated -- well, have

24  you ever heard of a company called CM Research

25  Associates?

HANNAH KAUFMAN & ASSOCIATES, INC.

1  staff.  Do you agree?"  And Harry probably -- looks

2  like said yes.

3       And so when I got a correspondence directly

4  from Dr. Ennix, based on that conversation, I wanted to

5  let Bill know that he thought and I thought it was

6  probably better to have everything go through the

7  medical staff.

8       Q.   Could you go back to Exhibit 1301,

9  please.

10      A.   Yes.

11      Q.   So the top part of this reflects a

12  conversation.  Let's see if we can put that in

13  context.  Put it together with 1322.

14      A.   Okay.

15      Q.   It looks like this is a conversation you

16  had with Dr. Isenberg and Mr. Shulman on

17  February 23rd --

18      A.   Yes.

19      Q.   -- correct?

20      A.   Yes.

21      Q.   Okay.  And so on February 23rd, you knew

22  that Dr. Ennix wanted to talk to the reviewers,

23  right?

24      A.   Yes.

25      Q.   And you say here, "Harry wants to avoid

HANNAH KAUFMAN & ASSOCIATES, INC.

1  learning what he would say for the first time at a

2  fair hearing."  Does that mean that Mr. Shulman

3  told you that one of the reasons he was in favor

4  of Dr. Ennix talking to the reviewers is so that

5  he would have a preview of what Dr. Ennix's

6  defense would be at a fair hearing?

7     A.   I would say that was one of the three purposes

8  stated in that paragraph.

9     Q.   And that's one of them?

10    A.   And that's one of them.

11    Q.   Have you ever had a situation like this

12  come up before where the lawyer for a hospital

13  says, Let's go ahead and have the physician being

14  examined talk to the reviewers so I can get a

15  preview in case this goes to a fair hearing?

16         MR. VANDALL:  Objection; misstates the

17  document.

18  BY MR. EMBLIDGE:

19    Q.   Has that ever happened before?

20         MR. VANDALL:  Objection; incomplete

21  hypothetical.

22         THE WITNESS:  I don't know.

23  BY MR. EMBLIDGE:

24    Q.   And do you think that's a legitimate role

25  for you and your company to play in the peer

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   Right.  Beginning to write the report and
2  calls.

3    Q.   With Shulman and Isenberg, right?

4    A.   Right.

5    Q.   And then the next day, you had a call,
6  which it says "client," comma, "attorney."  Is
7  that again Isenberg and Shulman?

8    A.   Yes.

9    Q.   And then on the 25th, you had another
10 call with Isenberg and Shulman, right?

11   A.   Yes.

12   Q.   Why all the calls?

13   A.   Well, I think it's the information that we've
14 kind of talked about and went through.  Part of it may
15 have been we needed additional information.  Some of it
16 may have been those -- weren't there emails around that
17 time about beginning to have a call with Dr. Ennix?

18   Q.   Well, rather than speculating, what do
19 you recall about those phone calls?  Anything?

20   A.   Nothing specific other than the issues we
21 discussed this afternoon.

22   Q.   So you began writing the report on
23 February 22nd?

24   A.   Yes.

25   Q.   Okay.  And this month -- well, the month

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    of February, you put in about 28 hours.  Your

2    reviewers put in about 11 hours, right?

3        A.   Yes.

4        Q.   And if you look on the next page, Suzanne

5    put in over 32 hours, right?

6        A.   Right.

7            MR. EMBLIDGE:  Let's take a break.

8            (A break was taken.)

9            (Exhibit No. 1332 was marked for

10   identification by the reporter.)

11   BY MR. EMBLIDGE:

12       Q.   Okay.  Taking a look at the next invoice,

13   the April invoice for the March work, which has

14   been marked as 1332, you spent over 53 hours in

15   the case in March, right?

16       A.   Yes.

17       Q.   And your specialty reviewers continued to

18   work.  They put in about fifteen and a half hours

19   that month.

20       A.   Yes.

21       Q.   It looks like, according to their entries

22   here, that they continued to review charts and

23   fill out the online worksheets.  Right?

24       A.   Yes.

25       Q.   Now, under Ms. McCluney, it says that she

HANNAH KAUFMAN & ASSOCIATES, INC.

1   Mr. Shulman?

2      A.   Let me see.  I don't find that entry.  Oh,

3   yes.  Call with an attorney.  Got it.

4      Q.   You talked to Mr. Shulman again that day,

5   right?

6      A.   Yes.

7      Q.   Now, it says 3.9 hours.  Now, 3.9 hours

8   was comprised of talking to Mr. Shulman and

9   completing your notes from the Ennix phone call?

10     A.   Yes.

11     Q.   Can you tell me, as you sit here today,

12  about how long each of those tests took.

