# EXHIBIT BB





# REDACTED

CONFIDENTIAL

### THE STAFF OF

## SUMMIT
MEDICAL CENTER

PRIVILEGED AND CONFIDENTIAL



January 4, 2005

Re:    Coyness Ennix, M.D.
           Cardiothoracic Surgeon
           Outside Review

Dear Dr. Smithline:

I am writing to you in my capacity as Chair of an Ad Hoc Committee that was appointed by the Medical Executive Committee of Summit Medical Center to investigate the professional performance of Coyness Ennix, M.D., a member of the Medical Staff who specializes in cardiothoracic surgery. It was at the Ad Hoc Committee's request that your company, Mercer Human Resource Consulting, Inc. ("Mercer"), was recently engaged by William Isenberg, M.D, President of the Medical Staff, to assist the Medical Staff in this matter. The purpose of this letter is to provide certain information that we hope will enhance the efficiency of Mercer's efforts and help its specialist reviewers to meet our needs. Please provide a copy of this letter to each reviewer, as you deem appropriate.

First, by way of general background, Dr. Ennix became a member of the Summit Medical Staff many years ago, but his surgical activity was largely at another medical center until 2001, when the cardiothoracic surgery program of Alta Bates Summit Medical Center was consolidated at the Summit Campus. This Medical Staff began to take an intensive interest in his practice in early 2004, following his performance of the first several minimally-invasive cardiac procedures at this facility.

We are submitting several cases and other information for Mercer's review. With each case, or group of cases, specific issues are raised for the reviewer to address. Additionally, summary data on blood and product usage, and outcomes, e.g. STS risk-adjusted mortality data for Dr. Ennix vs. comparators in his group are being provided and we would appreciate commentary and observations regarding these parameters as well.

MR# █████, █████ █████ █████
    These are the first 4 minimally-invasive cardiac surgery cases done here. Please evaluate: 1) does it appear that the appropriate background was laid with anesthesia, lab, ancillary staff, OR staff to prepare for performance of these cases; 2) is there evidence of adequate documentation of informed consent, specifically relating to "newness of procedure, and relative inexperience of surgeon;" 3) documentation of actual procedure performed—is it clear from operative note what was done; 4) OR times; and 5) patient selection.

William Isenberg, M.D., Ph.D. • Fredric Heiskowitz, M.D. • Bruce Moorstein, M.D. • Annette M. Shaieb, M.D.
*President*            *Vice-President*            *Secretary/Treasurer*        *Immediate Past President*
350 Hawthorne Avenue • Oakland, California 94609 • Telephone (510) 869-6565 • Fax 869-6107

D 2063

CONFIDENTIAL                    **REDACTED**

Dr. Smithline
Page Two

**MR#** ████ specifically: 1) patient selection and consenting (pt is a known schizophrenic); 2) what likely went wrong necessitating reoperation—could and should this have been anticipated; 3) documentation of need for reoperation.

**MR#** ████ specifically: 1) OR time, sizing of valve; 2) adequacy of operative note—is it clear that 2 different valves were sequentially placed; 3) blood product use.

**MR#** ████: specifically: 1) OR and bypass time; 2) regurg post-op; 3) neurologic deficits and death—reasonable expectations?

**MR#** ████: specifically: 1) OR time; 2) blood product usage; 3) informed consent; 4) adequacy of documentation.

**MR#** ████
57yo NIDDM with a history of MI s/p angioplasty in 1998. Had a re-CABG x3 02/2004. Remained in cardiogenic shock and died one day post-op. Issues: 1) choice of surgery; 2) consent with adequate and accurate description of risks, benefits, and alternatives; 3) outcome.

**MR#** ████
87yo underwent CABGx3 for unstable angina; complicated post-op course; post-op infections, MRSA, sepsis; difficulty weaning from respirator. Issues: 1) patient selection; 2) outcome.

**MR#** ████
63yo with hx HTN and obesity admitted with progressive angina and stress test positive for global ischemia. Pt admitted on 7/20/04 and cardiac cath showed significant triple vessel disease. Found at admission to have asymptomatic carotid bruit and was found to have 90% left common and internal carotid stenosis. Decision by surgeon to perform combined CABG and left endarterectomy on 7/23/04. Evening before scheduled surgery, pt had increasing chest pain, that resolved. Pain recurred on am of surgery and during transfer to OR. Developed asystole during dye injection of endarterectomy. Had a CABGx2 done. Heart began to fail as pt coming off bypass. Finally weaned using maximal inotropic support, but sternum was not rewired, and pt transferred to unit. That evening, pt went into Vfib and could not be resuscitated. Issues: 1) Should case have been done emergently on 7/20/04, given dx of progressive unstable angina; 2) should endarterectomy have been done in face of unstable angina; 3) was adequate documentation of decision-making and discussion of risks, benefits, and alternatives with patient apparent in the chart.

D 2064

CONFIDENTIAL                    **REDACTED**

Dr. Smithline
Page Three

MR# ▉▉▉▉▉

72yo with history of HTN, DM, and hyperlipidemia. Presented to ER with 4hr history of chest pain, nausea, vomiting; abnormal EKG demonstrated an acute inferior MI. Pt taken to cath lab, started on integrilin, cath showed severe 2-vessel disease. While waiting to go to OR, BP fell from 170 to 80, so was started on dopamine. She complained of RLQ pain and stat Hgb showed a drop from 14.2 to 10.3 with an emergent CT showing a small-to-moderate retroperitoneal hemorrhage. Pt taken for urgent CABGx3: friable right atrium, non-functioning tricuspid valve, and persistent bleeding secondary to coagulopathy. Required pressor support, developed diastolic dysfuntion and went into multiorgan system failure with mitral regurg. She died on POD#5. Issues: 1) patient selection; 2) should emergent surgery have been performed in face of unresolved retroperitoneal bleed—should pt have been stabilized from a bleeding perspective first; 3) consenting and documentation.

MR# ▉▉▉▉▉

79yo Jehovah's witness pt with 3-vessel disease on cath, underwent CABGx2 on 1/10/02. Staff anesthesiologist recommended preoperative administration of Epögen to build up pt's Hgb before surgery. Left hemiparesis on POD#1—CVA. Complicated postop course, ultimately resulting in comfort care only, and death. Issues: 1) evaluate appropriateness of proceeding as was done; 2) might some of pt's symptoms have resolved with better oxygen-carrying capacity; 3) were watershed infarcts anticipated outcomes in a pt like this.

