MAUREEN E. MCCLAIN (State Bar No. 062050)
Email: mcclain@kmm.com
ALEX HERNAEZ (State Bar No. 201441)
Email: hernaez@kmm.com
KAUFF MCCLAIN & MCGUIRE LLP
One Post Street, Suite 2600
San Francisco, California 94104
Telephone:  (415) 421-3111
Facsimile:   (415) 421-0938

Attorneys for Defendant
ALTA BATES SUMMIT MEDICAL CENTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX, JR., M.D.,<br><br>Plaintiff,<br><br>v.<br><br>ALTA BATES SUMMIT MEDICAL CENTER,<br><br>Defendant. | CASE NO.  C 07-2486 WHA<br><br>**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE:    April 24, 2008<br>TIME:    8:00 a.m.<br>DEPT:    Ctrm. 9, 19th Flr.<br>JUDGE:  Hon. William H. Alsup<br><br>COMPLAINT FILED: May 9, 2007<br>TRIAL DATE: June 2, 2008 |

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................1
II. ARGUMENT .............................................................................................................2
    A. The § 1981 Claim Fails Because There Is No "Contract" At Issue ..............2
    B. Ennix's § 1981 Claim Cannot Pass Muster Under McDonnell Douglas Corp. v. Green Because He Has No "Specific And Substantial" Evidence Of Pretext. ...................................................................3
        1. The Fundamental Premise Of Ennix's Argument—That He Was "Cleared" By Dr. Lee—Is Patently False. ...............................4
        2. The Medical Staff Conducted A Fair Peer Review Process .............6
        3. Ennix Has Not Identified Even A Single Similarly Situated Physician. ..........................................................................................12
        4. Physician H And Ennix's "Anecdotal Evidence." .............................12
        5. Statistical Evidence Related To Other Cardiac Surgeons ..............13
        6. The Amateur Statistics Compiled By Ennix's Attorney Are Inadmissible And Meaningless In Any Event. .................................14
III. CONCLUSION .......................................................................................................15

- i -

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000)..................................................................................15

*Domino's Pizza, Inc. v. McDonald*,
  546 U.S. 470 (2006) .................................................................................................2

*Imagineering, Inc. v. Kiewit Pacific Co.*,
  976 F.2d 1303 (9th Cir. 1992)...................................................................................3

*Janda v. Madera Community Hosp.*,
  16 F. Supp. 2d 1181 (E.D. Cal. 1998) .......................................................................3

*Kelley v. Goodyear Tire & Rubber Co.*,
  220 F.3d 1174 (10th Cir. 2000)...............................................................................12

*Lindsey v. SLT L.A., LLC*,
  447 F.3d 1138 (9th Cir. 2006)...................................................................................4

*Matthews v. Lancaster Gen. Hosp.*,
  87 F.3d 624 (3rd Cir 1996) .....................................................................................13

*McEuin v. Crown Equip. Corp.*,
  328 F.3d 1028 (9th Cir. 2003)...................................................................................8

*Newcal Indus. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008)...................................................................................3

*People Who Care v. Rockford Bd. of Educ.*,
  111 F.3d 528 (7th Cir. 1997)...................................................................................15

### FEDERAL STATUTES

42 U.S.C. § 1981 ............................................................................................... passim

### FEDERAL RULES

Fed. R. Civ. P. 56(e) ..................................................................................................3

Fed. R. Evid. 803 .......................................................................................................8

### CALIFORNIA CASES

*O'Byrne v. Santa Monica-UCLA Medical Ctr.*,
  94 Cal. App. 4th 797 (2001).....................................................................................2

-ii-

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT                CASE NO. C 07-2486 WHA

*Oskooi v. Fountain Valley Reg'l Hosp. & Medical Ctr.*,
   42 Cal. App. 4th 233 (1996) .............................................................................. 1, 15

*Rhee v. El Camino Hosp. Dist.*,
   201 Cal. App. 3d 477 (1988) ................................................................................ 12

*Westlake Comm. Hosp. v. Los Angeles Superior Ct.*,
   17 Cal. 3d 465 (1976) ............................................................................................ 1

**CALIFORNIA REGULATIONS**

22 Cal. Code Reg. § 70703(b) ....................................................................................... 2

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

- iii -

## I. INTRODUCTION

The Opposition Brief filed by Ennix is a breathtaking work of fiction. Among its many factual inaccuracies is the demonstrably false assertion that the continued review of Ennix was improper because he had somehow been "cleared of patient care issues" by Dr. Lee. But Dr. Lee never cleared Dr. Ennix of anything. Rather, Dr. Lee agreed that a reasonable person reviewing his report "might legitimately determine that there was a need for further review." Lee Tr. at 40:14-21. Here, taking into account all available information, the Medical Staff made the judgment that further review was necessary. And the propriety of that decision has been independently validated time and time again—by the NMA report, by Ennix's own experts, and by the Medical Board for the State of California.

