1  MAUREEN E. MCCLAIN (State Bar No. 062050)
   Email: mcclain@kmm.com
2  ALEX HERNAEZ (State Bar No. 201441)
   Email: hernaez@kmm.com
3  KAUFF MCCLAIN & MCGUIRE LLP
   One Post Street, Suite 2600
4  San Francisco, California 94104
   Telephone:   (415) 421-3111
5  Facsimile:   (415) 421-0938

6  Attorneys for Defendant
   ALTA BATES SUMMIT MEDICAL CENTER
7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  COYNESS L. ENNIX, JR., M.D.,            CASE NO. C 07-2486 WHA

12              Plaintiff,                  **SUPPLEMENTAL REQUEST FOR
                                            JUDICIAL NOTICE**

13  v.
                                           DATE:     April 24, 2008
14  ALTA BATES SUMMIT MEDICAL CENTER,      TIME:     8:00 a.m.
                                           DEPT:     Ctrm. 9, 19th Flr
15              Defendant.                  JUDGE:    Hon. William H. Alsup

16                                         COMPLAINT FILED: May 9, 2007
                                           TRIAL DATE: June 2, 2008
17

18

19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE                    CASE NO. C 07-2486 WHA

1        Defendant Alta Bates Summit Medical Center hereby request that the

2    Court take judicial notice of the Medical Board of California's Decisions regarding

3    Jaikrishna Balkissoon, M.D. attached as **Exhibit 1** and Sukhdeep K. Grewal, M.D.

4    attached as **Exhibit 2**. It is appropriate for this Court to take notice of records kept by

5    the Medical Board of California. *See Weiswasser v. Mendoza-Powers*, 2007 U.S. Dist.

6    LEXIS 14510 at *8 n.1 (E. D. Cal. 2007).

7    DATED:    April 3, 2008        Respectfully submitted,

8                       KAUFF MCCLAIN & MCGUIRE LLP

9

10                    By:_____ /S/_____

11                          ALEX HERNAEZ

12                    Attorneys for Defendant
ALTA BATES SUMMIT MEDICAL

13                    CENTER

14    4822-5769-6770.1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-1-

SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE            CASE NO. C 07-2486 WHA

# EXHIBIT 1

BEFORE THE
DIVISION OF MEDICAL QUALITY
MEDICAL BOARD OF CALIFORNIA
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA

In the Matter of the Accusation Against: )
)
)
SUKHDEEP K. GREWAL, M.D.                   )       File No.  12 2001 117266
)
Physician's and Surgeon's                 )
Certificate No.  A 52636                   )
)       MEDICAL BOARD OF CALIFORNIA
)       I do hereby certify that this document is a true
Respondent.                        )       and correct copy of the original on file in this
)       office.
Signature _____
Title _____  Date _____

**DECISION**

The attached Proposed Decision is hereby adopted as the Decision and Order of the
Division of Medical Quality of the Medical Board of California, Department of Consumer
Affairs, State of California.

This Decision shall become effective at 5:00 p.m. on ___June 21, 2004___.

IT IS SO ORDERED ___May 20, 2004___.

MEDICAL BOARD OF CALIFORNIA

By: _____
Lorie G. Rice, Chair
Panel A
Division of Medical Quality

BEFORE THE
DIVISION OF MEDICAL QUALITY
MEDICAL BOARD OF CALIFORNIA
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Accusation Against:: | |
| SUKHDEEP K. GREWAL, M.D. | Case No. 12 2001 117266 |
| Physician's and Surgeon's Certificate No. A 52636 | OAH No. N 2003070665 |
| Respondent. | |

## PROPOSED DECISION

Administrative Law Judge Ruth S. Astle, State of California, Office of Administrative Hearings, heard this matter in Oakland, California on November 3 through 6, 12 through 14, and 24 and December 2, 2003.

Kerry Weisel, Deputy Attorney General, represented complainant.

Gerhard O. Winkler, Attorney at Law, represented respondent who was present.

Submission of the matter was deferred for receipt of final arguments, which were received and considered. The matter was submitted on March 22, 2004.

FACTUAL FINDINGS

1.     Ronald Joseph made this accusation in his official capacity as Executive Director of the Medical Board of California (Board) and not otherwise.

2.     On December 8, 1993, Physician's and Surgeon's Certificate No. A 52636 was issued by the Board to Sukhdeep K. Grewal, M.D. (respondent) and at all times relevant to this matter this license has been in full force and effect.

DRUGS

3.     Aricept, a trade name for donepezil hydrochloride tablets, is a reversible inhibitor of the enzyme acetylcholinesterase. It is a dangerous drug within the meaning of

1

the law.  Aricept is indicated for the treatment of mild to moderate dementia of Alzheimer's type.

4.    Ativan is a trade name for lorazepam, a psychotropic drug for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety.  It is a dangerous drug as defined by law and a schedule IV controlled substance.  It has a central nervous system (CNS) depressant effect.

5.    Axid, a trade name for nizatidine capsules, is a competitive, reversible inhibitor of histamine in the histamine H2-receptors, particularly those in the gastric parietal cells.  It is a dangerous drug as defined by law.  It is indicated for the treatment of duodenal and gastric ulcers and for esophagitis.

6.    Baclofen, also know by the trade name Lioresal, is a muscle relaxant and antispastic.  It is a dangerous drug within the meaning of the law.  Baclofen is useful for the alleviation of signs and symptoms of spasticity resulting from multiple sclerosis, particularly for the relief of flexor spasms and concomitant pain, clonus and muscular rigidity.  It is not indicated in the treatment of skeletal muscle spasm resulting from rheumatic disorders.  Hallucinations and seizures have occurred on abrupt withdrawal of baclofen so the dose should be reduced slowly when the drug is discontinued.  The central nervous system effects of baclofen may be additive to those of alcohol and other CNS depressants.

7.    Benadryl, a trade name for diphenhydramine hydrochloride, is an antihistamine drug with drying and sedative effects.  It is a dangerous drug as defined by law.  Benadryl has an atrophine-like action and should therefore be used with caution in patients with a history of lower respiratory disease.  In addition, Benadryl has additive effects with alcohol and other central nervous system depressants.

8.    Ceftazidime is a semi-synthetic, broad-spectrum antibiotic for parenteral administration.  It is a dangerous drug as defined by law.  Ceftazidime is indicated for the treatment of infections caused by susceptible strains of the designated organisms in disease including urinary tract infections.

9.    Depakene, a trade name for valproic acid, is an anti-epileptic agent and a dangerous drug as defined by law.  Valproic acid dissociates to the valproate ion in the gastrointestinal tract.  It is used to treat simple and complex absence seizures and multiple seizure types which include absence seizures.  It is contraindicated in patients with compromised liver function, as hepatic failure resulting in fatality has occurred.  Its central nervous system depressant effects require caution in prescribing in combination with other CNS depressants or in patients who concurrently drink alcohol.  Clearance of this drug may be affected by the concomitant administration of drugs that exhibit extensive protein binding such as aspirin.

10.    Cipro, a trade name for ciprofloxacin hydrochloride, a synthetic broad spectrum anti-microbial agent, is a dangerous drug within the meaning of the law.

Cipro is indicated for the treatment of infections caused by susceptible strains of the designated microorganisms in various conditions including urinary tract infections.

11.    Depakote, a trade name for divalproex sodium, is a dangerous drug as defined by law. Divalproex sodium dissociates to the valproate ion in the gastrointestinal tract. It is used to treat migraine headache, epilepsy and the manic episodes associated with bipolar disorder. It is contraindicated in patients with compromised liver function, as hepatic failure resulting in fatality has occurred. Its central nervous system depressant effects require caution in prescribing in combination with other CNS depressants or in patients who concurrently drink alcohol. Clearance of this drug is affected by many factors, including the taking of aspirin, rifampin, or felbamate. Depakote can also affect the pharmaco-kinetics or pharmaco-dynamics of such drugs as carbamazepine, clonazepam, diazepam and warfarin. The dosage varies depending on the condition it is being used to treat.

12.    The fentanyl patch, which also goes by the trade name Duragesic, is a fentanyl transdermal system. Fentanyl is an opioid analgesic. It is a dangerous drug as defined by law and a schedule II controlled substance as defined by law. Fentanyl is a strong opioid medication and the fentanyl patch is indicated only for treatment of severe chronic pain that cannot be managed by lesser means and that requires continuous opioid administration. Fentanyl presents a risk of serious or life-threatening hypoventilation. When patients are using the fentanyl patch, the dosage of CNS depressant drugs should be reduced by 50%. Use of the fentanyl patch together with other CNS depressants, including alcohol, can result in increased risk to the patient.

13.    Flumazenil, also known by the trade name Romazicon, is a benzodiazepine receptor antagonist. It is a dangerous drug as defined by law. Flumazenil is indicated for the complete or partial reversal of sedative effects of benzodiazepines in cases where general anesthesia has been induced and/or maintained with benzodiazepines, where sedation has been produced with benzodiazepines for diagnostic and therapeutic procedures, and for the management of benzodiazepine overdose.

14.    Fosamax is a trade name for alendronage sodium tablets, a dangerous drug as defined by law. Fosamax is indicated for the treatment and prevention of osteoporosis in postmenopausal women.

15.    Gabapentin, which also goes by the trade name Neurontin, is an anti-epileptic and is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. It is a dangerous drug within the meaning of the law. The most commonly observed adverse events associated with the use of gabapentin in combination with other anti-epileptic drugs were somnolence, dizziness, ataxia, fatigue, and nystagmus.

16.    Haldol, a trade name for haloperidol, is a major tranquilizer used for the management of manifestations of psychotic disorders. It is a dangerous drug within the meaning of the law. Adverse reactions associated with the use of Haldol include

3

Extrapyramidal Symptoms (EPS), insomnia, restlessness, anxiety, agitation and hypotension. EPS can be categorized generally as Parkinson-like symptoms such as cog-wheeling, akathisia or dystonia.

17.    Klonopin is a trade name for clonazepam, an anti-convulsant of the benzodiazepine class of drugs. It is a dangerous drug as defined by law and a schedule IV controlled substance as defined by law. It produces CNS depression and should be used with caution with other central nervous system depressant. Like other benzodiazepines, it can produce psychological and physical dependence. Withdrawal symptoms similar to those noted with barbiturates and alcohol have been noted upon abrupt discontinuance of Klonopin.

18.    Lasix is a trade name for furosemide, a diuretic. It is a dangerous drug as defined by law. Lasix is indicated for the treatment of edema and hypertension.

19.    Lisinopril, also known by the trade name Prinivil, is a synthetic peptide derivative. It is a dangerous drug within the meaning of the law. Lisinopril is indicated for hypertension, heart failure, and acute myocardial infarction.

