1

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   COYNESS L. ENNIX JR., M.D., as an                    No. C 07-02486 WHA
     individual and in his representative capacity
11   under Business & Professions Code
     Section 17200, et seq.,
12                                                        **ORDER DENYING MOTION FOR**
13                  Plaintiff,                            **SUMMARY JUDGMENT**

14      v.

15   RUSSELL D. STANTEN, M.D., LEIGH I.G.
     IVERSON, M.D., STEVEN A. STANTEN,
16   M.D., WILLIAM M. ISENBERG, M.D.,
     Ph.D., ALTA BATES SUMMIT MEDICAL
17   CENTER, and DOES 1 through 100,

18                  Defendants.
                                               /
19

20                              **INTRODUCTION**

21          In this dispute arising out of a medical peer review, plaintiff Dr. Coyness Ennix, Jr.,

22   filed suit against defendants Russell Stanten, Leigh Iverson, Steven Stanten, William Isenberg

23   and Alta Bates Summit Medical Center ("ABSMC") for, *inter alia*, racial discrimination.

24   The essence of this case is that plaintiff, a cardiac surgeon, was subjected to investigation and

25   temporary loss of hospital privileges after he performed a new surgical procedure on four

26   patients, one of whom died and three of whom suffered severe complications.  Plaintiff claims

27   the heightened scrutiny was racially motivated.  Defendant ABSMC now moves for summary

28   judgment on the grounds that there was no "contract" at issue and plaintiff cannot establish

     racial discrimination under 42 U.S.C. 1981.  Even though plaintiff did not have a formal

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

contract with the hospital, this order holds that the arrangement between them for hospital privileges constituted a contract within the meaning of Section 1981, or so a jury might reasonably determine. It further holds that material fact issues exist as to the issue of race discrimination, at least on the summary judgment record. The motion for summary judgment is **DENIED**.

### STATEMENT[1]

Dr. Ennix is African-American and a cardiac surgeon. He practiced in a five-person cardiac-surgery group at Summit Hospital in Oakland from 1981 to 1993. In 1993, Dr. Ennix and another partner, Dr. J. Nilas Young, separated from the group and started an independent cardiac-surgery program at Alta Bates Hospital in Berkeley. (Summit Hospital and Alta Bates Hospital are both part of ABSMC; they are merely located in different cities.) In April 2001, Dr. Young left the Alta Bates practice. In the fall of that year, Dr. Ennix then merged his practice with that of Dr. Junaid Khan, Dr. Leigh Iverson, and Dr. Russell Stanten to form the East Bay Cardiac Surgery Center Medical Group.

The East Bay Cardiac Surgery Center Medical Group had certain contracts with ABSMC (Hernaez Decl. Exh. A). It is disputed as to whether or not Dr. Ennix had any contracts with ABSMC, a dispute that goes to the heart of the Section 1981 claim at issue. During Dr. Ennix's deposition after suit had commenced, he revealed the following (Hernaez Decl. Exh. B at 49–50):

> Q: Subsequent to October 2005, have you had any individual contract with Alta Bates Summit Medical Center? That is, just with you; not with Kaiser, not with a group?
>
> A: No.
>
> Q: Is it correct that your relationship to Summit Medical Center is as an independent contractor?
>
> A: Repeat the question, please.
>
> Q: Is your relationship with Summit Medical Center one of being an independent contractor?

---

[1] Dr. Ennix objects to some of the evidence provided by defendant in support of its motion for summary judgment. This order need not address these objections because, even taking this evidence into account, defendant's motion will be denied.

A: You mean currently?  As silly as it might sound, I'm not sure.

Q: You're certainly not an employee of the medical center; are you?

A: No.  That's for sure.

Q: Have you ever been an employee of the medical center?

A: No.

Q: Do you have individual contracts with your patients?  Do you write a contract that both of you sign?

A: Do I write a contract that both of us sign?  No.

Q: Have you ever written a contract with your patients that both of you sign?

A: No.

Dr. Ennix was, however, a member of the ABSMC medical staff.  He performed services at ABSMC, paid annual membership fees to Summit Hospital, and agreed to abide by the Medical Staff bylaws.  ABSMC permitted him to practice medicine there (Ennix Decl. ¶10; Exh. A).  In return, ABSMC received payment of hospital fees relating to Dr. Ennix's treatment of patients.  This can be shown in ABSMC's response to plaintiff's request for discovery. Dr. Ennix requested the production of "ALL DOCUMENTS (including but not limited to invoices, receipts and copies of checks) RELATING TO monetary compensation or other financial benefit YOU obtained RELATING TO medical services performed by Plaintiff between January 2002 to July 2006."  ABSMC responded, "Instead of providing such documents and pursuant to a meet and confer session on this issue between counsel, Defendant is prepared to enter into an agreed-upon statement that Defendant invoices patients and/or their insurers or other payment providers for hospital services provided to patients in conjunction with a physician's provision of patient care services at the Medical Center. The physician bills separately for physician services" (Sweet Decl. Exh. FF).

In early 2004, Dr. Ennix began using a new, minimally invasive process ("MIV") to perform cardiac surgeries instead of the standard procedure of opening a patient's chest. He performed four of these surgeries.  In these cases, Dr. Ennix and his surgical staff encountered problems such as prolonged procedure time, increased blood usage, and conversion

**United States District Court**
For the Northern District of California

1    to the standard procedure. One patient died. There were severe complications in the three other

2    cases. Dr. William Isenberg, the Chief of Staff at ABSMC, and Dr. Steven Stanten, the Chief of

3    the Department of Surgery, requested that Dr. Ennix cease performing MIV procedures out of a

4    professed concern with long operating times and the outcomes in these cases. Dr. Ennix agreed.

