1  MAUREEN E. MCCLAIN (State Bar No. 062050)
   Email: mcclain@kmm.com
2  ALEX HERNAEZ (State Bar No. 201441)
   Email: hernaez@kmm.com
3  KAUFF MCCLAIN & MCGUIRE LLP
   One Post Street, Suite 2600
4  San Francisco, California  94104
   Telephone:  (415) 421-3111
5  Facsimile:    (415) 421-0938

6  Attorneys for Defendant
   ALTA BATES SUMMIT MEDICAL CENTER
7
8  TAZAMISHA H. IMARA (State Bar No. 201266)
   Email: imara@kmm.com
   KAUFF MCCLAIN & MCGUIRE LLP
9  2049 Century Park East
   Suite 2690
10 Los Angeles, CA  90067
   Telephone:  (310) 277-7550
11 Facsimile:    (310) 277-7525

12 Attorneys for Defendant
   ALTA BATES SUMMIT MEDICAL CENTER
13

14                 UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16

17  COYNESS L. ENNIX, JR., M.D.,              CASE NO.  C 07-2486 WHA

18                  Plaintiff,                **DEFENDANT'S MOTION IN LIMINE
                                              NO. 1 TO EXCLUDE
19  v.                                        COMPARATIVE EVIDENCE
                                              ABSENT A FOUNDATIONAL
20  ALTA BATES SUMMIT MEDICAL CENTER,         SHOWING OF SIMILARITY**

21                  Defendant.                **DATE:**    May 19, 2008
                                              **TIME:**    2:00 p.m.
22                                            **DEPT:**    Ctrm. 9, 19th Floor
                                              **JUDGE:**   Hon. William H. Alsup
23
                                              **COMPLAINT FILED:** May 9, 2007
24                                            **TRIAL DATE:** June 2, 2008

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

1  I.    **INTRODUCTION**

2          Defendant Alta Bates Summit Medical Center ("ABSMC" or "the Hospital")

3  hereby applies for an order *in limine* directing that Plaintiff Coyness L. Ennix ("Plaintiff"),

4  his counsel, and witnesses be precluded from presenting evidence or argument in the

5  presence of the jury concerning any comparison between Plaintiff and any other

6  physician *unless* Plaintiff first makes a foundational showing of "similar situation."

7  II.   **ARGUMENT**

8          ABSMC anticipates that Plaintiff may seek to introduce evidence

9  comparing himself to other physicians.  However, to make any such comparison

10 meaningful, Ennix must first show that another physician is "similarly situated" to him "in

11 all material respects." *Beck v. UFCW, Local 99*, 506 F.3d 874, 885 (9th Cir. 2007).[1]  Or,

12 as this Court has observed, that Plaintiff is comparing "apples with apples."  Absent such

13 a foundational showing, no comparison should be allowed.

14          Here, Defendant contends that no physician is comparable to Plaintiff in all

15 material respects.  In particular, no surgeon shares with Plaintiff the following treatment

16 record:

17          Significant Problems With MIV Procedures

18          Early in 2004, Plaintiff performed a series of four minimally invasive valve

19 procedures (the "MIV Procedures").  Compl., ¶ 20.  Plaintiff admits to encountering

20 problems with these new procedures.  In particular, the Complaint alleges that Plaintiff

21 "encountered issues such as prolonged procedure time, increased blood usage and

22 conversion to the more traditional approach" during the MIV Procedures.  Compl., ¶ 20.

23

24 _____

25 [1]  *See also Mbadiwe v. Union Mem'l Reg'l Med. Ctr., Inc.*, 2007 U.S. Dist. LEXIS 30319, *5-*6 (W.D.N.C. Apr. 24, 2007) (applying the "similarly situated" standard to the Section
26 1981 claim of a minority physician who complained that his hospital privileges were restricted due to his race); *see also Vesom v. Atchison Hosp. Ass'n*, 2006 U.S. Dist.
27 LEXIS 68576, *70-*71 (D. Kan. 2006) (same within the context of an application for reappointment and renewal privileges); *see also Mehta v. HCA Health Servs. of Fla.,*
28 *Inc.*, 2006 U.S. Dist. LEXIS 79536, *19 (M.D. Fla. 2006) (same concerning the termination of staff privileges).

