1  MAUREEN E. MCCLAIN (State Bar No. 062050)
   Email: mcclain@kmm.com
2  ALEX HERNAEZ (State Bar No. 201441)
   Email: hernaez@kmm.com
3  KAUFF MCCLAIN & MCGUIRE LLP
   One Post Street, Suite 2600
4  San Francisco, California 94104
   Telephone:  (415) 421-3111
5  Facsimile:   (415) 421-0938

6  Attorneys for Defendant
   ALTA BATES SUMMIT MEDICAL CENTER
7
   TAZAMISHA H. IMARA (State Bar No. 201266)
8  Email: imara@kmm.com
   KAUFF MCCLAIN & MCGUIRE LLP
9  2049 Century Park East
   Suite 2690
10 Los Angeles, CA 90067
   Telephone:  (310) 277-7550
11 Facsimile:   (310) 277-7525

12 Attorneys for Defendant
   ALTA BATES SUMMIT MEDICAL CENTER
13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16

17 | COYNESS L. ENNIX, JR., M.D., | CASE NO. C 07-2486 WHA |
|---|---|
18 | Plaintiff, | **DEFENDANT'S MOTION IN LIMINE NO. 3 TO EXCLUDE EVIDENCE RELATING TO PLAINTIFF'S OWN STATISTICS** |
19 | v. | |
20 | ALTA BATES SUMMIT MEDICAL CENTER, | |
21 | Defendant. | **DATE:** May 19, 2008 |
| | **TIME:** 2:00 p.m. |
| | **DEPT:** Ctrm. 9, 19th Flr. |
22 | | **JUDGE:** Hon. William H. Alsup |
23 | | **COMPLAINT FILED:** May 9, 2007 |
| | **TRIAL DATE:** June 2, 2008 |

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

DEFENDANT'S MOTION IN LIMINE NO. 3                    CASE NO. C 07-2486 WHA

I.    **INTRODUCTION**

Defendant Alta Bates Summit Medical Center ("ABSMC" or "the Hospital"), hereby applies for an order *in limine*, directing that Plaintiff Coyness L. Ennix ("Plaintiff"), his counsel, and witnesses be precluded from presenting evidence or argument in the presence of the jury concerning Plaintiff's own statistics regarding the frequency of peer review and discipline of African American doctors at ABSMC as compared to their White counterparts. The compilation of data in question is inadmissible at trial because it is not relevant to the issues to be tried, and is substantially more prejudicial than probative. Any presentation of Plaintiff's asserted conclusions concerning the data, or the graphical representations of those conclusions prepared by Plaintiff's counsel constitutes inadmissible lay testimony. Additionally, Plaintiff's data purporting to compare the rate of peer review and discipline of African American physicians at ABSMC to that of white physicians is inadmissible because it fails to meet the requirements for statistical evidence under Federal Rule of Evidence 701.

II.    **FACTUAL AND PROCEDURAL BACKGROUND**

Following a peer review of Plaintiff's surgical practices and outcomes, the Summit Medical Staff Medical Executive Committee's ("MEC") restricted Plaintiff to surgical assisting between May and October 2005, and to proctoring between October and July of 2005. This action concerns Plaintiff's claims that the Hospital's decision to refer him for peer review, and MEC's resultant disciplinary actions constituted race discrimination in violation of 42 U.S.C. § 1981.

The Hospital anticipates that Plaintiff will seek to admit into evidence statistics and graphs prepared by his counsel purporting to show the frequency with which African American physicians at the Hospital have been subjected to peer review relative to White doctors. It is expected that this will be done in an effort to demonstrate that African American physicians were disproportionately selected for review and had more negative disciplinary outcomes relative to their White peers. To compile the statistics, Plaintiff's counsel relied upon a list of 991 physicians who were on the medical

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

DEFENDANT'S MOTION IN LIMINE NO. 3                    CASE NO. C 07-2486 WHA

1    staff of ABSMC between 2004 and 2006.[1]  (Decl. of Andrew Sweet in Opp. To Deft's

2    MSJ ("Sweet Decl.") ¶ 2, Ex. A.)  However, only 547 of the listed physicians are

3    identified by race – problematic for Plaintiff's attempted analysis of alleged racially

4    disparities.  This thorny issue was apparently addressed by simply "eliminat[ing] from

5    consideration all but the 547 doctors" identified by race.  (Sweet Decl. ¶ 2.)  Plaintiff's

6    counsel apparently extrapolated from this data the overall racial composition of the

7    Hospital Staff – without accounting for its incompleteness.  (Sweet Decl. ¶ 2, Ex. B.)

8    Plaintiff then compared the listing of staff doctors between <u>2004 and 2006</u> to other data

9    produced by the Hospital identifying physicians who have been subjected to peer review

10   <u>since 1992</u>.  (Sweet Decl. ¶ 4; Decl. of Alex Hernaez ("Hernaez Decl.") in Support of

11   ABSMC's MSJ, Ex. F.)

12          From this comparison, Plaintiff's counsel attempted to draw conclusions

13   concerning the frequency with which African American physicians have been referred to

14   peer review and subjected to discipline relative to their White counterparts.  (Opp. MSJ,

15   21:20-22:13.)  For example, Plaintiff concludes that 7.69 percent of African American

16   staff physicians were subject to peer review, compared with 2.64 percent of White

17   physicians.  (Sweet Decl., Ex. C.)  Plaintiff further contends that the data shows that 100

18   percent of African American doctors who were disciplined by the hospital were

19   disciplined for standard of care issues, as compared with 30 percent of White doctors.

