MAUREEN E. MCCLAIN (State Bar No. 062050)
Email: mcclain@kmm.com
ALEX HERNAEZ (State Bar No. 201441)
Email: hernaez@kmm.com
KAUFF MCCLAIN & MCGUIRE LLP
One Post Street, Suite 2600
San Francisco, California 94104
Telephone:   (415) 421-3111
Facsimile:    (415) 421-0938

Attorneys for Defendant
ALTA BATES SUMMIT MEDICAL CENTER

TAZAMISHA H. IMARA (State Bar No. 201266)
Email: imara@kmm.com
KAUFF MCCLAIN & MCGUIRE LLP
2049 Century Park East
Suite 2690
Los Angeles, CA 90067
Telephone:   (310) 277-7550
Facsimile:    (310) 277-7525

Attorneys for Defendant
ALTA BATES SUMMIT MEDICAL CENTER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX, JR., M.D.,<br><br>Plaintiff,<br><br>v.<br><br>ALTA BATES SUMMIT MEDICAL CENTER,<br><br>Defendant. | CASE NO.  C 07-2486 WHA<br><br>**DEFENDANT'S MOTION IN LIMINE NO. 7 TO EXCLUDE EVIDENCE CONCERNING THE REPORT AND ANTICIPATED TESTIMONY OF MARGO LEAHY, M.D.**<br><br>**DATE:**  May 19, 2008<br>**TIME:**  2:00 p.m.<br>**DEPT:**  Ctrm. 9, 19th Floor<br>**JUDGE:**  Hon. William H. Alsup<br><br>**COMPLAINT FILED:** May 9, 2007<br>**TRIAL DATE:** June 2, 2008 |

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
AN FRANCISCO, CA 94104

I.    **INTRODUCTION**

Defendant Alta Bates Summit Medical Center ("ABSMC" or "the Hospital") hereby applies for an order *in limine* directing that Plaintiff Coyness L. Ennix ("Plaintiff"), his counsel, and witnesses be precluded from presenting evidence or argument in the presence of the jury concerning the report and anticipated testimony of Margo Leahy, M.D. ("Leahy"), in its entirety.

Plaintiff has designated Dr. Leahy as an expert "to testify regarding whether Dr. Ennix obtained informed consent relating to the schizophrenic patient defendant has identified as ABS-001." (Plaintiff's Expert Witness Disclosure attached as Exhibit 1 to the Deposition of Margo Leahy, M.D. ("Leahy Depo")).[1] Dr. Leahy's specialized area of practice includes psychiatry. (*Id.*) Here, Dr. Leahy opines as to whether a single patient treated by Plaintiff "was capable of adequately understanding what had been told to him by Dr. Ennix when he obtained informed consent for the surgery." (*Id.*)

The motion is based upon the ground that Dr. Leahy's report and anticipated testimony do not meet the minimum threshold for admissibility of expert testimony. Careful scrutiny of the assumptions on which Dr. Leahy bases her opinions reveal that they are nothing more than rank speculation, unsupported by the relevant facts.

II.    **ARGUMENT**

A.    **Dr. Leahy's Report And Her Anticipated Testimony Are Unreliable And Fail to Meet the Expert Opinion Standards Set Forth in Federal Rule of Evidence 702 And Related Legal Doctrine.**

In deciding the admissibility of expert testimony, courts have a "gatekeeping obligation" to ensure expert testimony is reliable. *Kumho Tire Co., Ltd.* v. *Carmichael,* 526 US. 137, 141 (1999). Federal Rule of Evidence 702 requires that such

---

[1] Attached as Exhibit A. Pursuant to the Court's Order Granting in Part and Denying in Part Defendant's Request to File Under Seal filed on February 25, 2008, all patient-identifying information has been redacted from the Leahy Depo and accompanying exhibits.

1  testimony satisfy three separate relevance and reliability standards: (1) expert testimony

2  must be based upon sufficient facts or data, (2) expert testimony must be the product of

3  reliable principles and methods, and (3) the expert witness must have applied the

4  principles and methods reliably to the facts of the case.

5         Here, it is the first prong that is most fundamentally at issue.  As explained

6  in the notes to Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US.

7  579, 593-95 (1993) set forth a non-exclusive checklist for trial courts to use in assessing

8  the reliability of scientific expert testimony.[2]  The specific factors explicated by the

9  *Daubert* Court are:

10         (I) whether the experts technique or theory can be or has
been tested–that is, whether the expert's theory can be
11  challenged in some objective sense, or whether it is instead
simply a subjective, conclusory approach that cannot
12  reasonably be assessed for reliability; (2) whether the
technique or theory has been subject to peer review and
13  publication; (3) the known or potential rate of error of the
technique theory when applied; (4) the existence and
14  maintenance of standards and controls; and (5) whether the
technique or theory has been generally accepted in the
15  scientific community.

16  Fed. R. Evid. 702 2000 Advisory Committee Notes.

17         Additionally, courts have noted several other factors that may bear on the

18  reliability and admissibility of expert testimony, including:

19        (1) Whether experts are "proposing to testify about matters
growing naturally and directly out of research they have
20  conducted independent of the litigation, or whether they have
developed their opinions expressly for purposes of testifying,"
21  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311,
1317 (9th Cir. 1995).
22
(2) Whether the expert has unjustifiably extrapolated from an
23  accepted premise to an unfounded conclusion.  *See General
Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in
24  some cases a trial court "may conclude that there is simply
too great an analytical gap between the data and the opinion
25  proffered").

26  Fed. R. Evid. 702 2000 Advisory Committee Notes.

27  _____

28  [2] The *Daubert* test *applies* not only to scientific expert witnesses, but to all potential
testifying expert witnesses.  *Kumho Tire Co., Ltd.*, 526 U.S. at 148-149.

1      Dr. Leahy's report and anticipated testimony at trial fall woefully short of

2    those standards. Dr, Leahy's opinions are instead based upon insufficient facts and

3    data that renders wholly unreliable and subjective conclusions. Dr. Leahy merely relates

4    deficient hearsay information to form her "expert opinions." In fact, Dr. Leahy admits that

5    she was not provided with information relevant to rendering an expert opinion. In

6    concluding that the patient provided adequate informed consent, Dr. Leahy had no

7    discussion and made no inquiries of Plaintiff, the patient or the patient's health care

8    providers. (Leahy Depo., 16:5-17.) Had Dr. Leahy spoken to Plaintiff she would have

9    learned that Plaintiff, not the patient, had drafted the letter dated February 18, 2005

10   memorializing that informed consent had been provided by Plaintiff. (Deposition of

11   Coyness L. Ennix, Jr., M.D., 276:15- 277:20, attached as Exhibit B; Leahy Depo, 25:6-

12   19.) Dr. Leahy admits to the unreliable nature of her opinion given the fact that the

13   patient had not written the February 18, 2005 letter. (Leahy Depo, 28:3-11.) Dr. Leahy

14   concedes that the informed consent as to the second surgery performed by Plaintiff is

15   "sketchy." (Id., 31:21-32:14).

16      Nor is this the only area in which Dr. Leahy's opinions is uninformed and

17   unreliable. Dr. Leahy deviated from her own methodology by failing to review the

18   psychiatric history of the patient to determine whether informed consent had been

19   provided. To highlight the subjectivity of her review, Dr. Leahy testified about a separate

20   case concerning informed consent in which she was retained by the defendant. (Leahy

21   Depo., 10:13-11:19.) In that case, she had "voluminous hospital records for many, many

22   years," consisting entirely of psychiatric records. (Id.) Here, however, Dr. Leahy

23   rendered the psychiatric records irrelevant because she depended the "general medical

24   record" generated in part by Plaintiff. (Id., 11:25-12:15.) She admits that she merely

25   relied on the documents provided by Plaintiff for her review, which did not include any

26   psychiatric or psychological records of the patient. (Id., 9:22-10:6; 11:20-12:18.)

27      Dr. Leahy's opinions are defective in that she has scrutinized a limited

28   amount of documentation and data, none of which included the patient's psychiatric

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

- 3 -

DEFENDANT'S MOTION IN LIMINE NO. 7                                      CASE NO. C 07-2486 WHA

1  history or the circumstances surrounding the creation of the February 18, 2005 letter.

2  Therefore, her opinions are of little value and should be excluded.

3      **B.**    **Dr. Leahy's Opinions And Her Anticipated Testimony Regarding The Patient's Informed Consent Are Irrelevant.**

4

5      The Federal Rules of Evidence provide that relevant evidence is

admissible at trial.  Relevant evidence is defined as:

6

7          [E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

8          probable than it would be without the evidence.

9  Fed. R. Evid. 401; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 587.  The

10  Court's task as "gatekeeper" of proposed expert testimony is to determine whether or not

11  it is relevant; that is, whether it will assist the trier of fact to determine a fact in issue.

12  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 152 (objective of *Daubert* is to ensure

13  reliability and relevancy of expert testimony).  The testimony offered by Dr. Leahy fails to

14  meet this basic test of admissibility.

15      In this action, the proffered report and anticipated testimony is irrelevant to

16  the central issue in the case:  whether ABSMC intentionally discriminated Plaintiff based

17  on his race.  See 42 U.S.C. § 1981.  It is anticipated that Dr. Leahy's report and

18  testimony will be offered as evidence as to the informed consent provided by a single

19  patient.  Here, none of Dr. Leahy's opinions bear any relevance or connection with

20  issues to be decided in this case.

21      Under Federal Rule of Evidence 402, "[e]vidence which is not relevant is

22  not admissible."

23      **C.**    **Dr. Leahy's Opinions And Her Anticipated Testimony Regarding The Patient's Informed Consent Will Cause Unfair Prejudice.**

24

25      Because Dr. Leahy's testimony is unreliable and irrelevant, it would be

26  unduly prejudicial for a juror to hear Dr. Leahy's opinions as to the adequacy of the

27  patient's informed consent.  Such evidence is inadmissible pursuant to Federal Rule of

28  Evidence 403.  Rule 403 provides:

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

- 4 -

DEFENDANT'S MOTION IN LIMINE NO. 7                    CASE NO. C 07-2486 WHA

1

2

3

4

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

5

6

7

8

9

10

11

Given the clear lack of relevance and reliability, Dr. Leahy's report and anticipated testimony, if permitted at trial, has only the potential to be unfairly prejudicial to ABSMC. In addition, such evidence poses an unreasonable risk of misleading the jury with regard to the evidence provided in support of Dr. Leahy's opinion and the ultimate decision made by the Ad Hoc Committee. Dr. Leahy's opinions contribute nothing but intrude upon the area reserved for the jury. Here, Rule 403 justifies the preclusion of the requested evidence in this case.

12

**D.      Dr. Leahy Should Be Precluded from Testifying to Statements Made Known to Her Through Medical Records.**

13

14

15

16

17

18

19

20

21

22

23

The wholly separate provisions of Federal Rule of Evidence 703 lead to a very similar result. Even if the Court were to find some kernel of an expert analysis contained in Dr. Leahy's factual recitation, Rule 703 clearly provides that an expert may not merely relate hearsay to the finder of fact. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984); *U.S. v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) (A court must insure that an expert witness is testifying as an expert and not merely a conduit through which hearsay is brought before the jury). This is supported by the 2000 Advisory Committee Note to Federal Rule of Evidence 703, which stipulates that "Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted."

24

25

Rule 703 compels the use of a balancing test to determine whether the evidence is admissible, providing in part that:

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104

- 5 -

DEFENDANT'S MOTION IN LIMINE NO. 7                                CASE NO. C 07-2486 WHA

1

2

3

> Facts or data that are otherwise inadmissible shall he
> disclosed to the jury by the proponent of the opinion or
> inference unless the court determines that their probative
> value in assisting the jury to evaluate the expert's opinion
> substantially outweighs their prejudicial effect.

4   *Turner v. Burlington Northern Santa Fe R.R. Co.*, 338 F.3d 1058, 1061 (9th Cir. 2003).

5   This balancing test is weighted against the admission of such evidence. The 2000

6   Advisory Committee Note to Rule 703, states that "[t]he amendment provides a

7   presumption against disclosure to the jury of information used as the basis of an expert's

8   opinion and not admissible for any substantive purpose, when that information is offered

9   by the proponent of the expert." *Turner*, 338 F. 3d at 1062.

10       Numerous courts have applied these provisions to exclude expert

11   testimony. In *Paddack*, 745 F.2d at 1262, for example, the court found that audit reports

12   were hearsay and that the expert could not rely on such evidence to establish the truth

13   of what they assert. In *Turner*, 338 F. 3d 1062, the court found that because the

14   probative value that would result from the admission of a lab report relied upon by the

15   expert did not substantially outweigh its prejudicial effect, the expert was not allowed to

16   testify about the report.

17       In this case, as in those cited above, ABSMC believes Plaintiff will attempt

18   to use Dr. Leahy as a conduit for the hearsay contained in the "general record" and the

19   February 18, 2005 letter. Dr. Leahy's opinion is circular in its approach where it depends

20   on the logic that because physicians do not involve themselves with patients who are not

21   under control, one can presume that Plaintiff went forward with the procedure after

22   Plaintiff made the assessment that the patient was stable enough to tolerate the

23   procedure. (Leahy Depo, 15:23-16:4.) Dr. Leahy further opines that Plaintiff "discussed

24   the risks and benefits and alternatives, and all questions were answered." However, Dr.

25   Leahy's opinion that Plaintiff "describe[d] the procedures that were going to take place,

26   the reasons for it taking place, roughly how long it might take, what the risks are, [and]

27   what the recovery time might be" is based on nothing but her own presumption absent

28   any "factual substantiation." (*Id.*, 20:4-23.)

1    III.    **CONCLUSION**

2          Because Dr. Leahy's testimony is devoid of any evidentiary value, the court

3    should grant ABSMC's motion.  The Court should reject this attempt to usurp those

4    functions reserved for the jury.

5    DATED:        April 29, 2008                Respectfully submitted,

6                                               KAUFF MCCLAIN & MCGUIRE LLP

7

8                                               By: _____

9                                                        ALEX HERNAEZ

10                                              Attorneys for Defendant
                                                ALTA BATES SUMMIT MEDICAL
11                                              CENTER

12   4835-0557-1330.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104

- 7 -

DEFENDANT'S MOTION IN LIMINE NO. 7                              CASE NO. C 07-2486 WHA

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

COYNESS L. ENNIX, JR., M.D.,

        Plaintiff,

    vs.              Case No. C 07-2486 WHA

ALTA BATES SUMMIT MEDICAL CENTER,

        Defendant.

_____/

DEPOSITION OF MARGO M. LEAHY, M.D.

February 29, 2008

CONFIDENTIAL PROCEEDINGS

PURSUANT TO PROTECTIVE ORDER

REPORTED BY:

SANDRA L. CARRANZA, CRR, RPR, CSR 7062

PREFERRED REPORTERS
CERTIFIED SHORTHAND REPORTERS
19229 Sonoma Highway, Suite 112
Sonoma, California  95476
Phone (707) 938-9227

**Page 2**

I N D E X

DEPOSITION OF MARGO M. LEAHY, M.D.

EXAMINATION BY:                    PAGE
  MS. ELTANAL                       5

DEFENDANT'S EXHIBITS MARKED
1   Plaintiff's Expert Witness Disclosure        6
2   2/27/08 letter from Andrew Sweet to
    Mathew Vandall, enclosing documents
    Bates stamped L0001-L0657 and G0001-
    G1391                                         9

3   2/18/05 letter from Jessie       to
    Medical Staff President, Summit Campus       25

---oOo---

**REDACTED**

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF:
    MOSCONE, EMBLIDGE & QUADRA
    BY:  ANDREW E. SWEET, ATTORNEY AT LAW
    220 Montgomer Street, Suite 2100
    San Francisco, California 94104
    (415) 362-3599
    sweet@meqlaw.com

FOR THE DEFENDANT:
    KAUFF, MCCLAIN & MCGUIRE
    BY:  ROSSANA S. ELTANAL, ATTORNEY AT LAW
    One Post Street, Suite 2600
    San Francisco, California 94104
    (415) 421-3111
    eltanal@kmm.com

TAKEN AT:   KAUFF, McCLAIN & McGUIRE
    One Post Street, Suite 2600
    San Francisco, California 94104
    ---oOo---

**Page 4**

BE IT REMEMBERED that, pursuant to Notice of
Taking Deposition and on Friday, February 29, 2008,
commencing at the hour of 9:07 A.M., before me, SANDRA
L. CARRANZA, CSR No. 7062, RPR, there personally
appeared

        MARGO M. LEAHY, M.D.,

called as a witness by the Defendant, who, having
been first duly sworn, was examined and testified as
hereinafter set forth.