13     A.   Probably almost all.  It was completing the

14  notes from the phone call to Dr. Ennix.

15     Q.   Do you recall that?

16     A.   No, but that would -- that would be my

17  experience.

18        MR. EMBLIDGE:  Let's mark the May invoice as

19  1333.

20        (Exhibit No. 1333 was marked for

21  identification by the reporter.)

22  BY MR. EMBLIDGE:

23     Q.   Okay.  This is an invoice for the time

24  you spent in April, right?

25     A.   Yes, it is.

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.    And you were all the way in April, and

2    you spent about 28 hours that month on this

3    report, right?

4    A.    Yes.

5    Q.    And your specialist reviewers were still

6    doing work?

7    A.    Um-hmm.

8    Q.    You've got to say yes or no.

9    A.    Yes.

10    Q.    And you have an entry here that says

11    "call with client" for April 13th?

12    A.    April 13th?  "Call with client."  Yes.

13    Q.    In the way you make these reports, would

14    that be Mr. Shulman or Dr. Isenberg?

15    A.    It would be Dr. Isenberg.

16        MR. EMBLIDGE:  Now, let's go to the June

17    invoice, which we'll mark as 1334.

18        (Exhibit No. 1334 was marked for

19    identification by the reporter.)

20    BY MR. EMBLIDGE:

21    Q.    So this is for time you put in in May,

22    and you put in about six hours working on tests

23    relating to the final report, correct?

24    A.    Yes.

25    Q.    And while revising your report, you had

1    A.   No.  No.  So, for instance, on the overall

2   rating on this case, the deficiencies in care, they

3   said led to permanent harm.

4    Q.   So -- but here's my point.  The words,

5   "This is a case of poor judgment that led to

6   death," those are your words, right?

7    A.   Those are words that came from this --

8   numerous discussions with the reviewers.

9    Q.   If I combed through these documents, will

10   I find those words -- the phrase, "This is a case

11   of poor judgment leading to death"?

12    A.   I don't know.

13    Q.   But you felt that was a fair summary of

14   what you had gotten from the reviewers?

15    A.   Yes.

16    Q.   And so all these headings here on this

17   first page, that's something you drafted?

18    A.   I draft the reports.  Absolutely.

19    Q.   Okay.  Let's go to page 4.  Under

20   "Introduction," the beginning of the second line,

21   it says, "Peer review at the hospital had

22   identified problems in all of the cases."

23    A.   Yes.

24    Q.   On what did you base that statement?

25   You're talking about all ten cases.

HANNAH KAUFMAN & ASSOCIATES, INC.

1        THE WITNESS:  That is the same case.

2        (Exhibit No. 1344 was marked for

3    identification by the reporter.)

4    BY MR. EMBLIDGE:

5        Q.   Okay.  Now, this is -- if you look at the

6    bottom of this document, it's got a footer with a

7    date.

8        A.   Yes.

9        Q.   Was it the convention to put the date of

10   a draft in the footer?

11       A.   Sometimes.  We have several different

12   conventions we've used over the years.  We're keeping

13   track with different drafts because we have multiple

14   drafts and we want to avoid getting into divergent

15   control issues.  So I think at this time that was a

16   convention we were using.

17       Q.   So it's safe to assume that this is a

18   draft that you produced on or about February 17,

19   2005?

20       A.   Yes.

21       Q.   And you already have in here the heading

22   "Four Causes of Poor Judgment Leading to

23   Complications or Death."  Do you see that?

24       A.   Yes.

25       Q.   Why were you comfortable in reaching the

HANNAH KAUFMAN & ASSOCIATES, INC.

1  March 16th.

2      A.   Yes.

3      Q.   Is that the only reason you can think of

4  for why you left this paragraph in and, in fact,

5  edited it?

6      A.   Probably.  You know, sometimes, when we're

7  editing a document, we're editing cases 1 through 5 and

8  we don't even look at the others.  So it may be two

9  weeks more before we get back to look at the other part

10  of the document.

11     Q.   So -- I'm sorry -- if you look at

12  Exhibit 1345 and -46 and -47 --

13     A.   Yes.

14     Q.   -- you had your calls with Dr. Ennix at

15  the end of March, about the 19th and the 26th?

16     A.   Right.

17     Q.   If you look at 1345.  That is dated

18  March 16th.

19     A.   Okay.

20     Q.   I want to make sure we got that, 1345.

21     A.   Yes, I do.  It's March 16th.

22     Q.   So that was before you had the calls with

23  Dr. Ennix?

24     A.   Right.

25     Q.   Could you go to the last page.

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.   Of which one now?

2    Q.   1345.

3    A.   Yes.

4    Q.   You see right above where it says

5    "four-side letter"?  There is a sentence that

6    says, "If these pattens of care go uncorrected, it

7    is likely there will be future patient harm."