MR# ▉▉▉▉▉

41yo with a 2day history of crushing chest pain on exertion; angiography showed 95% occlusion of left main coronary artery. Taken to OR for CABG. Case begun off bypass; however, pt's pressure fell to 65 during harvesting and attempts at dissecting IMA, so pt put on bypass. Per anesthesia, pt fibrilated while on bypass. Weaned from bypass, although process took a little longer than usual. No IABP placed. Pt taken to CPU, where in less than one hour, pt developed profound hypotension. Surgeon gone from hospital. Resuscitation begun in CPU (chest opened) by another CT surgeon. Mediastinum explored, pt placed on bypass, and IABP placed. Pt ultimately transferred to another facility for potential placement of left ventricular assist device. Pt expired at the transfer facility. Issues: 1) decision to start CABG procedure off pump in pt with significant left main disease and clinical evidence of cardiac embarrassment; 2) given complexity of case, and issues that arose intra-operatively, should IABP have been placed prior to going to CPU; 3) given complexity of case would it be expected that surgeon might have been within hospital for first hour or so post-op; 4) adequacy of consent and documentation; 5) outcome.

D 2065

CONFIDENTIAL

Dr. Smithline
Page Four

**STS Risk Predicted vs. Observed Operative Mortality**
Along with a copy of the medical records, Mercer is being given a table summarizing Dr. Ennix's STS data for operative mortality in open heart surgery cases from 1999 through 8/31/2004, and for comparative purposes, the summed data from 3 comparator surgeons for the same time period. Please evaluate and comment regarding any patterns or areas of concern.

**Blood and Blood Product Usage**
Enclosed (Table 2) is data summarizing blood and blood product usage by Dr. Ennix and his comparators for Q4/2003, Q1/2004, Q2/2004, Q3/2004. Please evaluate and comment regarding any patterns or areas of concern.

Joanne Jellin, MA, CPMSM, our Director of Medical Staff Services, will provide general assistance in connection with Mercer's review. She can be reached at (510) 869-6884. If she is not available, please ask to speak with Karen Weaver, CPMSM, at (510) 869-6748.

Mercer is invited to speak directly with Dr. Ennix regarding any issue. Ms. Jellin will be happy to put you in touch with him, if you wish. It is also possible that Dr. Ennix will take the initiative in requesting an opportunity to speak with you and/or your specialist reviewers. By copy of this letter, he is asked to make any such arrangements through the Medical Staff Office. He should not attempt to contact you directly. Similarly, if Dr. Ennix has any additional materials that he would like Mercer to take into account, such as office records, literature or comments, he is asked to submit them to Ms. Jellin, and we will arrange for Mercer to receive them.

The results of Mercer's review should be presented in a written report, addressed to me as Chair of the Ad Hoc Committee in the matter of Dr. Ennix. Please deliver it to Ms. Jellin in the care of the Medical Staff Office. Please note that Dr. Ennix will have access to it.

Mercer's report should clearly describe its review process, including a description of the documents reviewed and any discussions with Dr. Ennix or others. Mercer's conclusions regarding the quality of Dr. Ennix's professional performance should be clearly stated with reference to each case. Mercer may also include such general comments as it considers appropriate. However, we ask that Mercer not make any recommendation regarding Dr. Ennix's clinical privileges. The Medical Staff leadership will address that matter on its own, based on the contents of Mercer's report and such other information as may be available, in accordance with the Medical Staff Bylaws.

D 2066

CONFIDENTIAL

Dr. Smithline
Page Five

Thank you again for your willingness to assist us in this process. We look forward to
receiving Mercer's report.

Sincerely,

*Lamont D. Paxton MD*

Lamont Paxton, M.D.
Chair, Ad Hoc Committee

William M. Isenberg, M.D.., Ph.D.
Medical Staff President

cc:     Coyness Ennix, M.D.

D 2067

DATA: Ad Hoc Comm To Mercer Group

CONFIDENTIAL



JAN-27-2005 09:02  FROM:SUMMIT MEDICAL STAFF 510 869 6107    TO:96557709    P:2/3



OHS Blood Utilization by Provider

CONFIDENTIAL

D 2069

# EXHIBIT CC

**CONFIDENTIAL**

Memo of TC to Steven Stanten  02/24/04
Minimally Invasive CT Surgery, CE

Spoke with SS after Officers this AM and long phone discussion with Bruce Moorstein this afternoon re: evaluative process for minimally-invasive CT surgery. Told SS that we were going to follow his recommendation of having an internal review first; however, instead of it being done in the format of all the CT surgeons from TPMG and "the group" sitting around the table, SS should ask one of the CT surgeons from TPMG to review all 4 charts confidentially and report back to SS.  SS should make it known to the reviewer that the report will be going directly to SS and ultimately to the Officers.  Only in the case of refusal by TPMG physicians to review these cases would we consider directly going to outside review.  This done at persuasive recommendation of Dr. Moorstein that 1) don't want to set precedent of primarily going to outside review when a new procedure potentially has quality issues, and 2) don't want to give impression that we are circumventing internal peer review process.



# EXHIBIT DD

**CERTIFIED COPY**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX, JR., M.D.,          )
                                      )
                    Plaintiff,        )
                                      )
        vs.                           )  Case No. C 07-2486 WHA
                                      )
ALTA BATES SUMMIT MEDICAL CENTER,     )
                                      )
                    Defendant.        )
_____ )

C O N F I D E N T I A L

DEPOSITION OF LELAND B. HOUSMAN, M.D., F.A.C.S., F.A.C.C.

January 23, 2008

256842





(212) 808-8500 New York          (310) 207-3600 Los Angeles    (949) 955-0400 Irvine      (415) 433-5777 San Francisco
(702) 366-0500 Las Vegas         (858) 455-5444 San Diego      (951) 686-0696 Riverside   (760) 322-2240 Palm Springs
                                                               (408) 885-0550 San Jose    (818) 702-0202 Woodland Hills

1    different way.

2            What I'd like to know is in the Ennix case you

3    were presented with, I think, five charts or five cases.

4    Right?

5        A    Yes, sir.

6        Q    And when you received those, did you know that

7    the hospital had identified problems in all five of

8    those cases?

9            MS. IMARA:  Objection.  Calls for speculation,

10   lacks foundation.

11           THE WITNESS:  Absolutely not.  I didn't know

12   anything about the hospital until this week when I got

13   this.

14   BY MR. SWEET:

15       Q    Okay.  So what did you think the five charts

16   were about?  I mean --

17           MS. IMARA:  Objection.  It's vague and

18   ambiguous.

19           THE WITNESS:  Well, somewhere out in the great

20   ether, somebody asked Mercer to look at some charts.

21   BY MR. SWEET:

22       Q    So I'm clear, your testimony is at no time

23   before last week when you reviewed this May 5th, 2005,

24   document, the Alta Bates Summit Medical Center Focus

25   Review, May 3rd, 2005, at no point prior to your review

30

1    of that last week did you know that the hospital had

2    identified problems in these five cases?

3            MS. IMARA:  Objection.  It's vague.

4            MR. BARTON:  Yeah, and it does misstate and it

5    is vague.