At bottom, Ennix simply has no admissible evidence of racial animus, and he has admitted this specifically with respect to all relevant decision-makers including Dr. Isenberg. *See* Opening Brief at 11:1-13:4. And he has conceded that the NMA review, **conducted by specialists in Ennix's field**, was not racially biased. *See* Ennix's Brief at 2:24-27. Moreover, Ennix's statistical evidence, presented not by an expert but by Ennix's counsel, Andrew E. Sweet, is both inadmissible lay opinion and factually meaningless. No statistically significant conclusions can be drawn from a review of, at most, 5 decisions regarding African-Americans over a 15 year period. The remainder of Ennix's argument is nothing but various potshots at the peer review process—procedural issues that, as this Court has held, Ennix should have raised administratively under *Westlake Comm. Hosp. v. Los Angeles Superior Ct.*, 17 Cal. 3d 465, 483-84 (1976), but instead chose to abandon. Peer review is both critical to patient safety and extremely difficult to administer. Thus the law does not require it to conform to some abstract model of investigatory perfection. "Hospitals exist to help the sick and injured; they are not detective agencies. They should have the widest possible discretion in decisions affecting physician staff privileges." *Oskooi v. Fountain Valley Reg'l Hosp. & Medical Ctr.*, 42 Cal. App. 4th 233, 248-249 (1996) (concurring op.). As discussed below and in

-1-

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT        CASE NO. C 07-2486 WHA

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

ABSMC's Opening Brief, the Medical Staff acted reasonably given the information it was presented. Nothing more is required.

Ennix's claim also fails for the simple reason that he has no contract with ABSMC.

## II. ARGUMENT

### A. The § 1981 Claim Fails Because There Is No "Contract" At Issue.

As he must, Ennix concedes that the existence of a contract is an essential element of his § 1981 claim. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 480 (2006). Yet Ennix does not point to any contract between **himself** and ABSMC. Rather, Ennix expressly concedes that he is not an employee of the hospital (Ennix Tr. at 50:3-8) and it is undisputed that Ennix provided services pursuant to a contract between an independent contractor (i.e., East Bay Cardiac Surgery Center) and ABSMC. *See, e.g.*, Hernaez Decl. at ¶ 2 & Ex. A (p. 1, defining the parties and not naming Ennix as one). Under the specific holding of *Domino's Pizza*, Ennix simply cannot use a third-party's contract to support his individual § 1981 claim even if he has some relationship to that third-party. *See* 546 U.S. at 480. Rather, because Ennix individually holds no contract with ABSMC (as either employee or independent contractor), his claim fails.

Nor does Ennix distinguish *O'Byrne v. Santa Monica-UCLA Medical Ctr.*, 94 Cal. App. 4th 797, 810 (2001), which holds that "under California contract law, medical staff bylaws adopted pursuant to California Code of Regulations, title 22, section 70703, subdivision (b), do not in and of themselves constitute a contract between a hospital and a physician on its medical staff." Arguing in a circle, Ennix says a purported contract arose based upon some combination of the bylaws and the granting of medical staff privileges. *See* Ennix Brief at 24:2-4. But it is the terms of the bylaws that govern the granting of staff privileges. E.g., Supplemental Hernaez Decl. at Ex. 4 (Article VI). There is no legal or logical distinction between these concepts. *O'Byrne* simply precludes the argument that Ennix urges.

- 2 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

Next, ignoring his express admission that he has never been employed by ABSMC (Ennix Tr. at 50:3-8), Ennix asks this Court to consider cases where an employment relationship may have existed between physician and hospital. *E.g., Janda v. Madera Community Hosp.*, 16 F. Supp. 2d 1181, 1185 (E.D. Cal. 1998). Although employment is sufficient to create a contract actionable under § 1981, these cases are irrelevant because no such relationship ever existed here.