20.    Luvox is a trade name for fluvoxamine maleate, a selective serotonin reuptake inhibitor (SSRI). It is a dangerous drug as defined by law. Luvox is indicated for the treatment of obsessive compulsive disorder. Benzodiazepines metabolized by hepatic oxidation (e.g. alprazolam, midazolam, triazolam, etc.) should be used with caution with Luvox because the clearance of these drugs is likely to be reduced by fluvoxamine.

21.    Narcan, a trade name for naloxone hydrochloride, is a narcotic antagonist. It is a dangerous drug as defined by law. It is indicated for complete of partial reversal of narcotic depression, including respiratory depression induced by opioids.

22.    Paxil, a trade name for paroxetine hydrochloride, is a selective serotonin reuptake inhibitor chemically unrelated to other SSRIs, tricyclic, tetracyclic or other available antidepressant agents. It is a dangerous drug as defined by law. Paxil is used for the treatment of depression, obsessive compulsive disorder, panic disorder and social anxiety disorder.

23.    Plavix, a trade name for clopidogrel bisulfate tablets, is an inhibitor of platelet aggregation. It is a dangerous drug as defined by law. Plavix is indicated for the reduction of atherosclerotic event (myocardial infarction, stroke and vascular death) in patients with atherosclerosis documented by recent stroke, recent myocardial infarction or established peripheral arterial disease.

24.    Potassium Chloride is indicated for the prevention and treatment of potassium depletion and hypokalemic-hypochloremic alkalosis. It is a dangerous drug within the meaning of the law.

4

25.    Risperidal, a trade name for risperidone, is an anti-psychotic agent of the benzisoxazole class and is indicated for the management of the manifestations of psychotic disorder. It is a CNS active drug and a dangerous drug as defined by law.

26.    Rocephin, a trade name for ceftriaxone sodium, is a semi-synthetic broad spectrum cephalosporin antibiotic. It is a dangerous drug as defined by law. Rocephin is indicated for the treatment of urinary tract and other infections.

27.    Seroquel, a trade name for quetiapine fumarate, is an anti-psychotic drug. It is a dangerous drug as defined by law. Seroquel is indicated for the management of the manifestations of psychotic disorders.

28.    Sinemet is a trade name for a combination of carbidopa and levodopa for the treatment of Parkinson's disease and syndrome. It is a dangerous drug as defined by law. Sinemet is associated with dyskinesias. It may cause mental disturbances and patients should be observed carefully for the development of depression with concomitant suicidal tendencies. Patients with past or current psychoses should be treated with caution. Sinemet 25-100 contains 25 mg of cabidopa and 100 mg of levodopa.

29.    Tegretol, a trade name for carbamazepine USP, is a dangerous drug within the meaning of the law. It is indicated for use as an anticonvulsant drug and in the treatment of the pain associated with true trigeminal neuralgia. The possibility of activation of a latent psychosis and, in elderly patients, of confusion or agitation should be borne in mind when prescribing or administering Tegretol. It is recommended that before beginning therapy with carbamazepine, a detailed history be taken and a thorough physical examination given, since it may exacerbate hematologic problems and should be used with caution in patients with a history of cardiac, hepatic or renal damage or patients who have had an adverse hematologic reaction to other drugs. Complete pretreatment blood counts, including platelets and possibly reticulocytes and serum iron should be obtained as a baseline, in case during the course of treatment, the patient exhibits low or decreased white blood cell or platelet counts. Increased plasma carbamazepine levels can be caused by the presence of valproate. Nervous system adverse reaction include dizziness, disturbance of coordination, confusion, abnormal voluntary movements and speech disturbances.

30.    Temazepam is a hypnotic agent sold under the trade name Restoril. It is a dangerous drug as defined by law and a schedule IV controlled substance and narcotic as defined by law. Temazepam is indicated for the short-term treatment of insomnia (generally 7 – 10 days. Patients using temazepam should be warned about the possible combined effects with alcohol and other central nervous system depressants.

31.    Trazodone hydrochloride, a triazolopyridine derivative anti-depressant, sometimes marketed under the trade name Desyrel, is a dangerous drug within the meaning of the law.

5

32.    Vasotec, a trade name for enalapril maleate, is an angiotensin-converting enzyme (ACE) inhibitor. It is a dangerous drug as defined by law. Vasotec is indicated for the treatment of hypertension and symptomatic congestive heart failure.

33.    Vioxx, a trade name for rofecoxib, is a nonsteroidal anti-inflammatory drug. It is a dangerous drug as defined by law. It is indicated for relief of the signs and symptoms of osteoarthritis, for the management of acute pain in adults, and for the treatment of primary dysmenorrhea.

34.    Zantac is a trade name for ranitidine hydrochloride. Zantac 150 is a dangerous drug as defined by law and is indicated for the treatment of ulcers, GERD, and erosive esophagitis.

35.    Zoloft, a trade name for sertraline hydrochloride, is an SSRI chemically unrelated to other SSRIs, tricyclic, tetracyclic or other available antidepressant agents. It is a dangerous drug as defined by law. Zoloft is used for the treatment of depression, obsessive compulsive disorder and panic disorder.

36.    Zyprexa, a trade name for olanzapine, is a psychotropic agent that belongs to the thienobenxodiazepine class. It is a dangerous drug as defined by law. Zyprexa is indicated for the management of the manifestations of psychotic disorders, the treatment of schizophrenia and the short term treatment of acute manic episodes associated with Bipolar I disorder.

FACTS

37.    At all time relevant to this matter, Sukhdeep K. Grewal, M.D. (respondent) practiced in or around Oakland, California. She was the director of the inpatient geriatric psychiatry unit at Summit Hospital in Oakland.

38.    On October 31, 2000, patient MS was referred by her family physician to the geriatric psychiatry unit at Summit Hospital. She had been falling down in recent months and had suffered behavioral deterioration. Her husband of 66 years had died eight months earlier, but had been buried more recently. At the time of her admission, MS was agitated, nervous, not sleeping and was having visual hallucinations.

39.    Dr. Grewal noted a medical history significant for Alzheimer's dementia, depression, peptic ulcer, congestive heart failure, hip fracture and compression fracture of lumbar spine.

40.    In addition, MS had osteoporosis and had suffered fractures of the knee, hip shoulder, spine, and ribs, had been on painkillers, required daily catheterization by her caregiver, had been on intravenous antibiotics for recurrent urinary tract infections, and had a history of intense reactions to medications resulting in severe behavioral disorganization.

41.    Dr. Grewal also noted in the initial admission mental status examination for MS that she was alert and oriented to name only, her mood was irritable, she was very repetitive, she repeated things obsessively,[1] she had poor sleep, she was restless and anxious, she had difficulty being redirected, her mood was quite labile, her insight, judgment and impulse control were poor, her cognition and intellect were poor, and she was "...confused, disorganized due to diagnosis of Alzheimer's dementia." The patient was also having visual hallucinations.

42.    Dr. Grewal's psychiatric diagnosis was "...psychotic disorder not otherwise specified, probably secondary to medical history of dementia,[2] history of anxiety disorder, possibly mood lability." Respondent did not include delirium[3] in her differential diagnosis. The symptoms set forth in Finding 41 are all consistent with a diagnosis of delirium. MS was at high risk for delirium. The fact that she was on multiple medications and had a chronic urinary tract infection make it essential that delirium be considered in the differential diagnosis.

43.    Dr. Grewal's plan for MS, a 90 year old[4] woman on numerous medications with multiple serious medical problems, did not include a complete medical work-up and evaluation of possible medication side effects to discover the etiology of her acute confusional episode. The old-old body handles medications differently. Age affects the way medications are metabolized, excreted and distributed.

44.    MS had signed a Durable Power of Attorney for Health Care in 1992 designating her daughter to make health care decisions for her should she be unable to do so herself.

45.    MS's daughter advised Dr. Grewal that her mother was very sensitive to medications. She provided Dr. Grewal with a written statement in which she reported, among other things, that "...the week of 10/16/00 we gave [MS] Darvocet for the pain in addition to her [fentanyl] patch. Also Lorizapan (sic) .5 mg as needed and then 2 tablets every four hours for 1/2 a day. It made her go out of her mind."

46.    MS's medications at the time of admission were: Zyprexa, Fosamax, Lasix, potassium chloride, Zantac, calcium, Cipro, Plavix, Vasotec, Zoloft, magnesium, and Aricept. Dr. Grewal ordered all medications except Zantac, Aricept, Tylenol and Vasotec held until MS was evaluated by her referring physician. Dr. Grewal did not continue MS's

---

[1] She repeated the Catholic prayer of the Rosary.
[2] Dementia is defined in Dorland's Illustrated Medical Dictionary, Twenty-fifth Edition, W.B. Saunders, Philadelphia, London, Toronto as: "a general designation for mental deterioration;"
[3] Delirium is defined in Dorland's Illustrated Medical Dictionary, Twenty-fifth Edition, W.B. Saunders, Philadelphia, London, Toronto as: "a mental disturbance marked by illusions, hallucinations, short unsystematized delusions, cerebral excitement, physical restlessness and incoherence, and having a comparatively short course. Delirium usually reflects a toxic state."
[4] MS's age qualifies her as "old-old". Medications metabolize differently in the old-old. Special considerations must be made for those persons in this category when making decisions about medications.

daily 7.5 mg of Zyprexa. Following the referring physician's review, the rest of the medications were continued initially except that the hospital pharmacy substituted Axid for Zantac and lisinopril for Vasotec. Although the admitting orders do not mention a fentanyl patch, it appears that MS was using a 25 mcg per hour fentanyl patch which was also continued. In addition, although the admitting orders note 25 mg of Benadryl at bedtime, it is not mentioned elsewhere and it does not appear that MS was taking it before she was admitted to the geriatric psychiatry unit and it was ordered by Dr. Grewal.

47.     On November 1, 2000, MS signed three informed consent forms. She signed a form for SSRI antidepressants which specified Paxil 5 to 40 mg; a form for benzodiazepine sedatives and hypnotics which specified temazepam 7.5 to 60 mg, Klonopin .25 to 6 mg, and Ativan .25 to 6 mg; and a form for major tranquillizers which specified Risperidal .25 to 6 mg, Haldol .25 to 6 mg, Zyprexa 2.5 to 10 mg, and Seroquel 25 to 200 mg. Despite MS's inability to give informed consent due to her mental confusion, her daughter was not asked to sign or countersign any of these informed consent forms.