5            ABSMC had a regular peer-review process for cardiac surgeons. The levels of review

6    generally were: the nurse level (through a quality-control nurse), physician level (through a

7    physician in the same specialty), Cardiothoracic Surgery Peer Review Committee ("CTSPRC")

8    level, Surgery Peer Review Committee ("SPRC") level, and Medical Executive Committee

9    and/or Ad Hoc Committee level.

10           Dr. Ennix claims that ABMSC deviated from the normal review procedure when

11   reviewing his case. Rather than have Dr. Ennix's case go through the CTSPRC, Dr. Steven

12   Stanten asked a staff cardiac surgeon, Dr. Hon Lee, to review the four MIV operations and to

13   report back to Dr. Steven Stanten. Dr. Isenberg, Dr. Russell Stanten, Dr. Lee, Dr. Iverson,

14   and Dr. Steven Stanten stated at later depositions that they were not aware of any other time

15   where a case involving a cardiac surgeon was reviewed outside the normal CTSPRC process

16   (Sweet Decl. Exh. K at 109; Exh. M at 144; Exh. N at 30; Exh. O at 72; Exh. P at 48).

17           Dr. Lee reviewed Dr. Ennix's case. He looked at patient files, admission reports from

18   the admitting physician, operating reports, and nursing notes. He spoke to the anesthesiologists

19   and technicians. Dr. Steven Stanten stated at his deposition that Dr. Lee concluded there were

20   no quality-of-care concerns (Sweet Decl. Exh. P at 75):

21                    Q: So when it says here, "Dr. Lee noted several documentation
                     issues, but no quality-of-care concerns" —
22
                     A: Right.
23
                     Q: — that's not accurate?
24
                     A: I think that — no. I think that's accurate. That is Dr. Lee's
25                   assessment of the situation.

26                   Q: And did you have concerns about the credibility of Dr. Lee's
                     assessment?
27
                     A: No.
28

4

United States District Court

For the Northern District of California

1    Dr. Steven Stanten further opined that Dr. Lee did a thorough job.  Despite his own assessment,

2    however, Dr. Lee testified at his deposition that it was possible that the case required further

3    review (Hernaez Decl. Exh. I at 40):

4              Q: Do you agree that reasonable minds, looking at the information
               with respect to these four cases and listening to your review, might
5              legitimately determine that there was a need for further review?

6              A: Review of the cases?  Review —

7              Q: Review of Dr. Ennix.

8              A: Review of Dr. Ennix.  Yes.

9            Dr. Stanten then took the cases to the SPRC, bypassing the lower levels of review.

10   It is unclear from the record how often the SPRC met or how many were on this committee.

11   The SPRC decided not to accept Dr. Lee's conclusion that the cases presented no quality-of-

12   care issues.  Dr. Russell Stanten and Dr. Steven Stanten stated at later depositions that they

13   were not aware of "any other instance in which the surgery peer review committee did not

14   accept the findings of a physician reviewer" (Sweet Decl. Exh. N at 111; Exh. P at 81).  The

15   SPRC did not make a final care determination and instead referred the issue to Dr. Isenberg and

16   the Medical Executive Committee.  Again, Dr. Russell Stanten and Dr. Iverson were not aware

17   of any circumstance where the SPRC deferred making a care determination (Sweet Decl. Exh.

18   N at 113; Exh. K at 122).  Lack of awareness about an event does not necessarily mean that the

19   event did not occur, but the witnesses in question likely would have knowledge had it occurred.

20           The Medical Executive Committee acted on Dr. Isenberg's recommendation to appoint

21   an Ad Hoc Committee to examine Dr. Ennix.  The "Rules and Regulations" for Summit

22   Hospital's medical staff stated: "For the purpose of the peer review program, a peer reviewer

23   shall be defined as a member of the medical staff, in good standing, practicing in the same

24   general specialty, and with similar and/or related training and experience as the individual under

25   review.  Peers may also include other medical staff members in good standing, not practicing in

26   the same specialty as the individual whose case is under review.  They may be consulted

27   regarding specific issues related to the management of the case under review" (Sweet Decl.

28   Exh. S at 48).  Although cardiac surgeons and cardiologists from ABSMC's medical staff were

**United States District Court**
For the Northern District of California

1   available, Dr. Isenberg did not appoint any of them to serve on the three-member Ad Hoc

2   Committee.  Instead, Dr. Isenberg appointed Dr. Lamont Paxton, who specialized in vascular

3   surgery and was a good friend and former neighbor of Dr. Steven Stanten, Dr. Dat Ly, an

4   anesthesiologist, and Dr. Barry Horn, a pulmonologist who practiced at Alta Bates Hospital

5   (rather than Summit Hospital) and was on the board of trustees with Dr. Isenberg.[2]

6           Dr. Isenberg attended all of the Ad Hoc Committee meetings.  At the end of a meeting,

7   the Ad Hoc Committee concluded that there was a "possible need for an outside reviewer"

8   (Sweet Decl. Exh. W).  Dr. Isenberg made the decision to select National Medical Audit

9   ("NMA"), an independent outside peer-review organization.  In January 2005, the Ad Hoc

10  Committee then sent information regarding the four MIV cases to NMA.  In addition to the four

11  MIV cases, the committee also sent to NMA six other cases that involved deaths but had

12  previously been reviewed and cleared of care issues by the CTSPRC.  The NMA therefore

13  reviewed ten total cases — nine of which were from January 2004 to October 2004 and one

14  from January 2002.  The Ad Hoc Committee had not yet issued a report at this point.[3]

15

16  _____

17          [2] Plaintiff contends that Dr. Ly was "an anesthesiologist who participated in one of the surgeries under
    scrutiny" (Opp. 6).  This is incorrect.  According to the deposition of Dr. Ly (Sweet Decl. Exh. T at 74):

18                  Q: . . .  There were four procedures that Dr. Ennix performed that were
                    at issue initially, correct?