KAUFF McCLAIN &
McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

DEFENDANT'S MOTION IN LIMINE NO. 1                                      CASE NO. C 07-2486 WHA

1   The "issues" consisted of excessive time in surgery and large blood usage, which

2   ultimately resulted in death, respiratory failure or a return to surgery.  Isenberg Decl., ¶ 9.

3                      The Junod Report.

4          Around the same time as the MIV procedures, Dr. Isenberg received a

5   report describing performance deficiencies with surgeries Plaintiff performed at the Alta

6   Bates Campus in 2002 (the "Junod Report").[2] The specific concerns identified in the

7   Junod Report involved Plaintiff's patient selection for surgery, length of operating time,

8   clinical judgment, time on the pump (during coronary bypass procedures), intra-operative

9   technique, and post-operative care.  S. Stanten Decl., ¶ 3; Isenberg Decl., Ex. D.

10                     The Assessment of Dr. Hon Lee.

11         Based on the information received by the Summit Medical Staff President

12  (Dr. Isenberg) and the Chair of the Department of Surgery (Dr. S. Stanten), a preliminary

13  review of the MIV Procedures was conducted by Dr. Hon Lee.  S. Stanten Decl., ¶ 4;

14  Compl., ¶ 20.  Dr. Lee's assessment described "major documentation issues" with two of

15  the MIV Procedures.  S. Stanten Decl., ¶ 4.  Also, Dr. Lee agreed suspending the MIV

16  procedures after Ennix's first four failures was "a reasonable response" and that the

17  "outcomes of these four procedures were alarming."  Lee Tr. at 24:5-15.  He also

18  specifically faulted Ennix's failure to obtain the proper patient consents.  Lee Tr. at

19  25:10-13.  Dr. Lee further agreed that a reasonable person reviewing his report "might

20  legitimately determine that there was a need for further review."  Lee Tr. at 40:14-21.

21  Hence Dr. Lee did not find the Medical Staff's action in continuing its peer review

22  process unfair to Dr. Ennix.  Lee Tr. at 38:24-39:1.

23

24

25

26

---

[2]  The Junod Report is so named because it was prepared by an outside physician
reviewer (Dr. Forrest Junod) in 2002.  Isenberg Decl., ¶ 9.  The Alta Bates Medical Staff
provided the Junod Report to the Summit Medical Staff because of the closure of the
cardiac program at Alta Bates.  Isenberg Decl, ¶ 9.

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111
- 2 -
DEFENDANT'S MOTION IN LIMINE NO. 1                                    CASE NO. C 07-2486 WHA

1    <u>High Mortality Rates</u>.

2         Additionally, in March 2004, Dr. Isenberg reviewed documents showing

3    that Plaintiff's mortality and return to surgery rates following open heart surgery were

4    significantly higher than his peers.  Isenberg Decl., ¶ 9 & Ex. E.

5         <u>The NMA Report, Which Plaintiff Concedes Is Not Racially Biased</u>.