20   (Sweet Decl., Ex. D.)  These conclusions, which counsel translated into a set of graphs,

21   were drawn without in any way accounting for the fact that 45% of the data was simply

22   ignored.  (Sweet Decl. ¶¶ 5-9, Exs. B-F.)  While purporting to demonstrate relevant

23   evidence of disparate treatment, Plaintiff's conclusions and graphical representations of

24   those conclusions are not the result of statistical analysis.  There is therefore no basis for

25   _____

26   [1] This list was prepared by the Hospital and was produced in discovery.  It includes a
     specific notation indicating that ABSMC "does not keep statistics re race; the information
27   [provided about the race of listed doctors] …is the best 'guess' of the three individuals
     who reviewed [the list]….Where these individuals have no basis for formulating an
28   estimation of race, the column [indicating the race of the doctor] contains the letter 'U' for
     'Undetermined'."

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

- 2 -

1    concluding that they have any statistical significance whatsoever.

2    **III.    ARGUMENT**

3        **A.    Plaintiff Has Made No Effort to Demonstrate That His Data Has Any Statistical Significance.**

4

5           Only statistics that are the product of reliable scientific method are

admissible.  That is, Plaintiff must demonstrate as an initial matter that the conclusions

6

he has reached regarding the rates at which African Americans are referred to peer

7

review and disciplined have some statistical significance.  Pursuant to Federal Rule of

8

Evidence 702:

9

10            If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

11            an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an

12            opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the

13            product of reliable principles and methods, and (3) the witness has applied the principles and methods

14            reliably to the facts of the case.

15    F.R.E. 702; *Calhoun v. Yamaha Motor Corp., U.S.A.* (3rd Cir. 2003) 350 F.3d 316, 320.

16    Statistical testimony requires a determination by the court that the "reasoning and

17    methodology underlying the testimony is scientifically valid and that the reasoning and

18    methodology can properly be applied to the facts in issue."  *Allen v. Pennsylvania*

19    *Engineering Corp.* (5th Cir. 1996) 102 F.3d 194, 196, citing  *Daubert v. Merrell Dow*

20    *Pharmaceuticals* (1993) 509 U.S. 579, 592-593.  Among the factors to be considered by

21    the court in this initial analysis are "the known or potential rate of error of the technique

22    or theory when applied," "whether the expert has unjustifiably extrapolated from an

23    accepted premise to an unfounded conclusion," and "whether the expert has adequately

24    accounted for obvious alternative explanations."  *In re Bextra and Celebrex Marketing*

25    *Sales Practices and Product Liability* Litigation (9th Cir. 2007) 524 F.Supp.2d 1166, 1171.

26    There is no indication that Plaintiff or his counsel have made any effort to ensure that the

27    statistics in question are scientifically valid or properly applied to the facts.  Plaintiff has

28    made no effort to account for any potential error, or to adhere to scientific principles of

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

- 3 -

DEFENDANT'S MOTION IN LIMINE NO. 3                    CASE NO. C 07-2486 WHA

1    statistical analysis that would ensure that his supposed evidence of disparate treatment

2    has any statistical significance whatsoever.

3            Plaintiff's "statistics" are also based on incomplete data, further

4    undermining their reliability and appropriateness for use at trial.  No effort has been

5    made to address its insufficiency.  Because it is not based on any reliable scientific

6    method, and does not meet the basic test of admissibility, the Court should exercise its

7    role as "gatekeeper" to exclude it.  *Mukhtar v. California State University* (9th Cir. 2002)

8    299 F.3d 1053, 1063.

9    **B.      Plaintiff's Counsel's "Statistics" Concerning ABSMC Peer
         Review Ignore All Explanatory Variables.**

10           "[A] statistical study that fails to correct for salient explanatory variables, or

11    even to make the most elementary comparisons, has no value as causal explanation

12    and is therefore inadmissible in a federal court."  *People Who Care v. Rockford Bd. of*

13    *Educ.*, 111 F.3d 528, 537-538 (7th Cir. 1997).  Statistics cannot be used unless they

14    show "a stark pattern of discrimination unexplainable on grounds other than [the

15    protected characteristic]."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir.

16    2000).  Mr. Sweet's analysis does no such thing.  Indeed, it merely ignores the fact that

17    other variables may exist.