        ---oOo---

**Page 5**

        MARGO M. LEAHY, M.D.,
having been duly sworn, testified as follows:

        EXAMINATION BY MS. ELTANAL
    MS. ELTANAL:  My name is Rossana Eltanal.  I'm
representing the defendant in this matter.  I have a few
preliminary statements.
    I would appreciate it if the court reporter can
designate the record confidential and all exhibits
confidential as well under the protective order that we
have in place in this action.
    Q.  Will you state your full name, please?
    A.  Margo Leahy.
    Q.  Have you ever been retained to provide expert
testimony for Alta Bates Summit Medical Center?
    A.  Not that I recall.
    Q.  And you have been retained in this action to
provide expert testimony; is that correct?
    A.  That's correct.
    Q.  You were retained by plaintiff's attorney?
    A.  That's correct.
    Q.  What was the date of your retention?
    A.  I have to check that.
        It was sometime in the beginning of 2008,
before January 16th, so the very beginning of January,

**6**

1   I'd say.
2     Q.  And what is the fee that you're charging for
3   your services in this matter?
4     A.  The fee is $400 an hour for record review,
5   examinations; 450 an hour for depositions, and a
6   different fee for trial testimony.
7     Q.  How many hours have you spent on this matter so
8   far?
9     A.  About eight hours.
10    MS. ELTANAL:  I will mark --
11    MR. SWEET:  We have taken so many depositions
12  in this case, the numbering is completely off.  We're
13  supposed to be sequential, but I didn't say anything
14  yesterday and it's not a big deal to me today because we
15  are going to go back and look at everything and put them
16  in sequential order for the court, so mark it whatever
17  you want.
18      (Whereupon, Defendant's Exhibit 1 was marked
19       for identification.)
20    MS. ELTANAL:  Q.  Have you ever been deposed
21  before?
22    A.  Yes, I have.
23    Q.  How many times?
24    A.  About a hundred plus times.
25    Q.  And you understand that your testimony is under

**7**

1   oath?
2     A.  Yes, I do.
3     Q.  And have you provided services for plaintiff's
4   counsel in the past?
5     A.  Yes, I have.
6     Q.  How many times?
7     A.  I want to say two times, one or two times.  I
8   can't recall.  I think two times.
9     Q.  And can you explain the context of those cases?
10    A.  The one case I remember which was about four
11  years ago was a plaintiff's case involving a woman
12  making claims against a psychiatrist for sexual
13  harassment, sexual abuse.  I don't remember all the
14  specifics of it.
15    Q.  And the other case?
16    A.  I can't remember.  There was another case, and
17  I just -- it's skipping my mind.  It may have been a
18  defense case.  I can't remember what it was.  Longer
19  than four years.
20    Q.  Have you had any prior relationship with the
21  plaintiff, Dr. Ennix?
22    A.  No, I have not.
23    Q.  So we marked Exhibit 1 as Plaintiff's Expert
24  Witness Disclosure.
25    And Exhibit B to this document is --

**8**

1   references, I believe, your report and CV; is that
2   correct?
3     A.  Uhm-hum.
4     Q.  Have you provided any other drafts or versions
5   to plaintiff's counsel of this report?
6     A.  No, I have not.
7     Q.  Is this an accurate copy of your CV?
8     A.  Yes, it appears to be.
9     Q.  Are you aware of inaccuracies or would you like
10  to make any modifications to your CV at this time?
11    A.  No.
12    Q.  Do you have any different versions of your CV?
13    A.  No.  I have ones from years ago, but my current
14  CV is as is.
15    Q.  Do you specialize in any special areas of
16  practice?
17    A.  I'm board eligible in child and adolescent
18  psychiatry, and I'm a certified union psychoanalyst, and
19  I do forensic psychiatric, although I'm not certified in
20  that area.
21    MS. ELTANAL:  We were provided with some
22  records in response to a subpoena.  Instead of marking
23  the entire stack of documents into the record, can you
24  mark this one?
25    We are going to reference the documents by

**9**

1   their Bates labels and just confirm that this is your
2   entire file of records in this matter.
3       (Whereupon, Defendant's Exhibit 2 was marked
4        for identification.)
5     MS. ELTANAL:  So that's a letter from
6   plaintiff's counsel indicating that your subpoena
7   documents are Bates numbered L0001 to L0657.
8     MR. SWEET:  Are you just asking her to look
9   through them generally, not every single document?
10    MS. ELTANAL:  Just generally, just to show that
11  it starts at L0001 and ends at L0657.
12    THE WITNESS:  The numbers correspond to the
13  ones you mentioned.  I can't really go through this pile
14  of documents.
15    MS. ELTANAL:  Q.  Have you provided all the
16  documents in your file to plaintiff's counsel for
17  production?
18    A.  Yes, I have.
19    Q.  Are there any documents that you've relied on
20  that you have not given to plaintiff's counsel?
21    A.  No.
22    Q.  When you were retained by plaintiff's counsel,
23  did you request any specific categories of documents, or
24  did plaintiff's counsel provide you with the documents?
25    MR. SWEET:  Objection.  Compound.

**10**

1   THE WITNESS: Normally, I do request specific
2   documents because I have a normal way to do evaluations
3   involves seeing the plaintiff. This was not that kind
4   of examination; it was a record review. So I relied on
5   the law firm to send me the records that they wanted
6   reviewed.
7   MS. ELTANAL: Q. Did you have to ask for
8   additional documents after you received the files from
9   plaintiff's counsel?
10   A. I don't remember. I don't remember whether
11   there was anything I wanted in addition that I received
12   or things were sent to me.
13   Q. In your experience as an expert or consultant,
14   how many times have you conducted a record review?
15   A. I don't remember. Probably a few dozen times
16   over the years.
17   Q. Did any of those situations involve the issue
18   of informed consent?
19   A. Yes.
20   Q. In what context was that?
21   A. They were in different contexts. The one I
22   remember most, probably the most recent one was a
23   contract dispute of a 1970s rock-and-roll person, you
24   know, star, who also had a chronic mental illness, and
25   the question was whether or not he had been capable of

**11**

1   making an informed choice in this contract, if he
2   understood what he was signing at the time because of
3   having schizophrenia.
4   Q. Who were you retained in by that action?
5   A. I believe I was retained by the defense side.
6   Yes, I was retained by the defense side.
7   Q. And the claim was brought by the 1970s
8   individual?
9   A. Yes, yes.
10   Q. And can you provide a short summary of your
11   conclusion in that action? Were you able to determine
12   that the individual provided informed consent?
13   A. In that case, yes, I had voluminous hospital
14   records for many, many years, and I was able to
15   determine that the person would have been able to
16   understand the contract accurately to have signed it.
17   Q. And the hospital records, did that include the
18   individual's psychiatric or psychological records?
19   A. Yes, it was all psychiatric records.
20   Q. In this matter, were you provided psychiatric
21   records for the patient in question?
22   A. No, I was not.
23   Q. Did you request those records?
24   A. No, I did not.
25   Q. Did you feel that the records would have been

**12**

1   relevant to your conclusions and opinions in this case?
2   A. No.
3   Q. Why is that?
4   A. I didn't think they were necessary. The person
5   was presented as someone with a long history of
6   schizophrenia but with a record of stability for some
7   time, as reflected in his general medical record.
8   Q. By "general medical record," what do you mean
9   by that? What are you referring to?
10   A. The records that I was given that were those of
11   his cardiologist that indicated he was well enough to be
12   considered for a surgery for cardiac catheterization and
13   seen in the office and no mention was ever made of any
14   sort of psychological instant or decompensation during
15   that time.
16   Q. Had you seen any record from the patient's
17   psychiatrist or psychologist?
18   A. No, I have not.
19   Q. Is it your opinion that a cardiologist is
20   capable of determining whether an individual is mentally
21   capable or well enough?
22   MR. SWEET: Objection. Incomplete
23   hypothetical.
24   THE WITNESS: Well enough to what?
25   MS. ELTANAL: Q. In any capacity, just to

**13**

1   determine the level of one's mental capacity, is that
2   within the realm of expertise and knowledge of a
3   cardiologist?
4   MR. SWEET: Same objection.
5   THE WITNESS: That's too vague a question. I
6   don't mean to be difficult, but mental capacity in what
7   regard.
8   MS. ELTANAL: Q. Would you feel comfortable
9   providing an opinion as to the -- as to -- as to
10   diagnosing an individual with a heart problem?
11   MR. SWEET: Objection. Vague. Incomplete
12   hypothetical.
13   THE WITNESS: Again, I'm not a cardiologist. I
14   wouldn't be asked to do that.
15   MS. ELTANAL: Q. That's somewhat of my point
16   is that Dr. Ennix is not a psychologist or a
17   psychiatrist, and you are relying on his opinion
18   concerning the mental health of a patient. That wasn't
19   a question so ...
20   Is it your opinion that Dr. Ennix had the
21   training and experience to render an opinion as to the
22   mental health of this patient?
23   MR. SWEET: Objection. Assumes facts not in
24   evidence. It's vague. Compound; incomplete
25   hypothetical.

## REDACTED 14

1       THE WITNESS: I'm not sure if I can answer
2 that, really. I never thought of Dr. Ennix or
3 Dr. Ferguson making a diagnosis of this patient, nor did
4 I think it was indicated.
5       MS. ELTANAL: Q. In the cases that you have
6 rendered an opinion on informed consent, did any of
7 those cases involve an individual's capacity to
8 understand the legal proceedings?
9       MR. SWEET: Objection. Vague as to legal
10 proceedings.
11       A. I don't remember, honestly. I don't remember.
12       MS. ELTANAL: Q. Can you tell me the scope of
13 your opinions that you were asked to render in this
14 case?
15       A. I was asked to determine whether or not it
16 appeared that the plaintiff -- not the plaintiff, the
17 patient, Mr. --
18       May I say his name in the context of this?
19       MR. SWEET: You can, since it's been marked
20 confidential.
21       THE WITNESS: Okay.
22       , was capable of understanding the
23 fact that he was going to be having cardiac surgery and
24 some idea of what the cardiac surgery entailed, and give
25 his agreement, his consent to the procedure.

## REDACTED 15

1       MS. ELTANAL: Q. And you have rendered
2 opinions and conclusions?
3       A. Yes, I have.
4       Q. Can you list for me those opinions and
5 conclusions?
6       A. In my opinion,       was able to
7 understand and give consent to the cardiac surgery. And
8 I say that based on several different things, but I
9 would say, in general, he was able to give consent to
10 that procedure.
11       Q. And what are your reasons for that conclusion?
12       A. Well, with psychiatric patients, one often
13 looks at the course of things, and although
14 cardiologists are not asked to make diagnoses
15 psychiatrically, as psychiatrists are not asked to make
16 diagnoses in cardiology, we all know how to assess when
17 one is distressed or disturbed by their clinical
18 presentation. And in this case, the clinical
19 presentation on multiple occasions to the cardiologist,
20 you know, was one of being well enough to undergo
21 procedures, examinations, and ultimately the plan for
22 surgery.
23       Historically, nonpsychiatrist MDs tend not to
24 want to be involved with psychiatric patients who are
25 not under control, so one presumes when they are willing

## 16

1 to go forward that they've made the assessment that the
2 person is stable enough to tolerate the procedure. And
3 I think that was true in this case, beginning with the
4 cardiac catheterization several months before.
5       Q. How many discussions have you had with
6 Dr. Ennix?
7       A. I've never had any discussions with Dr. Ennix.
8       Q. Why is that?
9       A. I don't need to talk to Dr. Ennix, basically.
10       Q. And you did not request to speak with him?
11       A. No, I did not.
12       Q. Have you ever met the patient -- the patient in
13 question?
14       A. No, I have not.
15       Q. Did you ever talk to any health or any of the
16 caregivers of the patient?
17       A. No, I did not.
18       Q. And do you agree that an important element of
19 understanding someone's state of mind is having a
20 discussion with that person?
21       MR. SWEET: Objection. Vague.
22       THE WITNESS: I'm not quite sure what you're
23 asking. It's a little vague for me, what you're saying.
24 Maybe you can rephrase it somehow.
25       MS. ELTANAL: Q. When rendering whether an

## 17

1 opinion as to an individual's state of mind, do you
2 think it's helpful to speak with that person?
3       A. Again, it's an odd question for me. I think
4 that if I'm asked to give an opinion about someone's
5 mental, psychological condition at a point in the past,
6 unless I were able to have been there at that point in
7 the past, to have talked with them, it wouldn't be
8 relevant to have met with them, you know, at this point.
9       Q. How confident are you concerning the opinion
10 that you've rendered in this action?
11       MR. SWEET: Objection.
12       THE WITNESS: How confident in what regard?
13       MS. ELTANAL: Q. In the regard that you've
14 never met the patient, the informed -- the procedure
15 took place over four years ago, and you're relying on
16 medical records from cardiologists.
17       A. Yes.
18       Q. How confident are you in your opinion?
19       MR. SWEET: Objection. Vague.
20       THE WITNESS: Sorry.
21       MR. SWEET: Objection. Vague.
22       You can answer the question.
23       THE WITNESS: I'm confident. I'm fully
24 confident to the extent that one can be confident in
25 anything. I mean, I wasn't there. The record is very

**18**

1  clear to me, though, that this was not -- I mean, I've
2  known and seen many, many schizophrenics, and I've seen
3  many, many records of schizophrenics, and this man
4  appears to have been very well compensated and in
5  remission, both at the times he was seen by the
6  cardiologist, the time he had his cardiac
7  catheterization, and most importantly, the times that he
8  under went cardiac surgery.  He was on a very good
9  regimen of medication.
10      He was brought in by a caregiver who knew him
11  well.  Caregivers would not bring someone acutely
12  psychotic or agitated to a doctor's appointment.  It's
13  too disruptive.  Usually, as I said a moment before, MDs
14  who are not psychiatrists don't want those patients in
15  their office because they're out of control or
16  decompensated.  So I'm presuming that the caregiver who
17  knew this patient felt that he was adequately controlled
18  to go to his doctor appointment.  That says a lot.
19      Furthermore, I think that the cardiologist who
20  had been seeing this patient for several years, I think
21  since 2001, had some sense of what he was like and felt
22  that he had some kind of a relationship with him, enough
23  to be able to tell if he was functioning or not
24  functioning.  It's not that subtle to tell when a
25  schizophrenic decompensates.

**19**

REDACTED

1      MS. ELTANAL:  Q.  When you refer to caregiver,
2  can you explain to me what you mean by that term?
3      A.  I'm only, I think, quoting what was in the
4  record.  The person that accompanied                    one
5  of his appointments.  I have to check the specific one,
6  when he was given the description of the procedure.
7  Maybe his admission workup.  I have to look at that more
8  directly, but ...
9      Q.  Do you have any idea whether the caregiver was
10  simply a driver, whether the caregiver was a doctor or a
11  nurse?
12      A.  I don't know any of those things.  My
13  experience with board-and-care facilities, which is
14  where          ) was residing, is that they usually send
15  one of the staff with their residents for a doctor's
16  appointment.
17      Q.  Staff meaning a doctor or a nurse?
18      A.  No.  The staff is not usually doctors or
19  nurses.  It's usually psychiatric technicians, and the
20  board-and-care facilities are overseen by doctors or
21  nurses.
22      Q.  But in this instance, you can't be certain as
23  to the identity of that individual?
24      MR. SWEET:  Objection.  Vague as to what you
25  mean by identity.  The name or the type of person?

**20**

1      MS. ELTANAL:  The type of person.
2      THE WITNESS:  I don't know exactly what their
3  credentials were; that's correct.
4      MS. ELTANAL:  Q.  If we look at page two of
5  your report, if we look to the end of the first full
6  paragraph, it says here that Dr. Ennix was present and
7  discussed the risks and benefits and alternatives, and
8  all questions were answered.  The patient agrees to
9  proceed.
10      Do you have any idea the substance and nature
11  of Dr. Ennix's conversation with the patient?
12      A.  Well, I have some idea.  I don't have any
13  specific factual substantiation to that idea, but in
14  general, when someone gives informed consent to a
15  patient, they describe the procedure that's going to
16  take place, the reasons for it taking place, roughly how
17  long it might take, what the risks are, what the
18  recovery time might be, that sort of thing.  So I'm
19  presuming that would be what he spoke of.
20      Q.  And you're presuming that because there's
21  nothing in the record that actually spells out what
22  Dr. Ennix discussed with the patient; is that correct?
23      A.  That's correct.
24      Q.  So when we refer to things like discussing the
25  risks and benefits and alternatives, there's really no

**21**

1  idea to understand what was discussed, what the risks
2  were, what the benefits were, what those alternatives
3  were?
4      MR. SWEET:  Objection.  That misstates the
5  testimony and the evidence in the case.
6      THE WITNESS:  I think -- are you asking me
7  because it's not spelled out in the note that I don't
8  know what they are?
9      MS. ELTANAL:  Q.  Yes.
10      A.  Well, I don't recall ever seeing them all
11  spelled out in an informed consent note.  Usually, the
12  doctor will say that the procedure to be undertaken was
13  discussed, risks and benefits were outlined, questions
14  were answered, something vague of that nature.  So to my
15  mind, reading the record, it was pretty standard.
16      Now you're correct, I was not there.  I don't
17  know exactly, but one presumes that when one writes that
18  in the record, that that's what it's been conveyed.
19      Q.  And for the record of the second surgery on the
20  31st, can you point to any place where that was
21  conveyed --
22      MR. SWEET:  Objection.  Vague as to that place.
23      MS. ELTANAL:  I wasn't finished.
24      MR. SWEET:  Sorry.
25      MS. ELTANAL:  Q.  -- that being the risks,

## 22

1    benefits, alternatives, and a place where it mentions
2    that all questions were answered?
3       A. I believe -- and this is not uncommon in those
4    more emergency cases -- that all that was indicated was
5    that the patient was informed of the need for the second
6    surgery. I'd have to go back and look over that. I'm
7    happy to do that if you like.
8       Q. But you agree that there is no notation of any
9    discussion with the patient prior to the second surgery
10   concerning the risks, benefits, and alternatives?
11      A. Again, as I recollect sitting here now, that
12   there was nothing specifically noted, simply that the
13   need for the second surgery was expressed to the
14   patient.
15      Q. And you mentioned something about in an
16   emergency situation. Is there anything in the record or
17   in your report that indicates that the second surgery
18   was an emergency surgery?
19      A. Well, normally, when there's a -- there's the
20   first surgery that doesn't go well, something has to
21   happen pretty quickly. Although it's not spelled out as
22   an emergency, it does seem to be somewhat of an urgent
23   procedure. It's done within a few days of the first
24   procedure, correcting a defect in the first procedure.
25      Q. But you're making that assumption in this case?