8    A.   Yes.

9    Q.   That's something you wrote?

10   A.   Yes.

11   Q.   And is that a conclusion that anyone put

12   in writing, either the cardiac surgeon reviewers

13   or the cardiologist reviewers?

14   A.   I doubt it.

15   Q.   Given that you had not yet had any input

16   from Dr. Ennix, why did you feel comfortable

17   writing such a damning conclusion?

18        MR. VANDALL:  Objection; argumentative.

19        THE WITNESS:  These were the conclusions based

20   on the information we had at the time.

21   BY MR. EMBLIDGE:

22   Q.   And you felt comfortable putting in

23   writing that Dr. Ennix was likely to cause future

24   patient harm even though you hadn't heard from him

25   yet?

DEPOSITION OF NEIL SMITHLINE, M.D.

1    A.   This was a draft that was based on the

2  information that we had, and we go through these and

3  change them as need be.  But at that point, that was

4  the conclusion.

5    Q.   Now, when you were preparing the final

6  report, you sent a draft to Dr. Isenberg and

7  Mr. Shulman to review, right?

8    A.   Yes.

9    Q.   And I think you already said that was to

10  either correct language errors or make it more

11  clear if they didn't understand what the findings

12  were or to correct any technical mistakes that

13  they might catch as far as the hospital is

14  concerned.  Right?

15    A.   Yes.

16    Q.   But not to make substantive changes.

17    A.   Yes.

18    Q.   But they did make a substantive change,

19  didn't they?

20    A.   Not that I recall.

21    Q.   Well, they -- Dr. Isenberg asked you to

22  add to the report a line explaining that not only

23  could Dr. Ennix be criticized for what you pointed

24  out but he could also be criticized with failing

25  to comply with the hospitals rules and

HANNAH KAUFMAN & ASSOCIATES, INC.

1   regulations.  Do you recall that?

2       A.   Is there -- do you have something that would

3   refresh my memory?

4       Q.   So you don't recall it?

5       A.   No, but --

6           MR. EMBLIDGE:  Let's mark as 1348 NMA

7   Document 836.

8           (Exhibit No. 1348 was marked for

9   identification by the reporter.)

10          THE WITNESS:  I think this had to do, as I

11  recall, with the late operative reports.

12  BY MR. EMBLIDGE:

13      Q.   Do you recall it now?

14      A.   Obviously, there was a communication about

15  that.

16      Q.   And in the communication, you got back to

17  the lawyer and said in a redline, What

18  Dr. Isenberg wants me to insert really wouldn't be

19  appropriate because it goes beyond clarification

20  and adds a substantive observation.  Right?

21      A.   Well, I think we said we don't have the rules

22  and regs of the hospital so that we couldn't comment on

23  those.

24      Q.   Of course, it wasn't your own

25  observation.  You hadn't concluded that there was

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1   a violation of the rules and regs, right?

2       A.   Well --

3       Q.   You're looking at the report now to see

4   if, in fact, you did include that in the final

5   report.

6       A.   We did, yes.  And at some point, it looks

7   like -- let me just read this for a second -- that

8   Dr. Ennix provided us with those rules and regulations.

9   And I don't remember why that comment is in there

10  except that -- in any event, we would have certainly

11  quoted the last line, which you know the joint

12  commission standard dictated immediately, or worst-case

13  scenario, within 24 hours, and signed within two weeks.

14      Q.   The point is, you went ahead and included

15  in your final report the substantive observation

16  that Dr. Isenberg communicated to you in a redline

17  of the report, right?

18      A.   Yes.

19      Q.   Okay.  Now, just a couple more questions,

20  and I think you can actually believe that.

21          Let me just show you, without marking it, NMA

22  5654.  You can tell me if that's your handwriting.

23      A.   I don't think so.  Some of it is.

24      Q.   And let's just look at 5823.  That's your

25  handwriting, right?

DEPOSITION OF NEIL SMITHLINE, M.D.

HANNAH KAUFMAN & ASSOCIATES, INC.

1        REPORTER'S CERTIFICATE

2

3      I, RICHARD M. RAKER, CSR #3445, Certified

4    Shorthand Reporter, certify:

5      That the foregoing proceedings were taken before

6    me at the time and place therein set forth, at which

7    time the witness was put under oath by me;

8      That the testimony of the witness and all

9    objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12     That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14     I further certify that I am not a relative or

15   employee of any attorney or of any of the parties,

16   nor financially interested in the action.

17     I declare under penalty of perjury under the laws

18   of the State of California that the foregoing is true

19   and correct.

20     Dated this 14th day of Fbruary, 2008.

21

22

23   ---------------------------------------------

     RICHARD M. RAKER, C.S.R. No. 3445

24

25

DEPOSITION OF NEIL SMITHLINE, M.D.

323