6            But you can answer the question.

7            THE WITNESS:  That's correct.  And just for

8    clarification, I received this -- I remember correctly

9    now.  I received it Monday morning of this week.

10   BY MR. SWEET:

11       Q    Okay.  At any point before Monday morning,

12   which was January 21st, 2008, did Neal Smithline

13   communicate with you in any way that the hospital had

14   concerns about the five cases you were reviewing?

15           MR. BARTON:  Vague and uncertain.

16           But you can answer.

17           MS. IMARA:  Objection.  It's vague.

18           THE WITNESS:  Could you read that back.

19           (Record read)

20           MS. IMARA:  Objection.  Also lacks foundation.

21           THE WITNESS:  Yeah.  I don't believe so.

22   BY MR. SWEET:

23       Q    What about anybody else at Mercer?  The same

24   question:  Did anybody at Mercer communicate with you

25   that the hospital had concerns about these five cases?

31

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.

BARKLEY

1          A     No, sir, and that's the nice thing about

2     Mercer.  We work in a vacuum.  We don't know who sends

3     the charts, who asks for them, why they ask for them.

4     It's literally they arrive in a box.  And also in that

5     box is the electronic form, you know, to answer, and you

6     answer it online.  I think early on we had to return the

7     form; now we can do it online.  And so I had no idea

8     that anyone else had reviewed it.

9          Q     As a Mercer reviewer, how many times have you

10     rendered an opinion voicing your opinion that the

11     physician did not fall below the standard of care in the

12     cases you were reviewing?

13               MR. BARTON:  It's vague.

14               MS. IMARA:  Objection.  It's vague and

15     ambiguous.

16               THE WITNESS:  If I understand the question,

17     I'll try and answer it in charts.  If they send me five

18     or ten charts to review of a physician, it's not

19     uncommon until this case to find, you know, maybe four

20     or five of them that were fine or that I didn't find any

21     problem with.  So that's not uncommon.

22     BY MR. SWEET:

23          Q     Are you saying that this is the only case that

24     you've done work for Mercer where you found problems or

25     errors in all five cases, all the cases they sent you?

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.                    **BARKLEY**

1    different than other Mercer reviews you were involved

2    in?

3            MS. IMARA:  Objection.  It's vague.

4            MR. BARTON:  It is vague.

5            You can answer.

6            THE WITNESS:  No, sir.

7    BY MR. SWEET:

8        Q    And can you describe what these electronic

9    forms are?  These are the worksheets.  Correct?

10       A    Right.

11       Q    And what are they and how do they work?

12       A    I believe it's a Word document.  And you go to

13   a Website, and you sign in with your number, and then

14   you fill it out electronically.  And at the last page it

15   says "Send," and you send it.

16       Q    And do you know who it goes to?

17       A    No, sir.

18       Q    Do you know who created the worksheets?

19       A    No, sir.

20       Q    Did you have any input in creating the

21   worksheets?

22       A    No, sir.

23       Q    Do you feel those worksheets are sufficient to

24   cover all different types of cardiac surgery

25   evaluations?

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.    BARKLEY

1          MS. IMARA:  Objection.  It's vague and

2    ambiguous.

3          MR. BARTON:  Lacks foundation.

4          THE WITNESS:  Well, the ones I've seen have

5    been adequate.  They have different ones for coronary

6    surgery, valve surgery, you know.

7    BY MR. SWEET:

8      Q    Okay.  Did you write a report in this case?

9      A    No, sir.

10     Q    Did you edit any drafts of reports in this

11   case?

12     A    No, sir.

13     Q    Did you review any drafts of reports in this

14   case?

15     A    No.  I never saw the report till Monday

16   morning.

17     Q    So you were never sent literally a draft of

18   this report for your review.

19     A    No, sir.  I've never been sent anything like

20   that from Mercer.

21     Q    Does that mean that you did not edit any drafts

22   in this case?

23     A    Correct.

24     Q    Do you know who wrote the final report, the

25   May 3rd, 2005, report?

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.      BARKLEY

BARKLEY

1      A    No, sir.

2      Q    Did you ever sign it?

3      A    Not to my knowledge.  Like I said, I think the

4  first time I ever saw it was this week.

5      Q    When you do your expert testifying, not in the

6  Mercer context, tell me if this is accurate.  You're

7  hired to render your expert opinion.  Correct?

8      A    Yes, sir.

9      Q    And then you, Dr. Housman, render the opinion

10  either in a deposition or court testimony or in a

11  declaration of some sort.  Right?

12      A    Correct.

13      Q    Have you ever in the non-Mercer context

14  rendered your expert opinion to a third party who then

15  expressed your opinion to somebody else?

16         MS. IMARA:  Objection.  That's compound, and

17  it's vague and ambiguous.

18         MR. BARTON:  And it lacks foundation.

19         You can answer.

20         THE WITNESS:  I have no idea what you're

21  talking about.

22  BY MR. SWEET:

23      Q    Well, do you understand what I'm saying?

24      A    No.

25      Q    In the Mercer situation it appears that you

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.

1  BY MR. SWEET:

2      Q    Okay.  Did you agree after that report came out

3  to no longer do bypass operations?

4      A    No.

5      Q    Did you tell a newspaper reporter that you were

6  no longer going to perform bypass operations?

7      A    Well, that's not to -- yeah, because I had

8  planned to stop doing cardiac surgery anyway.  It had

9  nothing to do with the report.

10     Q    Okay.  Did you stop doing cardiac surgery after

11  this report came out?

12     A    Not immediately, no.

13     Q    Did you at some point?

14     A    Right.

15     Q    When?

16     A    I think it was sometime the first quarter of

17  2007.

18     Q    Why?

19     A    I'd just been doing it a long time, been on

20  call since 1966.  I decided that I would just do

21  something else.

22     Q    So since -- I'm sorry.  It's late, and I

23  apologize.

24         You said in the first quarter of 2007 you

25  stopped doing cardiac surgery?

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.

BARKLEY

1    patient with a mental disease such as schizophrenia?

2        A    Yes, sir.

3        Q    Can you imagine circumstances that you do not

4    need a psychiatrist to assist with that consent?

5            MS. IMARA:  Objection.  Calls for speculation.

6            THE WITNESS:  I personally cannot imagine that.

7    I think one would be open to criticism in the area of

8    informed consent if you had somebody with a psychosis

9    and all you relied on was a standard permit, operative

10   permit.

11   BY MR. SWEET:

12       Q    Didn't Dr. Ennix tell you that this patient's

13   care provider was present during the informed consent

14   conversation?

15       A    I don't recall the details of the conversation

16   with Dr. Ennix.

17       Q    Would that have made a difference to you?

18       A    It might have made a difference, yeah.  By the

19   time we talked with Dr. Ennix, though, I had already

20   submitted this.  And it's not -- this was my opinion

21   from chart review only.  If Dr. Ennix had some other

22   information, then he could communicate it to people

23   other than myself.