Ennix also says that the prophylactic Independent Contractor language contained in the contract between East Bay Cardiac Surgery Center and ABSMC somehow creates a contract between Ennix and ABSMC. *See, e.g.*, Hernaez Decl. at ¶ 2 & Ex. A (p. 9, Section 5). Not so. The agreement is clear on its face—the parties to the contract are the hospital and the medical group. *Id.* (p. 1). And the "Agreement shall not be construed as creating any right, claim or cause of action against either party by any person or entity not a party to this Agreement." *Id.* at Ex. A (p. 12, Section 11.5). Ennix cannot make himself party to some imaginary contract.

Finally, Ennix concedes that the patient consent forms are not contracts. *See* Ennix Brief at 24:18-19. Rather, he argues that these forms constitute evidence of "contracts" between Ennix and his patients. However, Ennix does not identify a single specific contract that was supposedly frustrated. Rather, Ennix merely hypothesizes that "**if**" some patient had paid in advance for surgery, then that patient would have a cause of action for breach of contract "**if**" Ennix could not operate. *Id.* at 24:19-25. These hypotheticals do not establish any actual loss, and are not the type of "specific facts" required to oppose summary judgment. *See* Fed. R. Civ. P. 56(e). Indeed, here, as in *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1313 (9th Cir. 1992)[1], the Court "simply cannot know what contract [Defendant] prevented the [Plaintiffs] from entering into." Moreover, nowhere does Ennix establish that his restrictions precluded him from

---

[1] Overruled on other grounds. *See Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008).

- 3 -

fulfilling these supposed contracts at other local hospitals. Indeed, Ennix brags that he has privileges at other facilities. See Complaint at ¶ 5.

### B. Ennix's § 1981 Claim Cannot Pass Muster Under *McDonnell Douglas Corp. v. Green* Because He Has No "Specific And Substantial" Evidence Of Pretext.

In its Opening Brief, ABSMC demonstrated that Ennix lacked any evidence of discriminatory intent. See Opening Brief at § III(C)(1). Indeed, as he must, Ennix now concedes that he has no such evidence. See Ennix Brief at 1:6-9. Rather, Ennix attempts to avoid summary judgment by pointing to circumstantial evidence that ABSMC's "proffered motive" (i.e., patient safety) is pretextual because it is "inconsistent or otherwise not believable." *Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1152 (9th Cir. 2006). But a close reading of Ennix's papers shows only that he has made egregious misrepresentations of fact to this Court. Such falsehoods cannot form the "specific and substantial" evidence of pretext that Ennix admits he is required to produce. See Ennix Brief at 1:11 (conceding the "specific and substantial" standard).

#### 1. The Fundamental Premise Of Ennix's Argument—That He Was "Cleared" By Dr. Lee—Is Patently False.

The foundation of Ennix's argument is as follows: because Dr. Lee "cleared" him of "patient care issues" regarding the MIV procedures, any subsequent follow-up by the Medical Staff was unreasonable. *E.g.*, Ennix Brief at 2:2-3; 5:21-6:1; 11:9-12. This assertion, repeated again and again by Ennix, is simply untrue. To begin with, the cited testimony from Dr. S. Stanten reads as follows: "Dr. Lee noted several documentation issues, but no quality of care concerns." See S. Stanten Tr. at 75:5-13 (Sweet Decl. at Ex. P). Ennix somehow transforms this testimony into the assertion that Dr. Lee found no "**patient** care issues." *E.g.*, Ennix Brief at 5:21-22. But both "documentation" (i.e., obtaining fully informed consent and providing an accurate record of the procedure)[2] and "quality" directly impact patient care. Indeed, it is difficult to understand how Ennix makes such short shrift of his failure to adequately explain the

---

[2] Lee Tr. at 25:10-13.

- 4 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

1  possible implications of cardiac surgery, which "is by its nature a risky procedure" that
2  may result in death. See Ennix Brief at 4:21-22. Presumable the family of patient ABS-
3  001 (a diagnosed schizophrenic operated on by Ennix without a psychiatric consultation)
4  would take a more stringent view of this obligation. See Paxton Decl. at ¶ 5 & Ex. A
5  (Appendix A, p. 24).

6  More importantly, however, Ennix ignores Dr. Lee's sworn testimony.
7  Specifically, Dr. Lee never testified that he "cleared" Ennix of anything. Contrarily, Dr.
8  Lee agreed that a reasonable person reviewing his report "**might legitimately
9  determine that there was a need for further review**." Lee Tr. at 40:14-21 (emphasis
10  added). Because of this, Dr. Lee did not find the Medical Staff's action in continuing its
11  peer review process unfair to Dr. Ennix. Lee Tr. at 38:24-39:1. In addition, at the time
12  Dr. Lee agreed (1) that the Medical Staff's concern with the extended length of Ennix's
13  MIV procedures was valid; (2) that suspending the MIV procedures after Ennix's first four
14  failures was "a reasonable response;" and (3) that the "outcomes of these four [MIV]
15  procedures were alarming." See Opening Brief at 23:19-26.