48.     On November 1, 2000, Dr. Grewal started MS on Klonopin .5 mg, Ativan .5 mg and Haldol 1 mg and discontinued her daily 150 mg of Zoloft. Dr. Grewal stated that she gave MS Klonopin because she was "basically agitated," gave her Haldol because she was " acting paranoid," and gave her Ativan because she was "quite agitated." MS was also started on gabapentin, Baclofen, Vioxx, and Rocephin on November 1, 2000. Her fentanyl patch was continued and she received Benadryl 25 mg as needed at bedtime from November 1, 2000 through November 8, 2000.

49.     Benadryl has anti-cholinergic effects and, in people with Alzheimer's where brain cholinergic activity is already abnormally low, worsens memory deficits. The elderly are at greater risk for Benadryl's side effects of memory lapses, cognitive slowing and next day sedation.

50.     Klonopin is a long acting benzodiazepine with a half-life[5] of 18 to 50 hours. The medication can take days, weeks, or even months to clear from the system of an elderly person and therefore have a high risk for adverse drug effects in the elderly.

51.     In addition, Haldol is a lipophilic drug[6] that accumulates in sites of high lipid content and is released over time into the bloodstream even after the drug has been discontinued.

52.     In the old-old, an appropriate starting dose of Klonopin is .25 mg. and of Haldol is .25 to .5 mg.

---

[5] This is the a measurement of the time it takes for the body to clear the drug from its system.
[6] This drug accumulates in the fat cells of the body.

53.    On November 2, 2000, one day after starting MS on Klonopin, Dr. Grewal increased her dose of Klonopin 300% to 1.5 mg daily. She also started MS on a low dose of 50 mg of Luvox for her perceived symptoms of "obsession."

54.    Psychotropic medications such as Klonopin should be continued at a constant therapeutic dose for a reasonable duration of time to assess their efficacy before slowly increasing the dosage.

55.    On November 4, 2000, Dr. Grewal ordered another dose of Ativan .5 mg for MS. She also discontinued the Luvox on the same date because she was concerned the MS might become manic.

56.    On November 4, 2000, Dr. Grewal described MS as " out of it" and "confused." The same day, MS signed an informed consent form for Valproic Acid and derivatives that specifically identified Depakene. The form noted that the medication was being prescribed to treat her mood lability. MS's daughter did not sign or countersign this informed consent form.

57.    On November 4, 2000, Dr. Grewal started MS on the mood stabilizer Depakote. MS was already receiving another mood stabilizer, gabapentin. MS received 500 mg of Depakote on November 4, 2000. An appropriate starting dose in an old-old patient is 125 mg or less. She received 250 mg of Depakote on November 5, 2000 and by the evening of November 5, 2000, she was sedated and Dr. Grewal held the evening dose.

58.    On November 6, 2000, MS was agitated, confused, and drowsy throughout the day. Dr. Grewal ordered a urine culture and obtained a chemistry panel. Dr. Grewal noted that MS's BUN was elevated so she pushed fluids for dehydration.

59.    On November 6, 7 and 8, 2000, MS received Depakene (250 mg, 375 mg and 125 mg, respectively), instead of Depakote[7]. On November 8, 2000, in addition to the 125 mg of Depakene, MS also received 250 mg of Depakote. On November 8, 2000, Dr. Grewal ordered MS's Depakote dose increased because of increased agitation and on November 9, 10, and 11, 2000, she received 625 mg of Depakote.

60.    Depakene and Depakote should be continued at a constant therapeutic dose for a reasonable duration of time to assess its efficacy before slowly raising the dosage. A legitimate off label use of valproic acid is for agitation in Alzheimer's patients. However, this does not change the necessity to assess the efficacy of the drug.

61.    On November 7, 2000, Dr. Grewal discontinued MS's Klonopin and Haldol. The Rocephin was also discontinued on November 7, 2000, and ceftazadine started.

---

[7] Depakote is the pill form of valproic acid.

62.    On November 8, 2000, Dr. Grewal ordered that MS be out of bed and walked every day. She observed that patients sometimes become restless "just from lying around." MS required assistance to walk even short distances and there is no evidence that she was being walked before November 8, 2000.

63.    On November 9, 2000, Dr. Grewal noted that MS had "cog-wheeling." Haldol can cause a drug-related and reversible Parkinsonian syndrome that can include cog-wheeling. Dr. Grewal decided, however, that since the Haldol had been discontinued earlier, the cog-wheeling was the result of Parkinson's disease even though the 90 year old patient had no history of Parkinson's disease. As noted before, Haldol has a long half-life, especially in the old-old. Dr. Grewal started MS on the anti-Parkinson's medication Sinemet on November 9, 2000; order that she receive on Sinemet 25 – 100 mg capsule twice a day.

64.    Neither MS nor her daughter signed an informed consent form for the medication Sinemet. Sinemet is well known to have serious side effects including hallucinations and paranoia, with a higher risk of these side effects in the old-old. It is not appropriately prescribed when the Parkinson's disease is mild or probably due to a reversible drug side effect.

65.    Dr. Grewal observed that when MS's daughter came to see MS, MS would become more agitated. Dr. Grewal suggested that the daughter's visits upset MS and she suggested that she not visit MS so often. The most serious problem with this request is that MS cannot be treated in a vacuum. She lived with her daughter and that is where she was going to return after the patient was discharged from the hospital. Any management of MS's symptoms had to be dealt with in that context.

66.    On November 10, 2000, MS signed an informed consent form for Tegretol. MS's daughter did not sign or countersign this informed consent form.

67.    On November 10, 2000, Dr. Grewal started MS on Tegretol, 100 mg per day as a mood stabilizer. MS was already receiving two other mood stabilizers, Depakote and gabapentin and was likely already experiencing adverse medication side effects including fatigue, and dizziness.

68.    On November 11, 2000, MS was not eating or drinking, was dehydrated and had a change in her level of consciousness. She was started on intravenous fluids and later in the afternoon, Dr. Grewal ordered all psychotropic medications discontinued. At that time the psychotropic medications MS was taking were Depakote 625 mg daily, Sinemet 25 – 100 mg twice a day, Tegretol 100 mg daily and Neurontin 300 mg daily.

69.    MS was transferred to the emergency room on November 11, 2000, because her BUN and WBC count were elevated, her blood pressure and heart rate were low, and she had an altered state of consciousness. The diagnosis for MS was: altered state of consciousness, rule out urosepsis.

70.     In the emergency room, MS was given Narcan (a narcotic antagonist) with no effect and Flumazenil (a benzodiazepine receptor antagonist), which did have effect. MS became more alert.

71.     MS was admitted to the medical floor at Summit Hospital. The history and physical for the medical admission notes an altered level of consciousness, hypotension and bradycardia. The admitting physician ordered all psychiatric medications and medications causing sedation held because MS "currently has too many psychiatric medications."

72.     The Standard of Practice as articulated by Dr. Laura Duskin is for a psychiatrist to consider delirium in the differential diagnosis of psychosis or any significant alteration of mental status. Failure to do so is an extreme departure from the standard of practice. It was established by clear and convincing evidence that Respondent failed to act consistently with a differential diagnosis for MS of delirium, despite the fact that delirium is the most common cause of confusional episodes in the elderly. This constitutes gross negligence on the part of Dr. Grewal. Dr. Grewal dismissed this possibility claiming that MS's primary care physician, Dr. Michelle Branchaud-Simi would have diagnosed the delirium and brought it to her attention. It was Dr. Grewal's responsibility to discuss the possibility of delirium with MS's primary care physician and to act consistent with a differential diagnosis of delirium until it could be ruled out.

73.     It was established by clear and convincing evidence that Respondent failed to act consistently with a differential diagnosis for MS of delirium and ensure a complete medical work-up to rule out a medical or medication induced delirium as the cause for MS's altered mental status until November 11, 2000. This constitutes incompetence. A physician should proceed with caution in prescribing medications when there is a significant possibility of delirium. Respondent should have discussed reducing the total number of medications for MS and only given her short acting medications. A physician should not use CNS active drugs on a patient with the significant possibility of delirium except in a medical emergency. At the time of MS's admission there was no such medical emergency. Dr. Duskin expresses concern in her report that the "longer the delirium persists, and the longer the underlying cause is not recognized and addressed, the greater the risk of death or permanent disability."

74.     It was established by clear and convincing evidence that Respondent's use of psychopharmacology was inappropriate and dangerous. This constitutes gross negligence. Respondent selected inappropriate psychiatric medication and CNS medications; she used inappropriate starting dosages of the medication; she failed to monitor properly the efficacy and side effects of the medications; she improperly used poly pharmacy; and she rapidly escalated dosages and discontinued medications inappropriately. As articulated by Dr. Duskin, the standard of practice for a psychiatrist is to use the least number of medications in the smallest dosage in treating a condition. This is especially important when treating the old-old because the old-old are more susceptible to neurologic side-effects. Dr. Grewal departed from the standard of care when she ordered Ativan and Haldol to be given simultaneously on two occasions.

75.    It was established by clear and convincing evidence that Respondent failed to obtain the consent of MS's daughter, the holder of a Durable Power of Attorney for Health Care, for each of the medications given to MS. The Durable Power of Attorney covers both medical care and mental care. It was clear that MS could not give meaningful informed consent. This constitutes gross negligence. While part of the fault lies with the institution, the physician is ultimately responsible for obtaining informed consent. If the concept of **informed** (emphasis added) consent is to have any meaning, it must be given by someone who can appreciate the dangers and side effects, weight the risks and benefits, and make an informed decision to take the risk. Clearly, MS did not have the capacity to make this kind of decision. In this case there was an easy solution. The daughter had the power to consent. While it would require the extra step of explaining the medications and side effects to another person, that is not an unreasonable burden to place on a physician.

76.    It was established by clear and convincing evidence that Respondent's failure to involve MS's daughter in the care and treatment of her confused and elderly mother constitutes a cause for disciplinary action as repeated acts of negligence. As noted above, the patient did not exist in a vacuum. She had a daughter and a care-giver who were going to continue to relate to MS after MS was discharged from the hospital. There was no evidence of abuse or neglect of the patient by the daughter that would invalidate the daughter's authority to act as a surrogate decision maker. It may be inconvenient and difficult to deal with family members who are upset and concerned about their relative. "Bumping into" the daughter in the hallway does not constitute involving the family members. The physician must take the time to fully discuss the care and progress of the patient. Respondent did not do this.