19                  A: Yes.
                    Q: And did you act as the anesthesiologist on any of those?

20                  A: No.
    Plaintiff also claims that Dr. Horn had "no background in surgery" (Opp. 6).  Again, this is a misstatement.

21  The following is an excerpt from Dr. Horn's deposition (Sweet Decl. Exh. V. at 15):
                    Q: Are you a surgeon?

22                  A: No.
                    Q: Do your specialties or subspecialties, either internal medicine or

23                  pulmonology, find themselves within the surgery department?
                    A: No.  We're in the department of medicine.

24                  Q: Okay.  Do you perform surgery of any type?
                    A: Bronchoscopy.

25                  Q: What is that?
                    A: Procedure where you look down into the lungs [rest of the transcript

26                  not provided by counsel]

27          [3] Dr. Ennix does not argue that NMA was biased.  Instead, he claims that "Dr. Isenberg chose NMA
    knowing, based on past experience, that NMA would furnish a harsh report on request, and ensured that result

28  by maintaining close communication with NMA throughout the review and even commenting on drafts of its
    report" (Opp. 2 n.2).  Nothing in the record, however, shows that Dr. Isenberg requested that NMA provide a
    negative report.

United States District Court
For the Northern District of California

In March 2005, Dr. Isenberg sent Dr. Ennix a letter setting forth a procedure for him to speak with NMA reviewers and enclosing the reviewers' curriculum vitaes. Dr. Neil Smithline, NMA's Director of Clinical Quality, appointed two physician-reviewers, Dr. Leland B. Housman, a cardiothoracic surgeon, and Dr. Robert H. Breyer, a cardiovascular surgeon. Another participating physician in the NMA review was Dr. Jeffrey Breall, who worked in internal medicine, cardiovascular diseases, and interventional cardiology. Dr. Ennix was provided the opportunity to present written information, his perspectives on each case, and to answer questions from the NMA reviewers and the Ad Hoc Committee members, before each body submitted its report. He spoke to the reviewers by telephone and submitted "lots of information with respect to [his] position" (Hernaez Decl. Exh. B at 297). None of the NMA physician-reviewers knew of Dr. Ennix's race until after the NMA report was finalized. *See* Breall Decl. ¶ 3; Breyer Decl. ¶ 3; Hernaez Decl. Exh. C at 320; Hernaez Decl. Exh. D at 131–32.

NMA issued its report of Dr. Ennix's medical records on May 3, 2005. After reviewing the ten cases, the report indicated three major problems with Dr. Ennix's practice: (i) poor judgment; (ii) poor technique; and (iii) substandard documentation (Paxton Decl. Exh. A at 4–31). The report identified five cases of poor judgment — three leading to death, one leading to cardiac arrest, and another leading to severe complications. According to the report, "Dr. Ennix used poor judgment in deciding whether to operate, when to operate, the best option for the patient, and when additional information should have been obtained before making the decision" (*id.* at 30). There were substandard techniques used in six out of ten cases. Finally, the report stated that "Dr. Ennix's operative notes were grossly substandard. His notes do not provide detail of operative findings or describe what actually happened in the operating room. Rather, his notes convey the impression that surgery was routine, when in fact, there were multiple complications and very prolonged surgery times" (*id.* at 30–31). The report concluded, "If these patterns of care go uncorrected, it is likely that there will be future patient harm" (*id.* at 31). The Ad Hoc Committee did not interview Dr. Ennix until after the NMA had issued the report.

7

United States District Court

For the Northern District of California

As a result of the NMA report, Dr. Isenberg decided to summarily suspend Dr. Ennix's clinical privileges pursuant to Section 7.1 of the Medical Staff Bylaws, "Corrective Action" (*see* Isenberg Decl. Exh. A at 34). The letter sent to Dr. Ennix, dated May 11, 2005, stated the two main bases for summary suspension. *First*, the NMA report concluded that Dr. Ennix's pattern of care could cause future patient harm. *Second*, Dr. Ennix purportedly failed to provide proper post-operative patient care and falsified medical records on a recent occasion. On May 4, 2005, Dr. Ennix performed surgery on a patient with rheumatic heart disease. There was no evidence, however, that Dr. Ennix physically saw the patient on May 5th or May 6th. Rather, it was discovered that a note dated May 5th contained lab data from May 6th, which indicated that the May 5 note had been "falsely dated and entered into the record to document a visit that may or may not have occurred" (Isenberg Dec. Exh. I). In reality, however, some evidence indicates that Dr. Ennix *did* check on the post-operative patient. He did not, it seems, accurately document the visit. At least one nurse verified in an unsworn letter that Dr. Ennix visited the patient at issue (Sweet Decl. Exh. X).