6         NMA performed a focused review of ten of Plaintiff's patient cases (the MIV

7    Procedures and 6 bypass operations which resulted in death or substantial

8    complications).  Paxton Decl., ¶ 5 & Ex. A (Appendix A).  Three major problems with

9    Plaintiff's standard of care were identified:  (1) poor judgment (leading to death in three

10   cases, post-operative cardiac arrest in one case, and severe complications in another

11   case); (2) substandard surgical technique (six of ten cases); and (3) "grossly

12   substandard" documentation.[3]  Paxton Decl., ¶ 5 & Ex. A (Appendix A at pp. 4-31);

13   Isenberg Decl., ¶ 12. The NSA report concluded that "[i]f [Plaintiff's] patterns of care go

14   uncorrected, it is likely that there will be future patient harm."  *Id.*  Importantly, none of

15   the NMA reviewers knew Plaintiff's race.  Unless Plaintiff can point to another doctor with

16   a substantially similar background, any comparison is inappropriate under *Beck*, 506

17   F.3d at 885.

18        Additionally, any comparison necessarily fails because Plaintiff cannot

19   show any identity between the decision-makers, which is also required to establish

20   similar situation.  *Id.*

21   ///

22   ///

23   ///

24

25

26   [3]  NMA concluded that Plaintiff's operative notes were "grossly substandard."  Paxton
     Decl., Ex. A (Appendix A at p. 31).  The notes reviewed did not provide sufficient detail of
     operative findings or describe what actually happened in the operating room.  Rather, his
27   notes convey the impression that surgery was routine, when in fact, there were multiple
     complications and very prolonged surgery times.  Paxton Decl., Ex. A (Appendix A at p.
28   31).

KAUFF McCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

- 3 -

1  **III.    CONCLUSION**

2          In order to compare "apples with apples," Plaintiff must identify a similarly

3  situated surgeon.  If he cannot show foundational similarity, this Court should exclude

4  any comparator evidence or argument.

5  DATED:       April 29, 2008              Respectfully submitted,

6                                          KAUFF MCCLAIN & MCGUIRE LLP

7

8                                          By: _____

9                                               ALEX HERNAEZ
                                           Attorneys for Defendant
10                                         ALTA BATES SUMMIT MEDICAL
                                           CENTER

11  4825-3137-8690.1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104

DEFENDANT'S MOTION IN LIMINE NO. 1                    CASE NO. C 07-2486 WHA

1   G. SCOTT EMBLIDGE, State Bar No. 121613
    emblidge@meqlaw.com
2   RACHEL J. SATER, State Bar No. 147976
    sater@meqlaw.com
3   ANDREW E. SWEET, State Bar No. 160870
    sweet@meqlaw.com
4   MOSCONE, EMBLIDGE, & QUADRA, LLP
    220 Montgomery Street, Suite 2100
5   San Francisco, California 94104-4238
    Telephone:    (415) 362-3599
6   Facsimile:    (415) 362-2006

7   Attorneys for Plaintiff

8

                        REC'D MAY 0 9 2008

9                  UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12   COYNESS L. ENNIX JR., M.D.,              Case No. C 07-2486 WHA

13            Plaintiff,                      **PLAINTIFF'S OPPOSITION TO**
                                              **DEFENDANT'S MOTION IN**
14        vs.                                 **LIMINE NO. 1 RE COMPARATIVE**
                                              **EVIDENCE**
15   ALTA BATES SUMMIT MEDICAL
16   CENTER,                                  **Trial Date:   June 2, 2008**
                                              **Dept:         Ctrm. 9, 19th Floor**
17            Defendants.                     **Judge:        Hon. William H. Alsup**

18

19        To make his Section 1981 case, Dr. Ennix must show that ABSMC treated him less

20   favorably than it treated his "similarly situated" peers. "[I]ndividuals are similarly situated when

21   they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d

22   634, 641 (9th Cir. (Cal.) 2003). The conduct at issue in this case is Dr. Ennix's performance as a

23   cardiac surgeon. Thus, for the purposes of the Section 1981 analysis, Dr. Ennix may compare

24   himself with other cardiac surgeons at ABSMC who performed similar procedures and

25   experienced similar results during the time period at issue. That he can do: as shown by the

26   CCORP Report, Dr. Ennix's CABG mortality rate for 2003-04 was within the acceptable range,

27

28

                                          1

1  within the State norm, and, most important to this inquiry, within the same range or better than

2  his ABSMC cardiac surgeon peers.