18           For example, Plaintiff points to Physician H as anecdotal evidence

19    supposedly buttressing his allegations of discrimination against African-Americans.  But,

20    as with Plaintiff, the California Medical Board sustained the findings of the outside

21    reviewer.  *See* Supplemental Request for Judicial Notice at Ex. 1.  In fact, Physician H,

22    who was charged with "Gross Negligence / Incompetence" by the State of California,

23    agreed to accept discipline including the revocation of his medical license, which was

24    stayed pending the successful completion of a 3-year probationary period.  *Id.*  And

25    because Mr. Sweet's analysis relies upon such a small sample size, the inclusion of

26    Physician H in the analysis skews its result.

27

28

- 4 -

C.    **Plaintiff's Counsel's "Statistics" Concerning ABSMC Peer Review Are Not Relevant To The Issue Of Whether African American Physicians Were Subject To Disparate Treatment, And Are Likely To Mislead And Confuse The Jury.**

The Federal Rules of Evidence provide that only relevant evidence is admissible at trial. Relevant evidence is defined as:

> Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

F.R.E. 401; *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 587.

Based on incomplete data concerning the race of physicians on the ABSMC staff, Plaintiff seeks to present the trier of fact with a number of conclusions regarding the frequency with which African American physicians were reviewed and disciplined. Plaintiff's proffered data fails to meet this test of admissibility. In this instance, Plaintiff has taken a list of ABSMC staff physicians – only 55% of which are identified by race – and attempted to extrapolate from this the frequency with which African American doctors were selected for peer review. Because the data is incomplete, it is useless for purposes of identifying alleged disparate treatment of African American physicians.

In connection with opposing the motion for summary judgment, counsel for Plaintiff made a wholly inadequate effort to address the problem of incomplete data. He simply ignored those doctors who were not identified by race from his calculations. In other words, any African American physician not identified as such was excluded for purposes of analyzing whether African American physicians were subject to disparate treatment. This data is also an inappropriate basis for analysis of alleged disparate treatment because it covers only the years 2004 through 2006. The data concerning peer review and discipline of staff physicians covers a much longer time period – 1992 through 2007. Again, Plaintiff has simply ignored the discrepancy and assumes that the data in his possession concerning the race of the doctors remained constant. Plaintiff's

KAUFF McCLAIN & McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

1    novel and unscientific approach fundamentally undermines the very purpose of the

2    analysis, and presentation of this data at trial would provide no relevant or helpful

3    information to the trier of fact.

4          Statistics may be relevant in the context of a 42 U.S.C. section 1981 claim

5    to demonstrate the existence of a pattern of discrimination, to show that the proffered

6    reason for discrimination is pretextual, or to rebut a *prima facie* discrimination claim.

7    *Lewis v. Booz-Allen & Hamilton, Inc.* (D.D.C. 2001) 150 F. Supp.2d 81, 90.  However,

8    pursuant to F.R.E. 401, the statistics must constitute admissible evidence; evidence

9    "tending to make existence of a fact of consequence more probable or less probable

10   than it would be without the evidence." *Id.* at 91.  This standard is simply not met by

11   Plaintiff's attorney-prepared comparison of ABSMC physicians.  At the most basic level,

12   the data Plaintiff relies upon for his conclusions do not identify all of the staff doctors by

13   race.  Thus, Plaintiff's purported evidence of disparate treatment of African American

14   doctor's fails to fully account for *the* key factor on which Plaintiff bases his conclusions –

15   the race of the Hospital's staff physicians.

16         Pursuant to Rule 403, even relevant evidence must be excluded if "its

17   probative value is substantially outweighed by the danger of unfair prejudice, confusion

18   of the issues, or misleading to the jury."  The data and conclusions concerning the racial

19   breakdown of the hospital staff are fundamentally misleading.  Its presentation as

20   demographic data can only serve to confuse the jury.  The data, and Plaintiff's charts will

21   present the trier of fact with a skewed representation of the treatment of African

22   American physicians at the hospital.  Given the utter lack of probative value of the data

23   and graphs to the issue of whether African American doctors were disparately treated,

24   the evidence is inadmissible under Rule 403.

25   **D.     Plaintiff's Alleged Statistical Evidence or Discrimination
             Constitutes Improper Lay Testimony.**

26

27         Plaintiff intends to demonstrate through the use of the partial demographic

28   data that African American physicians were more likely to be subjected to peer review

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

- 6 -

DEFENDANT'S MOTION IN LIMINE NO. 3                                    CASE NO. C 07-2486 WHA

1  and discipline by the Hospital. In the course of this litigation, Plaintiff has presented this

2  supposed statistical evidence as a basis for lay testimony. (*See,* Sweet Decl.) Even if

3  such evidence were relevant, which the Hospital contends it is not, it is inadmissible as

4  lay testimony. Rule 701 provides:

5  
6  
7  
8  
9

> If the witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences is
> limited to those opinions or inferences which are (a)
> rationally based on the perception of the witness and
> (b) helpful to a clear understanding of the witness'
> testimony or the determination of a fact in issue, and
> (c) not based on scientific, technical, or other
> specialized knowledge within the scope of Rule 703.