## 23

1      A. I am, yes. It was not an elective procedure.
2      Q. You also reference on page three of your report
3   towards the end the additional fact of his having been
4   accompanied by a caregiver who knew his limitation
5   supports the opinion that the patient was capable of
6   understanding what was being told.
7      MR. SWEET: Do you see where she is, doctor?
8      THE WITNESS: Yes.
9      MS. ELTANAL: Q. Yes.
10      Did you -- was there any other documentation in
11   the record or any conversation that you had with an
12   individual to discuss the presentation of the caregiver
13   with the patient prior to the surgery?
14      A. I'm not sure.
15      MR. SWEET: Objection. Vague.
16      THE WITNESS: I'm not sure I understand your
17   question. I'm sorry.
18      MS. ELTANAL: Q. You're making an opinion here
19   about the caregiver that supports the opinion that the
20   patient was capable of understanding what was being
21   told, correct?
22      A. That's correct.
23      Q. Is there any -- what is that opinion based on?
24      A. That opinion is largely based on my own many,
25   many years of experience with the community of

## 24

1    board-and-care homes, chronic schizophrenics, and
2    knowing how they function, that they -- they have a very
3    serious chronic mental illness, but they also have to go
4    about life. They have to be taken to doctor's
5    appointments and medical appointments of one sort or
6    another. And the general rule is if they're
7    decompensated, if they're unstable, even in some
8    board-and-care facilities if they're having a
9    particularly bad day, they're not taken to the
10   appointment. So that's just my clinical experience,
11   that the presumption would be, the caregiver has brought
12   him, that he, you know, is in good enough shape to come
13   and participate fully in his appointment, undergo
14   whatever the treatments are, and not be destabilized.
15      Q. And you have -- in this situation, you have no
16   factual knowledge, though, that the caregiver knew the
17   patient and his needs and limitations?
18      A. I have no factual knowledge. In other words,
19   no written documents. This would be kind of implicit.
20      Q. You also referenced confirmation that can be
21   found in the February 18th, 2005, letter, from the
22   patient to the medical staff president in rendering your
23   opinion; is that correct?
24      A. That's correct.
25      MS. ELTANAL: I will have that marked.

## REDACTED 25

1      (Whereupon, Defendant's Exhibit 3 was marked
2     for identification.)
3      MS. ELTANAL: Q. Is this the letter that you
4   were referring to?
5      A. Yes, it is.
6      Q. Are you aware of the circumstances surrounding
7   how, when, and where this letter was prepared?
8      A. I can deduce from the date that it was prepared
9   sometime in January or February of 2005, but other than
10   that, I don't know anything else about the
11   circumstances.
12      Q. Do you have any idea who created the document?
13      A. I'm presuming it was created by       with
14   help by someone.
15      Q. You are not aware that Dr. Ennix created this
16   document?
17      MR. SWEET: Objection. Assumes facts not in
18   evidence.
19      THE WITNESS: I don't know anything about that.
20      MS. ELTANAL: Q. Are you aware that there are
21   five other documents dated February 18th, 2005, from
22   former patients of Dr. Ennix concerning their consent to
23   procedures?
24      A. No, I'm not.
25      Q. Do you have any concerns about a doctor going

**26**

1  to a patient one year later after surgery is performed
2  and asking the patient to validate the doctor's prior
3  actions?
4      MR. SWEET: Objection. Vague.
5      THE WITNESS: Do I have any concerns in what
6  regard?
7      MS. ELTANAL: Q. Is this, in your opinion,
8  ethical conduct?
9      A. Certainly, I don't see anything unethical about
10 asking a patient to document something that's happened,
11 if it's actually happened.
12     Q. Have you ever in your experience as a physician
13 obtained informed consent a year after the event
14 occurred?
15     MR. SWEET: Objection. It's vague and
16 misleading.
17     THE WITNESS: I don't -- no, I never have. I
18 don't know that I have ever needed to.
19     MS. ELTANAL: Q. Why is that?
20     A. I don't have a hospital practice. My consent
21 for treatment with parents about children is verbal,
22 with adults it's verbal. They take the treatment. It's
23 never been disputed. I guess that's the main thing.
24 It's never been disputed. I could imagine, sitting here
25 thinking about it, since it's not written, if it were

**27**

1  being disputed, it's something I might have to do.
2      Q. Do you think it's important to have a written
3  document contemporaneously reflecting informed consent?
4      MR. SWEET: Objection. Vague as to what
5  important means.
6      THE WITNESS: I think that, you know, any note
7  that indicates that the patient and the doctor have come
8  to some agreement about the treatment is important. I
9  think the detail varies, depending on the circumstance.
10     MS. ELTANAL: Q. And are you aware of any note
11 by Dr. Ennix concerning the second surgery that some
12 agreement was reached between he and the patient?
13     A. No, I'm not. I'm only aware of the note by
14 Dr. Ferguson which references the procedure.
15     Q. Can you explain to me what the symptoms of
16 schizophrenia are?
17     MR. SWEET: Objection. Vague.
18     THE WITNESS: Well, you know, the symptoms are
19 lengthy and you can find them in detail in the DSM4, the
20 Diagnostic and Statistical Manual, but in general, the
21 major characterization is a patient who has either at
22 the moment or over time inability to distinguish reality
23 from fantasy for some sustained amount of time and has
24 had this experience on more than one occasion. And some
25 of the accompanying symptoms that characterize the

**28**

1  illness is auditory hallucination, delusions, paranoid
2  ideation, that sort of thing.
3      MS. ELTANAL: Q. In reviewing the February 18,
4  2005, letter from the patient, is there any way to
5  ascertain the individual's mental capacity at that time?
6      A. If one presumes that the patient wrote the
7  letter, that would be supportive of a very functional
8  mental capacity.
9      If the patient did not write the letter and
10 simply signed it, it's basically impossible to make an
11 assessment of what the mental condition was.
12     Q. Did you come across anything in the documents
13 that you reviewed illustrating that Dr. Ennix conceded
14 that psychiatric evaluation would have been a good idea
15 prior to performing the surgery?
16     A. Not that I recall.
17     Q. Would it change your opinions or conclusions at
18 all if you had seen a notation concerning Dr. Ennix's
19 concession that a psychiatric evaluation would have been
20 a good idea?
21     MR. SWEET: Objection. Incomplete hypothetical
22 regarding the timing of when he said that, in the
23 context of an investigation.
24     THE WITNESS: No, I don't think it would.
25     MS. ELTANAL: Q. In your opinion, is it

**29**

1  standard course or are you familiar with patients
2  undergoing psychiatric evaluations prior to certain
3  surgeries?
4      A. With psychiatric patients, we tend not to
5  routinely ask for psychiatric consultation prior to
6  surgeries. The reason one would indicate is when there
7  is presence of symptomatology, that is if the
8  examining -- if the examination and in the interview the
9  person seems out of touch, they seem not to understand
10 what you're talking about, they seem agitated,
11 uncooperative, that sort of thing, then one would order
12 a psychiatric consultation, whether schizophrenic or
13 elderly or something like that. But in the absence of
14 any positive clinical findings that are observable to
15 any physician one wouldn't routinely order a psychiatric
16 consultation.
17     Q. You mentioned something in your report that
18 referenced the patient at one point became agitated and
19 I believe you referenced something about his medication
20 not being sufficient?
21     A. That's correct.
22     Q. What is the reason for that opinion? Do you
23 have any factual knowledge?
24     A. There was some notation in the postoperative
25 record after the second surgery, I believe -- I'd have

30

1 to go back and check -- that the patient was agitated,
2 and it's very common postoperatively for some people to
3 be agitated in general, but when you have a psychiatric
4 patient, chronic psychiatric patient, their medication
5 levels are very important to maintain. This is usually
6 counter-balanced, I think, in the surgeon's mind by the
7 risk of surgery, in terms of -- not risk of surgery, the
8 risk of anesthesia. Either the anesthesiologist or the
9 surgeon will sometimes have them on a lower dose until
10 postoperatively. I have no idea what their thinking was
11 in this case, but it's not an uncommon thing. And then
12 as they become agitated, that's frequently when a
13 psychiatric consult was gotten, as it was in this case,
14 and medication was restored to its previous levels and
15 the patient's equilibrium was restored.
16     Q. Do you have any understanding of the type of
17 surgery involved in this case?
18     A. Again, I'm not a cardiac surgeon. I was able
19 to read the medical records enough to understand some of
20 what they've done, but certainly I couldn't opine about
21 the surgery itself.
22     Q. Were you aware that it was -- involved new
23 equipment or new procedures at the hospital?
24     MR. SWEET: Objection. Vague. Incomplete
25 hypothetical.

31

1     THE WITNESS: Again, I really would be
2 reluctant to comment on anything about the surgical --
3 specific surgical procedure.
4     MS. ELTANAL: Q. And you have not been asked
5 to render an opinion as to the standard of care
6 concerning the surgery in this case?
7     A. No, I have not.
8     MS. ELTANAL: Can we take a break?
9     (Recess taken.)
10     MS. ELTANAL: Q. I just want to make sure that
11 we've covered all the opinions or conclusions that
12 you've rendered in this action. We've covered a lot of
13 ground so far.
14     Is there any other opinions or conclusions that
15 you can recall at this time that we have not covered?
16     MR. SWEET: Objection. Vague and compound.
17     THE WITNESS: Although it's not read into the
18 record, I certainly would consider all of my clinical
19 impression to be my opinion, although we haven't
20 discussed all of it this morning.
21     MS. ELTANAL: Q. If the February 18th, 2005,
22 letter did not exist, would you agree that the evidence
23 of informed consent is lacking?
24     A. I wouldn't agree that it's lacking. I would
25 say that certainly it's present for the first surgery

32

1 and it's sketchy for the second surgery. It's certainly
2 documented by the cardiologist but not by the surgeon.
3     Q. And what do you mean by the term "sketchy"?
4     A. Well, it's not -- you know, one likes to see as
5 a whole record where the surgeon has seen the patient
6 and made a notation that they readvised them of the
7 risks and inherent dangers, but the -- the surgeon has
8 indicated to the patient that the risks and benefits
9 again have been restated and that the need for surgery,
10 second surgery has been established, that one would like
11 to see that documented, but it wasn't. It was
12 implicitly referred to in Ferguson, the cardiologist,
13 notation; and I think that seems adequate. Perhaps not
14 ideal, but adequate. So that -- I'll leave it at that.
15     I can't remember if you had a question attached
16 to the other part.
17     Q. However, would you agree that it's not clear
18 what was explained or what information was provided by
19 the surgeon performing the surgery?
20     MR. SWEET: Objection. Vague as to what
21 surgery. The whole question is vague.
22     THE WITNESS: Are you referring to the first or
23 second?
24     MS. ELTANAL: Q. The second surgery.
25     A. The second surgery, again, I'm presuming,

33

1 because informed consent does involve some description,
2 that that was given to the patient by the cardiologist
3 at the time of the second surgery, and that the surgeon
4 had agreed with that, that there was some communication,
5 although it is not documented.
6     Q. And how does your opinion change if we assume
7 that the letter, the February 18th letter, was not
8 created by the patient? What is your -- would you agree
9 that the informed consent was lacking?
10     MR. SWEET: Objection. Vague.
11     THE WITNESS: No. I think I just answered
12 that, that I don't think that the informed consent was
13 as well documented as it could have been, but that it
14 was, according to Dr. Ferguson's note, it was adequate.
15 Again, there was a patient he knew, second surgery. The
16 patient was in the hospital in a somewhat compromised
17 state. One can only presume that it was a similar kind
18 of informed consent to the first surgery, although it is
19 not explicitly well documented.
20     MS. ELTANAL: Q. And you agree that many of
21 your opinions and conclusions in this matter are based
22 on presumptions and assumptions?
23     MR. SWEET: Objection. That question is vague
24 and compound.
25     THE WITNESS: I wouldn't agree with that. I

**34**

1  think that my conclusions are based on my many years of
2  experience as a psychiatrist, dealing with many, many
3  different schizophrenics and board-and-care homes and
4  having done consultations in hospitals, and that all of
5  that goes into my conclusions.  All that information,
6  experience over many years goes into my conclusions.
7      MS. ELTANAL:  I don't think I have any further
8  questions.
9      Did you mark for the record this time the
10  changes to the depo?
11      MR. SWEET:  I did not.  If you're done, I'll do
12  that now.
13      MS. ELTANAL:  Yeah.
14      MR. SWEET:  Okay.  I should have made a
15  statement at the beginning of the deposition that I
16  would like to reserve on behalf of Dr. Leahy the right
17  to review the transcript and make changes or
18  modifications which she feels are necessary within 30
19  days, which is something we have to ask for that right
20  in front of a Court.  In State Court you just get that
21  right.  So I have now asked for it.
22      Are we done?
23      MS. ELTANAL:  I think we're done.
24      MR. SWEET:  Thank you.
25      THE REPORTER:  Do you want a copy of the

**35**

1  transcript?
2      MR. SWEET:  I do.  Just in the regular course,
3  please.
4      (Whereupon, the deposition was adjourned
5      at 10:07 A.M.)
6      ---oOo---
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**36**

1
2
3          CERTIFICATE OF WITNESS
4
5
6
7      I, the undersigned, declare under penalty of
8  perjury that I have read the foregoing transcript, and I
9  have made any corrections, additions, or deletions that
10  I was desirous of making; that the foregoing is a true
11  and correct transcript of my testimony contained
12  therein.
13      EXECUTED THIS _____day of _____,
14  _____, at _____.
15
16
17
18
19
20      _____
21          MARGO M. LEAHY, M.D.
22
23
24
25

**37**

1          REPORTER CERTIFICATE
2      I hereby certify that the witness to the
3  foregoing deposition was by me duly sworn to testify to
4  the truth, the whole truth, and nothing but the truth in
5  the within-entitled cause; that said deposition was
6  taken at the time and place herein named; that the
7  deposition is a true record of the witness's testimony
8  as reported to the best of my ability by me, a duly
9  certified shorthand reporter and a disinterested person,
10  and was thereafter transcribed under my direction into
11  typewriting by computer; that the witness was given an
12  opportunity to read and correct said deposition and to
13  subscribe the same.  Should the signature of the witness
14  not be affixed to the deposition, the witness shall not
15  have availed himself or herself of the opportunity to
16  sign or the signature has been waived.
17      I further certify that I am not interested in
18  the outcome of said action, nor connected with, nor
19  related to any of the parties in said action, nor to
20  their respective counsel.
21      IN WITNESS WHEREOF, I have hereunto set my
22  hand this February 5, 2008.
23
24      _____
          SANDRA L. CARRANZA
          CSR No. 7062
25

38

PREFERRED REPORTERS
CERTIFIED SHORTHAND REPORTERS
19229 Sonoma Highway, Suite 112
Sonoma, California  95476
Phone (707) 938-9227

February 5, 2008
TO:  MARGO M. LEAHY, M.D.
    1902 Webster Street
    San Francisco, California 94115
RE:  COYNESS L. ENNIX, JR., M.D. vs. ALTA BATES
    SUMMIT MEDICAL CENTER
    Deposition taken February 29, 2008
    Reported by SANDRA L. CARRANZA, CSR No. 7062

Dear Dr. Leahy:

The original transcript of your deposition taken in the
above-entitled action has been prepared and is available
at this office for your reading, correcting and signing.
In the alternative, you may wish to review your
counsel's copy.  Please notify this office and all
counsel of any corrections you wish to make.
Your rights regarding signature of this deposition are
contained in the California Code of Civil Procedure
Section 2025.520.  Unless otherwise directed, your
original deposition transcript will be sealed after 35
days.
If you wish to make arrangements to review the original
transcript of your deposition, please contact this
office during office hours, 9:00 to 5:00 Monday through
Friday, to make an appointment.