24       Q    Well, I mean, hold on a second.  You submitted

25   these online reviews without talking to Dr. Ennix, but

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.          BARKLEY

BARKLEY

1    then you did talk to him later, didn't you?

2        A    Yes.

3        Q    And then are you saying you expressed no

4    opinion whatsoever about any of these cases after your

5    conversation with Dr. Ennix?

6            MS. IMARA:  Objection.  Lacks foundation.  It's

7    argumentative.

8            THE WITNESS:  I listened to what he had to say.

9    BY MR. SWEET:

10       Q    Did that affect your evaluation in any way?

11       A    I don't think it did.

12       Q    So you didn't amend any of your conclusions?

13       A    That's correct.

14       Q    Okay.  Do you recall -- I think I asked you

15   this, but I don't know that I got an answer.  You said

16   there's no good evidence that they were able to obtain a

17   fully informed consent.  That suggests to me there was

18   some evidence, it just wasn't very good.  Do you recall

19   what the some evidence was?

20           MS. IMARA:  Objection.  Lacks foundation.

21           THE WITNESS:  I said, you know, to me that

22   means there was no evidence, "good" just modifying the

23   word "evidence."

24   BY MR. SWEET:

25       Q    Okay.  So did you consider that his care

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.

1    provider was there?

2        A    You have to understand they sent me the charts.

3    Okay?  I reviewed the charts, and all I can comment is

4    on my chart review.  That was my job.  If Dr. Ennix or

5    Dr. Y or Dr. Z calls me up afterwards and says, Hey, I

6    did this, it ends up as a "he said/she said."  I don't

7    have any basis of fact of what he's telling me is either

8    true or not true.  You know, I'd have to see

9    documentation, and I didn't have any documentation to

10   change my opinions.

11       Q    Well, what was the purpose of talking to

12   Dr. Ennix, then?

13       A    I don't know.  Dr. Ennix asked if he could talk

14   to us, and it was a conference call with myself and -- I

15   believe Dr. Smithline and myself, and it was very

16   unusual to have that happen, you know, but we agreed to

17   talk to him.

18       Q    So basically when you submitted whatever the

19   date was that you submitted these forms on, that was the

20   end of your responsibilities related to this case.

21   Correct?

22           MS. IMARA:  Objection.  Lacks foundation.  It's

23   argumentative.

24           THE WITNESS:  That's correct.

25

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.

BARKLEY

BY MR. SWEET:

Q     Okay.  And to the extent that any conclusions were drawn different than yours regarding cases that you were working on, somebody else modified your opinions. Correct?

A     I don't know if they modified them or not.  I don't know any of that.  All I can tell you is that I was sent charts and other information, and I reviewed them and filled out the form.

Q     Is not getting a psychiatric consult below the standard of care?

A     In a psychotic patient, yes.

Q     In this patient.

A     Yes.

Q     Did you consider that there was evidence in the medical record that this patient was on the proper types of medications to cause him to be in remission?

MS. IMARA:  Objection.  Lacks foundation.

THE WITNESS:  Again, I think the national standard in a patient that's a severe schizophrenic, whether he's on treatment or not, it would behoove the surgeon or whomever is getting the informed consent to have someone there that could comment on whether the patient can give informed consent.  My opinion is that if you're a severe schizophrenic, you cannot give

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.

BARKLEY

1   informed consent.

2   BY MR. SWEET:

3       Q    If you could look at the final report, which is

4   marked 1110 in this case, and I'm sorry I'm going to do

5   this to you, I'm going to have you looking back and

6   forth between these two documents.  And if you would

7   look at page 24 of the report, please.  And at the

8   bottom of this page is the discussion of ABS-001, which

9   is the case we're discussing currently.  Correct?

10      A    Yes, sir.

11      Q    And second line from the bottom of the page,

12  the final report for Mercer reads as follows:  "The

13  patient was a severe schizophrenic and there was no

14  evidence of fully informed consent."  Do you see that?

15      A    Yes, sir.

16      Q    Why did the language from your review change

17  from "there is no good evidence" to "there was no

18  evidence" in the final report?  Do you know?

19          MS. IMARA:  Objection.  Lacks foundation, calls

20  for speculation.

21          MR. BARTON:  It's argumentative as phrased.

22          THE WITNESS:  To my way of thinking, that's the

23  same statement.

24  BY MR. SWEET:

25      Q    Did you suggest the language change from your

CONFIDENTIAL - LELAND B. HOUSMAN, M.D.          **BARKLEY**

1  report to the final report?

2    A    No, sir.  I already answered you that I didn't

3  do any of that.

4    Q    So you don't know who changed the language.

5    A    That's correct.

6    Q    Back to your evaluation, also on page 5 -- I'm

7  on the third line there after the parentheses about the

8  informed consent problem -- it says, "What went wrong is

9  not entirely clear, but it was definitely a technical

10 problem which most likely was related to the approach."

11 Do you see that?

12   A    Yes.

13   Q    What exactly was the technical problem?

14   A    Well, the problem is he didn't describe any

15 technical problem, so one just had to surmise.  But what

16 took place, again in my mind, it had to be a technical

17 problem.

18   Q    But you don't know what the technical problem

19 was.

20   A    I can probably give an educated guess.

21   Q    Well, what about based on our discussion a few

22 minutes ago where there's all these other reports that

23 could fill in the gaps if there's poor documentation?

24 Did those other reports fill in the gap in this case to

25 lead you to a conclusion what the technical problem was

63

BARKLEY

1    responsibility for this."  Do you see that?

2        A    Yes.

3        Q    Did you have a discussion with anybody at

4    Mercer about removing that parentheses statement there

5    and not including it in the final report?

6            MS. IMARA:  Objection.  Lacks foundation.

7            THE WITNESS:  No.  As I said, I've never seen

8    this report.  I've never talked to Mercer in any way,

9    shape, or form.  All I did was review charts and send in

10   a report.

11   BY MR. SWEET:

12       Q    Well, you just said you'd never talked to

13   Mercer in any way, shape, or form.  Before, you said you

14   may have.  I mean, do you know whether you talked to

15   them or not?

16       A    No.  I never talked to them in any way, shape,

17   or form about changing anything.

18       Q    I see.  I apologize.

19            If you could refer to page 14, please.

20            At the bottom you see the name Leland followed

21   by a colon?

22       A    Uh-huh.

23       Q    And then there's text which goes on for the

24   rest of page 14 through the end of the document, page

25   15.