16  And Ennix's willingness to falsify does not end with Dr. Lee. By selectively
17  quoting from a letter, Ennix also blatantly misrepresents the fact that the Medical Board
18  found that he committed "negligence" in 3 of the 10 reviewed cases (including 2 of the 4
19  MIV procedures). See Ennix Brief at 8:5-12. (In a remarkably disingenuous move,
20  Ennix quotes the Board's conclusion as to **some** reviewed cases and tells the Court this
21  conclusion is applicable to **all** reviewed cases). However, as discussed in the Opening
22  Brief,[3] the Medical Board's findings are clear: "The expert found no departure from the
23  standard of practice in two of the four cases reviewed for minimally invasive procedures.
24  The two cases that the expert found simple departures read as follows: [MIV case
25  descriptions]." See Ennix Tr. at 31:8-32:9 & Ex. 4 (p. 1). Regarding the non-MIV
26  procedure, the Board found that Ennix's "delay in transporting this patient to surgery . . .
27  represents a simple departure from the standard of practice." Id. at Ex. 4 (p. 2). (The

---
[3] See Opening Brief at 24:6-17.

- 5 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT    CASE NO. C 07-2486 WHA

Board defines "simple departures" as "negligence." See ABSMC's Request for Judicial Notice.)

Equally amazing, Ennix simply ignores the fact that two of his **own** experts—Dr. Reitz and Dr. Hill—expressed significant concerns about the MIV procedures. See Opening Brief at 19:22-23:13. For example, Dr. Reitz commented upon Ennix's lack of training (see Reitz Tr. at 36:23-37:3; 41:3-7) and the unusual length of surgery times. See Reitz Tr. at 72:17-20; 82:13-21. Going further, Dr. Hill specifically found that in at least one MIV case "the **medical standard of care for the community was breached**." See Hernaez Decl. at ¶ 9 & Ex. H (E002889, #2) (emphasis added). Given the foregoing, it is absurd for Ennix to suggest that continued peer review by the Medical Staff was unreasonable subsequent to Dr. Lee's report.

Because he has never been "cleared" by Dr. Lee (or by anyone for that matter), Ennix's entire subsequent argument—i.e., that he is the only physician that has ever been subjected to additional peer review after being cleared—is necessarily unfounded. Moreover, even a cursory review of the MEC discipline chart demonstrates that certain Caucasian physicians have been disciplined more harshly than Ennix. For example, the MEC, after appointing an Ad Hoc Committee, imposed upon "Physician F" a complete (100%) prospective review of his cases as well as a complete (100%) monitoring and proctoring of all aspects of his practice. Physician F subsequently resigned. See Hernaez Decl. at ¶ 7 & Ex. F (p. 5). And Physician G had his privileges suspended for 59 days in 2004, was restricted from supervising surgical assistants for 3 months, was restricted from sponsoring students visiting the hospital, was confined to a single Room in the Operating Room, was required to attend a course on professional ethics, and was required to submit to a prospective review of his medical records. See id. at Ex F (p. 6). Importantly, the MEC imposed these restrictions due to patient safety and charting issues—the same general reasons the MEC imposed restrictions upon Ennix.

### 2. The Medical Staff Conducted A Fair Peer Review Process.

Ennix argues that, under the governing rules and regulations, only a practicing cardiac surgeon is competent to peer review another cardiac surgeon. In support of this global assertion, Ennix quotes the following language:

> [A] peer reviewer shall be defined as a member of the medical staff, in good standing, practicing in the same general specialty, and with similar and/or related training and experience as the individual under review.

See Sweet Decl. at Ex. S (p. 48).

But, Ennix inexcusably fails to alert the Court to the text appearing **immediately below** the language he relies upon:

> Peers may also include other medical staff members in good standing, **not practicing in the same specialty as the individual whose case is under review**. They may be consulted regarding specific issues related to the management of the case under review.

Id. (emphasis added). Demonstrating a similar level of candor with the Court, Ennix also states flatly that it was "unheard of for ABSMC to conduct a peer review by a body that did not include a like-specialist." See Ennix Brief at 6:12-13. But his cite for this blanket statement, Paxton 85:24-86:3, is only evidence that one person could not think of a similar situation. Obviously the fact that one person cannot remember something happening is not evidence that it is "unheard of" or that it "never happened." (This dubious and unfair citation tactic is employed time and time again by Ennix.)