77.    Respondent's experts were not persuasive. They were not purely objective witnesses. One was a friend of respondent's brother, Dr. Reddy, and another was her colleague. Dr. Sabetian was not board certified in geriatric psychiatry. Dr. Duncan, who was a colleague of Dr. Gewal's did not have a CV, but testified that he was Board Certified in Psychiatry and Neurology, but not Geriatric Psychiatry. Dr. Reddy claimed that there is no standard of practice for geriatric psychiatry. Both of complainant's experts disagreed and articulated specific standards for geriatric psychiatry. The credentials of the Complainant's experts were superior to those of Respondent's experts. Dr. Duskin graduated from of the University of California at San Francisco Medical School in 1982. She did her psychiatric residency there from 1984 to 1987. She is Board Certified in Psychiatry and Geriatric Psychiatry. She is currently working as a psychiatrist for Kaiser Permanente Adult Services at the South San Francisco Medical Center and Senior Physician Specialist, Psychiatry for the San Francisco Department of Public Health community Clinics. She previously was Senior Physician specialist, Consultation-Liaison Psychiatry and Geriatric Psychiatry at San Francisco Department of Public Health facility at Laguna Honda Hospital. There was absolutely no evidence that complainant's experts were biased or prejudiced against respondent based on her race or age. Dr. Fenn, complainant's second expert, essentially concurred with Dr. Duskin. He is a 1971 graduate of Loyola University, Stritch School of Medicine. He did his residency at San Francisco General Hospital and Langley Porter Institute, University of California at San Francisco. At the time of this hearing he was the

Medical Director at the Acute Geropsychiatry Inpatient Unit at the Veterans Affairs Health Care System/Palo Alto. He is board certified in Psychiatry and Neurology and in Geriatric Psychiatry as well as Forensic Psychiatry.

78.     Respondent's contention that MS was improving every day is simply not supported by the medical records or the testimony. By November 6, 2000, MS had significantly deteriorated from the mental status she had when she was admitted.

79.     The use of Respondent's best judgment is not a defense to gross negligence, incompetence and/or repeated acts of negligence. On the contrary, if this case demonstrates respondent's best judgment, then it is appropriate to require respondent to take additional training before she can continue to practice in geriatric psychiatry.

80.     The argument that this matter can be condensed into an ongoing debate among experts in the field is simply not the case. While there may be some disagreement among the experts about the efficacy of some of the drugs used by respondent in the treatment of MS, that dispute is not the basis for the finding of gross negligence, incompetence and/or repeated acts of negligence.

81.     Dr. Grewal attended medical school at the Government Medical College in Amritsar, India. She graduated in 1984. After graduating from medical school, Dr. Grewal spend some time raising her family. In 1992 she began a psychiatric residency program at King Drew Medical Center in Los Angeles. She completed her residency in 1996. Respondent completed a fellowship at Stanford University in geriatric psychiatry in 1997. She is not board-certified in psychiatry or geriatric psychiatry. She has been in the field of geriatric psychiatry for approximately seven years. She was the director of the inpatient geriatric psychiatry unit at Summit Hospital in Oakland at the time of the matters referred to in this decision. She has had no prior disciplinary action taken against her license. It would not be against the public interest to allow respondent to continue to practice under terms and conditions of probation including an evaluation by the PACE program or similar program and education and training as directed by the program.

82.     The Board established that the reasonable costs of investigation and preparation of this matter were $24,724.00 for the Attorney General's costs, $4,275.44 for investigation and enforcement, and $9,800.00 for expert review for a total cost of $38,799.44.

## LEGAL CONCLUSIONS

1.     By reason of the matters set forth in Findings 3 through 36 (drugs) and 37 through 72, cause for disciplinary action exists pursuant to Business and Professions Code sections 2234 (a) and (b) (gross negligence) based on respondent's failure to act consistently with a differential diagnosis of delirium.

13

2.      By reason of the matters set forth in Findings 3 through 36 (drugs) and 37 through 71 and 73, cause for disciplinary action exists pursuant to Business and Professions Code sections 2234 (a) and (d) (incompetence) based on respondent's course of medical care and use of medications.

3.      By reason of the matters set forth in Findings 3 through 36 (drugs) and 37 through 71 and 74, cause for disciplinary action exists pursuant to Business and Professions Code sections 2234(a) and (b) (gross negligence) based on respondent's use of psychopharmacology.

4.      By reason of the matters set forth in Findings 3 through 36 (drugs) and 44, 47, 56, 64, 66 and 75, cause for disciplinary action exists pursuant to Business and Professions Code sections 2234 (a) and (c) gross negligence based on respondent's failure to obtain informed consent.

5.      By reason of the matters set forth in Findings 3 through 36 (drugs) and 44, 45, 47, 56, 64, 65, 66, and 76, cause for disciplinary action exists pursuant to Business and Professions Code sections 2234(a) and 2234 (c) (repeated acts of negligence) based on respondent's failure to involve the patient's family in her care.

6.      The matters set forth in Findings 77 through 80 have been considered in making the following order.

7.      Cost recovery in the amount of $38,799.34 is allowed pursuant to Business and Professions Code section 125.3 as the reasonable cost of investigation and enforcement of this matter.

ORDER

Physician's and Surgeon's Certificate No. A 52636 issued to respondent Sukhdeep K. Grewal, M.D., is hereby revoked.

However, revocation stayed and respondent is placed on probation for five (5) years upon the following terms and conditions:

1.      Controlled Substances- Maintain Records and Access to Records and Inventories

Respondent shall maintain a record of all controlled substances ordered, prescribed, dispensed, administered, or possessed by respondent, during probation, showing all the following:  1) the name and address of patient; 2) the date; 3) the character and quantity of controlled substances involved; and 4) the indications and diagnosis for which the controlled substances were furnished.

14

Respondent shall keep these records in a separate file or ledger, in chronological order. All records and any inventories of controlled substances shall be available for immediate inspection and copying on the premises by the Division or its designee at all times during business hours and shall be retained for the entire term of probation.

Failure to maintain all records, to provide immediate access to the inventory, or to make all records available for immediate inspection and copying on the premises, is a violation of probation.

2.    Education Course

Within 60 calendar days of the effective date of this Decision, and on an annual basis thereafter, respondent shall submit to the Division or its designee for its prior approval an educational program(s) or course(s) which shall not be less than 40 hours per year, for each year of probation. The educational program(s) or course(s) shall be aimed at correcting any areas of deficient practice or knowledge and shall be Category I certified, limited to classroom, conference, or seminar settings. The educational program(s) or course(s) shall be at respondent's expense and shall be in addition to the Continuing Medical Education (CME) requirements for renewal of licensure. Following the completion of each course, the Division or its designee may administer an examination to test respondent's knowledge of the course. Respondent shall provide proof of attendance for 65 hours of CME of which 40 hours were in satisfaction of this condition.

3.    Prescribing Practices Course

Within 60 calendar days of the effective date of this Decision, respondent shall enroll in a course in prescribing practices, at respondent's expense, approved in advance by the Division or its designee. Failure to successfully complete the course during the first 6 months of probation is a violation of probation.

A prescribing practices course taken after the acts that gave rise to the charges in the Accusation, but prior to the effective date of the Decision may, in the sole discretion of the Division or its designee, be accepted towards the fulfillment of this condition if the course would have been approved by the Division or its designee had the course been taken after the effective date of this Decision.

15

Respondent shall submit a certification of successful completion to the Division or its designee not later than 15 calendar days after successfully completing the course, or not later than 15 calendar days after the effective date of the Decision, whichever is later.

4.     Ethics Course

Within 60 calendar days of the effective date of this Decision, respondent shall enroll in a course in ethics, at respondent's expense, approved in advance by the Division or its designee. Failure to successfully complete the course during the first year of probation is a violation of probation.

An ethics course taken after the acts that gave rise to the charges in the Accusation, but prior to the effective date of the Decision may, in the sole discretion of the Division or its designee, be accepted towards the fulfillment of this condition if the course would have been approved by the Division or its designee had the course been taken after the effective date of this Decision.

Respondent shall submit a certification of successful completion to the Division or its designee not later than 15 calendar days after successfully completing the course, or not later than 15 calendar days after the effective date of the Decision, whichever is later.

5.     Clinical Training Program

Within 60 calendar days of the effective date of this Decision, respondent shall enroll in a clinical training or educational program equivalent to the Physician Assessment and Clinical Education Program (PACE) offered at the University of California - San Diego School of Medicine ("Program").

The Program shall consist of a Comprehensive Assessment program comprised of a two-day assessment of respondent's physical and mental health; basic clinical and communication skills common to all clinicians; and medical knowledge, skill and judgment pertaining to respondent's specialty or sub-specialty, and at minimum, a 40 hour program of clinical education in the area of practice in which respondent was alleged to be deficient and which takes into account data obtained from the assessment, Decision(s), Accusation(s), and any other information that the Division or its designee deems relevant. Respondent shall pay all expenses associated with the clinical training program.

16

Based on respondent's performance and test results in the assessment and clinical education, the Program will advise the Division or its designee of its recommendation(s) for the scope and length of any additional educational or clinical training, treatment for any medical condition, treatment for any psychological condition, or anything else affecting respondent's practice of medicine. Respondent shall comply with Program recommendations.

At the completion of any additional educational or clinical training, respondent shall submit to and pass an examination. The Program's determination whether or not respondent passed the examination or successfully completed the Program shall be binding.

Respondent shall complete the Program not later than six months after respondent's initial enrollment unless the Division or its designee agrees in writing to a later time for completion.

Failure to participate in and complete successfully all phases of the clinical training program outlined above is a violation of probation.

If respondent fails to complete the clinical training program within the designated time period, respondent shall cease the practice of medicine within 72 hours after being notified by the Division or its designee that respondent failed to complete the clinical training program.

6.    Notification

Prior to engaging in the practice of medicine the respondent shall provide a true copy of the Decision(s) and Accusation(s) to the Chief of Staff or the Chief Executive Officer at every hospital where privileges or membership are extended to respondent, at any other facility where respondent engages in the practice of medicine, including all physician and locum tenens registries or other similar agencies, and to the Chief Executive Officer at every insurance carrier which extends malpractice insurance coverage to respondent. Respondent shall submit proof of compliance to the Division or its designee within 15 calendar days.

This condition shall apply to any change(s) in hospitals, other facilities or insurance carrier.

7.    Supervision of Physician Assistants

During probation, respondent is prohibited from supervising physician assistants.

17

8.     Obey All Laws

Respondent shall obey all federal, state and local laws, all rules
governing the practice of medicine in California and remain in full
compliance with any court ordered criminal probation, payments, and
other orders.

9.     Quarterly Declarations

Respondent shall submit quarterly declarations under penalty of perjury
on forms provided by the Division, stating whether there has been
compliance with all the conditions of probation. Respondent shall
submit quarterly declarations not later than 10 calendar days after the
end of the preceding quarter.