Dr. Isenberg then called an urgent executive session of the Medical Executive Committee on May 18, 2005, to consider whether to continue, modify, or lift the summary suspension. Eleven of the fifteen physician members of the Medical Executive Committee were able to attend the meeting. To prepare, all Medical Executive Committee members had a copy of the NMA report. Dr. Isenberg also presented information that Dr. Ennix had 28 cases "fall out" for peer review from 2003 through April 2004, in contrast to an average of seven cases falling out for the other Summit Hospital cardiovascular surgeons. ("Fall out" means that there are certain specified events that mandate peer review, such as patient death or a return to surgery.) Dr. Ennix also addressed the Medical Executive Committee at the meeting. At the end of the meeting, the Medical Executive Committee unanimously decided to uphold and continue the suspension pending the outcome of an Ad Hoc Committee investigation. The next day, Dr. Ennix spoke to Dr. Isenberg over the phone and requested that he be allowed to continue working at Summit Hospital in the restricted role of a surgical assistant. The Medical

8

United States District Court

For the Northern District of California

1    Executive Committee agreed to lift the summary suspension based on Mr. Ennix's willingness

2    to restrict his surgical duties.

3        The Ad Hoc Committee issued a report on August 1, 2005, recommending that

4    Dr. Ennix's cardiothoracic surgery privileges be reinstated subject to proctoring at each phase

5    of his patient-care activities.  The report was presented to the Medical Executive Committee.

6    The Medical Executive Committee then met with Dr. Ennix in September 2005 to discuss the

7    report.  Dr. Ennix submitted to the Medical Executive Committee reviews of the ten cases by

8    cardiothoracic surgeons Dr. Bruce Reitz and Dr. Bruce W. Lytle, experts that had been hand-

9    selected by plaintiff.  (These ten cases were the same ones sent by the Ad Hoc Committee to

10   NMA.)  Dr. Reitz concluded that, although there might be problems with his documentation,

11   Dr. Ennix met the applicable standards of patient care with respect to all ten cases.  Dr. Lytle

12   similarly agreed and pointed out that the criticisms of Dr. Ennix's care "relate to the hospital

13   approach rather than Dr. Ennix's deficiencies" (Zapolanski Decl. Exh. B & C).  Dr. Ennix also

14   provided reports by medical statisticians to rebut the statistical evidence cited by NMA and the

15   Ad Hoc Committee allegedly showing that Dr. Ennix had higher mortality and return-to-surgery

16   rates than other physicians (Sweet Decl. Exh. GG & HH; Weintraub Decl. Exh. A & B).

17       Both parties object to the use of statistics by the opposing party.  According to

18   defendant, Dr. Ennix had an overall mortality rate of 7.4% as compared with a norm of 3.8%

19   between 1999 and April 2005.  This statistic included valve procedures and coronary bypass

20   procedures (Paxton Decl. Exh. A at 70).  Dr. Ennix, on the other hand, provided the California

21   Report on Coronary Artery Bypass Graft ("CABG") Surgery for 2003–04, which showed his

22   "risk-adjusted mortality rate" to be 4.78%.  This rate was only slightly higher than that of his

23   other peers cited in the report, with some other surgeons having higher mortality rates

24   (Sweet Decl. Exh. Z).[4]

25

26       [4] According to defendant's statistics, Dr. Ennix has 32 deaths out of 431 operations (7.4% mortality).
     The chart labeled CABG procedures as "ACB."  Dr. Ennix had a 4.4% mortality rate for isolated ACB
27   procedures (13 deaths out of 295 operations), 11.1% mortality rate for isolated valve procedures (5 deaths out of
     45 operations), and 10.7% mortality rate for combined ACB and valve procedures (4 deaths out of 24
28   operations).  This order notes that the totals do not match up; the number of deaths and operations due to ACB
     procedures, valve procedures, and combined ACB and valve procedures do not equal 32 deaths and 431

United States District Court

For the Northern District of California

Defendant says that Dr. Ennix's statistical evidence was irrelevant because it only considered CABG surgeries (rather than CABG *and* valve-procedure surgeries). Dr. Ennix in turn provided expert reports commenting and disputing defendant's statistics (Sweet Decl. Exhs. GG and HH). With respect to defendant's argument about CABG surgeries, one expert stated, "It is extremely difficult, if not impossible to compare cardiac surgeons by examining their overall surgical experience. The mortality and complications of isolated CABG surgical procedures vary substantially from those involving CABG and valve procedures. The valve and combination procedures carry a much higher risk. This is why the Society of Thoracic Surgeons (STS) national data registry reports the results for these types of surgeries separately. Since CABG surgery is the most commonly performed cardiac surgery, it is often used by itself to assess the outcomes of a program or an individual surgeon. This is why the State of California has chosen to evaluate cardiac surgical performance of institutions and surgeons based on their results in isolated CABG" (Sweet Del. Exh. HH). Defendant also proffers a chart purportedly showing that Caucasian doctors are over three times more likely than African-American physicians to be subjected to MEC peer review (Hernaez Decl. Exh. F). In stark contrast, Dr. Ennix provides his own chart showing that *African-American* physicians on staff have almost three times the risk of MEC review than their Caucasian counterparts (Sweet Decl. Exh. C). This order will not decide at the summary judgment stage which side should win the battle of statistics.