3         As for the non-CABG cases during this time frame, *these include only the four MIV*

4  *cases*, and Dr. Ennix performance on these cannot legitimately be distinguished from that of his

5  peers. First and foremost, Dr. Hon Lee cleared those cases of patient care issues at the time.

6  Second, Dr. Ennix performed four of the first five MIV cases performed at ABSMC, and Dr.

7  Hon Lee recommended a Departmental review of these procedures manifestly to improve

8  performance of *all* MIV medical staff, not just Dr. Ennix. Third, the complications Dr. Ennix

9  encountered in some of the MIV cases are frequently encountered by Dr. Ennix's peers, as

10  evidenced by: (a) the results of the first MIV case performed at ABSMC, by Drs. Iverson and

11  Khan; (b) deposition testimony of Dr. Lee and Dr. Ennix's peers; and (c) data regarding the first

12  group of MIV procedures performed by Dr. Ennix's peers.

13         ABSMC seeks to skirt responsibility for its disparate treatment of Dr. Ennix by casting

14  Dr. Ennix as an outlier whose surgical performance is so different from his peers that no

15  comparison for Section 1981 purposes is possible. But the factors ABSMC cites do not

16  distinguish Dr. Ennix with respect to *his performance as a surgeon*. Rather, these factors

17  distinguish Dr. Ennix with respect to *how ABSMC treated him*. It is as if ABSMC tripped Dr.

18  Ennix, and then insisted Dr. Ennix could not compare himself to his peers because his peers did

19  not trip. ABSMC's attempts to distinguish Dr. Ennix with respect to the MIV cases, Dr. Lee's

20  assessment, the Junod Report, bogus mortality statistics and the NMA report all reduce to the

21  same formula: ABSMC manipulates information to characterize it as damning to Dr. Ennix's

22  record. ABSMC did not do that with Dr. Ennix's peers.

23         At trial, Dr. Ennix will present evidence that he is similarly situated to his ABSMC

24  cardiac surgeon peers.

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S                                    Case No. C 07-2486 WHA
MOTION IN LIMINE NO. 1

1                           **ARGUMENT**

2    **I.    DR. ENNIX IS SIMILARLY SITUATED TO HIS PEERS.**

3           "Evidence that one or more similarly situated individuals outside of the protected class

4    received more favorable treatment can constitute sufficient evidence of discrimination" for a

5    discrimination plaintiff to prevail. *Beck v. United Food and Commercial Workers Union, Local*

6    *99*, 506 F.3d 874, 883 (9th Cir. 2007) (citations omitted). "Such a showing of disparate

7    treatment raises an inference of discrimination 'because experience has proved that in the

8    absence of any other explanation it is more likely than not that those actions were bottomed on

9    impermissible considerations.'" *Id.*; citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80

10   (1978) (emphasis added). "[W]hether two employees are similarly situated is ordinarily a

11   question of fact." *Id.* at 885, n. 5. A jury may infer discriminatory motive based on comparative

12   data involving a small number of employees when the plaintiff establishes that he or she is

13   "similarly situated to those employees in all material respects." *Beck*, 506 F.3d at 885.

14          Dr. Ennix surgical record is indistinguishable from his peers at ABSMC; therefore, they

15   are similarly situated to Dr. Ennix for purposes of Section 1981 disparate treatment analysis. At

16   trial, Dr. Ennix will offer such evidence, specifically:

17   - Dr. Ennix's CABG mortality rates for the time period at issue in this case were in the

18     same range as his peers'.

19   - For the reasons cited above, Dr. Ennix's record on the MIV cases is not significantly

20     different from his peers. Further, other cardiac surgeons at ABSMC had similarly long

21     operating times in their first few MIV cases. (See Exhibit B, document produced by

22     ABSMC in discovery showing the "cut to close" time for MIV procedures performed by

23     another ABSMC cardiac surgeon, identified as Physician I.)