10  F.R.E. 702. As discussed, the charts prepared by Plaintiff's counsel based upon the list

11  identifying <u>some</u> of the Hospital physicians by race, is not helpful to any understanding

12  of a fact in issue in this case. It is simply not possible to determine the overall racial

13  composition of the staff over time from the incomplete information the list provides. It

14  therefore will be of no use to the trier of fact in determining whether African American

15  doctors were less favorably treated than their White counterparts.

16         Additionally, Plaintiff's expected assertions that the data supports a

17  conclusion of race discrimination are beyond the scope of admissible lay testimony. The

18  conclusions presented in Plaintiff's graphs – that African Americans (1) are more likely to

19  be subject to peer review, (2) are more likely to be subjected to discipline, (3) are more

20  likely to be reviewed for standard of care, and (4) are more likely to be summarily

21  suspended, necessarily require specialized knowledge of statistical methods. Lay

22  testimony would be an inappropriate vehicle for introducing this information – which in

23  any event is not scientifically validated in any way.

24  **IV.    CONCUSION**

25         For each of the foregoing reasons, Defendant Alta Bates Summit Medical

26  Center respectfully request an in limine order that Plaintiff not be permitted to introduce

27  Plaintiff's statistics regarding the alleged frequency with which ABSMC physicians of

28  different races are peer reviewed or disciplined. ABSMC further requests a ruling that

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

1    the graphical representations of Plaintiff's counsel's conclusions concerning that data –

2    previously submitted to the Court as exhibits B-F to the Declaration of Andrew Sweet in

3    Opposition to Defendant's Motion for Summary Judgment – are inadmissible at the trial

4    of this action.

5    DATED:        April 29, 2008                    Respectfully submitted,

6                                                    KAUFF MCCLAIN & MCGUIRE LLP

7

8                                                    By: _____

9                                                        ALEX HERNAEZ

10                                                   Attorneys for Defendant
                                                     ALTA BATES SUMMIT MEDICAL
11                                                   CENTER

12   4836-5925-2482.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

- 8 -

DEFENDANT'S MOTION IN LIMINE NO. 3                    CASE NO. C 07-2486 WHA

G. SCOTT EMBLIDGE, State Bar No. 121613
emblidge@meqlaw.com
RACHEL J. SATER, State Bar No. 147976
sater@meqlaw.com
ANDREW E. SWEET, State Bar No. 160870
sweet@meqlaw.com
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

RECD MAY 0 9 2008

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| COYNESS L. ENNIX JR., M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>ALTA BATES SUMMIT MEDICAL CENTER,<br><br>Defendants. | Case No. C 07-2486 WHA<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 3 TO EXCLUDE EVIDENCE RELATING TO PLAINTIFF'S OWN STATISTICS**<br><br>**Trial Date:  June 2, 2008**<br>**Dept:        Ctrm. 9, 19th Floor**<br>**Judge:       Hon. William H. Alsup** |

## INTRODUCTION

For years, ABSMC has imposed discipline on doctors of color relatively more frequently and more harshly than their Caucasian peers. ABSMC's brand of racial discrimination is subtle and institution-wide, and it involves not just how harshly the MEC disciplines a doctor under review, but also who ABSMC targets for peer review or discipline at every level and what path that disciplinary process takes. In a system as specialized, extensive, complex, and secretive as hospital peer review, such institutional racial discrimination is hard to detect on an individual basis. And so far, ABSMC has gotten away with it in part because lay people have neither the

1

1  desire nor the expertise to "second guess" a hospital's determination that a particular doctor

2  requires discipline.

3      ABSMC knows this. And ABSMC knows that numerical comparisons will highlight the

4  racial disparity regarding how harshly the MEC disciplines a doctor under review and the racial

5  disparity regarding whom ABSMC targets for peer review.

6      So, ABSMC moves to exclude evidence they term "Plaintiff's own statistics" on the

7  grounds that this evidence is "not relevant" and "substantially more prejudicial than probative."

8  (Motion 1:7-8) ABSMC argues that the evidence amounts to improper expert evidence and

9  improper lay opinion evidence.

10      In fact, the evidence ABSMC contests here consists of numerical comparisons of data it

11  provided to Dr. Ennix in discovery. The evidence is clearly relevant because it shows that

12  ABSMC subjected physicians of color to harsher and more stringent peer review scrutiny than it

13  did Caucasian physicians. Specifically, the evidence is relevant to help Dr. Ennix prove a prima

14  facie case of discrimination absent direct evidence and to show ABSMC's nondiscriminatory

15  reason that it subjected Dr. Ennix to such an extreme version of peer review was a pretext for

16  unlawful discrimination.[1]

17      Such evidence is relevant and admissible circumstantial evidence to prove racial

18  discrimination in this case, and it is within the province of the jury to determine what weight it

19  should be given.

20                          **STATEMENT OF FACTS**

21      Pursuant to discovery requests, ABSMC provided Dr. Ennix with a chart that

22  summarized MEC level peer review activity at Summit from 1992 to the present. Sweet Decl.