        Sincerely,


        Sandra L. Carranza
        CSR No. 7062
cc:  All counsel

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

**A**

ability 37:8
able 11:11,14,15
  15:6,9 17:6
  18:23 30:18
above-entitled
  38:12
absence 29:13
abuse 7:13
accompanied
  19:4 23:4
accompanying
  27:25
accurate 8:7
accurately
  11:16
action 5:11,17
  11:4,11 17:10
  31:12 37:18
  37:19 38:12
actions 26:3
acutely 18:11
addition 10:11
additional 10:8
  23:3
additions 36:9
adequate 32:13
  32:14 33:14
adequately
  18:17
adjourned 35:4
admission 19:7
adolescent 8:17
adults 26:22
affixed 37:14
agitated 18:12
  29:10,18 30:1
  30:3,12
ago 7:11 8:13
  17:15
agree 16:18
  22:8 31:22,24
  32:17 33:8,20
  33:25

agreed 33:4
agreement
  14:25 27:8,12
agrees 20:8
Alta 1:7 5:15
  38:8
alternative
  38:13
alternatives
  20:7,25 21:2
  22:1,10
amount 27:23
Andrew 2:10
  3:5
anesthesia 30:8
anesthesiologist
  30:8
answer 14:1
  17:22
answered 20:8
  21:14 22:2
  33:11
appeared 4:5
  14:16
appears 8:8
  18:4
appointment
  18:12,18
  19:16 24:10
  24:13 38:19
appointments
  19:5 24:5,5
appreciate 5:8
area 8:20
areas 8:15
arrangements
  38:18
ascertain 28:5
asked 13:14
  14:13,15
  15:14,15 17:4
  31:4 34:21
asking 9:8
  16:23 21:6
  26:2,10

assess 15:16
assessment 16:1
  28:11
assume 33:6
Assumes 13:23
  25:17
assumption
  22:25
assumptions
  33:22
attached 32:15
attorney 3:5,13
  5:20
auditory 28:1
available 38:12
availed 37:15
aware 8:9 25:6
  25:15,20
  27:10,13
  30:22
A.M 4:3 35:5

**B**

B 7:25
back 6:15 22:6
  30:1
bad 24:9
based 15:8
  23:23,24
  33:21 34:1
basically 16:9
  28:10
Bates 1:7 2:11
  5:15 9:1,7
  38:8
beginning 5:24
  5:25 16:3
  34:15
behalf 34:16
believe 8:1 11:5
  22:3 29:19,25
benefits 20:7,25
  21:2,13 22:1
  22:10 32:8
best 37:8

big 6:14
board 8:17
board-and-care
  19:13,20 24:1
  24:8 34:3
break 31:8
bring 18:11
brought 11:7
  18:10 24:11

**C**

C 1:6 3:1
California 1:2
  1:24 3:7,15,21
  38:2,7,15
called 4:9
Campus 2:13
capable 10:25
  12:20,21
  14:22 23:5,20
capacity 12:25
  13:1,6 14:7
  28:5,8
cardiac 12:12
  14:23,24 15:7
  16:4 18:6,8
  30:18
cardiologist
  12:11,19 13:3
  13:13 15:19
  18:6,19 32:2
  32:12 33:2
cardiologists
  15:14 17:16
cardiology
  15:16
care 31:5
caregiver 18:10
  18:16 19:1,9
  19:10 23:4,12
  23:19 24:11
  24:16
caregivers
  16:16 18:11
Carranza 1:21

4:4 37:24 38:9
  38:22
case 1:6 6:12
  7:10,11,15,16
  7:18 11:13
  12:1 14:14
  15:18 16:3
  21:5 22:25
  30:11,13,17
  31:6
cases 7:9 14:5,7
  22:4
categories 9:23
catheterization
  12:12 16:4
  18:7
cause 37:5
cc 38:24
Center 1:7 5:15
  38:8
certain 19:22
  29:2
certainly 26:9
  30:20 31:18
  31:25 32:1
CERTIFICA...
  36:3 37:1
certified 1:23
  8:18,19 37:9
  38:1
certify 37:2,17
change 28:17
  33:6
changes 34:10
  34:17
characterizati...
  27:21
characterize
  27:25
charging 6:2
check 5:23 19:5
  30:1
child 8:17
children 26:21
choice 11:1

1

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

chronic 10:24
  24:1,3 30:4
circumstance
  27:9
circumstances
  25:6,11
Civil 38:15
claim 11:7
claims 7:12
clear 18:1 32:17
clinical 15:17
  15:18 24:10
  29:14 31:18
Code 38:15
come 24:12 27:7
  28:12
comfortable
  13:8
commencing
  4:3
comment 31:2
common 30:2
communication
  33:4
community
  23:25
compensated
  18:4
completely 6:12
compound 9:25
  13:24 31:16
  33:24
compromised
  33:16
computer 37:11
conceded 28:13
concerning
  13:18 17:9
  22:10 25:22
  27:11 28:18
  31:6
concerns 25:25
  26:5
concession
  28:19

conclusion
  11:11 15:11
conclusions
  12:1 15:2,5
  28:17 31:11
  31:14 33:21
  34:1,5,6
condition 17:5
  28:11
conduct 26:8
conducted
  10:14
confident 17:9
  17:12,18,23
  17:24,24
confidential
  1:14 5:9,10
  14:20
confirm 9:1
confirmation
  24:20
connected 37:18
consent 10:18
  11:12 14:6,25
  15:7,9 20:14
  21:11 25:22
  26:13,20 27:3
  31:23 33:1,9
  33:12,18
consider 31:18
considered
  12:12
consult 30:13
consultant
  10:13
consultation
  29:5,12,16
consultations
  34:4
contact 38:18
contained 36:11
  38:15
contemporan...
  27:3
context 7:9

10:20 14:18
  28:23
contexts 10:21
contract 10:23
  11:1,16
control 15:25
  18:15
controlled
  18:17
conversation
  20:11 23:11
conveyed 21:18
  21:21
copy 8:7 34:25
  38:13
correct 5:18,19
  5:21 8:2 20:3
  20:22,23
  21:16 23:21
  23:22 24:23
  24:24 29:21
  36:11 37:12
correcting
  22:24 38:12
corrections 36:9
  38:14
correspond
  9:12
counsel 7:4 8:5
  9:6,16,20,22
  9:24 10:9
  37:20 38:14
  38:24
counsel's 38:13
counter-balan...
  30:6
course 15:13
  29:1 35:2
court 1:1 5:8
  6:16 34:20,20
covered 31:11
  31:12,15
COYNESS 1:4
  38:8
created 25:12

25:13,15 33:8
credentials 20:3
CRR 1:21
CSR 1:21 4:4
  37:24 38:9,23
current 8:13
CV 8:1,7,10,12
  8:14

— D —

D 2:1
dangers 32:7
date 5:22 25:8
dated 25:21
day 24:9 36:13
days 22:23
  34:19 38:17
deal 6:14
dealing 34:2
Dear 38:10
declare 36:7
decompensated
  18:16 24:7
decompensates
  18:25
decompensati...
  12:14
deduce 25:8
defect 22:24
defendant 1:8
  3:11 4:9 5:6
Defendant's 2:8
  6:18 9:3 25:1
defense 7:18
  11:5,6
deletions 36:9
delusions 28:1
depending 27:9
depo 34:10
deposed 6:20
deposition 1:12
  2:3 4:2 34:15
  35:4 37:3,5,7
  37:12,14 38:9
  38:11,15,16

38:18
depositions 6:5
  6:11
describe 20:15
description 19:6
  33:1
designate 5:9
desirous 36:10
destabilized
  24:14
detail 27:9,19
determine
  11:11,15 13:1
  14:15
determining
  12:20
diagnoses 15:14
  15:16
diagnosing
  13:10
diagnosis 14:3
Diagnostic
  27:20
different 6:6
  8:12 10:21
  15:8 34:3
difficult 13:6
directed 38:16
direction 37:10
directly 19:8
Disclosure 2:9
  7:24
discuss 23:12
discussed 20:7
  20:22 21:1,13
  31:20
discussing
  20:24
discussion
  16:20 22:9
discussions 16:5
  16:7
disinterested
  37:9
dispute 10:23

2

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

disputed 26:23
26:24 27:1
disruptive
18:13
distinguish
27:22
distressed 15:17
DISTRICT 1:1
1:2
disturbed 15:17
doctor 18:18
19:10,17
21:12 23:7
25:25 27:7
doctors 19:18
19:20
doctor's 18:12
19:15 24:4
26:2
document 7:25
9:9 25:12,16
26:10 27:3
documentation
23:10
documented
32:2,11 33:5
33:13,19
documents 2:10
8:23,25 9:7,14
9:16,19,23,24
10:2,8 24:19
25:21 28:12
dose 30:9
dozen 10:15
Dr 7:21 13:16
13:20 14:2,3
16:6,7,9 20:6
20:11,22
25:15,22
27:11,14
28:13,18
33:14 34:16
38:10
drafts 8:4
driver 19:10

**E**

DSM4 27:19
duly 4:10 5:2
37:3,8

E 2:1 3:1,1,5
eight 6:9
either 27:21
30:8
elderly 29:13
elective 23:1
element 16:18
eligible 8:17
Eltanal 2:6 3:13
5:4,5,5 6:10
6:20 8:21 9:5
9:10,15 10:7
12:25 13:8,15
14:5,12 15:1
16:25 17:13
19:1 20:1,4
21:9,23,25
23:9,18 24:25
25:3,20 26:7
26:19 27:10
28:3,25 31:4,8
31:10,21
32:24 33:20
34:7,13,23
eltanal@km...
3:17
EMBLIDGE
3:4
emergency 22:4
22:16,18,22
enclosing 2:10
ends 9:11
Ennix 1:4 7:21
13:16,20 14:2
16:6,7,9 20:6
20:22 25:15
25:22 27:11
28:13 38:8
Ennix's 20:11
28:18

entailed 14:24
entire 8:23 9:2
equilibrium
30:15
equipment
30:23
established
32:10
ethical 26:8
evaluation
28:14,19
evaluations
10:2 29:2
event 26:13
evidence 13:24
21:5 25:18
31:22
exactly 20:2
21:17
examination 2:5
5:4 10:4 29:8
examinations
6:5 15:21
examined 4:10
examining 29:8
EXECUTED
36:13
Exhibit 6:18
7:23,25 9:3
25:1
exhibits 2:8 5:9
exist 31:22
experience
10:13 13:21
19:13 23:25
24:10 26:12
27:24 34:2,6
expert 2:9 5:14
5:18 7:23
10:13
expertise 13:2
explain 7:9 19:2
27:15
explained 32:18
explicitly 33:19

expressed 22:13
extent 17:24

**F**

facilities 19:13
19:20 24:8
fact 14:23 23:3
facts 13:23
25:17
factual 20:13
24:16,18
29:23
familiar 29:1
fantasy 27:23
far 6:8 31:13
February 1:13
4:2 24:21 25:9
25:21 28:3
31:21 33:7
37:22 38:5,9
fee 6:2,4,6
feel 11:25 13:8
feels 34:18
felt 18:17,21
Ferguson 14:3
27:14 32:12
Ferguson's
33:14
file 9:2,16
files 10:8
find 27:19
findings 29:14
finished 21:23
firm 10:5
first 4:10 20:5
22:20,23,24
31:25 32:22
33:18
five 25:21
follows 5:2
foregoing 36:8
36:10 37:3
forensic 8:19
former 25:22
forth 4:11

forward 16:1
found 24:21
four 7:10,19
17:15
Francisco 3:7
3:15,21 38:7
frequetly 30:12
Friday 4:2
38:19
front 34:20
full 5:12 20:5
fully 17:23
24:13
function 24:2
functional 28:7
functioning
18:23,24
further 34:7
37:17
Furthermore
18:19

**G**

general 12:7,8
15:9 20:14
24:6 27:20
30:3
generally 9:9,10
give 14:24 15:7
15:9 17:4
given 9:20
12:10 19:6
33:2 37:11
gives 20:14
go 6:15 9:13
16:1 18:18
22:6,20 24:3
30:1
goes 34:5,6
going 6:15 8:25
14:23 20:15
25:25
good 18:8 24:12
28:14,20
gotten 30:13

3

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**ground** 31:13
**guess** 26:23
**G0001** 2:11
**G1391** 2:11

_____
**H**

**hallucination**
28:1
**hand** 37:22
**happen** 22:21
**happened** 26:10
26:11
**happy** 22:7
**harassment**
7:13
**health** 13:18,22
16:15
**heart** 13:10
**help** 25:14
**helpful** 17:2
**hereinafter** 4:11
**hereunto** 37:21
**Highway** 1:24
38:2
**Historically**
15:23
**history** 12:5
**homes** 24:1 34:3
**honestly** 14:11
**hospital** 11:13
11:17 26:20
30:23 33:16
**hospitals** 34:4
**hour** 4:3 6:4,5
**hours** 6:7,9
38:19
**hundred** 6:24
**hypothetical**
12:23 13:12
13:25 28:21
30:25

_____
**I**

**idea** 14:24 19:9
20:10,12,13

21:1 25:12
28:14,20
30:10
**ideal** 32:14
**ideation** 28:2
**identification**
6:19 9:4 25:2
**identity** 19:23
19:25
**illness** 10:24
24:3 28:1
**illustrating**
28:13
**imagine** 26:24
**implicit** 24:19
**implicitly** 32:12
**important**
16:18 27:2,5,8
30:5
**importantly**
18:7
**impossible**
28:10
**impression**
31:19
**inability** 27:22
**inaccuracies** 8:9
**include** 11:17
**incomplete**
12:22 13:11
13:24 28:21
30:24
**indicate** 29:6
**indicated** 12:11
14:4 22:4 32:8
**indicates** 22:17
27:7
**indicating** 9:6
**individual** 11:8
11:12 12:20
13:10 19:23
23:12
**individual's**
11:18 14:7
17:1 28:5

**information**
32:18 34:5
**informed** 10:18
11:1,12 14:6
17:14 20:14
21:11 22:5
26:13 27:3
31:23 33:1,9
33:12,18
**inherent** 32:7
**instance** 19:22
**instant** 12:14
**interested** 37:17
**interview** 29:8
**investigation**
28:23
**involve** 10:17
14:7 33:1
**involved** 15:24
30:17,22
**involves** 10:3
**involving** 7:11
**issue** 10:17

_____
**J**

**January** 5:25
5:25 25:9
**Jessie** 2:12
**JR** 1:4 38:8

_____
**K**

**KAUFF** 3:12,19
**kind** 10:3 18:22
24:19 33:17
**knew** 18:10,17
23:4 24:16
33:15
**know** 10:24
15:16,20 17:8
19:12 20:2
21:8,17 24:12
25:10,19
26:18 27:6,18
32:4
**knowing** 24:2

**knowledge** 13:2
24:16,18
29:23
**known** 18:2

_____
**L**

**L** 1:4,21 4:4
37:24 38:8,9
38:22
**labels** 9:1
**lacking** 31:23
31:24 33:9
**largely** 23:24
**law** 3:5,13 10:5
**Leaahy** 38:10
**Leahy** 1:12 2:3
4:7 5:1,13
34:16 36:21
38:6
**leave** 32:14
**legal** 14:8,9
**lengthy** 27:19
**letter** 2:10,12
9:5 24:21 25:3
25:7 28:4,7,9
31:22 33:7,7
**level** 13:1
**levels** 30:5,14
**life** 24:4
**likes** 32:4
**limitation** 23:4
**limitations**
24:17
**list** 15:4
**little** 16:23
**long** 12:5 20:17
**Longer** 7:18
**look** 6:15 9:8
19:7 20:4,5
22:6
**looks** 15:13
**lot** 18:18 31:12
**lower** 30:9

**L0001** 9:7,11
**L0001-L0657**
2:11
**L0657** 9:7,11

_____
**M**

**M** 1:12 2:3 4:7
5:1 36:21 38:6
**main** 26:23
**maintain** 30:5
**major** 27:21
**making** 7:12
11:1 14:3
22:25 23:18
36:10
**man** 18:3
**Manual** 27:20
**Margo** 1:12 2:3
4:7 5:1,13
36:21 38:6
**mark** 6:10,16
8:24 34:9
**marked** 2:8
6:18 7:23 9:3
14:19 24:25
25:1
**marking** 8:22
**Mathew** 2:10
**matter** 5:6 6:3,7
9:2 11:20
33:21
**McCLAIN** 3:12
3:19
**McGUIRE** 3:12
3:19
**MDs** 15:23
18:13
**mean** 12:8 13:6
17:25 18:1
19:2,25 32:3
**meaning** 19:17
**means** 27:5
**medical** 1:7
2:13 5:15 12:7