                        117

BARKLEY

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3        Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: __February 4_____, 200_8_

10

11        _R. Denise Mullens_

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

BARKLEY

# EXHIBIT EE

Confidential Subje    o the Parties' Protective Order

1  MAUREEN E. McCLAIN (State Bar No. 062050)
   Email:  mcclain@kmm.com
2  ALEX HERNAEZ (State Bar No. 201441)
   Email:  hernaez@kmm.com
3  MATTHEW P. VANDALL (State Bar No. 196962)
   Email:  vandall@kmm.com
4  KAUFF McCLAIN & McGUIRE LLP
   One Post Street, Suite 2600
5  San Francisco, California  94104
   Telephone:   (415) 421-3111
6  Facsimile:    (415) 421-0938

7  Attorneys for Defendant
   ALTA BATES SUMMIT MEDICAL CENTER
8
                    UNITED STATES DISTRICT COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10

11

12  COYNESS L. ENNIX, JR., M.D.,            CASE NO. C 07-2486 WHA

13                      Plaintiff,          **DEFENDANT ALTA BATES
                                            SUMMIT MEDICAL CENTER'S
14        v.                                RESPONSES TO PLAINTIFF'S
                                            SPECIAL INTERROGATORIES,
15  ALTA BATES SUMMIT MEDICAL               SET ONE**
    CENTER,
16
                        Defendant.
17

18

19  **PROPOUNDING PARTY:** Plaintiff COYNESS L. ENNIX, JR., M.D.

20  **RESPONDING PARTY:**   Defendant ALTA BATES SUMMIT MEDICAL CENTER

21  **SET NUMBER:**          ONE

22

23        Defendant Alta Bates Summit Medical Center ("Defendant" or "ABSMC")

24  hereby makes the following responses (including objections) to Plaintiff Coyness L.

25  Ennix, Jr., M.D.'s ("Plaintiff") Special Interrogatories, Set One, dated August 17, 2007.

26  Each response is subject to all objections as to competence, relevance, materiality,

27  propriety and admissibility, and any and all other objections and grounds which would

28  require the exclusion of any statements contained herein, if such statements were made

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE                                              CASE NO. C 07-2486 WHA

Confidential Subje   to the Parties' Protective Order

1   by a witness present and testifying at court, all of which objections and grounds are

2   reserved and may be interposed at the time of trial.

3            It should be noted that Members of the Summit Medical Staff ("Medical

4   Staff") who have participated in peer review (either as reviewers or as a person being

5   reviewed) have done so with the expectation, established by both the Medical Staff's

6   Bylaws and California law, that the peer review material would be maintained on a

7   confidential basis and subject to the provisions of California Evidence Code Section

8   1157.  These responses, provided pursuant to the Parties' Protective Order, seek to

9   preserve such confidentiality to the extent possible, consistent with providing responsive

10  information within the parameters here set forth.  To the extent that Defendant makes

11  relevancy objections ("on the ground of relevancy" or "lacking in relevancy") in the

12  ensuing responses, those objections encompass privacy rights on the part of individual

13  medical staff members and, by extension, Medical Center patients.  Therefore, wherever

14  Defendant makes a relevancy objection hereafter, it includes an assertion of physician

15  and patient privacy relative to the information being sought.

16  **INTERROGATORY NO. 1:**

17           How many MEMBERS were on the MEDICAL STAFFS of the Alta Bates or

18  the Summit campus of Alta Bates Summit Medical Center ("ABSMC") during the period

19  of 2004 to 2006?  ("MEMBER" and "MEDICAL STAFF" have the definitions given in the

20  Bylaws of the Summit Medical Staff (June 2006) ("Bylaws"), except that both terms refer

21  to Alta Bates campus members and medical staff as well Summit campus members and

22  medical staff.)

23  **OBJECTION TO INTERROGATORY NO. 1:**

24           Defendant objects to the interrogatory on relevancy grounds to the extent

25  that it seeks information regarding the Alta Bates Medical Staff.  The peer review placed

26  at issue by Plaintiff's complaint was conducted by the Summit Medical Staff.  The Alta

27  Bates Medical Staff is distinct from the Summit Medical Staff, with separate Bylaws,

28  Rules and Regulations, officers, peer review committees, and peer review processes.

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-2-

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE                                                        CASE NO. C 07-2486 WHA

1   The physicians identified as decision-makers regarding Plaintiff's peer review are

2   members of the Summit Medical Staff.  Those decision-makers have not conducted peer

3   review for members of the Alta Bates Medical Staff.  The Alta Bates and Summit

4   campuses are separately licensed facilities with separate Medical Staff obligations for

5   the conduct of peer review.

6   **RESPONSE TO INTERROGATORY NO. 1:**

7           From 2004 to 2006, there have been approximately 800 Summit Medical

8   Staff members who hold clinical privileges each year.  Many of those persons have been

9   on the Medical Staff during the entire time period.

10  **INTERROGATORY NO. 2:**

11          How many MEMBERS on the MEDICAL STAFFS of the Alta Bates or

12  Summit campuses of ABSMC during the period of 2004 to 2006 were Caucasian?

13  **OBJECTION TO INTERROGATORY NO. 2:**

14          Defendant objects on relevancy grounds to the part of the inquiry directed

15  at the Alta Bates Medical Staff.

16  **RESPONSE TO INTERROGATORY NO. 2:**

17          Defendant is unable to answer this question.  The Summit Medical Staff

18  does not record the race of physicians.

19  **INTERROGATORY NO. 3:**

20          Please IDENTIFY each incident in the last twenty years in which a

21  MEMBER of the MEDICAL STAFFS of the Alta Bates or Summit campuses of ABSMC

22  was subject to INVESTIGATION.  ("IDENTIFY" means to designate: (a) each MEMBER

23  as provided for in the Confidentiality Stipulation and Protective Order applicable to this

24  case; (b) the MEMBER'S area of medical specialty, race and gender; and (c) the year(s)

25  of the INVESTIGATION.  "INVESTIGATION" has the meaning given in the Bylaws.)

26  **OBJECTION TO INTERROGATORY NO. 3:**

27          Defendant objects to the following portions of this interrogatory:

28

KAUFF, McCLAIN
& McGuire LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE                                                CASE NO. C 07-2486 WHA

Confidential Subje    o the Parties' Protective Order

1            1.        Information regarding the Alta Bates Medical Staff on relevancy

2    grounds;

3            2.        Information regarding the gender of Medical Staff members (which

4    is not, in any event, recorded by the Medical Staff) on relevancy grounds;

5            3.        Information covering a period of time prior to 1995 on relevancy and

6    burden grounds.  The Summit Medical Staff was established in 1992; prior to that date,

7    there were two different hospital Medical Staffs (Merritt and Providence) which were

8    merged to form the Summit Medical Staff.  Following a diligent search, Defendant has

9    not as yet located records for 1992-1994, but continues to search for those records.  It

10   has not attempted to locate records for time periods prior to the formation of the Summit

11   Medical Staff, but believes that such would require extensive search for predecessor

12   entities' records which should not be required because of the lack of relevancy of

13   decisions made by predecessor Medical Staffs many years ago.  Defendant believes

14   that any time earlier than 1995 is too remote in time to be relevant, and the burden to

15   find any such records (assuming that they exist and can be located) is substantial.