There is simply no factual basis for Ennix's assertion that peer review must always be confined to the particular specialty at issue. Indeed, the composition of the MEC, which oversees all peer review, is established by the Bylaws and cannot possibly encompass all specialties and sub-specialties. E.g., Isenberg Decl. at Ex. A (Section 11.3(A), p. 63). And any such rule would effectively halt peer review given the Medical Staff's difficulty in recruiting willing reviewers. See Isenberg Decl. at ¶ 8. Moreover, Ennix's argument presents a classic "Catch-22." Had the review been staffed entirely by cardiac surgeons, Ennix would doubtlessly argue that, as his competitors, some of these other surgeons would be biased.

- 7 -

Because there is no absolute requirement that peer review be conducted by physicians of the same specialty, Ennix's critique of the AHC's membership fails. *See* Ennix Brief at 6:16-7:3. Similarly, the notion that Dr. Isenberg "stacked" the AHC is without any factual basis. To begin with, four doctors, including two African-Americans, declined Dr. Isenberg's invitation to serve on the AHC. *See* Isenberg Decl. at ¶ 8.[4] Moreover, Dr. Isenberg testified that he could not identify a cardiac surgeon who was truly unbiased. *See* Isenberg Tr. at 161:7-19. Ennix points to nothing in the record calling into question this judgment. Ennix also suggests that Dr. Ly should not have served on the AHC because he participated in one of the surgeries. *See* Ennix Brief at 6:19-20. But nothing precludes Dr. Ly's service. And Ennix points to **nothing** supporting his bald assertion to the contrary. *See* Ennix Brief at 15:17-19. Indeed, the peer review rules expressly allow Dr. Ly's participation in the AHC so long as he did not medically manage the underlying case. *See* Sweet Decl. at Ex. S (pp. 48-49).

Nor is it valid to question Dr. Isenberg's participation in the AHC meetings. Pursuant to the Bylaws, Dr. Isenberg, as Medical Staff President, was expressly charged with "serving as an ex-officio member on all other staff committees except the credentials committee, with vote." *E.g.,* Isenberg Decl. at Ex. A (Section 9.2(A)(4), p. 52). And, most importantly, Ennix has already conceded that he has no evidence suggesting that Dr. Isenberg harbors racial animus against African Americans. *See* Ennix Tr. at 328:16-24; 339:12-25. Hence, whatever his motivations in forming the AHC and participating in its meetings, Dr. Isenberg's conduct did not violate § 1981.

Assuming *arguendo* that cardiac expertise was required for the peer review process, the AHC used NMA for that very purpose. **It is beyond dispute that the NMA employed a cardiothoracic surgeon and a cardiovascular surgeon to review Ennix.** *See* Isenberg Decl. at ¶ 11 (p. 8, lines 11-15). Importantly, Ennix expressly concedes that the NMA review was not racially biased. *See* Ennix's Brief at 2:24-27. Instead,

---

[4] Ennix objects to this and similar testimony on hearsay grounds. These statements are admissible under Fed. R. Evid. 803 as they show the declarants "state of mind." *See McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1035 (9th Cir. 2003)

- 8 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

Ennix argues that "Dr. Isenberg chose NMA knowing, based on past experience that NMA would furnish a harsh report upon request." *Id.* Here again, Ennix demonstrates his unfettered willingness to hurl accusations without any factual basis in the record. There is no evidence that Dr. Isenberg, **who Ennix concedes is not racist**, requested any particular conclusion from NMA.

The Medical Staff had engaged NMA only once before—to review Physician I. *See* Hernaez Decl. at ¶ 7 & Ex. F (p. 8). And what Dr. Isenberg knew of NMA was only that its findings were consistent with those of the Medical Board. Specifically, by Order dated April 27, 2004, the Board revoked Physician I's medical license pending completion of a 5-year period of probation that included numerous conditions. *See* Supplemental Request for Judicial Notice at Ex. 1 (p. 14). Given the Medical Board's validation of NMA's conclusions (both regarding Ennix and with respect to Physician I), it is unclear upon what factual basis Ennix argues that NMA is a "hired gun" used to "get" minority physicians. The evidence shows only that NMA is a competent reviewer.