10.     Probation Unit Compliance

Respondent shall comply with the Division's probation unit.
Respondent shall, at all times, keep the Division informed of
respondent's business and residence addresses. Changes of such
addresses shall be immediately communicated in writing to the
Division or its designee.  Under no circumstances shall a post office
box serve as an address of record, except as allowed by Business and
Professions Code section 2021(b).

Respondent shall not engage in the practice of medicine in respondent's
place of residence.  Respondent shall maintain a current and renewed
California physician's and surgeon's license.

Respondent shall immediately inform the Division or its designee, in
writing, of travel to any areas outside the jurisdiction of California
which lasts, or is contemplated to last, more than thirty (30) calendar
days.

11.     Interview with the Division or it's Designee

Respondent shall be available in person for interviews either at
respondent's place of business or at the probation unit office, with the
Division or its designee upon request at various intervals and either
with or without prior notice throughout the term of probation.

12.     Residing or Practicing Out-of-State

In the event respondent should leave the State of California to reside or
to practice respondent shall notify the Division or its designee in

18

writing 30 calendar days prior to the dates of departure and return.
Non-practice is defined as any period of time exceeding thirty calendar
days in which respondent is not engaging in any activities defined in
sections 2051 and 2052 of the Business and Professions Code.

All time spent in an intensive training program outside the State of
California which has been approved by the Division or its designee
shall be considered as time spent in the practice of medicine within the
State. A Board-ordered suspension of practice shall not be considered
as a period of non-practice. Periods of temporary or permanent
residence or practice outside California will not apply to the reduction
of the probationary term. Periods of temporary or permanent residence
or practice outside California will relieve respondent of the
responsibility to comply with the probationary terms and conditions
with the exception of this condition and the following terms and
conditions of probation:  Obey All Laws; Probation Unit Compliance;
and Cost Recovery.

Respondent's license shall be automatically cancelled if respondent's
periods of temporary or permanent residence or practice outside
California totals two years. However, respondent's license shall not
be cancelled as long as respondent is residing and practicing medicine
in another state of the United States and is on active probation with
the medical licensing authority of that state, in which case the two year
period shall begin on the date probation is completed or terminated in
that state.

13.     Failure to Practice Medicine - California Resident

In the event respondent resides in the State of California and for any
reason respondent stops practicing medicine in California, respondent
shall notify the Division or its designee in writing within 30 calendar
days prior to the dates of non-practice and return to practice. Any
period of non- practice within California, as defined in this condition,
will not apply to the reduction of the probationary term and does not
relieve respondent of the responsibility to comply with the terms and
conditions of probation. Non-practice is defined as any period of time
exceeding thirty calendar days in which respondent is not engaging in
any activities defined in sections 2051 and 2052 of the Business and
Professions Code.

All time spent in an intensive training program which has been
approved by the Division or its designee shall be considered time spent

19

in the practice of medicine. For purposes of this condition, non-practice due to a Board-ordered suspension or in compliance with any other condition of probation, shall not be considered a period of non-practice.

Respondent's license shall be automatically cancelled if respondent resides in California and for a total of two years, fails to engage in California in any of the activities described in Business and Professions Code sections 2051 and 2052.

14.    Completion of Probation

Respondent shall comply with all financial obligations (e.g., cost recovery, restitution, probation costs) not later than 120 calendar days prior to the completion of probation. Upon completion successful of probation, respondent's certificate shall be fully restored.

15.    Violation of Probation

Failure to fully comply with any term or condition of probation is a violation of probation. If respondent violates probation in any respect, the Division, after giving respondent notice and the opportunity to be heard, may revoke probation and carry out the disciplinary order that was stayed. If an Accusation, or Petition to Revoke Probation, or an Interim Suspension Order is filed against respondent during probation, the Division shall have continuing jurisdiction until the matter is final, and the period of probation shall be extended until the matter is final.

16.    Cost Recovery

Within 90 calendar days from the effective date of the Decision or other period agreed to by the Division or its designee, respondent shall reimburse the Division the amount of $38,799.44 for its investigative and prosecution costs. The filing of bankruptcy or period of non-practice by respondent shall not relieve the respondent his/her obligation to reimburse the Division for its costs.

17.    License Surrender

Following the effective date of this Decision, if respondent ceases practicing due to retirement, health reasons or is otherwise unable to satisfy the terms and conditions of probation, respondent may request the voluntary surrender of respondent's license. The Division reserves the right to evaluate respondent's request and to exercise its discretion whether or not to grant the request, or to take any other action deemed

appropriate and reasonable under the circumstances. Upon formal acceptance of the surrender, respondent shall within 15 calendar days deliver respondent's wallet and wall certificate to the Division or its designee and respondent shall no longer practice medicine. Respondent will no longer be subject to the terms and conditions of probation and the surrender of respondent's license shall be deemed disciplinary action.

If respondent re-applies for a medical license, the application shall be treated as a petition for reinstatement of a revoked certificate.



Probation Monitoring Costs

Respondent shall pay the costs associated with probation monitoring each and every year of probation, as designated by the Division, which may be adjusted on an annual basis. Such costs shall be payable to the Medical Board of California and delivered to the Division or its designee no later than January 31 of each calendar year. Failure to pay costs within 30 calendar days of the due date is a violation of probation.

DATED:    April 27, 2004

RUTH S. ASTLE
Administrative Law Judge
Office of Administrative Hearings

21

# EXHIBIT 2

BEFORE THE
DIVISION OF MEDICAL QUALITY
MEDICAL BOARD OF CALIFORNIA
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA

In the Matter of the Accusation Against:  )
                                          )
                                          )
                                          )
JAIKRISHNA BALKISSOON, M.D.               )     File No.  12 2003 142891
                                          )
Physician's and Surgeon's                 )
Certificate No.  G 71363                  )
                                          )     **MEDICAL BOARD OF CALIFORNIA**
                                          )     I do hereby certify that this document is a true
                     Respondent.          )     and correct copy of the original on file in this
                                          )     office.
_____     *Candy Fugitt*
                                                Signature
                                                *Dr. Custodian of Records*
                      **DECISION**              Title
                                                *4.1.08*
                                                Date

        The attached Stipulated Settlement and Disciplinary Order is hereby
adopted as the Decision and Order of the Division of Medical Quality of the Medical
Board of California, Department of Consumer Affairs, State of California.


        This Decision shall become effective at 5:00 p.m. on   August 31, 2006


        IT IS SO ORDERED   August 1, 2006



                                        MEDICAL BOARD OF CALIFORNIA

                                        By: _____, MD
                                            Cesar A. Aristeiguieta, M.D., Chair
                                            Panel A
                                            Division of Medical Quality

1  BILL LOCKYER, Attorney General
      of the State of California
2  JOSE R. GUERRERO
      Supervising Deputy Attorney General
3  BRENDA P. REYES, State Bar No. 129718
      Deputy Attorney General
4  California Department of Justice
   455 Golden Gate Avenue, Suite 11000
5  San Francisco, CA  94102-7004
   Telephone:  (415) 703-5541
6  Facsimile:  (415) 703-5480

7  Attorneys for Complainant

8

9                              BEFORE THE
                   DIVISION OF MEDICAL QUALITY
10                 MEDICAL BOARD OF CALIFORNIA
               DEPARTMENT OF CONSUMER AFFAIRS
11                      STATE OF CALIFORNIA

12  In the Matter of the Accusation Against:

13                                               Case No.  12 2003 142891

14  **JAIKRISHNA BALKISSOON, M.D.**              OAH No.  N2005110298
    **2999 Regent Street, Suite 300**
15  **Berkeley, CA  94705**                      **STIPULATED SETTLEMENT**
                                                 **AND DISCIPLINARY ORDER**
16  Physician's and Surgeon's Certificate No. G 71363

17
                              Respondent.
18

19

20      **IT IS HEREBY STIPULATED AND AGREED** by and between the parties to the

21  above-entitled proceedings that the following matters are true:

22                              **PARTIES**

23      1.  David T. Thornton (Complainant) is the Executive Director of the Medical Board

24  of California (Board), Department of Consumer Affairs, State of California, who brought this

25  action solely in his official capacity and is represented in the matter by Bill Lockyer, Attorney

26  General of the State of California, by Brenda P. Reyes, Deputy Attorney General.

27  ///

28  ///

                                      1

2.  Jaikrishna Balkissoon, M.D. (respondent) is represented in the matter by John A. Etchevers, Esq., of the law firm Hassard Bonnington LLP, whose address is Two Embarcadero Center, Suite 1800, San Francisco, California 94111.

3.  At all times relevant herein, respondent has been licensed by the Board under Physician's and Surgeon's Certificate No. G 71363.

## JURISDICTION

4.  The Accusation in Case No. 12-2003-142891 was filed before the Division of Medical Quality (Division), Medical Board of California, Department of Consumer Affairs, State of California. The Accusation, together with all other statutorily required documents, was duly served upon respondent on or about January 31, 2005, and respondent timely filed his Notice of Defense contesting the Accusation. A true and correct copy of Accusation is attached hereto as "Exhibit A."

## ADVISEMENT AND WAIVERS

5.  Respondent has carefully read and discussed with counsel the nature of the charges and allegations in the Accusation and the effects of this Stipulated Settlement and Disciplinary Order (hereinafter "Stipulation").

6.  Respondent is fully aware of his legal rights in this matter, including the right to a hearing on the charges and allegations in the Accusation; the right to be represented by counsel at his own expense; the right to confront and cross-examine the witnesses against him; the right to present evidence and to testify on his own behalf and to the issuance of subpoenas to compel the attendance of witnesses and the production of documents in both defense and mitigation of the charges; and, any and all other rights which are accorded respondent pursuant to the California Administrative Procedure Act (Gov. Code, § 11500, et seq.) and other applicable laws, including the right to seek reconsideration, review by the superior court and appellate review.

7.  With these rights in mind, respondent hereby voluntarily, knowingly, and intelligently waives and gives up each and every right set forth above in Paragraph 6.

///

///

2

## ADMISSIONS

8.  Respondent understands the nature of the charges and allegations in the Accusation and that, if proven at a hearing, the charges and allegations would constitute cause for imposing discipline upon his license to practice medicine in the State of California.

9.  This Stipulation is the result of a compromise between the Board and respondent. For purposes of the settlement of this action only, respondent admits that, if proven, there is a factual and legal basis for the imposition of discipline by the Board pursuant to the charges and allegations contained in the Accusation. Respondent, therefore, stipulates to the jurisdiction of the Board to adopt this Stipulated Settlement as its decision in this matter and to enter the following Disciplinary Order pursuant to Business and Professions Code section 2234.