The Medical Executive Committee determined in October 2005 to reinstate Dr. Ennix's surgery privileges subject to the aforementioned conditions. Dr. Ennix was also required to attend a two-day medical record keeping course. The Medical Executive Committee was supposed to review the proctoring restrictions at six-month intervals. Dr. Ennix had the proctoring requirement from October 2005 to July 2006. During that period, however, the proctors recommended removal of the proctoring requirement, which the Medical Executive

---

operations. Defense counsel then submitted a letter attempting to explain the discrepancy (Dkt. No. 184). The letter was difficult to follow. At this point, the record is unclear as to what other operations Dr. Ennix performed and the related mortality rates.

1    Committee did not do.  In a letter dated April 19, 2006, the proctors wrote to Dr. Paxton about

2    the proctored cases (Sweet Decl. Exh. Y):

> In summary, Dr. Ennix had 8 cases that were nonsurgical
> consultations.  Of the 29 surgical cases please refer to the attached
> summary spreadsheet.

> It was of unanimous opinion that Dr. Ennix met expectations in
> complying with the standards in the pre-op evaluation.  In the
> peri-op evaluation, there were no departures from the standard of
> care.  In the post-op evaluation, Dr. Ennix exceeded expectations in
> the care he provided for his patients.

> It is with unanimous decision from the group of proctors that we
> recommend the proctorship be terminated and that Dr. Ennix be
> reinstated to the medical staff with full unrestricted privileges.

10    Nonetheless, ABSMC initially rejected the proctors' recommendation.  Dr. Paxton

11    stated in his deposition that "Dr. Steven Stanten and I reviewed these cases and read through the

12    cases, the charts, the medical records, and it was our feeling that this was an inadequate number

13    of cases to make a sound judgment to allow Dr. Ennix to lift the proctoring" (Sweet Decl. Exh.

14    Q at 223–24).  Dr. Russell Stanten, however, testified that other surgeons needed fewer cases

15    under proctoring (Sweet Decl. Exh. N at 187–88):

> Q: And have there been — when you started performing cardiac
> surgeries at Summit, did you have proctoring?

> A: Yes.

> Q: And since you've been there, have other surgeons, cardiac
> surgeons come on board who have had proctoring?

> A: Yes.

> Q: Approximately how many cases of yours were proctored when
> you began performing surgeries?

> A: I believe it's in the range of 10 to 15.

> Q: And has that also been the range of cases that you believe have
> been proctored for other surgeons who have come on board?

> A: Yes.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1     In July 2006, the Medical Executive Committee finally acted upon the recommendation

2  of the Ad Hoc Committee and lifted the proctoring requirement.  Instead, Dr. Ennix's cases

3  were now subject to retrospective chart review by the Chief of the Cardiothoracic Surgery

4  Service or a designee.

5     ABSMC also filed an "805 Business and Professions Code Section" report regarding

6  Dr. Ennix's four cases with the Medical Board of California.  The Medical Board of California

7  concluded its investigation in a subsequent letter dated July 13, 2006 (Ennix Decl. Exh. C):

8          A simple departure in the standard of practice could be identified
           in one case [out of the four cases reviewed for MIV procedures].
9          The remainder of the cases had no evidence of deviations in the
           standard of practice by Dr. Ennix.  There is no evidence, however,
10         in these reviewed cases, that the conduct of Dr. Ennix; [sic]
           preoperatively, intraoperatively, or postoperatively, has violated the
11         standard of practice in cardiac surgery.

12                    *              *              *

13     Dr. Ennix commenced the instant action in May 2007.  He alleged five claims, one of

14  which was racial discrimination in violation of 42 U.S.C 1981.  The other four claims were state

15  claims.  An order dated August 28, 2007, granted in part and denied part defendant's motion to

16  dismiss (Dkt. No. 84).  The August 2007 order concluded that the only remaining claim in this

17  case was the Section 1981 claim.  Defendant Alta Bates now moves for summary judgment,

18  arguing that there was no contract between Dr. Ennix and Alta Bates and that a race

19  discrimination cannot be established.

20                              **ANALYSIS**

21     Summary judgment is granted when "the pleadings, depositions, answers to

22  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

23  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

24  matter of law."  FRCP 56(c).  A district court must determine, viewing the evidence in the light

25  most favorable to the nonmoving party, whether there is any genuine issue of material fact.

26  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).  A genuine issue

27  of fact is one that could reasonably be resolved, based on the factual record, in favor of either

28

party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).[5]

The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000).  When the moving party meets its initial burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**1.    IS THERE A "CONTRACT" AT ISSUE?**

ABSMC argues that the Section 1981 claim fails because there never was a "contract" at issue.  Section 1981 provides:

> (a) Statement of equal rights — All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined — For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment — The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

A contract is necessary to a Section 1981 claim.  In *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006), the African-American plaintiff was the sole shareholder and president of JWM Investments, Inc.  He sued Domino's under 42 U.S.C. 1981, alleging that JWM and Domino's had entered into several contracts and that Domino's had breached those contracts because of racial animus against the plaintiff.  The Supreme Court disagreed.  It reasoned, "[I]t was the

---

[5] Unless indicated otherwise, internal citations are omitted from all cites.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   right — denied in some States to blacks, as it was denied at common law to children — to give

2   and receive *contractual rights* on one's own behalf . . .  When the Civil Rights Act of 1866 was

3   drafted, it was well known that '[i]n general a mere agent, who has no beneficial interest in a

4   contract which he has made on behalf of his principal, cannot support an action thereon.'"