24   - Dr. Ennix agreed not to perform MIV cases after the first four and before this peer review

25     commenced. Therefore, even if there were any difference in his results from those of his

26     peers, ABSMC could not legitimately use Dr. Ennix's MIV outcomes to justify treating

27     him differently from his peers.

28

                                              3

1    Finally, ABSMC controls virtually all the data, other than that released in the CCORP

2    Report, which could prove Dr. Ennix's performance is in line with his peers. ABSMC

3    vigorously opposed all Dr. Ennix's efforts to obtain data in discovery regarding the performance

4    record of his peers, and ultimately produced very little of what Dr. Ennix sought. At trial, Dr.

5    Ennix will use the minimal data ABSMC provided as well as testimony of its experts and Dr.

6    Ennix's peers to demonstrate that his record is no different from his peers.

7    **II.    ABSMC's ATTEMPT TO DISTINGUISH DR. ENNIX'S RECORD MERELY**
     **HIGHLIGHTS ITS DISPARATE TREATMENT OF HIM.**
8

9    ABSMC cites several factors it alleges so significantly distinguish Dr. Ennix from his

10   peers that no comparison is possible. These are fabricated and vacuous allegations. For

11   example:

12   • Alleged Problems with MIV Procedures: ABSMC seizes on Dr. Ennix's

13      acknowledgement in the Complaint of some complications in the MIV procedures. All

14      experts who reviewed these cases other than ABSMC's, including Drs. Lee, Reitz, Lytle,

15      Rea, Hill and others, found no standard of care issues with these cases. And the

16      California Medical Board found only two minor issues with these cases. Further, as

17      discussed above, other doctors experienced similar complications in their first few MIV

18      cases. Finally, Dr. Ennix had stopped performing MIV cases, so the results of those

19      procedures could not justify a suspension or a concern about patient safety. Accordingly,

20      these results do not distinguish Dr. Ennix from his peers with respect to the issues in this

21      case.

22   • The Junod Report: ABSMC knew that Alta Bates had not vetted the report and had sent

23      it to Summit with a disclaimer. (See Exhibit C.) ABSMC also knew that the Junod

24      Report reviewed the *entire* Alta Bates campus cardiac surgery practice, not just Dr.

25      Ennix. Dr. Ennix fought vigorously to close this program due to systemic problems

26      inherent in low volume, problems that affected the performance of all members of the

27      cardiac surgery team, including nurses, technicians, anesthesiologists, and cardiologists,

28

4

1    not just Dr. Ennix as cardiac surgeon.  ABSMC knew then that maligning Dr. Ennix

2    based on this report was irresponsible.

3  • The Assessment of Dr. Lee:  First, meeting minutes and deposition testimony confirm

4    that Dr. S. Stanten understood that Dr. Lee found no care issues in the MIV cases in his

5    review.  ABSMC attempts to change history now by citing to Dr. Lee's deposition

6    testimony in this litigation.  However, that testimony was not before ABSMC at the time,

7    and so could not have justified treating Dr. Ennix differently than his peers.

8    Additionally, while acknowledging some reason for concern about the four MIV cases,

9    Dr. Lee stated that he "would think overall, the system of quality in peer review would

10   have stopped at" his own review of the four MIV cases.  As the attached deposition

11   excerpt demonstrates, the word "alarming" was supplied by ABSMC's counsel, not Dr.

12   Lee.  (Exhibit A.)

13  • Alleged High Mortality Rates:  Tellingly, ABSMC does not allege that Dr. Ennix's

14   mortality statistics actually *were* worse than his peers, only that Dr. Isenberg "reviewed

15   documents" allegedly showing that.  If so, such documents were inconsistent with the

16   statistics that ABSMC routinely transmits to the California Office of Statewide Health

17   Planning and Development, which formed the basis for the CCORP Report.  ABSMC's

18   irresponsible reliance on bogus statistics when evaluating Dr. Ennix is no basis for

19   distinguishing him from his peers.