23  ¶2. Pursuant to discovery requests, meet and confer sessions and ultimately a hearing in front of

24  Magistrate Judge Spero, on January 24, 2008, ABSMC provided Dr. Ennix with racial

25  composition data for the Summit Medical Staff for 2004-2006. Sweet Decl. ¶3. ABSMC's data

26

27  [1] The Ninth Circuit explained the crucial role of circumstantial evidence in this task: "[p]articularly because employers now know better, direct evidence of employment discrimination is rare." *Aragon v. Republic Silver State*

28  *Disp*, 292 F.3d 654, 662 (9th Cir. 2002).

2

1  identified 547 physicians by race but failed to make racial identifications for 444 physicians,

2  which ABSMC claimed it could not determine. Sweet Decl. ¶4. ABSMC refused to agree that

3  the categorical racial percentages of those they did identify could be extrapolated to apply to the

4  entire Medical Staff. ABSMC refused to take part in a survey to identify the racial identity of

5  those it could not identify.   Sweet Decl. ¶5. Dr. Ennix who has been on the Summit Medical

6  Staff since 1992, believes that the categorical racial percentages of the physicians identified by

7  ABSMC under report the percentage of Caucasian physicians on the Summit Medical Staff and

8  over report the percentage of African American physicians on the Summit Medical Staff for the

9  time he has been on staff. Ennix Decl. ¶¶2-4.

10         In preparation for Plaintiff's Opposition to Defendant's Motion for Summary Judgment,

11  Plaintiff's counsel added and totaled the number of physicians from ABSMC's list that fell into

12  each racial category that ABSMC had identified. Physicians whose race ABSMC failed to

13  identify were not considered. ABSMC's data was then presented visually in Plaintiff's

14  Opposition to Defendant's Motion for Summary Judgment. ABSMC's data was categorized by

15  percentage of physicians that fell in each racial category and was also compared to ABSMC's

16  chart summarizing MEC peer reviews.   Sweet Decl. ¶7. The visual data representations simply

17  painted a numerical picture and were not a statistical study. Sweet Decl. ¶8.

18         At trial, Dr. Ennix intends to use the same numerical comparisons.

19                                        **ARGUMENT**

20  **I.    ALL OF ABSMC's ARGUMENTS TO EXCLUDE DR. ENNIX'S NUMERICAL**
21  **      EVIDENCE GO TO THE WEIGHT NOT ADMISSIBILITY**

22         "All relevant evidence is admissible, except as otherwise provided [by law]. Evidence

23  which is not relevant is not admissible." Fed. Rule Evid. 402.   In a racial discrimination case,

24  numerical evidence may fall short of proving the plaintiff's case, but still remain relevant to the

25  issues in dispute. Objections to the completeness of a numerical presentation go to "the weight,

26  not the admissibility of the statistical evidence. Statistics showing racial or ethnic imbalance are

27  probative ... because such imbalance is often a telltale sign of purposeful discrimination." *Obrey*

28  *v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005)

## II.  PLAINTIFF IS ENTITLED TO PRESENT A NUMERICAL PICTURE TO HELP PROVE DISCRIMINATION

ABSMC argues that its data was not presented as a statistical study, which accounted for salient explanatory variables, thereby rendering its use irrelevant.  Dr. Ennix did not present an expert statistical study regarding the number totals related to the racial makeup of the Summit Medical Staff.  Instead, he presented comparative numerical evidence that paints a numerical picture.  This Ninth Circuit finds this exact type of evidence admissible to help prove discrimination.

Numerical evidence comparative in nature, rather than statistical, may support a plaintiff's showing of discriminatory intent in a disparate treatment case. *Beck v. United Food and Commercial Workers Union, Local 99* 506 F.3d 874, 884 -885 (9th Cir. 2007)

The evidence offered by Beck to establish the defendant's discriminatory intent was comparisons to <u>three</u> other individuals.  The defendant made the same arguments as ABSMC has in this motion, including that the evidence did not account for possible nondiscriminatory variables.

Rejecting the defendant's arguments, the Court held that the evidence was comparative in nature, rather than statistical and was a sufficient basis to find the defendant intentionally discriminated against Beck, even though the comparative evidence was based on only three individuals in addition to Beck. (*Id.* at 884-885)

Here, Dr. Ennix intends to use similar comparative evidence relating to 547 physicians on the Summit Medical Staff.  Dr. Ennix's evidence is much broader and therefore has much more predictive value than the evidence in *Beck*.  If the numerical evidence was admissible in *Beck*, certainly it is admissible here.

Further, a recent Ninth Circuit case reiterated that numerical or "[s]tatistical evidence may support a plaintiff's showing of pretext in a disparate treatment claim. *Noyes v. Kelly Services* 488 F.3d 1163, 1172 (9th Cir. 2007)

4

1   In *Noyes*, the Ninth Circuit addressed whether a plaintiff's statistical evidence in the form

2   a numeric accounting, which was part of a greater body of evidence, was admissible to help

3   prove his disparate treatment case.