4

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

12:8 17:16
24:5,22 30:19
38:8
medication 18:9
29:19 30:4,14
mental 10:24
13:1,6,18,22
17:5 24:3 28:5
28:8,11
mentally 12:20
mention 12:13
mentioned 9:13
22:15 29:17
mentions 22:1
met 16:12 17:8
17:14
mind 7:17 16:19
17:1 21:15
30:6
misleading
26:16
misstates 21:4
modifications
8:10 34:18
moment 18:13
27:22
Monday 38:19
Montgomer 3:6
months 16:4
morning 31:20
MOSCONE 3:4
multiple 15:19
M.D 1:4,12 2:3
4:7 5:1 36:21
38:6,8

_____

N

N 2:1 3:1
name 5:5,12
14:18 19:25
named 37:6
nature 20:10
21:14
necessary 12:4
34:18

need 16:9 22:5
22:13 32:9
needed 26:18
needs 24:17
never 14:2 16:7
17:14 26:17
26:23,24
new 30:22,23
nonpsychiatrist
15:23
normal 10:2
normally 10:1
22:19
NORTHERN
1:2
notation 22:8
28:18 29:24
32:6,13
note 21:7,11
27:6,10,13
33:14
noted 22:12
Notice 4:1
notify 38:13
numbered 9:7
numbering 6:12
numbers 9:12
nurse 19:11,17
nurses 19:19,21

_____

O

oath 7:1
objection 9:25
12:22 13:4,11
13:23 14:9
16:21 17:11
17:19,21
19:24 21:4,22
23:15 25:17
26:4,15 27:4
27:17 28:21
30:24 31:16
32:20 33:10
33:23
observable

29:14
obtained 26:13
occasion 27:24
occasions 15:19
occurred 26:14
odd 17:3
office 12:13
18:15 38:12
38:13,19,19
Okay 14:21
34:14
ones 8:13 9:13
one's 13:1
oOo 1:3 2:15
3:22 4:13 35:6
opine 30:20
opinion 12:19
13:9,17,20,21
14:6 15:6 17:1
17:4,9,18 23:5
23:18,19,23
23:24 24:23
26:7 28:25
29:22 31:5,19
33:6
opinions 12:1
14:13 15:2,4
28:17 31:11
31:14 33:21
opportunity
37:12,15
order 1:15 5:10
6:16 29:11,15
original 38:11
38:16,18
outcome 37:18
outlined 21:13
overseen 19:20

_____

P

P 3:1,1
page 2:5 20:4
23:2
paragraph 20:6
paranoid 28:1

parents 26:21
part 32:16
participate
24:13
particularly
24:9
parties 37:19
patient 11:21
13:18,22 14:3
14:17 16:12
16:12,16
17:14 18:17
18:20 20:8,11
20:15,22 22:5
22:9,14 23:5
23:13,20
24:17,22 26:1
26:2,10 27:7
27:12,21 28:4
28:6,9 29:18
30:1,4,4 32:5
32:8 33:2,8,15
33:16
patients 15:12
15:24 18:14
25:22 29:1,4
patient's 12:16
30:15
penalty 36:7
people 30:2
performed 26:1
performing
28:15 32:19
perjury 36:8
person 10:23
11:15 12:4
16:2,20 17:2
19:4,25 20:1
29:9 37:9
personally 4:4
Phone 1:25 38:3
physician 26:12
29:15
pile 9:13
place 5:11 17:15

20:16,16
21:20,22 22:1
37:6
plaintiff 1:5 3:3
7:21 10:3
14:16,16
plaintiff's 2:9
5:20 7:3,11,23
8:5 9:6,16,20
9:22,24 10:9
plan 15:21
please 5:12 35:3
38:13,18
plus 6:24
point 13:15 17:5
17:6,8 21:20
29:18
positive 29:14
Post 3:14,20
postoperative
29:24
postoperatively
30:2,10
practice 8:16
26:20
PREFERRED
1:23 38:1
preliminary 5:7
prepared 25:7,8
38:12
presence 29:7
present 20:6
31:25
presentation
15:18,19
23:12
presented 12:5
president 2:13
24:22
presume 33:17
presumes 15:25
21:17 28:6
presuming
18:16 20:19
20:20 25:13

5

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

32:25
presumption 24:11
presumptions 33:22
pretty 21:15 22:21
previous 30:14
prior 7:20 22:9 23:13 26:2 28:15 29:2,5
probably 10:15 10:22
problem 13:10
procedure 14:25 15:10 16:2 17:14 19:6 20:15 21:12 22:23 22:24,24 23:1 27:14 31:3 38:15
procedures 15:21 25:23 30:23
proceed 20:9
proceedings 1:14 14:8,10
production 9:17
protective 1:15 5:10
provide 5:14,18 9:24 11:10
provided 7:3 8:4,21 9:15 11:12,20 32:18
providing 13:9
psychiatric 8:19 11:18,19,20 15:12,24 19:19 28:14 28:19 29:2,4,5 29:12,15 30:3 30:4,13

psychiatrically 15:15
psychiatrist 7:12 12:17 13:17 34:2
psychiatrists 15:15 18:14
psychiatry 8:18
psychoanalyst 8:18
psychological 11:18 12:14 17:5
psychologist 12:17 13:16
psychotic 18:12
pursuant 1:15 4:1
put 6:15

_____
Q
QUADRA 3:4
question 10:25 11:21 13:5,19 16:13 17:3,22 23:17 32:15 32:21 33:23
questions 20:8 21:13 22:2 34:8
quickly 22:21
quite 16:22
quoting 19:3

_____
R
R 3:1
reached 27:12
read 30:19 31:17 36:8 37:12
reading 21:15 38:12
readvised 32:6
reality 27:22
really 9:13 14:2

20:25 31:1
realm 13:2
reason 29:6,22
reasons 15:11 20:16
recall 5:16 7:8 21:10 28:16 31:15
received 10:8,11
Recess 31:9
recollect 22:11
record 5:9 6:4 8:23 10:4,14 12:6,7,8,16 17:25 19:4 20:21 21:15 21:18,19 22:16 23:11 29:25 31:18 32:5 34:9 37:7
records 8:22 9:2 10:5 11:14,17 11:18,19,21 11:23,25 12:10 17:16 18:3 30:19
recovery 20:18
refer 19:1 20:24
reference 8:25 23:2
referenced 24:20 29:18 29:19
references 8:1 27:14
referred 32:12
referring 12:9 25:4 32:22
reflected 12:7
reflecting 27:3
regard 13:7 17:12,13 26:6
regarding 28:22 38:15
regimen 18:9

regular 35:2
related 37:19
relationship 7:20 18:22
relevant 12:1 17:8
relied 9:19 10:4
reluctant 31:2
relying 13:17 17:15
remember 7:10 7:13,16,18 10:10,10,15 10:22 14:11 14:11 32:15
REMEMBER... 4:1
remission 18:5
render 13:21 14:13 31:5
rendered 14:6 15:1 17:10 31:12
rendering 16:25 24:22
rephrase 16:24
report 8:1,5 20:5 22:17 23:2 29:17
reported 1:20 37:8 38:9
reporter 5:8 34:25 37:1,9
REPORTERS 1:23,23 38:1,1
representing 5:6
request 9:23 10:1 11:23 16:10
reserve 34:16
residents 19:15
residing 19:14
respective 37:20
response 8:22

restated 32:9
restored 30:14 30:15
retained 5:14,17 5:20 9:22 11:4 11:5,6
retention 5:22
review 6:4 10:4 10:14 34:17 38:13,18
reviewed 10:6 28:13
reviewing 28:3
right 34:16,19 34:21
rights 38:15
risk 30:7,7,8
risks 20:7,17,25 21:1,13,25 22:10 32:7,8
rock-and-roll 10:23
Rossana 3:13 5:5
roughly 20:16
routinely 29:5 29:15
RPR 1:21 4:4
rule 24:6

_____
S
S 3:1,13
San 3:7,15,21 38:7
Sandra 1:21 4:3 37:24 38:9,22
saying 16:23
says 18:18 20:6
schizophrenia 11:3 12:6 27:16
schizophrenic 18:25 29:12
schizophrenics 18:2,3 24:1

6

34:3
scope 14:12
sealed 38:16
second 21:19
  22:5,9,13,17
  27:11 29:25
  32:1,10,23,24
  32:25 33:3,15
Section 38:16
see 23:7 26:9
  32:4,11
seeing 10:3
  18:20 21:10
seen 12:13,16
  18:2,2,5 28:18
  32:5
send 10:5 19:14
sense 18:21
sent 10:12
sequential 6:13
  6:16
serious 24:3
services 6:3 7:3
set 4:11 37:21
sexual 7:12,13
shape 24:12
short 11:10
shorthand 1:23
  37:9 38:1
show 9:10
side 11:5,6
sign 37:16
signature 37:13
  37:16 38:15
signed 11:16
  28:10
signing 11:2
  38:12
similar 33:17
simply 19:10
  22:12 28:10
Sincerely 38:20
single 9:9
sitting 22:11
  26:24

situation 22:16
  24:15
situations 10:17
sketchy 32:1,3
skipping 7:17
  38:6
someone's
  16:19 17:4
somewhat 13:15
  22:22 33:16
Sonoma 1:24,24
  38:2,2
sorry 17:20
  21:24 23:17
sort 12:14 20:18
  24:5 28:2
  29:11
speak 16:10
  17:2
special 8:15
specialize 8:15
specific 9:23
  10:1 19:5
  20:13 31:3
specifically
  22:12
specifics 7:14
spelled 21:7,11
  22:21
spells 20:21
spent 6:7
spoke 20:19
stability 12:6
stable 16:2
stack 8:23
staff 2:13 19:15
  19:17,18
  24:22
stamped 2:11
standard 21:15
  29:1 31:5
star 10:24
starts 9:11
state 5:12 16:19
  17:1 33:17
  34:20

statement 34:15
statements 5:7
STATES 1:1
Statistical 27:20
Street 3:6,14,20
  38:6
subpoena 8:22
  9:6
subscribe 37:13
substance 20:10
substantiation
  20:13
subtle 18:24
sufficient 29:20
Suite 1:24 3:6
  3:14,20 38:2
summary 11:10
Summit 1:7
  2:13 5:15 38:8
supportive 28:7
supports 23:5
  23:19
supposed 6:13
sure 14:1 16:22
  23:14,16
  31:10
surgeon 30:9,18
  32:2,5,7,19
  33:3
surgeon's 30:6
surgeries 29:3,6
surgery 12:12
  14:23,24 15:7
  15:22 18:8
  21:19 22:6,9
  22:13,17,18
  22:20 23:13
  26:1 27:11
  28:15 29:25
  30:7,7,17,21
  31:6,25 32:1,9
  32:10,19,21
  32:24,25 33:3
  33:15,18
surgical 31:2,3

surrounding
  25:6
sustained 27:23
Sweet 2:10 3:5
  6:11 9:8,25
  12:22 13:4,11
  13:23 14:9,19
  16:21 17:11
  17:19,21
  19:24 21:4,22
  21:24 23:7,15
  25:17 26:4,15
  27:4,17 28:21
  30:24 31:16
  32:20 33:10
  33:23 34:11
  34:14,24 35:2
sweet@meqla...
  3:9
sworn 4:10 5:2
  37:3
symptomatol...
  29:7
symptoms
  27:15,18,25

T
take 20:16,17
  26:22 31:8
taken 3:19 6:11
  24:4,9 31:9
  37:6 38:9,11
talk 16:9,15
talked 17:7
talking 29:10
technicians
  19:19
tell 14:12 18:23
  18:24
tend 15:23 29:4
term 19:2 32:3
terms 30:7
testified 4:10
  5:2
testify 37:3

testimony 5:15
  5:18 6:6,25
  21:5 36:11
  37:7
Thank 34:24
thing 20:18
  26:23 28:2
  29:11 30:11
things 10:12
  15:8,13 19:12
  20:24
think 7:8 12:4
  14:4 16:3 17:2
  17:3 18:19,20
  19:3 21:6 27:2
  27:6,9 28:24
  30:6 32:13
  33:11,12 34:1
  34:7,23
thinking 26:25
  30:10
thought 14:2
three 23:2
time 8:10 11:2
  12:7,15 18:6
  20:18 27:22
  27:23 28:5
  31:15 33:3
  34:9 37:6
times 6:23,24
  7:6,7,8
  10:14,15 18:5
  18:7
timing 28:22
today 6:14
told 23:6,21
tolerate 16:2
touch 29:9
training 13:21
transcribed
  37:10
transcript 34:17
  35:1 36:8,11
  38:11,16,18
treatment 26:21

7

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

26:22 27:8
treatments
24:14
trial 6:6
true 16:3 36:10
37:7
truth 37:4,4,4
two 7:7,7,8 20:4
type 19:25 20:1
30:16
typewriting
37:11

**U**

Uhm-hum 8:3
ultimately
15:21
uncommon 22:3
30:11
uncooperative
29:11
undergo 15:20
24:13
undergoing
29:2
undersigned
36:7
understand
6:25 11:16
14:8 15:7 21:1
23:16 29:9
30:19
understanding
14:22 16:19
23:6,20 30:16
understood
11:2
undertaken
21:12
unethical 26:9
union 8:18
UNITED 1:1
unstable 24:7
urgent 22:22
usually 18:13

19:14,18,19
21:11 30:5

**V**

vague 13:5,11
13:24 14:9
16:21,23
17:19,21
19:24 21:14
21:22 23:15
26:4,15 27:4
27:17 30:24
31:16 32:20
32:21 33:10
33:23
validate 26:2
Vandall 2:10
varies 27:9
verbal 26:21,22
versions 8:4,12
voluminous
11:13
vs 1:6 38:8

**W**

waived 37:16
want 6:17 7:7
15:24 18:14
31:10 34:25
wanted 10:5,11
wasn't 13:18
17:25 21:23
32:11
way 10:2 28:4
Webster 38:6
went 18:8
we're 6:12
34:23
we've 31:11,12
WHA 1:6
WHEREOF
37:21
willing 15:25
wish 38:13,14
38:18

within-entitled
37:5
witness 2:9 4:9
7:24 9:12 10:1
12:24 13:5,13
14:1,21 16:22
17:12,20,23
20:2 21:6 23:8
23:16 25:19
26:5,17 27:6
27:18 28:24
31:1,17 32:22
33:11,25 36:3
37:2,11,13,14
37:21
witness's 37:7
woman 7:11
words 24:18
workup 19:7
wouldn't 13:14
17:7 29:15
31:24 33:25
write 28:9
writes 21:17
written 24:19
26:25 27:2
wrote 28:6

**X**

X 2:1

**Y**

Yeah 34:13
year 26:1,13
years 7:11,19
8:13 10:16
11:14 17:15
18:20 23:25
34:1,6
yesterday 6:14

**$**

$400 6:4

**0**

07-2486 1:6

**1**

1 2:9 6:18 7:23
10:07 35:5
112 1:24 38:2
16th 5:25
18 28:3
18th 24:21
25:21 31:21
33:7
1902 38:6
19229 1:24 38:2
1970s 10:23
11:7

**2**

2 2:10 9:3
2/18/05 2:12
2/27/08 2:10
2001 18:21
2005 24:21 25:9
25:21 28:4
31:21
2008 1:13 4:2
5:24 37:22
38:5,9
2025.520 38:16
2100 3:6
220 3:6
25 2:13
2600 3:14,20
29 1:13 4:2 38:9

**3**

3 2:12 25:1
30 34:18
31st 21:20
35 38:16
362-3599 3:8

**4**

415 3:8,16
421-3111 3:16
450 6:5

**5**

5 2:6 37:22 38:5
5:00 38:19

**6**

6 2:9

**7**

7062 1:21 4:4
37:24 38:9,23
707 1:25 38:3

**9**

9 2:11
9:00 38:19
9:07 4:3
938-9227 1:25
38:3
94104 3:7,15,21
94115 38:7
95476 1:24 38:2

8

**EXHIBIT 1**

G. SCOTT EMBLIDGE, State Bar No. 121613
RACHEL J. SATER, State Bar No. 147976
ANDREW E. SWEET, State Bar No. 160870
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:     (415) 362-3599
Facsimile:     (415) 362-2006

Attorneys for Plaintiff Coyness L. Ennix Jr., M.D.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COYNESS L. ENNIX JR., M.D., | Case No. C 07-2486 WHA |
| Plaintiff, | **PLAINTIFF'S EXPERT WITNESS DISCLOSURE** |
| vs. | |
| ALTA BATES SUMMIT MEDICAL CENTER, | |
| Defendant. | |

Plaintiff Coyness L. Ennix Jr., M.D. submits the following expert witness disclosure pursuant to Rule 26 of the Federal Rules of Civil Procedure and the Joint Stipulation and Order to Enlarge Time for Disclosure of Expert Reports of (1) Cardiac Surgeon Experts and (2) Statistician Experts ("the Order"). Dr. Ennix reserves the right to supplement and/or amend these disclosures and attached reports.