16   **RESPONSE TO INTERROGATORY NO. 3:**

17           Defendant will respond to Interrogatory No. 3 for the time period from

18   January 1, 1995 to present as to investigations as such term is defined in Article 7.1 (B)

19   of the June 2006 Bylaws, within the parameters of the above objection.  Defendant's

20   responses to this and ensuing interrogatories regarding peer review information

21   concerning physicians other than Plaintiff are provided without prejudice to Defendant's

22   position that each peer review proceeding is an examination into the unique facts of

23   such situation, often by different reviewers, and hence, each such individual is not

24   similarly-situated to the Plaintiff.  Defendant will provide such response subject to the

25   Parties' Protective Order and without identifying the physician who was the subject of

26   peer review.  Defendant will attempt to provide its best estimation of the individual's race,

27   where possible, but notes that many such answers will be "guesses" as there is no

28   mechanism for a Medical Staff member to self-identify his/her race.  This is the case for

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-4-

Confidential Subject to the Parties' Protective Order

1  all remaining interrogatories seeking the race of individuals subject to peer review.

2  Exhibit A to these Responses (to be served by October 17, 2007 in accordance with the

3  Parties' agreement) will provide such information.

4  **INTERROGATORY NO. 4:**

5        Please IDENTIFY each incident in the last twenty years in which a

6  MEMBER of the MEDICAL STAFFS of the Alta Bates or Summit campuses of ABSMC

7  was subject to CORRECTIVE ACTION.  ("IDENTIFY" means to designate: (a) each

8  MEMBER as provided for in the Confidentiality Stipulation and Protective Order

9  applicable to this case; (b) the MEMBER'S area of medical specialty, race and gender;

10  (c) the specific CORRECTIVE ACTION (as described in Article VII of the Bylaws) taken;

11  and (d) the year(s) of the CORRECTIVE ACTION.  "CORRECTIVE ACTION" has the

12  meaning given in the Bylaws.)

13  **OBJECTION TO INTERROGATORY NO. 4:**

14        Defendant objects to the following portions of this interrogatory:

15        1.    Information regarding the Alta Bates Medical Staff on relevancy

16  grounds;

17        2.    Information regarding the gender of Medical Staff members (which

18  is not, in any event, recorded by the Medical Staff) on relevancy grounds;

19        3.    Information covering a period of time prior to 1995 on relevancy and

20  burden grounds.

21  **RESPONSE TO INTERROGATORY NO. 4:**

22        Interpreting this interrogatory as seeking corrective actions imposed as part

23  of investigations undertaken under Article VII of the Bylaws involving MEC review,

24  Defendant will provide such information from January 1, 1995 to present within the

25  parameters of its objections, without prejudice to its position that such doctors are not

26  similarly-situated to Plaintiff, and under the terms of the Parties' Protective Order.  See

27  Exhibit A.

28

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-5-

1  **INTERROGATORY NO. 5:**

2         Please IDENTIFY each incident in the last twenty years in which a

3  MEMBER of the MEDICAL STAFFS of the Alta Bates or Summit campuses of ABSMC

4  was subject to any action for which a hearing is provided under Article VIII of the Bylaws.

5  ("IDENTIFY" means to designate: (a) each MEMBER as provided for in the

6  Confidentiality Stipulation and Protective Order applicable to this case; (b) the

7  MEMBER'S area of medical specialty, race and gender; and (c) the specific

8  CORRECTIVE ACTION (as described in article VII of the Bylaws) or other action taken

9  that entitled the MEMBER to a hearing under Article VIII of the Bylaws; and (d) the

10  year(s) of the action.)

11  **OBJECTION TO INTERROGATORY NO. 5:**

12         Defendant objects to the following portions of this interrogatory:

13         1.      Information regarding the Alta Bates Medical Staff on relevancy

14  grounds;

15         2.      Information regarding the gender of Medical Staff members (which

16  is not, in any event, recorded by the Medical Staff) on relevancy grounds;

17         3.      Information covering a period of time prior to 1995 on relevancy and

18  burden grounds.

19  **RESPONSE TO INTERROGATORY NO. 5:**

20         Defendant will provide such information from January 1, 1995 to present

21  within the parameters of its objections, without prejudice to its position that such doctors

22  are not similarly-situated to Plaintiff, and under the terms of the Parties' Protective Order.

23  See, Exhibit A.

24  **INTERROGATORY NO. 6:**

25         Please IDENTIFY each incident in the last twenty years in which a

26  MEMBER of the MEDICAL STAFFS of the Alta Bates or Summit campuses of ABSMC

27  agreed to restrict or suspend his or her clinical privileges in lieu of CORRECTIVE

28  ACTION.  ("IDENTIFY" means to designate: (a) each MEMBER as provided for in the

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA

1   Confidentiality Stipulation and Protective Order applicable to this case; (b) the

2   MEMBER'S area of medical specialty, race and gender; and (c) the restriction(s) on

3   clinical privileges that MEMBER agreed to in lieu of the CORRECTIVE ACTION; (c) the

4   specific CORRECTIVE ACTION(S) (as described in Article VII of the Bylaws) or other

5   action proposed and avoided by the voluntary restriction; and (d) the year(s) of the

6   action.)

7   **OBJECTION TO INTERROGATORY NO. 6:**

8       Defendant objects to the following portions of this interrogatory:

9          1.    Information regarding the Alta Bates Medical Staff on relevancy

10  grounds;

11         2.    Information regarding the gender of Medical Staff members (which

12  is not, in any event, recorded by the Medical Staff) on relevancy grounds;

13         3.    Information covering a period of time prior to 1995 on relevancy and

14  burden grounds.

15  **RESPONSE TO INTERROGATORY NO. 6:**

16      Defendant will provide such information from January 1, 1995 to present

17  within the parameters of its objections, without prejudice to its position that such doctors

18  are not similarly-situated to Plaintiff, and under the terms of the Parties' Protective Order.

19  See, Exhibit A.

20  **INTERROGATORY NO. 7:**

21      Please state the name, area of medical specialty, race and gender of each

22  MEMBER of the MEDICAL STAFF of the Alta Bates or Summit campuses of ABSMC

23  whose cases were referred in the last twenty years for OUTSIDE PEER REVIEW after

24  an INTERNAL PEER REVIEW concluded there had been no deviation from the standard

25  of care.  ("OUTSIDE PEER REVIEW" means peer review conducted by doctors without

26  privileges at any campus of ABSMC, and "INTERNAL PEER REVIEW" means peer

27  review conducted by doctors with privileges at any campus of ABSMC.)