Contrary to Ennix's claim, NMA's report was in no way "preordained." Setting aside the fact that NMA's conclusions were correct according to the Medical Board and that Ennix concedes NMA was not racially biased, the other massive problem with Ennix's NMA critique is that it focuses on specific parts of the process while at the same time ignoring others. For example:

> Ennix says "outside reviewers had only been used with minority physicians." Absolutely false. *See* Hernaez Decl. at ¶ 7 & Ex. F (p. 10, "Physician O" is a Caucasian reviewed by an outside reviewer).

> Ennix complains that NMA did not interview any of the people involved in the ten cases other than Ennix. But the AHC interviewed the Chair of the Department of Surgery, the Chief of the Cardiovascular Surgery Service, two cardiac surgeons, three anesthesiologists, one staff member, and Ennix. *See* Paxton Decl. at ¶ 4.

- 9 -

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT — CASE NO. C 07-2486 WHA

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

Ennix says he was not interviewed until "many weeks" into NMA's work and that certain conclusions were reached prior to his interview. Setting aside Ennix's imprecise hyperbole, NMA first interviewed Ennix about 12 weeks after starting its investigation. *See* Smithline Tr. at 128:10-15; 311:14-16. And nowhere does Ennix explain how he was prejudiced by this progression. Moreover, after the AHC received the NMA report, it met with Ennix for about 6 hours to discuss the report's findings. *See* Paxton Decl. at ¶ 7. The notion that Ennix did not have input into this process is patently false.

Dr. Smithline drafted certain report "headings" prior to completing the NMA investigation. Dr. Smithline drafted a single heading—not "headings" as Ennix alleges—in February of 2005. *See* Smithline Tr. at 296:17-24. The report was still a draft and, as discussed above, NMA's conclusions were validated by the Medical Board. Ennix should not be heard to micro-manage how a reviewer writes a report.

Ennix complains that NMA, through Dr. Smithline, was in "constant contact" with Dr. Isenberg and the Medical Staff attorney. The evidence cited by Ennix (Smithline Tr. at 218:8-219:22) shows a single conversation and not any "constant contact." And nowhere does Ennix even attempt to explain why such contact was improper.

NMA included "additional critical comments" at Dr. Isenberg's urging. The evidence cited by Ennix shows that NMA included one statement —not "additional critical comments." *See* Smithline Tr. at 313:5-315:18. Moreover, the evidence shows that Dr. Smithline did so even after being asked to not include the additional statement. *See* Supplemental Hernaez Decl. at Ex. 8 (email withdrawing proposed addition). And, at bottom, nowhere does Ennix argue that this statement was incorrect.

NMA used "bogus statistics" to justify its conclusions. The NMA report does not use any statistics to justify its conclusions. *See* Paxton Decl. at ¶ 5 & Ex. A (Appendix A).

- 10 -

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT    CASE NO. C 07-2486 WHA

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

Ennix's two remaining complaints regarding the process are simply inconsistent. First, Ennix complains that the peer review process was flawed because it did not include surgeons who operate with him every day, but also flawed because it included one person (Doctor Dat Ly) who had served as the anesthesiologist in one of the examined cases. Second, Ennix says the process was flawed because it did not include members of the CTPRC which had previously reviewed his cases but was also flawed because it included one surgeon who sat on the SPRC which decided to further review the MIV procedures.

Ennix's argument that peer review must progress in some lock-step fashion from nurse review to MEC or AHC review is also plainly wrong. *See* Ennix Brief at 4:25-5:11. To the contrary, the Bylaws provide wide latitude for the initiation of corrective action. *See* Isenberg Decl. at Exs. A-C (Section VII—Corrective Action). In particular, the applicable Bylaws state that "the MEC may undertake on its own to appoint an ad hoc investigative committee comprised of such individuals as it sees fit." *See* Isenberg Decl. at Ex. A (Section 7.1(B), p. 34). Even Ennix's own peer review expert, Eugene M. Spiritus, agrees that anyone on the medical staff may raise issues directly with the MEC:

> Q. So it would be within the discretion of the medical staff president to determine whether or not to raise a peer review issue directly with a medical executive committee; is that right?
> A. It's absolutely within his prerogative, as it is every member of the medical staff.

Spiritus Tr. at 36:9-14 (attached as Exhibit 6 to the Supp. Hernaez Decl.). Ennix can cite no evidence requiring some rigid procedure. Rather, with respect to peer review, and especially MEC level review, nothing "compel[s] adherence to formal proceedings or to any single mode of process. Instead it may be satisfied by any of a variety of procedures." *Rhee v. El Camino Hosp. Dist.*, 201 Cal. App. 3d 477, 489 (1988).