## RESERVATION

10.  All admissions of fact and conclusions of law contained in this stipulation are made exclusively for this proceeding and any future proceeding in which the Division of Medical Quality, Medical Board of California, or other professional licensing agency is involved, and shall not be deemed to be admissions for any purpose in any other criminal or civil proceedings.

## CONTINGENCY

11.  This stipulation shall be subject to approval by the Division of Medical Quality. Respondent understands and agrees that counsel for Complainant and the staff of the Medical Board of California may communicate directly with the Division regarding this stipulation and settlement, without notice to or participation by Respondent or his counsel. By signing the stipulation, Respondent understands and agrees that he may not withdraw his agreement or seek to rescind the stipulation prior to the time the Division considers and acts upon it. If the Division fails to adopt this stipulation as its Decision and Order, the Stipulated Settlement and Disciplinary Order shall be of no force or effect, except for this paragraph, it shall be inadmissible in any legal action between the parties, and the Division shall not be disqualified from further action by having considered this matter.

///

///

3

1    12. The parties understand and agree that facsimile copies of this Stipulated

2    Settlement and Disciplinary Order, including facsimile signatures thereto, shall have the same

3    force and effect as the originals.

4    13. In consideration of the foregoing admissions and stipulations, the parties agree

5    that the Division may, without further notice or formal proceeding, issue and enter the following

6    Disciplinary Order:

## DISCIPLINARY ORDER

**IT IS HEREBY ORDERED** that Physician's and Surgeon's Certificate No. G 71363 issued to Respondent Jaikrishna Balkissoon, M.D. is revoked. However, the revocation is stayed and respondent is placed on probation for three (3) years on the following terms and conditions.

**A.**   **CLINICAL TRAINING PROGRAM**   Within 60 calendar days of the effective date of this Decision, respondent shall enroll in a clinical training or educational program equivalent to the Physician Assessment and Clinical Education Program (PACE) offered at the University of California - San Diego School of Medicine ("Program").

The Program shall consist of a Comprehensive Assessment program comprised of a two-day assessment of respondent's physical and mental health; basic clinical and communication skills common to all clinicians; and medical knowledge, skill and judgment pertaining to respondent's specialty or sub-specialty, and at minimum, a 40 hour program of clinical education in the area of practice in which respondent was alleged to be deficient and which takes into account data obtained from the assessment, Decision(s), Accusation(s), and any other information that the Division or its designee deems relevant. Respondent shall pay all expenses associated with the clinical training program.

Based on respondent's performance and test results in the assessment and clinical education, the Program will advise the Division or its designee of its recommendation(s) for the scope and length of any additional educational or clinical training, treatment for any medical condition, treatment for any psychological condition, or anything else affecting respondent's practice of medicine. Respondent shall comply with Program recommendations.

///

4

1    At the completion of any additional educational or clinical training, respondent shall
2    submit to and pass an examination. The Program's determination whether or not respondent
3    passed the examination or successfully completed the Program shall be binding.
4        Respondent shall complete the Program not later than six months after respondent's
5    initial enrollment unless the Division or its designee agrees in writing to a later time for
6    completion.
7        Failure to participate in and complete successfully all phases of the clinical training
8    program outlined above is a violation of probation.
9    **B.    NOTIFICATION**  Prior to engaging in the practice of medicine, the
10   respondent shall provide a true copy of the Decision(s) and Accusation(s) to the Chief of Staff or
11   the Chief Executive Officer at every hospital where privileges or membership are extended to
12   respondent, at any other facility where respondent engages in the practice of medicine, including
13   all physician and locum tenens registries or other similar agencies, and to the Chief Executive
14   Officer at every insurance carrier which extends malpractice insurance coverage to respondent.
15   Respondent shall submit proof of compliance to the Division or its designee within 15 calendar
16   days.
17       This condition shall apply to any change(s) in hospitals, other facilities or insurance
18   carrier.
19   **C.    SUPERVISION OF PHYSICIAN ASSISTANTS**  During probation,
20   respondent is prohibited from supervising physician assistants.
21   **D.    OBEY ALL LAWS**  Respondent shall obey all federal, state and local laws, all
22   rules governing the practice of medicine in California, and remain in full compliance with any
23   court ordered criminal probation, payments and other orders.
24   **E.    QUARTERLY DECLARATIONS**  Respondent shall submit quarterly
25   declarations under penalty of perjury on forms provided by the Division, stating whether there
26   has been compliance with all the conditions of probation. Respondent shall submit quarterly
27   declarations not later than 10 calendar days after the end of the preceding quarter.
28   ///

5

1    **F.    PROBATION UNIT COMPLIANCE**  Respondent shall comply with the
2    Division's probation unit.  Respondent shall, at all times, keep the Division informed of
3    respondent's business and residence addresses.  Changes of such addresses shall be immediately
4    communicated in writing to the Division or its designee.  Under no circumstances shall a post
5    office box serve as an address of record, except as allowed by Business and Professions Code
6    section 2021(b).

7        Respondent shall not engage in the practice of medicine in respondent's place of
8    residence.  Respondent shall maintain a current and renewed California physician's and
9    surgeon's license.

10       Respondent shall immediately inform the Division, or its designee, in writing, of
11   travel to any areas outside the jurisdiction of California which lasts, or is contemplated to last,
12   more than 30 calendar days.

13   **G.    INTERVIEW WITH THE DIVISION OR ITS DESIGNEE**  Respondent
14   shall be available in person for interviews either at respondent's place of business or at the
15   probation unit office, with the Division or its designee, upon request at various intervals, and
16   either with or without prior notice throughout the term of probation.

17   **H.    RESIDING OR PRACTICING OUT-OF-STATE**  In the event respondent
18   should leave the State of California to reside or to practice, respondent shall notify the Division
19   or its designee in writing 30 calendar days prior to the dates of departure and return.  Non-
20   practice is defined as any period of time exceeding 30 calendar days in which respondent is not
21   engaging in any activities defined in Sections 2051 and 2052 of the Business and Professions
22   Code.

23       All time spent in an intensive training program outside the State of California which
24   has been approved by the Division or its designee shall be considered as time spent in the
25   practice of medicine within the State.  A Board-ordered suspension of practice shall not be
26   considered as a period of non-practice.  Periods of temporary or permanent residence or practice
27   outside California will not apply to the reduction of the probationary term.  Periods of temporary
28   or permanent residence or practice outside California will relieve respondent of the responsibility

1  to comply with the probationary terms and conditions with the exception of this condition and

2  the following terms and conditions of probation:  Obey All Laws; Probation Unit Compliance;

3  and Cost Recovery.

4      Respondent's license shall be automatically canceled if respondent's periods of

5  temporary or permanent residence or practice outside California total two years.  However,

6  respondent's license shall not be canceled as long as respondent is residing and practicing

7  medicine in another state of the United States and is on active probation with the medical

8  licensing authority of that state, in which case the two year period shall begin on the date

9  probation is completed or terminated in that state.

10  **I.   FAILURE TO PRACTICE MEDICINE - CALIFORNIA RESIDENT**

11      In the event respondent resides in the State of California and for any reason

12  respondent stops practicing medicine in California, respondent shall notify the Division or its

13  designee in writing within 30 calendar days prior to the dates of non-practice and return to

14  practice.  Any period of non-practice within California, as defined in this condition, will not

15  apply to the reduction of the probationary term and does not relieve respondent of the

16  responsibility to comply with the terms and conditions of probation.  Non-practice is defined as

17  any period of time exceeding 30 calendar days in which respondent is not engaging in any

18  activities defined in sections 2051 and 2052 of the Business and Professions Code.

19      All time spent in an intensive training program which has been approved by the

20  Division or its designee shall be considered time spent in the practice of medicine.  For purposes

21  of this condition, non-practice due to a Board-ordered suspension or in compliance with any

22  other condition of probation, shall not be considered a period of non-practice.

23      Respondent's license shall be automatically canceled if respondent resides in

24  California and for a total of two years, fails to engage in California in any of the activities

25  described in Business and Professions Code sections 2051 and 2052.

26  **J.   COMPLETION OF PROBATION**  Respondent shall comply with all

27  financial obligations (e.g., cost recovery, restitution, probation costs) not later than 120 calendar

28  days prior to the completion of probation.  Upon successful completion of probation,

7

1  respondent's certificate shall be fully restored.

2  **K.   VIOLATION OF PROBATION**  Failure to fully comply with any term or
3  condition of probation is a violation of probation.  If respondent violates probation in any respect,
4  the Division, after giving respondent notice and the opportunity to be heard, may revoke
5  probation and carry out the disciplinary order that was stayed.  If an Accusation, Petition to
6  Revoke Probation, or an Interim Suspension Order is filed against respondent during probation,
7  the Division shall have continuing jurisdiction until the matter is final, and the period of
8  probation shall be extended until the matter is final.

9  **L.   LICENSE SURRENDER**  Following the effective date of this Decision, if
10  respondent ceases practicing due to retirement, health reasons or is otherwise unable to satisfy
11  the terms and conditions of probation, respondent may request the voluntary surrender of
12  respondent's license.  The Division reserves the right to evaluate respondent's request and to
13  exercise its discretion whether or not to grant the request, or to take any other action deemed
14  appropriate and reasonable under the circumstances.  Upon formal acceptance of the surrender,
15  respondent shall within 15 calendar days deliver respondent's wallet and wall certificate to the
16  Division or its designee and respondent shall no longer practice medicine.  Respondent will no
17  longer be subject to the terms and conditions of probation and the surrender of respondent's
18  license shall be deemed disciplinary action.  If respondent re-applies for a medical license, the
19  application shall be treated as a petition for reinstatement of a revoked certificate.

20  **M.   PROBATION MONITORING COSTS**  Respondent shall pay the costs
21  associated with probation monitoring each and every year of probation, as designated by the
22  Division, which may be adjusted on an annual basis.  Such costs shall be payable to the Medical
23  Board of California and delivered to the Division or its designee  no later than January 31 of each
24  calendar year.  Failure to pay costs within 30 calendar days of the due date is a violation of
25  probation.

26  / / /

27  / / /

28  / / /

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ACCEPTANCE

I have carefully read the above Stipulated Settlement and Disciplinary Order and have fully discussed it with my attorney, John A. Etchevers, Esq. I understand the stipulation and the effect it will have on my Physician's and Surgeon's Certificate. I enter into this Stipulated Settlement voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order of the Division of Medical Quality, Medical Board of California.

DATED: Feb 8, 2006

JAIKRISHNA BALKISSOON, M.D.
Respondent

I have read and fully discussed with Respondent Jaikrishna Balkissoon, M.D. the terms and conditions and other matters contained in the above Stipulated Settlement and Disciplinary Order. I approve its form and content.