5   *Id*. at 475 (emphasis in original).  The Supreme Court did note, however, that "we do not mean

6   to exclude the possibility that a third-party intended beneficiary of a contract may have rights

7   under § 1981."  *Id.* at 476 n.3.  In *Domino's Pizza*, the plaintiff was an agent of JWM.

8   The whole purpose of corporation and agency law was that a shareholder and contracting

9   officer of a corporation had no rights and were exposed to no liability under the corporation's

10  contracts.  Consequently, the plaintiff could not assert rights under Section 1981 for the JWM-

11  Domino's contracts.  The Supreme Court stated that "a plaintiff cannot state a claim under §

12  1981 unless he has (or would have) rights under the existing (or proposed) contract that he

13  wishes 'to make and enforce.'  Section 1981 plaintiffs must identify injuries flowing from a

14  racially motivated breach of their own contractual relationship, not of someone else's."  *Id.* at

15  479–80.

16      Under California contract law, "[i]t is essential to the existence of a contract that there

17  should be: (1) Parties capable of contracting; (2) Their consent; (3) A lawful object; and,

18  (4) A sufficient cause or consideration."  Cal. Civ. Code § 1550.  *See also Lopez v. Charles*

19  *Schwab & Co., Inc.*, 118 Cal. App. 4th 1224 (2004).

20      ABSMC says there were no contracts between Dr. Ennix and ABSMC.  During his

21  deposition, as stated, Dr. Ennix was asked, "Subsequent to October 2005, have you had any

22  individual contract with Alta Bates Summit Medical Center?  That is, just with you; not with

23  Kaiser, not with a group?"  Dr. Ennix answered, "No."  He also stated that he had never been

24  "an employee of the medical center," nor had he "ever written a contract with [his] patients that

25  both of [them] sign[ed]" (Hernaez Decl. Exh. B at 49–50).

26      Dr. Ennix, on the other hand, contends that he did have contractual relationships

27  protected by Section 1981.  He claims that there were two such relationships: (i) his contractual

28  relationship with ABSMC to perform services at the hospital, and (ii) his contractual

14

United States District Court

For the Northern District of California

1    relationships with patients to treat them.  In *Janda v. Madera Community Hosp*, 16 F. Supp. 2d

2    1181, 1186–87 (E.D. Cal. 1998) (Wanger, J.), the district court found that an express

3    employment contract had been formed between the hospital and a doctor supported by

4    consideration.  The consideration consisted of the hospital's promise to employ the plaintiff

5    doctor on stated terms and conditions and the doctor's promise to work under those conditions.

6    The hospital also granted the doctor medical privileges and the use of the hospital's resources

7    and facilities.  In exchange, the hospital required the doctor to comply with the hospital's

8    bylaws, rules, and regulations.  *Ibid.*

9          Here, Dr. Ennix argues that he had a contract with ABSMC in a similar manner.  He was

10   a member of the ABSMC medical staff who performed services there, paid annual membership

11   fees to the hospital, and agreed to abide by the bylaws.  ABSMC permitted him to practice

12   medicine at its facilities.  ABSMC then received payment of hospital fees relating to Dr.

13   Ennix's treatment of patients.

14         ABSMC counters that Dr. Ennix cannot use a third party's contract — the one between

15   ABSMC and East Bay Cardiac Surgery Center — to support his individual Section 1981 claim,

16   even if he had a relationship with that third party.  This is most likely true under *Domino's

17   Pizza*, but Dr. Ennix is not asserting rights through the third-party contract; he is doing so

18   through his own contractual relationship with ABSMC.  Whether or not there was such a

19   relationship is a disputed issue of material fact that should be resolved at trial.

20         ABSMC next argues that Dr. Ennix erroneously points to the Medical Staff bylaws as

21   contractual.  Under *O'Byrne v. Santa Monica-UCLA Medical Ctr.*, 94 Cal. App. 4th 797, 810

22   (2001), "we hold that under California contract law, medical staff bylaws adopted pursuant to

23   California Code of Regulations, title 22, section 70703, subdivision (b), do not in and of

24   themselves constitute a contract between a hospital and a physician on its medical staff."

25   Again, ABSMC's argument is unpersuasive.  Dr. Ennix is not contending that the Medical Staff

26   bylaws "in and of themselves constitute a contract."  Instead, he says that contractual

27   relationship arose from ABSMC's granting of medical-staff privileges to Dr. Ennix.

28   Furthermore, the California court in *O'Byrne* cited *Janda* and stated, "Whether [medical staff

United States District Court

For the Northern District of California

1    bylaws] become incorporated into a separate employment contract between the hospital and the

2    physician is another question.  It need not be addressed here, however, in that plaintiff alleged

3    only that the Bylaws constituted the contract between himself and the Medical Center, and he

4    presented evidence of no other contract." *Id.* at 810.

5         Viewing the evidence in the light most favorable to the non-moving party, a jury could

6    reasonably conclude that there was a contract between ABSMC and Dr. Ennix.  There is a

7    genuine dispute of material fact as to whether or not there was a contractual relationship

8    between the two.  This is enough to defeat ABSMC's motion for summary judgment on this

9    issue, so this order need not address whether or not there was a contractual relationship arising

10   from Dr. Ennix's treatment of patients.[6]

11                    **2.    CAN DR. ENNIX ESTABLISH RACIAL DISCRIMINATION?**

12        "Analysis of an employment discrimination claim under § 1981 follows the same legal

13   principles as those applicable in a Title VII disparate treatment case." *Fonseca v. Sysco Food*

14   *Services of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004).  "In order to evaluate claims of

15   intentional discrimination where intent itself is generally impossible to prove, courts apply a

16   burden-shifting analysis [developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

17   802–03 (1973)].  "Under *McDonnell Douglas*, if the plaintiff satisfies the initial burden of

18   establishing a prima facie case of racial discrimination, the burden shifts to the defendant to

19   prove it had a legitimate non-discriminatory reason for the adverse action.  If the defendant

20   meets that burden, the plaintiff must prove that such a reason was merely a pretext for

21   intentional discrimination." *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1144 (9th Cir.