20  • NMA Report:  To use the NMA Report to distinguish Dr. Ennix from his peers is

21   specious.  That report resulted from a corrupt process; it is an example of disparate

22   treatment rather than a factor that distinguished Dr. Ennix from his peers.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S                              Case No. C 07-2486 WHA
MOTION IN LIMINE NO. 1

1

## CONCLUSION

2      Dr. Ennix can and will prove at trial that he is similarly situated to his cardiac surgeon

3  colleagues.

4                                    Respectfully submitted,

5  Dated:  May 9, 2008              MOSCONE, EMBLIDGE & QUADRA, LLP

6

7

8                              By: _____
                                         Rachel J. Sater

9                                    Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

# EXHIBIT A

**EXHIBIT A**

(Excerpt from Deposition of Dr. Hon Lee)

Lee page 25

```
 5     Q    Do you know that the officers of the medical

 6    staff placed a hiatus on the minimally invasive valve

 7    procedures after these first four were done?

 8     A    Yes.  And I recall that.

 9     Q    Did you think that was a reasonable response

10    to the outcomes?

11     A    I think that was a reasonable response.

12     Q    Do you agree that the outcomes of these four

13    procedures were alarming?

14     A    Yes.  There were -- there were reason to be

15    concerned.
```

Lee pages 41-42

```
14     Q    Do you agree that reasonable minds, looking

15    at the information with respect to these four cases

16    and listening to your review, might legitimately

17    determine that there was a need for further review?

18     A    Review of the cases?  Review --

19     Q    Review of Dr. Ennix.

20     A    Review of Dr. Ennix.  Yes.

21     Q    Did you think that your report had,

22    quote/unquote, cleared Dr. Ennix and there should be

23    no further discussion of what occurred in those four

24    cases?
```

7

25      MR. EMBLIDGE:  Objection.  Compound.

1       THE WITNESS:  I think that the reason we have peer

2    review is to make sure -- to make sure our quality

3    is -- is -- is on a practitioner level, and system

4    level is sound.  Everybody is allowed -- everybody are

5    allowed their opinions.  So I respect that.

6        I would think overall, the system of quality

7    in peer review would have stopped at that.  But I

8    respect other opinions, and I respect other

9    information that I do not have, if that issue would be

10   pressed.

11       So to answer your question, I would say,

12   essentially, this -- my opinion would be considered an

13   expert opinion within the process.  And if it was

14   isolated to those cases, it would have stopped.

15   BY MS. MCCLAIN:

16   Q    And you believe that it was not isolated to

17   those cases?

18   A    Because it did not stop, my conjecture is

19   there's something that's not isolated to these cases.

20   And it's the staff committee's prerogative to not take

21   my opinion.

Lee pages 102-103

7    Q    Have the other cardiothoracic surgeons that

8    we identified --

8

9       A       Yes.

10      Q       -- practicing at Summit --

11      A       Yes.

12      Q       -- have they had patients who have died

13  during or shortly after surgery?

14      A       Yes.

15      Q       Have they had to convert to cardiopulmonary

16  bypass while performing coronary artery bypass

17  procedures?

18      A       Yes.

19      Q       Have they had patients return to surgery

20  for -- and I'm going to pronounce this wrong,

21  mediastinal bleeding?

22      A       Yes.

23      Q       Have they had patients experience cerebral

24  vascular accidents during or shortly after open-heart

25  cases?

                                                            102

1       A       Yes.

2       Q       Have they had patients experience deep

3  sternal wound infections?