4   The Court of Appeals held that statistical evidence which standing alone might be

5   insufficient to prove disparate treatment, coupled with other evidence, led to a numerical picture

6   that buttressed the plaintiff's pretext case challenging the defendant's proffered race-neutral

7   reasons for its promotion decision, and was therefore admissible. *Id.*, at 1173.

8   Noyes claimed that she was not promoted because she did not follow the religious

9   teachings of a group called the Fellowship and that those who did follow the Fellowship's

10  teachings received promotions. Noyes presented evidence that the defendant "repeatedly

11  brought in Fellowship members as temporary contractors and consistently appointed Fellowship

12  members to management jobs where one of the duties is to select contractors. Before the April

13  2003 layoffs, thirteen of the thirty-five full-time employees were Fellowship members; between

14  1998 and November 2001, five of the eleven full-time hires in the Development Group were

15  Fellowship members (including [a defendant]); and two out of three recent hires in the 'Test

16  Bay' area were Fellowship members. Noyes also claimed that four of the five management-level

17  promotions made between 1997 and April 2001 were given to Fellowship members." *Id.* at

18  1172-1173 (internal markings omitted).

19  Noyes' rudimentary numbers were admissible since they were part of "the numerical

20  picture" of pretext. The numbers challenged here are similar to those in *Noyes* since they both

21  amount to a numerical accounting. If the numbers in *Noyes* were admissible to paint a numerical

22  picture, so are the numbers here.

23  The evidence Dr. Ennix intends to produce is comparative and paints a numerical picture

24  that is properly admissible to help prove intentional discrimination. It is then within the province

25  of the jury to determine what weight it should be given.

26

27

28

5

1    ABSMC relies on *People Who Care v. Rockfrod Bd. Of Educ.*, 111 F.3d 528 (7th Cir.

2    1997) and *Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000) to make the same

3    arguments rejected by *Beck* and *Noyes*.

4        *People Who Care*, concerned a statistical study about educational deficiencies of minority

5    students in local public schools that failed to "correct for salient explanatory variables, or even to

6    make the most elementary comparisons" of the very complicated cause and effect relationship as

7    to whether the failures were due to discrimination or other factors. Here, this evidence at issue is

8    not a statistical study. There are no salient explanatory variable to explain. And ABSMC points

9    to none. Instead, ABSMC just asserts, "other variables may exist." Def. Motion in Limine No. 3

10    4:17. Where true salient variable exist, a statistical study might have to account for the variables.

11    Here, where there are no variables, the need for statistical analysis is not a prerequisite to

12    admission into evidence.

13        Similarly inapposite, *Coleman* found that a statistical report failed to account for

14    variables in an age discrimination case since they did not account for the fact that older

15    individuals tended to occupy the level of positions eliminated during the reorganization, that

16    older individuals tended to occupy the sales positions eliminated and outsourced by defendant

17    employer and other variables-including education, previous position at the company, and

18    distribution of age groups by position-that would have affected the results of the analysis.

19    *Coleman v. Quaker Oats Co.* 232 F.3d at p. 1283.

20        Again in this case, the evidence at issue was not a statistical study and ABSMC failed to

21    point to any variables.

22    **III.    THE PREMISE OF ABSMC'S RELEVANCE ARGUEMNT IS MISGUIDED**

23        ABSMC argues that the racial composition data from 2002-2004 that it produced in

24    discovery is irrelevant since it is incomplete and cannot properly be compared to evidence

25    contained on its chart summarizing MEC peer reviews from 1992 to the present.

26        ABSMC provided incomplete information regarding the racial composition of its Summit

27    Medical Staff. It failed to identify the race of 444 of the physicians on it own Medical Staff. It

28

6

1  refused to agree that the categorical racial percentages of those it did identify could be

2  extrapolated to apply to the entire Medical Staff. ABSMC refused to take part in a survey to

3  identify the racial identity of those it could not identify. It cannot now claim that the evidence it

4  did provide is irrelevant since it is incomplete. Even so, Dr. Ennix who has been on the Summit

5  Medical Staff since 1992, believes that the categorical racial percentages of the physicians

6  identified by ABSMC under report the percentage of Caucasian physicians on the Summit

7  Medical Staff and over report the percentage of African American physicians on the Summit

8  Medical Staff for the time he has been on staff. The evidence ABSMC did produce is relevant

9  and Dr. Ennix should not be precluded from using important evidence that helps prove

10  discrimination because ABSMC failed to produce a full accounting of the racial makeup of its

11  own medical staff.

12      Throughout this litigation, ABSMC has repeatedly argued that Dr. Ennix may only be

13  compared (essentially) to himself or others identically situated in all respects. Now, it claims

14  that races of physicians it severely disciplined cannot be compared to the racial make up of the

15  Medical Staff at large because the data concerning the racial makeup of the Medical Staff

16  covered only 2002-2004, while data related to those disciplined by the MEC covers from 1992 to

17  the present.