I.    **EXPERTS WINESSES THAT PLAINTIFF MAY USE TO SUPPORT HIS CLAIMS.**

1.    William S. Weintraub, MD, FACC, FAHA, Cardiology Section Chief at Christiana Care Health System in Newark, Delaware; Director of the Christiana Care Center for Outcomes Research, to testify regarding statistical issues. (302-733-1200; Christiana Care

1

1 Health System, 4755 Ogletown-Stanton Rd. Newark, Delaware, 19718.) Dr. Weintraub's report

2 will be served on February 8, 2002, in accordance with the Order.

3       2.    Alex Zapolanski, M.D., Director of Cardiac Surgery, Valley Columbia Heart

4 Center, to testify regarding cardiac surgery standard of care issues and the validity of the NMA's

5 criticisms of Dr. Ennix. (201-251-3286; Valley Columbia Heart Center, 223 North Ban Dien

6 Ave., Richwood, NJ, 07450.) Dr. Zapolanski's report will be served on February 8, 2008 in

7 accordance with the Order.

8       3.    Eugene Spiritus, M.D., Chief Medical Officer, University of California, Irvine

9 Medical Center, to testify regarding peer review issues. (714-456-6844; 333 City Blvd. West,

10 Suite 1810, Orange, California 92868.) Dr. Spiritus' report is attached hereto as Exhibit A.

11       4.    Margo M. Leahy, M.D. to testify regarding whether Dr. Ennix obtained informed

12 consent relating to the schizophrenic patient defendant has identified as ABS-001. (415-929-

13 7789; 1902 Webster Street, San Francisco, California 94115.) Dr. Leahy's report is attached

14 hereto as Exhibit B.

15       5.    Jed Greene, CPA, CMA, Director, Forensic and Litigation Consulting, FTI

16 Consulting, Inc. FTI Consulting, to testify regarding damages issues. (415.283.4221; One Front

17 Street, Suite 1600, San Francisco, CA 94111.) Mr. Greene's report is attached hereto as

18 Exhibit C.

19

20 **II.    NONRETAINED EXPERTS WINESSES THAT PLAINTIFF MAY USE TO SUPPORT HIS CLAIMS.**

21     Plaintiff designates the following non-retained experts who may present expert testimony

22 at trial.

23

24       1.    Howard Barkan, DrPH. Plaintiff has already produced a report and contact

25 information for this expert.

26       2.    Richard Shaw, PhD. Plaintiff has already produced a report and contact

27 information for this expert.

28

1    3.    Dr. Bruce Reitz. Plaintiff has already produced a report and contact information

2  for this expert.

3    4.    Dr. John Rea. Plaintiff has already produced a report and contact information for

4  this expert.

5    5.    Dr. Jon Walkes. Plaintiff has already produced a report and contact information

6  for this expert.

7    6.    Dr. Bruce Lytle. Plaintiff has already produced a report and contact information

8  for this expert.

9    7.    Dr. Forrest Junod, to testify as to the systemic issues at Alta Bates Campus and

10  any other issues or investigation that lead to the Junod Report.

11    8.    Dr. Noli Silva, to testify as to the systemic issues at Alta Bates Campus that lead

12  to Junod Report, Dr. Ennix's performance on cases during which Dr. Silva was present, and her

13  experience relating to peer reviews of other non-white and white physicians at ABSMC.

14    9.    Dr. Ron Dritz, to testify as to the systemic issues at Alta Bates Campus that lead

15  to Junod Report, his experience relating to peer reviews of other non-white and white physicians

16  at ABSMC, his involvement with the peer review process, and Dr. Ennix's surgical skill and

17  competence.

18    10.    Dr. Maura Daugherty, to testify as to Dr. Ennix's surgical skill and competence,

19  her involvement with the peer review process, her experience relating to peer reviews of other

20  non-white and white physicians at ABSMC, and the assessment of Dr. Ennix's performance in

21  cases where Dr. Daugherty was present.

22    11.    Dr. Emily Reinys, to testify as to Dr. Ennix's skill and competence, her

23  involvement with the peer review process, and her experience relating to peer reviews of other

24  non-white and white physicians at ABSMC.

25    12.    Dr. Joe Bermudas, to testify as to his involvement with the peer review process,

26  his experience relating to peer reviews of other non-white and white physicians at ABSMC and

27  Dr. Ennix's skill and competence.

28

3

1    13.    Dr. Terry Daugherty to testify as to his involvement with the peer review process,

2    his experience relating to peer reviews of other non-white and white physicians at ABSMC and

3    Dr. Ennix's skill and competence

4    14.    Dr. Joe Wong, to testify as to his involvement with the peer review process, his

5    experience relating to peer reviews of other non-white and white physicians at ABSMC and Dr.

6    Ennix's skill and competence.

7    15.    Dr. Hon Lee, to testify as to his assessment of Dr. Ennix's four minimally

8    invasive cases, his involvement in the peer review process, his assessment of Dr. Ennix's

9    competence and skill, the proctorship process, communications with ABSMC regarding that

10    process, the decision to initiate a second peer review of the ten cases, his assessment of any or all

11    of the ten cases and his experience relating to peer reviews of other non-white and white

12    physicians at ABSMC.  His reports regarding Dr. Ennix's cases are in defendant's possession.

13    16.    Dr. Junaid Khan, to testify as to the assessment of the ten cases, his involvement

14    in the peer review process, communications between him and any of the individual defendants

15    regarding Dr. Ennix's peer review, his experience relating to peer reviews of other non-white and

16    white physicians at ABSMC and his assessment of Dr. Ennix's competence and skill.  Dr.

17    Khan's letter regarding Dr. Ennix's performance is in defendant's possession.

18    17.    Dr. Rollington Fergerson, to testify as to the assessment of any or all of Dr.

19    Ennix's four minimally invasive cases, and his experience relating to peer reviews of other non-

20    white and white physicians at ABSMC.

21    18.    Dr. Dhun Sethna, to testify as to the assessment of any or all of Dr. Ennix's four

22    minimally invasive cases and any or all of the ten cases, and his experience relating to peer

23    reviews of other non-white and white physicians at ABSMC.

24    19.    Dr. Dennis Drew, to testify as to the six additional cases subject to a second peer

25    review and Dr. Ennix's skill and competence regarding those cases, and his experience relating

26    to peer reviews of other non-white and white physicians at ABSMC.

27

28

4

20.    Dr. Gregory Quinn, to testify as to the six additional cases subject to a second peer review and Dr. Ennix's skill and competence regarding those cases, and his experience relating to peer reviews of other non-white and white physicians at ABSMC.

21.    Dr. General Hilliard, to testify as to the six additional cases subject to a second peer review and Dr. Ennix's skill and competence regarding those cases, and his experience relating to peer reviews of other non-white and white physicians at ABSMC.

22.    Dr. Paul Ludemere, to testify as to the six additional cases subject to a second peer review and Dr. Ennix's skill and competence regarding those cases, and his experience relating to peer reviews of other non-white and white physicians at ABSMC.

23.    Dr. Gary Woodworth, to testify as to the six additional cases subject to a second peer review and Dr. Ennix's skill and competence regarding those cases, and his experience relating to peer reviews of other non-white and white physicians at ABSMC.

24.    Dr. Bob Gwynn, to testify as to the six additional cases subject to a second peer review and Dr. Ennix's skill and competence regarding those cases, and his experience relating to peer reviews of other non-white and white physicians at ABSMC.

25.    Joan Shields, RN, to testify as to fact that Dr. Ennix adequately attended to patient in question on May 5, 2005.

26.    Carolyn Wong, RN, to testify as to fact that Dr. Ennix adequately attended to patient in question on May 5, 2005.

27.    Margaret C. Tavare, RN, to testify as to fact that Dr. Ennix adequately attended to patient in question on May 5, 2005.

28.    Dr. Brian Cain, to testify as to the proctorship process, communications with ABSMC regarding that process, his assessment of Dr. Ennix's surgical skill and competence and his experience relating to peer reviews of other non-white and white physicians at ABSMC.

29.    Dr. Dennis Durzinsky, to testify as to the proctorship process, communications with ABSMC regarding that process, his assessment of Dr. Ennix's surgical skill and competence and his experience relating to peer reviews of other non-white and white physicians at ABSMC.

5

1    30.    Dr. David Alyono, to testify as to the proctorship process, communications with

2  ABSMC regarding that process, his assessment of Dr. Ennix's surgical skill and competence and

3  his experience relating to peer reviews of other non-white and white physicians at ABSMC.

4    31.    Dr. John Jones, to testify as to the proctorship process, communications with

5  ABSMC regarding that process, his assessment of Dr. Ennix's surgical skill and competence and

6  his experience relating to peer reviews of other non-white and white physicians at ABSMC.

7    32.    Dr. Thomas Gonda, to testify as to the proctorship process, communications with

8  ABSMC regarding that process, his assessment of Dr. Ennix's surgical skill and competence and

9  his experience relating to peer reviews of other non-white and white physicians at ABSMC.

10    33.    Dr. Coyness L. Ennix, Jr., to testify to all aspects of the peer review process and

11  his allegations in the complaint, the facts surrounding the cases for which he was criticized, the

12  damages suffered as a result of the peer review, his agreements with his former business

13  partners, and his experiences of peer reviews of other non-white and white physicians at

14  ABSMC.

15

16  Dated:   January 25, 2008                    MOSCONE, EMBLIDGE & QUADRA, LLP

17

18

19                                                 By:

20                                                       G. Scott Emblidge
                                                         Rachel J. Sater
                                                         Andrew E. Sweet

21                                                 Attorneys for Coyness L. Ennix Jr., M.D.

22

23

24

25

26

27

28

6

**PROOF OF SERVICE**
Case No. C 07-2486 WHA

I, Omar Lateef, declare as follows:

I am a citizen of the United States, over the age of eighteen years and not a party to the within entitled action.

On December 21, 2007, I served the attached:

- **PLAINTIFF'S EXPERT WITNESS DISCLOSURE**

on the interested party(ies) named below:

Maureen E. McClain
Alex Hernaez
Matthew P. Vandall
Kauff McClain & McGuire LLP
One Post Street, Suite 2600
San Francisco, California 94104

I served the attached document(s) in the manner indicated below:

☒    **BY PERSONAL SERVICE:** I caused true and correct copies of the above documents to be placed and sealed in envelope(s) addressed to the addressee(s) and I caused such envelope(s) to be delivered by hand on the office(s) of the addressee(s).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed December 21, 2007, at San Francisco, California.

_____
Omar Lateef

1

**EXHIBIT B**

*Margo M. Leahy, M.D.*

1902 WEBSTER STREET
SAN FRANCISCO, CA. 94115

TEL (415) 929-7789    FAX (415) 366-1278

January 22, 2008

## Independent Record Review: Psychiatric

Coyness L. Ennix, Jr., M.D. v. Alta Bates Summit Medical Center
Case No. C 07 -2486
United States District Court, Northern District of California

### Identifying Information:

I am a psychiatrist with Board Certification in Psychiatry & Neurology. I graduated from the University of Maryland School of Medicine in 1973, and have been licensed in the State of California since 1974 (G 28374). I completed my psychiatric training at Stanford University Medical Center from 1974-1978. I am currently an Associate Clinical Professor at the University of California San Francisco and have a full-time private practice in San Francisco (complete CV attached). Over the past thirty years I have conducted several hundred psychiatric examinations involving a variety of issues in civil litigation. I have also been deposed in some of these cases and testified in trial in others (list of cases over past four years attached).

I was contacted by Mr. Emblidge in early January 2008 to review records in the above referenced legal case. More specifically, I was asked to review the medical records of a particular patient, ABS-001, who had been a patient of the plaintiff, Dr. Ennix. This man had suffered with schizophrenia for many years and had been hospitalized on numerous occasions. He was living in a board and care facility at the time of the surgery. The issue I was requested to address was whether or not the patient was capable of adequately understanding what had been told to him by Dr. Ennix when he obtained informed consent for the surgery.

### Records Reviewed:

1.  National Medical Audit Documents. These included a review of ten clinical cases of Dr. Ennix involving cardiothoracic surgery. ABS-001 was one of the cases.

2. Correspondence from Drs. Paxton and Isenberg as representatives of the Ad Hoc committee of Summit Medical Center to Dr. Smithline re: an outside review of Dr. Ennix's cases by Mercer Human Resource Consulting, Inc.
3. Meeting minutes of 2/9/04 of the Summit Surgery Department.
4. Correspondence from Dr. Ennix to Dr. Paxton re: Mercer findings.
5. Confidentiality Stipulation and Protective Order.
6. Correspondence from patient to President of Summit Medical Center dated February 18, 2005 re: his medical care by Dr. Ennix.
7. Summit Medical Center records for patient including previous hospitalization for cardiac catheterization.

### Review of Medical Records of Patient ABS-001:

Issue of Informed Consent

Patient ABS-001 was admitted to Summit Medical Center on 1/28/04 with aortic insufficiency for the purpose of a minimally invasive surgical correction of his aortic valve problem. His care was provided by Dr. Rollington Ferguson as his admitting physician and cardiologist, and by Dr. Coyness Ennix as his cardiothoracic surgeon. The admission note was written on 1/28/04 by Dr. Ferguson, and makes specific mention of the patient's psychiatric history, brief observation of mental state, and intention to manage psychiatric illness during the hospitalization. Also on 1/28/04, Dr. Ennix and Dr. Brun examined the patient and dictated an admission note. In this note, it is similarly observed that the patient suffered from schizophrenia. It further mentions, in the last section entitled "Assessment" that Dr. Ennix had discussed the planned surgical procedure with the patient and his representative from the board and care facility where the patient resided. Specifically, it is noted "Coyness L. Ennix, Jr., M.D. was present and discussed the risks and benefits and alternatives, and all questions were answered. The patient agrees to proceed."

As the medical records indicate, the patient underwent an aortic valve replacement on 1/28/04 but suffered multiple post-operative complications necessitating a second surgery on 1/31/04 to replace the first valve. A progress note in the chart dated 1/31/04 authored by Dr. Ferguson indicates that the patient was informed of the need for the second surgery, and that Dr. Ferguson discussed this with him and that he agreed. Although Dr. Ennix did not sign this note, nor generate his own at this time, the patient subsequently confirmed that he was present and explained the second procedure to him with Dr. Ferguson. This confirmation can be found in the February 18, 2005 letter from the patient to the Medical Staff President of Summit Medical Center. The patient states quite clearly: "Sometime after the operation Dr. Ferguson, the cardiologist, and Dr. Ennix told me that the new valve needed to be replaced because it wasn't working well. I was afraid but Dr. Ennix explained it to me in detail and I understood that there were some risks. I understood that I needed the second operation and I agreed to it. I also understood that the first operation might need to be longer because of the smaller incision."

2

## Issue of Schizophrenia and Ability to Understand:

The records reflect that the patient had suffered from Schizophrenia since the age of sixteen years. He had been hospitalized many times, and had been living in a board and care facility for many years. He was managed on a variety of psychiatric medications and was on disability. He was familiar to Dr. Ferguson since February 2001 when the patient was first referred for a cardiology consultation. He appears to have suffered with worsening cardiac disease for several years. The records reflect that Dr. Ferguson subsequently cared for him in his 2003 hospitalization for cardiac catheterization. This familiarity is an important factor in the determination of the patient's ability to understand informed consent, and tolerate stressful surgeries such as this patient required. There is no mention in the medical records of any psychological instability or acute psychotic symptoms, quite to the contrary he presents as someone with schizophrenia well controlled by medication. The additional fact of his having been accompanied by a caregiver from his residence who knew him and his needs and limitations, supports the opinion that the patient was capable of understanding what was being told to him. Except in situations of acute decompensation, where a patient is psychotic and unable to fully comprehend reality, patients with schizophrenia are capable of making informed decisions, asking relevant questions, and stating their objections. In this patient's case, his letter to Summit Medical Center explicitly states that he was capable of understanding Dr. Ennix.

## Clinical Impression:

It is my opinion that this patient adequately understood the information that Drs. Ferguson and Ennix gave him about his need for surgery, both the first and second times. It is further my opinion that his schizophrenia was being well controlled on medication, and that he did not suffer any adverse psychiatric effects from the experience of the surgeries. The bout of agitation and psychic decompensation that he experienced in the postoperative period was most likely due to the fact that he was not being given his usual dose of psychiatric medication (see admitting doses of depakote and seroquel and compare to doses administered from 1/28 until psychiatric consult on 2/2/04). As his medication dosages were restored and his medical condition improved, he appeared to return to his former level of functioning. While cognitive deficits can certainly be present in schizophrenia, there is no evidence that this patient's psychiatric disease was in an active state at the time of his surgery and rendering of consent. He had been able to consent to the cardiac catheterization and subsequently to understand (by his own testimony) the explanations of Drs. Ennix and Ferguson regarding the need for surgery, its risks and potential complications.