28

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-7-

CASE NO. C 07-2486 WHA

1  **OBJECTION TO INTERROGATORY NO. 7:**

2      Defendant objects to the following portions of this interrogatory:

3          1.    Information regarding the Alta Bates Medical Staff on relevancy

4  grounds;

5          2.    Information regarding the gender of Medical Staff members (which

6  is not, in any event, recorded by the Medical Staff) on relevancy grounds;

7          3.    Information covering a period of time prior to 1995 on relevancy and

8  burden grounds.

9      Defendant further objects to the phrase in Interrogatory No. 7 which reads

10  as follows: "after an INTERNAL PEER REVIEW concluded there had been no deviation

11  from the standard of care" on the grounds of ambiguity and relevancy. Defendant will

12  interpret such phrase to ask whether MEC investigation and corrective action, if any,

13  occurred following a review of such issues by a departmental peer review committee,

14  assuming such information is available.

15  **RESPONSE TO INTERROGATORY NO. 7:**

16      Defendant will provide such information from January 1, 1995 to present

17  within the parameters of its objections, without prejudice to its position that such doctors

18  are not similarly-situated to Plaintiff, and under the terms of the Parties' Protective Order.

19  See, Exhibit A.

20  **INTERROGATORY NO. 8:**

21      In the past twenty years, how many complaints have the medical staff

22  presidents, department heads, and MEDICAL EXECUTIVE COMMITTEES received

23  from physicians regarding their peers? ("MEDICAL EXECUTIVE COMMITTEES" means

24  the executive committees of the MEDICAL STAFFS of Alta Bates and Summit campuses

25  of ABSMC.)

26  **OBJECTION TO INTERROGATORY NO. 8:**

27      Defendant objects to providing information regarding Alta Bates Medical

28  Staff peer review on the relevancy grounds previously described. As to the inquiry

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-8-

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE                                                      CASE NO. C 07-2486 WHA

Confidential Subject to the Parties' Protective Order

1  limited to the Summit Medical Staff, Defendant objects to Interrogatory No. 8 on the

2  grounds of ambiguity, lack of relevancy and burden.  In referencing department heads,

3  MEC members and medical staff presidents for the past 20 years, the interrogatory

4  covers dozens of persons, some no longer part of the Medical Staff.  (There are

5  approximately 15 MEC members in any given year; there have been approximately 10

6  medical staff presidents in the last 20 years and approximately seven departments with

7  several different department heads.)  The term "complaint" could range from a note

8  written to any one of these persons, to incident reports completed by many different

9  persons, to certain events (such as unexpected outcomes) which always trigger some

10  form of departmental review.  Such "complaints" could involve a wide range of physician

11  conduct from behavioral issues to quality of care issues.  Plaintiff's offer to confine the

12  interrogatory to "written" complaints does not cure the ambiguity or the overbreadth of

13  the interrogatory.

14  **INTERROGATORY NO. 9:**

15          In the past twenty years, IDENTIFY each complaint received by the

16  medical staff presidents, department heads, and MEDICAL EXECUTIVE COMMITTEES

17  from physicians regarding their peers that has resulted in voluntary or involuntary

18  suspension of the privileges of the targeted physician.  ("IDENTIFY" means to designate:

19  (a) each MEMBER subject to the complaint, as provided for in the Confidentiality

20  Stipulation and Protective Order applicable to this case; (b) the MEMBER'S area of

21  medical specialty, race and gender; and (c) whether the suspension was voluntary or

22  involuntary; and (d) the years of the action.)

23  **OBJECTION AND RESPONSE TO INTERROGATORY NO. 9:**

24          To the extent that any such complaint resulted in a suspension of privileges

25  (voluntary or involuntary), Defendant believes it would have involved MEC action and

26  hence this information will be provided, subject to the parameters set forth in

27  Defendant's objections, in response to Interrogatories 4 through 6.  To the extent that

28

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA

Confidential Subject to the Parties' Protective Order

1   any such complaint did not reach the MEC level, Defendant objects to Interrogatory No.

2   9 on the grounds set forth in its Objections to Interrogatory No. 8.  See, Exhibit A.

3   **INTERROGATORY NO. 10:**

4              In the last twenty years, how many times has ABSMC or any committee

5   thereof requested National Medical Audit to conduct a peer review of a member of the

6   MEDICAL STAFF?

7   **OBJECTION TO INTERROGATORY NO. 10:**

8              Defendant objects to any time period prior to January 1, 1995 on relevancy

9   and burden grounds, and also objects to any information involving the Alta Bates

10   Medical Staff on relevancy grounds.  See, Defendant's Objections to Interrogatory No. 3.

11   **RESPONSE TO INTERROGATORY NO. 10:**

12              The Summit Medical Staff's MEC has requested that NMA conduct a peer

13   review audit on two occasions within such time frame, one of which concerned Plaintiff.

14   **INTERROGATORY NO. 11:**

15              Please state the name, area of medical specialty, race and gender of each

16   MEMBER of the MEDICAL STAFF for whom the MEDICAL EXECUTIVE COMMITTEES

17   reinstated, extended or renewed a proctoring restriction on his or her privileges at either

18   the Alta Bates or Summit campuses of ABSMC in the last twenty years and please

19   provide the year(s) of the action.

20   **OBJECTION TO INTERROGATORY NO. 11:**

21              Defendant objects to the following portions of this interrogatory:

22              1.      Information regarding the Alta Bates Medical Staff on relevancy

23   grounds;

24              2.      Information regarding the gender of Medical Staff members (which

25   is not, in any event, recorded by the Medical Staff) on relevancy grounds;

26              3.      Information covering a period of prior to 1995 on relevancy and

27   burden grounds

28

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-10-

Confidential Subject to the Parties' Protective Order

1   NOTE:  Defendant interprets this interrogatory as excluding proctoring

2   extended under 6.3 (A) of the June 2006 Bylaws to initial appointees to the medical staff

3   and to all members granted new clinical privileges.  To the extent that Interrogatory No.

4   11 was intended to cover such proctoring, Defendant objects on relevancy grounds.

5   **RESPONSE TO INTERROGATORY NO. 11:**

6   Defendant will provide such information from January 1, 1995 to present

7   within the parameters of its objections, without prejudice to its position that such doctors

8   are not similarly-situated to Plaintiff, and under the terms of the Parties' Protective Order.

9   See, Exhibit A.

10  **INTERROGATORY NO. 12:**

11  Please state the name, area of medical specialty, race and gender of each

12  MEMBER of the MEDICAL STAFF for whom the MEDICAL EXECUTIVE COMMITTEES

13  reinstated, extended or renewed a proctoring restriction on his or her privileges at either

14  the Alta Bates or Summit campuses of ABSMC in the last twenty years after all proctors

15  for that member of the MEDICAL STAFF opined in writing that continuation of the

16  proctoring requirement was not necessary?