Finally, regarding claims that certain peer review decisions had "never happened" before in ABSMC's history, the Court should be again reminded of Ennix's disingenuous citation style. For example, in support of his claim that the SPRC had "never before" forwarded a case to MEC without making a care determination (Ennix

- 11 -

ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

Case 3:07-cv-02486-WHA    Document 175    Filed 04/03/2008    Page 16 of 19

Brief at 6:4-6), Ennix cites merely the testimony of two individuals who said they could not remember of a similar occurrence.

### 3. Ennix Has Not Identified Even A Single Similarly Situated Physician.

"The burden is on the plaintiff to demonstrate he is similarly situated to the employees to whom he is comparing himself." *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1178 (10th Cir. 2000). In its Opening Brief, ABSMC argued that, under relevant case authority, it is very difficult to isolate a "similarly situated" physician in the peer review setting. In response, Ennix says that Drs. Iverson and Khan also had difficulties with an MIV procedure. *See* Ennix Brief at 20:14. But the evidence used to support this argument, Iverson Tr. at 84:15-86:10, does not even remotely establish similarity. Indeed, even assuming *arguendo* that Ennix had record support for his assertion (i.e., that Drs. Iverson and Khan had to abort one MIV procedure and convert it into a standard procedure), this is not "similar" to the extraordinary complications arising out of the **four** MIV patient procedures Ennix botched. Indeed, Ennix does not even allege that the patient of Drs. Iverson and Khan suffered a negative outcome.

### 4. Physician H And Ennix's "Anecdotal Evidence."

Ennix points to Physician H as anecdotal evidence supposedly buttressing his allegations of discrimination against African-Americans. To begin with, Physician H is not even African-American and, from the information provided in his declaration (which is intentionally vague), there is no basis upon which the Court can compare him with Ennix. *See* Decl. of Physician H at ¶ 3 (lines 11-12). Moreover, as with Ennix and Physician I, the California Medical Board sustained the findings of the outside reviewer. *See* Supplemental Request for Judicial Notice at Ex. 1.

In fact, Physician H, who was charged with "Gross Negligence / Incompetence" by the State of California, agreed to accept discipline including the revocation of his medical license, which was stayed pending the successful completion of a 3-year probationary period. *Id.* Far from showing any racial discrimination, what the

- 12 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

1  evidence here establishes is that the Medical Staff used outside reviewers for a good
2  reason: the physicians at issue had significant problems—all of which were subsequently
3  validated by the California Medical Board.  Finally, as numerous courts have found, the
4  use of an outside reviewer shows that the hospital made a good faith effort to reach
5  proper conclusions.  *E.g., Matthews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3rd Cir
6  1996).  This is especially true where, as here, it is conceded by Ennix that NMA was not
7  racially biased and there is no dispute that NMA used cardiac specialists.  At bottom, the
8  fact that Ennix disagrees with the NMA specialists simply cannot support a § 1981 claim.

9       **5.    Statistical Evidence Related To Other Cardiac Surgeons.**
10       Ennix argues that his statistically-adjusted mortality rate was within the
11  acceptable range.  *See* Ennix Brief at 12:19-13:21.  But, this claim fails to acknowledge
12  that the mortality rates in the California study are for coronary bypass procedures only
13  ("CABG" or "ABG") in 2003-2004 and not for all cardiac procedures performed by Ennix.
14  *See* Sweet Decl. at Ex. Z (Page 12 of 21).
15       By contrast a review of the statistically-adjusted mortality rates for valve
16  procedures and coronary bypass procedures relied upon by the AHC (covering the
17  period of 1999 through April 30, 2005) shows that Ennix's significantly higher mortality
18  rates are in two areas: (1) valve procedures and (2) combined AGB and valve
19  procedures.  Looking at all procedures in the combined data, Ennix had an overall
20  mortality rate over the 6.5 year period of 7.4% as compared with his partners' overall
21  rate of 3.8%.  *See* Paxton Decl. at Ex. A (p. 21 of 70 and p. 70 of 70).  True, if one
22  randomly excludes valve procedures and looks only at coronary bypass procedures on
23  p. 70 of 70, the results are less disparate.  But, because Ennix was performing both
24  valve and CABG procedures, it is irrelevant to look only at the CABG-related statistics of
25  the California report.
26       Ennix also argues that his statistically-adjusted mortality was better than at
27  least one Caucasian peer (Dr. Iverson).  But again Ennix is relying on numbers that
28  exclude valve procedures.  And nonetheless both physicians are within the normal range

- 13 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES
SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

looking only at this one type of procedure. *See* Sweet Decl. at Ex. Z (Page 19 of 21 for Ennix and p. 21 of 21 for Iverson). At the end of the day, the AHC, having considered the statistics and other information provided by Ennix, as well as all other available information, made a reasoned judgment. The law requires nothing more.