DATED: 2/13/06

HASSARD BONNINGTON LLP

JOHN A. ETCHEVERS, Esq.
Attorneys for Respondent

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ENDORSEMENT

The foregoing Stipulated Settlement and Disciplinary Order is hereby respectfully submitted for consideration by the Division of Medical Quality, Medical Board of California, Department of Consumer Affairs.

DATED: 2/14/06

BILL LOCKYER, Attorney General
of the State of California


BRENDA P. REYES
Deputy Attorney General

Attorneys for Complainant

Exhibit A

Accusation No. 12- 2003-142891

1  BILL LOCKYER, Attorney General
   of the State of California
2  VIVIEN H. HARA, State Bar No. 084589
   Supervising Deputy Attorney General
3  BRENDA P. REYES, State Bar No. 129718
   Deputy Attorney General
4  California Department of Justice
   455 Golden Gate Avenue, Suite 11000
5  San Francisco, CA 94102-7704
   Telephone: (415) 703-5541
6  Facsimile: (415) 703-5480

7  Attorneys for Complainant

8

FILED
STATE OF CALIFORNIA
MEDICAL BOARD OF CALIFORNIA
SACRAMENTO January 31, 20 05
BY _____ ANALYST

9                           BEFORE THE
10              MEDICAL BOARD OF CALIFORNIA
              DEPARTMENT OF CONSUMER AFFAIRS
11                   STATE OF CALIFORNIA

12  In the Matter of the Accusation Against:

13  JAIKRISHNA BALKISSOON, M.D.            Case No. 12 2003 142891
    2999 Regent Street, Suite 300
14  Berkeley, CA 94705                     A C C U S A T I O N

15  Physician and Surgeon Certificate No. G 71363

16                Respondent

17

18      Complainant alleges:

19                           PARTIES

20          1.      Complainant David T. Thornton ("Complainant") is the Executive

21  Director of the Medical Board of California ("Board") and brings this Accusation solely in his

22  official capacity.

23          2.      On or about May 21, 1991, Physician and Surgeon Certificate No.

24  G 71363 was issued by the Board to respondent Jaikrishna Balkissoon, M.D. ("respondent"or

25  "Dr. Balkissoon"). At all times mentioned in the charges herein, this certificate was in full force

26  and effect. Said certificate is renewed and current with an expiration date of April 30, 2007.

27  //

28  //

## JURISDICTION

3    This Accusation is brought before the Division of Medical Quality ("Division") of the Board under the authority of the following sections of the Business and Professions Code ("Code"):

A.    Section 2227 of the Code provides that a licensee who is found guilty under the Medical Practice Act may have his license revoked, suspended for a period not to exceed one year, placed on probation and ordered to pay the costs of probation monitoring, or subjected to such other action taken in relation to discipline as the Division deems proper.

B.    Section 2234 of the Code provides that the Division shall take action against any licensee who is charged with unprofessional conduct. Unprofessional conduct is defined therein to include, but not to be limited to:

"(b)    Gross negligence.
(c)    Repeated negligent acts. To be repeated, there must be two or more negligent acts or omissions. An initial negligent act or omission followed by a separate and distinct department from the applicable standard of care shall constitute repeated negligent acts.
   (1)    An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act.
   (2)    When the standard of care requires a change in the diagnosis, act or omission that constitutes the negligent act described in paragraph (1), including, but not limited to, as reevaluation of the diagnosis or a change in treatment, and the licensee's conduct departs from the applicable standard of care, each departure constitutes a separate and distinct breach of the standard of care.
(d)    Incompetence.
(e)    The commission of any act of dishonesty or corruption which is substantially related to the qualifications, functions, or duties of a physician and surgeon."

C.    Section 125.3 of the Code provides, in part, that the Board may request the administrative law judge to direct any licentiate found to have committed a violation or violations of the licensing act to pay the Board a sum not to exceed the reasonable costs of the investigation and enforcement of the case. A certified copy of the actual costs, or a good faith estimate of costs where the actual costs are not available, signed by

the Board or its designated representative shall be *prima facie* evidence of reasonable costs of investigation and prosecution of the case. The costs shall include the amount of investigative and enforcement costs up to the date of the hearing, including, but not limited to, charges imposed by the Attorney General.

4. Section 14124.12 of the Welfare and Institutions Code provides, in part, that a physician whose license has been placed on probation by the Medical Board shall not be reimbursed by Medi-Cal "for the type of surgical service or invasive procedure that gave rise to the probation."

5. At all times pertinent herein, respondent was practicing as a surgical oncologist with clinical privileges at Summit Medical Center, Alta Bates Medical Center, and San Ramon Medical Center. This matter was brought to the Board's attention through the filing of a report under Business and Professions Code section 805 by Alta Bates Summit Medical Center dated January 31, 2003 and received by the Board on February 5, 2003, indicating that respondent's clinical privileges were summarily suspended on January 21, 2003. A follow up report received by the Board on September 5, 2003, indicated that respondent had resigned from staff after he had requested and had been granted a Judicial Review Committee Hearing.

## FIRST CAUSE FOR DISCIPLINE

(Gross Negligence/Incompetence: Patient R.H.)

10. Patient R.H. was a 48 year old woman with a history of squamous cell carcinoma of the bladder that had earlier been surgically treated with pelvic extenteration. As part of this procedure, R.H.'s renal system was reconstructed with a uretero-ureteral anastomosis. Dr. Balkissoon was her surgeon on this procedure, which was performed at Summit Medical Center in Oakland, CA. **On January 21, 1998, a radiology report readily available in R.H.'s chart at Summit Medical Center indicated that R.H. had evidence of a leak at her uretero-ureteral anastomosis that "may require surgical repair."**

11. On February 1, 1998, R.H. was brought into the Summit Medical Center Emergency Room ("ER") with altered mental status, complaining of pain in her side. Her medications were Fentanyl patch, Tylenol with codeine, and methadone. She had a history of IV

drug use and cigarette smoking. She was noted in the ER to have a large sacral decubitus ulcer with foul-smelling discharge from the vaginal area. Dr. Balkissoon was called in on February 2, 1998, and on examination, he determined that there was no evidence of recurrent cancer and ordered that the ulcer be debrided with the dressing changed three times a day. He gave no orders concerning the vaginal discharge, but ordered continued wound care.

12.    On or about February 7, 1998, R.H. was found to have a recto-vaginal fistula, and on February 10, 1998, the foul-smelling discharge from the vaginal area was attributed to this fistula and a large non-healing perineal wound at the vagina. On February 13, 1998, respondent inserted a Port-A-Cath to allow better treatment of her medical condition. R.H. continued to have problems with line sepsis, fever, and pain, depression and malnutrition.

13.    On February 27, 1998, respondent undertook the repair of R.H.'s recto-vaginal fistula and debridement of the decubitus ulcer. By March 3, 1998, recurrent drainage from the perineum was noted, and recurrence of the recto-vaginal fistula was suspected. On March 13, 1998, respondent again operated upon R.H. to debride the perineal area and placed a split thickness skin graft. R.H.'s problems with drainage continued, and on March 24, 1998, respondent again operated upon R.H. for debridement of her perineum. After the procedure, R.H. remained in pain and was febrile.

14.    A contrast study of R.H.'s urinary system was done on March 26, 1998 due to persistent problems with perineal discharge despite repeated debridement. This study indicated extravasation of contrast at the distal end of the ileal conduit with a fistulous tract noted to the vagina, accounting for the ongoing vaginal discharge. Respondent was informed of these findings by the radiologist who did the study on the same day. By March 29, 1998, new perineal bleeding was noted, and respondent could not be reached by hospital staff. A note in R.H.'s chart by respondent on March 30, 1998 indicates plans to transfer the patient to another facility for ongoing care. After the imaging study results, R.H. was extremely reluctant to undergo another surgical procedure, even though the now proposed surgical procedures would act to solve her problems with infection and drainage.

//

15.    Respondent is subject to disciplinary action by reason of the following acts or omissions with reference to his treatment of patient R.H.:

a.    Respondent failed to note a radiologic finding on January 21, 1998 of leakage at the anastomosis site, thereby subjecting R.H. to hospitalization for a prolonged period, to three operative procedures that were potentially unnecessary, and to potentially avoidable discomfort, prolonged illness, depression, and pain.

b.    Respondent demonstrated a severe lack of knowledge of the role of imaging studies in developing a treatment plan for a surgical patient.

16.    Respondent's conduct in his treatment of patient R.H. constitutes gross negligence and/or incompetence, and therefore cause for discipline exists pursuant to section 2234(b) and/or (d) of the Code.

## SECOND CAUSE FOR DISCIPLINE

(Gross Negligence/Incompetence: Patient Y.L.)

17.    On September 19, 1999 at approximately 7:30 a.m., patient Y.L., a 76 year old female, presented to the Summit Medical Center ER with complaints of severe left-sided abdominal pain. She was hypotensive and acidotic. Y.L. had a history of gastritis, and her surgical history indicated she had had a cholecystectomy. Respondent was consulted and made arrangements for urgent surgical exploration. In the OR, respondent reported that Y.L. had a perforated colon with significant stool contamination of the peritoneal cavity, necrosis of a portion of the small bowel, and ischemic uterus. Respondent resected the colon with colostomy, resected the small bowel, and performed a hysterectomy. Respondent's findings on Y.L. indicated a dire clinical situation.

18.    On September 22, 1999, respondent noted in progress notes that the patient was doing better and that he doubted "ongoing ischemia" and ruled out further surgical intervention. The previous day, the on-call physician had expressed concerns over Y.L.'s lack of stabilization and indications for ongoing bowel ischemia/necrosis and intra-abdominal sepsis, and he or she had recommended that the surgeon assess Y.L. and decide whether further surgical exploration was necessary. Y.L.'s clinical situation continued to deteriorate over the next day.

19.    On September 23, 1999, respondent was unavailable and had indicated coverage by another physician, Dr. Mbanugo. Y.L. continued in septic shock with continuing lactic acidosis, hypotension and fever. Dr. Mbanugo examined Y.L. and determined that the fascia of the surgical wound appeared necrotic; he recommended surgical intervention, but did not schedule it right away due to Y.L.'s low platelet count. When Dr. Mbanugo felt Y.L. was more stable on September 24, 1999, he performed exploratory surgery and discovered leakage at the anastomosis site on the small bowel, necrotic fascia, and an ischemic bladder. Because of the patients critical condition, the covering surgeon elected to reinforce the sites of leakage rather than to subject this delicate patient to further surgery. Y.L. continued in septic shock, and her condition continued to deteriorate, and she expired on September 30, 1999.