22

23        [6]  Dr. Ennix argues that the contract between ABSMC and East Bay Cardiac Surgery Center describes
     Dr. Ennix as an "independent contractor" in relation to ABSMC.  That, Dr. Ennix says, indicates a contractual
24   relationship.  That is not the case.  The contract specifically states, "In performing the services described in this
     Agreement, Group (and each Physician and Employee) is acting as an independent contractor, and shall not be
25   considered an employee, joint venturer or partner of Hospital for any purpose whatsoever" (Hernaez Decl. Exh.
     A at 9).  The contract also had a section entitled, "No Third Party Rights," that stated, "The parties do not intend
26   the benefits of this Agreement to inure to any third person not a signatory to this Agreement.  Notwithstanding
     anything contained herein, or any conduct or course of conduct by any party to this Agreement, before or after
27   signing this Agreement, this Agreement shall not be construed as creating any right, claim or cause of action
     against either party by any person or entity not a party to this Agreement" (*id.* at 12).  Nonetheless, summary
28   judgment is still denied because plaintiff has provided other evidence — unrelated to the independent-contractor
     or third-party point — that creates a genuine dispute of material fact.

2006).

### a.    Did Dr. Ennix Establish a Prima Facie Case of Discrimination?

The Ninth Circuit in *Lindsey* held that the four elements needed to establish a *prima facie* case of discrimination were: (i) the plaintiff must be a member of a protected class; (ii) he attempted to contract for certain services; (iii) he was denied the right to contract for those services; and (iv) a similarly-situated group of a different protected class was offered the contractual services which were denied to the plaintiff. *Id.* at 1145. "The proof required to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Id.* at 1144.[7]

This order holds that Dr. Ennix provided the "minimal" proof necessary to meet the first burden under *McDonnell Douglas*. As an African-American, Dr. Ennix is a member of a protected class. In addition, jury could reasonably find that he attempted to contract for certain services. He used ABSMC's facilities, paid hospital-membership fees, and abided by the Medical Staff bylaws. In return, ABSMC received hospital fees relating to Dr. Ennix's patient-care services. A jury could also reasonably find that Dr. Ennix was denied the right to contract for those services. The summary suspensions and proctoring requirement impeded the contractual relationship because Dr. Ennix either could not practice at all or he could no longer be lead surgeon. Finally, there were similarly-situated people — other cardiac surgeons who had privileges at ABSMC — not subject to the same scrutiny and restrictions as Dr. Ennix. For example, more of his cases seemed to be proctored than those of other surgeons. Dr. Ennix therefore established a *prima facie* case of racial discrimination, or so a jury could so find.

### b.    Did Dr. Ennix Show "Pretext?"

The second question under *McDonnell Douglas* is to determine whether ABSMC met its burden in showing a legitimate non-discriminatory reason for the adverse action. This order will assume *arguendo* that ABSMC did so, thereby shifting the burden back to Dr. Ennix to

---

[7] Although both sides agree that the *McDonnell Douglas* analysis applies to disparate-impact racial discrimination cases, ABSMC failed to apply the four-element test for determining whether Dr. Ennix established a *prima facie* case of discrimination.

United States District Court
For the Northern District of California

1    show that this reason was mere "pretext" for discrimination.  In *Noyes v. Kelly Services*,

2    488 F.3d 1163, 1170 (9th Cir. 2007), the Ninth Circuit held (emphasis in original):

3              "[A] plaintiff can prove pretext in two ways: (1) *indirectly*,
              by showing that the employer's proffered explanation is 'unworthy
4              of credence' because it is internally inconsistent or otherwise not
              believable, or (2) *directly*, by showing that unlawful discrimination
5              more likely motivated the employer."  "All of the evidence [as to
              pretext] — whether direct or indirect — is to be considered
6              cumulatively."  Where the evidence of pretext is circumstantial,
              rather than direct, the plaintiff must present "specific" and
7              "substantial" facts showing that there is a genuine issue for trial.
              However, that requirement is tempered by our observation that, in
8               the context of Title VII claims, the burden on plaintiffs to raise a
              triable issue of fact as to pretext is "hardly an onerous one."

9

10   Here, Dr. Ennix provided circumstantial evidence of pretext, which had to be sufficiently

     "specific" and "substantial."