4       A       Yes.

5       Q       Have they had patients experience vein donor

6  site infections shortly -- during or shortly after

7  CAGB cases?

8       A       Yes.

9       Q       And have they had patients return to surgery

                            9

```
10   for valve-related problems?

11       A    Yes.
```

PLAINTIFF'S OPPOSITION TO DEFENDANT'S                    Case No. C 07-2486 WHA
MOTION IN LIMINE NO. 1

EXHIBIT B

**Physician I**

| Surgery, Control Field procedure | COMMENT / Redo of old MV | Surgery_Date | PRBC | PLATELETS | PLASMA | CRYO | Primary Incision | Out_Time | Close Time | Cut to Close | Perfusion_Time | Cross_Clamp_Time | Death | Reop_Bleeding | Reop_Valve_Dysfunction | Reop_Other, NonCardiac | CVA | Mort_Stat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MV+MAZE+ABP | Redo of old MV | 12-Sep-05 | 11 | 2 | 1 | 0 | Right Art / Thoracotomy | 10:34 | 22:51 | 12:17 | 591 | 184 | 1 | 0 | 0 | | | Dead |
| MV + MAZE | Atrial Appendage | 14-Aug-06 | 3 | 0 | 2 | 2 | Right Art / Thoracotomy | 9:15 | 18:55 | 9:40 | 291 | 179 | 0 | 0 | 0 | | | Dead |
| MV ONLY | | 22-Sep-06 | 0 | 2 | 2 | 0 | Right Art / Thoracotomy | 9:40 | 16:00 | 6:20 | 255 | 108 | 0 | 0 | 0 | | | Alive |
| MV ONLY | | 26-Sep-06 | 3 | 2 | 0 | 0 | Right Art / Thoracotomy | 8:47 | 15:05 | 6:18 | 175 | | 0 | 0 | 0 | | | Alive |
| MV ONLY | | 25-Sep-06 | 0 | 1 | 2 | 0 | Right Art / Thoracotomy | 8:13 | 15:25 | 7:12 | 223 | 192 | 0 | 0 | 0 | | | Alive |
| MV ONLY | | 19-Oct-06 | 4 | 0 | 0 | 0 | Right Art / Thoracotomy | 8:56 | 14:22 | 5:26 | 188 | 84 | 0 | 0 | 0 | | | Alive |
| MV + MAZE | Atrial Appendage | 10-May-07 | 0 | 0 | 2 | 0 | Right Art / Thoracotomy | 8:54 | 13:53 | 4:59 | 138 | | 0 | 0 | 0 | | | Alive |
| MV ONLY | | 31-May-07 | 1 | 3 | 2 | 0 | Right Art / Thoracotomy | 8:25 | 13:35 | 5:10 | 116 | 124 | 0 | 0 | 0 | | Yes | Alive |
| MV | Blood utilization includes transfusion related to colon surg | 07-Jun-07 | 18 | 6 | 8 | 3 | Right Art / Thoracotomy | 9:24 | 14:09 | 4:45 | 173 | 160 | 0 | 0 | 0 | Laparotomy / perforated colon / Tracheostomy | | Alive |
| MV ONLY | | 11-Jun-07 | 6 | 0 | 0 | 3 | Right Art / Thoracotomy | 8:28 | 14:30 | 6:02 | 210 | | 1 | 0 | 0 | | | Alive |
| MV ONLY | | 19-Jun-07 | 2 | 3 | 2 | 0 | Thoracotomy | 8:55 | 13:29 | 4:34 | 187 | 117 | 0 | 0 | 0 | | | Dead |
| MV ONLY | | 12-Jul-07 | 0 | 2 | 4 | 4 | Thoracotomy | 8:18 | 12:26 | 4:08 | 196 | 131 | 0 | 0 | 0 | | | Alive |
| Fungal endocarditis | | 07-Aug-07 | 8 | 4 | 2 | 0 | Right Art / Thoracotomy | 8:29 | 12:46 | 4:17 | 165 | 108 | 0 | 0 | 0 | | | Alive |
| 4TH QTR PEER NOT COMPLETED | | 20-Sep-07 | 4 | 2 | 4 | 2 | Right Art / Thoracotomy | 8:38 | 14:15 | 5:37 | 162 | 124 | 0 | 0 | 0 | | | Alive |
| 4TH QTR PEER NOT COMPLETED | | 02-Oct-07 | 4 | 3 | 0 | 0 | Thoracotomy | 8:08 | 13:55 | 5:47 | 220 | 106 | 0 | 0 | 0 | | | Alive |
| 4TH QTR PEER NOT COMPLETED | | 09-Oct-07 | 3 | 0 | 0 | 0 | Right Art / Thoracotomy | 8:18 | 13:10 | 4:52 | 194 | 103 | 0 | 0 | 0 | | Yes | Alive |
| 4TH QTR PEER COMPLETED | | 28-Oct-07 | 0 | 0 | 0 | 0 | Thoracotomy | 8:24 | 12:26 | 4:02 | 108 | 88 | 0 | 0 | 0 | | | Alive |
| 4TH QTR PEER NOT COMPLETED | | 28-Oct-07 | 0 | 0 | 0 | 0 | Right Art / Thoracotomy | 8:37 | 12:58 | 4:22 | 164 | 92 | 0 | 0 | 0 | | | Alive |
| AV+MV / 4TH QTR PEER COMPLETED | | 02-Nov-07 | 27 | 9 | 8 | 4 | Thoracotomy | 8:56 | 13:55 | 4:57 | 230 | 167 | 0 | 0 | 0 | Laparotomy / Upper GI bleed | | Alive |