18      Again, ABSMC only provided some information from some years and should not be

19  allowed to then argue the evidence it did provide is irrelevant since it is incomplete. The jury

20  will have to decide what weight to give this evidence which will be helped by the fact that Dr.

21  Ennix who has been on the Summit Medical Staff since 1992, believes that the categorical racial

22  percentages of the physicians identified by ABSMC under report the percentage of Caucasian

23  physicians on the Summit Medical Staff and over report the percentage of African American

24  physicians on the Summit Medical Staff over the longer period of time. In other words, the

25  numerical comparisons are conservatively made.

26      Second, ABMC highlighted the need to present the true numerical picture regarding the

27  comparison at issue by itself claiming that the chart regarding MEC discipline from 1992 to the

28

7

1    present "shows that Caucasian doctors are more than three times more (sic) likely than African

2    American physicians to be subjected to MEC peer review (i.e., 10 Caucasians have been

3    subjected to MEC review compared with only 3 African Americans)." (ABSMC Motion for

4    Summary Judgment 16:16-19)

5        This claim severely misrepresents an accurate picture of ABSMC's conduct and

6    Plaintiff's claims. Plaintiff claims that ABSMC subjects physicians of color to a higher level of

7    peer review scrutiny than it does Caucasian physicians. Of course, more Caucasian physicians

8    were disciplined at the MEC level because approximately 70% of the Summit Medical Staff is

9    Caucasian while only about 12% is African American. The point is that African American

10   physicians are three times more likely to face MEC-level scrutiny than Caucasian physicians.

11   Sweet Decl. ¶8.

12       Finally, statistical evidence is relevant in this disparate treatment case to determine if

13   ABSMC's treatment of Dr. Ennix "conformed to a general pattern of discrimination against

14   blacks." *McDonnell Douglas,* 411 U.S. at 804-05. By comparing the two sets of numbers, a jury

15   can decide whether ABSMC conformed to a pattern of discrimination over time.

16                                    **CONCLUSION**

17       This Court must permit Dr. Ennix to present evidence that support an inference of

18   intentional discrimination. Intentional discrimination is often difficult to prove without

19   significant reliance on circumstantial evidence.

20       ·Any arguments raised by ABSMC go to the weigh of the evidence and not to

21   admissibility.

22   DATED: May 9, 2008                    Respectfully submitted,

23                                         MOSCONE, EMBLIDGE & QUADRA, LLP

24

25

26   By: _____

27                                              Andrew E. Sweet

28   Attorneys for Plaintiff

REC'D MAY 0 9 2008

G. SCOTT EMBLIDGE, State Bar No. 121613
emblidge@meqlaw.com
RACHEL J. SATER, State Bar No. 147976
sater@meqlaw.com
ANDREW E. SWEET, State Bar No. 160870
sweet@meqlaw.com
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D<br><br>            Plaintiff,<br><br>vs.<br><br>ALTA BATES SUMMIT MEDICAL CENTER<br><br>            Defendant. | Case No.: C 07-2486 WHA<br><br>**DECLARATION OF ANDREW E. SWEET IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 3**<br><br>**Date:    April 24, 2008**<br>**Time:   8:00 a.m.**<br>**Dept.:  Ctrm. 9, 19th Floor**<br>**Judge:  Hon. William H. Alsup**<br><br>**Complaint Filed:  May 9, 2007**<br>**Trial Date:        June 2, 2008** |

I, Andrew E. Sweet declare:

1.      I am an attorney licensed to practice in California, admitted to this Court, and an attorney at Moscone, Emblidge & Quadra LLP, attorneys of record for Plaintiff Coyness L. Ennix, Jr. M.D. I have personal knowledge of the facts stated in this declaration.

2.      Pursuant to discovery requests, ABSMC provided Dr. Ennix with a chart that summarized MEC level peer review activity at Summit from 1992 to the present. (See Hernaez Decl. filed in support of Defendant's Motion for Summary Judgment ¶7.)

1

3.     Pursuant to discovery requests, meet and confer sessions and ultimately a hearing in front of Magistrate Judge Spero, on January 24, 2008, ABSMC provided Dr. Ennix with racial composition data for the Summit Medical Staff for 2004-2006.  (See Sweet Decl. filed in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ¶2.)

4.     ABSMC's data identified 547 physicians by race but failed to make racial identifications for 444 physicians, which ABSMC claimed it could not determine.

5.     ABSMC refused to agree that the categorical racial percentages of those they did identify could be extrapolated to apply to the entire Medical Staff.  ABSMC refused to take part in a survey to identify the racial identity of those it could not identify.

6.     Dr. Ennix who has been on the Summit Medical Staff since 1992, believes that the categorical racial percentages of the physicians identified by ABSMC under report the percentage of Caucasian physicians on the Summit Medical Staff and over report the percentage of African American physicians on the Summit Medical Staff.