Respectfully submitted,

Margo M. Leahy, M.D.

3

*Margo M. Leahy, M.D.*

1902 WEBSTER STREET
SAN FRANCISCO, CA. 94115
—
TEL (415) 929-7789   FAX (415) 566-1278

January 2008

Cases in which I have testified at deposition and/or trial during the last four years:

Curran v. Hyatt Regency Hotel  -  Deposition
Gomez v. City of Salinas – Deposition
Tim Hilton v. United States of America – Deposition
Brinker v. Blue Cross – Arbitration, San Francisco
Merchant v. Flint et al. – Deposition
Passeri v. Pacific Life Insurance et al. – Both, San Francisco Superior Ct.
Robin Scott King v. Stanford  - Both, Santa Clara County Superior Ct.
Hardin v. Hardin – Both, Monterey
Cheresnik, Harmon et al. City and County of San Francisco – Both, San Mateo
                                                                County Superior Court
Lee v. Mary Dunleavy – Both, Marin County Superior Court
Dorothy Waldeck, et al. v. National General Insurance – Arbitration, San Mateo
Dianna Roan, et al. v. AIMCO, et al – Deposition
Hernandez v. Hispanic Broadcasting Co. et al. – Both, JAMS
Helm v. Hernandez – Deposition
Angela Sze v. Permanente Medical Group – Both, San Francisco Superior Ct.
Franco v. Boston Scientific - Deposition

# CURRICULUM VITA

Margo M. Leahy, M.D.

1902 Webster Street
San Francisco, CA. 94115

Tel: 415-929-7789
Fax: 415-566-1278
Email:

Child, Adolescent & Adult Psychiatry
Forensic Psychiatry
Jungian Psychoanalysis

Licensure:    State of California, 1974.
G-28374

Certification:  American Board of Psychiatry & Neurology, 1983.

Education:

University of Maryland
College Park, Md.

B.S. Zoology 1964-68
Postgraduate research,
N.S. F. grant 1968-69

University of Maryland
Baltimore, Md.

M.D. with honors in
medicine, pediatrics,
and psychiatry.
1969-73

Postgraduate Training:

Washington Hospital Center
Washington, D.C.

Internship, medicine
1973-74

Stanford University
Stanford, Calif.

Residency, psychiatry
1974-76
Fellowship, child
psychiatry   1976-78

C.G. Jung Institute                                    Psychoanalytic training
San Francisco, Calif.                                           1978-87

Society for Analytical Psychology
Tavistock Centre
London, England                                        Child analytic training
                                                                1978-83

Academic Appointments:

Director, Child Psychiatry Outpatient Clinic                     1978-81
Children's Hospital @ Stanford
Department of Psychiatry and the Behavioral Sciences
Stanford, Calif.

Instructor, Training and Extended Education Program             1981-present
C.G. Jung Institute
San Francisco, Calif.

Assistant Clinical Professor, Psychiatry                         1981-91
Department of Psychiatry and the Behavioral
  Sciences
Stanford University
Stanford, Calif.

Guest Lecturer, Department of Psychology                         1981-85
Stanford University
Stanford, Calif.

Instructor, Pacific Graduate School of
  Psychology                                                   1982-present
Menlo Park, Calif.

Assistant Clinical Professor, Psychiatry                        1988-2001
Associate Clinical Professor, Psychiatry                       2001-present
Langley Porter Institute, University of California
San Francisco, Calif.

Other Appointments:

| | |
|---|---|
| Consultant, Palo Alto Unified School District<br>Palo Alto, Calif. | 1979-81 |
| Consultant, Peninsula Children's Center<br>Palo Alto, Calif. | 1981-87 |
| Consultant, Committee of Bar Examiners<br>State Bar of California<br>Los Angeles, Calif. | 1997-present |
| Professional Advisory Board<br>Gateway High School<br>San Francisco, Calif. | 1998-present |
| Consultant, Town School for Boys<br>San Francisco, Calif. | 1999-present |
| Medical Board of California<br>Division of Medical Quality | 2000-2002 |
| Kid's Turn, Board of Directors<br>San Francisco, Calif. | 2001-2004 |
| Ethics Task Force of the Medical Board<br>Of California | 2003- present |
| The Hamlin School, Board of Trustees<br>San Francisco, Calif. | 2005- present |
| C.G. Jung Institute, Treasurer<br>San Francisco, Calif. | 2005-present |

Professional Societies and Organizations:

C.G. Jung Institute, Member Analyst
Regional Organization of Child and Adolescent Psychiatry
Northern California Psychiatric Society
American Psychiatric Association
International Association of Analytical Psychologists
American Academy of Psychiatry and the Law

3

Teaching Experience:

| | |
|---|---|
| 1978-88 | Introduction to Child Psychiatry |
| | Play Therapy with Children |
| | D.W. Winnicott and Child Psychiatry |
| | Interviewing Techniques with Children & Families |
| | Individual Case Conference |
| | Diagnosis and Treatment of Children with Learning |
| |     Disabilities |

Stanford University, Dept. of Psychiatry

| | |
|---|---|
| 1980-85 | Introduction to Jungian Psychology |

Stanford University
Department of Psychology

| | |
|---|---|
| 1981-present | Object Relations Theory and Jungian Analysis |
| | Object Relations Theory, Kohutian, and |
| |     Jungian Psychology |
| | Introduction to British Object Relations |
| | Jungian Work with Children & Adolescents |
| | Symbol Formation in Adolescence |
| | Introduction to Jungian Child Therapy |
| | Infant Development and the Capacity for |
| |     Symbolic Thinking |
| | The Role of the Skin in the Development |
| |     of Symbol Formation |

C.G. Jung Institute
San Francisco, Calif.

| | |
|---|---|
| 1981-87 | Psychodynamics of Children with Learning |
| |     Disabilities and their Families. |
| | Play Therapy with Children |
| | Transference & Countertransference in Child Psychiatry |
| | Psychotherapy with Psychotic & Autistic Children |
| |     and Adolescents |

Peninsula Children's Center
Palo Alto, Calif.

4

Lectures Given:

May 1989     Child Sexual Abuse:  Origins, Dynamics and
                    Treatment

                                              Annual Meeting of the American
                                              Academy of Psychoanalysis
                                              San Francisco, Calif.

July 1991     Play Therapy: A Jungian-Winnicottian Perspective

                                              Bruno Klopfer Workshop
                                              C.G. Jung Institute of
                                              Los Angeles

April 1996    The Work of Michael Fordham:  An Historical
                    and Theoretical View

                                              Fordham Memorial Conference
                                              C.G. Jung Institute of
                                              San Francisco

April 1997    The Capacity for Symbolization in Children and
                    Adults with Histories of Early Trauma

                                              United Nations "Year of the Child"
                                              National Association for the
                                               Advancement of Psychoanalysis
                                              New York

April 1999    Parenting:  A Developmental Stage in Adulthood

                                              Town School for Boys
                                              San Francisco, Calif.

April 1999    The Difficulty with Affective Disorder Diagnosis
                    In Adolescence

                                              Grand Rounds
                                               Department of Psychiatry
                                              Langley Porter Institute
                                              University of California
                                              San Francisco, Calif.

August 1999   The Emotional Development of Boys in Same
                      Sex Independent Schools

                                                    Town School for Boys
                                                    San Francisco, Calif.


April 2000      Medications in Psychoanalysis:  the Analytic Perspective

                                                    Northern California Psychiatric
                                                    Society Annual Meeting
                                                    Monterey, Calif.


June 2000       Childhood Bullying

                                                    Seventh Annual International
                                                    Boys School Conference
                                                    San Francisco, Calif.


October 2000   The Emotional Health of Boys

                                                    Fairfield Country Day School
                                                    Fairfield, Connecticut


April 2002      Psychological Illness in Adolescence

                                                    Lick Wilmerding High School
                                                    San Francisco, Calif.


August 2002   Psychological Issues in the
                      Education of Girls                  The Hamlin School
                                                    San Francisco, Calif.


May 2003   How to Most Effectively Employ a
                    Psychiatric Expert Witness in Civil
                    Cases

                                                    Sedgwick, Detert, Moran &
                                                         Arnold  LLP
                                                    San Francisco, Calif.

November 2003  The Developmental and Emotional
Needs of Elementary School
Children

Bay Area Assistant Teachers
Coordinators Conference
San Francisco Day School
San Francisco, Calif.

April 2004  Parenting Your Pre-Adolescent
Daughter

The Hamlin School
San Francisco, Calif.

January 2005  Mother-Daughter Relationships

Marin Country Day School
Mill Valley, Calif.

Publications:

Leahy, Margo.  "Child Sexual Abuse: Origins, Dynamics, and
Treatment", The Journal of The American Academy of
Psychoanalysis, Vol. 19, Number 3, Fall 1991,
pp. 385-395.

Leahy, Margo.   Review of <u>Jungian Child Psychotherapy:
Individuation in Childhood</u> and <u>The Unfolding Self:
Separation and Individuation,</u> in The San Francisco
Jung Institute Library Journal. Vol. II, Number 1,
1992, .pp. 31-34

Leahy, Margo.  Review of <u>The Exploding Self:</u>  <u>The Creative and
Destructive Nucleus of the Personality,</u> in The Journal
of Analytical Psychology. Vol. 40, Number 3, 1995,
pp. 478-479.

7

Forensic Experience:

| | |
|---|---|
| 1974-76 | Court testimony for conservatorship hearings in Santa Clara County, Stanford University Department of Psychiatry. |
| 1976-78 | Forensic consultant for child custody evaluations, Division of Child Psychiatry, Stanford University Department of Psychiatry. |
| 1980- present | Forensic consultation in civil litigation involving the following: personal injury due to sexual harassment, wrongful termination, employment discrimination, product or premise liability, medical malpractice, and miscellaneous other civil matters. |
| 1997- present | Evaluation of petitions for special accommodations to take the State Bar of California admission examination. |

*Margo M. Leahy, M.D.*

1902 WEBSTER STREET
SAN FRANCISCO, CA. 94115

TEL (415) 929-7789    FAX (415) 566-1278

Psychiatric Consultation Fee Schedule:

| | |
|---|---|
| Interviews, presentations, consultation, record review and conferences | $ 400./hr. |
| Deposition testimony | $ 450./hr. |
| Court testimony or professional workshop | |
| | $ 2000./half-day |
| | $ 3500./full day |

**EXHIBIT 2**

LAW OFFICES OF

**MOSCONE, EMBLIDGE & QUADRA, LLP**

MILLS TOWER
220 MONTGOMERY STREET, SUITE 2100
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 362-3599  FAX: (415) 362-2006

February 27, 2008

<u>Via Hand Delivery</u>

Mathew Vandall, Esq.
Kauff, McClain & McGuire LLP
One Post Street, Suite 2600
San Francisco, California 94104

    Re: *Ennix v. Alta Bates Summit Medical Center*

Dear Matt:

    Enclosed are documents in response to subpoenas issued to Dr. Leahy and Mr. Greene.

    Documents responsive to Dr. Leahy's subpoena are Bates numbered L0001-L0657.  Documents responsive to Mr. Greene's subpoena are Bates numbered G0001-G1391.

    Sincerely,

    MOSCONE, EMBLIDGE & QUADRA, LLP

    Andrew E. Sweet

enclosure



**EXHIBIT 3**

**REDACTED**

MR# 1205056

February 18, 2005

Medical Staff President
Summit Campus
Alta Bates Summit Medical Center
350 Hawthorn Avenue
Oakland, CA 94609

Dear Sir:

I am writing to express my feelings and thoughts regarding Dr. Coyness Ennix. I believe Dr. Ennix to be a good and caring doctor. In January or February of 2004, Dr. Ennix operated on me to replace an aortic valve. I am now doing well and I am going on with my life, no longer worried about my heart valve.

I first met with Dr. Ennix in his office where he explained to me why my valve needed replacing. He drew pictures and he showed me a model heart so that I would understand. In addition, I also understood that he would try to do the operation through a small incision.. I understood this and I agreed. I knew that the operation carried some risks including death and bleeding. That's why I was at first nervous and afraid. But because of Dr. Ennix and his explanations, I felt better about it.

Sometime after the operation Dr. Ferguson, the cardiologist, and Dr. Ennix told me that the new valve needed to be replaced because it wasn't working well. I was afraid but Dr. Ennix explained it to me in detail and I understood that there were some risks. I understood that I needed the second operation and I agreed to it. I also understood that the first operation might need to be longer because of the smaller incision.

I believe Dr. Ennix to be a good and kind doctor and he explained everything to me so that I understood. I now feel well, I have seen Dr. Ennix and I am happy with his work. If you would like to discuss this with me, you can call me at my home at :

Thank you.

Sincerely yours,



L0017

**EXHIBIT B**

1          UNITED STATES DISTRICT COURT FOR THE

2            NORTHERN DISTRICT OF CALIFORNIA

3   COYNESS L. ENNIX, JR., M.D., as    )
    an individual and in his           )
4   representative capacity under      )
    Business and Professions Code      )
5   Section 17200, et seq.,            )
                                       )
6              Plaintiff,              )
    vs.                                ) Case No: 07-2486
7                                      )
    RUSSELL D. STANTEN., M.D., LEIGH   )
8   I:G. IVERSON, M.D., STEVEN A.      )
    STANTEN, M.D., WILLIAM M.          )
9   ISENBERG, M.D., Ph.D., ALTA BATES  )
    SUMMIT MEDICAL CENTER, DOES 1      )
10  through 100, inclusive,            )
                                       )
11             Defendants.             )
    _____)

12

13        **TRANSCRIPT MARKED CONFIDENTIAL**

14

15     DEPOSITION OF COYNESS L. ENNIX, JR., M.D.

       VOLUME II, pages 130 to 354
16

17         Saturday, May 26, 2007

18              10:11 a.m.

19     Taken at Kauff, McClain & McGuire
            One Post Street
20       San Francisco, California

21

22           PREFERRED REPORTERS
         Certified Shorthand Reporters
23          201 E. Watmaugh Road
          Sonoma, California 95476
24              707-938-9227

25  Reported By:  Linda Vaccarezza, RPR, CSR #10201

| | | |
|---|---|---|
| 1 | lost their relatives recently and said, would you | 02:19:35p |
| 2 | give me a letter supporting me? | 02:19:38p |
| 3 | A    It wasn't like that.  I'm very close to | 02:19:40p |
| 4 | my patients, and I'm very close to my families. | 02:19:44p |
| 5 | I wouldn't just show up at their home, if that's | 02:19:47p |
| 6 | what you're suggesting. | 02:19:50p |
| 7 | I frequently have conferences with | 02:19:51p |
| 8 | patients after -- I'm sorry, with family after a | 02:19:54p |
| 9 | loved one has died.  And invariably I have good | 02:19:56p |
| 10 | rapport with my patients and their families.  So | 02:20:00p |
| 11 | it didn't surprise me one bit that the patients | 02:20:04p |
| 12 | or their families were willing to verify that I | 02:20:07p |
| 13 | went over the case and went over the risk with | 02:20:10p |
| 14 | them. | 02:20:17p |
| 15 | MS. MCCLAIN:  May I have this marked as next | 02:20:18p |
| 16 | in order, please? | 02:20:19p |
| 17 | (Exhibit 24 was marked for identification.) | 02:20:31p |
| 18 | MR. EMBLIDGE:  Do you want him to read -- | 02:20:56p |
| 19 | BY MS. MCCLAIN: | 02:20:57p |
| 20 | Q    Did you write this letter to | 02:20:57p |
| 21 | Dr. Smithline? | 02:20:58p |
| 22 | A    It's my address and that's my name. | 02:20:59p |
| 23 | Q    Is that your signature? | 02:21:02p |
| 24 | A    And that's my signature. | 02:21:03p |
| 25 | Q    Did you write this letter to | 02:21:05p |