17  **OBJECTION TO INTERROGATORY NO. 12:**

18  Defendant objects to the following portions of this interrogatory:

19      1.      Information regarding the Alta Bates Medical Staff on relevancy

20  grounds;

21      2.      Information regarding the gender of Medical Staff members (which

22  is not, in any event, recorded by the Medical Staff) on relevancy grounds;

23      3.      Information covering a period of time prior to 1995 on relevancy and

24  burden grounds.

25  **RESPONSE TO INTERROGATORY NO. 12:**

26  To date, and after diligent search within the parameters above established,

27  Defendant has been unable to locate any situation, aside from Plaintiff's peer review

28  process, which falls within the parameters of Interrogatory No. 12.

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-11-

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA

Confidential Subject to the Parties' Protective Order

**INTERROGATORY NO. 13:**

Please IDENTIFY each peer review in the last twenty years for which ABSMC or a committee thereof used an OUTSIDE PEER REVIEW? ("IDENTIFY" means to designate: (a) each MEMBER subject to an OUTSIDE PEER REVIEW, as provided for in the Confidentiality Stipulation and Protective Order applicable to this case; (b) the MEMBER'S area of medical specialty, race and gender; and (c) the year(s) of the action.)

**OBJECTION TO INTERROGATORY NO. 13:**

Defendant objects to the following portions of this interrogatory:

1.      Information regarding the Alta Bates Medical Staff on relevancy grounds;

2.      Information regarding the gender of Medical Staff members (which is not, in any event, recorded by the Medical Staff) on relevancy grounds;

3.      Information covering a period of time prior to 1995 on relevancy and burden grounds.

**RESPONSE TO INTERROGATORY NO. 13:**

Defendant will provide such information from January 1, 1995 to present within the parameters of its objections, without prejudice to its position that such doctors are not similarly-situated to Plaintiff, and under the terms of the Parties' Protective Order. See, Exhibit A.

**INTERROGATORY NO. 14:**

Please provide the name, address, phone number, area of medical specialty, gender and race of each person who provided testimony, consultation or other input to Dr. William Isenberg, Dr. Steven Stanten, the Summit campus Surgical Peer Review Committee, the Ad Hoc Committee investigating Dr. Ennix, National Medical Audit, or the Summit campus Medical Executive Committee in the course of the peer review of Dr. Ennix that is the subject of this lawsuit.

KAUFF, MCCLAIN
& MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-12-

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA

## OBJECTION TO INTERROGATORY NO. 14:

Defendant objects to the request for gender and race on the grounds of a lack of relevancy (and also such information is not maintained with respect to members of the Medical Staff.) To the extent that this Interrogatory seeks the identification of persons who provided information to NMA, Defendant can answer such question only as reflected in its records of what was provided. The question should be posed to NMA for a complete answer.

## RESPONSE TO INTERROGATORY NO. 14:

Such information is set forth on Exhibit B to these interrogatories. It should be noted that Exhibit B does not include the reports and letters submitted by Plaintiff at any stage of the peer review process as Plaintiff has full knowledge of what he submitted. Material submitted by Plaintiff was considered by the peer reviewers to whom the material was submitted. Defendant further notes that the response does not include persons who considered the peer review issues concerning Plaintiff as members of the involved peer review committees, although such individuals would have had "input" during a committee discussion. Defendant does not view the interrogatory as asking for such information, which has, in any event, been provided in Defendant's Initial Disclosures. To the extent that members of the Alta Bates Medical Staff are identified, that is because they provided input to the Summit Medical Staff's peer review process.

## INTERROGATORY NO. 15:

Please provide the name, area of medical specialty, gender and race of all MEMBERS of the MEDICAL STAFF, other than Dr. Ennix, who were subject to INVESTIGATION, CORRECTIVE ACTION or any other disciplinary action with respect to their participation in the TEN CASES. ("TEN CASES" means the cases the Ad Hoc Committee, formed for the purposes of the peer review that is the subject of this lawsuit, referred to National Medical Audit for review.)

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-13-

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA

**RESPONSE TO INTERROGATORY NO. 15:**

No other individuals were subject to investigation (as such term is defined in Interrogatory No. 3), corrective action or other disciplinary action relative to such cases. NOTE: The correct term for peer review action is corrective action, not disciplinary action. Corrective action is designed for remedial purposes.

**INTERROGATORY NO. 16:**

Please identify by case name, court, case number and year each case filed within the last twenty years in which ABSMC, its subsidiaries, predecessors in interest or committees thereof have been sued for racial or gender discrimination.

**OBJECTION TO INTERROGATORY NO. 16:**

Defendant objects to this Interrogatory to the extent that it seeks information regarding any such suit by other than a member of the Summit Medical Staff on relevancy grounds.

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff is the only member of the Summit Medical Staff who has ever filed such a suit. [Note this answer is necessarily confined to a time period of 1992 forward given that the Summit Medical Staff first came into existence in 1992.]

**INTERROGATORY NO. 17:**

Please identify every individual involved in or consulted regarding the selection of National Medical Audit to review the TEN CASES involving Dr. Ennix. ("TEN CASES" means the cases the Ad Hoc Committee, formed for the purposes of the peer review that is the subject of this lawsuit, referred to National Medical Audit for review.)

**RESPONSE TO INTERROGATORY NO. 17:**

The following individuals were involved in or consulted regarding the selection of NMA to conduct outside peer review.

William Isenberg, M.D., Ph.D.

Joanne Jellin, PsyD., Director Summit Medical Staff Office

Lamont Paxton, M.D.

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-14-

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA

1    Dat Ly, M.D.

2    Barry Horn, M.D.

3    Warren Kirk, CEO, Alta Bates Summit Medical Center

4    Harry Shulman, Esq. (providing legal advice which was covered by the

5    attorney-client privilege).

6

7    DATED:  September 17, 2007          KAUFF McCLAIN & McGUIRE LLP

8

9                                       By: _____

10                                           MAUREEN E. McCLAIN

11                                       Attorneys for Defendant
                                         ALTA BATES SUMMIT MEDICAL
12                                       CENTER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-15-

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA

Confidential Subject to the Parties' Protective Order

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Joanne Jellin, PsyD., provide this verification of Defendant's Answers to Plaintiff's First Set of Special Interrogatories in my capacity as Director of Medical Staff Services for the Summit Medical Staff Office.  In such capacity, I oversee the retention of records relating to peer review conducted by the Summit Medical Staff.  I verify that the attached answers are true and correct either as a matter of my personal knowledge or as taken from records maintained by my office, or from information compiled by my office.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 14, 2007, in Oakland, California.

JOANNE JELLIN, PsyD.

120810.v1

KAUFF, MCCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES,
SET ONE

CASE NO. C 07-2486 WHA