### 6. The Amateur Statistics Compiled By Ennix's Attorney Are Inadmissible And Meaningless In Any Event.

The chart attached as Exhibit F to the Hernaez Declaration ("Exhibit F") summarizes corrective action taken by the MEC against 16 different physicians for the 15-year period from 1992 through 2007. Of these 16 physicians, only 3 or 4 are African-American (i.e., Physicians B, D, E and—according to Ennix—Physician H).[5] Exhibit A to the Sweet Declaration is a list of the 991 physicians on the Summit medical staff for the 3-year period from 2004 through 2006. Of these, only 547 (55%) are identified by race. From this data, Ennix, through his attorney (and not through a qualified statistician), draws a series of incorrect and inadmissible opinions. *See* Ennix Brief at 21:20-28; *see also* ABSMC's Objections to Evidence Submitted by Plaintiff.

Mr. Sweet's opinions are founded upon a <u>guess</u> as to the racial composition of the medical staff. Nowhere does Mr. Sweet offer a statistical justification for assuming that he can extrapolate the racial composition of the entire medical staff simply by looking at 55% of the group. Indeed, Mr. Sweet's opinions simply ignore 444 physicians. This alone invalidates them. Nor does Mr. Sweet justify his assumption that the racial composition of the physicians from 2004-2006 is the same as its composition from 1992 through 2007. In fact, all that Mr. Sweet's analysis shows is that in a 15-year period only 4 or 5 African-Americans have been subject to MEC review.

And, as discussed above, it is beyond dispute that at least two of the African-American MEC reviews were justified. The Medical Board agreed that Ennix was negligent in 3 out of 10 reviewed cases. *See* Ennix Tr. at 31:8-32:9 & Ex. 4. And

---

[5] The race of one physician, Physician H, is in unclear because (in another glaring example of gamesmanship) the declaration Ennix cites to is drafted to obscure the race of this physician. Presumably Mr. Sweet arrives at 18 MEC reviews because he adds Ennix to the 16 physicians listed in Exhibit F and then counts Physician G twice.

- 14 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA

1  Physician H admitted to charges of Gross Negligence / Incompetence and accepted a
2  host of severe sanctions. See Supplemental Request for Judicial Notice at Ex. 2 (pp. 4-
3  9). Here, Mr. Sweet's statistics wholly fail to account for the fact that MEC reviews were
4  justified on the merits.[6] "[A] statistical study that fails to correct for salient explanatory
5  variables, or even to make the most elementary comparisons, has no value as causal
6  explanation and is therefore inadmissible in a federal court." *People Who Care v.*
7  *Rockford Bd. of Educ.*, 111 F.3d 528, 537-538 (7th Cir. 1997). Statistics cannot be used
8  to avoid summary judgment unless they show "a stark pattern of discrimination
9  unexplainable on grounds other than [the protected characteristic]." *Coleman v. Quaker*
10 *Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000). Mr. Sweet's analysis does no such thing.

### III. CONCLUSION

> The hospital may indeed find itself between the proverbial "rock and a hard place"—being sued by the physician for expelling him from the medical staff or being sued by his patient for not expelling him, or both.

*Oskooi*, 42 Cal. App. 4th at 247-248 (concurring op.)

ABSMC's foremost concern is protecting the safety of its patients. To do that, it must have the freedom to run a robust peer review program, which necessarily includes the right to make reasonable judgment about its physicians. Ennix's lawsuit is bereft of any evidence of race based animus. It is nothing but an attack on a process Ennix disagreed with. The federal courts are not the proper forum for such a dispute.

DATED:   April 3, 2008              Respectfully submitted,
                                     KAUFF MCCLAIN & MCGUIRE LLP

                                     By:_____/S/_____
                                              ALEX HERNAEZ

                                     Attorneys for Defendant
                                     ALTA BATES SUMMIT MEDICAL CENTER

---

[6] In addition, Mr. Sweet opines that Caucasians are more likely to be investigated for "behavioral issues" rather than "standard of care" issues. See Ennix Brief at 22:1-10. As stated in ABSMC's Objections to Evidence Submitted by Plaintiff, there is no logical basis for this distinction and, in any event, Sweet is not qualified to draw such distinctions.

- 15 -

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT ALTA BATES SUMMIT MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

CASE NO. C 07-2486 WHA