20.    Respondent is subject to disciplinary action by reason of the following acts or omissions with reference to his treatment of patient Y.L.:

a.    Y.L. was a critically ill patient that required extreme vigilance after her initial surgery on September 19, 1999. Respondent failed to return the patient to the OR for a second exploration soon after her surgery in order to rule out any anastomotic leak or further ischemia prior to the patient's deteriorating clinical condition mandated a re-exploration. Early re-exploration may have at least incrementally improved Y.L.'s poor chances of survival.

b.    Respondent did not demonstrate adequate understanding of the pathophysiology or intestinal ischemia and the need for perfunctory re-exploration in the early post-operative period in a patient so ill.

21.    Respondent's conduct in his treatment of patient Y.L. constitutes gross negligence and/or incompetence, and therefore cause for discipline exists pursuant to section 2234(b) and/or (d) of the Code.

**THIRD CAUSE FOR DISCIPLINE**

(Gross Negligence/Negligence/Incompetence: Patient N.H.)

22.    On December 1, 1999 at approximately 2:40 p.m., patient N.H., a 68 year old male, presented to the Summit Medical Center ER in acute distress with complaints of a two-week history of right leg pain and a several day history of severe right lower quadrant abdominal

6

1   pain. **CT scan on December 1, 1999 revealed an abscess in the right ileopsoas muscle with**

2   **periappendiceal inflammation.** At presentation, N.H.'s white blood cell (WBC) count was

3   18,000; his bilirubin was elevated, and creatinine was 2.7.

4         23.   Respondent performed an exploratory laparotomy and appendectomy on

5   December 2, 1999. He did not view the initial CT scan until after this operation. Respondent

6   commented at the time of surgery that the psoas muscle had an inflammatory reaction, but no pus

7   or abscess. Postoperatively, N.H. remained septic and hypotensive, and he remained in the

8   intensive care unit (ICU). He had persistent fevers with tachycardia, persistent leukocytosis with

9   thrombocytopenia. N.H.'s bilirubin was rising; he had persistent respiratory failure. By

10   December 4, 1999, he was developing adult respiratory distress syndrome (ARDS) per chest x-

11   ray. Ultrasound on December 4, 1999 showed an abnormality in the gallbladder with a collection

12   of fluid adjacent. A CT scan of the abdomen and pelvis on December 6, 1999 revealed a likely

13   psoas abscess.

14         24.   On December 7, 1999, respondent performed another laparoscopy, and the

15   ileopsoas appeared normal, but respondent opened the fascia and discovered a crater in the

16   muscle with necrotic tissue. Respondent resected the necrotic ileopsoas muscle and drained the

17   ileopsoas abscess. Postoperatively, sepsis was not resolved, and multiorgan failure was noted on

18   December 8, 1999. N.H. died from complications of sepsis due to ileopsoas abscess on

19   December 17, 1999.

20         25.   Respondent is subject to disciplinary action by reason of the following acts

21   or omissions with reference to his treatment of patient N.H.:

22         a.   Respondent failed to review the CT scan taken on December 1, 1999 upon

23   N.H.'s admission, which documented the ileopsoas abscess. Because this information was not

24   incorporated into the patient's management plan, N.H. was taken to the operating room (OR)

25   unnecessarily and the surgery addressed the incorrect problem.

26         b.   Respondent failed to follow procedures designed to minimize the risk of

27   sepsis, *i.e.*, percutaneous drainage of the abscess with interval appendectomy; surgical

28   exploration in a patient with greater than several days of pain and a well-formed abscess on a CT

1  scan increases the chances for sepsis.

2          c.      When the second CT scan on December 6, 1999 revealed the ileopsoas
3  abscess, respondent again increased the risk of sepsis by surgical open abscess drainage, where
4  percutaneous drainage was indicated.

5          26.     Respondent's conduct in his treatment of patient N.H. constitutes gross
6  negligence and/or incompetence, and therefore cause for discipline exists pursuant to section
7  2234(b) and/or (d) of the Code.

8                          **FOURTH CAUSE FOR DISCIPLINE**

9                      (Gross Negligence/Incompetence:  Patient A.M.)

10         27.     Patient A.M. was a 32 year old woman experienced headache, then sudden
11  coma with difficulty of movement of the right side of her body on July 26, 2000.  She was seen
12  on an emergent basis at Kaiser Medical Center in Oakland.  CT scan of her brain revealed a mass
13  in her left cerebrum.  Kaiser also verified that A.M. was pregnant by HCG level, but this was
14  later determined to be erroneous and due to A.M.'s metastatic cancer.  A.M. was then transferred
15  on the same day to Summit Medical Center.  On July 28, 2000, an MRI demonstrated a
16  progressive mass effect with midline shift.  A CT scan of her chest and abdomen revealed
17  multiple lesions within the chest compatible with metastatic disease.  A percutaneous CT-guided
18  lung biopsy on July 29, 2000 revealed gestational trophoblastic disease consistent with
19  choriocarcinoma.  Cultures sent to detect tuberculosis (A.M. had immigrated to the United States
20  from Ethiopia, where she had a history of TB) came back positive for TB on August 31, 2000.

21         28.     In preparation for systemic chemotherapy on A.M., respondent was called
22  in for purposes of inserting a Port-A-Cath on July 30, 2000.  In the immediate post-operative
23  period, A.M. began experiencing cardiac arrhythmia.  At 1:00 p.m., she was documented to have
24  a supraventricular tachycardia and left bundle branch block.  A chest x-ray was reported to show
25  her Port-A-Cath catheter tip in the right ventricle of the heart, causing the arrhythmia.  Rather
26  than scheduling an immediate revision of the Port-A-Cath, at 7:15 p.m., respondent requested
27  that interventional radiology manipulate the catheter into its proper place.  Interventional
28  radiology then snared the catheter tip and pulled it into the inferior vena cava.  This did not

1   correct the problem, and the catheter tip again migrated into the right ventricle. On July 31, 2000

2   at 1:00 p.m., respondent noted that the catheter was again in the right ventricle, and he had A.M.

3   taken back to the OR later in the day, where he surgically repositioned the catheter.

4       29.    Respondent is subject to disciplinary action by reason of the following acts

5   or omissions with reference to his treatment of patient A.M.:

6       a.    Respondent allowed A.M. to have catheter-related ectopy for an extended

7   period of time through his request to have the catheter manipulated back into place. He knew or

8   should have known that poorly functioning catheters most often require re-operation to revise

9   placement of the port and/or tubing and that this becomes an urgent situation if the catheter is

10  triggering arrhythmia. He knew or should have known that the steps he ordered taken by

11  interventional radiology were not likely to remedy the problem, and a revision is a fairly simple

12  surgical procedure.

13      30.    Respondent's conduct in his treatment of patient A.M. constitutes gross

14  negligence and/or incompetence, and therefore, cause for discipline exists pursuant to section

15  2234(b) and/or (d).

16            **FIFTH CAUSE FOR DISCIPLINE**

17          (Gross Negligence/Incompetence: Patient K.L.)

18      31.    Patient K.L. was a 68 year old male was admitted to Summit Medical

19  Center on January 15, 2002 for an elective splenectomy. K.L. had a history of noninsulin

20  dependent diabetes, hypertension, and kidney failure. He had been on hemodialysis for about 18

21  months at the time of this procedure. A CT scan of K.L.'s abdomen six months previously

22  revealed splenic abnormalities, and after a non-diagnostic fine needle aspiration (FNA) of his

23  spleen, K.L. decided to undergo splenectomy due to possible malignancy. The mass was

24  determined to be a hemangioma; there was no malignancy.

25      32.    Postoperatively, K.L. had a slow recovery with an ileus and a WBC of

26  34,000 on January 25, 2002, of 32,000 on January 26 and 27. A CT scan indicated fluid

27  collection in the left upper quadrant, suspicious for abscess. Respondent considered

28  percutaneous drainage, but decided that the collection was probably old blood from dialysis, and

1   he discharged K.L. on February 1, 2002, though the patient was fatigued and weak.

2          33.     On February 13, 2002, K.L. developed a fever of 102° and chills. A

3   repeat CT scan revealed a large left subphrenic abscess and a left pleural cavity abscess. K.L.

4   was readmitted to Summit Medical Center and percutaneous drainage of the abscesses was

5   performed. Dr. Balkissoon was out of town at this time and had failed to provide definitive

6   coverage for his patients, and thus the hospital surgical team could not cover this patient

7   adequately. Respondent's office was contacted concerning the coverage, and the staff was

8   unable to remedy the situation. Respondent later explained that he was "under the impression"

9   that a certain surgeon was covering for him.

10         34.     Respondent is subject to disciplinary action by reason of the following acts

11  or omissions with regard to his treatment of patient K.L.:

12         a.      Respondent discharged K.L. during his first hospitalization without

13  determining whether the fluid collection in the left upper quadrant was an infection. There were

14  findings of a WBC over 30,000 over several days, the presence of a fluid collection, kidney

15  failure with hemodialysis, and a recent splenectomy to cite as factors calling for diagnostic and/or

16  therapeutic intervention.

17         b.      Respondent's failure to provide adequate coverage for his patients during

18  K.L.'s second hospitalization reflects a serious indifference toward the welfare of his patients.

19         35.     Respondent's conduct in his treatment of patient K.L. constitutes gross

20  negligence and/or incompetence, and therefore, cause for discipline exists pursuant to section

21  2234(b) and/or (d) of the Code.

## SIXTH CAUSE FOR DISCIPLINE

### (Repeated Negligent Acts:  All Patients)

24         36.     The allegations of the First through Fifth Causes for Discipline, above, are

25  incorporated herein by reference as if fully set forth.

26         46.     Respondent's conduct in this treatment of patients R.H., Y.L., N.H., A.M.,

27  and K.L., whether jointly or in any combination thereof, constitutes repeated negligent acts and

28  therefore cause for discipline exists pursuant to section 2234(c) of the Code.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PRAYER

WHEREFORE, complainant requests that a hearing be held on the matters herein alleged, and that following that hearing, the Division issue a decision:

       1.     Revoking or suspending Physician and Surgeon Certificate No. G 71363 heretofore issued to respondent Jaikrishna Balkissoon, M.D.;

       2.     Prohibiting respondent from being the supervisor of a physician assistant;

       3.     Ordering respondent to pay the Division the actual and reasonable costs of investigation and enforcement of this case, and if placed on probation, the costs of probation monitoring; and

       4.     Taking such other and further action as the Division deems necessary and proper.

DATED: January 31, 2005

DAVID T. THORNTON
Executive Director
MEDICAL BOARD OF CALIFORNIA
Department of Consumer Affairs
State of California

Complainant

11