11
          ABSMC cites *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993),
12
     which purportedly requires the plaintiff to show *both* that ABSMC's proffered reason was false
13
     *and* that discrimination was the real reason.  The Ninth Circuit in *Noyes*, however, specifically
14
     held that *St. Mary's Honor* did not address the plaintiff's burden to show pretext at the *summary*
15
     *judgment* stage.  The Ninth Circuit stated, "Taken out of context, this statement would appear to
16
     support an enhanced burden to show pretext.  However, considered in the proper procedural
17
     posture, *St. Mary's Honor* clearly does not alter the burden on summary judgment . . .
18
     We reiterate that at the summary judgment stage, a plaintiff may raise a genuine issue of
19
     material fact as to pretext via (1) direct evidence of the employer's discriminatory motive or
20
     (2) indirect evidence that undermines the credibility of the employer's articulated reasons."
21
     *Noyes*, 488 F.3d at 1170–71.
22
          This order finds that Dr. Ennix has met the proper burden for pretext at the summary
23
     judgment stage.  Dr. Ennix offered indirect evidence to undermine the credibility of ABSMC's
24
     reasons.  His assertions may or may not be true.  This order, however, finds that Dr. Ennix has
25
     provided a laundry list of items (cited back to the record) that create a genuine dispute of
26
     material fact with respect to the pretext issue.  One such item is that ABSMC did not act
27
     consistently with its claim that it acted out of concern for patient safety.  Even though Dr. Lee
28
     "noted several documentation issues, but no quality of care concerns" (according to Dr. Steven

United States District Court

For the Northern District of California

1   Stanten), Dr. Ennix's cases were still forwarded onto the SPRC for further review.

2   Defendant physicians Dr. Russell Stanten and Dr. Steven Stanten admitted that they could not

3   recall previous instances in which the SPRC did not accept the findings of a physician reviewer

4   or deferred making a care determination.

5          Furthermore, Dr. Ennix provided some evidence that other responsible members of the

6   operating team were not subjected to the same scrutiny.  For example, the NMA report stated,

7   "While the cardiologist, vascular surgeon and anesthesiologist bear some responsibility, it was

8   ultimately Dr. Ennix's responsibility to assure that the patient received bypass surgery when it

9   was indicated" (Paxton Exh. A at 10).  An interrogatory to defendant requested it to provide

10  information "of all MEMBERS of the MEDICAL STAFF, other than Dr. Ennix, who were

11  subject to INVESTIGATION, CORRECTIVE ACTION or any other disciplinary action with

12  respect to their participation in the TEN CASES ("TEN CASES" means the cases the Ad Hoc

13  Committed, formed for the purposes of the peer review that is the subject of this lawsuit,

14  referred to National Medical Audit for review.)" Defendant responded: "No other individuals

15  were subject to investigation . . . corrective action or other disciplinary action relative to such

16  cases" (Sweet Decl. Exh. EE, Response to Interrogatory No. 15).

17         Defendant says there was no pretext.  The *argument* made by defendant is that Dr. Ennix

18  had an abnormally high mortality rate associated with his surgeries, whereas the *argument* made

19  by Dr. Ennix is that this was not so.  Each side points to its own statistics.  The Court has tried

20  to sift through the statistics.  They are hard to reconcile.  For example, at the oral argument,

21  defense counsel could not explain why certain numbers did not add up.  After the hearing,

22  defense counsel submitted a letter attempting to explain the discrepancy.  The letter was also

23  hard to follow.  It referred to page numbers that did not track corresponding page numbers in

24  the record (*e.g.*, the letter referred to pages 69 and 70, but actual page numbers said pages 2 and

25  3).  Moreover, one of the photocopied pages for the summary judgment record was cut off at the

26  lefthand margin and was unreadable.  This order finds that the battle of statistics cannot be

27  resolved on summary judgment and needs to be sorted out through the examination of qualified

28  witnesses.

United States District Court

For the Northern District of California

1    Defendant offers further counterevidence claiming that Dr. Lee never "cleared"

2    Dr. Ennix and that there were certain Caucasian physicians who were disciplined "more

3    harshly" than Dr. Ennix.  ABSMC also provides excerpts of testimony from Dr. Ennix's

4    deposition where Dr. Ennix was asked whether he thought any non-defendant member of the

5    Medical Executive Committee harbored racial animus against African-Americans.  Dr. Ennix

6    generally answered "I don't know," "no," or "probably not" (Hernaez Decl. Exh. B at 325–26).

7    When asked whether he had "any basis for believing that Dr. Isenberg has a racial bone in his

8    body," Dr. Ennix answered, "I don't know."  He gave similar answers for Dr. Iverson and

9    Dr. Steve Stanten (*id.* at 328–39).

10    Again, that may be true.  It may also be true that when any surgeon, regardless of race,

11    has deaths on the operating table that hospital management is obligated to inquire with

12    diligence.  But again, at this stage of the proceedings, there are genuine issues of material fact

13    that must be resolved at trial.  This alone is enough to defeat ABSMC's motion for summary

14    judgment.  This order need not address the other factual issues regarding pretext raised by both

15    parties.

16                          *            *            *

17    Of course, the public has a keen interest in making sure that surgeons are qualified.

18    When a surgeon has an abnormally high number of complications and deaths, we expect, indeed

19    insist, the profession to investigate.  But investigations should not be racially motivated.  A jury

20    will have to decide if this particular investigation was racially motivated rather than a genuine

21    effort to protect the public from a potentially unqualified surgeon.

22                                  **CONCLUSION**

23    For the foregoing reasons, the motion for summary judgment is **DENIED**.  Please do not

24    contend that anything in this order has established anything for trial purposes.  The trial will be

25    a clean slate.  At trial, all facts must be proven via admissible evidence in the traditional way.

26    The mere fact that an item was in the summary judgment record does *not* mean that it will be

27

28

1    admitted at trial.  If the evidence actually received at trial fails to meet the Rule 50 standard,

2    then judgment will be entered.

3

4         **IT IS SO ORDERED.**

5

6    Dated:  April 28, 2008.

7                                              WILLIAM ALSUP
                                              UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California