# EXHIBIT C



*Alta Bates Summit*
*Medical Center*

A Sutter Health Affiliate

PROPERTY OF SUMMIT MEDICAL
CENTER MEDICAL STAFF. THIS
DOCUMENT PROTECTED BY CALIF.
EVIDENCE CODE 1157.



DEC 2 9 2003

SUMMIT
MEDICAL STAFF OFFICE

2450 Ashby Avenue
Berkeley, CA 94705
510.204.4444

Annette Schaieb, M.D.
President, Summit Medical Staff
350 Hawthorne Ave.
Oakland, CA 94609

December 18, 2003

Dear Dr. Schaieb:

Pursuant to your request, enclosed please find a copy of the outside report of Forest Junod, M.D. relative to the cases of Coyness Ennix, M.D., which were sent for outside review by the Alta Bates Medical Staff. As we discussed, the Alta Bates Medical Staff Leadership has just recently received this report and has not had an opportunity to either carefully review it or consider it in connection with any of our own internal peer review findings. Accordingly, we make no representation regarding its accuracy, credibility or reliability. Further, we make no representation or recommendation as to what impact, if any, this report should have on Dr. Ennix's membership and privileges on either the Alta Bates Medical Staff or the Summit Medical Staff. Rather, we are simply providing it to you as information for independent review and analysis by the Summit Medical Staff. It is our view that sharing this information at this early juncture is appropriate since Dr. Ennix is now practicing at the Summit Campus of Alta Bates Summit Medical Center and is no longer actively practicing at the Alta Bates Campus.

Please note that we are providing this information in reliance on the fact that the Summit Medical Staff is a "peer review body" within the meaning of Business and Professions Code Section 805 and, further, that you will use this information solely in connection with your evaluation of the qualifications and credentials of Dr. Ennix. We expect that you will maintain the confidentiality of this information and that this document will be appropriately handled such that it will continue to enjoy all applicable privileges and immunities, including the immunity from discovery of Evidence Code Section 1157.

We hope that you will share with us any information you have or may develop in the Summit peer review process regarding Dr. Ennix. In that regard, we expect to send a request for information once we are further along in our own internal peer review process.

Thank you for your kind attention.

Sincerely,

John G. Rosenberg, M.D., M.P.H.
President, Alta Bates Medical Staff

enclosure

**CONFIDENTIAL**



Δ π EXHIBIT 16
Deponent Ennix
Date 5/26/7  Rptr. LV
WWW.DEPOBOOK.COM