7.     In preparation for Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff's counsel added and totaled the number of physicians from ABSMC's list that fell into each racial category that ABSMC had identified.  Physicians whose race ABSMC failed to identify were not considered.  ABSMC's data was then presented visually in Plaintiff's Opposition to Defendant's Motion for Summary Judgment.  ABSMC's data was categorized by percentage of physicians that fell in each racial category and was also compared to ABSMC's chart summarizing MEC peer reviews.

8.     Attached hereto as Exhibit A are the visual data representations submitted by Plaintiff in Opposition to Defendant's Motion for Summary Judgment, which were described in the Sweet Decl. in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ¶¶5-9.

1       I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct and that this declaration was signed in San Francisco, California.

3

4  Dated: May 9, 2008

5                               Andrew E. Sweet

# EXHIBIT A



## MEC Review
### Percentage of Minorities on Medical Staff*
### vs. Percentage of Minorities Reviewed by MEC

**Percentage of Minorities Reviewed**

Hispanic: 0% (0/18)
Caucasian: 55.4% (10/18)**
Asian: 16.7% (3/18)
African American: 27.8% (5/18)***

**Percentage of Minorities on Medical Staff***

Hispanic: 1.3% (7/547)
Caucasian: 69.3% (379/547)
Asian: 17.6% (96/547)
African American: 11.9% (65/547)

* There were 991 physicians on medical staff, but ABSMC identified only 547 by race.
** One physician, identified by ABSMC as "Physician G," was reviewed twice by the MEC. He is treated here as two separate physicians in order to avoid undercounting MEC review of Caucasians.
*** ABSMC stated that the doctor it identified as "Physician H" is "Non African-American." In fact, that doctor's race is a mix of predominantly Indian, African American and Native American. For that reason, he is treated here as African American.



# MEC Review by Race
## As Percentage of Medical Staff

| | | |
|---|---|---|
| Caucasian | 2.64%* (10/379) | |
| African American | 7.69% (5/65) | |
| Asian | 3.13% (3/96) | |
| Hispanic | 0% (0/7) | |

* One physician, identified by ABSMC as "Physician G," was reviewed twice by the MEC. He is treated here as two separate physicians in order to avoid undercounting MEC review of Caucasians.

Disciplined ABSMC Physicians, 2004-06
Race Comparison

**Disciplined for standard of care issues**
- Caucasian: 30% (3/10)
- African American: 100% (5/5)
- Asian: 66.7% (2/3)

**Disciplined for violations of bylaws or rules and/or behavioral issues**
- Caucasian: 70% (7/10)
- African American: 0% (0/5)
- Asian: 0% (0/3)

**Disciplined for both standard of care issues and violations of bylaws**
- Caucasian: 0% (0/10)
- African American: 0% (0/5)
- Asian: 33.3% (1/3)



# MEC Review by Race, for Standard of Care Issues
## As Percentage of Medical Staff

* One physician, identified by ABSMC as "Physician G," was reviewed twice by the MEC. He is treated here as two separate physicians in order to avoid undercounting MEC review of Caucasians.

(Bar chart values:)

- Caucasian: 0.79%* (3/379)
- African American: 7.69% (5/65)
- Asian: 3.13% (3/96)
- Hispanic: 0% (0/7)



# Summarily Suspended ABSMC Physicians, 2004-06
## Race Comparison

G. SCOTT EMBLIDGE, State Bar No. 121613
emblidge@meqlaw.com
RACHEL J. SATER, State Bar No. 147976
sater@meqlaw.com
ANDREW E. SWEET, State Bar No. 160870
sweet@meqlaw.com
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

RECD MAY 0 9 2008

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D<br><br>      Plaintiff,<br><br>   vs.<br><br>ALTA BATES SUMMIT MEDICAL CENTER<br><br>      Defendant. | Case No.: C 07-2486 WHA<br><br>**DECLARATION OF COYNESS L. ENNIX JR., M.D. IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 3**<br><br>**Date:**   April 24, 2008<br>**Time:**   8:00 a.m.<br>**Dept.:**  Ctrm. 9, 19th Floor<br>**Judge:** Hon. William H. Alsup<br><br>**Complaint Filed:  May 9, 2007**<br>**Trial Date:**      June 2, 2008 |

I, Coyness L.Ennix Jr., M.D. declare:

1.     I am the plaintiff in this case.  I have personal knowledge of the facts stated in this declaration.

2.     I have reviewed the racial composition data for the Summit Medical Staff for 2004-2006 provided by ABSMC in this case.  (See Sweet Decl. filed in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ¶2.)

1

3.      I have also reviewed the visual data representations that I submitted in Opposition to Defendant's Motion for Summary Judgment, which were described in the Sweet Decl. in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ¶¶5-9.

4.      I have been on staff at Alta Bates or Summit Medical Center since 1992.  I believe that the categorical racial percentages of the physicians identified by ABSMC under report the percentage of Caucasian physicians on the Summit Medical Staff and over report the percentage of African American physicians on the Summit Medical Staff for the time I have been on staff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was signed in San Francisco, California.

Dated:  May 9, 2008

Coyness L. Ennix Jr., M.D.

2

SWEET DECLARATION                    Case No. C 07-2486 WHA