276

1    Dr. Smithline on March 5, 2005?                    02:21:06p

2        A    Sitting here, I don't -- it looks like    02:21:09p

3    March the 3rd 2005.                                02:21:12p

4        Q    Thank you.                                02:21:13p

5        A    I presume that that's correct.           02:21:13p

6        Q    In the second paragraph of the letter    02:21:15p

7    you say, "After discussions with each family or    02:21:21p

8    the patient, I prepared a letter for their        02:21:23p

9    signature.  They all reviewed the letter and      02:21:26p

10   affixed their signatures."                        02:21:30p

11       A    Okay.                                     02:21:33p

12       Q    Is it correct that you wrote all the      02:21:34p

13   letters from patients?                            02:21:37p

14       A    That is a possibility.  That's -- if I    02:21:38p

15   said that here, then that must have been the      02:21:42p

16   case.  But I did it with the full cooperation     02:21:44p

17   with the patients and had discussed it with the   02:21:50p

18   patients at exactly -- with regard to exactly     02:21:52p

19   what they felt about my discussing the risk with  02:21:56p

20   them.                                             02:22:02p

21       Q    Did every patient or family member sign  02:22:02p

22   such a letter?                                     02:22:06p

23       A    I think so.  I certainly -- I -- I don't  02:22:07p

24   quite recall, but I think certainly most of them  02:22:16p

25   did.  I was never actually turned down.  There    02:22:19p

277

1   MAUREEN E. MCCLAIN (State Bar No. 062050)
    Email: mcclain@kmm.com
2   ALEX HERNAEZ (State Bar No. 201441)
    Email: hernaez@kmm.com
3   KAUFF MCCLAIN & MCGUIRE LLP
    One Post Street, Suite 2600
4   San Francisco, California 94104
    Telephone:   (415) 421-3111
5   Facsimile:    (415) 421-0938

6   Attorneys for Defendant
    ALTA BATES SUMMIT MEDICAL CENTER
7
    TAZAMISHA H. IMARA (State Bar No. 201266)
8   Email: imara@kmm.com
    KAUFF MCCLAIN & MCGUIRE LLP
9   2049 Century Park East
    Suite 2690
10  Los Angeles, CA 90067
    Telephone:   (310) 277-7550
11  Facsimile:    (310) 277-7525

12  Attorneys for Defendant
    ALTA BATES SUMMIT MEDICAL CENTER
13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16

17  COYNESS L. ENNIX, JR., M.D.,            CASE NO.  C 07-2486 WHA

18              Plaintiff,                  **DECLARATION OF ROSSANA S.
                                            ELTANAL IN SUPPORT OF
19  v.                                      MOTION IN LIMINE NO. 7**

20  ALTA BATES SUMMIT MEDICAL CENTER,       **DATE:**      May 19, 2008
                                            **TIME:**      2:00 p.m.
21              Defendant.                  **DEPT:**      Ctrm. 9, 19th Floor
                                            **JUDGE:**     Hon. William H. Alsup
22
                                            COMPLAINT FILED: May 9, 2007
23                                          TRIAL DATE: June 2, 2008

24

25

26

27

28

1            I, Rossana S. Eltanal, declare as follows:

2            1.     I am an attorney at law licensed to practice before the Courts of the

3  State of California and before this Court. I am an associate with Kauff McClain &

4  McGuire LLP, attorneys of record for Defendant Alta Bates Summit Medical Center. I

5  make this declaration for the purpose of Defendant's Motion in Limine No. 7. I have

6  personal knowledge of the facts set forth herein. If called as a witness, I could and

7  would testify competently as to the facts set forth herein.

8            2.     I took the deposition of Margo M. Leahy, M.D. on February 29,

9  2008. Attached as **Exhibit A** to Defendant's Motion in Limine No. 7 is true and correct

10  copy of the deposition transcript of Margo M. Leahy, M.D.

11          3.     The deposition of Coyness L. Ennix, Jr., M.D. took place at the

12  offices of Kauff McClain & McGuire on May 26, 2007. Attached as **Exhibit B** to

13  Defendant's Motion in Limine No. 7 is a true and correct copy of the relevant portions of

14  the deposition transcript of Coyness L. Ennix, Jr., M.D. (Volume II).

15           I declare under penalty of perjury under the laws of the United States that

16  the foregoing is true and correct.

17           Executed this 29th day of April 2008, at San Francisco, California.

18

19                                ROSSANA S. ELTANAL

20

21

22

23  4819-8742-9890.1

24

25

26

27

28

KAUFF McCLAIN &
McGUIRE LLP
ONE POST STREET
SUITE 2600

DECLARATION OF ROSSANA S. ELTANAL IN SUPPORT OF
MOTION IN LIMINE NO. 7                        CASE NO. C 07-2486 WHA

REC'D MAY 0 9 2008

1  G. SCOTT EMBLIDGE, State Bar No. 121613
   emblidge@meqlaw.com
2  RACHEL J. SATER, State Bar No. 147976
   sater@meqlaw.com
3  ANDREW E. SWEET, State Bar No. 160870
   sweet@meqlaw.com
4  MOSCONE, EMBLIDGE, & QUADRA, LLP
   220 Montgomery Street, Suite 2100
5  San Francisco, California 94104-4238
   Telephone:    (415) 362-3599
6  Facsimile:    (415) 362-2006

7  Attorneys for Plaintiff

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  COYNESS L. ENNIX JR., M.D.,              Case No. C 07-2486 WHA

13            Plaintiff,
                                            **PLAINTIFF'S OPPOSITION TO**
14      vs.                                 **DEFENDANT'S MOTION IN**
                                            **LIMINE NO. 7 TO EXCLUDE**
15                                          **EVIDENCE CONCERNING THE**
    ALTA BATES SUMMIT MEDICAL              **REPORT AND ANTICIPATED**
16  CENTER,                                 **TESTIMONY OF MARGO LEAHY,**
                                            **M.D.**
17            Defendants.

18                                          **Trial Date:  June 2, 2008**
                                            **Dept:       Ctrm. 9, 19th Floor**
19                                          **Judge:      Hon. William H. Alsup**

20

21

22                              **INTRODUCTION**

23       In many instances during Dr. Ennix's peer review, ABSMC manufactured facts to

24  destroy Dr. Ennix's career by using faulty and inaccurate evidence against Dr. Ennix.  One

25  example is ABSMC's insistence that a schizophrenic patient was unable to give informed

26  consent before surgery, notwithstanding evidence that the patient actually gave informed

27  consent.

28
                                         1
    PLAINTIFF'S OPPOSITION TO DEFENDANT'S                    Case No. C 07-2486 WHA

1    To highlight the issue for the jury and establish that ABSMC's claims in this regard were

2  in bad faith and indicative of discrimination, Dr. Ennix hired an expert psychiatrist to review the

3  same records ABSMC reviewed and opine whether the schizophrenic patient was capable of

4  giving informed consent.  The expert opined that the patient was capable of giving informed

5  consent.

6    ABSMC moves to exclude this expert evidence on the ground that the opinion is not

7  based on sufficient facts, as irrelevant and unduly prejudicial.  In other words, ABSMC argues

8  that an expert psychiatrist should be precluded from presenting her expert opinion, but ABSMC

9  should be able to stand by its inaccurate, non-expert, statements and conclusions to the contrary.

10  ABSMC also seeks to preclude the expert from testifying to statements made known to her

11  through medical records.

12    The claims are all meritless.

13    ### STATEMENT OF FACTS

14    The patient at issue was admitted to the Summit Medical Center on January 28, 2004.

15  His care was provided by Dr. Rollington Ferguson as his admitting physician and Dr. Ennix as

16  his cardiothoracic surgeon.  The admission notes reflect that the patient suffered from

17  schizophrenia.  The admission notes also state, "Coyness L. Ennix, Jr. M.D. was present and

18  discussed the risks and benefits and alternatives, and all questions were answered.  The patient

19  agrees to proceed." Sweet Decl. ¶2.

20    Dr. Ennix performed surgery that same day.  The patient had a second surgery on January

21  31, 2004.  A progress note of the same date written by Dr. Ferguson indicated the patient was

22  informed of the need for a second surgery, and that Dr. Ferguson discussed it with him and that

23  he agreed.  Dr. Ennix was present for this meeting and explained the procedure to the patient.

24  The patient later signed a letter confirming that he gave informed consent to both surgeries.

25  Sweet Decl. ¶3.

26    Throughout Dr. Ennix's peer review, ABSMC repeatedly criticized Dr. Ennix regarding

27  this patient.  Sweet Decl. ¶4.  Notwithstanding the evidence that actual informed consent was

28

2

1  given, and without bothering to even interview Dr. Ferguson, ABSMC concluded in the AHC

2  report that this patient was "likely incapable of understanding the issues associated with" the

3  procedure. Sweet Decl. ¶5.

4     Dr. Ennix and Dr. Ferguson were present and observed that the patient was capable of

5  providing informed consent. Sweet Decl. ¶6.

6     Dr. Ennix retained an expert psychiatrist, Margo Leahy, M.D., to review the same

7  evidence reviewed by ABSMC. The evidence included medical records, physician

8  correspondence, ABSMC meeting minutes and correspondence between patient and doctor.

9  Sweet Decl. ¶7. Dr. Leahy reviewed the evidence and concluded that this patient was capable of

10  providing informed consent and did provide informed consent. Sweet Decl. ¶8.

11                              **ARGUMENT**

12  **I.    DR. LEAHY'S EXPERT TESTIMONY IS PROPER AND ADMISSIBLE**

13     ABSMC claims that Dr. Leahy's expert opinion is unreliable since it is not based upon

14  sufficient facts or data. Fed. Rule of Evid. 702(1). The claim is essentially that Dr. Leahy only

15  looked at records and failed to interview Dr. Ennix, the patient or the patient's health care

16  providers and therefore she cannot opine as to the patient's ability to consent or whether he gave

17  consent.

18     However, ABSMC failed to acknowledge that the seminal case regarding expert opinion

19  explicitly holds that experts are permitted wide latitude to offer opinions, including those that are

20  not based on firsthand knowledge or observations, so long as they have a reliable basis in the

21  knowledge and experience of the discipline. *Daubert v. Merrell Dow Pharmeceuticals Inc.,* 509

22  U.S. 579, 592.

23     Further, any issue regarding the source of Dr. Leahy's data goes only to the weight of her

24  testimony, not to admissibility, since it is the expert's reasoning or methodology, not the source

25  of her data, that qualifies her as an expert. The jury will receive an instruction from the Court

26  that the jury may give Dr. Leahy's testimony as much weight as the jury thinks it deserves. See

27  Ninth Circuit Model Civil Jury Instruction 2.11.

28

                                    3

1    ABSMC's argument is transparently ironic. ABSMC argues that an expert psychiatrist

2  should be precluded from presenting an expert opinion regarding whether or not a psychiatric

3  patient was capable of, and did, provide informed consent, while ABSMC presents their faulty,

4  inaccurate and uninformed conclusions to the contrary. ABSMC ruined the reputation of a well-

5  regarded cardiac surgeon and a leader in the community by relying on the same information it

6  now claims is too speculative for an expert to rely upon. Of note, the medical records contained

7  information regarding the types of medications the patient was on, offering Dr. Leahy insight

8  into his level of stability.

9    If the evidence was sufficient for ABSMC to use in the peer review, it is certainly

10  sufficient for Dr. Leahy to use here.

11  **II.    DR. LEAHY'S EXPERT TESTIMONY IS RELEVANT**

12    "All relevant evidence is admissible, except as otherwise provided [by law]. Evidence

13  which is not relevant is not admissible." Fed. Rule Evid. 402.

14    ABSMC argues that evidence regarding the informed consent of a single patient is too

15  insignificant to qualify as relevant. Not true. In this case, Dr. Ennix has to cobble together

16  discreet pieces of circumstantial evidence to prove discrimination. Dr. Leahy's testimony will

17  help establish that ABSMC cavalierly and without good cause drew unfair and inaccurate

18  conclusions against Dr. Ennix. ABSMC claims they treated Dr. Ennix fairly. Dr. Ennix can

19  prove, in part through the testimony of Dr. Leahy, that he was not treated fairly in that ABSMC

20  used bogus conclusions to manufacture a case against him.

21    ABSMC also claims that Dr. Leahy's expert opinion will cause it undue prejudice if the

22  jury hears that she thinks the patient was capable of giving, and gave, informed consent. The

23  argument is a reiteration of ABSMC's relevance objection and fails to explain why Rule 403

24  should preclude this evidence if it is found to be relevant other than to claim the opinion will

25  "contribute nothing but intrude upon the area reserved for the jury." Def. Motion in Limine No.

26  7 5:8-9. The statement is unclear, but suggests that ABSMC believes that the jury's role in this

27  case is only to hear only ABSMC's side of this case, an argument unworthy of a response.

28

4

### III. LIKE ANY OTHER EXPERT, DR. LEAHY MAY RELY ON HEARSAY IN THE RECORDS SHE REVIEWED TO SUPPORT HER EXPERT OPINION

Lastly, ABSMC argues that Dr. Leahy should be prohibited from acting simply as a conduit through which hearsay is brought before the jury and that somehow the hearsay will be admitted through her testimony to establish the truth of the matter.

But, ABSMC makes no showing at all why this expert witness is different than every other expert witness who testifies daily in our Courts under very familiar guidelines. As long as hearsay information is the type reasonably relied upon by experts in the field that information may used to form expert opinions. Fed. Rule of Evid. 703. Concurrently, the court can instruct the jury that any hearsay evidence is admitted only as the basis for the expert opinion and not for the truth of the matter. Ninth Circuit Model Civil Jury Instructions 1.8.

Clearly medical records and the other materials reviewed by Dr. Leahy, were the type regularly relied upon by experts in her field. She should be able to explain the basis for her opinion, with the proper limiting instruction.

At this point, Dr. Ennix is not advocating that the hearsay evidence itself be admitted into evidence pursuant to Fed. Rule of Evid. 703. However, to the extent ABSMC is advocating here that the records should be excluded, that issue should be addresses if and when raised at trial.

### CONCLUSION

For the above-stated reasons, the motion should be denied.


DATED: May 9, 2008                    Respectfully submitted,

                                      MOSCONE, EMBLIDGE & QUADRA, LLP


                                      By: _____
                                              Andrew E. Sweet

                                      Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANT'S                    Case No. C 07-2486 WHA

G. SCOTT EMBLIDGE, State Bar No. 121613
emblidge@meqlaw.com
RACHEL J. SATER, State Bar No. 147976
sater@meqlaw.com
ANDREW E. SWEET, State Bar No. 160870
sweet@meqlaw.com
MOSCONE, EMBLIDGE, & QUADRA, LLP
220 Montgomery Street, Suite 2100
San Francisco, California 94104-4238
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

Attorneys for Plaintiff

REC'D MAY 09 2008

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COYNESS L. ENNIX JR., M.D

Plaintiff,

vs.

ALTA BATES SUMMIT MEDICAL
CENTER

Defendant.

Case No.: C 07-2486 WHA

**DECLARATION OF ANDREW E.
SWEET IN OPPOSITION TO
DEFENDANT'S MOTION IN LIMINE
NO. 7**

**Date:    April 24, 2008**
**Time:    8:00 a.m.**
**Dept.:   Ctrm. 9, 19th Floor**
**Judge:  Hon. William H. Alsup**

**Complaint Filed:  May 9, 2007**
**Trial Date:        June 2, 2008**

I, Andrew E. Sweet declare:

1.      I am an attorney licensed to practice in California, admitted to this Court, and an

attorney at Moscone, Emblidge & Quadra LLP, attorneys of record for Plaintiff Coyness L.

Ennix, Jr. M.D. I have personal knowledge of the facts stated in this declaration.

2.      The patient at issue was admitted to the Summit Medical Center on January 28,

2004. His care was provided by Dr. Rollington Ferguson as his admitting physician and Dr.

Ennix as his cardiothoracic surgeon. The admission notes reflect that the patient suffered from

1

1  schizophrenia. The admission notes also state, "Coyness L. Ennix, Jr. M.D. was present and

2  discussed the risks and benefits and alternatives, and all questions were answered. The patient

3  agrees to proceed."

4      3.    Dr. Ennix performed surgery that same day. The patient had a second surgery on

5  January 31, 2004. A progress note of the same date written by Dr. Ferguson indicated the patient

6  was informed of the need for a second surgery, and that Dr. Ferguson discussed it with him and

7  that he agreed. Dr. Ennix was present for this meeting and explained the procedure to the

8  patient. The patient later signed a letter confirming that he gave informed consent to both

9  surgeries.

10      4.    Throughout Dr. Ennix's peer review, ABSMC repeatedly criticized Dr. Ennix

11  regarding this patient.

12      5.    Notwithstanding the evidence that actual informed consent was given, and

13  without bothering to even interview Dr. Ferguson, ABSMC concluded in the AHC report that

14  this patient was "likely incapable of understanding the issues associated with" the procedure.

15      6.    Dr. Ennix and Dr. Ferguson were present and observed that the patient was

16  capable of providing informed consent.

17      7.    Dr. Ennix retained an expert psychiatrist, Margo Leahy, M.D., to review the same

18  evidence reviewed by ABSMC. The evidence included medical records, physician

19  correspondence, ABSMC meeting minutes and correspondence between patient and doctor.

20      8.    Dr. Leahy reviewed the evidence and concluded that this patient was capable of

21  providing informed consent and did provide informed consent.

22

23

24

25

26

27

28

1      I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct and that this declaration was signed in San Francisco, California.

3

4  Dated:  May 9, 2008                                _____

5                                                              Andrew E. Sweet

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28